UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ELIZABETH A. SEAL as Personal Representative of The Estate of JOSHUA A. SEAL, et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 2:25-cv-442-LEW |
| v. | ) ) | |
| UNITED STATES of AMERICA, | ) ) | |
| Defendant. | ) ) | |

**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISIDICTION OR, IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General, Civil Division

GRANT E. TREASTER
Assistant Director, Torts Branch

PHILIP D. MACWILLIAMS
Senior Trial Counsel, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-4285
phil.macwilliams@usdoj.gov

 /s/ *Jocelyn Krieger*
JOCELYN KRIEGER
Trial Attorney, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-1679
jocelyn.krieger@usdoj.gov

## Table of Contents

Table of Authorities........................................................................................................iii

INTRODUCTION ............................................................................................................. 1

STANDARDS OF REVIEW ............................................................................................. 3

BACKGROUND ............................................................................................................... 5

ARGUMENT .................................................................................................................... 10

I.    ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION ............................................................................. 10

    A.   Plaintiffs' Claims Are Barred by the Discretionary Function Exception.......................11

    B.   Plaintiffs' Claims Are Barred by the Assault and Battery Exception ........................... 32

    C.   Plaintiffs' Claims Based on the Communication of Information and Failures to Communicate Information Are Barred by the Misrepresentation Exception ............... 35

    D.   Plaintiffs' Claims Based on the Discharge and Post-Discharge Care of Card Are Barred by the Contractor Exception ........................................................................ 37

II.    ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ................................................. 39

    A.   Plaintiffs Have Not Established the Elements of a Negligent Undertaking Claim (Counts A, E, F). ........................................................................................................ 39

    B.   Plaintiffs' Negligence Claims Fail For Lack of Duty (Counts B, C, D, E, F, G, H, I, J, and K)........................................................................................................................ 43

    C.   Plaintiffs' Negligence Claims Fail for Lack of Causation (Causes of Action B, C, D, E, F, G, H, I, J, and K). ................................................................................................. 47

    D.   Plaintiffs Have Not Established a Claim for Negligence in Responding to Danger Within the Foreseeable Zone of Risk (Count B)......................................................... 53

    E.   Plaintiffs Have Not Established a Cause of Action for Negligence of the United States in Violating Its Own Commitments, Orders, and Conditions of Card's Release Back into the Community (Count C). ...................................................................................... 54

F.    Plaintiffs Have Not Established a Cause of Action for Negligent Care, Treatment, Discharge, Follow Up, and Failure to Warn (Count D). .................................................. 54

G.    Plaintiffs Have Not Established a Cause of Action for Failure to Report Card to the FBI Background Search Database (Count F). ........................................................................ 56

H.    Plaintiffs Have Not Established Causes of Action for Negligent Training (Count H) or Negligent Supervision (Count I). .................................................................................... 57

I.    Plaintiffs Have Not Established a Cause of Action for Negligent Infliction of Emotional Distress (Bystander Claims) (Count J). .......................................................................... 58

J.    Plaintiffs Have Not Established a Cause of Action for Negligent Infliction of Emotional Distress (Zone of Danger) (Count K). ........................................................................... 59

K.    Plaintiffs' Wrongful Death and Survival Claims Are Derivate of Their Other Claims (Counts L and M). ........................................................................................................ 60

CONCLUSION ................................................................................................................... 60

# Table of Authorities

## Cases

*Abbey v. United States,*
    112 F.4th 1141 (9th Cir. 2024) ...................................................................37

*Abreu v. United States,*
    468 F.3d 20 (1st Cir. 2006) ......................................................... 11, 12, 14

*Alicea Baez v. United States,*
    976 F. Supp. 102 (D.P.R. 1997) ............................................... 18, 23, 29, 30

*Attallah v. United States,*
    955 F.2d 776 (1st Cir. 1992) ....................................................................15

*Ayer v. United States,*
    902 F.2d 1038 (1st Cir. 1990) ..............................................................14, 21

*Baer v. United States,*
    No.11–1277, 2011 WL 6131789 (D.N.J. Dec. 8, 2011) .............................31

*Baker v. Goodman,*
    442 F. Supp. 3d 366 (D. Me. 2020)......................................................46, 54

*Baroni v. United States,*
    662 F.2d 287 (5th Cir. 1981) ....................................................................36

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................4

*Belyea v. Shiretown Motor Inn, LP,*
    2 A.3d 276 (Me. 2010)..............................................................................44

*Berkovitz v. United States,*
    486 U.S. 531 (1988).................................................................................12

*Block v. Neal,*
    460 U.S. 289 (1983).............................................................................35, 37

*Bolduc v. United States,*
    402 F.3d 50 (1st Cir. 2005) ......................................................................15

*Bourgonje v. Machev,*
    841 N.E.2d 96 (Ill. App. Ct. 2005)............................................................41

*Brooks v. A. R. & S. Enters., Inc.,*
    622 F.2d 8 (1st Cir. 1980) ........................................................................38

*Bryan R. v. Watchtower Bible & Tract Soc. of New York, Inc.,*
    738 A.2d 839 (Me. 1999).....................................................................44, 55

*Cameron v. Pepin,*
    610 A.2d 279 (Me. 1992).................................................................46, 54, 59

*Campbell v. United States*,
    337 F. Supp. 2d 219 (D. Mass. 2004)..............................................................................33

*Carroll v. United States*,
    661 F.3d 87 (1st Cir. 2011)..........................................................................................4, 27

*Chappell v. Wallace*,
    462 U.S. 296 (1983)..........................................................................................................15

*Cluney v. Brownells, Inc.*,
    777 F. Supp. 3d 1 (D. Me. 2025)......................................................................................45

*CNA v. United States*,
    535 F.3d 132 (3d Cir. 2008).............................................................................................31

*Conway v. United States*,
    No. CV-17-71, 2018 WL 6605887 (D. Mont. Dec. 17, 2018)...........................................16

*Cosby v. U.S. Marshals Serv.*,
    520 F. App'x 819 (11th Cir. 2013)....................................................................................23

*Coward v. Gagne & Son Concrete Blocks, Inc.*,
    238 A.3d 254 (Me. 2020)..................................................................................................59

*Crowe v. Shaw*,
    755 A.2d 509 (Me. 2000)............................................................................................47, 52

*Cuadrado-Concepción v. United States*,
    No. CV-419-305, 2020 WL 4589041 (S.D. Ga. Aug. 10, 2020) ................................16, 35

*Cuadrado-Concepciónv. United States*,
    *851* F. App'x 985 (11th Cir. 2021) ..................................................................................16

*Culbert v. Sampson's Supermarkets Inc.*,
    444 A.2d 433 (Me. 1982)............................................................................................59, 60

*Curtis v. Porter*,
    784 A.2d 18 (Me. 2001)....................................................................................................60

*Davallou v. United States*,
    998 F.3d 502 (1st Cir. 2021) ......................................................................................13, 14

*Dillon v. Legg*,
    441 P.2d 912 (Cal. 1968).................................................................................................60

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..........................................................................................................56

*Doe v. Missionary Oblates of Mary Immaculate E. Province*,
    761 F. Supp. 3d 218 (D. Me. 2025)..................................................................................58

*Doe v. United States*,
    838 F.2d 220 (7th Cir. 1988)............................................................................................33

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006) ............................................................................................11

*Dragomir v. Spring Harbor Hosp.*,
  970 A.2d 310 (Me. 2009) ....................................................................................58

*Dynamic Image Techs. v. United States*,
  221 F.3d 34 (1st Cir. 2000) .................................................................................33

*Est. of Cilley v. Lane*,
  985 A.2d 481 (Me. 2009) ........................................................................43, 44, 46

*Est. of Smith ex rel. Richardson v. United States*,
  No. 3:10–CV–00651, 2011 WL 3880935 (W.D. Ky. Sep. 2, 2011) .....................16

*Est. of Smith ex rel.Richardson v. United States*,
  509 F. App'x. 436 (6th Cir. 2012) ..................................................................16, 35

*Evans v. United States*,
  876 F.3d 375 (1st Cir. 2017) .....................................................................14, 20, 27

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ............................................................................................10

*Flanders v. Cooper*,
  706 A.2d 589 (Me. 1998) ....................................................................................55

*Fortin v. The Roman Cath. Bishop of Portland*,
  871 A.2d 1208 (Me. 2005) ..................................................................................58

*Franklin v. United States*,
  992 F.2d 1492 (10th Cir. 1993) ..........................................................................33

*Gniadek v. Camp Sunshine at Sebago Lake, Inc.*,
  11 A.3d 308 (Me. 2011) .................................................................................45, 46

*Green v. United States*,
  629 F.2d 581 (9th Cir. 1980) ..............................................................................35

*Guile v. United States*,
  422 F.3d 221 (5th Cir. 2005) ..............................................................................16

*Harper v. United States*,
  No. 12-1802, 2020 WL 4192540 (D.D.C. July 21, 2020) ...........................passim

*Harris v. United States*,
  797 F. Supp. 91 (D.P.R. 1992) ............................................................................33

*Irving v. United States*,
  162 F.3d 154 (1st Cir. 1998) ..........................................................................20, 22

*JBP Acquisitions v. United States*,
  224 F.3d 1260 (11th Cir. 2000) ..........................................................................35

*Jimenez-Nieves v. United States*,
   682 F.2d 1 (1st Cir. 1982) ..............................................................................................36, 37

*Kreis v. Sec'y of Air Force*,
   866 F.2d 1508 (D.C. Cir. 1989) ..............................................................................................15

*Kugel v. United States*,
   947 F.2d 1504 (D.C. Cir. 1991) ..............................................................................................33

*Larsen v. Empresas El Yunque, Inc.*,
   812 F.2d 14 (1st Cir. 1986) ..............................................................................................38

*Lawrence v. United States*,
   340 F.3d 952 (9th Cir. 2003) ..............................................................................................36

*Leleux v. United States*,
   178 F.3d 750 (5th Cir. 1999) ..............................................................................................33

*Linke v. United States*,
   No. 14-CV-444, 2015 WL 12743613 (W.D. Tex. June 2, 2015) ..............................16, 47

*Logue v. United States*,
   412 U.S. 521 (1973) ..............................................................................................38

*Lopez v. U.S. Immigr. and Customs Enf't*,
   455 F. App'x 427 (5th Cir. 2011) ..............................................................................................30

*Mahon v. United States*,
   742 F.3d 11 (1st Cir. 2014) ..............................................................................................22

*Malone v. United States*,
   61 F. Supp. 2d 1372 (S.D. Ga. 1999) ..............................................................................16, 35

*McCants v. Nat'l Collegiate Athletic Ass'n*,
   201 F. Supp. 3d 732 (M.D.N.C. 2016) ..............................................................................................41

*McNeily v. United States*,
   6 F.3d 343 (5th Cir. 1993) ..............................................................................................33

*Merlonghi v. United States*,
   620 F.3d 50 (1st Cir. 2010) ..............................................................................................4

*Miami N., Inc. v. U.S. Dep't of Lab. Penobscot Job Corps*,
   939 F. Supp. 53 (D. Me. 1996) ..............................................................................33, 34

*Mixon v. Dobbs Houses, Inc.*,
   254 S.E.2d 864 (Ga. Ct. App. 1979) ..............................................................................................40

*Molchatsky v. United States*,
   778 F. Supp. 2d 421 (S.D.N.Y. 2011) ..............................................................................................31

*Molzof v. United States*,
   502 U.S. 301 (1992) ..............................................................................................11

*Mullens v. United States,*
    785 F. Supp. 216 (D. Me. 1992)................................................................36, 37

*Muniz–Rivera v. United States,*
    326 F.3d 8 (1st Cir. 2003) ....................................................................12, 35

*Murphy v. United States,*
    45 F.3d 520 (1st Cir. 1995) ....................................................................3, 4

*Myers v. United States,*
    17 F.3d 890 (6th Cir. 1994)....................................................................42

*Nat'l Rifle Ass'n of Am., Inc. v. Reno,*
    216 F.3d 122 (D.C. Cir. 2000)................................................................51

*Noyes v. R.E. Coleman Excavation, Inc.,*
    No. CUM-02-582, 2003 WL 27435806 (Me. Apr. 3, 2003) ........................39

*Ocasio-Hernandez v. Fortuno-Burset,*
    640 F.3d 1 (1st Cir. 2011)........................................................................4

*O'Ferrell v. United States,*
    253 F.3d 1257 (11th Cir. 2001) ..............................................................33

*Ogden v. Berry,*
    572 A.2d 1082 (Me. 1990)......................................................................60

*Olsen v. United States,*
    144 F. App'x 727 (10th Cir. 2005)..........................................................35

*Orloff v. Willoughby,*
    345 U.S. 83 (1953)................................................................................15

*Page v. Amtrak, Inc.,*
    168 F. Supp. 3d 337 (D. Me. 2016)........................................................44

*Patentas v. United States,*
    687 F.2d 707 (3d Cir. 1982) ..................................................................43

*Preston v. United States,*
    596 F.2d 232 (7th Cir. 1979) ................................................................35

*Price v. United States,*
    No. 25-cv-795, 2025 WL 3514066 (D.D.C. Dec. 8, 2025) ........................36

*Rawson v. United Steelworkers of Am.,*
    726 P.2d 742 (Idaho 1986)....................................................................41

*Richards v. United States,*
    369 U.S. 1 (1962)..................................................................................11

*Roberson v. United States,*
    382 F.2d 714 (9th Cir. 1967)................................................................40

*Rutherford v. United States*,
760 F. App'x 787 (11th Cir. 2019) ........................................................................30

*Sanchez ex rel. D.R.-S. v. United States*,
671 F.3d 86 (1st Cir. 2012) .................................................................11, 12, 13, 14

*Satterfield v. United States*,
788 F.2d 395 (6th Cir. 1986) ...........................................................................15, 33

*Sea Air Shuttle Corp. v. United States*,
112 F.3d 532 (1st Cir. 1997) ................................................................................44

*Shansky v. United States*,
164 F.3d 688 (1st Cir. 1999) .........................................................................passim

*Sheridan v. United States*,
487 U.S. 392 (1988) ..............................................................................................34

*Sheridan v. United States*,
969 F.2d 72 (4th Cir. 1992) ......................................................................33, 34, 41

*Shipe v. Chesapeake Bay Fishing Parties, Inc.*,
940 F. Supp. 130 (D. Md. 1996) ...........................................................................40

*Sloan v. U.S. Dep't Hous. & Urb. Dev.*,
236 F.3d 756 (D.C. Cir. 2001) ..............................................................................30

*Tarasoff v. Regents of Univ. of Cal.*,
551 P.2d 334 (Cal. 1976) ......................................................................................55

*Thigpen v. United States*,
800 F.2d 393 (4th Cir. 1986) ................................................................................33

*Toomer v. United States*,
615 F.3d 1233 (9th Cir. 2010) ..............................................................................41

*Turner v. United States*,
736 F.3d 274 (4th Cir. 2013) ................................................................................43

*United States v. Gaubert*,
499 U.S. 315 (1991) ..................................................................................12, 13, 14

*United States v. Mitchell*,
445 U.S. 535 (1980) ..............................................................................................10

*United States v. Orleans*,
425 U.S. 807 (1976) ........................................................................................10, 38

*United States v. Rehlander*,
666 F.3d 45 (1st Cir. 2012) .............................................................................56, 57

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
467 U.S. 797 (1984) ........................................................................................12, 13

*United States v. Shearer,*
  473 U.S. 52 (1985)..................................................................................14, 15, 32, 33

*Valentín v. Hosp. Bella Vista,*
  254 F.3d 358 (1st Cir. 2001) ...................................................................................3, 4

*Valle v. United States,*
  856 F.2d 406 (1st Cir. 1988) .....................................................................................15

*Watterson v. Page,*
  987 F.2d 1 (1st Cir. 1993) ...................................................................................4, 5, 7

*Westcott v. City of Omaha,*
  901 F.2d 1486 (8th Cir. 1990)...................................................................................33

*White v. Sabatino,*
  415 F. Supp. 2d 1163 (D. Haw. 2006).......................................................................41

*Wood v. United States,*
  115 F. Supp. 2d 9 (D. Me. 2000)...............................................................................38

*Wood v. United States,*
  290 F.3d 29 (1st Cir. 2002) ...............................................................15, 18, 21, 23

*Zabala Clemente v. United States,*
  567 F.2d 1140 (1st Cir. 1977)...................................................................41, 44, 54

*Zelaya v. United States,*
  781 F.3d 1315 (11th Cir. 2015) ................................................................................36

## **Statutes**

10 U.S.C. § 12301(h)...............................................................................................24, 25

15 U.S.C. § 78eee(a)(1) .................................................................................................36

18 U.S.C. § 922(d)..........................................................................................................56

18 U.S.C. § 922(g)...............................................................................................27, 28, 29

18 U.S.C. § 922(g)(4)...............................................................................48, 49, 51, 53

18 U.S.C. § 1385 ............................................................................................................26

28 U.S.C. § 2671 ............................................................................................................37

28 U.S.C. § 2680 ............................................................................................................11

28 U.S.C. § 2680(a) ............................................................................................2, 11, 12, 14

28 U.S.C. § 2680(h) ..........................................................................................2, 11, 32, 35

28 U.S.C. §§ 1346(b)(1) ...........................................................................................passim

34 U.S.C. § 40901(b) ......................................................................................................51

N.Y. Mental Hygiene Law § 9.46 ......................................................................................9, 52, 53

## **Rules**

Federal Rule of Civil Procedure 12(b)(1) ...............................................................................1, 2, 3

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................1, 3

## **Regulations**

27 C.F.R. § 478.11 ......................................................................................................................51, 57

28 C.F.R. § 25.9(b)(1)(iii) ...................................................................................................................51

x

Defendant United States of America respectfully moves this Court to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and/or Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The grounds for this motion are set forth in the memorandum in support below.

## INTRODUCTION

Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking damages from the United States through various claims arising out of the mass shooting committed by Robert Card on October 25, 2023, at the Just-In-Time bowling alley and Schemengees Bar & Grill in Lewiston, Maine. *See* Complaint (ECF No. 1) ("Compl."), ¶¶ 1.1, 1.32, 2.2.

Plaintiffs are composed of five groups: (1) Estates: the personal representatives of the individuals killed in the shooting; (2) Physically Injured Plaintiffs: individuals present at the sites of the shooting and physically injured by the shooting; (3) Bystander Plaintiffs: individuals present at the sites of the shooting who were there with a family member or close relative and who allegedly suffered severe emotional distress; (4) Zone of Danger Plaintiffs: individuals present at the sites of the shooting who allegedly suffered severe emotional distress from being at risk of serious bodily injury; and (5) Consortium Plaintiffs: individuals who lost the care, comfort, society, and companionship of their spouse who was present at the sites of the shooting and suffered physical injuries. *See* Compl. ¶ 2.2.

At the time of the shooting, Card was a reserve soldier in the U.S. Army Reserves, assigned to the 304th Infantry Regiment in Saco, Maine (the "reserve unit"). *See* Compl. ¶¶ 1.21, 5.1-5.2. Card was not on active-duty orders at the time of shooting and had not been on active-duty orders for several months prior to the shooting. *See* Compl. ¶ 1.21. Nevertheless, Plaintiffs

1

seek to hold the United States liable through various causes of action for the shooting for which Card is solely responsible. Regardless of how each cause of action is labeled, the crux of each is that Army personnel (primarily, fellow reserve soldiers in Card's chain of command) failed to take certain actions in the supervision of Card that would have prevented this shooting.

This mass shooting is an unspeakable tragedy. But for many reasons, Plaintiffs have no viable claims against the United States under the FTCA.

The Court does not have subject-matter jurisdiction over Plaintiffs' claims for several reasons, and therefore this action must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

First, this Court lacks subject-matter jurisdiction over all claims by all Plaintiffs because they are barred by the exception to the waiver of sovereign immunity under the FTCA referred to as the discretionary function exception. *See* 28 U.S.C. § 2680(a).

Second, this Court lacks subject-matter jurisdiction over all claims by all Plaintiffs because they are barred by the exception to the waiver of sovereign immunity under the FTCA for claims arising out of assault and battery. *See* 28 U.S.C. § 2680(h).

Third, this Court lacks subject-matter jurisdiction over all claims by all Plaintiffs, insofar as they are based upon the communication of allegedly incorrect information or the failure to communicate information, because such claims are barred by the exception to the waiver of sovereign immunity under the FTCA for claims arising out of misrepresentation. *Id.*

Fourth, this Court lacks subject-matter jurisdiction over claims by all Plaintiffs for the alleged negligence in discharging Card from inpatient hospital care and in the management of his care following discharge, insofar as these claims are based on acts or omissions by healthcare

providers who were not "employee[s] of the Government while acting within the scope of his office or employment[.]" *See* 28 U.S.C. § 1346(b)(1).

Additionally, Plaintiffs have failed to state claims upon which relief can be granted, and therefore this action must also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Under the FTCA, the United States' liability is limited to circumstances in which a "private person . . . would be liable in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here, because the alleged acts or omissions occurred in Maine, the law of Maine applies. However, Plaintiffs fail to plausibly allege facts sufficient to establish that, under Maine law, a duty was owed to them, that any putative duties were in fact breached, or that the alleged breaches were the proximate cause of their injuries. Also, several of Plaintiffs' causes of action are based on alleged violations of federal rather than state law, and several of Plaintiffs' causes of action have not been recognized by Maine courts.

For all these reasons, this entire action must be dismissed with prejudice.

## STANDARDS OF REVIEW

When challenging the subject-matter jurisdiction of the court, a motion pursuant to Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle. *See Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001). When faced with such a challenge, the plaintiff bears the burden to establish that such jurisdiction exists. *See Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).

A motion to dismiss pursuant to Rule 12(b)(1) can be in the form of a facial attack or a factual attack. *See Valentín*, 254 F.3d at 363. In a facial attack, the well-pleaded allegations are taken as true for purposes of the motion, and the challenge is to the sufficiency of such allegations to confer jurisdiction on the court. The allegations typically are found in the

complaint, but the court may also look to materials cited therein that augment the complaint. *Id.* Although the allegations are taken as true, a plaintiff cannot assert a proper jurisdictional basis "merely on unsupported conclusions or interpretations of law." *Murphy*, 45 F.3d at 522 (citations and internal quotation marks omitted).

A factual attack challenges the accuracy (rather than sufficiency) of the jurisdictional facts. *See Valentín*, 254 F.3d at 363. When resolving a factual attack to subject-matter jurisdiction, the court is not confined to the allegations in the complaint and can look beyond the pleadings to decide factual matters relating to jurisdiction. *Id.*; *see also Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must satisfy Rule 8(a)(2) by including "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011). However, "in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). However, the court must also "'identify[] and disregard[] statements in the complaint that merely offer 'legal conclusion[s] couched as . . . fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Ocasio-Hernandez*, 640 F.3d at 11 (quoting *Twombly*, 550 U.S. at 555).

While a court is ordinarily unable to consider documents outside the complaint without converting the motion to one for summary judgment, "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records;

4

for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3. The exhibits to this motion, which are referenced and relied on by Plaintiffs throughout the Complaint and the authenticity of which is not in dispute, include: various Department of Defense Instructions ("DoD Instructions"), various Army Regulations, the Findings and Recommendations of the Army Regulation 15-6 Investigation into the Suspected Suicide of SFC Robert F. Card II ("AR 15-6 Investigation"), the United States Army Inspector General Agency Review of the AR 15-6 Investigation ("OIG Report"), and the Final Report of the Independent Commission to Investigate the Facts of the Tragedy in Lewiston ("Maine Report"),[1].

## BACKGROUND

Robert Card committed the shooting that gives rise to Plaintiffs' claims. There is no dispute that at the time of the shooting Card was not on active duty, nor had he been so for several months. Plaintiffs attempt to assign blame to Army personnel who, in Plaintiffs' telling, had opportunities during the few brief interactions they had with him in the year or so prior to the shooting to take some action that could have prevented it. *See* Compl. ¶¶ 1.40, 2.8-2.9, 6.1-6.42.

Plaintiffs allege that by September 2022, members of Card's reserve unit had informed the unit commander that Card was experiencing "hallucinations," *see* Compl. ¶¶ 5.9-5.11, and that similar information was again brought to the unit commander's attention in March 2023, *see* Compl. ¶¶ 1.22, 5.12.

---

[1] Though Plaintiffs do not cite to this report, it is clear that they relied on it. *Compare* Compl. ¶ 5.13 *with* Maine Report at 8 (Ex. K) (describing Card's son's concern with "his father's increasingly erratic behavior, anger, and paranoia"); Compl. ¶ 5.20 *with* Maine Report at 10 (Ex. K) (describing Card's sister contacting the VA in June 2023); Compl. ¶ 5.21 *with* Maine Report at 10 (Ex. K) (describing Card's sister contacting the Army Reserve Unit five times).

Plaintiffs also allege that in May 2023, a Deputy Sheriff from the Sagadahoc County Sheriff's Office spoke with the first sergeant of Card's Army Reserve Unit to relay information provided by members of Card's family regarding his gun ownership and recent behavior. *See* Compl. ¶¶ 5.16-5.17.

The next opportunity to directly observe and interact with Card following these reports was while he was present at the unit's training session on May 6-7, 2023. *See* Compl. ¶ 5.18. However, the unit commander was not present at this training and the unit first sergeant, after observing Card (who, as Plaintiffs admit, was historically considered a positive performer), did not think any particular action or intervention was necessary. *See* Compl. ¶¶ 5.3, 5.18.

Following the May 2023 unit training, Card's family allegedly left messages with Card's reserve unit (albeit with unnamed members) between May and July 15, 2023, regarding his "worsening mental health". *See* Compl. ¶¶ 5.21-5.23.

On July 6, 2023, Card purchased the weapon ultimately used in the shooting. *See* Compl. ¶ 5.23.

On July 15, 2023, Card reported for duty for training to be held in West Point, New York. *See* Compl. ¶¶ 1.23, 5.26. Soon after arriving in New York, members of Card's unit reported his "alarming behavior" to the unit first sergeant and unit sergeant major. *See* Compl. ¶¶ 5.28-5.29. On the morning of July 16, 2023, the unit first sergeant requested the New York State Police check on Card, who responded and engaged with Card at his hotel. *See* Compl. ¶¶ 5.29, 5.32. Following this interaction, information relating to Card's behavior was relayed to the unit commander (who was not yet scheduled to report to this training) through the unit first sergeant, and he ordered a command-directed behavioral health evaluation ("command-directed evaluation"). *See* Compl. ¶ 5.32. That same day (July 16), members of Card's unit drove him to

Keller Army Community Hospital ("Keller"), *see* Compl. ¶ 5.37, where medical providers evaluated Card and recommended that Card be transferred to Four Winds Hospital in Katonah, New York.  *See* Compl. ¶¶ 5.40-5.41.

On the same day, Card was voluntarily admitted to Four Winds Hospital, where he remained until discharged on August 3, 2023.  *See* Compl. ¶¶ 5.42, 5.51.   Upon his discharge from Four Winds Hospital, Card was no longer on active-duty orders and would not be on active-duty again from that date through the shooting.  *See* Compl. ¶ 5.51.

On July 20, 2023, while Card was at Four Winds Hospital, the unit first sergeant drafted a Commander's Critical Incident Information Requirement and submitted it to the Army Reserve Medical Management Center.  *See* Compl. ¶ 5.44.  As a result, the Army Reserve Medical Management Center assigned a nurse reviewer to Card.  *Id.*  On July 28, 2023, the unit commander was provided with a copy of the DA Form 4856 pertaining to Card, which contains the Keller medical providers' recommendations regarding Card's treatment and supervision.  *See* Compl. ¶¶ 5.48-5.49.  Throughout August and September 2023, members of Card's case management team made multiple attempts to speak with Card by telephone but were successful only once in reaching him.  *See* Compl. ¶¶ 5.55-5.56.

On September 15, 2023, after Card's discharge from Four Winds Hospital, a fellow soldier in Card's unit, and personal friend of his, contacted the unit first sergeant to relay his concerns regarding Card's mental health and access to his personal weapons.  *See* Compl. ¶¶ 5.57-5.60.  In response, the unit first sergeant informed the unit commander.  *Id.*  At the unit commander's request, the unit first sergeant contacted local law enforcement (Ellsworth Police Department) in writing asking them to perform a well-being check on Card.  *See* Compl. ¶ 5.60.

The unit commander also spoke with Card by phone on September 15, 2023, but Card did not make any threats of violence during that conversation. *See* Compl. ¶ 5.65. Card informed the unit commander that he did not plan to attend the upcoming unit training scheduled to begin the next day on September 16 at the Army Reserve Center in Saco, Maine, and the unit commander opted not to order Card to attend the training. *See* Compl. ¶¶ 5.63-5.64, 5.82. However, officers from another local police department (Saco Police Department) arrived at the Army Reserve Center, apparently in case Card did show up with violent intentions. *See* Compl. ¶¶ 5.64-5.66. The officers spoke to the unit commander who informed them that while Card did appear to be experiencing some mental health issues, he did question the credibility and sobriety of the soldier and personal friend of Card's who instigated the report to the first sergeant regarding Card's putative statements about committing a shooting at the unit's facilities. *See* Compl. ¶¶ 5.64-5.66.

Meanwhile, that same day, because of the first sergeant's above-mentioned request, a Sagadahoc Deputy Sheriff went to Card's home. *See* Compl. ¶ 5.69. Before attempting to locate Card in the home, the Deputy Sheriff spoke briefly with the first sergeant as well as some of Card's family members. *See* Compl. ¶ 5.70. The Deputy Sheriff also connected with the unit commander by phone while the Deputy Sheriff was in Card's driveway, at which point they discussed, among other things, the possibility of whether Card still had access to personal weapons and the credibility of the soldier who initially relayed Cards' putative statements regarding a shooting. *See* Compl. ¶¶ 5.72-5.77. Ultimately, the Deputy Sheriff did not enter Card's home or make contact with him. *See* Compl. ¶ 5.79.

The unit chain of command did not have any further contact with Card after September 15, and he was not ordered to attend the unit training scheduled to take place in October 2023.

*See* Compl. ¶ 5.81.  Tragically, on October 25, 2023, Card committed the mass shooting detailed in the Complaint.  *See* Compl. ¶¶ 5.87-5.94.

Plaintiffs filed this action on September 3, 2025.  In their Complaint, Plaintiffs plead 13 separate causes of action.  First, Plaintiffs plead a cause of action for negligent undertaking (Count A) based upon the alleged failure to take various actions that allegedly would have prevented the shooting.  *See* Compl. ¶¶ 7.2-7.9.  Second, Plaintiffs plead a cause of action for negligence in responding to danger within the foreseeable zone of danger (Count B) based upon the same alleged failures asserted in the first cause of action.  *See* Compl. ¶¶ 7.10-7.15.  Third, Plaintiffs plead a cause of action for negligence (Count C) for failing to monitor and communicate with Card following his discharge from Four Winds Hospital to ensure compliance with the providers' recommendations on the DA Form 3822.  *See* Compl. ¶¶ 7.16-7.27.  Fourth, Plaintiffs plead a cause of action for negligence (Count D) for the decision to discharge Card from Four Winds Hospital and for failing to provide adequate follow-up treatment and monitoring.  *See* Compl. ¶¶ 7.28-7.33.[2]  Fifth, Plaintiffs plead a cause of action for negligence and negligent undertaking (Count E) for failing to initiate a Line of Duty investigation and Medical Board Adjudication for Card.  *See* Compl. ¶¶ 7.34-7.60.  Sixth, Plaintiffs plead a cause of action for negligence and negligent undertaking (Count F) for failing to report Card to the FBI's National Instant Criminal Background Check System ("NICS").  *See* Compl. ¶¶ 7.61-7.77.  Seventh, Plaintiffs plead a cause of action for negligence (Count G) for the Keller Army Hospital providers' failure to file a report pursuant to New York's Secure Ammunition and Firearms Enforcement Act (SAFE Act), codified at N.Y. Mental Hygiene Law § 9.46.  *See* Compl. ¶¶ 7.78-

---

[2] The distinction between Count C and Count D appears to be that the former focuses on Card's chain of command while the latter focuses on medical providers and others assigned to Card's post-discharge care management team.

7.88.  Eighth, Plaintiffs plead a cause of action for negligent training of Army personnel (Count H) for failing to properly train them on identifying and managing service members with signs of brain injuries resulting from exposure to blast forces, in reporting requirements to the FBI NICS, and in addressing "Insider Threats" and suicide prevention.  *See* Compl. ¶¶ 7.89-7.94.  Ninth, Plaintiffs plead a cause of action for negligent supervision of Card (Count I).  *See* Compl. ¶¶ 7.95-7.100.  Plaintiffs' Tenth and Eleventh causes of action are for negligent infliction of emotional distress ("NIED") (Counts J and K) brought by the Bystander Plaintiffs and the Zone of Danger Plaintiffs, respectively, both of which are for negligence in failing to "prevent the mass shootings."  *See* Compl. ¶¶ 7.101-7.111.   Finally, Plaintiffs' Twelfth and Thirteenth causes of action are a Survival Action pursuant to Maine's Survival Statute, Me. Stat. tit. 18, § 3-817 (Count L), and a Wrongful Death Action pursuant to Maine's Wrongful Death Statute, Me. Stat. tit. 18, § 2-807 (Count M), respectively.

For the reasons set forth below, each of Plaintiffs' claims must be dismissed.

## ARGUMENT

### I.    ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT- MATTER JURISDICTION

The United States is immune from liability absent its consent, and the terms of that consent define a court's jurisdiction to entertain a suit against the United States.  *See United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Absent a specific waiver, sovereign immunity bars the suit for lack of subject-matter jurisdiction.  *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

The FTCA is a limited waiver of sovereign immunity.  The terms of the United States' consent to be sued as delineated in the FTCA define the parameters of a federal court's jurisdiction to entertain such suits.  *See United States v. Orleans*, 425 U.S. 807, 814 (1976) ("the

10

United States can be sued only to the extent that it has waived its immunity"). The FTCA authorizes suits against the United States for:

> money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

The FTCA's waiver of sovereign immunity is subject to several exceptions set forth in 28 U.S.C. § 2680. Applicable here are the discretionary function exception, 28 U.S.C. § 2680(a), and the exceptions at 28 U.S.C. § 2680(h) for claims arising out of assault and battery and claims arising out of misrepresentation. These exceptions "are designed to protect certain important government functions and prerogatives from disruption." *Molzof v. United States*, 502 U.S. 301, 311 (1992); *see also Richards v. United States*, 369 U.S. 1, 13 n.28 (1962). If one of those exceptions applies, "the bar of sovereign immunity remains." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006).

Furthermore, a plaintiff has the burden of demonstrating that the negligent or wrongful acts or omissions that gave rise to their suit were those of an "employee of the Government." 28 U.S.C. § 1346(b)(1). Here, Plaintiffs' claims based on the decision to discharge Card from Four Winds and for the alleged failures by individuals in monitoring and following up with Card after his discharge must also be dismissed, because the facts as pleaded do not establish that these alleged acts or omissions were by any federal employees.

### A. Plaintiffs' Claims Are Barred by the Discretionary Function Exception

#### 1. Overview of the Discretionary Function Exception

The FTCA's waiver of sovereign immunity is a "limited waiver." *Molzof*, 502 U.S. at 305; *Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 92 (1st Cir. 2012); *Abreu v. United*

*States*, 468 F.3d 20, 23 (1st Cir. 2006).  One exception to that limited waiver is for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Referred to as the discretionary function exception, this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).  If the discretionary function exception applies, "the [government] is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction."  *Abreu*, 468 F.3d at 25 (brackets in original; citations omitted).

The Supreme Court established a two-part test to determine when the discretionary function exception bars a claim.  *See United States v. Gaubert*, 499 U.S. 315, 328-32 (1991).  First, a court must ask whether the challenged conduct was in fact "discretionary in nature"— that is, whether the conduct involved "an element of judgment or choice."  *Id.* at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  The first prong is met unless "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Id.*  Without this specificity requirement, "the discretionary function exception would be a dead letter."  *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir. 1999).  It is not sufficient for a plaintiff to identify a statute, regulation, or policy that merely contains mandatory directives.  Rather, the directives must be "'directly applicable' to the challenged conduct."  *Sanchez*, 671 F.3d at 97 (quoting *Muniz–Rivera v. United States*, 326 F.3d 8, 16 (1st Cir. 2003)).  It is the plaintiff's burden to plead allegations sufficient to establish the precise statute,

regulation, or policy at issue and its content, as well as the applicability of that content to the conduct at issue. *See id.* at 97 (upholding dismissal where the plaintiffs failed to adequately allege the conduct was non-discretionary, stating "[t]his court has repeatedly rejected arguments that conduct was non-discretionary under *Gaubert* when FTCA plaintiffs have identified only vague, permissive, or unidentified requirements for government conduct"); *id.* at 99 ("[The] plaintiffs' allegations say nothing of the specific content of the alleged internal directives, what these alleged directives require, or how the alleged requirements relate to the challenged conduct.").

Second, if the challenged conduct involves judgment or choice, a court must next determine if it was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. Congress intended for the discretionary function exception to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action. *Varig Airlines*, 467 U.S. at 814. "[T]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Conduct is susceptible to policy analysis if "some plausible policy justification could have undergirded the challenged conduct[,]" and it is not relevant whether the conduct was "the end product of a policy-driven analysis." *Shansky*, 164 F.3d at 692; *see also Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021) (it is not relevant whether the employee "consciously engaged in any analysis of any policy considerations . . . or whether its decision on how to proceed was in fact motivated by a policy concern") (citations and internal quotation marks omitted).

13

When a statute, regulation, or policy at issue allows for the exercise of discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. Accordingly, the plaintiff bears the burden of alleging facts that would support the finding that the conduct at issue is not susceptible to policy analysis. *See Davallou*, 998 F.3d at 505 ("For a complaint to survive a motion to dismiss [based on the discretionary function exception], it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.") (citing *Gaubert*, 499 U.S. at 324-25).

The discretionary function exception is not limited to high-level policymaking or planning functions. Rather, it applies as well to day-to-day operational decisions. *See Davallou*, 998 F.3d at 505 (citing *Gaubert*, 499 U.S. at 325). Nor does it matter whether the conduct was ultimately negligent. The exception shields the government for discretionary decisions "whether or not the discretion involved be abused." *See Davallou*, 998 F.3d at 505 (citing *Evans v. United States*, 876 F.3d 375, 381 (1st Cir. 2017) (quoting 28 U.S.C. § 2680(a)); *id.* at 507 ("Our federal government, however, does not allow itself to be sued for its discretionary decisions, even bad ones, so long as they are reasonably susceptible to policy analysis.").

### 2. Application of the Discretionary Function Exception to the Conduct at Issue

#### a. The conduct of a military unit's affairs and the supervision of its soldiers is inherently policy-based conduct

The discretionary function exception applies to activities by both civilian and military agencies. *See Sanchez*, 671 F.3d at 93. A plaintiff faces an especially high bar in overcoming the discretionary function exception when the activities of the military are at issue. *See Abreu*, 468 F.3d at 27-28 (noting the "numerous cases cautioning the courts to avoid interfering with the exercise of discretionary military authority.") (citing *United States v. Shearer*, 473 U.S. 52, 57

(1985).[3]  Also, it is virtually axiomatic that the discretionary function exception applies to decisions regarding the retention, training, and supervision of federal employees.  *See Attallah v. United States*, 955 F.2d 776, 784 (1st Cir. 1992) (discretionary function exception barred claims based on supervision of agents who committed criminal acts, holding "how, and to what extent the [agency] supervises its employees certainly involves a degree of discretion and policy considerations of the kind that Congress sought to protect through the discretionary function exception").[4]  This action is at the intersection of these principles, as the crux of Plaintiffs' claims (regardless of how labeled) is that Army personnel failed in supervising Card (who, notably, was under the Army's command and supervision for only brief periods of time in the months leading up to the shooting) in such a way that would have prevented the shooting.  As the Supreme Court has cautioned:

> To permit this type of suit would mean that commanding officers would have to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions; for example, whether to overlook a particular incident or episode, whether to discharge a serviceman, and whether and how to place restraints on a soldier's off-base conduct.  But as we noted . . . such complex, subtle, and professional decisions as to the composition, training, . . . and control of a military force are essentially professional military judgments.

*Shearer*, 473 U.S. at 58 (citations and quotation marks omitted).[5]

---

[3] *See also Ayer v. United States*, 902 F.2d 1038, 1043 (1st Cir. 1990) (military decisions regarding operational effectiveness of facilities are susceptible to policy analysis); *Davallou*, 998 F.3d at 505 (decisions regarding conduct of military ceremony, including use and placement of personnel and equipment, are susceptible to policy analysis).

[4] *See also Bolduc v. United States*, 402 F.3d 50, 61 (1st Cir. 2005) ("[T]he development and management of a supervisory model is a matter of agency discretion."); *Wood v. United States*, 290 F.3d 29, 41 (1st Cir. 2002) ("Decisions regarding the exercise of supervisory authority are traditionally the sort the discretionary function exception was designed to encompass."); *Mercado del Valle v. United States*, 856 F.2d 406, 409 (1st Cir. 1988) (supervision of R.O.T.C. program was a discretionary function).

[5] *See also Chappell v. Wallace*, 462 U.S. 296, 305 (1983) ("[C]ourts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have." (citation omitted)); *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."); *Satterfield v. United States*, 788 F.2d 395 (6th Cir. 1986) ("[C]ivilian courts are counseled not to 'question basic choices about discipline, supervision, and control of a serviceman.'") (quoting *Shearer*, 473 U.S. at 58); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (the Constitution vests "[t]he complex, subtle, and

Accordingly, courts faced with suits involving servicemembers who commit acts of violence consistently hold that the supervision of those servicemembers and the failure to prevent such violent acts involves discretionary policy-based conduct that is protected by the discretionary function exception.[6]  This entire action, regardless of how the various causes of action are labeled, is a challenge to that very sort of military judgment and thus satisfies the second part of the test under *Gaubert*.  And, like the myriad cases cited herein involving the failure to prevent acts of violence by military members, this action cannot be saved by any contention that Army personnel, including Card's chain of command, failed to adhere to any mandatory and specific directives in their dealings with and supervision of Card.  As established below, there were none.[7]

---

professional decisions as to the composition, training, equipping, and control of a military force exclusively in the legislative and executive branches.") (citation and quotation marks omitted).

[6] *See, e.g.*, *Guile v. United States*, 422 F.3d 221, 230-31 (5th Cir. 2005) (Army's supervision of contractor health care organization's conduct protected by discretionary function exception); *Malone v. United States*, 61 F. Supp. 2d 1372, 1379-80 (S.D. Ga. 1999) (claim based upon supervision of soldier who left based while on restricted status and committed rape barred by discretionary function exception, because "deciding how to restrain a soldier is inherently policy laden.") (citations and internal quotation marks omitted); *Cuadrado-Concepción v. United States*, No. CV-419-305, 2020 WL 4589041, *3 (S.D. Ga. Aug. 10, 2020) (claim based upon supervision of soldier with psychiatric problems, and decision regarding how to protect victim, barred by the discretionary function exception), *aff'd*, 851 F. App'x 985 (11th Cir. 2021); *Conway v. United States*, No. CV-17-71, 2018 WL 6605887, *5 (D. Mont. Dec. 17, 2018) (claim based upon negligent supervision of Air Force officer with history of psychiatric issues barred by discretionary function exception); *Est. of Smith ex rel. Richardson v. United States*, No. 3:10–CV–00651, 2011 WL 3880935, *4 (W.D. Ky. Sep. 2, 2011) (claim based upon supervision of soldier who shot base resident while walking to school barred by discretionary function exception), *aff'd on other grounds*, 509 F. App'x. 436 (6th Cir. 2012); *Linke v. United States*, No. 14-CV-444, 2015 WL 12743613, *4 (W.D. Tex. June 2, 2015) (claim based upon failure to supervise and train soldier who committed sexual assault barred by discretionary function exception); *Harper v. United States*, No. 12-1802, 2020 WL 4192540, *4-5 (D.D.C. July 21, 2020) (claims based upon Army's negligence in supervising and retaining soldier who committed mass shooting barred by discretionary function exception).

[7] Generally, the regulations and policies Plaintiffs contend were not properly followed (and that essentially supply the acts or omissions on which their 13 causes of action are based) are set forth in the section of the Complaint titled "THE ARMY'S FAILURES."  *See* Compl. ¶¶ 6.1-6.42.  To the extent allegations are made elsewhere in the Complaint (albeit redundantly) about the failure to follow allegedly mandatory directives, citations to those paragraphs are provided herein as well.  Also, because there is substantial redundancy as to the conduct on which each separate cause of action is based, this section of the motion addresses the applicability of the United States' jurisdictional defenses to the conduct at issue as it allegedly occurred chronologically, rather than progressing claim by claim.  For the sake of clarity, the extent to which a particular defense applies to (and thus should result in dismissal of) a particular cause of action is then noted.

**b. The conduct and decisions challenged by Plaintiffs called for the exercise of judgment**

**i. Failure to issue a command-directed evaluation sooner**

Plaintiffs assert that Card's chain of command should have issued a command-directed evaluation much earlier, based on information it learned about Card's mental health issues between July 2022 and March 2023.  *See* Compl. ¶¶ 6.1-6.9.  But the guidance pertaining to the decision to initiate a command-directed evaluation imbues significant discretion in the commanding officer.[8]  Notably, the applicable DoD Instruction states in relevant part that "Commanders and supervisors who in good faith believe a subordinate Service member may require a mental health evaluation are authorized to direct an evaluation under this instruction or take other actions consistent with the procedures in Enclosure 3."  *See* DoD Instruction 6490.04 ¶ 3.b (attached at Exhibit A).  The commanding officer has the discretion in the first instance to decide not only if a referral is warranted, but if the referral should be an emergency referral or a non-emergency referral.  *Id.*  Determining if the latter is warranted calls for the exercise of judgment in assessing whether there are "concerns" regarding "fitness for duty, occupational requirements, safety issues, significant changes in performance, or behavior changes that may be attributable to possible mental status changes."  *Id.*  For the former, an emergency mental health evaluation is authorized when a servicemember (1) "by actions or words, such as actual, attempted, or threatened violence, intends or is likely to cause *serious* injury to him or herself or others", (2) "When the facts and circumstances indicate that the Service member's intent to cause

---

[8] *See* Compl. ¶ 5.33 (citing MEDCOM Policy Memo 22-020 and DoD Instruction 6490.04).  Although Plaintiffs cite to these, and other, Army and Department of Defense (DoD) documents throughout the Complaint, none were included as exhibits to the Complaint even though it is their burden to establish the existence, content, and applicability of any putative directives.  Nevertheless, to ensure the Court has before it the documents Plaintiffs rely on, the United States attaches those documents (or relevant parts thereof) as exhibits to this motion.

such injury is *likely*", and (3) "When the commanding officer believes that the Service member may be suffering from a *severe* mental disorder." *Id.* ¶ 3.d (emphasis added).

In virtually identical fashion, MEDCOM Policy Memo 22-020, which implements DoD Instruction 6490.04, states that a commanding officers "who in good faith believe a subordinate [servicemember] may require a [behavioral health] evaluation are authorized to direct an evaluation" when the servicemember "expresses intent or is *likely* to cause *serious* injury to him or herself or others," if the "intent to cause injury is *likely*", and the commanding officer "believes that the [servicemember] may be suffering from a *severe* mental disorder." *See* MEDCOM Policy Memo 22-020 ¶ 6.b & 6.d (emphasis added) (attached at Exhibit B); *see also id.* ¶ 7.b (evaluation warranted if servicemember "indicates an intent to cause *serious* injury to himself/herself other others and the Commander believes that the [servicemember] may be suffering from a [behavioral health] related disorder"). This authority clearly calls for judgment as to the severity of the issue and the likelihood and seriousness of potential harm and therefore is not a mandatory and specific directive. *See Wood*, 290 F.3d 39 (whether a situation is "serious" or "imminent" calls for judgment); *Alicea Baez v. United States*, 976 F. Supp. 102, 106 (D.P.R. 1997) (decisions "rest[ing] on subjective, qualitative evaluations" are considered discretionary).[9]

---

[9] This policy authorizes only a commanding officer to make the decision that such an evaluation is warranted and to issue such an order. DoD Instruction 6490.04, Encl. 3 ¶ 2 (Ex. A). Thus, to the extent Plaintiffs assert that other members of the chain of command who are not commissioned officers (such as the first sergeant) observed behavior by Card that necessitated a command-directed evaluation, the relevant policy provides no such authority (and thus cannot supply a mandatory directive for purposes of the discretionary function exception).

### ii.    Failure to investigate potential abuse and harassment of Card

Plaintiffs also contend that the alleged hallucinations (including hearing voices and imaginary conversations) experienced by Card also should have been viewed by Card's unit commander as potentially real and, thus, a form of abuse and harassment of Card that called for intervention. *See* Compl. ¶¶ 6.5-6.9. Plaintiffs allege that these incidents therefore should have been investigated by the unit commander pursuant to Army Regulation 600-20 ¶ 4-19. *Id.* Plaintiffs then surmise that this investigation, in turn, would have revealed to the unit commander that Card was hallucinating and thus prompted the unit commander to initiate a command-directed evaluation. *Id.*[10]

As already established above, the decision to initiate a command-directed evaluation is at the discretion of the commanding officer. Thus, even if the unit commander treated these reports as Plaintiffs contend he should have, whether to order a command-directed evaluation would have been in his discretion.

In any event, the Army regulation cited by Plaintiffs, which pertains to efforts to address "hazing" and "bullying" and "discrimination," not only appears to be inapplicable (as it relates only to such behavior by servicemembers directed at other servicemembers, whereas Card complained of voices from various persons in the community), it also provides no specific and mandatory course of action for a commanding officer to follow regarding whether or how to respond if made aware of instances that could meet the definition of such conduct. *See* Army Regulation 600-20 ¶ 4-19 (stating merely that commanders "will lead by example and do what is right to prevent abusive treatment of others") (attached, in part, as Exhibit C). Indeed, the regulation calls for discretion to decide, in the first instance, whether any alleged conduct meets

---

[10] The allegations do not demonstrate which portion, if any, of this time period Card was present with his unit on active-duty orders.

the definitions of "hazing" or "bullying" or "discrimination" provided in the policy.  *See id.* ¶ 4-19 (conduct is to be assessed by a "reasonable person" standard).  Therefore, this Army Regulation does not provide a mandatory and specific directive.  *See Shansky*, 164 F.3d at 691 (determining what is "acceptable" calls for judgment); *Evans*, 876 F.3d at 382 (determining what is "appropriate" calls for judgment); *Irving v. United States*, 162 F.3d 154, 163 (1st Cir. 1998) (en banc) (regulations calling for determinations of what is "reasonable" are not mandatory and specific).

### iii.    Failure to directly address Card at May 2023 training

The next opportunity for the unit leadership to intervene, according to Plaintiffs, was in May 2023, when Card was present with his unit for training.  *See* Compl. ¶¶ 6.10-6.14. Tellingly, Plaintiffs cite to no regulation or policy that they contend would have required Card's chain of command to take some specific action while he was on active duty and present for training.[11]  On the contrary, the Army Regulation cited previously by Plaintiffs affords commanding officers considerable discretion in how they operate their units and in deciding whether and how to address issues with their soldiers.  *See* Army Regulation 600-20 ¶ 2-3.a ("Unit commanders will determine the timing and specific methods used to provide guidance and direction through counseling.") (Ex. C); *id.* ¶ 4-4 a.2 (commanders will "[t]ake appropriate action, consistent with Army regulations, in any case where a Soldier's conduct violates good order and military discipline.").  What is "appropriate" calls for the exercise of judgment.  *See Evans*, 876 F.3d at 382.  Notably, this regulation expressly states: "Commanders exercise broad disciplinary powers in furtherance of their command responsibilities.  Discretion, fairness, and

---

[11] As noted, the unit commander was not even present for this May 2023 training.  *See* Compl. ¶¶ 5.3, 5.18.

sound judgment are essential ingredients of military justice." *See* Army Regulation 600-20 ¶ 4-7.a (Ex. C).

Further, a commanding officer exercises this discretion relating to engaging with and addressing individual soldiers while also attending to the overall mission and training needs of the unit as a whole. Commanding officers are "responsible for all aspects of unit readiness" and "[t]raining is the cornerstone of unit readiness and must be the commander's top peacetime priority." *See* Army Regulation 600-20 ¶ 1-6.c (Ex. C). This regulation leaves to the discretion of a commanding officer the decision of whether and how to engage with a specific soldier during a unit training while at the same time striving to achieve the "top priority" of readiness. *See Shansky*, 164 F.3d at 691 (guidance setting forth priorities and objectives do not satisfy *Gaubert*'s specificity requirement, as such statements involve "discretionary judgments about how to apply concretely the aspirational goal embedded in the statement"); *Ayer*, 902 F.2d at 1043 (Air Force manual calling for balancing of safety with operational effectiveness involves exercise of judgment); *Wood*, 290 F.3d at 34 (regulations that call for the consideration of "a variety of factors" call for judgment and choice); *Harper*, 2020 WL 4192540, *7 (Army regulations relating to evaluations of soldiers call for judgment).

### iv.    Failure to monitor Card following hospitalization

Plaintiffs' next attempt to establish a lack of discretion pertains to the supervision of Card following his release from Four Winds Hospital in August 2023. *See* Compl. ¶¶ 6.21-6.23.[12] According to the policies cited by Plaintiffs, following the evaluation the medical provider will "advise" and provide "recommendations" to the commanding officer regarding, among other

---

[12] Notably, Card was no longer on active-duty orders following his discharge from Four Winds Hospital and would not be again for the entire time from his discharge to the shooting.

things, monitoring and duty limitations, as well as whether to make a referral to a Medical

Evaluation Review Board for processing through the Disability Evaluation System.  *See* DoD

Instruction 6490.04 ¶ 5.b. (Ex. A); MEDCOM Policy Memo 22-020 ¶ 9 (Ex. B) (addressing

"recommendations" medical provider gives commanding officer following evaluation).  Mere

"recommendations," as set forth in the DA Form 4856, cannot be an "order" for the commanding

officer (or any other person for that matter) to follow in monitoring and engaging with Card

following his discharge.  *See Mahon v. United States*, 742 F.3d 11, 15 (1st Cir. 2014)

("recommendations" are not mandatory directives).[13]

Moreover, to the extent Plaintiffs contend that any of the individuals affiliated with Keller

Hospital or Four Winds Hospital or the individuals assigned to his case management were

negligent in their post-discharge monitoring of Card, *see* Compl. ¶¶ 7.28-7.30, Plaintiffs not only

fail to sufficiently allege that such individuals were employees of the Government per 28 U.S.C.

§ 1346(b)(1) (discussed *infra*), but they also fail to identify any applicable statutes, regulations,

or policies containing mandatory and specific directives that were not followed.  Nor do

Plaintiffs identify a regulation or policy requiring the unit commander to compel Card's

attendance at subsequent unit training.  Even if there were such a regulation or policy, as noted

above whether or how to engage with Card during these unit trainings would have been left

wholly to the commander's discretion.[14]

---

[13] Plaintiffs refer to these recommendations as an "order", which clearly they were not.  Even if properly construed as an order, that would not transform the DA Form 4856 into a mandatory and specific directive for purposes of the discretionary function exception.  *See Irving*, 162 F.3d at 165 (courts look to "*established* agency policy" rather than orders or directions from superiors in deciding whether discretion has been cabined) (emphasis in original).

[14] It is unclear if, pursuant to Count D, Plaintiffs seek to hold the United States liable for the transfer of Card from Keller to Four Winds, rather than just the discharge from Four Winds.  If, however, Plaintiffs also fault the Army for the transfer, such a claim also would be barred by the discretionary function exception, as the government's decisions regarding what treatment capabilities to provide at its facilities is discretionary and policy-

### v.    Failure to initiate a Line of Duty investigation

Plaintiffs next assert that after Card's discharge from Four Winds Hospital, a Line of Duty investigation should have been initiated.  *See* Compl. ¶¶ 6.24-6.28.  Plaintiffs rely on Army Regulation 600-8-4.  But this regulation does not prescribe a mandatory and specific course of action.  Rather, it leaves to the commander's discretion the decision of whether a Line of Duty investigation should be initiated at all.  In particular, if there is a loss of duty time for more than 24 hours, the commander will determine if a Line of Duty investigation should take place by examining whether "[t]he injury, illness, or disease is of lasting significance," whether "[t]here is a likelihood that the injury, illness, or disease will result in a permanent disability," and for a reserve component soldier, whether there will be a need for "follow-on care for an injury, illness, or disease incurred during a period of active duty".  *See* Army Regulation 600-8-4 ¶ 2-2a (attached, in relevant part, at Exhibit D).   If so, the commander can decide whether to initiate a formal or informal investigation.  *See id.* ¶ 1-14b (authorizing commanders to "[e]valuate the circumstances surrounding the injury, illness, disease, or death and determine if a formal investigation is required in accordance with paragraph 2-2."); *see also id.* ¶ 5.8b ("The commander reviews the circumstances of the case to determine if the Soldier's injury, illness, disease, or cause of death requires a formal investigation.  If no formal investigation is required, the commander will make the determination using the procedures for an informal LOD."); *id.* ¶ 5.8c (commander assesses whether the incident involves "strange and unusual circumstances").  These subjective factors call for the exercise of judgment.  *See Wood*, 290 F.3d at 34 (regulations that call for the consideration of "a variety of factors" call for judgment and choice); *Alicea*

---

based.  *See Cosby v. U.S. Marshals Serv.*, 520 F. App'x 819, 821 (11th Cir. 2013) (decisions regarding what care to make available at a particular facility are susceptible to policy considerations).

*Baez*, 976 F. Supp. at 106 (decisions "rest[ing] on subjective, qualitative evaluations" are considered discretionary).

Plaintiffs' reliance on this regulation is shown to be even more misplaced when the purpose and consequences of such an investigation are understood. The purpose of a Line of Duty investigation is to determine duty status at the time of the incident where injury or illness occurred and whether misconduct was involved. *See* Army Regulation 600-8-4 ¶ 2-2 (Ex. D). The findings are not used for any disciplinary-related consequences. *See id.* ¶ 4-1 ("An LOD determination is an administrative action and is not to be used for punitive/judicial action."); *id.* ¶ 4-21 (The determination "is an administrative determination and not a punitive/judicial action. Disciplinary and other administrative actions, if warranted, will be taken independently of any LOD determination."). Rather, its purpose simply is to determine if the servicemember is entitled to benefits. *See id.* ¶ 2-1; *see also id.* ¶ 5-2 (noting specifically for reserve soldiers that the "determination will impact that Soldier's eligibility for Federal benefits, such as access to medical care, compensation, and disability entitlements.).

The only incidental consequence of such an investigation that Plaintiffs postulate could have prevented the shooting is if Card was placed back on active-duty orders during the pendency of the Line of Duty investigation. *See* Compl. ¶ 6.28 ("Card should not have been released from his orders until the investigation was complete, and the root causes were identified."). But not only should active-duty orders not be confused or equated with a confinement that removes a soldier from the community, as a reserve soldier Card could only have been placed or retained on active-duty orders for purposes of a Line of Duty investigation (or any other medical treatment or review) if he consented to such orders. *See* 10 U.S.C. § 12301(h) (the Army "may, *with the consent of the member*, order a member of a reserve

24

component to active duty . . . to receive authorized medical care [or] to be medically evaluated for disability or other purposes") (emphasis added).  It cannot be said that the unit commander was operating under a specific and mandatory course of action when the relevant law provides him with no authority to take the specific action (that is, placing Card on active-duty orders during the pendency of the investigation) that allegedly would have prevented the shooting.[15]

Plaintiffs also rely on DoD Instruction 1332.18, which pertains to the Disability Evaluation System.  *See* Compl. ¶ 6.27.[16]  Plaintiffs identify no part of this document requiring the initiation of any processes within this system for Card, or how being placed into this system in turn would have prompted any action that would have prevented Card from committing the shooting.  To the extent Plaintiffs contend that Card should have been retained or placed on active-duty orders for the duration of the DES process, that contention also fails because such orders likewise could only have been with Card's consent.  *See* 10 U.S.C. § 12301(h); *see also* DoD Instruction 1332.18 ¶ 1.2f. ("[Reserve] members may, with the consent of the Service member, be ordered to active duty to receive authorized medical care or to be medically evaluated for disability or other purposes.") (Ex. E); *id.* ¶ 1.2k ("[Reserve] members may elect to be released from active duty before completing DES processing.").

### vi.    Failure to monitor Card for brain injury

In addition to the specific mental health issues Card apparently experienced, Plaintiffs speculate that he also suffered from a brain injury resulting from repeated blast exposures

---

[15] Of course, even if subsequent reviews of this decision note that such an investigation should have been initiated under the circumstances, that is not material to the analysis here as even abuses of discretion are protected.

[16] The Disability Evaluation System (DES) "is the mechanism for determining fitness for duty because of disability, and whether a Service member . . .  found unfit for duty due to disability will be separated or retired." DoD Instruction 1332.18 ¶ 1.2a. (attached, in part, at Exhibit E).

throughout his Army career.  *See* Compl. ¶¶ 6.16-6.20.  Plaintiffs allege that the Army was aware

that Card was experiencing symptoms of such an injury but took no action to evaluate it.

However, in addition to the fact that Plaintiffs attempt to attribute knowledge amorphously to

"the Army" rather than identifying the specific individuals with the requisite knowledge of the

situation and authority to act, here too they fail to identify a mandatory directive requiring any

specific course action to be followed regarding whether, when, or how to investigate and address

potential brain injuries of servicemembers.

### vii.    Failure to secure Card's personal firearms

Plaintiffs also complain that Card's chain of command did not take and secure Card's

personal firearms following his discharge from Four Winds Hospital.  *See* Compl. ¶¶ 6.29-6.35.

To the extent Plaintiffs rely on the DA Form 3822 as prescribing a requirement that efforts be

made to remove and secure Card's personal firearms, *see* Compl. ¶ 6.30, as already noted, that

form provides recommendations only.

Also, Plaintiffs implicitly acknowledge (as they must) that the Army itself has no

authority whatsoever to remove a reserve soldier's privately owned weapons from his (or any)

personal residence.  To the extent the removal of his weapons would have been possible, it could

have occurred only through the intervention of local law enforcement and the courts.  But as the

Army regulation cited by Plaintiffs make clear, whether to alert local law enforcement regarding

Card's conduct and his possession of weapons is entirely discretionary, and that interaction with

local law enforcement must be carefully crafted to avoid running afoul of legal restrictions on

assisting local law enforcement.  *See* Army Regulation 600-20 ¶ 4-10 ("Military personnel *may*

report crimes or other suspicious activities to civilian police agencies or cooperate with civilian

authorities in *their capacities as private citizens*" but  "Military support of civilian law

enforcement is governed by the Posse Comitatus Act (18 USC 1385) and DoDI 3025.21" and

"Commanders will not sanction use of military personnel in support of civilian law-enforcement agencies[.]") (emphasis added) (Ex. C).  Thus, whether to involve local law enforcement was entirely at the discretion of Card's chain of command, as the regulations simply state that a commanding officer "may" contact local law enforcement.  Also, the regulations provide no specific course of action to follow when doing so, what information to convey, or how and when such involvement is sought.

Insofar as Plaintiffs assert that the removal of Card's weapons eventually could have been effectuated by initiating a report to State authorities pursuant to the New York Red Flag Law or the Maine Yellow Flag Law, *see* Compl. ¶¶ 6.32-6.33, any putative duty of Army personnel under those laws is irrelevant.  For purposes of the discretionary function exception, discretion can be removed only by a *federal* statute, regulation, or agency policy.  State statutes cannot be sources of a mandatory directive, because looking to such sources would collapse the question of whether the discretionary function exception bars the claim into the separate question of whether the conduct was negligent under State law.  *See Carroll*, 661 F.3d at 101; *see also Evans*, 876 F.3d at 381 ("A state policy promulgated by a state agency, without more, cannot divest the federal government of its sovereign immunity.") (citations omitted).

Nor can Plaintiffs avoid the discretionary function exception by contending that Army personnel had a mandatory duty to report Card to the FBI through NICS, as none of the criteria under Army Regulation 190-45 and 18 U.S.C. § 922(g) were met.  Plaintiffs assert that section 922(g)(4) is applicable, which applies to persons "adjudicated as mental defectives or have been committed to a mental institution."  As established *infra* at pp. 56-57, that provision is not

applicable as Card was never adjudicated as such by an appropriate body or involuntarily committed.[17]

### viii. Failure to act on alleged statements in September 2023 regarding a shooting

Plaintiffs contend that Card's chain of command failed to act on information it received by one of Card's fellow soldiers regarding threats Card supposedly made in September 2023 after his discharge from Four Winds about a mass shooting. *See* Compl. ¶¶ 6.36-6.42. Regarding Plaintiffs' contention that this information should have prompted the unit commander to initiate another command-directed evaluation, *see* Compl. ¶ 6.41, Plaintiffs offer no authority for such an evaluation to be directed at this time considering Card was not on active-duty status and had not experienced any loss of active-duty time. Moreover, as noted above, whether to initiate such an evaluation is committed to the commanding officer's discretion. And, to the extent Plaintiffs contend that this information also should have prompted reporting under Maine's Yellow Flag law, *see* Compl. ¶ 6.42, as previously noted a state statute cannot be the source of a mandatory directive for purposes of the discretionary function exception.

Plaintiffs further contend that the alleged threats in September 2023 should have been reported internally to the Army Criminal Investigative Division and the Insider Threat Hub pursuant to Army Regulation 190-45, and the Army's personnel security program through a DA Form 5248 pursuant to Army Regulation 380-67. *See* Compl. ¶¶ 6.38-6.40. Plaintiffs also assert that Card's commander should have addressed this threat as part of the Army's suicide

---

[17] Plaintiffs' reliance on that provision also conflicts with one of the Army reports cited in their Complaint, which states that "[t]he facts and circumstances surrounding SFC Card's voluntary behavioral health evaluation and hospitalization in July 2023 did not require the Army to report information to NICS because it did not meet the statutory requirements of Title 18 U.S.C. Section 922(g)(1) and (4)." *See* OIG Report at 15 (attached at Exhibit F). It must also be noted that any putative duty to report Card to NICS as a result of his hospitalization would have arisen *after* he already purchased the weapon used to commit the shooting.

prevention program, pursuant to Army Regulation 600-92. *Id.* None of these regulations contain applicable directives that are mandatory and specific.

Army Regulation 190-45 pertains to the reporting system for crimes and "serious incidents." *See* Army Regulation 190-45 ¶ 1-1 (attached, in relevant part, at Exhibit G). The applicability of this regulation is unclear, as Plaintiffs do not explain what, if anything, is done with such reports or how such reports would have somehow prevented the shooting. Further, the criminal reporting process in Army Regulation 190-45 applies only to "founded criminal offenses investigated by Army installation offices." *See* Army Regulation 190-45 ¶ 4-1 (Ex. G). To be considered such, the incident, among other things, must have been "adequately substantiated by police investigation." *Id.* ¶ 4-3a. Card's alleged statements (to a fellow soldier and personal friend, while not on active duty) that were never investigated as a crime, let alone substantiated, by local police, do not meet this threshold criteria for reporting. This regulation is therefore inapplicable. In any event, the reporting occurs only when "credible information exists that the person or entity has committed a criminal offense." *Id.* Determining what is "credible" calls for the exercise of judgment. *See Alicea Baez*, 976 F. Supp. at 106.

Insofar as Plaintiffs contend that Card's statements were reportable as a "serious incident," that determination calls for the exercise of judgment in assessing such factors as the "[s]everity of the incident," its "[p]otential for adverse publicity," the "[p]otential consequences of the incident," and the "[e]ffect of the incident on readiness or the perception of readiness." Army Regulation 190-45 ¶ 8-1a (Ex. G). Evaluating these subjective factors calls for judgment. *See Harper*, 2020 WL 4192540, at *6 (Army and DoD regulations call for exercise of officer's judgment in handling of soldier alleged to have dangerous propensities); *Alicea Baez*, 976 F. Supp. at 106.

Army Regulation 380-67 provides procedures relating to the access of personnel to sensitive or classified information or positions.  *See* Army Regulation 380-67 ¶ 1-1(attached in relevant part at Exhibit H).  Again, Plaintiffs do not make clear which specific part of this regulation applies, what would have happened if such a report was made, or how the making of such a report within this system somehow would have prevented the shooting.  Regardless, the reporting processes set forth in Army Regulation 380-67 likewise applies only when a commander learns of "credible derogatory information," *see* Army Regulation 380-67 ¶ 8-2 (Ex. H), the assessment of which is guided by, among other things, "an overall common sense determination based upon all available facts." *Id.* ¶ 2-4 (Ex. H).   Whether information is both "credible" and "derogatory" as determined by a common-sense standard also calls for the exercise of judgment.  *See Harper*, 2020 WL 4192540, *7 (Army and DoD regulations regarding reporting of threats did not prescribe specific and mandatory courses of action); *see also Sloan v. U.S. Dep't Hous. & Urb. Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2001) (decisions that call for judgment as to credibility are discretionary); *Rutherford v. United States*, 760 F. App'x 787, 793 (11th Cir. 2019) (determining what is "reasonable" calls for judgment).

Army Regulation 600-92 pertains to the Army's suicide prevention program.  This regulation simply provides general strategies for mitigating such risks, *see* Army Regulation 600-92 ¶ 1-10 (attached in relevant part at Exhibit I) but does not set forth a mandatory and specific course of action for identifying such a risk or for addressing such a risk once identified. *See Shansky*, 164 F.3d at 691 (guidance setting forth priorities and objectives are not specific directives); *see also Lopez v. U.S. Immigr. and Customs Enf't*, 455 F. App'x 427, 433 (5th Cir. 2011) (agency manuals prescribing "best practices" are not mandatory directives); *Baer v. United States*, No.11–1277, 2011 WL 6131789, *4 (D.N.J. Dec. 8, 2011) ("abstract guidance about

30

action" is not a "specific course[] of action."); *Molchatsky v. United States*, 778 F. Supp. 2d 421, 434 (S.D.N.Y. 2011) (agency policies stating "best practices" do not remove judgment); *Harper*, 2020 WL 4192540, *6 ("generally stated policies" do not remove discretion).

### ix.    Negligent training

Finally, Plaintiffs' separate claim for negligent training at Count I, *see* Compl. ¶¶ 7.89-7.94, even if viewed as being based on conduct distinct from the alleged acts and omissions recounted above that form the basis for Plaintiffs' other claims, also is barred by the discretionary function exception.  Plaintiffs fail to cite any statute, regulation, or policy providing a specific and mandatory course of action for Army personnel to follow relating to training personnel on identifying and addressing mental health issues or NICS reporting.  And, of course, as already established, whether and how to train government employees (especially in the military context) are quintessential discretionary policy-based decisions.  *See supra* at 16; *see also CNA v. United States*, 535 F.3d 132, 148-50 (3d Cir. 2008) (claim based on failure to adequately train and supervise Army recruiter barred by discretionary function exception); *Harper*, 2020 WL 4192540, *5 ("As Plaintiffs are at bottom questioning the Army and DOD's supervision and discipline decisions with respect to [the Army shooter], [cited caselaw] and its underlying reasoning show that such decisions involve judgment and discretion.").

### 3.    Conclusion

In sum, all of the alleged acts or omissions in the Army's handling of Card on which all of Plaintiffs' claims are based—whether they are in the form of failing to order a command-directed evaluation sooner, failing to intervene with him more directly when he was present at training, failing to maintain sufficient contact with him after his discharge from Four Winds, failing to make certain reports internally within the Army or to state agencies, or failing to engage more effectively with local law enforcement—called for the exercise of judgment in the

conduct of various military affairs and personnel supervision.  And it is firmly established by decades of jurisprudence that the conduct of all manner of military affairs—and most especially a chain of command's handling of one of its soldiers—involve myriad policy considerations. Accordingly, each and all of Plaintiffs' claims are barred in their entirety by the discretionary function exception.

### B.  Plaintiffs' Claims Are Barred by the Assault and Battery Exception

Plaintiffs' claims also are barred in their entirety by the exception at 28 U.S.C. § 2680(h) for claims arising out of assault and battery.  The alleged harms suffered by Plaintiffs in this action were caused by the shootings carried out by Card, conduct which clearly meets the definition of assault and battery under section 2680(h).  Plaintiffs cannot avoid the jurisdictional bar of section 2680(h) by arguing that their claims do not arise out of the actual shootings but rather arise out of acts or omissions that at their essence are the failure to properly supervise Card or take other actions pursuant to their command authority over him sufficient to prevent the shootings.  Such claims, regardless of how worded, are encompassed in the jurisdictional bar at section 2680(h).[18]

In *United States v. Shearer*, 473 U.S. 52 (1985), an off-duty Army soldier was kidnapped and murdered by a fellow servicemember, who had previously been convicted and imprisoned for manslaughter. The deceased soldier's estate sued the United States on a theory of negligent supervision, and the Supreme Court held that § 2680(h) barred the claim. The plurality held that the death arose from an assault and battery and thus § 2680(h) barred the claim, stating:

---

[18] To be clear, and as explained above, each and all of Plaintiffs' theories of liability are properly viewed as the failure to supervise Card in such a way to prevent the shooting, regardless of whether they relate specifically to the direct supervision of Card, the hospitalization and discharge of Card, interactions with local law enforcement and Card's family, or efforts (or lack thereof) to meet alleged reporting requirements under state or federal law.

> Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee. Thus the express words of the statute bar respondent's claims against the Government.

*Id.* at 55 (emphasis in original).

Accordingly, "*Shearer* established the proposition that any case arising from an assault or battery by a government official is barred from consideration by federal courts." *Campbell v. United States*, 337 F. Supp. 2d 219, 222 (D. Mass. 2004); *see also Miami N., Inc. v. U.S. Dep't of Lab. Penobscot Job Corps*, 939 F. Supp. 53, 56 (D. Me. 1996) ("*Shearer* dictates that the Government does not owe a duty to the world to prevent employees from committing foreseeable illegal or violent acts whether they are on or off the job."); *Harris v. United States*, 797 F. Supp. 91, 96 (D.P.R. 1992) ("It is clear that actions premised on negligence in the hiring and supervision of an employee with violent tendencies or similar background are barred because they are inextricably related to the assault and battery.").

In fact, the majority of circuits to have dealt directly with this issue have held that negligent supervision and failure to prevent claims arise out of the underlying assault and battery and are thus barred.[19] The First Circuit likewise is aligned with this approach. *See Dynamic Image Techs. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000) (holding that negligent supervision claims are "inextricably intertwined with the incident involving the false arrest" and thus would be barred by section 2680(h)).

---

[19] *See, e.g., Leleux v. United States*, 178 F.3d 750, 757-58 (5th Cir. 1999); *Franklin v. United States*, 992 F.2d 1492, 1499 n.6 (10th Cir. 1993); *Sheridan v. United States*, 969 F.2d 72, 75 (4th Cir. 1992) ("*Sheridan II*"); *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993); *Kugel v. United States*, 947 F.2d 1504, 1507 & n.2 (D.C. Cir. 1991); *Westcott v. City of Omaha*, 901 F.2d 1486, 1490 (8th Cir. 1990); *Satterfield v. United States*, 788 F.2d 395, 400 (6th Cir. 1986); *Doe v. United States*, 838 F.2d 220, 222–24 (7th Cir. 1988); *Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir. 1986); *O'Ferrell v. United States*, 253 F.3d 1257, 1266 (11th Cir. 2001).

Nor can Plaintiffs avoid the assault and battery exception by contending that their claims arise out of a duty to prevent the shooting that is independent of the Army's employment relationship with Card.  Following *Shearer*, the Supreme Court, in *Sheridan v. United States*, 487 U.S. 392 (1988), allowed a FTCA claim to proceed which involved the failure of two servicemembers, who encountered a drunken servicemember with a rifle, to prevent a shooting by that servicemember.  The Court held that while the assault and battery by that servicemember cannot give rise liability under the FTCA, the government could be liable if the claim is based upon the negligent breach of a duty to prevent the assault and battery that is "entirely independent of [the tortfeasor's] employment status."  *Id.* at 401.[20]

In this action, though, Plaintiffs' claims rely entirely on the Army's supposed duty to control Card through the exercise of various regulations and policies, none of which would be applicable but for Card's employment status with the government.  Thus, Plaintiffs cannot circumvent the exception for assault and battery, because to the extent any duty to control Card existed at all it was entirely dependent on his employment status with the Army.  *See Miami N., Inc.*, 939 F. Supp. at 56 ("the Government does not owe a general duty to the world" and, therefore, the bar of section 2680(h) applied where no duty independent of the employment relationship existed).[21]

---

[20] *Sheridan* did not overrule or even cite *Shearer* and thus left the plurality decision of *Shearer* in place. Moreover, for purposes of *Sheridan*, it was assumed but not decided that such an independent duty could exist under Maryland law (which, per 28 U.S.C. § 1346(b)(1), was applicable to the claims).  On remand, the United States was found not liable, and the Fourth Circuit specifically rejected the argument that the voluntary adoption of regulations alone constitutes a voluntary undertaking that could give rise to a duty to prevent the shooting.  *See Sheridan II*, 969 F.2d at 74 ("Neither has the United States voluntarily assumed such a duty under a 'Good Samaritan' theory of liability by promulgating the regulation prohibiting naval personnel from possessing weapons on base except under certain circumstances and the regulation generally requiring naval personnel to report all infractions.").

[21] *See also Olsen v. United States*, 144 F. App'x 727, 734 (10th Cir. 2005) (claims based upon failure to prevent assault by Army recruiter barred by section 2680(h), because any obligation to investigate the recruiter for previous misconduct arose from the employment relationship); *Est. of Smith ex rel. Richardson*, 509 F. App'x. at 443 (claim based upon supervision of soldier who shot base resident while walking to school barred by section 2680(h)); *Cuadrado-Concepción*, 2020 WL 4589041, *4-5 (claims for failure to prevent assault and battery by soldier barred

For these reasons, each and all of Plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction because they are claims arising out of assault and battery.

### C.  Plaintiffs' Claims Based on the Communication of Information and Failures to Communicate Information Are Barred by the Misrepresentation Exception

Plaintiffs' claims also are barred by the exception at 28 U.S.C. § 2680(h) for claims arising out of misrepresentation, insofar as they are based on Plaintiffs' allegations relating to the Army's communications with law enforcement and Card's family, as well as the alleged failures to make reports under state and federal law.

The misrepresentation exception applies to both negligent and intentional misrepresentations, *see Block v. Neal*, 460 U.S. 289, 296 (1983), and "extends to a wide range of communicative activity (including failures of communication)[,]" *Muniz-Rivera v. United States*, 326 F.3d 8, 13 (1st Cir. 2003) ("The case law makes manifest that the prophylaxis of the misrepresentation exception extends to failures of communication.") (citing *JBP Acquisitions v. United States*, 224 F.3d 1260, 1265 (11th Cir. 2000); *Green v. United States*, 629 F.2d 581, 584 (9th Cir. 1980)), as well as conduct that creates "implied assurances." *Id.*; *see also Preston v. United States*, 596 F.2d 232, 238-39 (7th Cir. 1979) (holding that exception barred claims based on conduct that creates an "implied misrepresentation"); *Baroni v. United States*, 662 F.2d 287, 288 (5th Cir. 1981) (same).  The misrepresentation exception involves the dissemination of information generally and is not limited to commercial contexts.  *See Mullens v. United States*, 785 F. Supp. 216, 220 (D. Me. 1992).  Accordingly, claims based on the failure to communicate information that are recast as failure to warn claims are barred by the misrepresentation

---

by section 2680(h) because awareness of dangerous tendencies and any ability to control resulted from employment relationship); *Malone*, 61 F. Supp. 2d at 1381 (claim based upon supervision of soldier who committed rape barred by section 2680(h) because the plaintiff failed to establish a duty to control the soldier independent of the employment relationship).

exception.  *Id.* at 219-20 (failure to warn of a hazardous condition barred by the misrepresentation exception).

The misrepresentation exception also applies to communications (or lack thereof) with a third person or entity who then, in reliance on that misrepresentation, took or forewent an action that resulted in harm to the plaintiff.  *See Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003) (misrepresentation exception barred claim arising out of failure by Federal agents to report to state officials information about person in federal witness protection program that would have disqualified him from employment, and thus would have precluded opportunity for him to harm victim); *see also Zelaya v. United States*, 781 F.3d 1315, 1334-35 (11th Cir. 2015) (claim arising out of failure by federal agency to report information to the Securities Investors Protection Corporation ("SIPC"), a third party that allegedly could have taken action to prevent the harm pursuant to 15 U.S.C. § 78eee(a)(1), barred by the misrepresentation exception).  Similarly, the failure to communicate information within the government likewise falls within the exception. *See Price v. United States*, No. 25-cv-795, 2025 WL 3514066, at *3 (D.D.C. Dec. 8, 2025) (alleged misrepresentations by FBI to magistrate judge for purposes of securing a warrant covered by misrepresentation exception).[22]

---

[22] First Circuit precedent is not to the contrary.  In *Jimenez-Nieves v. United States*, 682 F.2d 1, 4 (1st Cir. 1982), the Court of Appeals observed that the communication in question was not directly relied on by the plaintiff as typically would be the case in the traditional notion of misrepresentation.  *Id.* at 4.  However, this aspect of the decision was in dicta, as the crux of the decision was that the conduct underlying the claim was not properly viewed as a misrepresentation but rather the bureaucratic or "operational" mistyping on a keypad that was not made to anyone (the plaintiff included) and thus could not have engendered any reliance.  *Id.* at 4-5; *see also Abbey v. United States*, 112 F.4th 1141, 1151 (9th Cir. 2024) (observing that the decision in *Jimenez-Nieves* did not turn on the lack of communication directly to the plaintiff, but rather on the fact that such clerical typographical error was not a misrepresentation); *Mullens*, 785 F. Supp. at 220 (observing that the *Jimenez-Nieves* decision turned on the "operational" nature of the conduct at issue).  Notably, the traditional understanding of the tort of misrepresentation was addressed by the Supreme Court in *Block v. Neal*, which described it not being limited to miscommunications to the actual plaintiff but rather as including "the communication of misinformation on which *the recipient* relies." *Block*, 460 U.S. at 296 (emphasis added).

In this action, Plaintiffs base several of their claims, at least in part, on the failure of members of Card's chain of command to report Card's mental health situation and gun ownership to Maine and New York state authorities and to separate agencies within the federal government, the miscommunication of information to Card's family and local law enforcement, and any failure to warn Plaintiffs to the extent they could reasonably be viewed as being on Card's so-called "hit list." *See* Compl. ¶¶ 7.4h-i, 7.12h-i, 7.30, 7.78-7.88. These alleged omissions clearly involve failures to convey information and/or the conveyance of inaccurate information, and thus, are barred by section 2680(h).

### D. Plaintiffs' Claims Based on the Discharge and Post-Discharge Care of Card Are Barred by the Contractor Exception

Plaintiffs' claims also are barred by the FTCA's contractor exclusion, 28 U.S.C. § 2671, to the extent they are based on acts or omissions of individuals who are not employees of the Government. The FTCA authorizes suits against the United States for damages "caused by the negligent or wrongful act or omission of any *employee of the Government* while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1) (emphasis added). Section 2671 defines the term "employee of the Government" to include "officers or employees of any federal agency . . . [or] persons acting on behalf of a federal agency in an official capacity . . . ." As further defined by § 2671, the term "'Federal agency' includes the executive departments . . . of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." The last clause in this definition is commonly referred to as the contractor exclusion and provides that FTCA coverage does not extend to a contractor. *See Orleans*, 425 U.S. at 814; *Logue v. United States*, 412 U.S. 521, 526 (1973); *Larsen v. Empresas El Yunque, Inc.*, 812 F.2d 14, 15 (1st Cir. 1986); *Brooks v. A. R. & S. Enters., Inc.*, 622 F.2d 8, 10-11 (1st Cir. 1980). "Under this [contractor] exception, the

37

United States retains its sovereign immunity when the acts or omissions that serve as the basis for a claim are committed by contractors hired by the United States." *Wood v. United States*, 115 F. Supp. 2d 9, 16 (D. Me. 2000), *aff'd on other grounds*, 290 F.3d 29 (1st Cir. 2002).

Plaintiffs seek to recover for the alleged negligence in the discharge of Card from medical care even though he was allegedly still "homicidal" and without there being a full understanding of the cause of his mental decline. *See* Compl. ¶ 7.30.  However, the allegations throughout the Complaint make clear that the discharge was from Four Winds Hospital and that the providers at Four Winds Hospital made the decision to discharge Card. *See* Compl. ¶¶ 5.41, 5.45, 5.51, 5.52.  Plaintiffs make no assertion that the providers at Four Winds Hospital should be considered employees of the Government for purposes of the FTCA or make allegations of any kind that would support such a proposition if true.  On the contrary, throughout the Complaint Plaintiffs rely on an Army report that unequivocally states that Four Winds Hospital operates under a contract with the U.S. Army. *See* AR 15-6 Investigation at 4, 112 (attached at Exhibit J).

Likewise, with respect to Card's post-discharge case management, *see* Compl. ¶ 7.30, Plaintiffs fail to include any allegations that the alleged failures relating to this case management are attributable to individuals who were employees of the Government.  Again, Plaintiffs' reliance on the Army Regulation 15-6 Investigation demonstrates otherwise, which notes that post-discharge case management services were provided by Spectrum Services Group, Inc. pursuant to a contract with the Army. *See* Army Regulation 15-6 Investigation at 4 (Ex. J).

## II.    ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Plaintiffs Have Not Established the Elements of a Negligent Undertaking Claim (Counts A, E, F).

Count A in Plaintiffs' Complaint asserts a negligent undertaking in the investigation and management of Robert Card's mental health crisis, while Counts E and F assert negligent undertaking claims for, respectively, the Army's failure to follow its processes relating to Line of Duty investigations and Medical Board adjudications, and for the failure to report Card to NICS.[23]  Maine courts have not recognized a negligent undertaking cause of action.  *See, e.g.*, *Noyes v. R. E. Coleman, Inc.*, No. CV-01-457, 2002 WL 31367234, at *2 (Me. Super. Sep. 18, 2002), *aff'd sub nom.*, *Noyes v. R.E. Coleman Excavation, Inc.*, No. CUM-02-582, 2003 WL 27435806 (Me. Apr. 3, 2003) (noting that the Maine Supreme Judicial Court has not adopted Section 324A of the Restatement (Second) of Torts).  Even if the Maine courts were to recognize this cause of action, Plaintiffs have not plausibly alleged the elements of a negligent undertaking. Courts that do recognize this cause of action often turn to the Restatement (Second) of Torts § 324A, which sets forth the following elements:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Restatement (Third) of Torts § 43 provides similar elements:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to which a third person

---

[23] Counts E and F also are styled as negligence claims and therefore are addressed again below with Plaintiffs' other negligence claims.

is exposed has a duty of reasonable care to the third person in conducting the undertaking if:

(a) the failure to exercise reasonable care increases the risk of harm beyond that which existed without the undertaking,

(b) the actor has undertaken to perform a duty owed by the other to the third person, or

(c) the person to whom the services are rendered, the third party, or another relies on the actor's exercising reasonable care in the undertaking.

As an initial matter, some of the alleged actions do not constitute undertakings at all. "An undertaking entails an actor voluntarily rendering a service, gratuitously or pursuant to contract, on behalf of another." Restatement (Third) of Torts § 42 cmt. d.[24] Likewise, the Restatement (Second) of Torts requires that the actor "undertake[] . . . to render services to another." § 324A. Neither the Army ordering Card to attend a training, Compl. ¶ 7.3d, nor the Army investigating or coordinating with local law enforcement after renewed threats of violence, Compl. ¶ 7.3i-j, constitute rendering services to another—in both instances, the Army was acting in its own interests. *See Roberson v. United States*, 382 F.2d 714, 721 (9th Cir. 1967) ("In conducting its safety inspection program, the Government was not undertaking to render services to the contractor. It sought only to protect its own interest."); *Shipe v. Chesapeake Bay Fishing Parties, Inc.*, 940 F. Supp. 130, 134 (D. Md. 1996) ("if the actor undertook his activity for entirely self-serving purposes, liability does not attach").

Other alleged undertakings constitute only promises, with no affirmative actions taken. Compl. ¶ 7.3a-c, h. States have differing views on whether a promise, with no other action, may constitute an undertaking. *Compare Mixon v. Dobbs Houses, Inc.*, 254 S.E.2d 864, 866 (Ga. Ct. App. 1979), *and Bourgonje v. Machev*, 841 N.E.2d 96, 107 (Ill. App. Ct. 2005) (promise alone actionable) *with White v. Sabatino*, 415 F. Supp. 2d 1163, 1177 (D. Haw. 2006), *and McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 743 (M.D.N.C. 2016) (requiring some

---

[24] Comment c to the Third Restatement Section 43 incorporates comment d of Section 42.

affirmative action). Maine, of course, has taken no position, since it has not recognized such a cause of action in the first place.

Even if the acts alleged by Plaintiffs constitute an undertaking, Plaintiffs have not alleged facts that demonstrate any of the three conditions. First, Plaintiffs have not alleged, in any way, that the United States undertook to perform a duty owed to the Plaintiffs by another.

Second, the allegations do not demonstrate that the Army increased any risk of harm that may have already existed. To satisfy this element, a plaintiff must show that the risk to the plaintiffs was increased "beyond that which existed without the undertaking." Restatement (Third) of Torts § 43. Failures to act (or failing to convince others to act) do not increase the harm but simply leave an existing danger in place. *See Zabala Clemente v. United States*, 567 F.2d 1140, 1145 (1st Cir. 1977) ("the failure to inspect in no way added to the risk of injury to the passengers or crew"); *Rawson v. United Steelworkers of Am.*, 726 P.2d 742, 746 (Idaho 1986) ("the Union's alleged failure to inspect, warn and make safe did not increase the danger to the miners beyond that under which they were operating"); *Sheridan II*, 969 F.2d at 74-75 ("Plaintiffs suffered no greater risk of harm . . . from a serviceman such as Carr because of the gratuitous promulgation of the regulations and their breach than if the United States had never promulgated such regulations in the first instance."); *Toomer v. United State*s, 615 F.3d 1233, 1239 (9th Cir. 2010) ("we must compare the risk of harm to Little that existed on the night of the shooting with the risk that would have existed had the United States provided no security services at Club Metro, not with the risk that would have existed had the United States provided reasonably competent security service"). The only allegation of *increased* risk of harm caused by the Army is that "the decision of the United States to forcibly hospitalize Card exacerbated Card's paranoia, resentment and anger, such that it actively increased the risks posed by Card

41

following his discharge back into the community." Compl. ¶ 7.5.  However, there are no plausible allegations in the Complaint that support the claim that the hospitalization worsened Card's mental state and made it more likely that he would commit a mass shooting, let alone a mass shooting at the precise locations where Plaintiffs happened to be.  At most, the hospitalization would have caused Card to turn his ire toward his unit chain of command, not a bowling alley and bar.  *See* Compl. ¶ 5.60 (letter from unit first sergeant reporting that Card "said he was going to get 'them.'  Since the commander and I are the ones who had him committed we are the 'them.'").

Third, Plaintiffs do not plausibly allege that they suffered harm because of reliance upon any undertaking by federal employees.  Plaintiffs allege vaguely that "[o]thers, including the Card family, fellow Army reserve Soldiers, local law enforcement, and those within the community . . . relied upon the United States' undertaking, and based upon such reliance, forewent other avenues or opportunities to investigate, manage, and mitigate the dangers presented by Card."  Compl. ¶ 7.6.  Mere recitation of the elements of tort do not suffice,[25] and there are no allegations in the Complaint to support the assertion that these persons forewent any specific action to remove Card's weapons or to remove him from the community on the belief that the Army chain of command was doing so.  On the contrary, the letter from the unit first sergeant to the local law enforcement clearly made law enforcement aware that Card was at risk for violence and that he retained his personal firearms.  Compl. ¶ 5.60.  Likewise, the Maine Report shows that in June and July 2023 Card's family was reaching out to the Army and others

---

[25] Here, this allegation is simply a paraphrasing of the reliance elements in the Restatement.  *See* Restatement (Second) of Torts § 324A cmt. e (reliance requires that someone "forgo other remedies or precautions against such a risk"); *see also Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) ("the reliance must have been detrimental").

to seek help for Card.  *See* Maine Report at 10 (attached at Exhibit K).  As of September 17,

2023, Card's family was aware that his firearms had not been removed and that law enforcement

was concerned a psychiatric evaluation might be needed.  *See* Maine Report at 22-23 (Ex. K).

There is no allegation that any specific actions that would have prevented the shootings were

forewent based on any statements by Card's chain of command.  Further, reliance cannot be

established when, as here, Plaintiffs do not allege that they were even aware of any supposed

undertakings by Card's chain of command.  *See, e.g.*, *Turner v. United States*, 736 F.3d 274, 281

(4th Cir. 2013) (noting that the victims of a boating accident "never spoke with the Coast Guard,

and so could not have relied on representations by the USCG."); *Patentas v. United States*, 687

F.2d 707, 717 (3d Cir. 1982) (explaining that the appellants did not rely on a Coast Guard

inspection to prevent an explosion when they were unaware the inspection had occurred).

### B.  Plaintiffs' Negligence Claims Fail for Lack of Duty (Counts B, C, D, E, F, G, H, I, J, and K).

Plaintiffs' causes of action at Counts B, C, D, E, F, G, H, I, J, and K assert negligence

claims.  In Maine, "a plaintiff who brings a cause of action for negligence must establish a *prima*

*facie* case that the defendant owed him a duty of care, the defendant breached that duty, and the

breach was a proximate cause of some injury to the plaintiff."  *Est. of Cilley v. Lane*, 985 A.2d

481, 485 (Me. 2009).  Plaintiffs' allegations, taken on their face, do not establish a *prima facie*

case that the United States owed them a duty of care.  For this reason alone, each of Plaintiffs'

negligence claims must be dismissed.[26]

---

[26] Each of Plaintiffs' negligence claims must also be dismissed for lack of proximate causation, as established *infra*.  This motion then proceeds to set forth additional reasons why each claim should be dismissed, addressing each claim separately.

The fundamental assertion underlying all of Plaintiffs' negligence claims, regardless of how labeled, is that the United States had a duty to protect them from Robert Card.  *See* Compl. ¶ 1.1 (asserting that the "mass shooting . . . could and should have been stopped by the United States Army").  As a threshold matter, Plaintiffs' negligence claims rest almost entirely on the alleged failures to follow Army regulations and policies, but such federal sources alone cannot establish the existence of a duty in an FTCA action.  *See Zabala Clemente*, 567 F.2d at 1149 ("[E]ven where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability."); *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997) ("What is necessary is some relationship between the governmental employee[s] and the plaintiff to which state law would attach a duty of care in purely private circumstances" (citation and internal quotation marks omitted)).

Furthermore, Maine courts have repeatedly found that "[t]here does not exist a general obligation to protect others from harm not created by the actor."  *Bryan R. v. Watchtower Bible & Tract Soc. of New York, Inc.*, 738 A.2d 839, 844 (Me. 1999); *see also Est. of Cilley*, 985 A.2d at 485; *Belyea v. Shiretown Motor Inn, LP*, 2 A.3d 276, 279 (Me. 2010); *Page v. Amtrak, Inc.*, 168 F. Supp. 3d 337, 342 (D. Me. 2016).  "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  *Bryan R.*, 738 A.2d at 844.

Maine courts recognize two potential exceptions to this general rule: "An actor has a duty to protect those with whom he stands in a special relationship and those facing harm created by the actor."  *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 11 A.3d 308, 313 (Me. 2011).  Neither are applicable here.

There are no allegations here that the Army stood in a special relationship with the Plaintiffs, nor could any such allegations plausibly be made. As to the creation of harm, in Count B Plaintiffs allege the United States "owed a legal duty to those within the foreseeable zone of risk created by the conduct of the United States relating to its handling of Card." Compl. ¶ 7.10. But mere recitations of the elements of a claim do not suffice, and the allegations of the Army's failures do not demonstrate that the Army actually *created* the harm faced by Plaintiffs. At most, these alleged failures were mere failures to mitigate an already existing risk stemming from Card's own mental illness, which, by their very nature, are not affirmative acts that created a risk.[27]

Plaintiffs speculate that Card's mental decline may have been caused by his exposure to blast explosions throughout his Army service but fall short of explicitly alleging that the Army created the harm to Plaintiffs through Card's blast exposures that were incidental to his service. *See* Compl. ¶¶ 4.12-4.15, 5.5-5.8, 6.17-6.18. Even if they did so, such a duty should not be imposed here given the public policy implications of doing so and the lack of foreseeability.[28] *See Cluney v. Brownells, Inc.*, 777 F. Supp. 3d 1, 14 (D. Me. 2025) ("When deciding whether the law imposes a duty in a specific context, the Law Court looks to both factual foreseeability and considerations of public policy.") (citing *Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992)).

An assertion that the United States had a legal duty to Plaintiffs because aspects of Card's military service created their harm or risk of harm has serious public policy implications. In September 2025, there were approximately 1.8 million servicemembers (*see* Defense Manpower

---

[27] As previously summarized, Plaintiffs allege Card's chain of command failed to take actions to address Card's mental health between July 2022 and July 2023; failed to reasonably follow up on medical recommendations, orders, and Army directives after Card's hospitalization; failed to prevent Card's access to firearms; failed to follow various Army regulations; and failed to adequately communicate with law enforcement in September 2023.

[28] As already discussed *supra*, claims based upon any duty to monitor and address supposed mental decline resulting from blast exposures would also be barred by the discretionary function exception to the FTCA.

Data Center, *DoD Personnel, Workforce Reports & Publications*, DoD Data/Reports,

https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports (last visited Feb. 5,

2026)), and millions more veterans.  Plaintiffs' argument would mean that the Army has a legal

duty to anyone who may be harmed by a current or former servicemember who developed a

mental illness as a result of their service, even if the specific mental illness issue was unknown to

the servicemember or to the Army.  The Maine Supreme Court has noted that "one of the primary

reasons for limiting duties in cases of nonfeasance is the potential for boundless liability." *Est. of*

*Cilley*, 985 A.2d at 489.  The creation of a duty based on activities performed by Card pursuant

to his military service could give rise to unending liability for the United States in relation to the

conduct of current or former servicemembers.

Further, as both this Court and the Maine Supreme Judicial Court have recognized,

foreseeability alone cannot establish a duty, especially when, as here, the theory of foreseeability

is especially attenuated.  *See Gniadek,* 11 A.3d at 312 (refusing to adopt Restatement (Second) of

Torts § 302B cmt. e(D), and holding that risk of assault was not foreseeable); *Baker v. Goodman*,

442 F. Supp. 3d 366, 375 (D. Me. 2020) (noting that Maine courts have rejected a "pure

foreseeability" test to find a legal duty).  Plaintiffs allege that the Army has researched potential

mental and emotion impacts of repeated blast exposures, *see* Compl. ¶ 4.15, as well as the

general stressors of military service, *see* Compl. ¶ 4.2.  But Plaintiffs do not allege that any

particular person in the Army was aware that Card was suffering from mental decline specifically

because of blast exposures (let alone one who was in a position requiring him or her to take any

particular action), or that any such person should have foreseen the particular mass shooting at

issue here was likely to occur *because of* these blast exposures.

For these reasons, no duty was owed to Plaintiffs under Maine law.  Their negligence claims therefore must be dismissed.

### C.  Plaintiffs' Negligence Claims Fail for Lack of Causation (Causes of Action B, C, D, E, F, G, H, I, J, and K).

To make a *prima facie* claim of negligence, Plaintiffs must demonstrate not only a breach of a duty of care, but also that the breach proximately caused their injuries.  *Crowe v. Shaw*, 755 A.2d 509, 512 (Me. 2000).  Thus, a plaintiff must establish that "the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence." *Id.*  "The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment."  *Id.*  When deciding whether alleged breaches were the proximate cause of the injuries, a court is permitted "to consider its own judicial experience and common sense[.]").  *Linke*, 2015 WL 12743613, at *4 (in case involving acts of violence by a servicemember, the court held that the alleged failures to follow various Army regulations and policies were "too attenuated to constitute the cause-in-fact element necessary to achieve proximate causation.").

Here, it is purely speculative that any of the alleged failures by the Army could have prevented the shooting, as each proposed action or intervention would have required multiple subsequent discretionary actions of additional parties, all of which would have had to occur in a timeframe soon enough to prevent the shooting.  For example, interventions before July 2023 might not have resulted in the Army Reserve command directing Card to obtain medical treatment – or might have led to the same result as the command-directed evaluation that occurred in July 2023.  How additional or different medical care would have affected Card is

completely unknown—had such medical care even been possible, as Card had petitioned for release from Four Winds. Compl. ¶ 5.45. Additional follow-up on medical recommendations and attempts at monitoring were unlikely to be effective, as Card did not respond to the efforts that were made. Compl. ¶¶ 5.55-5.56. Removing Card's firearms under Maine's Yellow Flag Law required the intervention of a court, *see* Compl. ¶ 6.33, and a court might have ruled in Card's favor. Plaintiffs do not plausibly allege otherwise. Plaintiffs do not point to any other mechanism by which Card's firearms could have been removed, and, as already discussed, the Army has no authority to remove a reserve soldier's privately-owned weapons.

Plaintiffs also allege negligence claims based on the Army's failure to properly investigate Card's mental condition following his hospitalization, the failure to report Card to NICS, and the failure to report Card under the New York SAFE Act. *See* Compl. ¶¶ 7.34-7.60, 7.61-7.77, and 7.78-7.94. Plaintiffs, however, do not plausibly allege that any of these alleged failures proximately caused the shooting.

### 1. Plaintiffs' Allegations do not Establish Proximate Cause Between Any Failure to Conduct a Line of Duty Investigation or Issuing a Report to NICS and the Alleged Harm.

First, Plaintiffs contend that a Line of Duty investigation and review by a Medical Evaluation Board were required, and that had these been done, the Board would have determined Card to be a danger to himself and others. *See* Compl. ¶¶ 7.34-7.60. Such a finding, Plaintiffs surmise, would then have prohibited Card from possessing firearms under the Gun Control Act, 18 U.S.C. § 922(g)(4), and would require Card to be reported to the FBI NICS. As demonstrated below, the causal chain between a Line of Duty investigation, a potential NICS report, and the shooting at issue here is too attenuated to establish proximate cause under Maine law.

The Army regulation relating to the process for initiating a Line of Duty investigation has been summarized *supra*. Also relevant here is that if a commander decides to initiate a Line of

Duty investigation, informal investigations are to be completed within 60 days, while formal

investigations do not have a deadline for completion. *See* Army Regulation 600-8-4 ¶ 3-2 (Ex.

D). A Line of Duty investigation does not require review by a medical evaluation board. *Id.*

The Disability Evaluation System ("DES") sets a goal for the Department of Defense and

the Department of Veterans Affairs to complete 80 percent of all service member cases in no

more than 180 days from the date of referral to the DES. *See* DODI 1332.18 ¶ 1.2(g) (Ex. E).

The DES process includes a medical evaluation, including a review by a Medical Evaluation

Board ("MEB"), which is responsible for reviewing medical evidence and documenting any

medical conditions that may prevent a service member from "reasonably performing the duties

of their office, grade, rank, or rating." *Id.* ¶¶ 3.1, 3.2(a)(1). The MEB also determines if any of

the conditions warrant a referral to a Physical Evaluation Board ("PEB"). *Id.* ¶ 3.2(f). If the

soldier has a behavioral health diagnosis, the MEB provider must indicate whether the soldier is

medically competent for pay purposes, capable of understanding and cooperating with PEB

proceedings, and dangerous to themselves or others. Army Regulation 635-40 ¶ 4-12(b)(8)

(attached in part at Exhibit L). The MEB then recommends either that the case file be forwarded

to a PEB for a fitness determination if the medical conditions do not meet medical retention

standards, or recommends that the soldier be returned to duty, either fully or with limitations. *Id.*

¶ 4-12(f). After the MEB decision, the soldier may request an impartial medical review or seek

rebuttal of the MEB findings, and they are permitted to seek legal counsel with respect to either

option. *Id.* ¶ 4-13(a). Following these steps, the matter is referred to a PEB.

A formal PEB provides a "full and fair hearing" before a service member is separated or

retired for physical disability. DODI 1332.18 ¶ 3.3(c)(1)(a) (Ex. E). The PEB record of

proceedings documents the determination of fitness or unfitness; whether and why a condition is

compensable; the nature, stability and permanency of a disability for members being temporarily or permanently retired; administrative determinations; and a record of the proceedings. *Id.* ¶ 3.3(f). The regulations do not include time limitations for these proceedings, other than a goal of 180 days from referral.

As can be seen by this lengthy and multi-step matrix of processes, Plaintiffs clearly cannot show proximate causation between Army personnel's failure to refer Card for a Line of Duty investigation or to the disability evaluation system, and the shooting. As an initial matter, Plaintiffs argue that "had the Army followed proper command procedures, it would have first learned of Card's 'injury' in March 2023 and was affirmatively on notice of it by May 2023." Compl. ¶ 7.42. However, the Line of Duty investigation is only done when "the Soldier experiences a loss of duty time for a period of more than 24 hours." Army Regulation 600-8-4 ¶ 2-2(a) (Ex. D). There are no allegations that Card experienced a loss of duty time greater than 24 hours prior to July 2023, when he was admitted to Four Winds. Compl. ¶¶ 5.12, 5.19.

Plaintiffs also allege that "the Army was required to begin the investigation within five days of discovering Card's mental illness" and that "such investigation would likely have been initiated – and completed – while Card remained under active-duty orders and hospitalized." Compl. ¶¶ 7.47-7.48. There are no facts alleged to plausibly support the claim that a Line of Duty investigation would have been completed during the approximately three weeks that Card was hospitalized, much less that an MEB would have been completed in the same time frame.

Even if each event had occurred as Plaintiffs allege—the Line of Duty investigation, an investigation and finding by the MEB that Card was a danger to himself or others,[29] a report to

---

[29] Additionally, there is no legal support for an argument that an MEB is the type of body that can adjudicate whether someone is a "mental defective" within the meaning of 18 U.S.C. § 922(g)(4), *see* 27 C.F.R. § 478.11, *see also infra.*

NICS—there is nothing to suggest that all of these steps would have been completed prior to the shooting.  And, even if all the steps had occurred quickly, Plaintiffs fail to allege how a report to NICS would have divested Card of his personally owned firearms.  NICS is used by firearms dealers to search the backgrounds of prospective gun purchasers for information that would disqualify them from purchase.  *See Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000); Pub. L. No. 103-159, § 103(b), 107 Stat. 1541, now codified at 34 U.S.C. § 40901(b) (formerly 18 U.S.C. § 922 note) ("Not later than 60 months after November 30, 1993, the Attorney General shall establish a national instant criminal background investigation system that any licensee may contact, by telephone, for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate section 922 of Title 18 or State law.").  There are three possible responses to a NICS request: "proceed," "delayed" or "denied."  28 C.F.R. § 25.6(c)(1)(iv)(A)-(C).  If the response to the request is "proceed," most of the information related to the transaction is destroyed after 24 hours; after 90 days the NICS system destroys all information related to the purchase, except for a transaction number.  28 C.F.R. § 25.9(b)(1)(iii).  If a person who purchased firearms later becomes prohibited, there is no information in NICS about their prior firearms purchases, and no means by which NICS would facilitate the removal of those weapons.

Here, Plaintiffs allege that Card had numerous firearms in May 2023.  Compl. ¶ 5.16.  He purchased the weapon used in the shooting in early July 2023.  Compl. ¶ 5.23.  He did not purchase any new weapons after his hospitalization.  Even if the numerous events had played out exactly as Plaintiffs alleged, and quickly enough that information was reported to NICS before the shooting, there was no mechanism by which Card's weapons would have been removed from his possession as a result of a Line of Duty investigation or an MEB evaluation initiated after

Card's hospitalization.  Such a long chain of events between the initiation of a Line of Duty investigation and a *potential* report to NICS—which would not have resulted in the removal of Card's weapons in any event—reflects that Plaintiffs' theory of liability would stretch the boundaries of proximate causation into the realm of pure speculation.  *Crowe*, 755 A.2d at 512.

### 2. Plaintiffs' Claims Relating to New York's SAFE Act Fail for Lack of Proximate Cause.

Plaintiffs also assert that the Army was negligent in failing to file a report under New York's Secure Ammunition and Firearms Enforcement Act ("SAFE Act"), N.Y. Mental Hygiene Law § 9.46.  Compl. ¶ 7.78.  According to Plaintiffs, the filing of a SAFE Act report would have led to "one or more of the following: (a) reporting of Card to the FBI's National Instant Criminal Background Check System (NICS); (b) communication of Card's "prohibited person" status to Federal and local law enforcement; (c) prohibitions against the purchase of firearms and ammunition at the point of sale; and (d) mandate for search of Card's residence and seizure of his firearms."  Compl. ¶ 7.85.  Plaintiffs then conclude that the failure to report Card under the SAFE Act was a "substantial contributing factor" that led to the shooting.  Compl. ¶ 7.86.

The provisions of the SAFE Act on their face make clear that a report would not have resulted in any of the consequences theorized by Plaintiffs.  The SAFE Act requires that "when a mental health professional currently providing treatment services to a person determines, in the exercise of reasonable professional judgment, that such person is likely to engage in conduct that would result in serious harm to self or others," that professional must report "to the director of community services, or the director's designee, who shall report to the division of criminal justice services whenever he or she agrees that the person is likely to engage in such conduct."  N.Y. Mental Hygiene Law § 9.46(b).  The information reported may include only "names and other non-clinical identifying information," which may only be used "for determining whether a

license issued pursuant to section 400.00 of the penal law should be suspended or revoked, or for determining whether a person is ineligible for a license issued pursuant to section 400.00 of the penal law, or is no longer permitted under state or federal law to possess a firearm." *Id.* Section 400 of the N.Y. Penal Law involves licensing for firearm possession. There is no mechanism in the SAFE Act for the removal of weapons.

Card lived in Maine, and there is no allegation that Card had been issued a license to own a firearm in New York. There are no provisions in the SAFE Act for conveying a report to law enforcement in another state or permitting the report to be used to mandate a search and seizure of weapons in another state. Further, as established *infra*, Card was still permitted to possess firearms under 18 U.S.C. § 922(g)(4), as he was neither committed nor adjudicated as a "mental defective." Thus, even if Card's medical providers filed a report under the SAFE Act, there was no legal mechanism in place that would have resulted in his firearms being confiscated. For these reasons, Plaintiffs' negligence claims in Counts E, F, and G should be dismissed because Plaintiffs fail to establish a proximate causal link between the actions they allege Army personnel should have taken and the alleged harms arising out of the shooting.

### D. Plaintiffs Have Not Established a Claim for Negligence in Responding to Danger Within the Foreseeable Zone of Risk (Count B).

The cause of action for Negligence in Responding to Danger Within the Foreseeable Zone of Risk is based on the putative duty "to those within the foreseeable zone of risk created by the conduct of the United States relating to its handling of Card." Compl. ¶ 7.10. This is not a cause of action recognized by the Maine courts. While litigants have argued (unsuccessfully, *see infra*) that the zone of danger rule should permit recovery to a bystander, there is no freestanding cause of action for injuries where the duty is based solely on foreseeability. Indeed, the proposition that foreseeability alone is sufficient to create a legal duty has been rejected by

53

the Maine courts.  *See Baker*, 442 F. Supp. 3d at 375 (citing *Cameron*, 610 A.2d at 282).

Accordingly, the Court should dismiss Count B.

### E.    Plaintiffs Have Not Established a Cause of Action for Negligence of the United States in Violating Its Own Commitments, Orders, and Conditions of Card's Release Back into the Community (Count C).

Plaintiffs assert a cause of action based on the Army failing to take certain actions

following Card's release, based either on the recommendations of his medical providers or Army

policy.  *See* Compl. ¶¶ 7.16-7.23.  This cause of action appears redundant in many respects to

Counts A and B, both of which allege failures to follow medical recommendations, orders, and

Army directives following Card's hospitalization.  *See* Compl. ¶¶ 7.4(e), 7.12(e).  Furthermore,

as already noted, Army policies are not a basis to impose a legal duty on the United States to

Plaintiffs.  For the same reasons, the medical recommendations by Card's providers, even if

interpreted as military orders, likewise do not impose a legal duty on the United States to

Plaintiffs.  *See also Zabala Clemente*, 567 F.2d at 1144 (internal communications and orders

within the government do not create legal duties).

### F.    Plaintiffs Have Not Established a Cause of Action for Negligent Care, Treatment, Discharge, Follow Up, and Failure to Warn (Count D).

Plaintiffs assert that the United States, by recognizing Card's mental condition, "assumed

responsibility for Card's medical care and treatment, including decisions regarding admission,

discharge and follow up to Card's hospital admission and the need to warn those in the

community of the risks posed by Card."  Compl. ¶ 7.28.  Thus, Plaintiffs argue, "the United

States had a duty to provide Card with medical care, treatment, admission, discharge, follow up

and warnings that were reasonable under the circumstances and consistent with accepted

standards of medical and psychiatric care."  Compl. ¶ 7.29.  Plaintiffs allege that the United

States breached that duty in several ways, including permitting Card to be discharged from care,

54

failing to follow up with him after his discharge, and failing to perform certain testing to determine a physical cause for his condition. *See* Compl. ¶ 7.30.

It is unclear whether Plaintiffs are alleging a cause of action for failure to warn pursuant to *Tarasoff v. Regents of Univ. of Cal.*, 551 P.2d 334 (Cal. 1976).[30]  Maine has not adopted *Tarasoff* or its analysis.  In any event, Plaintiffs have not alleged that they constituted "specific, foreseeable, and identifiable" victims of Card's threats.  While they allege that Card had a "hit list," there are no allegations that any of the Plaintiffs, or even the locations of the shootings, were on that list.  *Tarasoff* and its progeny, therefore, cannot be the basis for liability here.

To the extent Plaintiffs contend that medical or mental health caregivers owe a duty of care to third persons who are injured by patients who have been subject to negligent medical treatment, this theory fails too because the Supreme Judicial Court of Maine has rejected a general duty of care to third persons who may foreseeably be injured by a medical provider's negligence.  *See Flanders v. Cooper*, 706 A.2d 589, 590 (Me. 1998) (rejecting this claim because the proposed duty "might restrict the treatment choices of health care professionals, and hence it would intrude directly on the professional-patient relationship").  The same is true here. Plaintiffs allege that the Army was negligent in making decisions relating to Card's treatment, discharge, and follow-up care.  These decisions go to the core of the relationship between a patient and his health care provider, and finding a duty to a third party might limit treatment choices.  Accordingly, the Maine courts would not recognize a duty in this situation, and this cause of action must be dismissed.

---

[30] In *Tarasoff* and similar cases, "courts have recognized that an actor may have a duty to warn third parties of the dangerous propensities of another when the actor has a special relationship with the dangerous person and the person threatened is a specific, foreseeable, and identifiable victim of the dangerous person's threats." *Bryan R.*, 738 A.2d at 844 n.5 (citing cases).

### G.  Plaintiffs Have Not Established a Cause of Action for Failure to Report Card to the FBI Background Search Database (Count F).

Plaintiffs assert that "Card was committed to a mental institution within the meaning of the Gun Control Act and, therefore, should have been reported as a person prohibited from purchasing or possessing firearms."  Compl. ¶ 7.64.  Plaintiffs argue that "Army personnel compelled Card under duress and threat of sanctions to go to the hospital and to be admitted as an inpatient at a mental institution," Compl. ¶ 7.65, and assert that, based on the "conditions of duress under which Card was admitted to the psychiatric hospital [and] the fact that he was compelled to be there by an Army order, his confinement there is a 'commitment' within the meaning of the Gun Control Act."  Compl. ¶ 7.71.

The Gun Control Act of 1968, as amended, makes it unlawful for any person to knowingly transfer a firearm to certain classes of individuals, and also makes it unlawful for such individuals to receive a firearm.  *See* 18 U.S.C. § 922(d), (g) & (n).  Individuals prohibited by the statute from receiving a firearm include anyone who has been adjudicated a "mental defective" or committed to any mental institution.  *Id.* § 922(g)(4)).  Following the Supreme Court's ruling in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the federal courts, including the First Circuit, have re-examined what constitutes a "commitment" under section 922(g)(4).  *United States v. Rehlander*, 666 F.3d 45, 46 (1st Cir. 2012).  Because *Heller* established a qualified constitutional right to possess arms, the First Circuit found that "to work a permanent or prolonged loss of a constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required."  *Id.* at 48.  In the interests of constitutional avoidance, the court held that section 922(g)(4) "should not be read to encompass a temporary hospitalization attended only by [] ex parte procedures."  *Id.* at 49.  Further, the Court of Appeals rejected the argument that a voluntary extension of an involuntary temporary

56

hospitalization confirmed a mental illness, stating "[s]uch voluntary hospitalizations do not qualify as "commitments." *Id.* at 50; *see also* 27 C.F.R. § 478.11 ("[T]he term [committed to a mental institution] does not include a person . . . a voluntary admission to a mental institution.").

Notwithstanding the circumstances surrounding Card's hospitalization, ultimately he agreed to it. *See* Maine Report at 14 (Ex. K) and Compl. ¶ 5.45. Moreover, Card was never subjected to an "adjudicatory hearing" with "a right to offer and test evidence" before or after his admission to Four Winds. *See* Compl. ¶ 5.45. Accordingly, Card was never "committed to a mental institution" within the meaning of the Gun Control Act.

In sum, not only can federal statutes not supply the duty in a cause of action under the FTCA, here the particular statute relied on by Plaintiffs was not breached. And, as established above, even if it had been, such a breach could not have been the proximate cause of Plaintiffs' injuries because there is no mechanism by which the guns he already owned would have been removed from his possession even if he had been reported to NICS.

### H. Plaintiffs Have Not Established Causes of Action for Negligent Training (Count H) or Negligent Supervision (Count I).

Plaintiffs assert that the Army was negligent in training its personnel with respect to: servicemembers with mental health issues who express violent ideation and threaten mass shootings; identifying and managing signs and symptoms of brain injuries; and the operational requirements of reporting to the FBI NICS system. The United States is unaware of any case law in Maine recognizing a cause of action for negligent training.

Plaintiffs also assert that the Army had a duty to reasonably supervise employees to ensure policies, procedures, and federal law were followed, and that the failure of the United States to supervise its personnel was a substantial contributing factor in the shooting at issue here. *See* Compl. ¶¶ 7.95-7.98. Maine recognizes the tort of negligent supervision only in

57

limited circumstances, namely where the plaintiff has a "special relationship with a defendant in accordance with section 315(b) of the Restatement (Second) of Torts." *Dragomir v. Spring Harbor Hosp.*, 970 A.2d 310, 315 (Me. 2009) (quoting *Fortin v. The Roman Cath. Bishop of Portland*, 871 A.2d 1208, 1222 (Me. 2005)); *see also Doe v. Missionary Oblates of Mary Immaculate E. Province*, 761 F. Supp. 3d 218, 223 (D. Me. 2025). Plaintiffs here have not alleged facts that would suggest any kind of special relationship between themselves and the United States. Without a special relationship, Plaintiffs do not have a cause of action for negligent supervision under Maine law.

## I.    Plaintiffs Have Not Established a Cause of Action for Negligent Infliction of Emotional Distress (Bystander Claims) (Count J).

The "Group 3" Plaintiffs are alleged to have been "at the bowling alley or bar with a family member(s) or close relation(s) and contemporaneously perceived the mass shooting while a family member(s) or close relation(s) was present." Compl. ¶ 7.101. Plaintiffs further assert that "[t]he Plaintiffs in Group 3 suffered severe emotional distress from watching a family member(s) or close relation(s) suffer injuries; from watching a family member(s) or close relation(s) suffer the threat of serious injury; and/or from knowing a family member(s) or close relation(s) was in danger of serious injury." Compl. ¶ 7.102. While the Plaintiffs in Group 3 are named, Compl. ¶ 2.5, none of these Plaintiffs provide the name, familial relationship, or injuries allegedly suffered by their family members or relations.

The Maine Supreme Judicial Court recognizes a cause of action for negligent infliction of emotional distress ("NIED") where a bystander has "serious mental distress foreseeably resulting from witnessing another person harmed by the tortfeasor's negligent act." *Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433, 438 (Me. 1982); *see also Cameron*, 610 A.2d at 284-85 (to recover NIED on a bystander theory "a plaintiff must demonstrate that he i) was present at the

58

scene of the accident, ii) suffered serious mental distress as a result of contemporaneously

perceiving the accident, and iii) was closely related to the victim."). "The psychic injury may be

deemed foreseeable when the plaintiff bystander was present at the scene of the accident,

suffered mental distress as a result of observing the accident and ensuing danger to the victim,

and was closely related to the victim." *Id.*; *see also Coward v. Gagne & Son Concrete Blocks,*

*Inc.*, 238 A.3d 254, 266 (Me. 2020) (holding that the bystander may recover if they heard the

accident and saw the injury to a close relative in the immediate aftermath).

The case law does not provide a cause of action where the family member "suffer[ed] the

threat of serious injury" or "was in danger of serious injury." Compl. ¶ 7.102. Rather, the cases

require that the direct victim was actually injured. *See, e.g.*, *Culbert*, 444 A.2d 433 (mother

watched her child choking); *Coward*, 238 A.3d 254 (Plaintiff's son observed "lying face

down . . . with blood coming in and out of his mouth" and later died). Further, the direct victim

must be closely related to the victim. While Plaintiffs have generally alleged that their family

members or close relations suffered injuries, they have not provided the names of or their

relationships to the direct victims. The Court thus cannot determine if the criteria for an NIED

claim is met. Accordingly, all causes of action asserted by the Group 3 Plaintiffs should be

dismissed.

**J. Plaintiffs Have Not Established a Cause of Action for Negligent Infliction of Emotional Distress (Zone of Danger) (Count K).**

The "Group 4" of Plaintiffs assert that they were "at the bowling alley or bar and,

although not physically injured, were directly in danger of immediate and serious bodily harm,

including death," and that as a result they "experienced severe emotional distress and harm."

Compl. ¶¶ 7.107, 7.109. Maine has rejected the "zone of danger" rule for claims of negligent

infliction of emotional distress. *See Culbert*, 444 A.2d at 436 (adopting three part rule of *Dillon*

*v. Legg*, 441 P.2d 912 (Cal. 1968) over zone of danger rule); *Curtis v. Porter*, 784 A.2d 18, 25 (Me. 2001) (recognizing "a duty to act reasonably to avoid emotional harm to others in very limited circumstances," namely "liability actions" and "circumstances in which a special relationship exists between the actor and the person emotionally harmed."). The Group 4 Plaintiffs have not alleged plausible claims for negligent infliction of emotional distress under the limited circumstances described in *Culbert* or *Curtis*. Accordingly, this cause of action, and all causes of action asserted by the "Group 4" Plaintiffs, must be dismissed.

**K. Plaintiffs' Wrongful Death and Survival Claims Are Derivate of Their Other Claims (Counts L and M).**

Wrongful death claims and survival claims are essentially derivative claims, based on the same conduct that forms the basis for Plaintiffs' other claims. *See Ogden v. Berry*, 572 A.2d 1082, 1083 (Me. 1990). Therefore, these claims also must be dismissed for each and all of the reasons set forth above.

<u>**CONCLUSION**</u>

For the foregoing reasons, this action must be dismissed for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted.

Dated: February 5, 2026                    Respectfully Submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           JONATHAN D. GUYNN
                                           Deputy Assistant Attorney General,
                                           Torts Branch

                                           GRANT E. TREASTER
                                           Assistant Director, Torts Branch

                                           PHILIP D. MACWILLIAMS

Senior Trial Counsel, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-4285
phil.macwilliams@usdoj.gov

/s/ *Jocelyn Krieger*
JOCELYN KRIEGER
Trial Attorney, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-1679
jocelyn.krieger@usdoj.gov