Exhibit C to the United States' Motion to Dismiss

*Seal v. United States*, Case No. 2:25-cv-442 (D. Me.)

Army Regulation 600–20

Personnel-General

# Army Command Policy

Headquarters
Department of the Army
Washington, DC
24 July 2020

## UNCLASSIFIED

# SUMMARY of CHANGE

AR 600–20
Army Command Policy

This administrative revision, dated 30 July 2020—

o   Updates information (fig 2–5).

This major revision, dated 24 July 2020—

o   Adds reference to DoDI 1342.22 which now serves as the primary source of Family readiness policy guidance (title page).

o   Adds and/or updates responsibilities for the Assistant Secretary of the Army (Installations, Environment and Energy); Deputy Chief of Staff, G–9; Commanding General, U.S. Army Materiel Command; and the Commanding General, U.S. Army Installation Management Command (paras 1–4b, 1–4f, 2–5b, 5–2b, 7–5d).

o   Requires command leadership to treat Soldiers and Department of the Army Civilians with dignity and respect at all times (para 1–6c).

o   Clarifies the written abbreviation for the grade of "Specialist" (table 1–1, note 5).

o   Updates roles and responsibilities for command of installations (para 2–5b).

o   Clarifies policy on assumptions of command during the temporary absence of the commander (paras 2–9a(3), 2–9d, 2–10, and 2–12).

o   Adds policy for command of installations, activities, and units on Joint bases (para 2–6).

o   Clarifies policy on the role of the reviewing commander regarding designation of junior in the same grade to command (para 2–8c).

o   Adds and/or updates the Army's Ready and Resilient efforts in the following manner: Defines Ready and Resilient Strategic Objectives; modifies the Ready and Resilient Governance Structure; and realigns responsibilities (chap 3).

o   Clarifies military authority for corrective training (para 4–6).

o   Adds policy that commanders will notify the provost marshal office (Director of Emergency Services) or provost marshal of military protective orders involving Soldiers (para 4–7e).

o   Adds policy regarding commander's actions toward deserters (para 4–7f).

o   Adds policy on extremist organizations, cyber activity, and social media (para 4–12h).

o   Clarifies that fraternization policy does not apply to married persons (para 4–14c(2)(a)).

o   Incorporates DoDI 1304.33 and Army Directive 2016–17, Protecting Against Prohibited Relations During Recruiting and Entry-Level Training, which prohibits relationships between recruiters and recruits, and trainers and trainees (para 4–15).

o  Adds online misconduct to harassment (hazing, bullying, or discriminatory harassment) (para 4–19).

o  Clarifies the reporting, investigation, and data recording of harassment cases pursuant to DoDI 1020.03, Harassment and Prevention and Response in the Armed Forces (paras 4–19*c*).

o  Clarifies The Army Harassment Prevention and  Response Program (hazing, bullying, and discriminatory harassment) and incorporates Army Directive 2018–23, Improving the Effectiveness of Essential and Important Army Programs: Sexual Harassment/Assault Response and Prevention, Equal Opportunity, Suicide Prevention, Alcohol and Drug Abuse Prevention, and Resilience (paras 4–19, 6–10, chap 7).

o  Adds policy that Army individuals report harassment (hazing, bullying, and discriminatory harassment) to their commander/supervisor, the Military Equal Opportunity, or law enforcement (para 4–19*f*).

o  Adds policy that commanders notify Soldiers of requirements in the Domestic Violence Amendment to the Gun Control Act of 1968 (para 4–22*c*(2)).

o  Adds policy for command responsibility under the law of war (para 4–24).

o  Adds policy for personnel recovery and code of conduct training (para 4–25).

o  Adds policy for combating trafficking in persons (para 4–26).

o  Adds Department of the Army Civilian Expeditionary Workforce to the list of those who may need a Family care plan (para 5–3).

o  Adds policy on the assistance role of Family readiness services in developing Family care plans (para 5–3*r*).

o  Adds policy for command aspects of medical readiness and medical care (para 5–4).

o  Incorporates Army Directive 2015–43, Revised Breastfeeding and Lactation Support policy (para 5–5).

o  Incorporates Army Directives 2016–34, Processing Religious Accommodation Requests Requiring a Waiver to Army Uniform or Grooming Policy and Army Directive 2018–19, Approval, Disapproval, and Elevation of Requests for Religious Accommodation (para 5–6).

o  Adds policy on Better Opportunities for Single Soldiers (para 5–8).

o  Adds policy on the Soldier for Life Transition Assistance Program (SFL–TAP) for Soldiers and Department of the Army Civilians (para 5–9).

o  Updates policy on complaints or accusations against military personnel, in accordance with AR 20–1 (para 5–12).

o  Updates policy on the Military Whistleblower Protection Act, in accordance with 10 USC 1034 and DoDD 7050.06 (para 5–12).

o  Incorporates Army Directive 2014–20, Prohibition of Retaliation Against Soldiers for Reporting a Criminal Offense (para 5–13).

o  Clarifies policy on political activities as contained in DoDD 1344.10 (para 5–15 and app B).

o  Adds policy on the Insider Threat Program (para 5–18).

o  Adds policy on risk management (5–19).

o  Adds policy for operations security (para 5–20).

o    Adds policy for the Adoption Reimbursement Program (para 5–21).

o    Updates Army Military Equal Opportunity Policy (chap 6).

o    Incorporates Army Directive 2018–07–9, Prioritizing Efforts-Readiness and Lethality (Update 9) (chap 6).

o    Removes sexual harassment from the Military Equal Opportunity Program (formerly discussed in chap 6).

o    Updates policy on the Military Equal Opportunity and Harassment (hazing, bullying, or discriminatory harassment) Complaint Processing System (para 6–6).

o    Incorporates Army Directive 2019–20, Implement Army Heritage Month in the Military Equal Opportunity Program (para 6–10j(5)).

o    Adds policy on the Sexual Harassment/Assault Response and Prevention Program (chap 7).

o    Incorporates DoDI 5505.18, Investigation of Adult Sexual Assault in the Department of Defense, and DoDI 6495.02, Sexual Assault Prevention and Response (SAPR) Program Procedures, (para 7–2).

o    Adds Sexual Assault Incident Response Oversight Report requirements and incorporates DoDD 6495.01, Sexual Assault Prevention and Response (SAPR) Program, and DoD 6495.02, Sexual Assault Prevention and Response (SAPR) Program Procedures (para 7–2).

o    Incorporates Army Directive 2013–20, Assessing Officers and Noncommissioned Officers on Fostering Climates of Dignity and Respect and on Adhering to the Sexual Harassment/Assault Response and Prevention Program (para 7–5o(33)).

o    Incorporates Army Directive 2018–16, Suitability Criteria for Military Personnel in Specified Positions (paras 7–5n(1) and 7–5o(29)).

o    Prescribes DA Form 7746 (Sexual Harassment Complaint) and DA Form 7746–1 (Sexual Harassment Complaint Resolution Assessment) (paras 7–5y(3) and 7–8n(6)).

o    Incorporates Army Directive 2015–16, Command Engagement to Prevent Retaliation (para 7–8 and app H).

o    Adds policy on military equal opportunity professional staffing (app C).

o    Adds policy on military equal opportunity, training, and education (app D.)

o    Incorporates Army Directive 2013–29, Army Command Climate Assessments (app E).

o    Incorporates Army Directive 2018–07–6, Prioritizing Efforts—Readiness and Lethality (Update 6) (app E).

o    Updates policy on the Sexual Assault Review Board for unrestricted reports of sexual assault (app F).

o    Adds Department of Defense Sexual Assault Advocate Certification Program requirements (app G).

o    Incorporates Army Directive 2011–19, Expedite Transfer or Reassignment Procedures for Victims of Sexual Assault (para 7–5 and app I).

o    Adds commander's critical information requirement(s) (app J).

o    Updates confidentiality guidelines for restricted/unrestricted reporting (app L).

o    Adds inspector general activities in support of the commander (app O).

o   Incorporates DA Pam 600–26 (hereby superseded) (app Q).

o   Adds an internal control evaluation (app R).

o   Identifies a functional proponent for all command policies for which the Directorate of Military Personnel Policy, Deputy Chief of Staff, G–1 (DAPE–MPC) is not the primary subject matter expert (throughout).

o   Incorporates Army Directive 2013–17, Sexual Harassment/Assault Response and Prevention Program in Initial Military Training (throughout).

o   Incorporates Army Directive 2016–35, Army Policy on Military Service of Transgender Soldiers (throughout).

o   Incorporates Army Directive 2015–39, Inclusion of Sexual Orientation in the Military Equal Opportunity Program (throughout).

**Headquarters
Department of the Army
Washington, DC
24 July 2020**

**\*Army Regulation 600–20**

**Effective 24 July 2020**

Personnel-General

# Army Command Policy

By Order of the Secretary of the Army:

**JAMES C. MCCONVILLE**
*General, United States Army
Chief of Staff*

Official:

**KATHLEEN S. MILLER**
*Administrative Assistant
to the Secretary of the Army*

**History.** This publication is an administrative revision. The portions affected by this administrative revision are listed in the summary of change.

**Summary.** This regulation implements DoDI 1020.03, DoDI 1300.17, DoDI 1325.02, DoDI 1325.06; DoDI 1342.22; DoDI 5240.22, DoDI 5240.26, DoDI 5505.18; DoDI 6495.02; DoDI 6495.03, DoDD 1350.2, DoDD 6495.01, DoDD 5205.16 and DoDD 7050.06. Also, it prescribes the policy and responsibility of command, which include the Army Ready and Resilient Campaign Plan, military discipline and conduct, the Army Equal Opportunity Program, and the Army Sexual Harassment/Assault Response and Prevention Program. The 30-day advanced publication requirement has been waived because the revision implements previously published law, DoD directives and instructions, and Army directives that need to be consolidated and communicated to the field as soon as possible.

**Applicability.** This regulation applies to the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to all assigned, attached, or operationally controlled U.S. Army Corrections Command personnel, and all Army Corrections System prisoners incarcerated in Army Corrections System facilities. Chapters 6 and 7 and appendix E apply to members of the Army National Guard of the United States when on active duty Title 10 orders, for 30 days or more. In all other cases, members of the Army National Guard are governed by regulations issued by the Chief, National Guard Bureau consistent with Chief, National Guard Bureau's authorities under 32 USC 110, 10 USC 10503, and DoDD 5105.77. It also applies where stated to Department of the Army Civilians. Portions of this regulation that prescribe specific conduct are punitive, and violations of these provisions may subject offenders to nonjudicial or judicial action under the Uniform Code of Military Justice. The equal opportunity terms found in the glossary are applicable only to uniformed personnel. AR 690–600 and AR 690–12 contains similar terms that are applicable to Department of the Army Civilians.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency in the grade of colonel or the civilian equivalent may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (app R).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Committee management.** AR 15–39 requires the proponent to justify establishing/continuing committee(s), coordinate draft publications, and coordinate changes in committee status with the Office of the Administrative Assistant to the Secretary of the Army, Department of the Army Committee Management Office (AARP–ZA), 105 Army Pentagon, Washington DC, 20310–0105. Further, if it is determined that an established "group" identified within this regulation later takes on the characteristics of a committee as found in AR 15–39, then the proponent will follow AR 15–39 requirements for establishing and continuing the group as a committee.

**Distribution.** This regulation is available in electronic media only and is intended for the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

\*This regulation supersedes AR 600-20, dated 6 November 2014; DA Pam 600-26, dated 23 May 1990. The following Army Directives rescind upon publication of this regulation; AD 2011-19, dated 3 October 2011; AD 2013-17, dated 22 July 2013; AD 2013-20, dated 27 September 2013; AD 2013-29, dated 23 December 2013; AD 2014-20, dated 19 June 2014; AD 2015-16, dated 4 March 2015; AD 2015-39, dated 14 October 2015; AD 2015-43, dated 10 November 2015; AD 2016-17, dated 22 June 2016; AD 2016-34, dated 6 October 2016; AD 2018-19, dated 8 November 2018; and AD 2019-20, dated 16 May 2019.

# UNCLASSIFIED

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References and forms • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Records management (recordkeeping) requirements • 1–5, *page 2*
Command • 1–6, *page 2*
Military grade and rank • 1–7, *page 3*
Precedence between Soldiers and other Service Members serving with the Army • 1–8, *page 7*
Precedence between members of the Army and members of foreign military services serving with the
    Army • 1–9, *page 8*

**Chapter 2**
**Command Policies,** *page 8*
Chain of command • 2–1, *page 8*
Open door policies • 2–2, *page 8*
Performance counseling • 2–3, *page 8*
Staff or technical channels • 2–4, *page 9*
Command of installations, activities, and units • 2–5, *page 9*
Command of installations, activities, and units of Joint bases • 2–6, *page 16*
Specialty immaterial commands • 2–7, *page 20*
Designation of junior in the same grade to command • 2–8, *page 20*
Death, disability, retirement, reassignment, or absence of the commander • 2–9, *page 21*
Absence or disability of all officers of a unit • 2–10, *page 21*
Emergency command • 2–11, *page 22*
Functions of an individual in temporary command • 2–12, *page 22*
Responsibility of successor • 2–13, *page 22*
Separate commands of the Army serving together • 2–14, *page 22*
Separate commands of the several military services of the United States serving together • 2–15, *page 22*
Ineligibility for command of post or activity • 2–16, *page 22*
Restrictions • 2–17, *page 23*
Relief for cause • 2–18, *page 23*
Noncommissioned officer support channel • 2–19, *page 24*

**Chapter 3**
**Ready and Resilient,** *page 25*
General • 3–1, *page 25*
The Army Ready and Resilient strategic governance process • 3–2, *page 25*
Responsibilities • 3–3, *page 26*

**Chapter 4**
**Military Discipline and Conduct,** *page 27*
Military discipline • 4–1, *page 27*
Obedience to orders • 4–2, *page 27*
Military courtesy • 4–3, *page 27*
Soldier conduct • 4–4, *page 27*
Maintenance of order • 4–5, *page 28*
Exercising military authority • 4–6, *page 28*
Disciplinary powers of the commanding officer • 4–7, *page 28*
Settlement of local accounts on change of station • 4–8, *page 29*
Civil status of members of the U.S. Army Reserve • 4–9, *page 29*

Contents—Continued

Participation in support of civilian law-enforcement agencies • 4–10, *page 30*
Membership campaigns • 4–11, *page 30*
Extremist organizations and activities • 4–12, *page 30*
Army language policy • 4–13, *page 34*
Relationships between Soldiers of different grades • 4–14, *page 34*
Other prohibited relationships • 4–15, *page 35*
Fraternization • 4–16, *page 38*
Standards of conduct • 4–17, *page 38*
Employment and volunteer work of spouse • 4–18, *page 38*
The Army Harassment Prevention and Response Program (hazing, bullying, and discriminatory harassment) • 4–19, *page 39*
Informal funds • 4–20, *page 42*
Misuse of government travel charge cards • 4–21, *page 42*
Domestic Violence Amendment to the Gun Control Act of 1968 • 4–22, *page 43*
Self-reporting of criminal convictions by officers and senior enlisted members • 4–23, *page 46*
Command responsibility under the law of war • 4–24, *page 47*
Personnel recovery and code of conduct training • 4–25, *page 47*
Combating trafficking in persons • 4–26, *page 47*

**Chapter 5**
**Other Responsibilities of Command,** *page 48*
General • 5–1, *page 48*
Army Family readiness • 5–2, *page 48*
Family care plans • 5–3, *page 49*
Command aspects of medical readiness and medical care • 5–4, *page 54*
Breastfeeding and lactation support policy • 5–5, *page 57*
Accommodating religious practices • 5–6, *page 57*
Unit memorial ceremonies and services policy • 5–7, *page 60*
Better Opportunities for Single Soldiers • 5–8, *page 62*
Soldier for Life – Transition Assistance Program • 5–9, *page 62*
Federal Parent Locator Service • 5–10, *page 63*
Complaints or accusations against military personnel • 5–11, *page 63*
Military Whistleblower Protection Act • 5–12, *page 64*
Retaliation • 5–13, *page 65*
Appearance before congressional committees • 5–14, *page 66*
Political activities • 5–15, *page 66*
Prohibition of military labor unions • 5–16, *page 67*
On-post distribution of non-government printed materials • 5–17, *page 69*
Insider Threat Program • 5–18, *page 70*
Risk management • 5 – 19, *page 71*
Operations security • 5 – 20, *page 71*
Adoption Reimbursement Program • 5 – 21, *page 71*

**Chapter 6**
**Military Equal Opportunity Policy and Program,** *page 72*
Purpose • 6 – 1, *page 72*
Military equal opportunity policies • 6 – 2, *page 72*
Military equal opportunity professional staffing • 6 – 3, *page 73*
Military equal opportunity training and education • 6 – 4, *page 73*
Command climate assessment • 6 – 5, *page 73*
Military Equal Opportunity and Harassment Complaint Processing System • 6 – 6, *page 73*
Retaliation Prevention and Response • 6 – 7, *page 83*
Military equal opportunity definitions • 6 –8, *page 83*
Racial and ethnic categories • 6 – 9, *page 83*
Military Equal Opportunity Program and Harassment Prevention and Response Program responsibilities • 6 – 10, *page 83*

Contents—Continued

**Chapter 7**
**Sexual Harassment/Assault Response and Prevention Program,** *page 87*
Scope • 7 – 1, *page 87*
Policy • 7 – 2, *page 88*
Purpose • 7 – 3, *page 88*
Program eligibility • 7 – 4, *page 88*
Responsibilities • 7 – 5, *page 88*
Program fundamentals • 7 – 6, *page 103*
Sexual harassment • 7 – 7, *page 104*
Sexual Harassment Complaint Processing System • 7 – 8, *page 105*
Sexual assault • 7 – 9, *page 112*
Retaliation in response to reports of sexual assault and sexual harassment • 7 – 10, *page 113*
Commander actions upon notification of a sexual assault • 7 –11, *page 113*

**Appendixes**

**A.** References, *page 117*

**B.** Political Activities, *page 130*

**C.** Military Equal Opportunity Professional Staffing, *page 132*

**D.** Military Equal Opportunity and Harassment Training and Education, *page 137*

**E.** Command Climate Assessment, *page 139*

**F.** Sexual Assault Review Board for Unrestricted Reports of Sexual Assault, *page 146*

**G.** Department of Defense Sexual Assault Advocate Certification Program Requirements, Training, and Additional Skill Identifier Assignment, *page 151*

**H.** Retaliation Prevention and Response, *page 156*

**I.** Expedited Transfer Victim Requests, *page 160*

**J.** Sexual Harassment/Assault Response and Prevention Commander's Critical Information Requirement(s), *page 162*

**K.** Sexual Assault Incident Response Oversight Report, *page 164*

**L.** Confidentiality Guidelines for Restricted/Unrestricted Reporting, *page 167*

**M.** 24/7 Sexual Harassment/Assault Response and Prevention Hotline, *page 172*

**N.** Sexual Harassment/Assault Response and Prevention Program Organization Inspection Program, *page 175*

**O.** Inspector General Activities in Support of the Commander, *page 177*

**P.** Religious Accommodation, *page 184*

**Q.** Racial and Ethnic Designation Categories, *page 191*

**R.** Internal Control Evaluation, *page 194*

**Table List**

Table 1–1: Grades, Army, *page 3*
Table 1–2: Comparable grades among the Services, *page 7*
Table E–1: Command Climate Assessment guidance, *page 140*
Table G–1: Qualifications, *page 151*
Table I–1: Victim transfer processes, *page 161*
Table K–1: Sexual Assault Incident Response Oversight report reporting responsibilities, *page 165*
Table P–1: Process for General Court-Martial Convening Authority uniform and grooming requests and all waiver requests, *page 189*
Table Q–1: Reporting codes–race/population group, *page 191*

**Contents—Continued**

Table Q–2: Reporting codes–ethnic group, *page 191*
Table Q–3: Racial/ethnic designation categories, *page 193*

**Figure List**

Figure 2–1: Command and support relationships at U.S. Army Materiel Command-managed installations, *page 12*
Figure 2–2: Assumption of command, *page 14*
Figure 2–3: Appointment of commander, *page 15*
Figure 2–4: Command relationships at Joint bases, *page 18*
Figure 2–5: Joint Base Management Oversight Structure, *page 20*
Figure O–1: Right of Soldiers to present complaints to the inspector general, *page 181*
Figure O–1: Right of Soldiers to present complaints to the inspector general—Continued, *page 181*
Figure O–2: Right of Department of the Army Civilian employees to present complaints to the inspector general, *page 183*
Figure O–2: Right of Department of the Army Civilian employees to present complaints to the inspector general—Continued, *page 183*

**Glossary**

# Chapter 1
# Introduction

## 1–1. Purpose
This regulation prescribes the policies and responsibilities of command, which include the Army Ready and Resilient Campaign Plan, military discipline and conduct, the Army Military Equal Opportunity (MEO) Program, the Army Harassment Prevention and Response Program, and the Army Sexual Harassment/Assault Response and Prevention (SHARP) Program.

## 1–2. References and forms
See appendix A.

## 1–3. Explanation of abbreviations and terms
See the glossary.

## 1–4. Responsibilities
Detailed responsibilities are listed and described in separate chapters under specific programs and command functions. This paragraph outlines general or overarching responsibilities.

*a.* The Principal Officials of Headquarters, Department of the Army (HQDA) direct policies, programs, and resources in support of command responsibilities.

*b.* The Assistant Secretary of the Army (Installations, Energy and Environment) (ASA (IE&E)) is responsible for setting the strategic direction for and ensuring that Army policies and programs  related to installations, including Army real estate, joint basing, military construction, energy and water security and sustainability, and the environment, safety, and occupational health are executed consistent with law, regulation, and policy. In addition, the ASA (IE&E) is responsible for oversight of the execution functions performed by the Corps of Engineers related to the Army's military construction, real property, real estate, energy, and environmental safety and occupational health programs.

*c.* The Assistant Secretary for the Army (Manpower and Reserve Affairs) (ASA (M&RA)) is responsible for setting the strategic direction for and ensuring Army policies, plans, and programs for personnel, force structure, manpower management, total force management, total force policy, training, military and personnel readiness, Reserve affairs, and Army protection are executed consistent with law, regulation, and policy. In addition, the ASA (M&RA) is specifically responsible for the Equal Employment Opportunity (EEO) and MEO Programs and morale, welfare, recreation (MWR) and Family support programs.

*d.* The Vice Chief of Staff, Army (VCSA) tasks the Army Staff (ARSTAF) as necessary to coordinate the readiness and resiliency of the force.

*e.* The Deputy Chief of Staff, G–1 (DCS, G–1) has ARSTAF responsibility for developing and executing Army strategy, policy, plans, and programs that relate to—

(1) Chain of command (see para 2–1), designation of junior in the same grade to command (see para 2–8), and assumption of command by the senior regularly assigned Soldiers when the commander dies, is disabled, resigns, retires, or is absent (see para 2–9).

(2) The Army Ready and Resilient Plan (see chap 3).

(3) Extremist organizations and activities (see para 4–12), relationships between Soldiers of different grade (see para 4–14), and other prohibited relationships (see para 4–15).

(4) Political activities (see para 5–16), Family care plans (see para 5–3), and accommodation of religious practices (see para 5–6).

(5) The Army SHARP Program (see para 7–4).

*f.* The Deputy Chief of Staff, G–9 (DCS, G–9) has ARSTAF responsibility for planning, developing, implementing, resourcing, overseeing, and evaluating the execution of strategies, policies, plans, and programs for the delivery of installation services and infrastructure to support readiness. The DCS, G–9 will—

(1) Advise the ASA (IE&E) on planning, developing policy, resourcing, implementing, and evaluating—

*(a)* Comprehensive installation management operations, facilities' investment, environmental programs, excess installation property, real property management, master planning, joint basing, and energy and water security and sustainability.

*(b)* Army housing, nontactical vehicles, public and private partnerships, installation safety, and installation logistics.

(2)  Advise the ASA (M&RA) on planning, developing policy, resourcing, implementing, and evaluating MWR programs, nonappropriated fund instrumentalities, and Soldier and Family readiness programs.

*g.*  The Commanding General, Army Materiel Command (AMC) is responsible for the execution and delivery of Soldier, Civilian, and Family programs and services at the installation in support of total force Readiness and Resilience. Installation Management Command (IMCOM) is a major subordinate command to AMC.

*h.*  Commanding Generals of Army commands (ACOMs), Army service component commands (ASCCs), Chief, National Guard Bureau (CNGB), Chief, Army Reserve, and/or direct reporting units (DRUs) implement policies and programs within their respective commands to support the readiness and resilience of the force.

*i.*  Commanders at all levels will implement and enforce the chain of command and Army command policies.

## 1–5.  Records management (recordkeeping) requirements

The records management requirement for all record numbers, associated forms, and reports required by this regulation are addressed in the Army Records Retention Schedule-Army (RRS–A). Detailed information for all related record numbers, forms, and reports are located in Army Records Information Management System (ARIMS)/RRS–A at https://www.arims.army.mil. If any record numbers, forms, and reports are not current, addressed, and/or published correctly in ARIMS/RRS–A, see DA Pam 25–403 for guidance.

## 1–6.  Command

*a.  Privilege to command.*  Command is exercised by virtue of office and the special assignment of members of the Armed Forces of the United States holding military grade who are eligible to exercise command. A commander is, therefore, a commissioned or warrant officer (WO) who, by virtue of grade and assignment, exercises primary command authority over a military organization or a prescribed territorial area that is recognized as a "command" under pertinent official directives. The privilege to command is not limited solely by branch of Service, except as indicated in chapter 2. A civilian, other than the President as Commander-in-Chief (or National Command Authority), may not exercise command. However, a DA Civilian may be designated to exercise general supervision over an Army installation or activity (for example, Dugway Proving Ground).

*b.  Elements of command.*  The key elements of command are authority and responsibility. Formal authority for command is derived from the policies, procedures, and precedents presented in chapters 1 through 3.

*c.  Characteristics of command leadership.*  The commander is responsible for all aspects of unit readiness. Training is the cornerstone of unit readiness and must be the commander's top peacetime priority. Establishing a positive leadership climate within the unit and developing disciplined and cohesive units contributes to combat readiness and sets the tone for social and duty relationships and responsibilities within the command. As the primary unit trainers, commanders must develop their leaders to extract the greatest training value from every opportunity in every activity in order to build combat readiness and prepare their units and Soldiers to rapidly deploy and accomplish their decisive action missions. Commanders remain responsible for the professional development of their Soldiers at all ranks. Commanders and other leaders will treat their subordinates with dignity and respect at all times and establish a command and organizational climate that emphasizes the duty of others to act in a similar manner toward their subordinates in accomplishing the unit mission.

(1)  Commanders and other leaders committed to the professional Army Ethic promote a positive environment. If leaders show loyalty to their Soldiers, the Army, and the nation, they earn the loyalty of their Soldiers. If leaders consider their Soldiers' and DA Civilians' needs and care for their well-being, and if they demonstrate genuine concern, these leaders build a positive command climate.

(2)  Duty is obedient and disciplined performance. Soldiers with a sense of duty accomplish tasks given them, seize opportunities for self-improvement, and accept responsibility from their superiors. Soldiers, leader and led alike, work together to accomplish the mission rather than feed their self-interest.

(3)  Integrity is a way of life. Demonstrated integrity is the basis for dependable, consistent information, decision-making, and delegation of authority.

(4)  Professionally competent leaders will develop respect for their authority by—

*(a)*  Striving to develop, maintain, and use the full range of human potential in their organization. This potential is a critical factor in ensuring that the organization is capable of accomplishing its mission.

*(b)*  Giving troops constructive information on the need for and purpose of military discipline. Articles (Art.) in the Uniform Code of Military Justice (UCMJ) that require explanation will be presented in such a way to ensure that Soldiers are fully aware of the controls and obligations imposed on them by virtue of their military Service (see UCMJ, Art. 137).

*(c)*  Properly training their Soldiers and ensuring that both Soldiers and equipment are in the proper state of readiness at all times. Commanders must assess the command climate periodically to analyze the human dimension of

combat readiness. Soldiers must be committed to accomplishing the mission through the unit cohesion developed as a result of a healthy leadership climate established by the command. Leaders at all levels promote the individual readiness of their Soldiers by developing competence and confidence in their subordinates. In addition to being mentally, physically, tactically, and technically competent, Soldiers must have confidence in themselves, their equipment, their peers, and their leaders. A leadership climate in which all Soldiers and DA Civilians are treated with fairness, justice, and equity will be crucial to development of this confidence within Soldiers. Commanders are responsible for developing disciplined and cohesive units sustained at the highest readiness level possible. Command climate assessments (CCAs) will be conducted in accordance with appendix E.

(d) Requirement of exemplary conduct (Section 7233, Title 10, United States Code (10 USC 7233)). All commanding officers and others in authority in the Army are required—

1. To show in themselves a good example of virtue, honor, patriotism, and subordination.

2. To be vigilant in inspecting the conduct of all persons who are placed under their command.

3. To guard against and suppress all dissolute and immoral practices, and to correct, according to the laws and regulations of the Army, all persons who are guilty of them.

4. To take all necessary and proper measures, under the laws, regulations, and customs of the Army, to promote and safeguard the morale, the physical well-being, and the general welfare of the officers and enlisted persons under their command or charge.

*d. Assignment and command.* Soldiers are assigned to stations or units where their services are required. The commanding officer then assigns appropriate duties. Without orders from proper authority, a Soldier may only assume command when eligible according to chapter 2.

### 1–7. Military grade and rank

*a.* Military rank among officers of the same grade or of equivalent grade is determined by comparing dates of rank. An officer whose date of rank (DOR) is earlier than the DOR of another officer of the same or equivalent grade is senior to that officer (see 10 USC 741). Grade and precedence of rank confers eligibility to exercise command or authority in the U.S. military within limits prescribed by law.

*b.* Grade is generally held by virtue of office or position in the Army. For example, second lieutenant (2LT), captain (CPT), sergeant first class (SFC), chief warrant officer two (CW2) are grades. Table 1–1 shows the grades in the Army in order of their precedence. It indicates the grouping of grades into classes, pay grades, titles of address, and abbreviations.

*c.* The pay grade is also an abbreviated numerical device with useful applications in pay management, personnel accounting, automated data organization, and other administrative fields. However, the numerical pay grade will not be used as a form of address or title in place of the proper title of address of grade. A Soldier holding the numerical pay grade of E–5 will be addressed as "Sergeant," not as "E–5" (see table 1–1).

*d.* All chaplains are addressed as "Chaplain," regardless of military grade or professional title. When a chaplain is addressed in writing, grade is indicated in parentheses, for example, Chaplain (Major) John F. Doe.

*e.* Conferring honorary titles of military grade upon DA Civilians is prohibited. However, honorary titles already conferred will not be withdrawn.

**Table 1–1**
**Grades, Army**

**General officers**

Grade: General of the Army
Pay grade: Special
Title of address: General
Abbreviation: GA[1]

Grade: General
Pay grade: O–10
Title of address: General
Abbreviation: GEN

Grade: Lieutenant General
Pay grade: O–9
Title of address: General
Abbreviation: LTG

Grade: Major General

**Table 1–1**
**Grades, Army—Continued**

Pay grade: O–8
Title of address: General
Abbreviation: MG

Grade: Brigadier General
Pay grade: O–7
Title of address: General
Abbreviation: BG

**Senior field grade officers**

Grade: Colonel
Pay grade: O–6
Title of address: Colonel
Abbreviation: COL

**Field grade officers**

Grade: Lieutenant Colonel
Pay grade: O–5
Title of address: Colonel
Abbreviation: LTC

Grade: Major
Pay grade: O–4
Title of address: Major
Abbreviation: MAJ

**Company grade officers**

Grade: Captain
Pay grade: O–3
Title of address: Captain
Abbreviation: CPT

Grade: First Lieutenant
Pay grade: O–2
Title of address: Lieutenant
Abbreviation: 1LT

Grade: Second Lieutenant
Pay grade: O–1
Title of address: Lieutenant
Abbreviation: 2LT

**Senior field grade warrant officers**

Grade: Chief Warrant Officer, Five
Pay grade: W–5
Title of address: Chief/Mr./Mrs./Miss./Ms.
Abbreviation: CW5

**Field grade warrant officers**

Grade: Chief Warrant Officer, Four
Pay grade: W–4
Title of address: Chief/Mr./Mrs./Miss./Ms.
Abbreviation: CW4

Grade: Chief Warrant Officer, Three
Pay grade: W–3
Title of address: Chief/Mr./Mrs./Miss./Ms.
Abbreviation: CW3

**Company grade warrant officers**

Grade: Chief Warrant Officer, Two

**Table 1–1**
**Grades, Army—Continued**

Pay grade: W–2
Title of address: Chief/Mr./Mrs./Miss/Ms.
Abbreviation: CW2

Grade: Warrant Officer, One
Pay grade: W–1
Title of address: Mr./Mrs./Miss/Ms.
Abbreviation: WO1

**Cadets**

Grade: Cadet, U.S. Military Academy
Pay grade: Special
Title of address: Mr./Mrs./Miss/Ms./Cadet
Abbreviation: CDT

Grade: Cadet, Senior Advanced Reserve Officer's Training Corps (ROTC)
Pay grade: Special
Title of address: Mr./Mrs./Miss/Ms./Cadet
Abbreviation: CDT

**Candidates**

Grade: Officer Candidate
Pay grade: Special
Title of address: Candidate
Abbreviation: OC

Grade: Warrant Officer Candidate
Pay grade: Special
Title of address: Candidate
Abbreviation: WOC

**Enlisted noncommissioned officers**

Grade: Sergeant Major of the Army
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: SMA

Grade: Command Sergeant Major[2]
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: CSM

Grade: Sergeant Major[3]
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: SGM

Grade: First Sergeant
Pay grade: E–8
Title of address: First Sergeant
Abbreviation: 1SG

Grade: Master Sergeant
Pay grade: E–8
Title of address: Sergeant
Abbreviation: MSG

Grade: Sergeant First Class
Pay grade: E–7
Title of address: Sergeant
Abbreviation: SFC

Grade: Staff Sergeant

**Table 1–1**
**Grades, Army—Continued**

Pay grade: E–6
Title of address: Sergeant
Abbreviation: SSG

Grade: Sergeant
Pay grade: E–5
Title of address: Sergeant
Abbreviation: SGT

Grade: Corporal
Pay grade: E–4
Title of address: Corporal
Abbreviation: CPL

**Junior enlisted Soldiers**

Grade: Specialist[4]
Pay grade: E–4
Title of address: Specialist
Abbreviation: SPC[5]

Grade: Private first class
Pay grade: E–3
Title of address: Private
Abbreviation: PFC

Grade: Private
Pay grade: E–2
Title of address: Private
Abbreviation: PV2

Grade: Private
Pay grade: E–1
Title of address: Private
Abbreviation: PV1

Legend:
The following acronyms have been introduced:
Brigadier general (BG)
Cadet (CDT)
Colonel (COL)
Chief warrant officer four (CW4)
Chief warrant officer five (CW5)
First lieutenant (1LT)
First sergeant (1SG)
Command sergeant major (CSM)
Chief warrant officer (CW3)
General (GEN)
Lieutenant colonel (LTC)
Lieutenant general (LTG)
Major (MAJ)
Major general (MG)
Master sergeant (MSG)
Officer candidate (OC)
Private enlisted one (PV1)
Private enlisted two (PV2)
Private first class (PFC)
Specialist (SPC)
Sergeant (SSG)
Sergeant Major of the Army (SMA)
Warrant officer candidate (WOC)
Warrant officer one (WO1)

Notes:

[1] Other abbreviations authorized for use in correspondence with the general public and agencies outside Department of Defense (DoD), on identification cards, and in personal correspondence are listed in AR 25–50.

[2] Personnel formally selected by DA for participation in the Command Sergeants Major Program.

[3] All E–9s not formally selected for the Command Sergeants Major Program.

[4] Specialist will rank immediately below corporal. This does not require or justify change to table of organization and equipment or table of distribution and allowances (TDA).

[5] Specialist and its abbreviation (SPC) will be used in written correspondence.

## 1–8. Precedence between Soldiers and other Service Members serving with the Army

Members of other Services serving with the Army have equal status with Army Soldiers of equivalent grade. (Comparable grades among the Services are shown in table 1–2.)

**Table 1–2**
**Comparable grades among the Services**

| Army | Air Force | Marine Corps | Navy |
|---|---|---|---|
| **Officers** | | | |
| General of the Army | General of the Air Force | — | Fleet Admiral |
| General | General | General | Admiral |
| Lieutenant General | Lieutenant General | Lieutenant General | Vice Admiral |
| Major General | Major General | Major General | Rear Admiral (U) |
| Brigadier General | Brigadier General | Brigadier General | Rear Admiral (L) |
| Colonel | Colonel | Colonel | Captain |
| Lieutenant Colonel | Lieutenant Colonel | Lieutenant Colonel | Commander |
| Major | Major | Major | Lieutenant Commander |
| Captain | Captain | Captain | Lieutenant |
| First Lieutenant | First Lieutenant | First Lieutenant | Lieutenant (Junior Grade) |
| Second Lieutenant | Second Lieutenant | Second Lieutenant | Ensign |
| Chief Warrant Officer Five | — | Chief Warrant Officer Five | Chief Warrant Officer Five |
| Chief Warrant Officer Four | — | Chief Warrant Officer Four | Chief Warrant Officer Four |
| Chief Warrant Officer Three | — | Chief Warrant Officer Three | Chief Warrant Officer Three |
| Chief Warrant Officer Two | — | Chief Warrant Officer Two | Chief Warrant Officer Two |
| Warrant Officer One | — | Warrant Officer One | — |
| **Cadets** | | | |
| Cadet | Cadet | — | Midshipman |
| **Enlisted** | | | |
| Sergeant Major of the Army | Chief Master Sergeant of the Air Force | Sergeant Major of the Marine Corps | Master Chief Petty Officer of the Navy |
| Command Sergeant Major | Command Chief Master Sergeant | Sergeant Major | Command Master Chief Petty Officer |
| Sergeant Major | Chief Master Sergeant | Master Gunnery Sergeant | Master Chief Petty Officer |
| First Sergeant | Senior Master Sergeant | First Sergeant | Senior Chief Petty Officer |
| Master Sergeant | — | Master Sergeant | — |
| Sergeant First Class | Master Sergeant | Gunnery Sergeant | Chief Petty Officer |
| Staff Sergeant | Technical Sergeant | Staff Sergeant | Petty Officer First Class |

**Table 1–2**
**Comparable grades among the Services—Continued**

| Army | Air Force | Marine Corps | Navy |
|------|-----------|--------------|------|
| Sergeant | Staff Sergeant | Sergeant | Petty Officer Second Class |
| Corporal | — | Corporal | Petty Officer Third Class |
| Specialist | Senior Airman | — | —- |
| Private First Class | Airman First Class | Lance Corporal | Seaman |
| Private | Airman | Private First Class | Seaman Apprentice |
| Private | Airman Basic | Private | Seaman Recruit |

### 1–9. Precedence between members of the Army and members of foreign military services serving with the Army

Members of foreign military services serving with the Army have equal status with Army members of equivalent grade. When authorized by the President or the Secretary of Defense, members of foreign military Service serving with the Army may exercise operational or tactical control over Army units, but they may not perform inherently governmental functions, to include exercising command over Soldiers of the U.S. Army or supervising Department of the Army Civilians.

## Chapter 2
## Command Policies

### 2–1. Chain of command

*a.* The chain of command assists commanders at all levels to achieve their primary function of accomplishing the unit's assigned mission while caring for personnel and property in their charge. A simple and direct chain of command facilitates the transmittal of orders from the highest to the lowest levels in a minimum of time and with the least chance of misinterpretation. The command channel extends upward in the same manner for matters requiring official communication from subordinate to senior.

*b.* Commanders are responsible for everything their command does or fails to do. However, commanders subdivide responsibility and authority and assign portions of both to various subordinate commanders and staff members. In this way, a proper degree of responsibility becomes inherent in each command echelon. Commanders delegate sufficient authority to Soldiers in the chain of command to accomplish their assigned duties, and commanders may hold these Soldiers responsible for their actions. Commanders who assign responsibility and authority to their subordinates still retain the overall responsibility for the actions of their commands.

*c.* Proper use of the chain of command is vital to the overall effectiveness of the Army. Commanders must acquaint all their Soldiers with its existence and proper function. Effective communication between senior and subordinate Soldiers within the chain of command is crucial to the proper functioning of all units. Therefore, Soldiers will use the chain of command when communicating issues and problems to their leaders and commanders.

### 2–2. Open door policies

Commanders will publish an open door command policy statement within their commands. Soldiers are responsible for ensuring that the commander is made aware of problems that affect discipline, morale, and mission effectiveness; and an open door policy allows members of the command to present facts, concerns, and problems of a personal or professional nature or other issues that the Soldier has been unable to resolve. The timing, conduct, and specific procedures of the open door policy are determined by the commander. They are responsible for ensuring that Soldiers are aware of the command's open door policy.

### 2–3. Performance counseling

Commanders will ensure that all members of their command receive timely performance counseling. Effective performance counseling and feedback provided to officers, noncommissioned officers (NCO), enlisted Soldiers, and DA Civilian helps to ensure that they are prepared to carry out their duties efficiently and accomplish the mission.

*a. Soldiers.* AR 623–3 contains counseling requirements in conjunction with the evaluation reporting systems. Unit commanders will determine the timing and specific methods used to provide guidance and direction through counseling. ATP 6–22.1 provides advice and makes suggestions concerning effective counseling. Providing regular and effective performance counseling to all Soldiers, not just those whose performance fails to meet unit standards, is a command function. All commanders will ensure that their subordinate commanders have implemented and are maintaining an effective performance counseling program.

*b. Department of the Army Civilian.* Commanders will refer to the applicable civilian performance management policies and regulation (for example, DoDI 1400.25, Volume 431; DoDI 1400.25, Volume 2011) for requirements for providing DA Civilian performance feedback during their performance cycle. All commanders will ensure that their subordinate leaders have implemented and are maintaining an effective performance management program.

## 2–4. Staff or technical channels
Staff or technical channels may be used for sending reports, information, or instructions not involving variations from command policy and directives.

## 2–5. Command of installations, activities, and units
*a. Responsibility.* Normally, the senior regularly assigned Army officer present for duty is responsible for the command of units, except as shown in paragraphs 2–8a, 2–13 and 2–15.

*b. Command of installations.* Command of Army installations is subject to policies, procedures, and regulations promulgated by HQDA.

(1) A senior commander (SC), designated by Army senior leadership, exercises command of Army installations. The Command authority over the installation derives from the Title 10 authority of the Secretary of the Army (SECARMY) over installations. This is a direct delegation of command authority for the installation to the SC. The command authority of the SC includes all authorities inherent in command, including the authority to ensure the maintenance of good order and discipline for the installation.

(2) Army installations are identified in one of two categories as follows:

*(a) Army installations managed by AMC and AMC units, which include Garrison Commands, IMCOM Directorates and IMCOM Headquarters.* Installations that AMC manages are discussed in paragraph 2–5b(3)(d).

*(b) Army installations not managed by AMC.* Installations that are not managed by AMC are discussed in paragraph 2–5b(3)(e).

(3) Roles and responsibilities.

*(a) Senior commander.* The SC is normally, but not always, the senior General Officer (GO) at the installation. The mission of the SC is to care for Soldiers, Families, and DA Civilians, and to enable unit readiness. While the delegation of senior command authority is direct from HQDA, the SC will routinely resolve installation issues with AMC (normally, through AMC's subordinate organizations) and, as needed, the associated ACOM, ASCC, or DRU. The SC's higher headquarters (ACOM, ASCC, or DRU), on behalf of HQDA, will maintain oversight of the SC while executing installation missions. The SC uses the garrison command as the primary organization to provide services and resources to customers in support of accomplishing this mission. All applicable commands support the SC in the execution of SC responsibilities; therefore, the SC is the commander supported by AMC's Garrison Command and affiliated IMCOM Director, other installation service providers, and tenants as depicted in figure 2–1, Command and Support Relationships at AMC-managed Installations. The SC—

1. Is normally a dual-hatted position. When this occurs, the commander exercises discrete authorities as the SC and as a mission commander. The SC responsibilities and authorities are installation focused; the responsibilities and authorities as the mission commander are mission focused.

2. Can, in rare cases, be an HQDA-appointed DA Civilian instead of a uniformed SC, who will have the SC roles and responsibilities, except for UCMJ and command authority. In these instances, the individual will be referred to as the senior manager. Before the appointment of the senior manager, command and UCMJ authorities for the installation will be specified.

3. Is responsible for synchronizing and integrating Army priorities and initiatives at the installation.

4. Exercises the duties and responsibilities of the installation commander where that title is mentioned in the USC or DoD or Army policies, except on installations designated to be managed under DoD Joint Basing Guidance.

5. Exercises the duties and responsibilities of the senior commander when that title is mentioned in Army regulations, except for regulations involving operational duties and responsibilities. Mission commanders will retain operational duties and responsibilities.

6. May delegate, as necessary, unless prohibited by law, regulation, or HQDA general orders, assigned duties and responsibilities to the garrison commander (GC), subordinate GOs, or other GOs within the area of responsibility with

the agreement of the parent organizations of those GOs. Such delegation will be made in writing and specifically state the duties and responsibilities delegated and the termination date of the delegation. SCs are not authorized to change rating chains for GCs, or delegate general court-martial convening authority (GCMCA).

7. Establishes installation priorities between all resident and supported units.

8. Prioritizes base operations support consistent with HQDA priorities and approved Army standards and minimum capability levels.

9. Oversees the base operation services and capabilities provided to customers. Ensures those services are provided within the HQDA guidance, designated priorities, and approved Army standards and coordinates with the Garrison Commander and, as needed, with the IMCOM Director or AMC to tailor the HQDA-approved minimum capability levels as required (either higher or lower), within available resources, to best meet local mission requirements.

10. Approves and submits the installation master plan consistent with HQDA long-range plans and goals through AMC's respective IMCOM Director to the ACOMs, ASCCs, or DRUs. For AMC-managed installations, the SC collaborates with the Garrison Commander and IMCOM Director before the SC submits the installation master plan.

11. Approves the Military Construction, Army and Military Construction, Army Reserve project priority list at the installation level. For AMC-managed installations, the SC collaborates with the Garrison Commander and IMCOM Director before the SC approves the project priority list for the installation. The IMCOM Director will consolidate and prioritize the SC-established priorities for their aligned installations and will gain appropriate ACOM, ASCC, or DRU agreement before submission to Commander, AMC. See AR 420–1 for additional information about military construction programs, master planning, and facilities operations and management.

12. Reviews and approves the prioritization of Family and installation programs consistent with law, regulation, and policy. For AMC-managed installations, the SC collaborates with the Garrison Commander and the IMCOM Directorate before the SC approves execution of Family and installation programs. The IMCOM Director will consolidate and prioritize the SC-established priorities for their aligned installations, and will gain appropriate ACOM, ASCC, or DRU agreement before submission to AMC.

13. Is, in coordination with the IMCOM Director, responsible for the FP of installations and facilities under his or her control. SCs will ensure local implementation of FP conditions is compliant with the ASCC minimum baseline, while assuming an adequate FP posture necessary to protect personnel and other vital assets from local threats. Commands with personnel residing on installations, regardless of military service, or whether on a permanent or temporary basis, will support and comply with the FP directives of the SC.

14. May be designated as a GCMCA pursuant to UCMJ, Art. 22(a). SCs who are not authorized to convene a general court-martial pursuant to UCMJ, Art. 22 and who the SECARMY has designated as a GCMCA may request designation as a GCMCA pursuant to AR 27–10, paragraph 5–2(a).

15. Submit appeals from administrative actions taken against individual Soldiers through ACOM, ASCC, or DRU channels, unless otherwise specified in Army regulations. The terms "next superior authority," "next higher authority," "next higher commander," and "next higher headquarters" as used in other Army regulations mean ACOM, ASCC, or DRU commander or headquarters.

16. Will follow command responsibilities for the Total Army Sponsorship Program in accordance with AR 600–8–8.

17. Serves as the senior Army representative to the surrounding community.

18. Is delegated, as an integral part of his command authority, oversight authority (including project prioritization) of all installation public works activities. Detailed descriptions of approval limits and project management are in AR 420–1, AR 140–483, and other facilities engineering publications (see AR 420–1 for a complete list).

19. Senior-rates the GC. On installations where that is not practical, an exception to this regulation should be obtained.

20. Consistent with applicable laws and policies, oversees, coordinates, and deconflicts resources to support mobilization operations on the installation; establishes installation priorities; and ensures mobilized units are supported to meet deployment requirements. These efforts may require the SC to reach out to AMC (for general support), or to the SC's ACOM, ASCC, or DRU (for command support).

*(b) Garrison commander.* The GC is a military officer, LTC/O–5 or COL/O–6, selected by HQDA. The GC commands the garrison, is the SC's senior executive for installation activities, is rated by the IMCOM Director, and is senior-rated by the SC. The GC and IMCOM organizations are the primary organizations to provide services to the customers. The GC is responsible for the day-to-day operation and provision of base support services, which includes oversight of Government-owned, leased, and privatized housing and other services necessary to maintain installation readiness. The GC ensures that installation services and capabilities are provided in accordance with Army senior leader priorities, HQDA-directed programs, Army standard minimum capability levels, and SC and IMCOM guidance. The GC provides additional support in accordance with HQDA directives and provides reimbursable services in

accordance with memoranda of agreement and/or installation support agreements as required by AR 5–9. The GC delivers Soldier and Family Readiness and installation programs, coordinates and integrates the delivery of support from other service providers, and obtains SC approval of the installation master plan. In some cases, the senior official on an installation may be the garrison manager. A garrison manager (the DA Civilian equivalent of a GC) has the same responsibility and authority as the military counterpart, except for UCMJ and command authority. Before the appointment of the garrison manager, command and UCMJ authorities for the garrison will be specified. The GC or garrison manager—

1. Represents the Army and the installation in the surrounding community as directed by the SC.

2. Serves as the Army's installation level representative in the Residential Communities Initiative's operating entity, on behalf of the Assistant Secretary of the Army (Installations, Energy, and Environment).

3. Approves and issues garrison policies in accordance with respective Army regulations or installation level policies involving tenant units as directed by the SC.

4. Implements policies for DA Civilians assigned to the garrison on the installation, subject to satisfaction of any applicable labor relations obligations.

5. Develops and implements an Integrated Protection Plan incorporating the functional elements of the Army Protection Program (such as anti-terrorism, critical infrastructure risk management, emergency management, physical security, law enforcement, fire and protection services, and continuity of operations).

6. Supports mobilization station requirements.

7. Integrates all installation services on the installation from all service providers.

*(c) ACOM, ASCC, or DRU commanders.* On AMC-managed installations, the commanders will—

1. Provide to AMC a prioritized list of Military Construction, Army and Military construction, Army Reserve projects and requirements that affect subordinate units to support the development of the military construction program and the program objective memorandum (POM).

2. Provide AMC with subordinate mission priority requirements for military construction and base operations.

3. Identify to AMC, through the base operations process and other requirements development processes, the required levels of garrison support needed to meet mission requirements, as well as any support requirements. Collaborate with IMCOM in developing garrison support requirements.

4. Evaluate the effectiveness of installation services and support and participate in the prioritization of these services and support.

5. Ensure the mobilization of subordinates as specified in AR 10–87 and Army executive orders.

6. Provide prioritization requirements for information technology (IT) and training enabler support to IMCOM.

7. Support and comply with the FP actions of the garrison as directed by the SC if they have personnel residing on installations, whether on a permanent or temporary basis.

8. Follow command responsibilities for the Total Army Sponsorship Program as stated in AR 600–8–8 and related official guidance.

9. Provide AMC protection requirements for critical infrastructure located on and off AMC-managed installations.

10. Provide installation services and support in direct support of the Army SC (ADRP 5.0 and FM 6–0). Modifications to installation service and support levels by these organizations will be coordinated through the SC and the respective ACOM, ASCC, DRU or other command before implementation on the installation. See figure 2–1.

*(d) Installations managed by Army Materiel Command.* The SECARMY designated IMCOM as a major subordinate command of Army Materiel Command (AMC) pursuant to General Orders No. 2019–13, Reassignment of the U.S. Army Installation Management Command as a Major Subordinate Command of the U.S. Army Material Command. U.S Army Environmental Command is a subordinate command of IMCOM. AMC manages Army garrisons assigned to it, executes installation readiness missions, provides equitable installation base operations services and facilities, optimizes resources, sustains the environment, and enhances the well-being of the military community. AMC integrates and delivers support to enable readiness within the strategic support area for a globally responsive Army through the supporting relationships illustrated in figure 2–1.

1. IMCOM, as a subordinate command to AMC, commands the garrisons assigned to it.

2. IMCOM and its subordinate organizations are in direct support (ADRP 5–0 and FM 6–0) to the SC on AMC-managed installations. A strong collaborative relationship between the SC and IMCOM Director is required. Directors are the first Senior Executive Service (SES) members in the IMCOM organizational structure and must know and maintain a positive communication stream with SCs in their region. Directors can help shape expectations for installation support, announce and explain emerging IMCOM policy and changes, and be the focal point for resolving conflicting priorities. The SC commands the installation, but funding and processes for most base operations flow through IMCOM.

3. The GC is rated by the IMCOM Director and senior-rated by the SC.

4.  AMC, through IMCOM, ensures compliance with HQDA-directed programs and Army standard minimum capability levels. AMC staffs and coordinates with HQDA funding requests for garrison support requirements identified by ACOMs, ASCCs, or DRUs that are not included in base operations services. The command and support relationships between HQDA; AMC; IMCOM; the ACOM, ASCC, or DRU; and the SC are shown in figure 2–1. Additionally, IMCOM—

a)  Establishes the organizations and procedures for garrison public works operations and functions addressed in this regulation.

b)  Manages and integrates the delivery of facilities engineering services across garrisons to ensure consistent quality with optimal customer satisfaction.

c)  Integrates safety and risk management in all installation operations (for example, facilities, utilities, nontactical vehicles, equipment, planning and design, and community activities and operations).

## Command & Support Relationship at AMC-Managed Installations



Figure 2–1.  Command and support relationships at U.S. Army Materiel Command-managed installations

(e)  Army Material Command industrial base installations   are managed in compliance with AR 700 – 90 and other appropriate industrial base authorities.

(f)  Army installations not managed by AMC. The SC is designated in accordance with paragraphs 2–5b(3)(a) and 2–5b(3)(f). The SC roles and responsibilities are the same as for all other Army installations.

1.  Army National Guard (ARNG) installations, facilities, and sites are managed in compliance with National Guard Bureau (NGB) requirements by commanders through individual U.S. Property and Fiscal Officers.

2. U.S. Army Military Surface Deployment and Distribution Command performs terminal management services as the ASCC for U.S. Transportation Command under the authority of DoDD 5158.04 and other appropriate authorities.

3. U.S. Army Training and Doctrine Command (TRADOC), ROTC detachments, and recruiting sites do not provide garrison support functions and do not have garrison activities.

4. U.S. Army Corps of Engineers-funded installations and separate facilities not on AMC-managed installations are managed in accordance with Federal law, AR 420–1, and other appropriate regulations.

*(g)* Change of senior commander.

1. Permanent change. Commanders of ACOMs (continental United States (CONUS)), ASCCs (CONUS and outside CONUS (OCONUS)), and DRUs (CONUS) may request a permanent change of SCs from the HQDA General Management Office (DACS–GOM) for the CSA's approval.

2. Temporary change. When commanders are temporarily absent from the installation, including for deployment, SCs may remain in command of installations or may relinquish command and designate an acting commander after coordination with the applicable ACOM, ASCC, or DRU commander. When designating an acting commander, the SC will notify senior Army leadership; AMC; IMCOM; and affected mission commands. Designation of an acting commander will be in accordance with the procedures established in this regulation for appointing acting commanders.

*c.* Uniform Code of Military Justice authority. UCMJ authority will be governed by AR 27–10.

*d.* Command by commanders in the grade of lieutenant general. Army commanders in the grade of lieutenant general or above may not assume command of Army installations, except when the installation serves as the location for a corps or higher headquarters. The CSA must approve exceptions to this policy and HQDA (DACS–GOM) will issue orders to implement the exception.

*e.* Announcement of assumption of command. Assumption of command will be announced in a memorandum and will contain the information in figure 2–2. Appointment orders that apply to only three- and four-star GOs, are shown in figure 2–3. SC designation will be indicated on the individual's permanent change of station (PCS) orders published by the General Officer Management Office.



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP

OFFICE SYMBOL                                                    [Date]

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Assumption of Command by Authority of (appropriate subparagraph).

The undersigned assumes command of (complete unit designation and unit identification code (UIC)), effective (time/date).

                              (Signature block)
                              NAME, GRADE, BRANCH
                              Commanding
                              (or use the words "Acting Commander"
                              as appropriate [see paragraph 2-9a(3)]

**Figure 2–2.  Assumption of command**



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP


OFFICE SYMBOL                                                                                      [Date]


MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Appointment of Commander.


By direction of the President, (grade, name, and branch) is appointed Commanding officer or commanding general of (complete unit designation and UIC), Effective (date).

**Figure 2–3.  Appointment of commander**

(1) Oral assumption of command. Oral assumption of command may be used by units not using orders or other documentation to announce assumption of command or when other circumstances necessitate. Oral assumption of command should be followed by an assumption of command memorandum as expeditiously as possible.

(2) Distribution. Distribution will be limited to one copy to each person concerned, subordinate commands or elements, interested commands, or agencies, and the next higher headquarters. A copy will be placed in the files of the issuing command and/or the affected command. When a GO, or GO designee, assumes permanent command, one copy will be provided to General Officer Management Office, Office of the Chief of Staff (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200.

(3) Filing. Organizations and units governed by AR 25–400–2 will file one copy of the assumption document under organizational history files. Disposition is shown in those documents.

(4) Correction and amendments. Assumption of command documents will be amended, rescinded, or revoked by publishing the correct information in another assumption of command document. The document containing the correction will properly identify (by date) the document being corrected, and state to whom it pertains. The amended document will be distributed and filed, as appropriate.

*f.* Optimum length of command tours. The optimum length of command tours will be based on the needs of the Army, stability within units, need for officers with command experience, and availability of personnel. Normal optimum command tours are as follows:

(1) Regular Army.

*(a)* For company grade, 18 months with a minimum of 12 months.

*(b)* For field grade, normal command tour length for battalion/brigade commanders is 18 to 24 months, or coincides with tour length for short tour and may be as long as 36 months or more for lifecycle manned units. Commanders who have completed 18 or more months of command as of 30 days before the unit's mission readiness exercise or culminating pre-deployment exercise will relinquish command. Officers who surpass 24 months because of deployment will relinquish command 30 to 90 days after redeployment. Extensions or curtailments will be coordinated through the officer's ACOM, ASCC, or DRU and then with the Colonel Management Office (DACS–CMO) for COLs or the Command Management Division, U.S. Army Human Resources Command (HRC) for LTCs.

*(c)* Commanding generals (CGs) (MG or above) in coordination with the CG, HRC may curtail or extend field grade command tours up to 30 days. The ACOM, ASCC, or DRU commander in coordination with the CG, HRC, may curtail or extend field grade command tour for 31 to 60 days. The CSA must approve curtailments and extensions of field grade command tours for more than 61 days or for any extensions of field grade command beyond the normal 36 months.

*(d)* The policy in paragraph 2–5*f*(1)(*b*), does not apply to commands that have established 36 to 48 month tour lengths or to Army Acquisition Corps commands.

*(e)* In overseas areas where the tour length prevents such tenure of command, the command tour will coincide with the overseas tour.

*(f)* A COL will not normally hold a battalion-level command. Accordingly, if a promotable (P) LTC serving as a battalion commander has a projected promotion date during the command tour, ACOM, ASCC, or DRU commanders will coordinate with HRC to schedule a change of command date as close as possible to the projected promotion date of the officer. In cases when the change of command would adversely affect a significant operational requirement, the ACOM, ASCC, or DRU commander will submit a request through the Colonel Management Office to the Vice Chief of Staff, Army for an exception to policy.

(2)  Army Reserve. Army Reserve command tours are governed by AR 140–10.

*g.*  Command by general officers. Except as indicated in paragraph 2–7, a GO will not be assigned through the General Officer Management Office, Office of the Chief of Staff (DACS–GOM), without the prior approval of the CSA.

*h.*  Command of dental units. The senior Dental Corps officer, assigned or attached to a dental table of organization and equipment unit deployed to receive and treat patients, will assume command of that unit until properly relieved.

*i.*  Command of veterinary units. The senior veterinary officer assigned or attached to a veterinary unit deployed to care for Government-owned animals, for food inspection responsibilities, and/or for civic action programs, will assume command of that unit until properly relieved.

*j.*  Command of Regular Army training units. Army National Guard of the United States (ARNGUS) officers (when activated under 10 USC) and U.S. Army Reserve (USAR) officers, serving on active duty or active duty for training under 10 USC, may be assigned as acting commanders of Regular Army (RA) training units during annual training. This includes authority under the UCMJ, unless withheld by competent authority. SCs implementing the authority granted by this paragraph will ensure that—

(1)  Paragraphs 3–1 and 3–3 are followed.

(2)  USAR organizations have adequately trained their commanders according to the Manual for Courts-Martial (MCM) and AR 27–10.

(3)  USAR commanders receive orientation regarding the administration of military justice at the installation and unit levels.

(4)  Necessary attachment orders, direction of the Presidential authority, assumption of acting command letter, administrative measures, and appeal channels are accomplished.

(5)  Staff or command judge advocates monitor the fair and just administration of military justice.

*k.*  Active Guard Reserve personnel. Active Guard Reserve (AGR) personnel may be assigned duties (for example, serve as company commanders of RA units in U.S. Army Recruiting Command) that—

(1)  Support operations or missions assigned in whole or in part to RCs.

(2)  Support operations or missions performed or to be performed by a unit composed of elements from more than one component of the same Armed Force; or a joint forces unit that includes one or more USAR units; or a member of a USAR whose USAR assignment is in a position in an element of the joint forces unit.

(3)  Advise the Secretary of Defense, the Secretaries of the military departments, the Joint Chiefs of Staff, and the commanders of the unified combatant command regarding RC matters.

*l.*  All Commanders—

(1)  Commanders are required to fulfill applicable labor relations obligations before implementing policy for DA Civilians covered by collective bargaining agreements.

(2)  Commanders are reminded that AR 20–1 requires that complaints against a promotable COL, an active or retired GO, IGs of any component, members of the SES, or executive schedule personnel will be forwarded to the Department of the Army Inspector General's Investigation Division (SAIG–IN).

(3)  Commanders will conduct command climate assessments at the outset of and periodically during the command tenure (see app E).

(4)  Commanders are reminded that AR 614–100 and AR 614–200 prescribe procedures for transfer of victims of sexual assault. Requests for transfers and transfers must be accomplished within the timeframes included in these regulations.

## 2–6.  Command of installations, activities, and units of Joint bases

*a. The senior authority for Army commands and units on installations derives from the Secretary of the Army and the Chief of Staff of the Army.*  The appointment is usually designated to the senior United States Army commander assigned for duty. Inherent in the appointment is the responsibility for the unity of effort of all Army commands and

units on the installations. Accordingly, Army commands and units of joint bases have, at minimum, a tactical operation/tactical control command relationship to the senior Army commander.

*b. Title 10 USC* commanding of Joint bases. DoD joint basing guidance sets forth the policy for operating a joint base. The designated supporting (lead) component is responsible for documenting force requirements for joint base organization structure including a joint base commander (JBC) billet (see fig 2–5). The JBC is responsible for the delivery of installation support to all components, both DoD and non-DoD tenants. The JBC reports to the next echelon of the supporting component's installation support organization. The Joint Management Oversight Structure (JMOS), established by DoD's joint basing guidance, provides a governing body that will resolve conflicts involving land and facilities use, installation support costs, competing demands for installation resources, and total obligatory authority transfers. A joint base MOA for each separate joint base, signed by the VCSA and the other Service components' VCSAs, provides the framework for component relationships.

*c. Authorities, roles, and responsibilities for joint bases.* Authorities, roles, and responsibilities for joint bases where the Army is the supporting component, such as Joint Base Lewis-McCord and Joint Base Myer-Henderson Hall, are executed in accordance with paragraph 2-5 to the extent they do not conflict with DoD joint basing requirements. Base operation services and 10 USC authorities, roles and responsibilities for installations where the Army is the supported component reside with the supporting component. In such cases, the senior Army commander is designated as the Senior Army Element Commander (SAEC) and fulfills the roles and responsibilities on the installation as defined in this paragraph. In rare cases, the senior Army representative is a DA Civilian. In this case, the individual will be referred to as the senior Army manager. Prior to the appointment of the senior Army manager, command and UCMJ authorities for the Army commands and units will be specified. Unless prohibited by law or regulation, the SAEC or senior Army manager may delegate, in writing, installation roles to an appropriate-level subordinate or officers/senior noncommissioned officers/DA Civilians in tactical control units with the concurrence from their unit's higher headquarters.

## Command Relationships at Joint Bases



**Figure 2–4. Command relationships at Joint bases**

*d. Joint base governing process.* Army commands and units will operate in full compliance with DoD requirements. In the event of a discrepancy between this regulation and the DoD policies and procedures for Joint bases, the DoD policy or procedure takes precedence.

(1) Joint bases are governed by the JMOS (see fig 2–5).

(2) The SAEC has two formal avenues to influence base operations and mission readiness services through the JMOS. The first avenue is through representation on the Joint Base Partnership Council and the joint base installation collaboration forums mandated by DoD. The second avenue is through the support command relationship with IMCOM Directors, who represent Army interests on the Intermediate Command Summit and, when necessary, can elevate SAEC joint base issues to the Military Department level for resolution.

(3) For Army interests and equities on joint bases where the Army is the supported component, the SAEC is the supported command and the IMCOM Director is the supporting command.

*e. Senior Army Element Commander roles and responsibilities.*

(1) May be designated as the GCMCA pursuant to UCMJ, Art. 22(a). The appellate and review authority for administrative actions taken by the SAEC pertaining to individual Soldiers and DA Civilians will flow through ACOM, ASCC, or DRU channels, unless otherwise specified in Army regulations. The terms "next superior authority," "next higher authority," "next higher commander," and "next higher headquarters" as used in other Army regulations, mean ACOM, ASCC, or DRU commander or headquarters.

(2)  Establish and synchronize base operations and installation mission readiness priorities among Army commands, units, and residents. Communicate the Army's priorities to the JBC, AMC, and the supporting IMCOM Director.

(3)  Ensure the Army has appropriate representation and an active voice at all DoD mandated joint base forums, such as real property, morale and welfare, and force protection, and in all financial reviews to inform the JBC's decision cycles.

(4)  Review the joint base performance output to ensure the delivery of base operations and installation mission readiness services meet the needs of the Army mission, Soldiers, Families, and DA Civilians. Participates in updates to the joint base MOA.

(5)  Approve the Army's input into the joint base master plan.

(6)  Prioritize and submit Army commands' and units' restoration and modernization needs, minor military construction projects and military construction projects.

(7)  Advise the JBC, AMC, and IMCOM Director on new or changed base operations and installation mission readiness services for adjudication and implementation.

(8)  Serve as the senior Army representative to the joint base and the surrounding community.

(9)  Maintain good order and discipline.

(10)  Senior rate the Army support activity commander.

*f.  Army support activity commander.*

(1)  Army support activities (ASA) exist on joint bases where the Army is the supported component. The ASA provides services that are inherently Army mission and warfighter related, as well as Army-centric services excluded/exempted for transfer by DoD (see fig 2–4 for organization relationships on joint bases).

(2)  The ASA commander is a military officer in the grade of COL or LTC. The position is typically rated by the IMCOM Director and senior rated by the SAEC. The ASA commander is responsible for day-to-day operations and management of Army specific base operation services in accordance with HQDA programs, Army standards, and the SAEC's intent. Service to other entities may be provided on a reimbursable basis.

(3)  The ASA commander may be designated as a summary courts-martial convening authority or special courts-martial convening authority (SPCMCA) for the Army units and activities in the area of responsibility. In rare cases, the ASA commander may be designated by SECARMY as GCMCA.

(4)  In some cases, the senior official in an ASA may be a Garrison Manager. In this case, the individual will be referred to as the ASA manager. An ASA manager has the same responsibility and authority as an ASA commander, with the exception of UCMJ and command authority. Prior to the appointment of an ASA manager, command and UCMJ authorities for the Army units and activities will be specified.

# Joint Management Oversight Structure (JMOS)



**Figure 2–5. Joint Base Management Oversight Structure**

## 2–7. Specialty immaterial commands
The senior officer regularly assigned and present for duty with logistical commands (or communication zone headquarters, sections, and areas) and similar specialty immaterial commands will assume command of the organization. (This provision applies unless the senior officer is ineligible under paras 2–16 or 2–17.)

## 2–8. Designation of junior in the same grade to command
The DCS, G–1 is responsible for policy on the designation of junior in the same grade to command.

*a.* When two or more commissioned officers of the same grade, both of whom are eligible to command, are assigned to duty in the same command or organization, the President may assign the command of forces without regard to seniority by DOR.

*b.* GOs are authorized to announce by direction of the President, the designation of one of several officers of the same grade within a command under their jurisdiction as a commander thereof, subject to the following conditions:

(1) This refers to GOs commanding ACOMs, ASCCs, or DRUs, armies, corps, installations, divisions, separate brigades, regional support commands (RSCs), and heads of DA staff agencies. This may be done without regard to relative seniority. (See paras 2–5 and 2–9 for policy on GOs.) When an officer who is junior by DOR is designated to command, a memorandum will be used to announce the appointment and will contain the information shown in figure 2–2.

(2) This appointment is used only if the duties of the position require exercising command. It is not used to assign a junior officer to a staff position that requires supervising and controlling activities of an officer senior by DOR. In staff supervisory positions, commanders make such appointments merely by designation in a memorandum.

*c.* Commanders will not use the Presidential authority cited in this paragraph to appoint a junior member as their own successor, either temporarily or permanently. In some cases, a commander having authority under this paragraph may find it preferable to place a junior member in his or her position temporarily as acting commander. If so, a request stating the circumstances and asking for the appointment to be made will be sent to the next higher commander having authority under this paragraph. The next higher commander will review the request and approve or disapprove the request. Commanders will not issue a blanket designation without prior approval from the ACOM, ASCC, or DRU commander, and, in cases involving GOs, coordination with the General Officer Management Office (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200 for CSA approval. Each designation of a junior to a command position requires a separate action by the appropriate authority, except when prior approval of a blanket designation has been authorized.

*d.* The authority in this paragraph will not be used to assign command functions to chaplains or, unless authorized by the SECARMY or their appointee, to officers of the Army Medical Department (AMEDD), except as authorized in paragraph 2–17.

*e.* Commanders and their staffs, at all levels of command, are responsible for ensuring proper delegation of authority to NCOs by their seniors. This policy applies whether the senior is an officer, WO, or another NCO.

## 2–9. Death, disability, retirement, reassignment, or absence of the commander

*a. Commander of Army element.*

(1) Except as provided for in paragraphs 2–9*c* and 2–9*d*, if a commander of an Army element, other than a commander of a headquarters and headquarters element, dies, becomes disabled, retires, is reassigned, or is temporarily absent in any status other than present for duty, the senior regularly assigned Army Soldier will assume command.

(2) If the commander of a headquarters and headquarters element dies, becomes disabled, retires, is reassigned, or is temporarily absent in any status other than present for duty, the senior regularly assigned Army Soldier of the particular headquarters and headquarters element who performs duties within the element will assume command. For example, if a division headquarters and headquarters company commander is temporarily absent, the executive officer as the senior regularly assigned Army Soldier who performs duties within the headquarters company would assume command, rather than the division commander.

(3) Senior regularly assigned Army Soldier refers (in order of priority) to officers, WOs, cadets, NCOs, specialists, or privates present for duty unless they are ineligible under paragraphs 2–16 or 2–17. They assume command until relieved by proper authority, except as provided in paragraph 2–9*c*. Assumption of command under these conditions is announced per paragraph 2–5. However, the announcement will indicate assumption as acting commander unless designated as permanent by the proper authority. It is not necessary to rescind the announcement designating an acting commander to assume duties of the commander "during the temporary absence of the regularly assigned commander" if the announcement gives the time element involved. A rescinding announcement is required if the temporary assumption of command is for an indefinite period.

*b. Principal officials of the Headquarters, Department of the Army.* On the death, disability, or temporary absence of a principal official of HQDA, the SECARMY will designate an acting principal official. This does not apply to those principal officials of HQDA who are Presidentially-appointed and Senate confirmed. The succession of Presidentially-appointed and Senate confirmed positions is governed by the Federal Vacancies Reform Act.

*c. Commanders of Army commands, Army service component commands, or direct reporting units.* A commander of an ACOM, ASCC, or DRU may continue to discharge the functions of command while absent from the limits thereof, if—

(1) Such absence is for a short period only.

(2) The commander has reasonable communication with the ACOM, ASCC, or DRU headquarters.

(3) The absence is not caused by physical disability.

*d. General officers.* During the temporary absence of the regularly assigned GO commander, ACOMs, ASCCs, or DRUs are authorized to assign GOs under their command to the vacant command position.

## 2–10. Absence or disability of all officers of a unit

On death, disability, or absence of all officers (to include W2 to W5) of a unit normally commanded by an officer, the appropriate commander of the next higher command permanently assigns an officer to command, preferably of the branch to which the unit belongs. Higher commanders should continue to seek out officers to serve in this role before deferring to the permanent assignment of non-officers. Pending assignment and arrival of the new commander, a cadet, NCO, specialist, or private regularly assigned to the unit will exercise temporary command. Restrictions on assuming command in paragraphs 2–16 and 2–17 apply. Assumption of command will be as noted in paragraph 2–9.

## 2–11. Emergency command

The senior officer, WO, cadet, NCO, or junior enlisted Soldier among troops at the scene of an emergency will assume temporary command and control of the Soldiers present. These provisions also apply to troops separated from their parent units under battlefield conditions. The senior person eligible for command, whether officer or enlisted, within a prisoner of war camp or among a group of prisoners of war, or a group of personnel detained by hostile forces or elements will assume command according to grade and DOR seniority without regard to Service.

## 2–12. Functions of an individual in temporary command

A commander in temporary command will not, except in urgent cases, alter or annul the standing orders of the permanent commander without authority from the next higher command. Temporary command is defined to include command assumed under conditions outlined in paragraphs 2–9, 2–10, and 2–11. Such commanders will be considered temporary until designated as permanent, or until replaced by the proper appointing authority.

## 2–13. Responsibility of successor

A commander who succeeds to any command or duty assumes the duties of his or her predecessor. The successor will assume responsibility for all orders in force and all the public property and funds pertaining to the command.

## 2–14. Separate commands of the Army serving together

   *a.* When separate commands of the U.S. Army join (or perform duty) together, the senior officer present for duty on full-time duty in the active military service of the United States with the commands concerned will command the forces unless otherwise directed by the President. He or she must not be ineligible under paragraph 2–16 or 2–17.

   *b.* 32 USC 317 states: "When any part of the National Guard that is not in Federal service participates in an encampment, maneuver, or other exercise for instruction, together with troops in Federal service, the command of the post, air base, or other place where it is held, and of the troops in Federal service on duty there, remains with the officers in Federal service who command that place and the Federal troops on duty there, without regard to the grade or DOR of the officers of the National Guard not in Federal service who are temporarily participating in the exercise."

   *c.* When USAR units take part in active duty for training or annual training at a post, the command of that post remains with the officers normally in command. This provision applies regardless of the rank of the officers of the USAR unit who are temporarily taking part in training there.

## 2–15. Separate commands of the several military services of the United States serving together

   *a.* When separate commands of the several military services join (or perform duty) together, or personnel of another Service serve with the Army, operational control by an officer of one Service over the units or members of the other Services may be given by agreement between the Services concerned, or as directed by the National Command Authority, by the commander of a unified command to which the separate commands are assigned, or by agreement between two or more commanders of unified commands to which the separate commands are assigned. When the different commands of the Army, Navy, Air Force, Marine Corps, and Coast Guard join or serve together, the officer highest in grade in the Army, Navy, Air Force, Marine Corps, or Coast Guard, who is otherwise eligible to command, will command all those forces, unless otherwise directed by the President (see 10 USC 747).

   *b.* Unless otherwise directed by proper authority in the operational chain of command, the commander of the joint forces exercises operational control of the forces of each Service. This will be done through the commander of each component, who will retain responsibility for such intra-service matters as administration, discipline, internal organization, and unit training. Ordinarily, an accused will not be tried by a court-martial convened by a member of a different Armed Force unless the accused cannot be delivered to their own Service without manifest injury to the Armed Forces. However, commanders of unified combatant commands may convene courts-martial over members of any of the Armed Forces, and commanders of joint commands or joint task forces may convene general courts-martial for the trial of members of any of the Armed Forces assigned or attached to their command when specifically empowered to convene general courts-martial by the President or Secretary of Defense under UCMJ, Art. 22(a)(9) (see MCM, Rule for Courts-Martial (RCM) 201(e)).

## 2–16. Ineligibility for command of post or activity

A person will be considered ineligible for command of an installation, a post or activity when—

   *a.* Quartered there, but has a headquarters or office elsewhere.

   *b.* A student at a Service school or DA Civilian institution or undergoing individual training, instruction, or temporary duty (TDY) enroute to a post where they are not a part of the command.

   *c.* Not permanently assigned, and/or the unit involved is not permanently assigned to the post.

*d.* Assigned primarily as a permanent member of a board.

*e.* Prohibited from assuming command by statute or by paragraph 2–17.

*f.* Assigned specific duty aboard a military vessel or aircraft where the officer's particular duty, specialty, or military occupational specialty (MOS) does not technically qualify him or her to assume the duty of ship's master or aircraft commander.

*g.* In arrest (a person under arrest is ineligible to exercise command of any kind).

## 2–17. Restrictions

*a. Officers on duty in Department of the Army Staff agencies.* Officers on duty or detailed to any of the Services or staff agencies and bureaus of DA (including heads thereof) will not normally assume command of troops other than those of the Service, staff, or bureaus where they are on duty. Exceptions must be directed by proper authority.

*b. Officers of the Army Medical Department.*

(1) Officers of the AMEDD may exercise command within the AMEDD according to AR 40–1.

(2) As an exception, officers of the Medical Service Corps may command troops not part of the AMEDD when authorized by the SECARMY; commanders of ACOMs, ASCCs, DRUs, Army groups, armies, corps, divisions, or comparable units; chiefs of the military services; or heads of other DA staff agencies.

*c. Chaplains.* A chaplain has rank without command. Although chaplains may not exercise command, they may exercise operational supervision and control.

*d. Commanding officer of troops on transports.* Military personnel embarking on Military Sealift Command vessels are available for command duty unless otherwise indicated in their travel orders or precluded from assuming command by reason of their branch of Service. GOs will be excluded from this requirement. Designation of colonels will be at the discretion of the terminal commander.

*e. U.S. Army Reserve unit commanders.* The authority delegated under paragraph 2–8 will apply in the following cases when it is not practical to assign the senior officer to command:

(1) When the USAR officer selected to command a USAR unit, while in Reserve duty training status, is junior in DOR to other officers of the same grade assigned to that unit (see AR 600–8–29).

(2) When a USAR unit is ordered to active duty, and the assigned unit commander is junior in DOR to other assigned officers of the same grade (see AR 600–8–29).

*f. Warrant officers.* When assigned duties as station, unit, or detachment commander, WOs are vested with all the powers usually exercised by other commissioned officers (see DA Pam 611–21 for exceptions).

*g. Partially disabled officers.* Partially disabled officers continued on active duty under AR 635–40 will be assigned to positions in which their special qualifications make them of particular value to the Service. Such officers will not be assigned to command positions unless the assigning authority determines that the person—

(1) Has the medical (physical) career potential to serve in combat situations.

(2) Able to serve until the age for mandatory retirement.

*h. Inspectors general.* An officer detailed to duty as an inspector general (IG) will not assume command of troops while so detailed. However, an IG is not precluded from assuming temporary command of an organization if he or she—

(1) Is the next senior regularly assigned Army officer of the organization.

(2) Is not otherwise ineligible.

(3) Has been relieved from detail as an IG during the period of temporary command.

*i. Program executive officers.* With the exception of the CG, U.S. Army Corps of Engineers and the CG, U.S. Army Space and Missile Defense Command, an officer assigned as a program executive officer will not assume command of troops, installations, or activities while so assigned. Requests for exceptions for GOs, other than those specified above, will be submitted to General Officer Management Office (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200.

*j. Professors at the U.S. Military Academy.* Officers appointed as permanent professors at the U.S. Military Academy (USMA) exercise command only in the academic departments of the USMA.

## 2–18. Relief for cause

*a.* When a higher ranking commander loses confidence in a subordinate commander's ability to command due to misconduct, poor judgment, the subordinate's inability to complete assigned duties, or for other similar reasons, the higher ranking commander has the authority to relieve the subordinate commander. Relief is normally preceded with formal counseling by the commander or supervisor unless such action is not deemed appropriate or practical under the circumstances. Although any commander may temporarily suspend a subordinate from command, final action to relieve an officer from any command position will not be taken until after written approval is obtained from the first

GO (to include one frocked to the grade of BG) in the chain of command of the officer being relieved. Any action purporting to finally relieve an officer from any command position prior to the required written approval will be considered for all purposes as a temporary suspension from assigned duties, rather than a final relief from command for cause. If a GO (to include one frocked to the grade of BG) is the relieving official, no further approval of the relief action is required; however, the provisions of AR 623–3 concerning the administrative review of relief reports remain applicable.

*b.* When a commander loses confidence in a CSM's ability to perform duties due to any of the reasons outlined in subparagraph 2–18*a*, the procedures in AR 614–200 must be followed.

*c.* If a relief for cause is contemplated on the basis of an investigation under AR 15–6, the referral and comment procedures of that regulation must be followed before initiating or directing the relief. This does not preclude a temporary suspension from assigned duties pending completion of the procedural safeguards contained in AR 15–6. Any action purporting to initiate or direct a relief for cause on the basis of an investigation under AR 15–6 taken prior to completion of the procedural safeguards of AR 15–6 will be considered for all purposes as a temporary suspension from assigned duties.

## 2–19. Noncommissioned officer support channel

*a.* The NCO support channel (leadership chain) parallels and complements the chain of command. It is a channel of communication and supervision from the CSM to the 1SG, and then to other NCOs and enlisted personnel of the unit. Commanders will define the responsibilities and authority of their NCOs to their staffs and subordinates. This NCO support channel will assist the chain of command in accomplishing the following:

(1) Transmitting, instilling, and ensuring the efficacy of the professional Army Ethic.

(2) Planning and conducting the day-to-day unit operations within prescribed policies and directives.

(3) Training enlisted Soldiers in their MOS, as well as in the basic skills and attributes of a Soldier.

(4) Supervising unit physical fitness training and ensuring that unit Soldiers comply with the weight and appearance standards of AR 600–9 and AR 670–1.

(5) Teaching Soldiers the history of the Army, to include military customs, courtesies, and traditions.

(6) Caring for individual Soldiers and their Families both on and off-duty.

(7) Teaching Soldiers the mission of the unit and developing individual training programs to support the mission.

(8) Accounting for and maintaining individual arms and equipment of enlisted Soldiers and unit equipment under their control.

(9) Administering and monitoring the Noncommissioned Officer's Development Program and other unit training programs.

(10) Achieving and maintaining courage, candor, competence, commitment, and compassion.

(11) Fostering initiatives through the NCO support channel that encourage first-line and junior leaders to take responsibility for building a team in a climate of respect and trust.

*b.* DA Pam 611–21 and TC 7–22.7 contain specific information concerning the responsibilities, command functions, and scope of NCO duties.

(1) *Sergeant Major of the Army.* This is the senior SGM grade and designates the senior enlisted position of the Army. The SGM in this position serves as the senior enlisted advisor and consultant to the SECARMY and CSA, and advises senior Army leadership on matters affecting manning, equipping, training, quality of life, and other policies and programs that may affect the Army.

(2) *Command sergeant major.* This position title designates the senior NCO of the command at battalion or higher levels. They carry out policies, enforce standards, and advise the commander on the performance, training, appearance, and conduct of enlisted Soldiers. The CSM administers the unit Noncommissioned Officer's Development Program.

(3) *First sergeant.* The position of 1SG designates the senior NCO at company level. The 1SG of a separate company or equivalent level organization administers the unit Noncommissioned Officer's Professional Development Program.

(4) *Platoon sergeant.* The platoon SGT is the key assistant and advisor to the platoon leader. In the absence of the platoon leader, the platoon SGT leads the platoon.

(5) *Section, squad, and team leaders.* These direct leaders are the NCOs responsible at this level.

*c.* NCO disciplinary policies are shown below:

(1) NCOs are important to maintaining discipline in the Army. The policies prescribed in this subparagraph should be considered together with the provisions of chapter 4 of this regulation, AR 27–10, and the MCM.

*(a)* NCOs have the authority to apprehend persons subject to the UCMJ pursuant UCMJ, Art. 7; RCM 302(b); and chapter 4.

*(b)* NCOs may be authorized by their commanders to order enlisted Soldiers of the commanding officer's command or enlisted Soldiers subject to the authority of that commanding officer into arrest or confinement pursuant to UCMJ, Art. 9 and RCM 304(b).

(2) NCOs do not have authority to impose nonjudicial punishment on other enlisted Soldiers under the MCM (UCMJ, Art. 15). However, the commander may authorize an NCO in the grade of SFC or above, provided such person is senior to the Soldier being notified, to deliver the DA Form 2627 (Record of Proceedings under Article 15, UCMJ) and inform the Soldier of his or her rights. In cases of nonjudicial punishment, the recommendations of NCOs should be sought and considered by the unit commanders.

(3) As enlisted leaders of Soldiers, NCOs are essential to furthering the efficiency of the company, battery, or troop. This function includes preventing incidents that make it necessary to resort to trial by courts-martial or the imposition of nonjudicial punishment. Thus, NCOs are assistants to commanders in administering minor nonpunitive corrective actions as found in AR 27–10 and Part V of the MCM. "Nonpunitive measures" are not "nonjudicial punishment."

(4) In taking corrective action with regard to subordinates, NCOs will be guided by and observe the principles listed in chapter 4.

*d.* NCO prerogatives and privileges are shown below. NCOs will—

(1) Function only in supervisory roles on work details and only as NCOs of the guard on guard duty, except when temporary personnel shortages require the NCO to actively participate in the work detail.

(2) Be granted such privileges as organizations and SCs are capable of granting and consider proper to enhance the prestige of their enlisted troop leaders.

## Chapter 3
## Ready and Resilient

### 3–1. General

*a.* The Deputy Chief of Staff, G–1 (DAPE–AR) executes the Ready and Resilient requirements, under the supervision of the Assistant Secretary of the Army, Manpower and Reserve Affairs (ASA M&RA), 300 Army Pentagon, Washington, DC 20310–0300.

*b.* The Army requires innovative and adaptive leaders of character and cohesive teams of fit, resilient individuals who are committed to the Army Profession and able to thrive in conditions of complexity and uncertainty. To sustain this vision, the Army provides commanders and leaders ready and resilient capabilities enabling them to strengthen resiliency and improve readiness. Sustaining personal readiness is a necessary component of maintaining the readiness of the Force. Personal readiness is an individual's physical, psychological, social, spiritual and Family preparedness to strengthen individual readiness and promote a culture of trust founded on the Army Values.

*c.* The Army has implemented a holistic, comprehensive prevention model to strengthen Soldiers, build protective factors, and foster a culture of trust to promote deployability, successful service, and unit cohesion. The prevention model empowers Army leaders to gain a holistic picture of personal readiness from entry to end-of-service and tailor and operationalize resources and training based on identified opportunities and evidence-informed practices that focus on strengthening the force. The Army is also focused on improving readiness of the Army through the development and enhancement of science and research, data collection and analysis, strategic communications, training, and policies that are designed to improve individual readiness and resilience and minimize suicide behaviors for Soldiers, DA Civilians, and Families.

*d.* R2 has four strategic objectives—

(1) Sustained personal readiness to meet operational requirements.

(2) Sustain a values-based organization of trusted Army professionals.

(3) Enhanced visibility of personal readiness throughout a career.

(4) R2 management that enables personal readiness.

### 3–2. The Army Ready and Resilient strategic governance process

The R2 governance process is one by which individual programs and processes, that once operated independently, provide senior leadership with a collaborative synthesis of information to oversee, identify and critically assess the attributes of personal readiness, as well as gaps and potential solutions that enhance R2 execution. The process evaluates and strengthens the Army through a comprehensive strategy that utilizes feedback and metrics that support timely decisions; identifies, synchronizes and improves efficiencies; and allocates the appropriate resources needed to increase the readiness of the Force. Overall, R2 governance streamlines and facilitates communication and provides

(4) Conducts analysis and makes recommendations to governance bodies addressing the integration and synchronization of policy, programs, training, resources, and strategic messaging in support of R2.

(5) Monitors R2 Portfolio programs and oversee biennial review of the R2 Portfolio.

## Chapter 4
## Military Discipline and Conduct

### 4–1. Military discipline

*a.* Military discipline is founded upon self-discipline, respect for properly constituted authority, and the embracing of the professional Army Ethic with its supporting individual values. Military discipline is instilled through positive leadership, reinforcing the regulatory standards for personnel, and the training readiness standards for individual and collective tasks, together, resulting in a mental attitude about proper conduct and obedience to lawful military authority.

*b.* While military discipline is the result of effective training, it is affected by every feature of military life. It is manifested in individuals and units by cohesion, bonding, and a spirit of teamwork; by smartness of appearance and action; by cleanliness and maintenance of dress, equipment, and quarters; by deference to seniors and mutual respect between senior and subordinate personnel; by the prompt and willing execution of both the letter and the spirit of the legal orders of their lawful commanders; and by fairness, justice, and equity for all Soldiers, regardless of race, color, sex (including gender identity), national origin, religion, and sexual orientation.

*c.* Commanders and other leaders will maintain discipline according to the policies of this chapter, applicable laws and regulations, and the orders of seniors.

### 4–2. Obedience to orders

All personnel in the Army are required to strictly obey and promptly execute the legal orders of their lawful seniors.

### 4–3. Military courtesy

*a.* Courtesy among members of the Armed Forces is vital to maintaining military discipline. Respect to seniors will be extended at all times (see AR 600–25).

*b.* The actions of military personnel will reflect respect to both the national anthem and the national colors. The courtesies listed in AR 600–25 should be rendered the national colors and national anthem at public events whether the Soldier is off or on duty, whether he or she is in or out of uniform. Intentional disrespect to the national colors or national anthem is conduct prejudicial to good order and discipline and discredits the Army.

### 4–4. Soldier conduct

*a.* Ensuring the proper conduct of Soldiers is a function of command. Commanders and leaders in the Army, whether on or off-duty or in a leave status, will—

(1) Ensure all Soldiers present a neat, military appearance.

(2) Take appropriate action, consistent with Army regulations, in any case where a Soldier's conduct violates good order and military discipline.

*b.* On public conveyances in the absence of military police (MP), the person in charge of the conveyance will be asked to notify the nearest MP and arrange to have them, if necessary, take custody of military personnel. In serious situations, such as physical assault, the person in charge of the conveyance will be asked to stop at the first opportunity and request local police assistance. In all such cases, the local police will be advised to telephone the nearest Army post or Army headquarters.

*c.* When an offense endangering the reputation of the Army is committed elsewhere (not on a public conveyance) and MP are not available, civilian police will be requested to take appropriate action.

*d.* When the MP is not present, the senior officer, WO, or NCO present will obtain the Soldier's name, grade, organization, and station. The information and a statement of the circumstances will be sent to the Soldier's commanding officer without delay. If the Soldier is turned over to the civilian police, the above information will be sent to the civilian police for transmittal to the proper military authorities.

*e.* The Director of Emergency Services (DES)/Provost Marshal Office (PMO) will conduct criminal history checks and provide monthly reports to brigade-level commanders of newly-assigned Soldiers. The DES/PMO will compile the brigade-level rosters and provide a consolidated list to the U.S. Army Criminal Investigation Command (USACIDC). USACIDC will check the newly assigned Soldiers against Army law-enforcement databases and provide

results to the installation DES/PMO via the USACIDC SharePoint portal monthly. The installation DES/PMO will then distribute individual criminal history reports to the Soldier's brigade-level commander.

(1) Commanders will use the information in the reports to ensure that, if required, Soldiers are in compliance with paragraph 4–22 (the Domestic Violence Amendment to the Gun Control Act of 1968, known as the Lautenberg Amendment) and have completed DD Form 2791 (Notice of Release/Acknowledgement of Convicted Sex Offender Registration Requirements) as required by AR 27–10.

(2) Commanders will not initiate judicial or adverse administrative actions based solely on the information in criminal history reports. Commanders will consult with their servicing legal advisor for assistance in determining available options and will not retain criminal history reports after the Soldier leaves the unit.

## 4–5. Maintenance of order

Army and Marine Corps MP, Air Force security police, and members of the Navy and Coast Guard shore patrols are authorized and directed to apprehend Armed Forces members who commit offenses punishable under the UCMJ. Officers, WOs, NCOs, and petty officers of the Armed Forces are authorized and directed to quell all quarrels, frays, and disorders among persons subject to military law and to apprehend participants. Those exercising this authority should do so with judgment and tact. Personnel so apprehended will be returned to the jurisdiction of their respective Service as soon as practical. Confinement of females will be according to AR 190–47.

## 4–6. Exercising military authority

a. Military authority is exercised promptly, firmly, courteously and fairly. Commanders should consider nonpunitive corrective measures before deciding to impose nonjudicial punishment. Trial by court-martial is ordinarily inappropriate for minor offenses unless lesser forms of administering discipline would be ineffective (see MCM, Part V, and AR 27–10). Nonpunitive corrective measures are the primary tools for teaching proper standards of conduct and performance and do not constitute punishment, nor are they required as a first step toward nonjudicial punishment. Included among nonpunitive measures are denial of pass or other privileges, counseling, administrative reduction in grade, administrative reprimands and admonitions, extra training, bar to continued service, and military occupational specialty (MOS) reclassification. Some of the administrative corrective actions cited may deteriorate into hazing and/or bullying; therefore, commanders should monitor whether the disciplinary efforts of their subordinates are appropriate.

b. One of the most effective nonpunitive corrective measures is extra training or instruction. For example, if Soldiers appear in an improper uniform, they are required to correct it immediately; if they do not maintain their Government housing area properly, they must correct the deficiency in a timely manner. If Soldiers have training deficiencies, they will be required to take extra training or instruction in subjects related to the shortcoming.

(1) The training or instruction given to a Soldier to correct deficiencies must be appropriately tailored to curing the deficiency. It must be oriented to improving the Soldier's performance in their problem area. Brief physical exercises are an acceptable form of corrective training for minor acts of indiscipline (for example, requiring the Soldier to do push-ups for arriving late to formation), so long as it does not violate the Army's policies prohibiting hazing, bullying, and unlawful punishment.

(2) Corrective measures may be taken after normal duty hours. Such measures assume the nature of training or instruction, not punishment. Corrective training should continue only until the training deficiency is overcome. Authority to use it is part of the inherent powers of command.

(3) Care should be taken at all levels of command to ensure that training and instruction are not used in an oppressive manner to evade the procedural safeguards inherent to the imposition of nonjudicial punishment. Deficiencies satisfactorily corrected by means of training and instruction will not be noted in the official records of the Soldiers concerned.

## 4–7. Disciplinary powers of the commanding officer

a. Commanders exercise broad disciplinary powers in furtherance of their command responsibilities. Discretion, fairness, and sound judgment are essential ingredients of military justice.

b. Commanders will familiarize themselves with their powers and responsibilities as outlined in MCM, AR 27–10, AR 600–37, AR 635–200, and other authorities. Legal advice is available from supporting judge advocates.

c. Disciplinary measures are tailored to specific offenses and individual offenders. Commanders will neither direct subordinates to take particular disciplinary actions, nor unnecessarily restrict the disciplinary authority of subordinates (see UCMJ, Art. 37 and AR 27–10 regarding the proper exercise of authority by commanders).

d. In accordance with the requirements and time limits listed in AR 190–45, commanders will submit a DA Form 4833 (Commander's Report of Disciplinary or Administrative Action) following offense notification from the PMO,

DES, or USACIDC. Commanders will refer to Army law-enforcement officials (MP investigation or USACIDC) allegations that an assigned Soldier committed a crime that falls outside of the commander's investigative purview. In accordance with AR 190–45 and AR 195–2, if a commander has reason to believe that a Soldier assigned to their unit has committed a criminal offense that commander will decide the appropriate authority to handle the investigation.

(1)  Commanders will report disposition of offenses investigated during a command investigation or inquiry under their authority, meeting the reporting requirements of AR 195–2, when a military law-enforcement activity is not involved. Commanders will ensure there is reason to believe an offense has been committed and that the person to be identified as the offender committed it. Commanders will complete a DA Form 4833 when they obtain legal review of the investigation or inquiry, and determine to take action (or no action) against the offender about an incident. Email the completed and signed DA Form 4833 with the required supporting documents (record of commander's inquiry, UCMJ, Art. 15, or court-martial paperwork) to the supporting installation PMO/DES. For commands not on an installation or commands on a joint base, the supporting PMO/DES can be found in AR 190–45.

(2)  The commander will complete and sign DA Form 5248–R (Report of Unfavorable Information for Security Determination) in accordance with AR 380–67. The DA Form 5248–R must include the results recorded on the DA Form 4833 as well as the commander's recommendation for security reliability. The security manager will submit the DA Form 5248–R to the Department of Defense Central Adjudication Facility (DoD CAF) via the Joint Personnel Adjudication System (JPAS) or successor system.

*e.*  Commanders will notify DES/PMO of DD Forms 2873 (Military Protective Order (MPO)) involving their Soldiers. The DES/PMO will notify the military and local civilian law enforcement.

*f.*  Commanders are responsible to take proper administrative action regarding Soldiers who have deserted. Classification of a Soldier as a deserter is based on intent and not the time the Soldier has been absent from his or her unit; however, the time a Soldier has been absent may be used as a factor when determining intent. A commander should seek the advice and counsel of their legal advisor when determining intent to be a deserter. Commanders will consider the circumstances surrounding unauthorized absences and request warrants via DD Form 553 (Deserter/Absentee Wanted by the Armed Forces) as directed in AR 190–9, and in DoDI 1325.02 for high-risk Soldiers who desert to avoid prosecution of charges, or when the commander believes there is a risk that the Soldier may commit violent acts, or harm themselves or others.

*g.*  Dual-hatting MP leaders as the installation DES. The installation SC may elect to assign the senior MP brigade or battalion commander to serve as the provost marshal officer and DES. As the DES, this officer advises and supports senior, installation, and GCs on issues relating to protection and installation emergency services. Exception to this may occur in the overseas areas, geographically dispersed regions, and locations where military brigades and battalions are not located.

## 4–8.  Settlement of local accounts on change of station
To ensure organizations and individuals have properly settled their accounts, commanders will—

*a.*  Make a reasonable effort to settle local accounts of their organizations before movement.

*b.*  Take action to promptly settle organizational accounts with local firms when unable to settle before movement.

*c.*  Take action as needed when Soldiers under their command fail to clear their personal accounts before departure from their stations. This includes consideration under UCMJ, Arts. 121, 123a, 133, or 134. When indebtedness information is received after a Soldier departs from the station consult the servicing judge advocate.

## 4–9.  Civil status of members of the U.S. Army Reserve
*a.*  The USAR members, not serving on active duty, are not for most purposes considered officers or employees of the United States solely by reason of their Reserve status. They may accept a civilian office or position in the federal service, and receive the pay of that office or position in addition to any pay and allowances they may be entitled to under the laws governing members of RCs.

*b.*  A member of the USAR, not serving on active duty, may generally practice his or her civilian profession or occupation before or in connection with any department of the Federal Government, unless prohibited by law (see 18 USC 205).

*c.*  Conflict-of-interest laws impose limitations on activities in which persons may engage after terminating active duty or employment by the United States. A Reservist who has handled a government matter will not, while in a civilian status, represent any party, other than the government, in connection with the same particular matter (see 18 USC 207). While handling government matters, reservists will not take any direct or indirect action in a particular matter in which they have an outside financial interest (see 18 USC 208 and DoD 5500.07–R).

*d.* ARNG and USAR Soldiers may accept and be paid for civil employment with any foreign government, when approved by the SECARMY and the Secretary of State. This includes any concern controlled in whole or in part by a foreign government. AR 600–291 is used for processing applications.

## 4–10. Participation in support of civilian law-enforcement agencies

*a.* Military support of civilian law enforcement is governed by the Posse Comitatus Act (18 USC 1385) and DoDI 3025.21. Commanders will not sanction use of military personnel in support of civilian law-enforcement agencies in the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, or United States Territories, except when authorized by law. Because this is a complex area of the law, commanders and law-enforcement personnel should consult with their servicing judge advocate or legal advisor.

*b.* Military personnel may report crimes or other suspicious activities to civilian police agencies or cooperate with civilian authorities in their capacities as private citizens. Military law-enforcement personnel may exchange information with civilian authorities according to AR 190–45.

## 4–11. Membership campaigns

DA recognizes and benefits from the activities of many worthy organizations, associations, and clubs. Many of these organizations enjoy close, historical ties with the military community and are composed largely of active or retired military personnel. The DA support of private organizations is strictly regulated by DoDI 1000.15 and DoD 5500.07–R.

*a.* In supporting such organizations and associations, post commanders and heads of DA staff agencies will—

(1) Ensure membership among personnel under their jurisdiction is truly voluntary.

(2) Prohibit any practice that involves or implies compulsion, coercion, influence, or reprisal in the conduct of membership campaigns. This prohibition includes repeated orientations, meetings, or similar counseling of persons who have chosen not to join after given a chance to do so. It also includes using membership statistics in support of supervisory influence.

(3) Prohibit any practice that involves or implies DA sponsorship or endorsement of the organization and its activities.

(4) Prohibit the use of government property, facilities, or services, for example, golf course membership, as an inducement to join a private organization.

*b.* This policy does not prohibit commanders from informing personnel without coercion about membership in such organizations. When doing so, commanders will ensure they do not favor one organization over others.

## 4–12. Extremist organizations and activities

Participation in extremist organizations and activities by Army personnel is inconsistent with the responsibilities of military service. It is the policy of the United States Army to provide EO and fair treatment for all Soldiers without regard to race, color, sex (including gender identity), national origin, religion, or sexual orientation. Enforcement of this policy is a responsibility of command, is vitally important to unit cohesion and morale, and is essential to the Army's ability to accomplish its mission. It is the commander's responsibility to maintain good order and discipline in the unit. Every commander has the inherent authority to take appropriate actions to accomplish this goal. This paragraph identifies prohibited actions by Soldiers involving extremist organizations, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ. This paragraph must be used in conjunction with DoDI 1325.06.

*a. Participation.* Military personnel must reject participation in extremist organizations and activities. Extremist organizations and activities are ones that advocate—

(1) Racial, sex (including gender identity), sexual orientation, or ethnic hatred or intolerance.

(2) Creating or engaging in discrimination based on race, color, sex (including gender identity), national origin, religion, or sexual orientation.

(3) The use of force or violence or unlawful means to deprive individuals of their rights under the United States Constitution or the laws of the United States, or any State.

(4) Support for terrorist organizations or objectives.

(5) The use of unlawful violence or force to achieve goals that are political, religious, discriminatory, or ideological in nature.

(6) Expressing a duty to engage in violence against DoD or the United States in support of a terrorist or extremist cause.

(7) Support for persons or organizations that promote or threaten the unlawful use of force or violence or criminal activity.

(8) Encouraging military or civilian personnel to violate laws or disobey lawful orders or regulations for the purpose of disrupting military activities (subversion).

(9) Participating in activities advocating or teaching the overthrow of the U.S. Government by force or violence, or seeking to alter the form of government by unconstitutional means (sedition).

*b. Prohibitions.* Soldiers are prohibited from the following actions in support of extremist organizations or activities. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative.

(1) Participating in public demonstrations or rallies.

(2) Attending a meeting or activity with the knowledge that the meeting or activity involves an extremist cause when—

*(a)* Whether on or off duty.

*(b)* Whether in or out of uniform.

*(c)* In a foreign country (whether on or off-duty or in or out of uniform).

*(d)* It constitutes a breach of law and order.

*(e)* It is likely to result in violence.

*(f)* In violation of off-limits sanctions.

*(g)* In violation of a commander's order.

(3) Fundraising activities.

(4) Recruiting or training members (including encouraging other Soldiers to join).

(5) Creating, organizing, or taking a visible leadership role in such an organization or activity.

(6) Distributing literature on or off a military installation, the primary purpose and content of which concerns advocacy or support of extremist causes, organizations, or activities; and it appears that the literature presents a clear danger to the loyalty, discipline, or morale of military personnel or the distribution would materially interfere with the accomplishment of a military mission.

(7) Receiving financial assistance from a person or organization who advocates terrorism, the unlawful use of force or violence to undermine or disrupt U.S. military operations, subversion, or sedition.

*c. Command authority.* Commanders have the authority to prohibit military personnel from engaging in or participating in any other activities that the commander determines will adversely affect readiness, good order and discipline, or morale within the command. This includes, but is not limited to, the authority to order the removal of symbols, flags, posters, or other displays from barracks, to place areas or activities off-limits (see AR 190–24), or to order Soldiers not to participate in those activities that are contrary to good order and discipline or morale of the unit or pose a threat to health, safety, and security of military personnel or a military installation.

*d. Command options.* Commander's options for dealing with a Soldier's violation of the prohibitions includes the following:

(1) UCMJ action—Possible punitive articles include the following:

*(a)* UCMJ, Art. 92—Failure to obey a lawful general order or regulation.

*(b)* UCMJ, Art. 116—Riot or breach of peace.

*(c)* UCMJ, Art. 117—Provoking speeches or gestures.

*(d)* UCMJ, Art. 133 – Conduct unbecoming an officer.

*(e)* UCMJ, Art. 134—General article, specifically, conduct which is prejudicial to good order and discipline or service discrediting.

(2) Involuntary separation for unsatisfactory performance or misconduct or for conduct deemed prejudicial to good order and discipline or morale.

(3) Reclassification actions or bar to continued service actions, as appropriate.

(4) Other administrative or disciplinary action deemed appropriate by the commander, based on the specific facts and circumstances of the particular case.

*e. Command responsibility.* Any Soldier involvement with or in an extremist organization or activity (such as membership, receipt of literature, or presence at an event) could threaten the good order and discipline of a unit. In any case of apparent Soldier involvement with or in extremist organizations or activities, whether or not in violation of the prohibitions in paragraph 4–12*b*, commanders will take positive actions to educate Soldiers, putting them on notice of the potential adverse effects that participation in violation of Army policy may have upon good order and discipline in the unit and upon their military service. These positive actions includes the following:

(1) Educating Soldiers regarding the Army's MEO policy. Commanders will advise Soldiers that extremist organizations' goals are inconsistent with Army goals, beliefs, and values concerning MEO. The extremist organizations

and activities block of instruction, when presented by MEO professionals, will only be conducted by Defense EO Management Institute (DEOMI) graduate currently serving in an authorized MEO professional billet. The standardized plan of instruction and training slides are located on the Central Army Registry and may not be supplemented with other training material or slides. The training will be vetted by the commander (or their representative) after obtaining a local legal review prior to presentation of the training.

(2)  Commanders will ensure Soldiers understand the identification of extremist organizations or activities is the responsibility of USACIDC.

(3)  Commanders will report all incidents pertaining to extremist activities to the USACIDC and servicing legal advisor.

(4)  Advising Soldiers that any participation in extremist organizations or activities—

(a)  Will be taken into consideration when evaluating their overall duty performance, to include appropriate remarks on evaluation reports (officer evaluation reports (OERs) and noncommissioned officer evaluation reports (NCOERs)) which include: DA Form 67–10–1 (Company Grade Plate (O1 - O3; WO1 - CW2) Officer Evaluation Report); DA Form 67–10–2 (Field Grade Plate (O4 - O5; CW3 - CW5) Officer Evaluation Report); DA Form 67–10–3 (Strategic Grade Plate (O6) Officer Evaluation Report); and DA Form 67–10–4 (Strategic Grade Plate General Officer Evaluation Report); hereafter referred to collectively as "DA Form 67–10 series (officer evaluation report (OER)" or "OER"). This also includes: DA Form 2166–9–1 (NCO Evaluation Report (SGT)); DA Form 2166–9–2 (NCO Evaluation Report (SSG–1SG/MSG)); DA Form 2166–9–3 (NCO Evaluation Report (CSM/SGM)); hereafter referred to collectively as "DA Form 2166–9 series (noncommissioned officer evaluation report (NCOER))" or "NCOER." This also includes: DA Form 1059 (Service School Academic Evaluation Report); and DA Form 1059–1 (Civilian Institution Academic Evaluation Report); hereafter referred to collectively as academic evaluation reports). (DA Form 67–10 series, DA Form 2166–9 series, DA Form 1059, and DA Form 1059–1 are hereafter referred to collectively as "evaluation reports.")

(b)  Will be taken into consideration when selections for positions of leadership and responsibility are made.

(c)  May result in the suspension or revocation of security clearances or access to government-owned IT systems, as appropriate.

(d)  May result in reclassification actions or bar to continued service actions, as appropriate.

(e)  Will result in being reported to law-enforcement authorities.

(5)  The commander of an Army installation or other Army-controlled facility will prohibit any demonstration or activity on the installation or facility that could result in interference with or prevention of orderly accomplishment of the mission of the installation or facility, or present a clear danger to loyalty, discipline, or morale of the troops. Further, such commanders will deny requests for the use of Army- controlled facilities by individuals or groups that engage in discriminatory practices or for activities involving such practices.

(6)  Suspected affiliation or involvement in extremist activities may come to the attention of a commander in a number of ways, including reports through the chain of command, anonymous calls, or personal observation. A commander receiving such information should consult with their servicing Judge Advocate on how to proceed. Commanders who identify individuals as extremists will, at a minimum, counsel the individual on Army policy concerning extremism. Commanders may also consider taking other action, either administrative or judicial as listed in paragraph 4–12d.

f.  Reporting requirement.  Commanders will notify the supporting counterintelligence organization in cases where they know or suspect that Soldiers are engaging in the activities specified in paragraphs 4–12a(3) to (9) or when they become aware of any of the activities or behaviors defined in AR 381–12. If a Soldier possesses a security clearance, commanders will ensure the security manager records the derogatory information as an incident report in the JPAS (or subsequent system) in accordance with AR 380–67.

g.  Criminal gangs and activity.  Participation in criminal gangs and activities by Army personnel is inconsistent with the responsibilities of military service. This subparagraph identifies prohibited actions by Soldiers involving criminal gangs, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ.

(1)  Criminal gangs and activities are ones that advocate the planning or commission of one or more criminal offenses, by persons who share a group identity, and may share a common name, slogan, tattoos, graffiti, clothing style or color, or other shared characteristics like the use of violence and intimidation to further its criminal objectives.

(2)  Participation, command authority, command options, and command responsibility are addressed above, in paragraph 4–12.

(3) Soldiers are prohibited from active participation in gangs or their activities. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative, as listed in paragraph 4–12*d*. Below are examples of active participation that are specific to criminal gangs:

*(a)* Knowingly wearing gang colors or clothing.

*(b)* Having tattoos or body markings associated with criminal gangs.

*(c)* Engaging in activities in furtherance of the objective of such gangs or organizations that are detrimental to good order, discipline, or mission accomplishment.

*h. Extremist organizations, criminal gangs, and associated cyber activity and social media.* Army personnel are responsible for content they publish on all personal and public internet domains to include social media sites, blogs, and other websites. Participation in internet sites sponsored by extremist organizations and activities is inconsistent with the responsibilities of military service. Army personnel who maintain a presence on the internet could be perceived as representatives of the Army. This paragraph identifies prohibited actions by Soldiers involving participation in cyber activities sponsored by or promoting extremist organizations or criminal gangs and the use of social media to promote activities associated with extremism and criminal gangs, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ.

(1) *Participation.* Military personnel must reject participation in extremist organizations and associated cyber activities. Extremist organizations and criminal gangs are described in paragraphs 4–12*a* and 4–12*g*.

(2) *Prohibitions.* Soldiers are prohibited from engaging in cyber-related activities in support of extremist organizations or criminal gangs. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative. Examples of prohibited cyber-related activities include:

*(a)* Participating in the promotion of demonstrations or rallies through the use of cyber activities and social media.

*(b)* Promotion of a meeting or activity through the use of cyber activities and or social media with the knowledge that the meeting or activity involves an extremist cause.

*(c)* Fundraising activities using cyber activity or social media.

*(d)* Recruiting or training members (including encouraging other Soldiers to join) using cyber activity or social media.

*(e)* Creating, organizing, or taking a visible leadership role in such a cyber or social media activity.

*(f)* Promoting information through cyber activity, the primary purpose and content of which concerns advocacy or support of extremist causes, organizations, or activities; and it appears that the information presents a clear danger to the loyalty, discipline, or morale of military personnel or the distribution would materially interfere with the accomplishment of a military mission.

*(g)* Browsing or visiting internet Web sites or engaging in cyber activities when on duty, without official sanction, that promote or advocate violence directed against the U.S. or DoD, or that promote international terrorism or terrorist themes.

(3) *Command authority.* Commanders have the authority to prohibit military personnel from engaging in or participating in any cyber or social media activities that the commander determines will adversely affect good order and discipline or morale within the command. This includes, but is not limited to, the authority to order the removal of images, symbols, flags, language, or other displays from social media and internet domains, or to order Soldiers not to participate in cyber and social media activities that are contrary to good order and discipline or morale of the unit or pose a threat to health, safety, and operational security of military personnel or a military installation.

(4) *Command options.* Commander's options for dealing with a Soldier's violation of these prohibitions include—

*(a)* UCMJ action—Possible punitive articles include the following:

1. UCMJ, Art. 92—Failure to obey a lawful general order or regulation.

2. UCMJ, Art. 116—Riot or breach of peace.

3. UCMJ, Art. 117—Provoking speeches or gestures.

4. UCMJ, Art. 133—Conduct unbecoming an officer.

5. UCMJ, Art. 134—General article, specifically, conduct which is prejudicial to good order and discipline or service discrediting.

*(b)* Involuntary separation for unsatisfactory performance or misconduct or for conduct deemed prejudicial to good order and discipline or morale.

*(c)* Reclassification actions or bar to reenlistment actions, as appropriate.

*(d)* Other administrative or disciplinary action deemed appropriate by the commander, based on the specific facts and circumstances of the particular case to include removal of access to government-owned IT systems.

*i. Command responsibility.* Command responsibility is addressed in paragraph 4–12*e*.

*j. Social media or cyber activity.* Commanders of an Army installation or other Army-controlled facility have the authority to prohibit any social media or cyber activity that could result in interference with or prevention of orderly accomplishment of the mission of the installation or facility, or present a clear danger to loyalty, discipline, or morale of the troops. Further, such commanders will deny requests for the use of Army-controlled facilities by individuals or groups that engage in discriminatory practices or for activities involving such practices.

*k. Preventive activities.*

(1) Commanders should remain alert for signs of future prohibited activities. They should intervene early, primarily through counseling, when observing such signs even though the signs may not rise to active advocacy or active participation or may not threaten good order and discipline, but only suggest such potential. The goal of early intervention is to minimize the risk of future prohibited activities.

(2) Examples of such signs, which, in the absence of the active advocacy or active participation, could include mere membership in criminal gangs and extremist organizations. Signs could also include possession of literature associated with such gangs or organizations, or with related ideology, doctrine, or causes. While mere membership or possession of literature normally is not prohibited, it may merit further investigation and possibly counseling to emphasize the importance of adherence to the Army's values and to ensure that the Soldier understands what activities are prohibited.

*l. Legal advice and counsel.* Commanders should seek the advice and counsel of their legal advisor when taking actions pursuant to this policy.

## 4–13. Army language policy

English is the operational language of the Army. Soldiers must maintain sufficient proficiency in English to perform their military duties. Their operational communications must be understood by everyone who has an official need-to-know their content, and, therefore, will normally be in English. However, commanders may not require Soldiers to use English, unless such use is clearly necessary and proper for the performance of military functions. Accordingly, commanders may not require the use of English for personal communications that are unrelated to military functions.

## 4–14. Relationships between Soldiers of different grades

*a.* The term "officer" used in this paragraph includes both commissioned and WOs, unless otherwise stated. The term "noncommissioned officer" refers to a Soldier in the grade of corporal to CSM/SGM. The term "junior enlisted Soldier" refers to a Soldier in the grade of private to specialist. The provisions of this paragraph apply to both relationships between Soldiers in the RA and USAR, and between Soldiers and personnel of other military services.

*b.* Soldiers of different grades must be cognizant that their interactions do not create an actual or clearly predictable perception of undue familiarity between an officer and an enlisted Soldier, or between an NCO and a junior enlisted Soldier. Examples of familiarity between Soldiers that may become "undue" can include repeated visits to bars, nightclubs, eating establishments, or homes between an officer and an enlisted Soldier, or an NCO and a junior enlisted Soldier, except for social gatherings, that involve an entire unit, office, or work section. All relationships between Soldiers of different grades are prohibited if they—

(1) Compromise, or appear to compromise, the integrity of supervisory authority or the chain of command.

(2) Cause actual or perceived partiality or unfairness.

(3) Involve, or appear to involve, the improper use of grade or rank or position for personal gain.

(4) Are, or are perceived to be, exploitative or coercive in nature.

(5) Create an actual or clearly predictable adverse impact on discipline, authority, morale, or the ability of the command to accomplish its mission.

*c.* Certain types of personal relationships between officers and enlisted Soldiers, or NCOs and junior enlisted Soldiers, are prohibited. Prohibited relationships include the following:

(1) Ongoing business relationships between officers and enlisted personnel, or NCOs and junior enlisted Soldiers. This prohibition does not apply to landlord/tenant relationships or to one-time transactions such as the sale of an automobile or house, but does apply to borrowing or lending money, commercial solicitation, and any other type of ongoing financial or business relationship. Business relationships between NCOs and junior enlisted Soldiers that exist at the time this policy becomes effective and that were authorized under previously existing rules and regulations, are exempt provided the individuals are not in the same unit or chain of command and the relationship does not meet the criteria listed in paragraphs 4–14*b*(1) through (5). In the case of ARNG or USAR personnel, this prohibition does not apply to relationships that exist due to their civilian occupation or employment.

(2) Dating, shared living accommodations other than those directed by operational requirements, and intimate or sexual relationships between officers and enlisted personnel, or NCOs and junior enlisted Soldiers. This prohibition does not apply to the following:

*(a)* Marriages between an officer and an enlisted member or an NCO and a junior enlisted Soldier. However, when evidence of fraternization between an officer and enlisted member or an NCO and a junior enlisted Soldier prior to their marriage exists, their marriage does not preclude appropriate command action based on the prior fraternization. Commanders have a wide range of responses available including counseling, reprimand, order to cease a relationship prior to marriage, reassignment, administrative action, or adverse action. Commanders must carefully consider all of the facts and circumstances in reaching a disposition that is appropriate. Generally, the commander should take the minimum action necessary to ensure that the needs of good order and discipline are satisfied.

*(b)* Situations in which a relationship that complies with this policy would move into noncompliance due to a change in status of one of the members (for instance, a case where two junior enlisted members are dating and one is subsequently commissioned or selected to be a WO, commissioned officer, or NCO). In relationships where one of the enlisted members has entered into a program intended to result in a change in his or her status from enlisted to officer or junior enlisted Soldier to NCO, the couple must terminate the relationship permanently or marry within 1 year of the date of the appointment or the change in status occurs.

*(c)* Personal relationships between members of the ARNG or USAR, when the relationship primarily exists due to civilian acquaintanceships, unless the individuals are on active duty (other than annual training), on full-time National Guard Duty (FTNGD) (other than annual training), or serving as a dual status military technician.

*(d)* Personal relationships between members of the RA and members of the ARNG or USAR when the relationship primarily exists due to civilian association and the USAR member is not on active duty (other than annual training), on FTNGD (other than annual training), or serving as a dual status military technician.

*(e)* Soldiers and leaders share responsibility for ensuring that these personal relationships do not interfere with good order and discipline. Commanders will ensure that personal relationships that exist between Soldiers of different grades emanating from their civilian careers will not influence training, readiness, or personnel actions.

(3) Gambling between officers and enlisted personnel, or NCOs and junior enlisted Soldiers.

*d.* These prohibitions are not intended to preclude unit-based normal team building or activity based on interaction which occurs in the context of community based, religious, or fraternal associations such as scouting, youth or adult sports leagues or teams; membership in organizations such as the Masons or Elks; religious activities including chapel, church, synagogue, mosque, or religious education; Family gatherings; unit-based social functions; or athletic events.

*e.* All military personnel share the responsibility for maintaining professional relationships. However, in any relationship between Soldiers of different grade or rank, the senior member is generally in the best position to terminate or limit the extent of the relationship. Nevertheless, all members may be held accountable for relationships that violate this policy.

*f.* Commanders should seek to prevent inappropriate or unprofessional relationships through proper training and personal leadership. Commanders have a wide range of responses available should inappropriate relationships occur. These responses may include counseling, reprimand, order to cease, reassignment, or adverse action. Potential adverse action may include official reprimand, adverse evaluation report(s), nonjudicial punishment, separation, bar to continued service, promotion denial, demotion, and courts-martial. Commanders must carefully consider all of the facts and circumstances in reaching a disposition that is warranted, appropriate, and fair.

## 4–15. Other prohibited relationships

*a.* Army personnel will treat each prospect, applicant, recruit, and trainee with dignity and respect as they pursue their aspiration of serving in the military. Army policy prohibits inappropriate relations between recruiters and prospects, applicants, and/or recruits and between trainers providing entry-level training or permanent party personnel and trainees.

*b.* Inappropriate relationships and prohibited activities between recruiters and prospects, applicants, and/or recruits and between trainers providing entry-level training or permanent party personnel and trainees, are not permitted and appropriate action will be taken. Violations may be subject to punishment under the UCMJ and/or adverse administrative action. DA Civilians are subject to administrative or disciplinary actions under applicable Federal law and regulation.

*c.* These prohibitions apply from the first contact between a recruit and recruiter through entry-level training and for 6 months after the trainee completes entry-level training. This list is not all-inclusive. Training commands (for example, TRADOC, AMEDD Center and School, and U.S. Army Recruiting Command) are authorized to publish supplemental regulations to paragraph 4–15*c*(1), which further detail prohibited conduct within their respective organizations.

(1) Recruiters, permanent party personnel, and trainers providing entry-level training will not—

*(a)* Develop, attempt to develop, or conduct a personal, intimate, or sexual relationship with any prospect, applicant, recruit, or trainee. These relationships include, but are not limited to, dating, handholding, kissing, embracing,

caressing, and engaging in sexual activities. Prohibited personal, intimate, or sexual relationships include those relationships conducted in person; through a third person; or via cards, letters, emails, telephone calls, instant messaging, video, photographs, social media, social networking, and any other means of communication.

*(b)* Use rank or position, threats, pressure, or promise of return of favors or favorable treatment in an attempt to gain sexual favors from any prospect, applicant, recruit, or trainee.

*(c)* Make sexual advances toward, or seek or accept sexual advances or favors from, any prospect, applicant, recruit, or trainee. In addition, recruiters and trainers will report all offers of sexual favors or sexual advances any prospect, applicant, recruit, or trainee makes to their chain of command.

*(d)* Allow any prospect, applicant, recruit, or trainee to enter their dwelling.

*(e)* Establish a common household with any prospect, applicant, recruit, or trainee (that is, they will not share the same living area in an apartment, house, or other dwelling). This prohibition does not include facilities open to all members of a homeowners association or all tenants in an apartment complex.

*(f)* Allow any prospect, applicant, recruit, or trainee to enter their privately owned vehicles. Exceptions are permitted for official business when the safety or welfare of the prospect, applicant, recruit, or trainee is at risk. Recruiters and trainers will report all such instances to their chain of command as soon as practicable.

*(g)* Provide alcohol to, or consume alcohol with, any prospect, applicant, recruit, or trainee on a personal social basis. This prohibition does not apply to the practice of participation in religious services, rites, or rituals.

*(h)* Attend social gatherings, clubs, bars, theaters, or similar establishments on a personal social basis with any prospect, applicant, recruit, or trainee.

*(i)* Gamble with any prospect, applicant, recruit, or trainee.

*(j)* Lend money to, borrow money from, or otherwise become indebted to or by any prospect, applicant, recruit, or trainee.

*(k)* Solicit donations from any prospect, applicant, recruit, or trainee.

*(l)* Hire or otherwise employ, in an official or personal capacity, any prospect, applicant, recruit, or trainee (for example, for babysitting or maintenance jobs).

*(m)* Accept personal goods, in an official or personal capacity, from any prospect, applicant, recruit, or trainee for storage or any other reason.

*(n)* Participate in closed-door discussions with any prospect, applicant, recruit, or trainee. Recruiters and trainers will keep doors open when meeting with prospects, applicants, recruits, and trainees except when—

1. Another person at least 18 years of age or older is present;

2. Because of the proximity of others, it is necessary to protect personally identifiable, sensitive, or confidential information (these closed-door sessions will be short in duration); or

3. The design of the office is such that the door opens to a public area where the office is left unprotected from the elements or allows unwanted public interaction. In these cases, the door will be left unlocked and clearly marked that it is open for business and visitors are welcome.

(2) Recruits or trainees will not—

*(a)* Develop, attempt to develop, or conduct a personal, intimate, or sexual relationship with a recruiter, permanent party personnel, or trainer. These relationships include, but are not limited to, dating, handholding, kissing, embracing, caressing, and engaging in sexual activities. Prohibited personal, intimate, or sexual relationships include those relationships conducted in person; through a third party; or via cards, letters, emails, telephone calls, instant messaging, video, photographs, social media, social networking, or any other means of communication.

*(b)* Make sexual advances toward, or seek or accept sexual advances or favors from, a recruiter, permanent party personnel, or trainer.

*(c)* Allow any recruiter, permanent party personnel, or trainer to enter their dwelling or privately owned vehicles except to conduct official business. Exceptions are permitted for official business when the safety or welfare of a recruiter or trainer is at risk.

*(d)* Establish a common household with a recruiter, permanent party personnel, or trainer (that is, will not share the same living area in an apartment, house, or other dwelling). This prohibition does not include facilities open to all members of a homeowners association or all tenants in an apartment complex.

*(e)* Consume alcohol with a recruiter or trainer on a personal social basis.

*(f)* Attend social gatherings, clubs, bars, theaters, or similar establishments on a personal social basis with a recruiter or trainer.

*(g)* Gamble with a recruiter, permanent party personnel, or trainer.

*(h)* Lend money to, borrow money from, or otherwise become indebted to or by a recruiter, permanent party personnel, or trainer.

*d.* At a minimum and as required, the recruit, trainee, recruiter, permanent party personnel, or trainer will complete the following administrative actions. Commanders may add requirements to this list.

(1) Administrative requirements for recruiters and recruits.

*(a)* Before performing recruiter duties, recruiters will sign a DD Form 2982 (Recruiter/Trainer Prohibited Activities Acknowledgment) to acknowledge their understanding of the prohibitions listed in paragraph 4–15*c*(1) and their responsibilities to avoid the prohibited inappropriate behaviors and relations outlined in this regulation. Recruiters will recertify the DD Form 2982 annually. The DD Form 2982 will be locally filed and kept for 1 year after the recruiter has left the unit.

*(b)* During the initial visit, recruiters will provide all applicants with contact information they can use to notify someone if they believe their recruiter has acted improperly.

*(c)* No later than the first visit with a recruiter after a recruit's entry into the Delayed Entry Program (DEP), Future Soldier Program, Delayed Training Program, or Recruit Sustainment Program, a recruit must sign a DD Form 2983 (Recruit/Trainee Prohibited Activities Acknowledgment)  to acknowledge their understanding of the prohibitions listed in paragraph 4–15*c*(2). The DD Form 2983 will be filed in the recruit's enlistment Electronic Records System and kept in accordance with system policy.

*(d)* Exceptions may be granted to accommodate relationships that existed before the recruit started the recruiting process. These relationships include, but are not limited to, Family members. Only the recruiter's commander in the rank of MAJ or higher, or a higher level authority, has the authority to approve these exceptions. Recruiters must request the exception in writing to their commander. Higher level commanders may withhold this authority from subordinate commanders. All exceptions will be documented on DD Form 2982 and DA Form 2983, as applicable.

(2) Administrative requirements for trainers, trainees, and permanent party personnel.

*(a)* Trainers providing entry-level training will sign a DD Form 2982 that acknowledges their understanding of the prohibitions listed in paragraph 4–15*c*(1) and their responsibilities regarding the policies to avoid the inappropriate behaviors and relations outlined in this directive. The DD Form 2982 will be recertified annually. The form will be locally filed and kept for 1 year after the trainer has left the unit.

*(b)* At the onset of the first training session, trainers will brief trainees on the policies in this regulation and provide information that trainees can use to contact someone in leadership if they wish to report any issue related to a trainer's inappropriate conduct.

*(c)* Trainees will sign a DD Form 2983 to acknowledge their understanding and responsibilities as  outlined in this regulation no later than the first day of entry-level training. The DD Form 2983 will be locally filed and kept until 6 months after the trainee has left the unit.

*(d)* Exceptions may be granted to accommodate relationships that existed before the trainee started formal training. An exception may be permitted for Family members. Commanders for the trainer or permanent party personnel and trainee will approve the exception for it to apply to both parties. Only the trainer's or permanent party personnel's and trainee's commanders in the rank of MAJ or higher, or higher level authority, have the authority to approve these exceptions. Higher level commanders may withhold this authority from subordinate commanders. Trainers, permanent party personnel, and trainees must request the exception in writing to their commander. All exceptions will be documented on DD Form 2982 and DA Form 2983, as applicable.

(3) Special consideration. The policy in this regulation is not intended to eliminate all opportunities for trainer and trainee external classroom professional development and mentorship because these opportunities are important to the learning process. Leaders are responsible for setting the right command climate and providing guidelines for outside the classroom mentoring and team-building activities. The prohibitions listed in paragraphs 4–15*c*(1) and 4–15*c*(2) related to private dwellings, privately owned vehicles, alcohol, and social gatherings do not apply to command-authorized programs such as the Military Academy's Cadet Sponsorship or Character Development programs or other similar social development programs within ROTC programs, which provide breadth and depth to the education of future leaders. The prohibitions in paragraphs 4–15*c*(1) and 4–15*c*(2) related to alcohol and social gatherings also do not apply to command-authorized unit social events, such as unit dining in/out events, holiday receptions, or hail and farewell events, or inclusive group social functions, such as those by team, squad, or platoon, to which all group members are invited. The policy in this directive will not infringe upon the right to the free exercise of religion for trainers and trainees.

*e.* Substantiated violations, of actions identified in paragraphs 4–15*c*(1) and 4–15*c*(2) by any military recruiter or military trainer providing entry-level training will require the Soldier to be processed for administrative separation from the Army, unless the Soldier is otherwise punitively discharged or dismissed from the Army for the violation as part of a court-martial sentence. The requirement to initiate administrative processing does not mean that the result of that processing must be administrative discharge; the specific facts of each individual case will determine whether administrative discharge is appropriate. In all other findings of wrongdoing for actions identified in paragraphs 4–

15*c*(1) and 4–15*c*(2), commanders will take appropriate action. If the separation authority approves retention, they may initiate action for Secretarial plenary separation authority under AR 135–178 or AR 635–200, as appropriate.

(1) Findings of wrongdoing for actions identified in paragraph 4–15*c*(1) against any military recruiter, permanent party personnel, or military trainer providing entry-level training will result in the recruiter, permanent party personnel, or trainer being held accountable at the discretion of their commander.

(2) DA Civilians who violate 4–15*c*(1) may be subject to administrative or disciplinary action up to and including removal from federal service.

(3) Contract employees with substantiated violations of paragraph 4–15*c*(1) (charges supported by a preponderance of the evidence), the command to whom the contractor provides recruiting or training services will immediately contact the cognizant contracting officer for the contract. The command should not take disciplinary action against either the contractor or the contractor employee. The contracting officer has authority to take such action against the contractor as is warranted under the contract to the extent that a substantiated violation by the contractor's employee is deemed a violation of the terms and conditions of the contractor's contract with the Army.

## 4–16. Fraternization
Violations of paragraphs 4–14*b*, 4–14*c*, and 4–15 may be punished under the UCMJ.

## 4–17. Standards of conduct
Public service is a public trust. DA personnel have a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. The performance of their duties should be in keeping with the highest tradition of military and civilian service to the U.S. Government.

*a. Guidance.* Standards of conduct required of Soldiers and DA Civilians are prescribed by Part 2635, Title 5, Code of Federal Regulations, and DoD 5500.07–R. These regulations provide Army personnel with guidance on a multitude of ethical issues, including the avoidance of conflicts of interests between their commercial/financial interests and their official duties.

*b. Annual ethics training.* Commanders at all levels will ensure that all Army personnel required to file a public financial disclosure report, a confidential financial disclosure report, and contracting officers complete annual ethics training as required by DoD 5500.07–R and Part 2638 , Title 5, Code of Federal Regulations.

## 4–18. Employment and volunteer work of spouse
*a.* The Army affirms the rights of a spouse of a Soldier to pursue and hold a job, attend school, or perform volunteer services on or off a military installation. No DA official will, directly or indirectly, impede or otherwise interfere with these rights. Moreover, no DA official will use the preferences and requirements of the Army or any other DoD component to influence the employment, educational, or volunteer service decisions of a spouse. Neither will such decision of a spouse, nor the marital status of the Soldier, affect, favorably or adversely, the performance evaluations, assignments, or promotion opportunities of the Soldier.

(1) In discharging their responsibilities, members of military promotion, continuation, and similar personnel selection boards are prohibited from considering the marital status of a Soldier, or the employment, educational, or volunteer service activities of a Soldier's spouse. AR 135–155 and AR 600–8–29 provide specific policies governing board conduct.

(2) Personnel decisions, including those related to the assignments of Soldiers, will not be affected favorably or adversely, by the employment, educational, or volunteer services activities of a Soldier's spouse, or solely by reason of a Soldier's marital status. AR 140–10, AR 614–30, AR 614–100, AR 614–200, and AR 690–700 provide specific policies. Exceptions may be—

*(a)* Necessary to alleviate the personal hardship of a Soldier or spouse upon the request of the Soldier concerned, such as when a Family member requires specialized medical treatment or educational provisions or similar personal preference accommodations.

*(b)* Needed to facilitate the assignment of dual-military couples in the Army Married Couples Program to the same geographic area.

*(c)* Required by law, such as instances in which a prohibited conflict-of-interest may exist between the official duties of a Soldier and the employment of the Soldier's spouse. DoD 5500.07–R provides specific policies.

*(d)* Made by the Assistant Secretary of Defense (Personnel and Readiness), with the concurrence of the general counsel, on a case-by-case basis, for reasons of national security, that marital status is an essential assignment qualification for particular military billets or positions.

(3) Performance appraisals on Soldiers, including officer and enlisted evaluations reports, will not contain any information regarding the employment, educational or volunteer service activities of the Soldier's spouse, or reflect

favorably or adversely on the member based solely on the Soldier's marital status. AR 623–3 provides specific policies.

*b.* Violations of this policy provide a basis for disciplinary action under the UCMJ in addition to appropriate administrative sanctions.

### 4–19. The Army Harassment Prevention and Response Program (hazing, bullying, and discriminatory harassment)

The Army is a values-based organization where everyone is expected to do what is right by treating all persons as they should be treated—with dignity and respect. Army personnel are expected to treat all people with respect in all aspects of life and forms of communication (for example, online or in person). Furthermore, Army personnel, especially those entrusted with the mantle of leadership, will lead by example and do what is right to prevent abusive treatment of others. Failure to do so brings discredit on the Army and may have strategic implications. Hazing, bullying, and discriminatory harassment of people or their property is prohibited; allegations of harassment will be addressed swiftly, individually, and in light of their circumstances. Hazing, bullying, online misconduct, and other acts of misconduct, undermine trust, violate our ethic, and negatively impact command climate and readiness. Paragraphs 4–19*a*(1) through (5) are punitive, and violators may be punished under the UCMJ or subject to administrative action. Commanders will seek the advice and counsel of their legal advisor when taking actions pursuant to this paragraph. This policy does not apply to DA Civilian employees wishing to file a harassment complaint; they should seek assistance from their appropriate servicing EEO office in accordance with DoDD 1440.1; DoDI 1400.25, Volume 771; Section 1561 of Title 10, United States Code (USC); AR 690–12 and AR 690–600.

*a. Harassment.*

(1) *Hazing.* A form of harassment that includes conduct through which Soldiers or DA Civilian employees (who haze Soldiers), without a proper military authority or other governmental purpose but with a nexus to military service, physically or psychologically injures or creates a risk of physical or psychological injury to Soldiers for the purpose of: initiation into, admission into, affiliation with, change in status or position within, or a condition for continued membership in any military or DA Civilian organization. Hazing can be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person.

*(a)* Hazing is evaluated by a reasonable person standard and includes, but is not limited to, the following when performed without proper military authority or other governmental purposes:

1. Any form of initiation or congratulatory act that involves physically striking, beating, paddling, whipping, or burning another person in any manner or threatening to do the same;

2. Pressing any object into another person's skin, regardless of whether it pierces the skin, such as "pinning" or "tacking on" of rank insignia, aviator wings, jump wings, diver insignia, badges, medals, or any other object;

3. Oral or written berating of another person with the purpose of belittling or humiliating;

4. Encouraging another person to engage in illegal, harmful, demeaning, or dangerous acts;

5. Playing abusive or malicious tricks;

6. Excessive physical exercise;

7. Confinement to restricted areas, isolation, or sleep-deprivation;

8. Immersion in noxious substances;

9. Branding, handcuffing, duct taping, tattooing, shaving, greasing, or painting another person;

10. Subjecting another person to excessive or abusive use of water; and

11. Forcing another person to consume food, alcohol, drugs, or any other substance.

*(b)* Soliciting, coercing, or knowingly permitting another to participate, solicit or coerce such conduct, may be considered hazing. Soldiers will be held responsible for an act of hazing even if there was actual or implied consent from the victim, without regard to the Service, rank, status, or position of the victim.

(2) *Bullying.* A form of harassment that includes acts of aggression by Soldiers or DA Civilian employees, with a nexus to military service, with the intent of harming a Soldier either physically or psychologically, without proper military authority or other governmental purpose. Bullying is the exposure of an individual or group to physical and/or emotional aggression with the intent to cause distress or harm. Bullying may involve the singling out of an individual from his or her coworkers, or unit, for ridicule because he or she is considered different or weak. It often is indirect or subtle in nature and involves an imbalance of power between the aggressor and the victim. Bullying can be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person.

*(a)* Bullying is evaluated by a reasonable person standard and includes, but is not limited to, the following when performed without a proper military authority or other governmental purpose:

1. Physically striking another person in any manner or threatening to do the same;

2.  Intimidating, teasing, name calling, mockery, threats of violence, harassment, taunting, social exclusion,  isolating, manipulating, blackmailing, and spreading rumors in which there is often a power differential, whether by rank, position, physical stature, social standing or other measures, between the aggressor (one or more) and the victim (one or more);

3.  Oral or written berating of another person with the purpose of belittling or humiliating;

4.  Encouraging another person to engage in illegal, harmful, demeaning, or dangerous acts;

5.  Playing abusive or malicious tricks;

6.  Branding, handcuffing, duct taping, tattooing, shaving, greasing, painting, hitting, spitting, shoving another person;

7.  Subjecting another person to excessive or abusive use of water;

8.  Forcing another person to consume food, alcohol, drugs, or any other substance; and

9.  Degrading or damaging another's property or reputation.

*(b)* Soliciting, coercing, or knowingly permitting another to participate, solicit or coerce such conduct, may be considered bullying. Soldiers will be held responsible for an act of bullying even if there was actual or implied consent from the victim, without regard to the Service, rank status, or position of the victim.

(3) *Discriminatory harassment.* A form of harassment that is unwelcome conduct based on race, color, religion, sex (including gender identity), national origin, or sexual orientation.

(4) *Other acts of misconduct.* Misconduct may or may not meet the definitions above for hazing or bullying, yet may violate the dignity and respect of others. Additionally, acts of reprisal or retaliation, as defined in paragraph 5–11 or other policy, regulation or law, and/or violations against persons as outlined in the UCMJ may violate the provisions of this paragraph.

*(a)* Harassment is prohibited in all circumstances and environments, including off-duty and "unofficial" unit functions and settings.

*(b)* Harassment is not limited to superior-subordinate relationships. They may occur between peers or, under certain circumstances, may involve actions directed toward senior personnel by those junior in rank, grade, or position to them.

*(c)* Incidents involving sexual assault, harassment, or discrimination must be addressed in accordance with the full display of laws, regulations, and policies pertaining to such allegations. In all cases, appropriate responding and investigative procedures will be followed.

(5) *Online misconduct.* The use of electronic communication to inflict harm. Electronic communication is the transfer of information (signs, writing, images, sounds, or data) transmitted by computer, phone or other electronic device. Electronic communications include, but are not limited to: text messages, emails, chats, instant messaging, screensavers, blogs, social media sites, electronic device applications, and Web/video conferencing. Examples of online misconduct include, but are not limited to: hazing, bullying, harassment, discriminatory harassment, stalking, retaliation, or any other types of misconduct that undermines dignity and respect. When using electronic communication devices, Army personnel should apply "Think, Type, and Post": "Think" about the message being communicated and who could potentially view it; "Type" a communication that is consistent with Army values; and "Post" only those messages that demonstrate dignity and respect for self and others.

*(a)* Commanders and leaders are to reinforce a climate where current and future Army personnel, including Soldiers and DA Civilian employees understand that online misconduct is inconsistent with Army values and where online-related incidents are prevented, reported, and where necessary addressed at the lowest possible level.

*(b)* Personnel experiencing or witnessing online misconduct should promptly report matters to the chain of command/supervision. Alternative avenues for reporting and information include: Family Support Services, Military Equal Opportunity, Equal Employment Opportunity, Sexual Harassment/Assault Response and Prevention, and Army Law Enforcement.

(6) *The imposition of necessary or proper duties and the requirement of their performance does not violate this policy even though the duties may be arduous, hazardous, or both.* Harassment does not include properly directed command activities that serve a legitimate purpose, or the requisite training activities required to prepare for such activities. When authorized by the chain of command and/or operationally required, the following activities do not constitute hazing or bullying:

*(a)* The physical and mental hardships associated with operations or operational training.

*(b)* Lawful punishment imposed pursuant to the UCMJ.

*(c)* Administrative corrective measures, including verbal reprimands and command-authorized physical exercises.

*(d)* Extra military instruction or corrective training that is a valid exercise of military authority intended to correct a Soldier's deficient performance in accordance with paragraph 4–6.

*(e)* Physical training (PT) and remedial PT.

*(f)* Other similar activities that are authorized by the chain of command and conducted in accordance with this or another applicable regulation.

(7) *Traditional events.* Many time-honored customs of the Army include traditional events that celebrate personal milestones and professional achievements. These events are part of our heritage and include hails and farewells, promotion and graduation ceremonies, and other official command functions. When properly organized and supervised, these events serve to enhance morale, esprit de corps, pride, professionalism, and unit cohesiveness. The chain of command will ensure these traditions and customs are carried out in accordance with the moral principles of the Army Ethic and reinforce a positive professional climate within the Army culture of trust.

*b. The Commanding General, U.S. Army Training and Doctrine Command.* Responsibilities outlined in paragraph 6–10.

*c. Commander (or equivalent) at all levels—*

(1) Enforce the Army's policy on harassment at all levels.

(2) Reinforce a climate where current and future Army personnel understand that harassment, including online misconduct, erode mission readiness by diminishing dignity and respect and negatively impacts morale.

(3) Hold leaders at all levels appropriately accountable for fostering a climate of inclusion within their organizations that supports diversity, is free from harassment, and does not tolerate retaliation for those reporting harassment allegations.

(4) Publish and post written command policy implementing The Army Harassment Prevention and Response Program. Statements will be consistent with the Army policy, include the local command's commitment to preventing harassment (including hazing, bullying, discriminatory harassment, online misconduct, and other misconduct). They will also include information regarding how to identify the types of harassment (hazing, bullying, discriminatory harassment, online misconduct, and other misconduct) and Army standard definitions, as outlined in paras 4–19a(1) through (5). The policy will reaffirm that such acts of harassment are prohibited, will explain how and where to file complaints, and will state that all complainants and victims will be protected from acts or threats of reprisal and/or retaliation. Each ACOM, ASCC, DRU, installation, unit, agency, and activity down to company, troop, or battery level will publish a harassment policy. Commanders must consult with their legal advisor prior to publishing.

(5) On an annual basis, commanders will conduct harassment training in combination with their annual MEO training requirement, in accordance with AR 350–1. Training will occur at all levels, from accessions to the assumption of senior leader rank and position. Command participation and emphasis is crucial in this effort. Harassment prevention and response training and education programs at all levels will include—

*(a)* Roles and responsibilities of Soldiers, including fostering a culture fee from harassment.

*(b)* Information on how to identify types of harassment and Army definitions.

*(c)* Options and procedures for submitting informal, formal, and anonymous harassment complaints.

*(d)* Information regarding how to identify and report retaliation in accordance with the Army's Retaliation Strategy.

*(e)* Information regarding how to identify and report reprisal in accordance with DoDD 7050.06.

*(f)* Information regarding bystander intervention to ensure Soldiers have the skills to recognize when to intervene and the tools necessary to implement the intervention.

*(g)* Information regarding any administrative or disciplinary action that could be taken.

*(h)* Include examples of hazing, bullying, and discriminatory harassment and illustrate how these behaviors negatively impact the mission.

*(i)* Victim rights and resources.

(6) Conduct compliance reviews on an annual basis, to include—

*(a)* Assessment of subordinate commanders' impartiality, timeliness, and sufficiency of response to harassment complaints.

*(b)* Assessment of subordinate commanders' execution of harassment (hazing, bullying, and discriminatory harassment) prevention training.

*(c)* Assessment of subordinate commanders' organizational climate pursuant to appendix E. Assessments will consider whether organizations are free from harassment (hazing, bullying, and discriminatory harassment) and Soldiers are treated with dignity and respect.

*(d)* Assessment of the effectiveness of subordinate commanders' policies and programs in reducing incidents of harassment and providing appropriate victim services, care, and support.

(7) Ensure programs incorporate, at a minimum: long-term goals, objectives, and milestones; results-oriented performance measures to assess effectiveness; and compliance standards for promoting, supporting, and enforcing policies, plans, and programs.

(8)  Collects, assesses, and analyzes information and data regarding harassment complaints received by the, command and compiles and submits quarterly MEO database reports on a quarterly bases (prior to 30 days after each fiscal quarter) in preparation for HQDA data pull.

(9)  Report allegations of criminal behavior to law enforcement authorities. Investigations of such allegations are recorded and tracked in the Army Law Enforcement Reporting and Tracking System (ALERTS) in accordance with AR 190–45 and AR 195–2. This regulation does not alter the investigative authority or responsibility of Army law-enforcement officials.

(10)  Report allegations (all components) against a promotable COL, an active or retired GO, IG of any component, members of the SES, or executive schedule personnel, to the Investigations Division, U.S. Army Inspector General Agency (SAIG–IN), Pentagon, Washington, DC 20310–1700 by rapid but confidential means within 2 working days of receipt when practicable. The complaint may be emailed to the HQDA IG's investigations mailbox at usarmy.pentagon.hqda-otig.mbx.saig-in-office@mail.mil in order to provide timely submission.

(11)  If a Soldier possesses a security clearance, commanders will ensure the security manager records the substantiated violations of this paragraph as an incident report in the JPAS (or subsequent system) in accordance with AR 380–67.

(12)  Ensure MEO database is updated on a quarterly bases (prior to 30 days after each fiscal quarter) in preparation or HQDA data pull.

*d. Tracking and reporting—*

(1)  Harassment complaints will be processed through the command MEO Program using the MEO and Harassment Complaint Processing System (see para 6–6).

(2)  Tracking and reporting of criminal behavior in violation of this paragraph will be consolidated by the Office of the Provost Marshal General, and OTJAG, then forwarded to the HQDA MEO policy office on a quarterly basis.

(3)  Harassment complaints against Soldiers reported via EEO channels in accordance with AR 690–600 will be reported to and tracked by the command MEO Program as required by DoDI 1020.03.

*e. 24 hour hotline.*  See paragraph 6–6.

*f. Individual reporting.*  Army personnel should report harassment (hazing, bullying, discriminatory harassment) to their commander/supervisor, the MEO, or law enforcement. Individuals should report cases of sexual assault and sexual harassment as described in chapter 7.

*g. Individual information.*  Army personnel may seek information from the following agencies: Family support services, MEO office, EEO office, law enforcement, and the Army SHARP professional. These agencies will refer complainants to the commander, or law enforcement to file a complaint pertaining to harassment.

*h. Guidance.*  Individuals should—

(1)  Promptly report matters to the chain of command/supervision or their MEO professional if they experience or witness any incidents of harassment (hazing, bullying, discriminatory harassment, online misconduct, or other acts of misconduct).

(2)  Conduct themselves in accordance with this paragraph and treat all persons as they should be treated with dignity and respect.

(3)  Intervene or prevent harassment, if safe to do so, such that incidents are addressed at the lowest possible level.

## 4–20.  Informal funds

HQDA Principal Officials and commanders may authorize informal funds. Examples of informal funds are office coffee, cup and flower, and annual picnic funds. These funds are subject to the following guidelines:

*a.* Use is limited to expenses consistent with the purpose and function of the fund.

*b.* Only one individual is to be responsible for fund custody, accounting, and documentation. Annually, this individual's supervisor is advised of the fund's financial status.

*c.* Operation of the fund will be consistent with Army Values and DoD 5500.07–R.

*d.* Fundraising solicitations conducted by organizations composed of DA Civilian employees and/or members of the Uniformed Services among their own members for organizational support or for the benefit of specific member welfare funds are permitted; however, such efforts should be limited in number and scope during the official Combined Federal Campaign and Army Emergency Relief fundraising periods, in order to minimize competition with Combined Federal Campaign/Army Emergency Relief.

## 4–21.  Misuse of government travel charge cards

The functional proponent for policy on the misuse of government travel charge cards is the Assistant Secretary of the Army (Financial Management and Comptroller) (ASA (FM&C)). Members of the Army are provided government travel charge cards to facilitate official travel and official travel- related expenses away from the Soldier's official

duty station. Individual accountability for the management of the government travel charge card is vital for the continued success of the government charge card program. Personal use, misuse, abuse, or fraud of the travel card is prohibited.

*a. Definition.* Misuse of a government charge card includes any improper or fraudulent use of a government travel charge card, including any use at establishments or for purposes that are inconsistent with the official business of the Army or with applicable standards of conduct. Examples of misuse can include, but are not limited to: (a) expenses related to adult entertainment and gambling (including those expenses discovered by Inspector General audits), (b) purchases for personal, family or household purposes except for authorized PCS expenses, (c) cash withdrawals or advances used during non-travel periods or not related to official government travel requirements are not authorized (includes but is not limited to any withdrawal of a credit balance remaining on the card), (d) intentional failure to pay undisputed charges in a timely manner, and (e) cash withdrawals or advances taken more than three working days prior to official government travel.

*b. Scope.* Government charge cards are to be used in accordance with the DoD Government Travel Charge Card Regulations, (See DoDI 5154.31, Volume 4, and the terms of the application agreement for the government travel charge card.) Use of the government travel charge card is mandatory, unless an exception applies.

*c. Command responsibilities.* Enforcement of this policy is a responsibility of commanders at all levels. Commanders will ensure that all Soldiers issued government travel charge cards are properly counseled on the appropriate use of the charge card. The best way to curtail charge card misuse is to prevent it through proper selection of cardholders, training, and leadership by example. Commanders will further monitor use of the government travel charge card to detect abuse and take appropriate corrective or disciplinary action.

*d. Command options.* This paragraph is punitive with regards to Soldiers. Violators of this policy may be subject to UCMJ or administrative action. Commanders should seek the advice and counsel of their legal advisor when taking actions pursuant to this paragraph.

*e. Official travel related expenses.* While these cards will be used only for reimbursable expenses associated with official travel, the following (while not reimbursable) are considered to be related to official travel. Therefore, the travel card may be used for the following purposes:

(1) The cardholder, while in a travel status, may use the card for non-reimbursable incidental travel expenses, such as rental movies, personal telephone calls, exercise fees, and beverages, when these charges are part of a room billing or meal and are reasonable.

(2) The traveler will pay for incidental non-reimbursable personal expenses as part of the normal billing process.

## 4–22. Domestic Violence Amendment to the Gun Control Act of 1968

*a. General.* The Domestic Violence Amendment to the Gun Control Act of 1968 (18 USC 922), the Lautenberg Amendment, makes it unlawful for any person to transfer, issue, sell or otherwise dispose of firearms or ammunition to any person whom he or she knows or has reasonable cause to believe has been convicted of a misdemeanor crime of domestic violence. It is also unlawful for any person who has been convicted of a misdemeanor crime of domestic violence to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce. This chapter applies to all Soldiers throughout the world, including those in hostile-fire areas.

*b. Definitions.* For the purpose of this paragraph only, the following definitions apply:

(1) *Crime of domestic violence.* An offense that involves the use or attempted use of physical force, or threatened use of a deadly weapon committed by a current or former spouse, parent, or guardian of the victim; by a person with whom the victim shares a child in common; by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian; or by a person who was similarly situated to a spouse, parent, or guardian of the victim. Persons who are similarly situated to a spouse include two persons who are residing at the same location in an intimate relationship with the intent to make that place their home.

(2) *Qualifying conviction.* A State or Federal conviction for a misdemeanor crime of domestic violence and any general or special court-martial for an offense that otherwise meets the elements of a crime of domestic violence, even though not classified as a misdemeanor or felony. A qualifying conviction does not include a summary court-martial conviction or the imposition of nonjudicial punishment under UCMJ, Art. 15. By DoD policy, a State or Federal conviction for a felony crime of domestic violence adjudged on or after 27 November 2002, will be considered a qualifying conviction for purposes of this regulation and will be subject to all the restrictions and prohibitions of this regulation. A person will not be considered to have a qualifying conviction unless the convicted offender was represented by counsel or knowingly and intelligently waived the right to counsel, and, if entitled to have the case tried by a jury, the case was actually tried by a jury, or the person knowingly and intelligently waived the right to have the case tried by a jury; and, the conviction has not been expunged or set aside, or the convicted offender has not been

pardoned for the offense, or had civil rights restored; unless the pardon, expungement, or restoration of civil rights provides that the person may not ship, transport, possess, or receive firearms.

(3) *Security clearance.* If a completed security clearance investigation reveals that a Soldier has a qualifying conviction, then the investigation will be referred to the Soldier's chain of command for appropriate action consistent with this regulation.

(4) *Commander.*

(a) Unless otherwise stated, the commander with responsibility is the senior commander. Delegation of authority is authorized.

(b) For the USAR, unless otherwise stated, the commander is the first general officer in command of the appropriate Reserve command (for example, 7th Mission Support Command; 9th Mission Support Command; or U.S. Army Civil Affairs and Psychological Operations Command). Delegation of authority is authorized.

c. *Commander's responsibilities.*

(1) The commander will ensure that all Soldiers who have a qualifying conviction are notified that it is unlawful to possess, ship, transport, or receive firearms and ammunition as prohibited in this regulation.

(2) Company and battery-level commanders will ensure that Soldiers in-processing to their unit are notified of the following requirements in the Domestic Violence Amendment to the Gun Control Act—

(a) It is unlawful for any person to transfer, issue, sell, or otherwise dispose of firearms or ammunition to any person whom he or she knows, or has reason to believe, has been convicted of a misdemeanor crime of domestic violence.

(b) It is unlawful for any person who has been convicted of a misdemeanor crime of domestic violence to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce.

(c) Soldiers have an affirmative, continuing obligation to inform commanders or supervisors if they have, or later obtain, a conviction of a misdemeanor crime of domestic violence.

(d) Soldiers who report a conviction of a misdemeanor crime of domestic violence will be asked by company and battery-level commanders to complete DD Form 2760 (Qualification to Possess Firearms or Ammunition). Soldiers will be notified that neither the information nor evidence gained by filling out the DD Form 2760 may be used against them in any criminal prosecutions for a violation of 18 USC 922, including prosecution under the UCMJ, based on a violation of 18 USC 922 for conduct that occurred prior to completion of the DD Form 2760. Company and battery-level commanders will file the DD Form 2760 in the Soldier's local military personnel file in accordance with AR 600–8–104 and AR 25–400–2.

(e) A copy of paragraph 4–22 will be displayed outside unit arms rooms and all facilities in which government firearms or ammunition are stored, issued, disposed, or transported.

(3) The senior commander will ensure that policy and procedures are in place to enforce the provisions of this chapter if privately owned firearms or ammunition are permitted in government quarters. The senior commander will also ensure that policy and procedures are in place in MWR activities and other government sponsored or sanctioned activities on their installation that engage in the transfer or sale of firearms or ammunition.

(4) The senior commander will ensure that procedures are implemented to track domestic violence arrests and convictions in the civilian community. These procedures should include regular coordination with local law enforcement and judicial agencies.

(5) If a commander knows or has reasonable cause to believe that a Soldier has a qualifying conviction, then the commander should take all reasonable action to investigate. Soldiers with qualifying convictions must be identified and reported to HQDA to ensure compliance with the law. A commander at any level may initiate the investigation by ordering the Soldier to complete DD Form 2760. Soldiers who have or may have a qualifying conviction should be referred to a Trial Defense Service (TDS) attorney. A TDS attorney will also be available to assist the Soldier in seeking expungement of a qualifying conviction or a pardon.

(6) If a commander knows or has reasonable cause to believe that a Soldier has a qualifying conviction, then he or she will immediately retrieve all government-issued firearms and ammunition and advise the Soldier to consult with a legal assistance attorney for guidance on lawful disposal or sale of any privately owned firearms and ammunition. Individuals with qualifying convictions are exempt from weapons qualification in accordance with AR 350–1 and will not be assigned individual weapons or ammunition.

(7) Accommodation: Domestic violence is incompatible with Army Values. However, Soldiers will be given a reasonable time to seek expungement of, or to obtain a pardon for a qualifying conviction, and may request to extend up to one year for that purpose. The following factors will be considered in the commander's determination of the amount of time granted to seek expungement or pardon:

(a) Whether the Soldier attempted to conceal his conviction. In no event will Soldiers be accommodated who have made false statements on the DD Form 2760.

*(b)* Whether firearms or deadly weapons were used in the offense that formed the basis for the Soldier's domestic violence conviction.

*(c)* Whether the conviction is recent or remote in time.

*(d)* Whether there were incidents of domestic violence before or after the qualifying conviction. In no event will Soldiers be accommodated who have more than one qualifying conviction.

*(e)* Whether serious injury was caused during the crime of domestic violence.

*(f)* Whether the Soldier cooperated with law-enforcement or investigating authorities.

*(g)* Whether circumstances suggest the probability of future incidents of domestic violence.

*(h)* Whether the Soldier has expressed remorse or regret or has entered counseling.

*(i)* Whether the Soldier has satisfied the judgment of the court.

*(j)* The length and character of service of the Soldier, the ability and potential of the Soldier, and the needs of the Army for the skills of the Soldier.

*(k)* Whether accommodation of the Soldier is consistent with actions taken in similar cases.

*(l)* Whether accommodation of the Soldier would be consistent with good order and discipline and public safety.

(8) Commanders must detail Soldiers whom they have reason to believe have a qualifying conviction to meaningful duties that do not require bearing weapons or ammunition. Commanders may reassign Soldiers to local TDA unit positions that deny them access to weapons and ammunition. Commanders will not appoint or assign Soldiers with qualifying convictions to leadership, supervisory, or property accountability positions that would require access to firearms or ammunition.

*d. Personnel policies.*

(1) *Enlistment/reenlistment.* Enlistment of applicants with a qualifying conviction is prohibited and no waivers will be approved. Soldiers with a qualifying conviction will be barred from reenlistment and are not eligible for the indefinite reenlistment program. Soldiers in the indefinite reenlistment program will be given an expiration of term of service not to exceed 12 months from the date HQDA is notified of the qualifying conviction. Enlistment and reenlistment policy and procedures for RA are provided in AR 601–210. Reenlistment policy and procedures for USAR are provided in AR 140–111. Applicants who have enlisted in the DEP who are found to have a qualifying conviction will be separated from the DEP.

(2) *Commissioning/appointment.* Applicants with a qualifying conviction will not be approved for commissioning in accordance with AR 135–100. Officers with a qualifying conviction will be separated no later than 12 months from the date HQDA is notified of the qualifying conviction.

(3) *Flags.* Soldiers with a qualifying conviction will be denied favorable personnel action in accordance with AR 600–8–2. The flag may be removed if the qualifying conviction is expunged or set aside by competent authority.

(4) *Attendance at Service schools.* Soldiers with a qualifying conviction are not authorized to attend any Service school where instruction with firearms or ammunition is part of the curriculum. Commanders will counsel Soldiers that inability to complete service schools may affect future promotion or retention. Soldiers with a qualifying conviction may not attend any school that requires an active duty service obligation; AR 350–100 and AR 621–1 apply.

(5) *Department of the Army selection board guidance.* Selection boards for school, command, and promotion will be instructed that appropriate consideration should be given to qualifying convictions in evaluating the Soldier's potential for future service.

(6) *Promotion.* Enlisted Soldiers with a qualifying conviction may not be promoted to the next higher grade in accordance with AR 600–8–19. Officers with a qualifying conviction may not be promoted to the next higher grade in accordance with AR 135–155 and AR 600–8–29.

(7) *Separation/retention policy.* Officers on active duty may request release from active duty, submit requests for unqualified resignation, or be processed for elimination under the provisions of AR 600–8–24. The USAR officers not on active duty may submit requests for unqualified resignation or be processed for involuntary separation in accordance with AR 135–175. Enlisted Soldiers on active duty may request voluntary separation for the convenience of the government under Secretarial plenary authority as specified in AR 635–200. They also may be processed for involuntary discharge under the misconduct provisions of AR 635–200 on the basis of the misconduct that resulted in the qualifying conviction, or for involuntary separation under Secretarial plenary authority if the commander does not believe that discharge for misconduct is warranted. The misconduct and Secretarial plenary authority provisions of AR 135–178 also apply to voluntary or involuntary separation of USAR enlisted Soldiers not on active duty. The foregoing separation provisions do not apply to Soldiers within statutory military retirement sanctuaries.

(8) *Mobilization/deployment.* All Soldiers known to have, or whom commanders have reasonable cause to believe have, a qualifying conviction are not mobilization assets and are non-deployable for missions that require possession of firearms or ammunition.

(9) *Assignment.* All Soldiers will complete a DD Form 2760 prior to receipt of PCS orders. Soldiers with a qualifying conviction are not eligible for overseas service in accordance with AR 614–30. Assignment of Soldiers with a qualifying conviction will be restricted in accordance with AR 600–8–11 and AR 140–10. Soldiers with a qualifying conviction will not be approved for entry into the AGR Program in accordance with AR 135–18.

(10) *Evaluation reports.* A qualifying conviction is an appropriate subject for comment in an evaluation report in accordance with AR 623–3.

(11) *"Sanctuary" statutes.* This regulation and its policies are subject to the "sanctuary" provisions of 10 USC 637(a), 580(a)(4)(C), 1176, and 12686.

*e. Reporting requirements.*

(1) Commanders will add Soldiers identified as non-deployable under this chapter to unit status reports. Personnel identified will be added to the non-deployable total under the code "L9" in accordance with AR 220–1 (commander's unit status report).

(2) The active RA will report qualifying convictions using assignment consideration code L9 (Lautenberg Amendment). Army Reserve will enter Lautenberg data as ASG–CONS "L9" in the Total Army Personnel Data Base-Reserve, database table IAF–T. Refer to current military personnel messages for further guidance.

(3) The ARNG Directorate (NG–ARH–S) will report for ARNG. USARC will report for the USAR. Biannual reports will be made (15 January) and (15 July) to the DCS, G–1 (DAPE–MPE). The Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve are not subject to reporting requirements.

## 4–23. Self-reporting of criminal convictions by officers and senior enlisted members

*a.* All U.S. Army commissioned officers, WOs, and enlisted members above the grade of E–6 will report, in writing, any conviction of such member for violation of a criminal law of the United States— whether or not the member is on active duty or inactive duty at the time of the conduct which provides the basis for the conviction. The member will report using either a DA Form 4187 (Personnel Action) or a memorandum (see AR 600–8–6). Reporting is required for any criminal conviction announced on or after 1 March 2008.

*b.* The report will be made to the Soldier's commander within 15 days of the date the conviction is announced, even if sentence has not been imposed or the Soldier intends to appeal the conviction.

*c.* USAR Soldiers not on active duty but in an active status will submit reports under this policy at the first drill period after the date the conviction is announced, or within 30 days of the date the conviction is announced, whichever is earlier, even if sentence has not been imposed or the Soldier intends to appeal the conviction.

*d.* Soldiers in the IRR will submit their report to the Commander, U.S. Army Human Resources Command (AHRC–PDR–H), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5402 or by email to usarmy.knox.hrc.mbx.tagd-ask-hrc@mail.mil within 30 days of the date the conviction is announced.

*e.* The written report will be on a DA Form 4187 or in memorandum format and include: Soldier's name, rank, unit of assignment, date of offense(s), specified nature of the offense (charged offenses(s)), place and date of trial, result of the trial, sentence (if available at the time of conviction), and any other supporting documents. In addition, a copy of the conviction and sentencing documents will be submitted with the report. Soldiers may include statements of extenuation or mitigation with their report. Statements of extenuation or mitigation may be used by their chain of command and the GCMCA in determining the filing disposition of the conviction as outlined in paragraph 4–23*g*.

*f.* Understanding self-reporting terminology—

(1) *Conviction.* For the purposes of this policy, the term "conviction" includes a plea or finding of guilty, a plea of nolo contendere (plea of no contest – plead guilty to the charge(s) without admitting guilt), and all other actions tantamount to a finding of guilty, including adjudication withheld, deferred prosecution, entry into adult or juvenile pretrial intervention programs, and any similar disposition of charges.

(2) *Criminal Law of the United States.* Includes any conviction of Federal criminal law, or the law of any State, district, commonwealth, territories, or equivalent criminal law or ordinance, and any criminal law or ordinance of any county, parish, municipality, or local subdivision of any such authority, other than motor vehicle violations that do not require a court appearance.

(3) *Suspension of favorable personnel actions.* Suspension of favorable personnel actions is mandatory when an investigation (formal or informal) is initiated on a Soldier by military or civilian authorities.

*g.* Upon receipt of a report of a criminal conviction, the commander will forward that report to the SPCMCA and will include any statements of extenuation or mitigation, if provided. The SPCMCA, with the assistance of the servicing judge advocate, will obtain an authenticated copy of the conviction and the sentence, if available, from civilian authorities and all available supporting evidence. After review, the SPCMCA will forward the authenticated conviction (and sentence, if available) along with any supporting evidence, and statements of extenuation or mitigation, if provided, to the GCMCA with a recommendation on whether to file the conviction in the Soldier's official military

personnel file in accordance with AR 600–37. Commanders at all levels may consider the conviction for official purposes, to include, but not limited to, evaluation reports, assignments, selection for schools, awards, initiation of separation, and suspension of security clearance and access to government-owned IT systems. If the commander initiates separation action, the case will be processed through the chain of command to the separation authority for appropriate action.

*h.* In accordance with AR 380–67, commanders will forward a copy of the DA Form 4187, including all attachments and any statements of extenuation or mitigation provided by the Soldier, to the DoD CAF (Army Division) using derogatory information reporting procedures in the JPAS. The report will include the commander's recommendation regarding retention or revocation of the Soldier's security clearance.

*i.* In the event a commander or military law-enforcement official receives information that a covered member of the Armed Forces under the jurisdiction of another military department has become subject to a conviction for which a report is required by this section, the commander or military law-enforcement official receiving such information will forward it to the member's immediate commander. If the member's immediate commander cannot be readily identified, the commander or military law-enforcement official receiving the information will forward it to the appropriate Service point of contact listed below—

(1) U.S. Army: Army Operations Center, 3200 Army Pentagon, Washington, DC 20310–3200; (703) 697–0219/DSN 227–0219.

(2) U.S. Marine Corps active duty: Commandant of the Marine Corps (HQMC–JAM), 3000 Marine Corps Pentagon, Washington, DC 20350–3000; (703) 614–4250.

(3) U.S. Marine Corps Reserve: Staff Judge Advocate, Marine Corps Mobilization Command, 15303 Andrews Road, Building 100, Kansas City, MO 64147–1207; 1–800–255–5082.

(4) U.S. Air Force: Headquarters, Air Force Personnel Center (AFPC/DPISIM), Special Programs Office, 550 C Street West, Randolph Air Force Base, TX 78150–4745; (210) 585–2591/DSN 665–2591.

(5) U.S. Navy active duty: Commander, Navy Personnel (PER–83), 5720 Integrity Drive, Millington, TN 38055–8340. Officers: (901) 874–4424/DSN 882–4424. Senior enlisted: (901) 874–4433/DSN 882–4433.

(6) U.S. Navy Reserve: Commander, Navy Personnel Command (PERS–9), 5720 Integrity Drive, Millington, TN 38055–8340; (901) 874–3087/DSN 882–3087.

## 4–24. Command responsibility under the law of war

Commanders are legally responsible for war crimes they personally commit, order committed, or know or should have known about and take no action to prevent, stop, or punish. In order to prevent law of war violations, commanders are required to take all feasible measures within their power to prevent or repress breaches of the law of war from being committed by subordinates or other persons subject to their control. These measures include requirements to train their Soldiers on the law of land warfare, investigate suspected or alleged violations, report violations of the law of war, and take appropriate corrective actions when violations are substantiated.

## 4–25. Personnel recovery and code of conduct training

Commanders at all levels are responsible for maintaining compliance for the Army's Personnel Recovery Program in accordance with AR 525–28, to prevent or reduce any strategic advantage our enemies may gain due to a tactical event involving the isolation of Army personnel.

## 4–26. Combating trafficking in persons

Commanders are responsible for maintaining compliance for the DoD, Combating Trafficking in Persons Program in accordance with DoDI 2200.01 and Army policy as explained in Secretary, Chief of Staff, and Sergeant Major of the Army Memorandum, dated 24 July 2006, Subject: Combating Trafficking in Persons and implemented in AR 350–1. Trafficking in persons, often called human trafficking, is defined as recruitment, transportation, transfer, harboring, or receipt of persons by means of threat, use of force, coercion, abduction, fraud, deception, abuse, or exploitation. Trafficking in persons is a grave violation of human rights. Human trafficking is a world-wide criminal threat to security, civil rights, and stability, and a direct threat to our national foreign policy goals.