Exhibit F to the United States' Motion to Dismiss

*Seal v. United States*, Case No. 2:25-cv-442 (D. Me.)

# CUI

## ATTENTION

Use this space to indicate categories, limited dissemination controls, special instructions, points of contact, etc., if needed.

CONTROLLED BY: Investigations Division (SAIG-IN)
CUI CATEGORY: PRIIG, PRVCY, INV
LIMITED DISSEMINATION CONTROL:  FEDCON
POC: (b)(6), (b)(7)(C)

## ATTENTION

All individuals handling this information are required to protect it from unauthorized disclosure.

Handling, storage, reproduction, and disposition of the attached document(s) must be in accordance with 32 CFR Part 2002 and applicable agency policy.

Access to and dissemination of Controlled Unclassified Information shall be allowed as necessary and permissible to any individual(s), organization(s), or grouping(s) of users, provided such access or dissemination is consistent with or in furtherance of a Lawful Government Purpose and in a manner consistent with applicable law, regulations, and Government-wide policies.

Standard Form 901 (11-18)

Prescribed by GSA/ISOO | 32 CFR 2002

# CUI

## EXECUTIVE SUMMARY

The United State Army Inspector General Agency (USAIGA) independently reviewed the U.S. Army Reserve Command's (USARC) investigation into the facts that tragically led to Sergeant First Class (SFC) Robert R. Card II killing 18 people and injuring 13 others in Lewiston, Maine, on October 25, 2023. While SFC Card was a Soldier in the U.S. Army Reserve, his abhorrent acts on October 25th, 2023 occurred while he was a civilian and not in an Army duty status. Army leadership determined there was a moral and ethical imperative to investigate all actions and events associated with the tragedy. USARC investigated the facts and circumstances surrounding SFC Card's suicide.[1] The IG conducted its review parallel to the USARC investigation.

The Army IG also responded to seven questions related to the mass shooting at the request of Senator Susan Collins and Senator Angus King, Jr. of Maine.

We presented our review in seven sections.

- Section I:  Introduction;
- Section II:  Key facts related to SFC Card's military background and civilian occupations;
- Section III: Summary of SFC Card's unit mission and key leaders;
- Section IV: Summary and chronology of key events from SFC Card's enlistment through his death (military service events are highlighted in green);
- Section V:  Assessment and a summary of the USARC investigation;
- Section VI: Detailed responses to the seven questions from Senator Collins and Senator King Jr.;
- Section VII: Conclusion and Recommendations.

Our review used the USARC investigation, open-source media reports, findings from the Maine Independent Commission, Department of Defense and Army Policy, applicable laws, and subject matter experts to assess what may have contributed to the incident.

A.  Analysis of USARC Findings. We found USARC completed a thorough and comprehensive investigation. We found the USARC report comprehensive and agreed with their findings and recommendations. We added clarifying comments to six of their thirteen findings.

B.  We responded to seven questions presented by Senator Collins and Senator King.

- We assessed the Army's knowledge and actions concerning SFC Card.
- We found the Army generally followed Army regulations and policies with minor exceptions.
- We presented the circumstances of when the Army reports information to the National Instant Criminal Background Check System (NICS).
- We determined the Army has no specific authority to invoke state crisis intervention laws. The Army must work with local, state, or federal law enforcement.

---

[1] Per AR 600-92, paragraph 5-8. U.S. Army Reserve suicide investigations.

- We found no specific action or inaction by Army personnel directly contributed to, or definitively would have prevented, the events of October 25, 2023.
- We concluded there are no existing laws, regulations, policies, or procedures that prevented the Army from communicating with law enforcement and healthcare officials.
- We responded to question seven with the below recommendations.

Recommendations for improving a Soldier's continuity of care in behavioral health emergencies:

- We recommend conducting a review of existing Army behavioral health policies and procedures to develop a standardized Command Directed Behavioral Health Evaluation (CDBHE) form and checklist to guide commanders during a behavioral health crisis. We recommend these standards include a requirement for commanders to coordinate with providers to outline a plan to include actions if behavioral health conditions change after discharge.[2] We further recommend the inclusion of proposed behavioral health crisis actions in AR 600-20 (Army Command Policy).
- We recommend expanding the scope and title of AR 600-92, (Army Suicide Prevention Program) to encompass broader behavioral health emergencies. The current title implies the regulation applies only to suicides, but it also outlines valuable steps for behavioral health intervention.
- We recommend reviewing Army policy with an eye towards facilitating USAR commanders' coordination with MTFs across the Department of Defense to increase MTF-to-MTF referrals when feasible of USAR Soldiers on active duty less than 30 days.
- We recommend evaluating any legal or policy provisions which impact commanders' authority to keep USAR Soldiers on orders involuntarily for behavioral health emergencies identified by a medical professional.[3]
- We recommend an assessment of current Army leader training curricula to ensure it incorporates suicide prevention and behavioral health intervention policies and procedures.

**Conclusion**

USARC completed a thorough and comprehensive investigation. As requested by Members of Congress, we completed a review of the USARC report and clarified matters as needed. Based on our review of the facts and circumstances related to SFC Card and the actions of his leaders in (b)(6), (b)(7)(C) we conclude that SFC Card is singularly responsible for the mass shooting in Lewiston, Maine. On October 25, 2023, SFC Card was a civilian who was not on a duty status.

---

[2] We found there is not a standardized Department of the Army form a commander uses to direct a behavioral health evaluation. Army Commands are using non-standardized forms that do not ensure continuity between the command and health providers. These standardized forms should include a section for providers and commanders to address necessary actions to take if conditions change after discharge.

# UNITED STATES ARMY INSPECTOR GENERAL AGENCY REVIEW OF THE U.S. ARMY RESERVE COMMAND ARMY REGULATION 15-6 INVESTIGATION INTO THE ACTIONS AND SUICIDE OF SERGEANT FIRST CLASS ROBERT R. CARD II, U.S. ARMY RESERVE

## I. INTRODUCTION

The United States Army Inspector General Agency independently reviewed the U.S. Army Reserve Command's (USARC) investigation into the facts that tragically led Sergeant First Class (SFC) Robert R. Card II to kill 18 people and injure 13 others in Lewiston, Maine, on October 25, 2023. While SFC Card was a Soldier in the U.S. Army Reserve, his abhorrent acts occurred while he was a civilian and not in an Army duty status. Army leadership determined there was a moral and ethical imperative to investigate all actions and events associated with the tragedy. USARC investigated the facts and circumstances surrounding SFC Card's suicide. The IG reviewed the USARC investigation's work and findings and presented a summary of events, Army actions, and an assessment of the USARC investigation.

Our investigation team consisted of four experienced inspectors general, supported by an attorney from the Office of the Judge Advocate General, a representative of the Office of the Surgeon General, a member of the Office of the Provost Marshal General, agent support from the Army Criminal Investigation Division (CID) and other Army staff subject matter experts. Our team reviewed the 3,300-page USARC investigation, open-source media reports, findings from the Maine Independent Commission interim report, Department of Defense and Army Policy, and applicable laws to assess if the USARC report adequately identified what may have contributed to the incident.

The Army IG also responded to seven questions related to the mass shooting at the request of Senator Susan Collins and Senator Angus King, Jr. of Maine.

*Origin*

On October 25, 2023, SFC Card, U.S. Army Reserve (USAR), Troop Program Unit (TPU) Soldier, tragically shot and killed 18 civilians and wounded 13 others. Although SFC Card was a member of the USAR, he was not in an Army duty status at the time of the shooting. He was a private citizen and subject to Federal and Maine laws. USARC had administrative control over SFC Card for the 29 days of military duty he performed in 2023.

On November 2, 2023, Lieutenant General (LTG) Jody Daniels, Commanding General, USARC, directed an administrative investigation following the procedures outlined in Army Regulation (AR) 15-6 (Procedures for Administrative Investigations and Boards of Officers) into the facts and circumstances of SFC Card's suicide.

On November 2, 2023, Maine Senators Susan M. Collins and Angus S. King Jr. asked LTG Donna W. Martin, The Inspector General of the Army (TIG), to conduct a comprehensive review of the facts leading up to the Lewiston shooting. On November 15, 2023, Honorable Gabe Camarillo, Under Secretary of the Army, wrote Senator Collins, stating LTG Martin instructed her team to conduct an independent investigation to ensure the Army took corrective actions at the conclusion of the USARC investigation. On December 8, 2023, Senator Collins and Senator King co-wrote a letter with Maine Representatives Chellie M. Pingree and Jared F. Golden asking LTG Martin to conduct a parallel review of the facts and events leading up to the shooting, and to determine if anything could have been done differently.

While the Maine State Police led a criminal investigation into the Lewiston shooting, Governor Janet T. Mills, State of Maine, issued an executive order on November 9, 2023, appointing seven experts with extensive legal, investigative, and behavioral health backgrounds to serve on the Maine Independent Commission to Investigate the Facts of the Lewiston Tragedy. The Commission's goal is to review the circumstances behind the Lewiston shooting and the police response to it, and to issue a public report detailing its findings upon the conclusion of its investigation. The Army is cooperating in the Maine Commission's review. The Commission released an interim report on March 15, 2024.

On May 23, 2024, LTG Daniels approved the USARC Report of Investigation (ROI). The report covered matters related to SFC Card's death, actions of his unit leadership, USARC medical policies and procedures, and the civilian law enforcement actions and response. The USARC report included recommendations ranging from adverse action, training improvements, unit administrative processes, liaison with law enforcement, and USAR force management adjustments. The findings and recommendations highlighted the difficult nature of coordinating USAR Soldier medical transitions, the challenges of managing a behavioral health crisis, and the limited jurisdiction USAR commanders have over their personnel when they are not in a duty status.

## II. SFC CARD'S BACKGROUND (MILITARY AND CIVILIAN)

*SFC Card's Military Training and Duties*

On December 14, 2002, SFC Card enlisted as a USAR TPU Soldier. He completed basic training in February 2003 at Fort Knox, Kentucky. In May 2003, he completed advanced individual training as a petroleum supply specialist at Fort Lee, Virginia. He served in two other USAR units before transferring to B Company on April 9, 2014, where he served as a trainer. SFC Card's primary duties included training United States Military Academy (USMA) cadets for two weeks annually at West Point. This training included how to safely employ hand grenades.[4] [5] In addition to hand grenade training, SFC Card performed safety duties on various weapons qualification ranges during summer training events.

---

[4] The hand grenade assault course teaches Cadets to employ a grenade using proper hand grenade preparation, correct form in different body positions, individual movement techniques and various engagement usage skills. Instructors use training practice grenades on the course, which have an extremely low concussion compared to a fragmentary grenade. TC 3-23.30 (Grenades and Pyrotechnic Signals), February 1, 2023.

[5] Boston University completed an independent evaluation that concluded SFC Card did not have chronic traumatic encephalopathy (CTE).

SFC Card never deployed on active duty. On December 14, 2022, he accumulated 20 years of military service in the USAR. From January 1 through June 30, 2023, SFC Card was in a duty status for 10 days while he attended unit training assemblies (UTA). He served an additional 19 days on duty orders from July 15 through August 3, initially for annual training (AT) at West Point, then for his hospitalization at Four Winds Hospital. He did not perform any range safety or hand grenade instruction duties in 2023 at West Point due to his hospitalization. In summary, SFC Card served a total of 29 military duty days in 2023.

*Military Jurisdiction*

Unlike active-duty Soldiers, USAR Soldiers do not serve full time. USAR Soldiers normally serve for one weekend a month and two weeks of AT each year.[6] Most USAR Soldiers serve for approximately 38 calendar days per year.

Reserve component commanders generally cannot order their Soldiers to serve beyond 15 days of consecutive active duty. Reserve component Soldiers may "volunteer" to serve longer than 15 days. However, under 10 U.S.C. § 12301(h), USAR Soldiers can stay on active duty orders beyond 29 days under the following: *"(1) When authorized by the Secretary of Defense, the Secretary of a military department may, **with the consent of the member**, order a member of a reserve component to active duty - (A) to receive authorized medical care; (B) to be medically evaluated for disability or other purposes; or (C) to complete a required Department of Defense health care study, which may include an associated medical evaluation of the member. (2) A member ordered to active duty under this subsection may, **with the member's consent**, be retained on active duty, if the Secretary concerned considers it appropriate, for medical treatment for a condition associated with the study or evaluation, if that treatment of the member is otherwise authorized by law."*

SFC Card's chain of command was responsible for his military performance, his military administrative actions, and his compliance with Army regulations when he was on a duty status under 10, U.S.C. § 10147. When not in a military duty status, SFC Card was a private citizen and subject to the various county, state, and federal laws as any other citizen. His military chain of command had no authority over him as a private citizen.

*Service Records*

SFC Card's military service records showed he never received any unfavorable personnel or disciplinary actions. The USARC report showed the Topsham Maine Police Department arrested SFC Card on April 14, 2007, for operating a vehicle under the influence of alcohol. He pled guilty, received a fine, was incarcerated for 48 hours, and had his driver's license suspended for 90 days. SFC Card did not have to report this arrest to the Army because his military rank at the time was below Staff Sergeant (SSG). The USARC report also showed a judge in Maine signed an arrest warrant on October 26, 2023, alleging SFC Card murdered 18 people during the mass shooting in Lewiston the day before.[7]

---

[6] Title 10 U.S. Code § 10147 defines the training requirements for members of the Ready Reserve. Accordingly, USAR Soldiers are commonly referred to as "Title 10" Soldiers.

[7] USARC ROI, pp.1010-1013.

3

*Performance*

On May 6, 2023, SFC Card received a "highly qualified" rating on his Non-Commissioned Officer Evaluation Report (NCOER), meaning he had strong promotion potential. The evaluation included a comment that he was a "consummate professional" who excelled at "mentoring his troops." His previous evaluations showed he was qualified in his job duties.

*Military Health Records*

SFC Card's military health records indicated he had reduced hearing in his left ear. That condition did not require a waiver to enlist. He struggled throughout life with diminished hearing capabilities, resulting in a permanent medical profile in 2017. The conditions of the profile required him to remain in his current unit.

He did not have a documented history of behavioral health issues in his medical file until July 16, 2023, when the U.S. Army Reserve Medical Management Center entered a profile for a behavioral health condition. This profile limited SFC Card from accessing weapons, attending live fire exercises, and participating in combat simulations. The profile also restricted SFC Card from operating heavy machinery or driving vehicles because his prescription medication for this condition could cause drowsiness.

*Other Medical References*

Records indicated SFC Card used tobacco and received tobacco cessation training in 2008. SFC Card's (b)(6), (b)(7)(C) reported that SFC Card smoked cigarettes and drank alcohol socially. (b)(6); (b)(7)(C) reported SFC Card experimented with drugs earlier in his life and drank alcohol in social settings.[8]

Records showed that in 2008, SFC Card broke his neck when he fell off a ladder at his home. We did not have access to these medical records to determine if SFC Card experienced brain trauma because of the fall.

In June 2023, SFC Card's (b)(6), (b)(7)(C) noticed an egg-sized lump on his head from an unknown origin. We found no medical documentation on this.

*Civilian Occupations*

SFC Card held many civilian occupations throughout his life primarily related to construction, driving commercial trucks, and manual labor. He worked at a recycling center around the time his behavioral health reportedly began to decline in 2023. SFC Card's civilian jobs may or may not have exposed him to occupational health risks and hazards. He did not report any civilian job occupational health issues to the military.

---

[8] USARC ROI, pp.300; 1690. SFC Card did not report any drug use at the time of his enlistment on December 14, 2002.

## III. UNIT MISSION AND LEADERSHIP

*Mission of* [(b)(6); (b)(7)(C)]
*(Leader Training)*

On October 19, 2001, the Department of the Army established the [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] as a unit in the USAR. [(b)(6); (b)(7)(C)] one of three subordinate units to the [(b)(6); (b)(7)(C)] was located at the Lieutenant Colonel (LTC) Charles Butler U.S. Army Reserve Center in Saco, Maine. [(b)(6); (b)(7)(C)] had a company command element and four training teams called "committees" with an authorized military strength of 66 Soldiers. None of the Soldiers were in a full-time duty status. [(b)(6); (b)(7)(C)] provided instructors to conduct weapons qualification training and other courses of instruction as required at the USMA, West Point, New York. [(b)(6); (b)(7)(C)] did not deploy as a unit in support of any Army contingency operations.

*SFC Card's Chain of Command*

[(b)(6); (b)(7)(C)] was SFC Card's [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)] knew SFC Card as a "hard worker" who was "even keeled."

[(b)(6); (b)(7)(C)] reported to [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)] first met SFC Card in 2015 and described him as a good non-commissioned officer.

[(b)(6); (b)(7)(C)] was SFC Card's [(b)(6); (b)(7)(C)] Unlike most platoon sized elements in the Army, SFC Card's committee did not have a commissioned officer assigned as a platoon leader. The only commissioned officers assigned to [(b)(6); (b)(7)(C)] were [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]                    [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]

[(b)(6); (b)(7)(C)]. Prior to mid-April 2023, [(b)(6); (b)(7)(C)] knew very little about SFC Card other than he was a quiet Soldier.

[(b)(6); (b)(7)(C)] was [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]. Neither [(b)(6); (b)(7)(C)] ever met SFC Card. [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)] was [(b)(6); (b)(7)(C)]          [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)].        [(b)(6); (b)(7)(C)] reported to [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]

## IV.  SUMMARY OF EVENTS

In early 2023, SFC Card's family first noticed SFC Card demonstrating paranoid behavior.  SFC Card told his friends and family that people were talking about him being a pedophile, having a small penis, and being homosexual.  SFC Card was convinced his civilian co-workers started the rumors, which he believed spread as a conspiracy online, leading to just about everyone believing the rumors.

In March 2023, SFC Card made similar comments to some of his peers in his USAR unit about the people talking about him behind his back.  He also discussed the details of (b)(6); (b)(7)(C) (b)(6); (b)(7)(C).  He mentioned he had his 20-year service letter and he was not interested in attending AT; however, someone convinced him to have "one last hurrah," so he decided to go.  In mid-April 2023, SFC Card's (b)(6); (b)(7)(C), reported to SFC Card's unit leaders that another Soldier was harassing SFC Card over the rumors.  SFC Card did not cooperate with his commander's efforts to investigate the matter and the inquiry into the rumors was subsequently determined to be unfounded.  Throughout May and June 2023, SFC Card's leadership observed he was behaving normally.

Members of SFC Card's unit first noticed his paranoid and aggressive behaviors when they arrived in New York for AT on July 15, 2023.  Members of the unit reported SFC Card's behaviors to senior non-commissioned officers who spoke with SFC Card.  The senior non-commissioned officers contacted local law enforcement on July 16, 2023.  After law enforcement spoke to SFC Card and determined there was no reason to detain him, the non-commissioned officers brought SFC Card to Keller Army Community Hospital (KACH) at West Point.  While at KACH, (b)(6); (b)(7)(C) ordered him to undergo a command directed behavioral health evaluation at KACH.  Based on a recommendation from the evaluating psychiatrist, SFC Card agreed to an inpatient psychological evaluation and therapy at the Four Winds Hospital, a private facility in nearby Katonah, New York.  He remained voluntarily hospitalized for 19 days at Four Winds undergoing additional psychological evaluation and therapy.

On July 24, 2023, Four Winds contacted KACH reporting SFC Card may need a higher level of care.  On July 25, 2023, Four Winds notified KACH that SFC Card submitted a 72-hour request for discharge and release from treatment.  On July 26, 2023, Four Winds notified SFC Card they applied for a court hearing to involuntarily retain him at their facility with a scheduled court date on August 2, 2023.  On July 31, 2023, SFC Card withdrew his voluntary release request and consented to continue treatment at Four Winds, at which time Four Winds cancelled the court hearing.  On August 3, 2023, Four Winds discharged SFC Card.  They categorized him as "low risk" of harm to himself and others and cleared him to return to work.  He returned to his home in Bowdoin, Maine, ending his active-duty status.

Four Winds communicated directly with KACH regarding the care they provided SFC Card.  Four Winds did not speak with SFC Card's chain of command prior to his discharge.  This resulted in a poor transition plan for returning SFC Card to military service and hindered SFC Card's (b)(6); (b)(7)(C) from complying with Army policy.

After his discharge from Four Winds, SFC Card became increasingly withdrawn from family and friends and refused to participate in further military training with his unit. Between August 7 and August 29, 2023, the Army medical community made multiple attempts to follow-up with SFC Card. On August 11, 2023, SFC Card spoke with a nurse from KACH. He told her he was fine, he stopped taking his medications, he had not enrolled in his follow up health care with Telemynd, and he was upset because his behavioral health assessment prohibited him from purchasing a gun suppressor. This was the only successful contact with SFC Card during this period.

On September 14, 2023, SFC Card and [(b)(6); (b)(7)(C)] spent the evening at a local casino.[9] While returning home late in the evening, SFC Card assaulted [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)]. At two o'clock in the morning on September 15, 2023, [(b)(6); (b)(7)(C)] alerted SFC Card's chain of command of SFC Card's threats to the unit and other places. He shared his belief that SFC Card was going to commit a mass shooting. SFC Card's chain of command alerted the Sagadahoc County (Maine) Sheriff's Office (SCSO) that SFC Card posed a threat to himself and others and asked the SCSO to perform a welfare check on SFC Card at his home. The SCSO went to SFC Card's house on September 15 and September 16, 2023, but did not establish contact with SFC Card.

SFC Card did not perform any military duties or serve in a duty status after his discharge from Four Winds. On September 15, 2023, SFC Card told [(b)(6); (b)(7)(C)] he wanted to retire from the USAR. [(b)(6); (b)(7)(C)] had no further contact with SFC Card after September 15, 2023. SFC Card did not attend any further unit assemblies and told his supervisors he could not attend because he had to work. The unit recorded SFC Card with unexcused absences for the September and October 2023 unit training assemblies. SFC Card was not in a military duty status on October 25, 2023, when he committed the shootings. The Maine State Police found SFC Card dead two days later of a self-inflicted gunshot wound.

We provided a detailed chronology of events, showing SFC Card's duty status during key events, as an appendix to this report.

## V. DAIG ASSESSMENT

*DAIG REVIEW OF THE USARC AR 15-6 INVESTIGATION*

We found USARC conducted a thorough investigation. In response to LTG Daniels' directive, and in accordance with AR 15-6, Major General (MG) Eugene LeBeouf, Deputy Commanding General, USARC, appointed an investigating officer (IO) and LTG Daniels approved the final report.

*USARC Appointment Memorandum and Directive*

On November 2, 2023, MG LeBeouf appointed [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] as the lead investigating officer responsible for investigating SFC Card's behavior, command actions and circumstances contributing to his suicide and

---

[9] SFC Card and [(b)(6); (b)(7)(C)] were not on a military duty status at the time.

providing any relevant recommendations.  In addition, MG LeBoeuf appointed members from the legal, medical and law enforcement branches to assist [(b)(6); (b)(7)(C)]    He also appointed [(b)(6); (b)(7)(C)]

MG LeBoeuf also asked the USARC investigators to make specific findings of fact on 82 separate issues including the following topics:  1) SFC Cards' military service history, personality, lifestyle, and medical records; 2) The chronology of events leading up to the mass shooting; and 3) The details of the mass shooting incident and SFC Card's suicide.

*Summary of Findings and Relevant Facts*

[(b)(6); (b)(7)(C)] team completed the final report on March 7, 2024, and on May 23, 2024, LTG Daniels approved the USARC report.  The report analyzed SFC Card's military and civilian health care services, his chain of command's involvement, and civilian law enforcement's response.  The report could not determine what caused SFC Card to commit the mass shooting or suicide.  The report identified multiple errors made by unit leadership, medical professionals, and local law enforcement.  The report recommended adverse action against three members in SFC Card's chain of command for dereliction of duty.

The USARC report was comprehensive in findings and recommendations and addressed all but the following two of the 82 issues:

1.  [(b)(6); (b)(7)(C)] was not able to determine if Four Winds Hospital "properly discharged" SFC Card on August 3, 2023.  We found Walter Reed National Military Medical Center is still reviewing this matter;

2.  [(b)(6); (b)(7)(C)] was unable to determine if SFC Card contacted the Army OneSource to receive referrals for behavioral health services.  We contacted Army OneSource and confirmed SFC Card never contacted them.

In the following paragraphs, we provide our comments on the USARC report findings we did not concur with or felt required clarifying information.

*Interpretation of Civilian Law Enforcement Actions and the Yellow Flag Law*

The USARC report commented on the actions of Maine law enforcement officials and the employment of the Maine yellow flag law in the Executive Summary, Section 1b(6), Section 6b(4), and Section 6b(5).

We neither concur nor non-concur with the report findings concerning the actions of local law enforcement and the use or non-use of Maine's yellow flag law.  We defer these assessments of civilian law enforcement efforts and implementation of State of Maine laws to civilian authorities and Maine's Independent Commission.

*Ordering SFC Card to AT in July 2023*

The USARC report found [(b)(6); (b)(7)(C)] was [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)]. The USARC report determined the SCSO report on May 3, 2023, combined with SFC Card experiencing auditory hallucinations, and his mental health crisis in response to those hallucinations, were sufficient reasons for [(b)(6); (b)(7)(C)] to cancel SFC Card's AT orders.

We concur with the report's finding that [(b)(6); (b)(7)(C)] had sufficient cause, at the time, to cancel SFC Card's AT orders, with the following comments:

a. [(b)(6); (b)(7)(C)] had concerns with SFC Card's behavior and planned to speak with him during the June UTA. [(b)(6); (b)(7)(C)] did not attend the UTA, and [(b)(6); (b)(7)(C)] merely observed SFC Card. The chain of command did not discuss their concerns with SFC Card prior to the AT.

b. [(b)(6); (b)(7)(C)] decision to allow SFC Card to attend AT gave him Title 10 jurisdiction and Uniform Code of Military Justice (UCMJ) authority over SFC Card. This resulted in SFC Card's command directed behavioral health evaluation and allowed SFC Card the opportunity to receive follow on behavioral health care at Four Winds.

*Line of Duty (LOD) Investigation*

We concur with the report's finding that SFC Card's unit did not conduct a required Line of Duty Investigation to properly document SFC Card's condition and hospital stay. We add to the finding the unit prepared a pre-authorization for payment using a Military Medical Support Office Form 1. The pre-authorization would flag the requirement for the Line of Duty Investigation.

SFC Card did not qualify for no-cost TRICARE coverage as he was not on duty for 30 days or more. A completed Line of Duty Investigation would likely have authorized payment of SFC Card's medical expenses. Four Winds provided us a copy of the [(b)(6); (b)(7)(C)] bill for SFC Card's care. The bill listed TRICARE EAST/HUMANA MIL as the payee.

*Use of terms to describe SFC Card's Hospitalization Status*

The report, at times, used terms to describe SFC Card's inpatient healthcare that were inaccurate or misleading.

a. In paragraph 5g(1) of the report, the IO wrote: "SFC Card was command directed to undergo a behavioral health evaluation. He was then *committed* to a civilian hospital for 19 days and given medication to aid him in his condition." We found SFC Card volunteered to additional hospitalization and was not "committed."

b. In paragraph 6c(1), the IO wrote the following: "*SFC Card was command directed to Four Winds*; however, Four Winds considered SFC Card's hospitalization as voluntary." [(b)(6); (b)(7)(C)] was the military official at Keller Hospital who recommended SFC Card receive follow on inpatient behavioral healthcare. [(b)(6); (b)(7)(C)] did not have the military authority to "order" SFC Card to receive the follow-on care. We found SFC Card was not command directed to Four Winds.

c. In paragraphs 1b(4) and 6(c) of the report, the IO wrote that Four Winds released SFC Card on August 3, 2023 *"under questionable circumstances."* The IO deferred their findings of the Four Winds discharge to [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] on "whether SFC Card's treatment or discharge from Four Winds were within the standard of care." We found the IO should have used a more neutral phrase when describing the release as [(b)(6); (b)(7)(C)] had not yet determined if the release was or was not proper.

*Authority to Store Privately Owned Weapons in USAR Unit Arms Rooms*

We concur with the USARC findings. We found none of [(b)(6); (b)(7)(C)] commanding officers were aware this option was available to a USAR commander. Most likely many USAR commanders are similarly unaware of this option.

*USARC Adverse Findings*

We found USARC adverse findings consistent with Army regulation. While we concur with the findings, we provided additional comments.

a. *The conditions of SFC Card's release from Four Wind*s. We noted [(b)(6); (b)(7)(C)] had a plan to pick up SFC Card on his release from Four Winds. [(b)(6); (b)(7)(C)] allowed [(b)(6); (b)(7)(C)] to pick up SFC Card from Four Winds on August 3, 2023, by himself, and while not on military orders. He reasoned [(b)(6); (b)(7)(C)] had the best rapport with the "most volatile" member of his unit. [(b)(6); (b)(7)(C)] had better options available, such as putting personnel in a duty status to get SFC Card. [(b)(6); (b)(7)(C)] late notification of SFC Card's release appeared to influence [(b)(6); (b)(7)(C)] decision.

b. *SFC Card's postvention after care strategy*. We found it unreasonable [(b)(6); (b)(7)(C)] had no direct contact with SFC Card between July 16, 2023, and September 15, 2023, when he had a three-minute phone call with SFC Card. Whether in a duty status or not, [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] ; he had a moral responsibility to care for his Soldiers. Based on his knowledge of SFC Card's behavioral health issues and his absence from training assemblies, he should have contacted SFC Card to gauge his military readiness.

c. *Reporting SFC Card as an insider threat.* [(b)(6); (b)(7)(C)] text message stating SFC Card posed a threat to the LTC Butler U.S. Army Reserve Center and personnel warranted a serious incident report per AR 190-45 (Law Enforcement Reporting), September 27, 2016. While [(b)(6); (b)(7)(C)] did not file an incident report, his request for police presence during the September 2023 UTA after SFC Card assaulted [(b)(6); (b)(7)(C)] was a risk mitigating action.

## VI.  QUESTIONS FROM SELECT MEMBERS OF CONGRESS

**a.   QUESTION #1.  What concerns were raised by (or to) Army personnel regarding Mr. Card, including with regards to his mental health? When were those concerns raised? What actions were taken in response?**

*EVENT:  Non-commissioned officer (NCO) report to the battalion on April 12, 2023*

CONCERN:  On April 12, 2023, [(b)(6); (b)(7)(C)] of SFC Card, reported to [(b)(6); (b)(7)(C)] that SFC Card complained that unit members were accusing him of being a pedophile. [(b)(6); (b)(7)(C)] reported this to [(b)(6); (b)(7)(C)].[10]
RESPONSE: [(b)(6); (b)(7)(C)] spoke to [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)], [(b)(6); (b)(7)(C)] directed [(b)(6); (b)(7)(C)] to investigate the report to determine if SFC Card's claims were valid. [(b)(6); (b)(7)(C)] discussed the concerns with [(b)(6); (b)(7)(C)]. [(b)(6); (b)(7)(C)] told [(b)(6); (b)(7)(C)] that SFC Card did not want to pursue a complaint; he was merely upset and frustrated when he discussed the issue with [(b)(6);]. [(b)(6); (b)(7)(C)] did not speak to SFC Card directly about the matter.[11]
RESULT: [(b)(6); (b)(7)(C)] took a reasonable action based on the information he had.  While [(b)(6); (b)(7)(C)] actions were reasonable, he could have also directly engaged SFC Card to discuss his concerns.

*EVENT:  Sagadahoc County Sheriff's Office (SCSO) report on May 3, 2023*

CONCERN:  On May 3, 2023, SFC Card's [(b)(6); (b)(7)(C)] filed a report with the SCSO reporting what they described as SFC Card's "deteriorating mental health." [(b)(6); (b)(7)(C)] that received the report did not speak to SFC Card.  Instead, he asked SFC Card's USAR unit to intervene. [(b)(6); (b)(7)(C)] spoke with [(b)(6); (b)(7)(C)] about the family's concerns.  The next day, [(b)(6); (b)(7)(C)] called [(b)(6); (b)(7)(C)] and told him SFC Card's family had intervened and had positive results.  [(b)(6); (b)(7)(C)] reported that SFC Card was going to seek medical care and surrender his privately owned weapons to his family.
RESPONSE:  On May 4, 2023, [(b)(6); (b)(7)(C)] reported the information to [(b)(6); (b)(7)(C)]. They agreed to speak with SFC Card during the June unit training assembly. [(b)(6); (b)(7)(C)] did not to attend the June 2023 unit training assembly. [(b)(6); (b)(7)(C)] attended both the May and June 2023 unit training assemblies but did not speak with SFC Card directly.  [(b)(6); (b)(7)(C)] observed SFC Card performing as a "normal" Soldier, which reinforced his belief that SFC Card was getting appropriate medical care.[12]

---

[10] USARC ROI, pp. 371
[11] USARC ROI, pp.220-221; 305.
[12] USARC ROI, pp.218; 327; 988-990.

RESULT:  [(b)(6); (b)(7)(C)] had concerns with SFC Card's behavioral health based on a combination of information they received.  They developed a plan to discuss the matter with SFC Card at the June 2023 unit training assembly.  That did not occur.

*EVENT:  Interaction with unit members at West Point, New York, on July 15, 2023*

CONCERN:  On July 15, 2023, SFC Card was on annual training orders for training at West Point, New York.  Shortly after his arrival, he began telling several of his fellow unit members that people were talking about him behind his back, accusing him of being a pedophile, and saying he had a small penis.  Later that afternoon, SFC Card accused [(b)(6); (b)(7)(C)] of saying bad things about him.  SFC Card verbally threatened [(b)(6); (b)(7)(C)] saying he "would take care of it" and "you'll get what you have coming to you."  SFC Card lunged at [(b)(6); (b)(7)(C)] and chased him around a car before regaining his composure.

RESPONSE:  Soldiers who interacted with SFC Card reported his behavior to [(b)(6); (b)(7)(C)].  [(b)(6); (b)(7)(C)] spoke with SFC Card.  Since it was late, [(b)(6); (b)(7)(C)] restricted SFC Card to his room and assigned someone to watch SFC Card's room overnight.

RESULT:  [(b)(6); (b)(7)(C)] assessed the situation and reasonably delayed further action until the next day.

*EVENT:  Interaction with New York State Police (NYSP) on July 16, 2023*

CONCERN:  On July 16, 2023, [(b)(6); (b)(7)(C)] contacted the NYSP over concerns with SFC Card's behavior.  [(b)(6); (b)(7)(C)] accompanied two troopers to SFC Card's room.

RESPONSE:  After speaking with witnesses and interviewing SFC Card, the NYSP troopers found no probable cause to take him into protective custody.

RESULT:  [(b)(6); (b)(7)(C)] unsuccessful attempt to place SFC Card in police protective custody led him to pursue medical care for SFC Card at Keller Army Community Hospital (KACH).

*EVENT:  Command Directed Behavioral Health Evaluation on July 16, 2023*

CONCERN:  [(b)(6); (b)(7)(C)] was concerned with SFC Card's behavior on July 15, 2023.

RESPONSE:  [(b)(6); (b)(7)(C)] arranged for a military treatment facility to evaluate SFC Card in accordance with DoDI 6490.04, Mental Health Evaluations of Service Members of the Military Services.  SFC Card consented to evaluation and the unit took him to KACH at West Point.  The KACH staff conducted a command directed behavioral health evaluation based on [(b)(6); (b)(7)(C)] directive.  The evaluation determined SFC Card [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)].  Based on safety concerns,[13] the evaluating physician referred SFC Card for follow-on diagnosis and care at private facility.  SFC Card consented to the referral, and KACH transported him to Four Winds Hospital in Katonah, New York.[14]

---

[13] Under DHA regulations, KACH did not qualify as a mental health treating provider for SFC Card because he needed at least three evaluations.
[14] KACH did not have the level of inpatient mental health services or resources required for SFC Card's diagnosis necessitating a referral to an outside agency.

KACH attempted to submit New York Secure Ammunition and Firearms Enforcement (SAFE) Act paperwork concerning SFC Card through a web-based portal but was unsuccessful because SFC Card was not a New York resident.[15]

      RESULT:  The behavioral health evaluation resulted in SFC Card's voluntary inpatient care and treatment, provided short term risk mitigation and prevented a possible escalation of violent behavior at West Point.

*EVENT:  Voluntary Inpatient Behavioral Healthcare at Four Winds from July 16 to August 3, 2023, and attempts at follow-on care following release*

      CONCERN:  SFC Card's requirement for inpatient behavioral health treatment exceeded the capabilities of KACH.

      RESPONSE:  SFC Card consented to receive follow-up behavioral health evaluation and care that was not available at the military treatment facility.  SFC Card arrived at the Four Winds Hospital angry and upset.  After their initial assessment, Four Winds told KACH that SFC Card may need treatment at a "locked facility."  On July 25, 2023, SFC Card submitted a 72-hour request for discharge and release from treatment.  In response, Four Winds applied for a court hearing to involuntarily retain him at their facility with a scheduled court date on August 2, 2023.  On July 31, 2023, SFC Card withdrew his voluntary release request and consented to continue treatment at Four Winds, at which time Four Winds cancelled the court hearing.

      After 19 days of psychiatric evaluation and treatment, Four Winds assessed SFC Card "could return to work," he "did not demonstrate a risk of harm to self or others," and he was "acutely safe for discharge."  Four Winds discharged SFC Card on August 3, 2023, with instructions that he schedule follow-up appointments for psychotherapy with Telemynd.[16]

      On August 11, 2023, SFC Card told [(b)(6); (b)(7)(C)] from KACH, who was conducting a follow-up, that he was fine, he stopped taking his medications because he did not like the way they made him feel, and he had not enrolled in his follow-up care.  SFC Card did not respond to any other attempts by Army medical personnel to provide follow-up care.

      RESULT:  The voluntary hospitalization likely prevented SFC Card from becoming a risk to himself and others at West Point.

*EVENT:  Report of assault and threats on September 15, 2023*

      CONCERN:  On the evening of September 14, 2023,[17] SFC Card and [(b)(6); (b)(7)(C)] went to [(b)(6); (b)(7)(C)]  While driving home, SFC Card became very angry, telling his friend "They are ruining his life."  SFC Card punched the steering wheel and then directed his anger at [(b)(6); (b)(7)(C)], accusing him of being a liar.  SFC Card punched [(b)(6); (b)(7)(C)] in the face, then left him at a gas station.  Around 2:00 a.m. on September 15, 2023, [(b)(6); (b)(7)(C)] sent a text message to [(b)(6); (b)(7)(C)], communicating his belief that SFC Card may commit a mass shooting.

      RESPONSE:  None of the parties were in a USAR duty status.  [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] alerted [(b)(6); (b)(7)(C)]

---

[15] USARC ROI, p.945. New York SAFE Act notification is required when two physicians deem a person a threat to themselves or others, or if a New York Court issues an involuntary committal order. Neither of those conditions applied to SFC Card.

[16] Telemynd is an online platform allowing military personnel to receive mental health care virtually.

[17] [(b)(6); (b)(7)(C)] statements to the USARC IO and CID varied between September 13 and 14 as the exact date he and SFC Card went out to the casino.

[(b)(6); (b)(7)(C)] of [(b)(6); (b)(7)(C)] text message. [(b)(6); (b)(7)(C)] also wrote a letter expressing his concerns of the threats SFC Card posed to himself and others. The Ellsworth Police Department sent the letter to the SCSO and requested a welfare check on SFC Card at his residence in Bowdoin, Maine. [(b)(6); (b)(7)(C)] went to SFC Card's residence on September 15 and September 16, 2023, but SFC Card did not answer the door. [(b)(6); (b)(7)(C)] called [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] and told him he believed [(b)(6); (b)(7)(C)] and SFC Card's family had managed to remove weapons from SFC Card's home. [(b)(6); (b)(7)(C)] also spoke with [(b)(6); (b)(7)(C)], who could not provide specifics on SFC Card's alleged mass shooting threat. [(b)(6); (b)(7)(C)] contacted the Saco Police Department who sent uniformed officers to the U.S. Army Reserve Center in Saco for the September unit training assembly. [(b)(6); (b)(7)(C)] spoke to SFC Card for about three minutes on the evening of September 15, 2023. SFC Card told [(b)(6); (b)(7)(C)] he was angry over being hospitalized in July. SFC Card said he wanted to retire from the military and did not want to attend unit training any longer. [(b)(6); (b)(7)(C)] told SFC Card he would have unit personnel send him retirement information. That was the last contact [(b)(6); (b)(7)(C)] had with SFC Card.

RESULT: Though not on a duty status, unit leaders reported SFC Card's abnormal behavior and threats to civilian law enforcement.

### b. QUESTION #2. Were all existing Army regulations, policies, and procedures followed with regard to Mr. Card?

Army regulations, policies and procedures were followed with the following exceptions:

REGULATION: AR 190-11 (Physical Security of Arms, Ammunition, and Explosives) USAR Pam 190-1 (Physical Security Program), and USARC CG Policy #20-14 (Care of U.S. Army Reserve (USAR) Soldiers with Suicidal Ideations) authorized USAR commanders to ask Soldiers if they are willing to store privately owned weapons in USAR centers arms rooms.

ISSUE: SFC Card's [(b)(6); (b)(7)(C)] did not ask SFC Card if he wanted to voluntarily store his private weapons in the LTC Charles Butler U.S. Army Reserve Center arms room.

REGULATION: Department of Defense Instruction (DODI)1241.01, "Reserve Component (RC) LOD Determination for Medical and Dental Treatments and Incapacitation Pay Entitlements," April 19, 2016; AR 600-8-4; and USARC Commanding General Policy #20-14, (Care of USAR Soldiers with Suicidal Ideations) required a Line of Duty (LOD) investigation to determine a Soldier's duty status at the time of injury, illness, disability, or death. USAR Soldiers are generally only in the line of duty while in a duty status.

ISSUE: SFC Card's [(b)(6); (b)(7)(C)] did not initiate a Line of Duty Investigation after SFC Card's hospitalization. The Line of Duty Investigation was an administrative requirement to properly account for SFC Card's duty status.

REGULATION: AR 600-20 (Army Command Policy) stated commanders have responsibilities with respect to medical readiness. They must ensure Soldiers meet medical fitness standards.

ISSUE: (b)(6); (b)(7)(C) did not speak to SFC Card about his behavioral health issues or his follow-up care. While this requirement is complicated by the duty status of both (b)(6); (b)(7)(C) and SFC Card, it did not relieve (b)(6); (b)(7)(C) of his responsibility to check on the welfare of one of his Soldiers.

REGULATION: AR 190-45 (Law Enforcement Reporting) and AR 600-20 (Army Command Policy) required commanders to submit a serious incident report for incidents the commander determines to be of concern to HQDA based on the nature, gravity, potential for adverse publicity, or potential consequences of the incident.

ISSUE: On September 15, 2023, (b)(6); (b)(7)(C) did not submit a serious incident report (SIR) on SFC Card's alleged threat to Army personnel and facilities.

### c. QUESTION #3. Under what circumstances does the Army report its personnel to the National Instant Criminal Background Check System (NICS)?

Army Law Enforcement reports information to the National Instant Criminal Check System (NICS) when they receive information that a service member meets any of the ten federally prohibited criteria under AR 190-45 Law Enforcement Reporting and 18 U.S. Code § 922 –Unlawful acts – Section (g):

(1) Persons who have been convicted in any court of a crime punishable by imprisonment for term exceeding one year;
(2) Persons who are fugitives from justice;
(3) Persons who are unlawful users of or addicted to any controlled substance;
(4) Persons who have been adjudicated as mental defectives or have been committed to a mental institution;
(5) Persons who are aliens and are illegally or unlawfully in the United States;
(6) Persons who have been discharged from the U.S. Armed Forces under dishonorable conditions;
(7) Persons who, having been citizens of the United States, have renounced their U.S. citizenship;
(8) Persons subject to a court order that restrains them from harassing, stalking, or threatening an intimate partner or child of such intimate partner, or from engaging in other conduct that would place the partner or child in reasonable fear of bodily injury;
(9) Persons convicted in any court of a misdemeanor crime of domestic violence; and
(10) Persons who are under indictment or information for a crime punishable by imprisonment for a term exceeding one year.[18]

The facts and circumstances surrounding SFC Card's voluntary behavioral health evaluation and hospitalization in July 2023 did not require the Army to report information into NICS because it did not meet the statutory requirements of Title 18 U.S.C. Section 922(g)(1) and (4), "Persons Who Have Been Adjudicated as Mental Defectives or Have Been Committed to a Mental Institution."

---

[18] Federal Prohibitors, Federal Bureau of Investigation Criminal Justice Information Services Division, National Instant Criminal Background Check System Section, April 2009.

**d.  QUESTION #4.  Under what circumstances would the Army seek to invoke a state's crisis intervention laws to temporarily remove firearms from the possession of a Soldier who is in danger to themselves or others?**

The Army has no specific authority to invoke state crisis intervention laws.  The Army must work with local, state, or federal law enforcement during situations involving Soldiers who are a danger to themselves or others.  The USAR has no authority to remove privately owned firearms from a USAR Soldier and the Army has very limited options when contemplating removing weapons from Soldiers who do not live on a military post.  The Army encourages commanders to consult with their supporting legal offices for advice and to work closely with civil authorities when addressing these types of emergencies.

**e.  QUESTION #5.  Is there anything that Army personnel should (or could) have done consistent with existing law to prevent the events of October 25, 2023?**

We found no specific action or inaction by Army personnel directly contributed to or definitively would have prevented the events of October 25, 2023.  Our review identified several areas for improvement; however, our assessment concluded that even a flawless execution by Army personnel in every identified area unfortunately would likely not have prevented the tragic events of October 25, 2023.

The chain of command operated within the limits of their authority when addressing SFC Card's issues.  SFC Card's chain of command recognized his abnormal behavior and took proactive measures to protect him and others from the threat of violence.  At West Point, the chain of command acted promptly when they realized SFC Card was in a behavioral health crisis.

SFC Card's chain of command notified law enforcement of his condition, but law enforcement personnel declined to take SFC Card into protective custody.  After learning civilian law enforcement could not intervene, SFC Card's superiors acted swiftly by ordering SFC Card to undergo a command directed behavioral health evaluation on July 16, 2023.  KACH assessed they did not have the resources to treat SFC Card and referred him to a private facility. SFC Card voluntarily went to Four Winds.  While at Four Winds, SFC Card ended his voluntary treatment after 19 days.  Neither Four Winds nor SFC Card clearly communicated the decision to end treatment with KACH or the chain of command.

After his discharge from Four Winds, SFC Card distanced himself from his family and his unit.  During his discharge process, he told his treatment team he would continue taking his medications and participate in psychotherapy.  He did not do so.  He did not answer phone calls from medical personnel to follow-up.  He told (b)(6); (b)(7)(C) he wanted to retire and was not going to attend drill because of work commitments.

While SFC Card's chain of command could have attempted additional communications, there is no evidence SFC Card would have responded.  The command actively took steps to help SFC Card.  They directed him to medical treatment, they engaged with local law enforcement who was in contact with SFC Card's family, and they contacted SFC Card directly.

The facts require us to conclude that SFC Card was singularly responsible for the mass shooting in Lewiston, Maine.

**f. QUESTION #6. Are there any existing laws, regulations, policies, or procedures that prevented the Army from alerting or communicating with any judicial, law enforcement, healthcare, or other entities that could have taken action to prevent the mass shooting on October 25, 2023?**

There are no existing laws, regulations, policies, or procedures that prevented the Army from alerting or communicating with any judicial, law enforcement, healthcare or other entities that could have taken action to prevent the events of October 25, 2023.

**g. QUESTION #7. What reforms or actions, if any, is the Army undertaking in response to the events of October 25, 2023? What actions does your Office believe the Army should take?**

We responded to Question #7 in our recommendations.

## VII. CONCLUSIONS AND RECOMMENDATIONS

USARC completed a thorough and comprehensive investigation. As requested by Members of Congress, we completed a review of the USARC AR 15-6 report and clarified matters as needed. Based on our review of the facts and circumstances related to SFC Card and the actions of his leaders in (b)(6); (b)(7)(C), we conclude that SFC Card was singularly responsible for the mass shooting in Lewiston, Maine. On October 25, 2023, SFC Card was a civilian who was not on a duty status.

We make the following recommendations for improving a Soldier's continuity of care in behavioral health emergencies:

- We recommend conducting a review of existing Army behavioral health policies and procedures to develop a standardized CDBHE form and checklist to guide commanders during a behavioral health crisis. We recommend these standards include a requirement for commanders to coordinate with providers to outline a postvention plan to include actions if behavioral health conditions change after discharge.[19] We further recommend the inclusion of proposed behavioral health crisis actions in AR 600-20 (Army Command Policy).

- We recommend expanding the scope and title of AR 600-92, (Army Suicide Prevention Program) to encompass broader behavioral health emergencies. The current title implies the regulation applies only to suicides, but it also outlines valuable steps for behavioral health intervention.

---

[19] We found there is not a standardized Department of the Army form a commander uses to direct a behavioral health evaluation. Army Commands are using non-standardized forms that do not ensure continuity between the command and health providers. These standardized forms should include a section for providers and commanders to address necessary actions to take if conditions change after discharge.

- We recommend revising Army policy to facilitate USAR commanders' coordination with MTFs across the Department of Defense to increase MTF-to-MTF referrals, when feasible, of USAR Soldiers on active duty less than 30 days.

- We recommend evaluating any legal or policy provisions which impact commanders' authority to keep USAR Soldiers on orders involuntarily for behavioral health emergencies identified by a medical professional.[20]

- We recommend an assessment of current Army leader training curricula to ensure it incorporates suicide prevention and behavioral health intervention policies and procedures.

(b)(6); (b)(7)(C)

Investigator

APPROVED:

MARTIN.DONNA.W HITLEY (b)(6); (b)(6);  Digitally signed by MARTIN.DONNA.WHITLEY (b)(6); (b)(6); Date: 2024.07.15 16:44:56 -04'00'

DONNA W. MARTIN
Lieutenant General, USA
The Inspector General