# Exhibit J to the United States' Motion to Dismiss

*Seal v. United States*, Case No. 2:25-cv-442 (D. Me.)

DEPARTMENT OF THE ARMY
HEADQUARTERS, UNITED STATES ARMY RESERVE COMMAND
4710 KNOX STREET
FORT LIBERTY 28310-5010

AFRC-OPI (800B-15-6b2) 7 March 2024

MEMORANDUM FOR Commanding General, United States Army Reserve Command, Fort Liberty, North Carolina 28310

SUBJECT: Findings and Recommendations, Army Regulation (AR) 15-6 Investigation into the Suspected Suicide of SFC Robert R. Card II

**1. Executive Summary.**

a. BLUF. On 25 October 2023, SFC Robert R. Card II, B Company, 3d Battalion, 304th Infantry Regiment, 2d Brigade, 104th Training Division, 108th Training Command, killed 18 civilians and wounded 13 others in Lewiston, Maine. Maine law enforcement officials found SFC Card's body two days later at the Maine Recycling Company, SFC Card's former employer. SFC Card committed suicide by a self-inflicted gunshot wound [redacted]. This investigation identified multiple errors made by unit leadership, medical professionals, and local law enforcement. For example, SFC Card's unit should not have ordered SFC Card to Annual Training and should have conducted a Line of Duty Investigation when he was hospitalized in July 2023. Keller Army Community Hospital (KACH) and the chain of command should have kept SFC Card on Active-Duty orders for a Line of Duty determination and Medical Evaluation Board. I was unable to determine whether SFC Card received signed discharge instructions from Four Winds Hospital, the day after a court hearing should have taken place in New York State Court. Local law enforcement authorities in Maine could have conducted a more extensive welfare check and follow-through in September 2023 and better employed the Maine Yellow Flag law to prevent harm. Given the nature of the United States Army Reserve (USAR), with only 38 duty days per year, the USAR had limited jurisdiction over SFC Card during non-duty periods.[1] I recommend holding unit leaders accountable and making systemic adjustments to improve oversight and care of Army Reserve Soldiers in the future.

[1] In accordance with 10 USC 10147, members of the Ready Reserve, including the Troop Program Unit (TPU), are expected to participate in 48 Multiple Unit Training Assemblies (MUTAs) for a total of 24 days and at least 14 active duty (AT) days a year, for a total of 38 duty days. A standard drill weekend consists of 4 MUTAs.

EXHIBIT
4

b. Findings. The findings of this investigation are based on a preponderance of the evidence.[2]

(1) SFC Card enlisted in the United States Army Reserve on 14 December 2002, and his Military Occupational Specialty (MOS) was 92F, Petroleum Supply Specialist with an Additional Skill Identifier EH7, Enlisted Petroleum Vehicle Operator. At the time of his enlistment, SFC Card had no identified mental health issues requiring a medical waiver to join. According to all reports, SFC Card had an unremarkable military career spanning twenty-years. SFC Card did not deploy or mobilize; therefore, he was not exposed to conditions found in a combat environment.

(2) SFC Card's death was preceded by a series of events beginning in the Fall of 2022, which likely exacerbated his mental health issues leading up to his suicide. These events included [redacted] his perception of others making derogatory statements about him, beginning the use of hearing aids, and conflicts with [redacted], and with his fellow USAR unit members. Family members became concerned with SFC Card's deteriorating mental state and reported their concerns, seeking assistance from local law enforcement authorities for the first time, on 3 May 2023.

(3) Despite not attending the unit validation exercise in April 2023, SFC Card was ordered to his Fiscal Year Annual Training (AT) from 15 – 28 July 2023. After engaging in a verbal altercation with unit members on 15 July 2023, SFC Card was ordered by [redacted] 3d Battalion, 304th Infantry Regiment (3-304th), to undergo a Command Directed Behavioral Health Evaluation (CDBHE) on 16 July 2023. While undergoing this evaluation, medical officials at Keller Army Community Hospital (KACH), West Point, NY, assessed SFC Card's condition to be significant enough to order his hospitalization at a civilian mental health facility, the Four Winds Hospital - Westchester, Katonah, NY, for further evaluation and treatment. At the conclusion of his AT orders, 3-304th placed SFC Card on a medical Active Duty Operational Support-Reserve Component (ADOS-RC) duty order for six-days to facilitate his stay in the hospital. SFC Card's reported symptoms included psychosis, mood lability/aggression, homicidal ideations, paranoia, and auditory hallucinations, according the Four Winds discharge summary.

[2] Army Regulation 15-6 (1 April 2016) defines preponderance of the evidence as Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

(4) The Army medical provider who conducted the CDBHE concluded SFC Card did not meet the Army's medical retention standards and recommended to SFC Card's chain of command that SFC Card be entered into the Disability Evaluation System, which would facilitate his discharge from the military.[3] SFC Card's access to his assigned (military owned) weapon was restricted on 20 July 2023. SFC Card was eventually discharged from Four Winds Hospital on 3 August 2023 under questionable circumstances, and released from his USAR orders, after 20 days with a diagnosis of "Brief Psychotic Disorder" and recommended scheduling of follow-on treatment and prescribed psychiatric medications.

(5) After SFC Card's release in early August 2023, SFC Card's unit did not conduct a required Line of Duty Investigation to properly document SFC Card's condition and hospital stay which would allow the government to pay for treatment of his condition, nor did the unit initiate disability processing.[4] Upon SFC Card's release from Four Winds Hospital on 3 August 2023, SFC Card's chain of command was not provided with any information regarding SFC Card's diagnosis, prognosis, or discharge instructions. SFC Card's discharge instructions were eventually sent to KACH on 11 August 2023, but were not relayed to SFC Card's chain of command.

(6) On 13 September 2023, SFC Card told his [redacted] and fellow unit member, [redacted] he "could take out 100 people with this expensive scope" he had just bought followed by a list of different places he could "shoot up." [redacted] reported SFC Card's threats to commit a mass shooting to the chain of command who then referred the threats to local law enforcement. Law enforcement attempted to establish contact with SFC Card on 15 and 16 September 2023. Despite SFC Card being inside his home on the 16th, local authorities did not force an interaction or attempt to employ the Maine Yellow Flag Law, which could have restricted SFC Card's access to his privately owned firearms.

(7) On 25 October 2023, SFC Card was identified as the lone shooter, killing 18 people, and wounding an additional 13 in Lewiston, Maine. After a two-day manhunt, SFC Card's body was discovered. The Office of Chief Medical Examiner, State of

[3] The Disability Evaluation System is the Army's mechanism for determining whether a Servicemember will return to duty, medically separate, or medically retire due to disability. The Disability Evaluation System, also referred to as the Integrated Disability Evaluation System (IDES), consists of a Medical Evaluation Board and a Physical Evaluation Board. The applicable Army Regulations are Army Regulation 40-501 (Standards of Medial Fitness) and Army Regulation 635-40 (Disability Evaluation for Retention, Retirement, or Separation).

[4] A Line of Duty determination is an administrative tool for determining a Soldier's duty status at the time of injury, illness, disability, or death. USAR Soldiers are generally only in the Line of Duty while in a duty status. See Army Regulation 600-8-4 (Line of Duty Policy, Procedures, and Investigations).

Maine, found that SFC Card died due to a single perforating self-inflicted gunshot wound [redacted]. At the time of his death, SFC Card had no intoxicating drugs, including alcohol, in his system.

c. Recommendations.

(1) Refer this investigation to the Director, Defense Health Agency (DHA), to evaluate whether Four Winds Hospital met the standard of care, and if not, consider removing Four Winds as an authorized treatment facility, in accordance with Title 32 to the Code of Federal Regulations. Additionally, consider terminating the contract of Spectrum Services Group, Inc., who provided nurse case management services within KACH.

(2) Request DHA and the Army Surgeon General update procedures of Army medical agencies to require written communication with a Soldier's chain of command at the lowest level at every stage of a Soldier's case. Also request Army medical agencies are trained on the basic nature of Reserve personnel's service to better communicate with unit and civilian agencies when there is a requirement for monitoring and follow-on care.

(3) Take appropriate administrative action against SFC Card's [redacted]

d. This investigation has been turned over, in its entirety, to the Department of Forensic Psychology at the Walter Reed National Military Medical Center for review and expert analysis of whether SFC Card's care at Four Winds met the established Standard of Care and whether SFC Card's condition requiring hospitalization in July-August 2023 was in the Line of Duty. Walter Reed will also provide a Root Cause Analysis and a Forensic Autopsy.[5] The results of Walter Reed's examination are pending.

---

[5] Root cause analysis (RCA) is a structured method used to analyze serious adverse events. Initially developed to analyze industrial accidents, RCA is now widely deployed as an error analysis tool in health care. A central tenet of RCA is to identify underlying problems that increase the likelihood of errors while avoiding the trap of focusing on mistakes by individuals. RCA thus uses the systems approach to identify both active errors (errors occurring at the point of interface between humans and a complex system) and latent errors (the hidden problems within health care systems that contribute to adverse events). It is one of the most widely used retrospective methods for detecting safety hazards. See

**2. Background.**

a. On 2 November 2023, I was appointed by the Deputy Commanding General, United States Army Reserve Command (USARC), Major General Eugene J. LeBoeuf, to serve as the Investigating Officer to determine the facts and circumstances surrounding the suspected suicide of Sergeant First Class (SFC) Robert Russell Card II, B Company, 3d Battalion, 304th Infantry Regiment, 2d Brigade, 104th Training Division, 108th Training Command located in Saco, Maine. [redacted] were assigned as my Assistant Investigating Officers (AIO). [redacted], USARC, was assigned as my Legal Advisor. The purpose of the investigation was "to identify the circumstances, methods, and contributing factors surrounding the suspected suicide." Specifically, I was directed to "examine the Soldier's behavior before the event; actions by the chain of command; and potential improvements to the unit's, installations', and/or Army's suicide prevention program." I was directed to "provide clear, relevant, and practical recommendation(s) to prevent future suicides."[6]

b. As part of this investigation, my team and I interviewed 43 witnesses.[7] I gathered 445 exhibits, including photographs, videos, documents, text messages, e-mails, medical records, public records, police reports, search warrants and affidavits, military records, witness statements, policies, regulations, standard operating procedures, open-source media reports, and autopsy results. I visited multiple sites of interest pertinent to the investigation or to conduct interviews, including: Camp Smith, New York; Keller Army Community Hospital (KACH), West Point, New York; Range 1 at West Point, New York; the West Point Office of the Department of the Army's Criminal Investigation Division (CID); the C.W. Bill Young Armed Forces Reserve Center and Army Reserve Medical Management Center (ARMMC) in Pinellas Park, Florida; Schemengees Bar and Grille Restaurant, Lewiston Maine; Just-In-Time Recreation Center, Lewiston, Maine; Maine Recycling and Annex, Lisbon Falls, Maine; Lisbon Falls,

---

https://psnet.ahrq.gov/primer/root-cause-analysis. A forensic autopsy is an examination conducted postmortem to address medicolegal objectives. A forensic autopsy is also called a medicolegal autopsy. The performance of a forensic autopsy follows instructions from the concerned legal authority responsible for the medicolegal investigation of sudden, unexpected, suspicious, mysterious, unwitnessed, obscure, unexplained, or litigious deaths, criminal deaths, industrial deaths, and deaths associated with medical or surgical treatment where medical negligence is alleged or anesthetic deaths. In brief, all deaths of unnatural (homicide, suicide, accident) manner, suspicious deaths, and unexpected deaths necessitate a legal investigation, which includes an autopsy as a portion of the evidence-gathering process. See https://www.ncbi.nlm.nih.gov/books/NBK539901/.

[6] Enclosure 1.

[7] A list of the individuals interviewed, as well as those I was unable to interview for a variety of reasons, is attached hereto. Exhibit A.

Maine boat ramp; the United States Attorney's Office for the District of Maine, Portland, Maine; the LTC Charles L. Butler U.S. Army Reserve Center in Saco, Maine; and SFC Card's and SFC Card's [redacted], Maine.

c. On 14 February 2024, this investigation was informally presented to the Commanding General, USARC, for an informal review and further guidance. On 20 February 2024, I received additional requests for information, and received an extension until 20 March 2024.

d. Unfortunately, there are several unresolved issues. Despite multiple requests, I was unable to speak to several key witnesses, including the [redacted] at Keller Army Community Hospital, a contract employee. Additional witnesses include civilian co-workers and managers, and key [redacted]), and SFC Card's [redacted]. I was unable to speak to hospital staff at Four Winds Hospital to determine why SFC Card was released on 3 August 2023. I requested multiple times but never received the Maine State Police reports, which included interviews with other witnesses I needed to interview and other forensic information about the last days of SFC Card's life. I requested expert assistance from the Chief of Forensic Psychology at the Walter Reed National Military Medical Center. Specifically, I requested a Root Cause Analysis and Forensic Autopsy. I made a supplemental request to Walter Reed to determine if SFC Card's condition was exacerbated by service in July 2023 for the purposes of a Line of Duty determination and whether Four Winds complied with the standard of care in its treatment of SFC Card.

**3. Facts**.

a. Family and Childhood.

(1) SFC Card was born on [redacted] in Brunswick, Maine, to [redacted].[8]

(2) SFC Card had [redacted]

(3) SFC Card grew up on his [redacted] in Bowdoin, Maine. At the time of his death, he resided at [redacted], Bowdoin, Maine 04287.[10]

[8] Exhibits H2, D.
[9] Exhibit B21.
[10] Exhibits B21, G54-56, J1-J2.

(4) During his childhood, SFC Card's [redacted][12]

(5) SFC Card dealt with anxiety and was described as "sensitive" and "an introvert." While SFC Card reportedly lived with hearing issues since childhood, there is no information that he saw a medical professional for his diminished hearing until he was an adult. SFC Card was reportedly refused hearing aids by a doctor later in life, because "his hearing was too far gone to benefit."[13] A review of SFC Card's enlistment report of medical examination (DD Form 2808) indicated reduced hearing in his left ear but not at the level requiring a waiver to enlist in the USAR. The [redacted] suspected his long-term hearing issues were a [redacted] "hardening of the ear canal," likely [redacted]

(6) As a child, and later as an adult, SFC Card had a small group of friends.[15] He was close with his [redacted] and generally had good relationships with [redacted]. Throughout [redacted] childhood, SFC Card and [redacted] routinely competed. [redacted] while SFC Card was tech savvy.[16]

(7) SFC Card was not violent as a child. He "never wanted to kill anything" and would often hide with [redacted] when it was time to go hunting with [redacted] or if a farm animal had to be euthanized. SFC Card did not kill his first deer until he was an adult.[17]

(8) SFC Card's [redacted][18]

(9) As an adolescent, SFC Card was described as "straight edge," despite experimenting with drugs briefly as a young adult.[19] SFC Card drank socially but "didn't handle alcohol well. He became emotional or angry if he drank too much."[20]

---

[11] Exhibit B21.
[12] *Id.*
[13] Exhibits B21, K42.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] Exhibit B21.
[18] *Id.*
[19] *Id.*

(10) SFC Card possessed a strong work ethic, which his [redacted] credited to his desire to "get away from doing work on the [redacted]."[21]

(11) SFC Card attended college but did not graduate.[22]

b. Entry into the Army/Family:

(1) SFC Card enlisted in the U.S. Army Reserve on 14 December 2002. At the time, SFC Card's [redacted][23]

(2) SFC Card's Military Occupational Specialty (MOS) was 92F, Petroleum Supply Specialist, with an Additional Skill Identifier (ASI) EH7, Enlisted Petroleum Vehicle Operator.[24]

(3) In 2001, SFC Card met [redacted]

(4) According to [redacted][28]

(5) In September 2006, SFC Card, then-SPC Card met [redacted] SFC Card and [redacted] remained best friends from September 2006 until one month prior to SFC Card's death. [redacted]

---

[20] *Id.*
[21] *Id.*
[22] Exhibit D.
[23] Exhibit B21.
[24] Exhibit N79.
[25] Exhibit B39.
[26] Exhibit N69.
[27] Exhibit B21.
[28] Exhibit B21.
[29] Exhibit B36.

(6) In April 2007, SFC Card was arrested for, and subsequently convicted of, operating (a vehicle) under the influence.[30]

(b) (6), (b) (7)(C) [redacted]

(b) (6), (b) (7)(C) [redacted]

(9) In 2008, SFC Card fell from the roof of his home and broke his neck.[35] There is no evidence that SFC Card reported this accident to the USAR and there are no notes in his military medical file documenting the accident.

(10) SFC Card joined B Company, 3d Battalion, 304th Infantry Regiment, 2d Brigade, 104th Training Division, 108th Training Command, on 9 April 2014.[36]

(11) While assigned to B Company, SFC Card served primarily as a "senior trainer," training West Point Cadets in a variety of firearms instruction with a particular focus as a "pit NCO" instructor on the hand grenade range and "lane NCO" for crew-served weapons.[37]

(12) In 2017, SFC Card was referred to an MOS Administrative Retention Review to determine if he should be referred to a Medical Evaluation Board due to his persistent hearing issues. On 12 July 2017, SFC Card was found fit for duty and given a permanent H3 profile with a W code. This profile and code indicated that although SFC Card had a permanent profile, he should be retained and returned to duty.[38]

(13) Unit members described SFC Card as kind, friendly, calm, and generous.[39] According to his (b) (6), (b) (7)(C) [redacted] SFC Card had no previously reported performance or conduct issues prior to the Spring of 2023.[40]

---

[30] Exhibit J4.
[31] Exhibits H2, N70, N71.
[32] Exhibit B36.
[33] Exhibit B21.
[34] Exhibits B21, B39.
[35] Exhibit B21.
[36] Exhibit N79.
[37] Exhibits H2, B5, B10, B42, R13.
[38] Exhibit E7.
[39] Exhibits B10, B42, B36, B39.

(14) SFC Card worked primarily as a truck driver in his civilian capacity, and at the time of his death was employed as a bread delivery driver for First Fleet, Inc. in Lewiston, Maine.[41] SFC Card also worked as a truck driver for Maine Recycling Corporation in Lisbon Falls, Maine, from 2021 until early July 2023.[42] SFC Card previously worked at Pine State Beverage distribution in Gardiner, Maine, Kris-Way Truck Leasing in Auburn, Maine, and Baxter Brewing Company in Lewiston, Maine, according to [redacted].[43]

(15) [redacted] observed SFC Card daily [redacted] in the Spring of 2022. [redacted] reported SFC Card was financially responsible. SFC Card reportedly made $50,000 in three months in the stock market in 2021 and afterwards took a break from working. According to [redacted] SFC Card returned to work purely out of boredom.[44]

(16) Between 2007 and the Fall of 2022, [redacted]

(17) Until early 2023, SFC Card and [redacted].[46] [redacted] SFC Card [redacted] would regularly go fishing, bowling, out to restaurants, and attend "cornhole" nights at Schemengees Bar and Grille, a bar and recreation facility located in Lewiston, Maine.[47]

c. Fall 2022.

(1) SFC Card met [redacted] in November 2022.[48]

(2) SFC Card and [redacted][49]

---

[40] Exhibit B3.
[41] Exhibits D, B36, B21.
[42] Exhibit B21.
[43] Exhibit K41.
[44] Exhibit B36.
[45] *Id.*
[46] Exhibits B38, B21.
[47] Exhibits B38, G48-53.
[48] Exhibit B38.

(3) SFC Card told (b)(6), (b)(7)(C) [redacted][51]

(4) Members of SFC Card's unit and his (b)(6), (b)(7)(C) [redacted] SFC Card.[52]

(5) SFC Card told (b)(6), (b)(7)(C) [redacted] anymore.[53]

(6) (b)(6), (b)(7)(C) [redacted][55]

d. December 2022/January 2023.

(1) SFC Card reached 20 years of service in the U.S. Army Reserve on 14 December 2022. In early 2023, SFC Card received his 20-year letter memorializing the same.[56]

(2) In January 2023, SFC Card bought hearing aids online from Audicus (www.audicus.com), receiving them on 2 March 2023.[57]

(3) In or about January 2023, (b)(6), (b)(7)(C) [redacted] noticed SFC Card's mental health began to decline.[58]

---

49 *Id.*
50 Exhibit B36.
51 *Id.*
52 Exhibits B36, B10, B21.
53 Exhibit B38.
54 *Id.*
55 Exhibit B36.
56 Exhibits N77, B36, B10.
57 Exhibit B21.
58 Exhibits B36, B38.

(4) Among the mental health issues observed was SFC Card reporting that he was hearing voices. There are no reports of SFC Card hearing voices prior to January 2023. The first time SFC Card complained about hearing people talking about him behind his back occurred in January 2023 when he was with [redacted] at Schemengees Bar and Grille.[59]

(5) [redacted] were out in public places SFC Card would claim that people around him were talking about him.[60] SFC Card told [redacted] he believed that people nearby were saying derogatory things, such as calling him a "pedophile."[61] [redacted] came to the conclusion that SFC Card was "hearing voices" and that he was "starting to experience paranoia."[62] [redacted] described SFC Card as "acting angry and paranoid."[63]

e. March 2023.

(1) Upon receiving his hearing aids on 2 March 2023, SFC Card texted [redacted] stating, "Got my hearing aids today got my right ear perfect but left is about where my hearing in my right ear was about 40 percent hearing loss but they may be able to adjust it to get it a little better or I'll have to send these back and head to the doctors and spend 8 to 10 grand to get it better (sic)."[64]

(2) In March 2023, SFC Card and [redacted] went to the Gowell's Shop 'n Save grocery store in Litchfield, Maine.[65] SFC Card told [redacted] he "heard" an older couple 50-100 feet away in the store talking about him, and he told [redacted] they were calling him a "pedophile."[66] [redacted] told SFC Card that he did not hear the older couple say anything about him, but SFC Card insisted they were talking about him.[67] SFC Card did not confront the older couple.[68]

(3) Also in or about March 2023, SFC Card told [redacted] that there was "something online" about him being a pedophile.[69] [redacted] retrieved an online photograph

---

[59] Exhibit B38.
[60] Exhibits J1 pg. 3, B38.
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] Exhibit C29.
[65] Exhibit B38.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] Exhibit B38.

[redacted] but SFC Card insisted there had to be something else out there pertaining to him.[71] SFC Card then became very upset, accusing [redacted] derogatory information about him that [redacted] had seen on the internet.[72]

f. April 2023.

(1) Between March and April 2023, SFC Card often called [redacted], one of SFC Card's closest friends in the 3/304th, to complain that people in the unit were calling him "gay." When [redacted] asked for specific names of the people calling him "gay," SFC Card did not respond. Instead, SFC Card indicated that it was people who sat at the front of the room in the group of classrooms. An estimate of the amount of unit members and the distance between SFC Card and the alleged people talking about him is at least thirty people sitting about 30-40 feet away.[73]

(2) On 11 April 2023, [redacted] for 3/304th Infantry Regiment informed the [redacted] that he received a call from [redacted] regarding rumors that SFC Card was gay and/or a pedophile.[74]

(3) [redacted] responded by contacting [redacted] and asking him to investigate potential harassment of SFC Card.[75] [redacted] instructed [redacted] to keep up with SFC Card and to investigate the matter further.[76]

(4) Also in April 2023, the 3/304th conducted a unit annual training validation event at Joint Base McGuire-Dix-Lakehurst in New Jersey, to determine trainers for the upcoming summer Annual Training at West Point.[77] SFC Card did not attend the validation exercise.[78]

---

70 Exhibits B38, J13.
71 Exhibit B38.
72 *Id.*
73 Exhibit B10.
74 Exhibits B22, C19.
75 Exhibit B22.
76 Exhibits B22, C19.
77 According to [redacted] 2d Brigade, 104th Training Division, validation in this context is a term the Division has borrowed from U.S. Army Cadet Command (USACC) since the majority of the Division's Battalions (8 of 9) support US Army Cadet Command (USACC). At USACC, "validation" refers to the time period (usually late May) before Cadet Summer Training (CST) where the CST Commandant will ensure each training lane, of which the 104th Division has several participants in, meets the

(5) The third incident observed by [redacted] occurred in April 2023 when he and SFC Card were shopping at a Lowe's Hardware Store. According to [redacted], there was a couple talking to a Lowe's employee about electrical work in their garage.[79] SFC Card told [redacted] he believed the couple was calling him a pedophile.[80] [redacted] said he told [redacted] he did not hear the couple say anything other than ask questions about electrical work.[81]

(6) The fourth and final alarming incident observed by [redacted] occurred in late April 2023. Planning to go fishing with his friends [redacted] went to SFC Card's house [redacted].[82] As soon as he saw [redacted] in his yard [redacted] SFC Card came out of his trailer and started screaming at [redacted] telling him that he [redacted] before SFC Card went inside his trailer and slammed the door.[83]

(7) From April 2023 to June 2023, [redacted] New Hampshire during this time. The unit [redacted] were physically present and in charge at the unit during that three-month period. According to a review of [redacted]

---

standards set forth by the USACC G37. The 104th Training Division's battalions generally run internal training events called "validations" during an FTX or Battle Assembly in the April or May timeframe. Each battalion "validation" is tailored to the battalion's mission to support USACC or the United States Military Academy (USMA). The "validation" is not Soldier validation or qualification, nor is it an externally evaluated training event, but rather a battalion internal collective training event or rehearsal focused on the requirements, running various ranges, of the customer unit (USMA). Thus, 3-304's validation event consisted of running various ranges and the battalion had enough leaders with the proper training to be range OICs/NCOICs and that they are prepared to conduct their respective range IAW USMA's requirements. Upon the battalion's arrival at USMA, USMA's Department of Military Instruction assess the various training lanes a few days prior to the execution of USMA's summer training missions. According to [redacted] it was not uncommon for Soldiers to still be assigned to AT despite not attending the "validation" event because there are always duties that don't require specific requirements at the various summer training events, for example vehicle drivers or ammunition detail.

[78] Exhibit B38.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] Exhibits B38, B21.

[redacted]

g. May 2023.

(1) After the incident at SFC Card's house in late April 2023, [redacted] report SFC Card's erratic behavior to law enforcement.[84]

(2) On or about 3 May 2023, [redacted] reported their concerns about SFC Card's mental health to the [redacted] (Topsham Police Officer [redacted]

(3) The Topsham Police Officer referred the matter to the Sagadahoc County Sheriff's Office, responsible for Bowdoin, Maine, the town where SFC Card lived.[86] The Sagadahoc County Sheriff's Office (SCSO) assigned [redacted] to investigate the matter.[87]

(4) On 3 May 2023, [redacted] prepared a police report memorializing his interviews with [redacted] reported the four alarming incidents evidencing [redacted] deteriorating mental state.[88] [redacted] expressed concern that [redacted] had access to weapons, telling [redacted] that SFC Card had weapons locked in his bedroom and possibly in his vehicle.[89]

---

[84] Exhibit B38.
[85] Exhibits B38, H6.
[86] Exhibits J1, H6.
[87] Exhibit J1 pg. 1.
[88] Exhibit B38.
[89] *Id.*

(5) [redacted] informed [redacted] that SFC Card was an Army Reservist assigned to a training unit in Saco, Maine. [redacted] also expressed concern about SFC Card's access to weapons. [redacted] was not aware of any specific threats SFC Card had made involving a weapon but was generally concerned because SFC Card had access to weapons, having recently retrieved 10-15 rifles and/or handguns previously stored at [redacted] home.[90]

(6) [redacted] also told [redacted] that SFC Card's [redacted] was aware of his deteriorating mental state and that she was working with SFC Card's [redacted] to get him the help he needed.[91] However, SFC Card refused any assistance and denied anything was wrong.[92]

(7) [redacted] they did not want SFC Card to know they had gone to law enforcement, fearing that it would aggravate the situation with SFC Card.[93] [redacted] was simply trying to avoid contact with SFC Card.[94]

(8) Based on a lack of any specific threat, [redacted] explained that their options were limited.[95] Nevertheless, [redacted] discussed several options with [redacted] including how to approach SFC Card.[96] They all agreed the best course of action was to connect with SFC Card's command in the U.S. Army Reserve.[97] [redacted] that he would contact SFC Card's commanding officer in "the hopes of getting them involved."[98] [redacted]

(9) In addition to contacting SFC Card's U.S. Army Reserve unit, the Sagadahoc County Sherriff's Office asked [redacted] if he would be willing to speak to [redacted] further stated that when [redacted] said he would speak to SFC Card, the Sagadahoc Sherriff's Office considered the matter closed.[101]

---

90 Exhibit H6.
91 Exhibits H6, J1, B39.
92 *Id.*
93 Exhibit J1 pg. 3.
94 Exhibits J1 pg. 3, B39.
95 Exhibit J1 pg. 3.
96 *Id.*
97 *Id.*
98 Exhibit J1.
99 *Id.*
100 Exhibits B21, B39, H6, J1.
101 Exhibit B21.

(10) After interviewing [redacted] researched the Army Reserve Center in Saco, Maine, and contacted [redacted] provided [redacted] with the phone number for SFC Card's [redacted], and relayed that both [redacted] were police officers.[103] [redacted] that "there has recently been considerable concern for Robert (SFC Card)."[104] [redacted] then left a voice mail message with [redacted].[105]

(11) While awaiting a return phone call from [redacted] contacted [redacted] to update her with his findings.[106] [redacted] relayed that she had spoken to [redacted], who stated at the time that he "didn't realize that Robert was becoming paranoid or hearing voices."[107] [redacted] also reported to [redacted] that [redacted] allegedly made a reference to SFC Card's heavy drinking, during which "he has made angry rants about having to shoot someone."[108] [redacted] then told [redacted] that [redacted] was allegedly going to check in with Robert later that day and was "much in favor" of involving SFC Card's commanding officer to seek help.[109]

(12) [redacted] then spoke with [redacted] on 3 May 2023, and they discussed SFC Card's situation "at length."[110] [redacted] that SFC Card had accused other Soldiers of calling him a sex offender, which coincided with the report that [redacted] had given about [redacted].[111]

(13) [redacted] acknowledged that he had no idea that SFC Card's problem was as serious as [redacted] was describing. [redacted] also thanked [redacted] for making him aware of the extent of SFC Card's mental health decline, since the unit was planning an upcoming training exercise involving crew-served weapons and grenades.[112] [redacted] that he would contact [redacted] and

---

102 Exhibit J1 pg. 4.
103 *Id.*
104 *Id.*
105 *Id.*
106 *Id.*
107 Exhibit J1 pg. 4.
108 *Id.*
109 *Id.*
110 Exhibits B7, J1.
111 Exhibit J1 pg. 4.
112 *Id.*

"start to figure out options to get Robert help."[113] [redacted] agreed to keep each other updated with any changes.[114]

(14) After speaking with [redacted] spoke with [redacted], who reported that he was not aware SFC Card had picked up guns from his house, which caused him great concern.[115] [redacted] also explained that he believed SFC Card's paranoia and anger started around the time that SFC Card received hearing aids for the first time in or about March 2023.[116]

(15) [redacted] performed some online research and found that "hearing loss-induced mental illness" is a documented condition that can project itself in paranoid behavior.[117] [redacted] that he had spoken with SFC Card's command in the U.S. Army Reserve and that they discussed strategies for approaching SFC Card directed at getting him help.[118]

(16) [redacted] told him he thought the presence of a police officer might worsen the situation. [redacted] agreed to keep [redacted] posted on any developments, and [redacted] reiterated that should [redacted] meet with SFC Card and determine he is a danger to himself or others, to call him (law enforcement) immediately.[119]

(17) Later that evening, on 3 May 2023, [redacted] went to [redacted] trailer. SFC Card answered the door holding a gun because "he was worried about people coming to kill him. He immediately hid the gun when he let in [redacted]"[120] SFC Card made comments about "punching people in the face," with regard to the people he believed were talking about him, although he did not mention anyone specifically.[121] SFC Card was "in denial that the voices weren't real."[122] During their visit, [redacted] noticed that sometimes SFC Card would "have to take

---

[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] Exhibit J1 pg. 4.
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] Exhibit B21.
[121] *Id.*
[122] *Id.*

the hearing aids out because it would be overstimulating in a loud environment."[123] SFC Card refused to stop using the hearing aids but did agree to go to the doctor because his [redacted] expressed concern about SFC Card's weight loss.[124]

(18) On 3 May 2023, [redacted] reported to the [redacted] [redacted], Topsham Police Officer [redacted] about SFC Card's deteriorating mental condition.[125] [redacted] explained that the Sagadahoc County Sheriff's Office (SCSO) had the matter (because SFC Card lived in their jurisdiction). According to [redacted] only relayed that SFC Card had been involved in an incident at a Home Depot ([redacted] reported as Lowe's) where someone was "talking about SFC Card behind his back."[126] [redacted] agreed they would talk to SFC Card at the June 2023 Battle Assembly and figure out a way forward then, despite the fact the unit had a Battle Assembly scheduled from 6-7 May 2023.[127]

(19) On 3 May 2023, [redacted] texted [redacted] asking if he was available for an update on SFC Card.[128] [redacted] presumably had a phone discussion about speaking with SFC Card during the June Battle Assembly (BA), but [redacted] does not recall if [redacted] relayed the specifics of the early May incident involving SFC Card.[129] When asked why he did not call SFC Card to follow-up in May 2023, [redacted]

(20) On 4 May 2023, [redacted] left a voicemail for [redacted] stating that SFC Card's [redacted] had intervened and that SFC Card agreed to seek medical treatment.[131]

(21) On 4 May 2023, [redacted] updated [redacted] regarding [redacted] voicemail.[132] Neither [redacted] spoke directly to SFC Card to check on him throughout the month of May 2023.[133]

---

[123] *Id.*
[124] *Id.*
[125] Exhibits B3, B38, J1.
[126] Exhibit B3.
[127] *Id.*
[128] Exhibits B3, C20.
[129] Exhibit B22.
[130] Exhibit B3.
[131] Exhibits J1, C15, B7.
[132] Exhibit H12.
[133] Exhibits H12, B7, B3.

(22) On 4 May 2023, [redacted] called [redacted] again to determine if she had an update. [redacted] explained that [redacted] had met with SFC Card on 3 May 2023. [redacted] communicated that SFC Card answered the door with a gun because he heard people talking outside his house.[134] [redacted] told [redacted] had relayed to her that his conversation with SFC Card went "very well" and that he had agreed to go see a doctor about the paranoia and the voices he had been hearing.[135]

(23) [redacted] asked [redacted] to follow-up with SFC Card's command in the U.S. Army Reserve, and relay that she wanted them to approach SFC Card but to [redacted] out of the process. [redacted] reiterated that [redacted] did not want SFC Card to know that the initial phone call to the police had come from [redacted].[136] According to [redacted] were going to make sure that SFC Card got to the doctor.[137]

(24) On 4 May 2023, [redacted] texted SFC Card to follow-up on their visit from the prior evening. She wrote, [redacted] Please keep me posted on the recordings and please make a physicians appointment TODAY (sic). It is so important to rule out and (sic) physical health problems. We are all unique and have strengths and weaknesses. It's important to know both to navigate through life. You are not alone. Keep in touch. [redacted]"[138] However, when [redacted] called SFC Card later that day to check on him, SFC Card had changed his mind about seeing a doctor.

(25) [redacted] and [redacted] spoke a second time on 4 May 2023. [redacted] updated [redacted] with respect to what he had learned from his recent conversations [redacted] [redacted] explained that the command's plan was to sit down with SFC Card in the "near future" and see if they could get him to open-up about what had been going on. [redacted] specifically warned [redacted] that [redacted] had told him that SFC Card answered his door with a gun in his hand and was talking about people outside "casing" his house.[139] Neither [redacted] knew that at the time of their discussion, SFC Card had decided he was not willing to see a doctor.

---

134 Exhibit J1 pg. 4.
135 *Id.*
136 *Id.* at pg. 5.
137 *Id.*
138 Exhibit B21.
139 *Id.* at pgs. 4-5.

(26) B Company, 3/304th held its Battle Assembly (BA) on 6-7 May 2023. SFC Card attended this BA.[140] Despite what he had told [redacted] about speaking to SFC Card [redacted] saw SFC Card at BA but did not approach or speak to him because he thought he should "let the doctors deal with the situation."[141] However, SFC Card had told [redacted] two days earlier that would not see a doctor.

(27) [redacted] did not attend the Battle Assembly (BA) [redacted] The company's [redacted] served as [redacted] for the May 2023 Battle Assembly.[143] [redacted] was "nervous that SFC Card was a threat," so she released the unit early on 7 May 2023, "perhaps right after lunch."[144] However, [redacted] stated "I do not recall any time we released early based on concerns with SFC Card."[145] [redacted] "followed up to make sure [redacted] were aware of the situation."[146] [redacted] confirmed with [redacted] that SFC Card's [redacted] was also aware of his mental health.[147]

(28) The unit's sign-in roster did not indicate an early release on 7 May 2023.[148] Other unit members interviewed could not recall an early release.[149] [redacted] did not recall being notified about an early release between March and June.[150]

(29) Later in May 2023, [redacted] told [redacted] that SFC Card said he had hired three attorneys because he was hearing people talk about him.[151] [redacted] mentioned that SFC Card's attorneys did not believe him either.[152] [redacted] also told [redacted] that SFC Card even bought a recorder to prove that people were talking about him.[153]

---

140 Exhibit L1 pg. 17.
141 Exhibit H12.
142 Exhibits B3, L4.
143 Exhibit B41.
144 Exhibits B41, L1.
145 Exhibit B7.
146 Exhibit B41.
147 *Id.*
148 Exhibit L1.
149 Exhibits L1, B3, B7.
150 Exhibit B3.
151 Exhibit B21.
152 *Id.*
153 Exhibit B21.

(30) As of May 2023, SFC Card's [redacted] assumed that people really were talking about SFC Card.[154] However, [redacted] explained to [redacted] that the voices SFC Card was hearing were not real.[155]

(31) At some point in the spring of 2023, [redacted] called [redacted] "to relay that SFC Card was saying that people are calling him a pedophile at the unit."[156] [redacted] told [redacted] that he needed to speak with SFC Card regarding this issue and that SFC Card needed to call him. SFC Card and [redacted] never called [redacted] back. [redacted] called [redacted] later to discuss a separate matter [redacted] asked about SFC Card and [redacted] told [redacted] that "SFC Card did not want to pursue it further and that he was only upset and frustrated."[157]

h. June 2023.

(1) SFC Card attended the unit's Battle Assembly on 3-4 June 2023.[158] [redacted] saw SFC Card at Battle Assembly and recalled that SFC Card seemed normal.[159] [redacted] did not speak to SFC Card at the June 2023 Battle Assembly because he believed he should let the doctors handle the situation.[160]

(2) [redacted] claimed he assumed that [redacted] had spoken directly with SFC Card and had inquired into his wellbeing.[161] However, [redacted] did not attend the June 2023 Battle Assembly and did not speak with SFC Card in June 2023.[162]

(3) In early June 2023, [redacted] checked in with SFC Card, inquiring as to whether he had sought medical treatment.[163] SFC Card became upset when asked about medical treatment, but as of 5 June 2023 SFC Card confirmed with [redacted] that he was okay.[164]

---

154 *Id.*
155 *Id.*
156 Exhibits B3, B36.
157 Exhibit B3.
158 Exhibit L1.
159 Exhibits H12, L1, B7.
160 Exhibit H12.
161 Exhibit H12.
162 Exhibits B3, L1.
163 Exhibit C8.
164 Exhibits C8, C9.

(4) Between on or about 6 June 2023 and on or about 7 June 2023, [redacted] stopped by SFC Card's house to drop off [redacted]. [redacted] was also present. During the conversation, [redacted] relayed that [redacted] stated, "If that [redacted], I'll kill [redacted]."[165]

(5) [redacted] Despite the tense interactions between them in April 2023, [redacted] invited SFC Card to the [redacted] [redacted] reportedly observed a mass on SFC Card's head when she briefly stood next to him at the end of the [redacted].[167]

(6) In June 2023, both [redacted] and [redacted] were under the mistaken impression that SFC Card was seeking treatment and that everything was going well.[168] [redacted] did not have any contact with SFC Card from 3 May 2023 (*i.e.*, the date on which he received the initial report) until 16 July 2023.[169]

(7) On 24 June 2023, [redacted] of the 3/304th to [redacted][170] [redacted] did not discuss SFC Card's previous incidents with [redacted] during [redacted] handover.[171] [redacted] believed the previous incidents involving SFC Card were not a "high enough issue," despite having previously assisted other Soldiers with behavioral health issues by placing them on orders.[172]

i. July 2023.

(1) Despite his well-known, ongoing behavioral health issues, SFC Card received orders for Annual Training (AT) in July 2023. [redacted] and [redacted] made that decision "because everyone needs to do Annual Training."[173] Of note, [redacted] did not factor in SFC Card's mental health issues, by not cancelling SFC Card's AT orders, dated 5 April 2023, because "it wasn't a detriment to his military job."[174] SFC Card was initially scheduled to serve as a lane NCO for a crew-served weapons range. [redacted] also did not factor in SFC Card's absence from the validation exercise in April

165 Exhibit B38.
166 Exhibits B38, B39.
167 Exhibit B39.
168 Exhibit H12.
169 Exhibit B3.
170 Exhibit B6.
171 Exhibit B22.
172 *Id.*
173 Exhibit B3.
174 Exhibits B3, J1 pg. 4.

2023. Of the 148 Soldiers who conducted Annual Training at West Point in July 2023, 32 did not attend the April 2023 "validation" event.[175]

(2) According to [redacted] "SFC Card did not want to be at AT this year. He just wanted to retire but was ordered to go to AT."[176] [redacted] maintained that SFC Card first mentioned his desire to retire to him in September 2023, but as of the Spring of 2023 SFC Card had not indicated to [redacted] that he did not want to attend AT.[177]

(3) On the morning of 15 July 2023, SFC Card picked up a rental van from the Army Reserve Center in Saco, Maine. The [redacted] left the vehicle keys and a fuel card for SFC Card. SFC Card left his personally owned vehicle, a Subaru Outback, at the Army Reserve Center. SFC Card departed Saco, Maine for Camp Smith, New York, for fourteen days of Annual Training at West Point, NY ending on 28 July 2023.[178]

(4) SFC Card arrived late on the afternoon of 15 July 2023.[179] At that time, other training NCOs, including [redacted] were relaxing in the pool at Camp Smith lodging.[180]

(5) [redacted] asked SFC Card to drop his luggage off in his room and join the others at the pool.[181] SFC Card dropped his luggage off and approximately twenty minutes later joined the others in the pool. Immediately upon getting into the pool, SFC Card began complaining that the "lady at the front desk" at the Camp Smith lodging office who was checking him into his room was "talking about me."[182] [redacted] and the other NCOs expressed skepticism at SFC Card's allegation, suggesting to him that he may have misheard the "lady at the front desk."[183]

(6) Following this conversation, SFC Card appeared quiet and withdrew from the group conversation.[184] SFC Card returned to the group conversation approximately

---

175 Exhibit K38.
176 Exhibits B36, B10.
177 Exhibit B3.
178 Exhibit N32.
179 Exhibit B10.
180 Exhibits B10, B2, B5, B4, B16, G5-G9.
181 Exhibit B10.
182 *Id.*
183 *Id.*
184 Exhibits 10, B5.

twenty minutes later, complaining that while traveling to Camp Smith a lady working at a Dunkin Donuts, located at a highway rest stop in Massachusetts halfway down from Maine, had been talking about him as well.[185] [redacted] questioned SFC Card about this statement, explaining that the Dunkin Donuts lady probably sees hundreds of people every day, that she did not know him, and therefore it was unlikely she was talking about him.[186]

(7) Later that afternoon, the group ordered pizza for dinner. SFC Card, [redacted] went to a convenience store located near Camp Smith to purchase beer and then pick up the pizza at the restaurant next door.[187] On the way to the convenience store, SFC Card, while seated in the back of the truck, stated, "I can't believe you're talking about me too, [redacted] I'll take care of it," or words to that effect.[188] At that point, [redacted] felt SFC Card's demeanor change "180 degrees."[189] [redacted] then asked [redacted] if he had said anything, to which [redacted] replied he had not.[190]

(8) According to [redacted] SFC Card was "mad dogging" at him (which he defined as looking menacingly) and grinding his teeth the entire way to the convenience store.[191] SFC Card was still observed as angry when the group arrived at the convenience store. He was the first to open the vehicle door, slamming it and walking into the convenience store. SFC Card then jerked the beer cooler door open, stomped his way to the clerk to pay for the beer, and then left the store returning to the truck.[192] Arriving at the truck, SFC Card charged at [redacted] who was standing near the front of the vehicle, and then circled the truck to avoid contact with SFC Card.[193] After SFC Card calmed down, [redacted] and SFC Card entered the truck and returned to Camp Smith.[194] During the return trip, SFC Card was observed staring blankly out the window.[195]

(9) Upon returning to Camp Smith, SFC Card exited the truck without speaking to anyone, grabbed his beer, and went directly to his room.[196] [redacted] told the other

---

[185] Exhibits B2, B5, B10.
[186] Exhibit B10.
[187] Exhibits B10, B2, G20-23.
[188] Exhibit B10.
[189] *Id.*
[190] Exhibits B10, B2.
[191] Exhibit B10.
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] Exhibits B10, B2, B5.

NCOs about SFC Card's strange and threatening behavior, recommending they make the [redacted] aware of the situation. [redacted] also described SFC Card's behavior as "paranoia."[197]

(10) Observing SFC Card's agitated mental state, [redacted] was concerned about his handling crew-served weapons near United States Military Academy (USMA) Cadets.[198] [redacted] told [redacted] that something was wrong with SFC Card.[199] SFC Card's [redacted] was initially skeptical of the notion that SFC Card was exhibiting paranoid behavior, given his prior interactions working with him.[200] However, once he personally observed SFC Card, [redacted] agreed that SFC Card was exhibiting paranoid characteristics.[201] [redacted] then connected with [redacted] and [redacted] explaining to them what he had observed, as well as his belief that SFC Card should not be around live-fire weapons training.[202]

(11) [redacted] contacted [redacted] on the evening of 15 July 2023, explaining to him SFC Card's strange behavior since arriving at Camp Smith, including that SFC Card was "trying to pick fights with everybody."[203] [redacted] told [redacted] that he did not believe SFC Card's behavior was alcohol related.[204] [redacted] then immediately called [redacted] to explain the situation.[205]

(12) Staying at another location at the time, [redacted] then traveled to Camp Smith, arriving at approximately 2130 on 15 July 2023.[206] [redacted] and 15 other Soldiers were lodged at Camp Natural Bridge, a billeting location in closer proximity to West Point on the west side of the Hudson River. With command approval, [redacted] and several other NCOs elected to stay at Camp Smith for an out-of-pocket cost of $30/night because of its better facilities. Upon arrival [redacted] spoke with [redacted] about SFC Card's behavior. They explained SFC Card's paranoia at the swimming pool and threatening behavior at the convenience store.[207] [redacted] also spoke with [redacted] and expressed concern regarding SFC Card's access to crew-served weapons.[208] [redacted] and [redacted]

---

197 Exhibit B16.
198 Exhibit B10.
199 Exhibits B2, B5.
200 Exhibit B4.
201 *Id.*
202 *Id.*
203 Exhibits B1, B2.
204 Exhibit B2.
205 Exhibits B1, B7.
206 Exhibit B7.
207 Exhibits B7, B2, B5, B10.
208 Exhibits B7, B1.

went to SFC Card's room attempting to speak with him, but his door was locked, and he initially refused to answer.

(13) SFC Card eventually answered the door. [redacted] could smell alcohol emanating from inside and assumed SFC Card had been drinking. SFC Card said that he wanted to be left alone and to go to bed, and then attempted to close his door.[209] [redacted] stuck his foot into the door well. SFC Card told [redacted] that "he wanted people to stop talking about him," to which [redacted] reiterated that everyone there was a friend and that no one was talking about him.[210] SFC Card did not say much, if anything, in response, but was observed having a "thousand-yard stare" as he successfully closed the door on them.[211] A short time later, [redacted] retrieved a "master key" and entered SFC Card's room. At that point, SFC Card was in his bed. [redacted] retrieved SFC Card's rental van keys while [redacted] surveyed the room for weapons and ammunition but found none.[212] SFC Card told them he just wanted to sleep, and [redacted] planned to reengage SFC Card again in the morning.[213]

(14) [redacted] then called [redacted] on the way back to his lodging site.[214] [redacted] told [redacted] what had happened with SFC Card as well as his plan to reengage the next morning.[215] [redacted] was not on AT orders and not physically at West Point at this time [redacted]. They made a command decision to stagger their AT days for the two-week crew-served weapons lanes training period in July 2023, so one of them would be on the ground at all times. [redacted]

(15) On the morning of 16 July 2023, [redacted] returned to Camp Smith at 0700, where he first met with [redacted][217] [redacted] then went to SFC Card's room. SFC Card answered the door, telling them to leave him alone with the same "thousand-yard stare" as had been observed the night prior.[218] [redacted] scanned SFC Card's room and noticed that only two beers were missing from the

209 Exhibit B7.
210 Exhibit J2 pg. 4.
211 Exhibit B7.
212 *Id.*
213 *Id.*
214 Exhibits B7, B3.
215 *Id.*
216 Exhibit B3, K39.
217 Exhibits B7, B1.
218 Exhibits B2, B7.

twelve-pack SFC Card had purchased the day before.[219] This led [redacted] to believe SFC Card's behavior was not alcohol related and that he needed to go to the hospital.[220]

(16) [redacted] then contacted Camp Smith Security which informed him that because Camp Smith was a New York Army National Guard installation, this matter would be within the jurisdiction of New York State Police.[221] The New York State Police responded to the scene and interviewed SFC Card.[222] According to the New York State Police, unit members reported that SFC Card was drunk and threatening them the night before.[223]

(17) SFC Card told the New York State Police he "was fed up with hearing others talk behind his back. He further told the police that his unit is afraid that he "will do something and that (he) is capable."[224] However, he confirmed that he did not desire to harm himself or others.[225]

(18) SFC Card was not taken into custody. The New York State Police advised [redacted] that it had insufficient cause to place SFC Card in protective custody. The New York State Police also refused to transport SFC Card to Keller Army Community Hospital (KACH) at West Point.[226] However, the New York State Police did agree to escort a personally owned vehicle from Camp Smith to KACH.[227]

(19) [redacted] then called [redacted], informing him that SFC Card remained uncooperative.[228] Thereafter, [redacted] ordered SFC Card to undergo a Command Directed Behavioral Health Evaluation (CDBHE) IAW MEDCOM Policy 17-031 and AR 40-68.[229] [redacted] then departed [redacted] New Hampshire at 1100 on 16 July 2023, enroute to KACH, West Point, New York, arriving there at 1500.[230] [redacted] was neither paid base pay nor travel pay for this one-day round trip to West Point and back [redacted].

---

219 Exhibit B7.
220 *Id.*
221 Exhibits H12, B7.
222 Exhibit J3.
223 *Id.* However, based on statements from Exhibits B1, B2, B5, B7, B10, all stated that alcohol was not a contributing factor.
224 Exhibit J3 pg. 2.
225 *Id.*
226 Exhibit B7.
227 Exhibit J3 pg. 2
228 Exhibit B7.
229 Exhibit B3, B7, E1 pg. 42.
230 Exhibit B3.

(20) [redacted] transported SFC Card to KACH.[231] SFC Card did not speak during the trip but was observed shedding tears silently at one point for about five minutes during the hour-long ride.[232] [redacted] repeatedly attempted to speak with SFC Card during the ride, explaining that they would not be taking him to KACH if they did not care for him.[233]

(21) The group arrived at KACH at approximately 1250 on 16 July 2023. SFC Card was evaluated at the Emergency Department.[234] He was admitted for behavioral health reasons with directions for 1:1 observation.[235] [redacted] arranged for [redacted] to serve as observers.[236]

(22) The medical providers at KACH coded the visit as "Primary- R45.850 homicidal ideations, Secondary- Unspecified psychosis not due to a substance or known physiological condition."[237] Medical Records list the provider as [redacted].[238]

(23) SFC Card was observed as alert and responsive upon arriving at KACH. [redacted] in KACH's Emergency Department, noted that SFC Card denied having suicidal ideations but expressed that people were talking about him behind his back, which angered him.[239]

(24) [redacted] assessed that SFC Card was experiencing a "stress reaction causing mixed disturbance of emotion and conduct, unspecified psychosis not due to substance or known physiological condition."[240] [redacted] noted that SFC Card was accompanied by [redacted] also documented veiled threats made by SFC Card, including that he "will take care of this."[242]

---

[231] *Id.*
[232] Exhibits B5, B10, C32.
[233] Exhibit B10.
[234] Exhibit E1 pg.72.
[235] *Id.* at pg.75.
[236] Exhibits E1 pgs. 88-90, B7, B10 pg. 3.
[237] Exhibit E1 pg. 73.
[238] *Id.* at pgs. 74-75.
[239] *Id.* at pg. 77.
[240] *Id.* at pg. 78.
[241] *Id.* at pg. 78.
[242] Exhibit E1 pg. 79, B10 pg. 3.

(25) [redacted] called [redacted] while enroute to West Point, New York, to inform him that he was traveling to West Point to order a Command Directed Behavioral Health Evaluation (CDBHE).[243] [redacted] arrived at KACH at 1500 on 16 July 2023. Upon arrival, [redacted] met with KACH's on-call [redacted][244] [redacted] told [redacted] it was a good thing that SFC Card had been admitted.[245] [redacted] expressed concern that SFC Card had privately owned weapons.[246] [redacted] did not recommend at that point or any other time that SFC Card's firearms or ammunition be voluntarily stored at the unit, or another DoD-controlled location approved for the storage of firearms. Regardless, [redacted] had no authority to compel SFC Card to store his privately owned weapons at a DoD-controlled facility.

(26) [redacted] then completed the paperwork necessary to effectuate SFC Card's CDBHE.[247] [redacted] did not obtain any other information beyond the information contained on the DA Form 3822 Report of Mental Status Evaluation completed by [redacted] departed West Point at 1600 on 16 July 2023, after staying approximately one hour, returning to [redacted] New Hampshire.[249]

(27) SFC Card's CDBHE was completed on 16 July 2023.[250] The evaluation noted that SFC Card failed to meet medical retention standards IAW AR 40-501, had reached the medical retention determination point, and that a Disability Evaluation System referral was required.[251] The evaluation signed by [redacted] further noted that SFC Card had perception and cognitive impairment but that the risk of harming himself or others was low at that time.[252]

(28) In the comment section of the DA 3822 (Report of Mental Status Evaluation), [redacted] recommended that, upon SFC Card's discharge, his chain of command remain engaged with his care, the Brigade Medical Officer follow-up with him concerning case management, and the Command initiate the Medical Evaluation Board

---

[243] Exhibits B3, B6.
[244] Exhibits B3, B15. [redacted]
[245] Exhibits B3, B15.
[246] *Id.*
[247] Exhibit B3.
[248] *Id.*
[249] *Id.*
[250] Exhibit E1 pgs. 38-39.
[251] *Id.* at pg. 33.
[252] *Id.*

process.[253] [redacted] also recommended "that measures be taken to safely remove all firearms and weapons from SFC Card's home of record."[254]

(29) [redacted] completed the Medical Necessity Certification Statement for Non-Emergency Ambulance Services, noting the medical condition necessitating transport was "psychosis/harm to others."[255] [redacted] noted that SFC Card could not be safely transported by car or wheelchair, due to [redacted] representing a "danger to self/other and need, or possible need for restraints."[256]

(30) SFC Card called [redacted] after completing his Command Directed Behavioral Health Evaluation on 16 July 2023.[257] SFC Card told [redacted] that he was "pissed off that everyone was running their mouths" and he was angry that he was stuck in the hospital.[258] SFC Card told [redacted] he did not think he needed help, he did not think there was anything wrong with him, that he wanted to defend himself, and that he wanted to see the "videos."[259]

(31) [redacted] submitted to the chain of a command a Commander's Critical Information Requirement (CCIR) and a CCIR Update on 17 July 2023 and 18 July 2023 detailing information provided by [redacted] in connection with SFC Card's erratic behaviors and ultimate hospitalization, respectively. The CCIR and CCIR Update were routed to USARC by 18 July 2023.[260]

j. Four Winds Hospital - Westchester.

(1) At approximately 2120 on 16 July 2023, SFC Card was transferred from KACH to Four Winds Hospital - Westchester in Katonah, New York.[261] He was listed in stable condition.[262] The Four Winds admission note reads "reason for hospitalization, 40 y/o male reports he doesn't need to be here as he doesn't believe he is Schizophrenic or hearing voices."[263] Additional reasons for SFC Card's admission were due to reports

---

253 *Id.* at pg. 40.
254 *Id.* at pg. 40.
255 Exhibit E1 pg. 84.
256 Exhibit E1 pg. 91.
257 Exhibit B36.
258 *Id.*
259 *Id.*
260 Exhibit B7, R4.
261 Exhibit E1 pg. 79.
262 *Id.*
263 Exhibit B36 pg. 35.

of psychosis, mood lability/aggression, homicidal ideations, the patient endorsing having a "hit list", paranoia, and AH (auditory hallucinations).[264]

(2) SFC Card told Four Winds staff about the "rumors" going around that he was a pedophile or gay, telling them that "everyone" or "just about everyone" – to include those at his civilian and military jobs, a coffee shop, and the hospital – was spreading these rumors.[265] SFC Card told them the rumors began at a local bar where he plays cornhole and that the rumors quickly spread to his job. SFC Card also said people were threatening to hurt him because they think he is a "bad ass."[266] He admitted that thinking about all these rumors had become a big distraction for him while at work. SFC Card referenced a rumor going around about him at work that he had a small penis, to which he responded by showing a coworker a picture of his penis, resulting in SFC Card receiving a written warning.[267] SFC Card told them he ultimately decided to quit his job before he got fired or before he "ended up killing someone."[268] SFC Card denied any AHs or VHs (visual hallucinations).[269]

(3) SFC Card told Four Winds staff that in his 20s he used to get into physical fights with others, but he had not fought since then.[270] He denied any history of prior suicidal ideations or suicidal attempts.[271] SFC Card also told them he recently changed his truck driving schedule to nights so that he would avoid seeing people during the day.[272] He acknowledged sleeping only about 3-4 hours during the day.[273] He denied any recent changes in appetite. He had stopped drinking soda, resulting in the loss of approximately 40-50 pounds within a month's time back in December but had since gained back 20 pounds.[274] He acknowledged being angry and frustrated at being admitted to Four Winds because he did not need to be there, but he understood that if he left, his commander would just send him right back.[275] He told them he might be agreeable to taking medication if someone could give him a good sales pitch.[276]

---

264 Exhibit E1 pg. 5.
265 *Id.*
266 Exhibit E1 pg. 5.
267 *Id.*
268 *Id.*
269 *Id.*
270 *Id.*
271 Exhibit E1 pg. 5.
272 *Id.*
273 *Id.*
274 *Id.*
275 *Id.*
276 Exhibit E1 pg. 5.

(4) SFC Card denied any history of depression, but acknowledged having social anxiety, not liking large crowds, and drinking "to loosen up" in social settings.[277] He told Four Winds staff he had mostly acquaintances and not any close friends.[278] With respect to his dating history, SFC Card identified as a male attracted to females only, confirmed that he was not currently dating anyone, but that he had previously dated an individual back in December, and then again in February for a period of two weeks, and that he lost this relationship over all these rumors.[279] He denied feeling hopeless or helpless as well as any history of mania or hypomania.[280] SFC Card told Four Winds staff that he shared [redacted] and that he was very active in [redacted] SFC Card became "irritable and agitated" after the Four Winds intake team began discussing guns at his residence.[282]

(5) SFC Card participated in individual support, medication management, and family support sessions with staff while being treated at Four Winds.[283] He resisted most group therapy, despite encouragement from staff.[284]

(6) SFC Card was able to report feelings and symptoms during treatment targeting Psychosis and Thought Disorders.[285] Over time, SFC Card engaged in limited, but mostly positive, interactions with his treatment group, whereas he often appeared more guarded and resistant to treatment when interacting with Four Winds staff.[286] However, he appeared able to comply with program expectations with staff support and encouragement.[287]

(7) Four Winds staff experienced difficulties engaging with SFC Card's [redacted] during his hospitalization, as [redacted] did not answer the phone during most attempted calls.[288] After numerous attempts, Four Winds staff established contact with [redacted], and discussed SFC Card's ongoing treatment, safety, and discharge planning.[289] [redacted] told them that SFC Card "could not return to [redacted]

---

277 *Id.*
278 *Id.*
279 *Id.*
280 *Id.*
281 Exhibit E1 pg. 5.
282 *Id.*
283 *Id.*
284 *Id.*
285 *Id.*
286 Exhibit E1 pg. 5.
287 *Id.* at pg. 6.
288 *Id.*
289 *Id.*

[redacted][290] A Four Winds therapist provided supportive therapy to [redacted] and SFC Card, which included safety planning and SFC Card's treatment throughout his stay.[291]

(8) [redacted], coordinated with the KACH team throughout SFC Card's hospitalization due to his ongoing concerns over SFC Card's presentation, coordination and continuity of care, and his access to firearms.[292] [redacted] noted that he spoke with SFC Card's [redacted] after admission and relayed his concerns about SFC Card's access to firearms at his home; however, [redacted] stated he never spoke with anyone at Four Winds.[293] [redacted] further noted that SFC Card's command was looking into having firearms removed from his home.[294] He also noted that he had been told by [redacted] that SFC Card had previously removed firearms from his home once for an unknown reason.[295] [redacted] also told [redacted] that the majority of SFC Card's firearms were stored in [redacted] gun safe.[296]

(9) On 20 July 2023, based on the CCIR submitted by [redacted] on 17 July, [redacted] at the Army Reserve Medical Management Center (ARMMC), was assigned to SFC Card's case and created a MEDCHART[297] case for SFC Card.[298] The medical diagnosis used in MEDCHART was "F329, Major Depressive Disorder, Single Episode, Unspecified."[299] The medical records from KACH and Four Winds do not support this medical diagnosis.[300]

(10) The MEDCHART case was then tasked to [redacted] at ARMMC, who completed a 90-day profile for SFC Card. [redacted] noted, "Please touch base with command to ascertain SM status. Continue to maintain contact so we can also know the status of the SM." The case was then returned to [redacted] for assignment to a Nurse Case Reviewer (NCR). At ARMMC, the NCRs manage temporary profiles (up to 365 days, unless changed to a

---

290 *Id.*
291 Exhibit E1 pg. 6.
292 *Id.*
293 *Id.*
294 *Id.*
295 *Id.*
296 Exhibit E1 pg. 6-7.
297 MEDCHART is The Medical Electronic Data (for) Care History and Readiness Tracking system and is a customizable, centralized approach to managing all aspects of a Soldier's medical readiness and care history. From routine services, dental treatments, and medical record imaging to full case management capabilities, MEDCHART aims to provide better care and readiness tracking for military Soldiers.
298 Exhibit E1 pg. 4.
299 *Id.*
300 Exhibit E1.

permanent profile sooner) and Nurse Case Managers (NCM) manage permanent profiles. At times, ARMMC leadership will switch roles based on experience and skillsets.[301]

(11) On 20 July 2023, SFC Card's case was then transferred to [redacted][302] As part of her review, [redacted] noted that SFC Card belonged to the 108th Training Command, had a profile based on suicidal ideations and psychosis as noted on the CCIR, and that he had not had any previous behavioral health profiles.[303] [redacted] then transferred the case to [redacted] on 20 July 2023.[304]

(12) [redacted] began his initial case review on 20 July 2023.[305] [redacted] noted the following: "Soldier is displaying s/s of psychosis and sent to Hospital for further evaluation...reviewed information in his online military records (IWS) which included information that his expiration of term of service was 20430430. Soldier has 19 years, 00 months, and 00 days. His last PHA was completed 20230102. HRR notes that the PHA on 20230102 had no PCL-C or PHQ-8 scores results. AHLTA/JLV reflected the Soldier has received care at the VA/MTF. In the JLV system it shows that the Soldier has a VA rating of 0%. JLV-Federal EHR/MHS GENESIS-BEH Psychiatrist OP initial visit note shows on 20230716, Soldier being transferred to Four Winds Hospital for further psych care/eval. There is no DD214 found in system."[306]

(13) On 20 July 2023, [redacted] then contacted [redacted] and informed him of the behavioral health profile created for SFC Card following receipt of the CCIR.[307] [redacted] told [redacted] that SFC Card remained at Four Winds and his discharge date was unknown.[308] [redacted] told [redacted] he planned on going to the hospital during the upcoming weekend to receive a further status update on SFC Card.[309] [redacted] indicated that he would email SFC Card regarding his behavioral health profile.[310]

---

301 Exhibit K40.
302 *Id.*
303 Exhibit E1 pg. 4.
304 *Id.*
305 *Id.*
306 *Id.*
307 *Id.*
308 Exhibit E1 pg. 4.
309 *Id.*
310 *Id.*

(14) On 20 July 2023, [redacted] emailed SFC Card and [redacted], notifying them of SFC Card's behavioral health profile and follow-up instructions.[311] Despite also speaking with [redacted] on 20 July 2023, [redacted] stated that he "missed the email on 20 July 2023," did not see it "until after October 26," and "did not recall" what SFC Card's profile stated.[312]

(15) On 21 July 2023, [redacted] U.S. Army Reserve Psychological Health Program (PHP), was assigned SFC Card's case.[313] She reviewed the CCIR and noted the elevated risk level.[314] [redacted] texted [redacted] informing him that she planned to speak with SFC Card when discharged and to let her know if she could be of any further assistance.[315] [redacted] acknowledged receipt and informed her he had no additional updates.[316]

(16) [redacted] During this time, [redacted] did not visit, or attempt to visit, SFC Card, while he remained hospitalized at Four Winds.[318] Further, [redacted] did not attempt to discuss a treatment plan or way forward with medical providers at KACH or Four Winds while on the ground [redacted]

(17) On 23 July 2023, [redacted] prepared a DA Form 3822, Report of Mental Status Evaluation, pertaining to SFC Card. [redacted] noted that SFC Card failed to meet medical retention standards and recommended that Case Management and the Brigade Surgeon follow-up. The completed DA 3822 was placed in SFC Card's medical record and those with permissions for MHS Genesis or JLV would have been able to access his records. Behavioral Health records have an added level of security and those attempting to view the record in MHS Genesis or JLV would have to note why they requested access. [redacted] also sent the DA 3822 to [redacted] via DOD Safe. [redacted] was unable to download the document due to difficulties with his email. Therefore, [redacted] left a hard copy DA 3822 in an envelope for [redacted] at KACH, which he picked up a few days later [redacted]

---

311 Exhibit E1 pg. 3.
312 Exhibit B3.
313 Exhibit E1 pg. 6.
314 Exhibits E1 pg. 5, B31.
315 Exhibit E1 pg. 5.
316 *Id.*
317 Exhibit B3.
318 *Id.*
319 *Id.*

(18) On 24 July 2023, [redacted] entered a nurse case management note into the KACH medical documentation system, noting that Nurse Management had started and assigning [redacted] as the medical provider.[320] However, while [redacted] was assigned by [redacted] as the provider, he never saw SFC Card in person or reviewed his medical chart until after SFC Card's suicide, when directed to review SFC Card's medical file by the KACH [redacted].

(19) While at Four Winds, on 26 July 2023, SFC Card received psychological testing to assist in differential diagnosis and treatment planning.[321] SFC Card did not participate in psychological testing after 26 July 2023. Four Winds staff faxed this information to [redacted] at KACH on 28 July 2023.[322]

(20) Four Winds used the following psychological testing methods: Wechsler Adult Intelligence Scale, 4th Edition (Wais-IV); WAIS-IV Advanced Clinical Solutions: Test of Premorbid Functioning (TOPF); Wechsler Memory Scales, 4th Edition (WMS-IV)-Nonverbal Working Memory; California Verbal Learning Test, Third Edition (CVLT-3); Wide Range Achievement Test-Revision 5 (WRAT-5); Wisconsin Card Sorting Test (WCST); Four Winds Continuous Performance Task (FWCPT); Delis-Kaplan Executive Functioning System (D-KEFS); Minnesota Multiphasic Personality Inventory-Revision 2 (MMPI-2); Personality Assessment Inventory (PAI); Beck Hopelessness Scale (BHS); Suicide Probability Scale (SPS); Adult Suicidal Ideation Questionnaire (ASIQ); Firestone Assessment of Violent Thoughts (FAVT); Classification of Violence Risk (COVR); Rorschach (Comprehensive System)[323]; and Hopkins Psychiatric Rating Scale (HPRS).[324]

(21) The Four Winds staff [redacted] assessed SFC Card's personality using questionnaire instruments and performance-based measures, as listed in paragraph 20, above.[325] During testing, [redacted] indicated that SFC Card was "guarded and skeptical" when discussing the test's validity.[326] The diagnosis under

---

320 *Id.* at pg. 16.
321 *Id.* at pgs. 54-71.
322 Exhibit E1 pg. 53.
323 Exhibit JLV pg. 55. The Rorschach test is a projective psychological test in which subjects' perceptions of inkblots are recorded and then analyzed using psychological interpretation, complex algorithms, or both. Some psychologists use this test to examine a person's personality characteristics and emotional functioning.
324 *Id.* at pg. 54.
325 *Id.* at pg. 55.
326 *Id.*

primary consideration as part of the psychological testing was an "unspecified schizophrenia spectrum or other psychotic disorder" and information was requested "concerning Mr. Card's risk for homicidal and assaultive behaviors at the present time."[327]

(22) [redacted] observed that SFC Card responded to the testing in a thoughtful and consistent manner, and there was no indication of any effort to exaggerate or deny psychological problems or personal shortcomings.[328] SFC Card's responses were sufficient in number and complexity to serve as a reliable basis for inferences likely to provide an accurate picture of his personality organization and current psychological functioning.[329]

(23) [redacted] determined that SFC Card's coping resources were about as well-developed as those of most adults, and he was no more likely to be overwhelmed, disorganized, or lose control in the face of the ordinary demands of daily life than others his age.[330] According to [redacted], this "does not mean that his behavior is always effective, appropriate, or admirable," only that SFC Card's actions are typically the result of his decisions, beliefs, preferences, and general predilections and rarely the result of overwhelming stress of symptoms of some abnormal state.[331] However, [redacted] did note there were three aspects of Mr. Card's personality that were likely to contribute to a pervasive and recurring effect on his judgement and behavior: inconsistent coping style, poor emotional controls, and narcissism.[332]

(24) [redacted] further stated that people lacking consistent coping styles make them less efficient in their approach to the world and more likely to reverse direction or change course which lends an unstable and unpredictable quality to their behavior.[333] Other things being equal, these individuals tend to make more errors, experience greater stress, and appear more mercurial to the people around them. According to [redacted]. [redacted] "[SFC] Card appears to be one such individual and for that reason he may be less predictable-both to himself and to those around him."[334]

(25) [redacted] observed SFC Card to have very limited emotional controls, and for that reason "it is difficult to know when [SFC] Card will react in this volatile and

---

327 *Id.* at pg. 54.
328 Exhibit E1 pg. 54.
329 *Id.*
330 *Id.* at pg. 57.
331 *Id.*
332 *Id.*
333 Exhibit E1 pg. 57.
334 *Id.*

extreme fashion. There will be times when he has intense and volatile reactions that sometimes dominate his psychological functioning, but there will be other times when his reactions seem moderate, appropriate, and well-integrated into his decision-making activities."[335]

(26) According to [redacted], SFC Card was "likely to be particularly reactive to anything that he perceives as somehow related to his self-concept or his self-worth. This is because [SFC] Card's approach to life is based on a fundamental belief in his own uniqueness and superiority."[336] [redacted] opined that "[SFC] Card is likely to experience an extreme emotional reaction that clouds or distorts his perceptions, biases his thinking, and drives his actions."[337]

(27) Taken together, [redacted] interpreted the data as suggesting that SFC Card's "lifetime risk for violence may be somewhat higher than most people and his risk may increase sharply at times when he is paranoid and emotionally overwrought. However, they do not suggest that he is high risk for violence at this moment," but "his risk for violence is likely to fluctuate with this level of emotional arousal and the extent to which he has suffered some acute narcissistic injury."[338]

(28) [redacted] interpreted the data as suggesting that SFC Card was "a man of average intellectual abilities. His mental abilities appear to be evenly developed and the only neuropsychologically based cognitive impairment suggested by his test performance was some difficulty sustaining focus when tracking auditory stimuli."[339]

(29) Based on the data, [redacted] found SFC Card "extremely paranoid." Given his observed erratic coping style, poor emotional controls, and unusual levels of narcissism, [redacted] noted SFC Card's actions would be difficult to predict.[340]

(30) [redacted] concluded that SFC Card's central problems stemmed from SFC Card's personality rather than symptoms of some psychiatric condition and as a result the benefits derived from psychotropic medications may be somewhat limited.[341] Nevertheless, [redacted] noted SFC Card may derive some benefit from neuroleptic medications.[342] [redacted] considered SFC Card a poor candidate for psychotherapy

---

335 *Id.*
336 *Id.* at pg. 58.
337 Exhibit E1 pg. 58.
338 *Id.* at pgs. 59-60.
339 *Id.* at pg. 60.
340 *Id.*
341 *Id.*
342 *Id.*

because SFC Card previously indicated on questionnaires that he found such therapy disconcerting and unappealing.[343]

(31) On 26 July 2023, the [redacted] emailed SFC Card, introducing herself, the [redacted] and offering resources and support.[344] Due to his in-patient status, SFC Card would not have had access to retrieve this email until 3 August 2023.

(32) On 27 July 2023, the KACH [redacted] spoke to [redacted] reported that Four Winds had previously submitted an application for a court-ordered retention. SFC Card was served accordingly on 26 July 2023 and a hearing was to occur in five days. [redacted] advised [redacted] that he was calling SFC Card's command to have all firearms removed from SFC Card's home.[346] However, neither [redacted] nor [redacted] ever spoke to anyone at Four Winds about SFC Card's treatment.[347]

(33) Also on 27 July 2023, KACH personnel coordinated with [redacted] telephonically to discuss the admissions process and discharge planning.[348] Based on information received from KACH, the 3/304th extended SFC Card's orders keeping him in a duty status until he was released from Four Winds.[349]

(34) On 28 July 2023, KACH and Four Winds conducted a weekly meeting.[350] During this meeting, Four Winds reported that "SFC Card is taking Zyprexa (Olanzapine) 5mg AM and 7.5mg PM."[351] SFC Card reported that he would refuse to take his medication "tomorrow."[352] Four Winds staff observed he "continues to be paranoid" and that Four Winds would fax psychological testing results to (KACH) behavioral health "today. [SFC Card's] Court Hearing is Wednesday 02 August. No discharge information at this time."[353]

(35) [redacted] was "not provided much information" about SFC Card during his hospitalization at Four Winds.[354] [redacted] was told SFC Card was not accepting

---

343 Exhibit E1 pg. 60.
344 *Id.* at pg.5.
345 *Id.* at pg.15.
346 *Id.*
347 Exhibits B7, B3, E1.
348 Exhibits B3, B12.
349 Exhibit E1.
350 *Id.* at pg.15.
351 *Id.*
352 *Id.*
353 *Id.*
354 Exhibit B3.

visitors and he thought "he would not have access to health information due to HIPPA (sic)."[355] [redacted] claims that Four Winds did not provide him with SFC Card's discharge instructions.[356] However, [redacted] also did not seek information from Four Winds concerning SFC Card's prognosis, discharge instructions, or his follow-on care requirements.[357]

(36) Neither [redacted] command team maintained any contact with KACH following SFC Card's discharge from Four Winds.[358] [redacted] was also unaware of the relationship between KACH and Four Winds pertaining to the sharing of medical information.[359]

(37) [redacted] understood that KACH and Four Winds held weekly meetings.[360] [redacted] indicated the only update he received from a female representative at KACH regarding SFC Card's care was that SFC Card was still at Four Winds on or around 25 or 26 July 2023.[361]

(38) [redacted] did not request additional information from KACH or Four Winds concerning SFC Card because he "thought [SFC Card] was at the best place he could be, which was at the hospital. After speaking with [redacted], SFC Card was not only at the Army hospital, but he was also at a next level up of higher care at Four Winds being seen by professionals. SFC Card didn't want to see anyone, but he was in a safe spot, and he was getting professional help."[362]

k. August 2023.

(1) On 1 August 2023, [redacted] noted that "SM appears to still be admitted to BH facility. We will monitor and reach out after discharged."[363]

(2) On 2 August 2023, [redacted] spoke to [redacted] at Four Winds.[364] [redacted] learned that SFC Card rescinded his 72 hours request for discharge and that his court

---

[355] *Id.* Additionally, [redacted] informed his chain of command – to include battalion, brigade, and division command teams – of his understanding with respect to obtaining SFC Card's health information.
[356] *Id.*
[357] *Id.*
[358] *Id.*
[359] Exhibit B3.
[360] *Id.*
[361] *Id.*
[362] *Id.*
[363] Exhibit E1.
[364] *Id.* at pg.17.

appearance was cancelled.[365] She noted that SFC Card was to be discharged at 1100 on 3 August 2023.[366] "The discharge plan is to have Telemynd for psychiatry and psychology."[367]

(3) On or about 2 August 2023, SFC Card called [redacted], explaining that he was about to be released from Four Winds and asked him to drive down from Maine to pick him up the next day.[368] SFC Card called [redacted] again on the morning of 3 August 2023 to "make sure he was coming" to Four Winds to pick him up.[369] [redacted] then called [redacted] on his drive down and informed him that he was going to retrieve SFC Card from the hospital.[370] [redacted] did not ask [redacted] to turn around and not pick up SFC Card. Additionally, [redacted] did not make alternative arraignments for the military to return SFC Card to Saco, Maine.

(4) On 3 August 2023, Four Winds discharged SFC Card and [redacted] retrieved him from the hospital that day.[371] When [redacted] arrived, SFC Card saw him through the window and SFC Card walked out of the hospital under his own volition.[372] [redacted] never saw any discharge instructions and he did not speak to anyone at Four Winds about SFC Card's follow-on care requirements.[373]

(5) [redacted] then told SFC Card he was [redacted], and so he gave SFC Card the keys and asked him to drive them back to the unit in Saco, Maine.[374] On the drive back [redacted] asked SFC Card how things went for him in the hospital, to which SFC Card replied that the hospital had misdiagnosed him and that he was smarter than the Four Winds staff.[375]

(6) SFC Card stated that he "flipped out" on a female patient at Four Winds who he claimed was talking about him.[376] SFC Card told [redacted] that he was really angry about being committed to the hospital, so angry that he placed his mattress

---

[365] *Id.*
[366] *Id.*
[367] Telemynd is an online service that provides mental health services. Telemynd partners with TRICARE to provide beneficiaries with therapy and psychiatry.
[368] Exhibit B36.
[369] *Id.*
[370] Exhibits B36, B3.
[371] Exhibit B36.
[372] *Id.*
[373] *Id.*
[374] *Id.*
[375] *Id.*
[376] Exhibit B36.

against the wall and punched it until his hands became bloody.[377] SFC Card further explained that he did not want to be in the hospital and that he did not like that the medications made him feel "lazy."[378] Eventually, SFC Card stopped taking his medication altogether.[379] When SFC Card and [redacted] arrived at the Butler Army Reserve Center in Saco, SFC Card was "really angry that his [car] doors were unlocked." [redacted] stated "I believe he had weapons in his car, specifically a rifle."[380]

(7) The Four Winds Discharge Summary, dated 7 August 2023, noted the following: "SFC Card received Individual, Group, Art, Family and Recreation Therapies. The discharge diagnosis was noted as "F23 Brief Psychotic Disorder". His abilities to attend to activities of daily living, day to day ability to attend work/school and family/peer interaction are noted as fair. His ability to access treatment after discharge is noted as poor. He was discharged without appointments, with a note of referrals pending."[381]

(8) Additionally, the Four Winds discharge summary noted that SFC Card "appeared to be resistant to psychoeducation throughout treatment when discussing presentation of symptoms. SFC Card acknowledged to providers at Four Winds that he had a 'hit list.' He often appeared to place blame on others for his behaviors, stating that 'they were messing with me.' At the time of discharge, he denied any auditory or visual hallucinations. However, at the time of discharge, he did not demonstrate a risk of harm to self or others."[382]

(9) SFC Card was not formally evaluated for a Medical Evaluation Board, and his unit did not conduct a formal Line of Duty Investigation, following SFC Card's discharge from Four Winds.[383]

(10) On 3 August 2023, SFC Card's duty status terminated (for the last time) when his AT orders and medical ADOS orders ended.[384] [redacted] was not aware of the Army Reserve Psychological Health Program at the time SFC Card's AT and medical ADOS orders ended.[385] The only action [redacted] took upon SFC Card's

---

[377] *Id.*
[378] *Id.*
[379] *Id.*
[380] Exhibit B36.
[381] Exhibit E1 pg. 4.
[382] *Id.* at pg. 7.
[383] Exhibit B3.
[384] Exhibits N32, R6, B3, L1.
[385] Exhibit B3.

discharge was to update [redacted][386] The unit did not submit a CCIR update to the 18 July 2023 CCIR, upon SFC Card's release from Four Winds.

(11) On 5 August 2023, two days following his discharge from Four Winds, SFC Card went to a gun shop in Auburn, Maine, to pick up a suppressor he had ordered online.[387] SFC Card ordered the suppressor before he departed for Annual Training on 15 July 2023, but intended to pick it up after Annual Training, according to [redacted]8

(12) Upon arrival at the gun shop, SFC Card completed the required ATF Form 4473 in order to complete the transfer and take possession of the suppressor.[389] One of the questions on that form asked if the purchaser had ever been committed to a psychiatric facility.[390] SFC Card answered in the affirmative, and the store employees told him they could not sell him the suppressor.[391] According to the store owner, SFC Card was polite, but said he would return after consulting a lawyer.[392] SFC Card apparently never returned to the store.[393]

(13) On 6 August 2023, [redacted] texted SFC Card following his discharge, texting that she was "happy to hear you are home safely. I would love to hear about your experience if you ever want to talk. [redacted][394]

(14) The Four Winds Hospital discharge summary was completed on 7 August 2023.[395] [redacted] made a chart entry on 7 August 2023 noting Case Management visit type as continued.[396]

(15) On 8 August 2023, [redacted] made a Case Manager entry, noting that she left voicemails for SFC Card on 7 August 2023 and 8 August 2023, respectively, but that

386 *Id.*
387 Exhibit T6.
388 Exhibit C29.
389 Exhibit T6.
390 *Id.*
391 *Id.*
392 *Id.*
393 *Id.*
394 Exhibit C9.
395 Exhibit E1 pgs. 2-14.
396 *Id.* at pg. 18.

she had not received any return calls as of the time of her entry.[397] The noted provider was [redacted].[398]

(16) The Four Winds Discharge Summary was faxed to KACH at 1432 on 11 August 2023.[399] This document was not uploaded into the military medical system until 21 August 2023.[400] The discharge summary included relevant and critical information which if it had been provided to the chain of command would have detailed the extent of SFC Card's mental health issues. The summary provided the following functional assessment. SFC Card's "ability to access treatment after discharge was noted as poor, referrals were pending, and patient discharged without appointment at the time of discharge." According to the Discharge Summary, SFC Card told providers at Four Winds that he "decided to quit his job before he ended up killing someone," that he was "sleeping 3-4 hours during the day", he "had a history of social anxiety" and that "he usually drinks to loosen up in social situations." The discharge summary indicated SFC Card had homicidal ideations (Pt endorsed having a "hit list"), he appeared resistant to psychoeducation, and he blamed others for his behavior. The therapist and treatment team had difficulty engaging with [redacted] throughout the hospitalization and further noted that SFC Card's [redacted] confirmed that the majority of the firearms were stored in [redacted] gun safe.

(17) The [redacted] telephoned SFC Card on 11 August 2023.[401] SFC Card told her he had been frustrated since being discharged due to limitations with respect to his weapons.[402] He reported problems with anxiety but not with respect to anger or safety.[403] He denied any SI/HI.[404] SFC Card indicated that a Nurse Case Manager had contacted him about starting virtual therapy.[405] He indicated he planned to start therapy soon but did not have any dates.[406] [redacted] and SFC Card discussed phone applications he can use at home as well as his behavioral health profile.[407] [redacted] emailed SFC Card with phone applications for military Soldiers as well as contact info for the ARMMC NCR.[408]

---

397 *Id.* at pg. 20.
398 *Id.*
399 *Id.* at pg. 1.
400 Exhibit E1.
401 *Id.*
402 *Id.*
403 *Id.*
404 *Id.*
405 Exhibit E1.
406 *Id.*
407 *Id.*
408 *Id.*

(18) On 25 August 2023, the ARMMC [redacted] emailed SFC Card's personal and military email addresses, cc'ing [redacted] was conducting a routine monthly follow-up concerning SFC Card's behavioral health profile.[410] [redacted] inquired as to whether any updates to the profile were requested as well as reminding SFC Card and [redacted] about the process for modifying profiles.[411]

(19) [redacted] attempted to call SFC Card on 28 August 2023 to follow-up and provide support with follow up care.[412] She left a voicemail requesting a return call.[413] [redacted] also sent a text message.[414]

(20) As of 31 August 2023, [redacted] had not received any response from SFC Card.[415] PHP subsequently closed his case.[416] SFC Card's case was closed based on the PHP standard operating procedure (SOP or handbook) in use at the time. Based on that SOP, PHP staff were required to reach out to SFC Card via email, phone, and/or text, weekly until contact had been established or until the individual failed to respond to at least five PHP documented contact attempts over a three-week period. PHP closed this case based on the non-response by SFC Card.[417]

l. September 2023.

(1) On 13 September 2023, SFC Card and [redacted] went to the Oxford Casino located in Oxford, Maine, to gamble and drink.[418] While driving home from the casino, SFC Card "started talking about guns and how he could take out 100 people with this expensive scope he had just bought."[419] SFC Card then told [redacted] about the various places he could "shoot up."[420]

---

409 *Id.*
410 Exhibit E1.
411 *Id.*
412 *Id.*
413 *Id.*
414 *Id.*
415 *Id.*
416 *Id.*
417 Exhibit E1.
418 Exhibits B10, B36.
419 *Id.* This statement was made by SFC Card to [redacted]. [redacted] later recalled this information to [redacted].
420 Exhibit B10.

(2) Also, on the ride home from the casino, SFC Card began repeating that "they are ruining my life," and became very angry.[421] SFC Card described "places" where he believed that people were talking about him and became angry about those as well.[422]

(3) SFC Card complained to [redacted] that the reason he could not buy guns presently was due to his being committed to a mental hospital.[423]

(4) Shortly thereafter, SFC Card began accusing [redacted] of talking about him and then began punching the steering wheel, shouting "Shut the fuck up!"[424] SFC Card punched [redacted] in the face while driving the car.[425] At that point, [redacted] began "to put two and two together," regarding SFC Card's deteriorating mental health.[426]

(5) Needing an excuse to get out of the car, [redacted] told SFC Card he wanted to get a pack of cigarettes and asked him to pull over at a nearby gas station.[427] When [redacted] exited the car, SFC Card told [redacted] he was "done with" him and left him at the gas station.[428]

(6) Shocked and concerned by the interaction, [redacted] immediately texted [redacted] at 0204 on 14 September 2023. [redacted] texted the following: "You up i have something to report. Change the passcode at the unit gate and be armed if sfc (sic) card does arrive. Please. I believe he's messed up in the head. And threaten the unit and other places. [redacted] but I do not know how to help him, and he refuses to get help or continue help. I'm afraid he's going to fuccck (sic) up his life from hearing things he thinks he heard. When i dropped him off he was concerned his weapons were still in the car. I beleive (sic) they were at the unit. And no one searched his vehicle on federal property. And yes he still has all of his weapons. [redacted]. I believe he's going to snap and do a mass shooting."[429]

(7) [redacted] then called [redacted] at approximately 0400 on 14 September 2023, informing him of their physical altercation.[430] [redacted] told [redacted]

---

421 Exhibit B36.
422 *Id.*
423 Exhibit J2 pg. 4.
424 Exhibit B36.
425 *Id.*
426 *Id.*
427 *Id.*
428 *Id.*
429 Exhibits B36, C24, J2.
430 Exhibit B3.

[redacted] that "SFC Card starting yelling at him, saying 'I can't believe you're talking behind my back' and was punched by SFC Card."[431] [redacted] told [redacted] he got out of the vehicle at a gas station and found his own way home.[432] [redacted] did not personally contact law enforcement or submit a CCIR following his conversation with [redacted].[433] [redacted] directed [redacted] to contact the Sagadahoc County Sherriff's Office (SCSO) and request that it conduct a health and welfare check on SFC Card.[434] Despite not submitting a CCIR, [redacted] maintains he informed [redacted] of his plan and that [redacted] approved his intended course of action.[435]

(8) [redacted] called [redacted], who at the time was unable to give additional specifics about the threat SFC Card posed.[436]

(9) [redacted] called SFC Card at 0800 on 15 September 2023, leaving a voicemail message.[437] SFC Card returned [redacted] call at 1400, telling him that he was angry about how everything went down during AT, that he wanted to punch [redacted], that he would not be attending Battle Assembly, and that he had received his 20-year letter and wanted to retire.[438] [redacted] responded telling SFC Card he "would coordinate with [redacted] to send him retirement information." While [redacted] did direct [redacted] to send SFC Card retirement information, he also coded SFC Card as a "U" (*i.e.*, unexcused absence) for the September and October 2023 Battle Assemblies.[439]

(10) On or about 15 September 2023, [redacted] went to his [redacted] at the Ellsworth Police Department, Ellsworth, Maine, [redacted], making him aware of SFC Card's history.[440] In an effort to maintain objectivity and create a degree of separation for [redacted] between [redacted] and as a [redacted], [redacted] directed [redacted] to have a detective from the Ellsworth Police Department request assistance from the Sagadahoc County Sheriff's Office (SCSO). The assistance request from Ellsworth Police Department to the SCSO was for a well-being check on SFC Card because that was the

431 *Id.*
432 *Id.*
433 Exhibit B3.
434 Exhibits B7, J2.
435 Exhibit B3.
436 *Id.*
437 Exhibits B3, L2, L3.
438 *Id.*
439 *Id.*
440 Exhibit J2 pg. 4.

law enforcement agency with jurisdiction over SFC Card.[441] [redacted] formally requested assistance from the Ellsworth Police Department as directed.[442]

(11) On 15 September 2023, Ellsworth Police Department [redacted] wrote to Sagadahoc County Sheriff's [redacted] to thank him for his assistance with the well-being check request.[443]

(12) In order to assist the Ellsworth Police Department in its request for assistance, [redacted] wrote a letter describing SFC Card's recent mental health history over the preceding nine months, describing SFC Card's physical altercation with [redacted] fear that SFC Card would commit a mass shooting.[444] [redacted] also provided a copy of the text message he received from [redacted] on 14 September 2023.[445] [redacted] described SFC Card as "one of my senior firearms instructors in Bravo Company, 3/304TH Infantry Regiment (USMA)."[446] [redacted] also informed the detective that SFC Card had spent fourteen (sic) days in the hospital, had been released, and that to his knowledge SFC Card had not received any subsequent treatment.[447]

(13) [redacted] formally requested, on the order of [redacted] that the "Sagadahoc County conduct a well-being check on Card at his residence, [redacted] Bowdoin, Maine, to gauge his mental health and determine if he is a threat to himself and/or others."[448] [redacted] also attached a photograph of SFC Card to his letter.[449] [redacted] concluded his letter by stating that he "would rather err on the side of caution with regards to Card since he is a capable marksman and, if he should set his mind to carry out the threats made to [redacted] he would be able to do it."[450]

(14) [redacted] of the Sagadahoc County Sheriff's Office received the request for assistance from [redacted] at 1447 on 15 September 2023, along with [redacted] letter and accompanying photograph and

---

441 *Id.*
442 *Id.*
443 *Id.*
444 *Id.* at pgs. 3-4, 9-10.
445 Exhibit J2 pgs. 3-4, 9-10.
446 *Id.* at pg. 3.
447 *Id.* at pg. 4.
448 *Id.* [redacted] mistakenly provided an incorrect address for SFC Card in his request. The address [redacted] provided to the SCSO was for SFC Card's [redacted] and located approximately eight miles away. SFC Card used the [redacted] address on his official military documents. However, it appears Sagadahoc County Sheriff's Office deputies did respond to SFC Card's residence, which was the white trailer located at [redacted] Bowdoin, Maine 04287.
449 *Id.* at pg. 4.
450 Exhibit J2 pg. 4.

text.[451] [redacted] then traveled to SFC Card's residence at [redacted] Bowdoin, Maine, arriving at 1504.[452] Upon arrival, [redacted] noticed a motorcycle with license number [redacted] under the garage overhang.[453] He completed a vehicle registration inquiry on the motorcycle and confirmed it was registered to Robert Card, although the registered address was SFC Card's [redacted] located at [redacted] Bowdoin, Maine.[454] However, [redacted] determined that SFC Card lived in the trailer adjacent to the garage at [redacted].[455] However, [redacted] was unable to locate SFC Card during his visit to the property on 15 September 2023.[456]

(15) Although [redacted] report indicates he was going to request the evening shift check on SFC Card, it is unknown as to whether anyone from the Sagadahoc County Sheriff's Office checked on him on the evening of 15 September 2023.[457] [redacted] requested that a "file 6" be sent out.[458] In his report, [redacted] misidentified the complaint as emanating from the Maine National Guard, stating that "it has come to the Guard's attention that Card is having psychotic episodes where he is hearing voices that are insulting him calling him a pedophile. Card is also making threats to shoot up the Saco National Guard facility. He had been committed over the summer for a couple of weeks due to his altered mental state but has since been released."[459] [redacted] stated that he had been asked by the National Guard "to identify any specific individuals who were concerned for Card whereas he may focus his altered aggression toward them as he has already demonstrated."[460] He also noted that "Card is a firearms instructor with the Guard so utmost caution should be utilized."[461]

(16) [redacted] returned to SFC Card's residence at approximately 0845 the following day, 16 September 2023.[462] Upon arrival, [redacted] noticed that a white Subaru Outback was now parked in the yard, causing him to request backup from another unit.[463] About 45 minutes later, [redacted] of

---

451 *Id.* at pg. 3.
452 *Id.*
453 *Id.*
454 *Id.*
455 Exhibit J2 pg. 3.
456 *Id.*
457 *Id.* No supplemental report was attached to incident report #23-015694.
458 *Id.*
459 *Id.*
460 Exhibit J2 pg. 3.
461 *Id.*
462 *Id.* at pg. 4.
463 *Id.*

the Kennebec County Sheriff's Office arrived to assist.[464] Both deputies then attempted to contact SFC Card.[465] The deputies could hear SFC Card moving around inside his trailer, but he would not answer the door.[466] The deputies ultimately decided to leave the property "due to being in a very disadvantageous position."[467]

(17) [redacted] called [redacted] after departing the property.[468] According to [redacted] told him that SFC Card "no longer had any weapons from the reserve unit" and that they "had made arrangements with Card's [redacted] who retrieved the personal weapons belonging to Card."[469]

(18) [redacted] never spoke directly with [redacted] about SFC Card's weapons or any other matter.[470] [redacted] had spoken with [redacted] about SFC Card's weapons and "was under the assumption" that he had planned with [redacted] to retrieve the weapons, although [redacted] did not follow-up.[471]

(19) [redacted] told [redacted] that he had tried to make physical contact with SFC Card, but that he would not answer the door.[472] According to [redacted], [redacted] told him that this was something SFC Card had done in the past and that after he "keeps to himself for a while he will come back out."[473]

(20) [redacted] indicated that he informed [redacted] that [redacted] was the source of the alleged threat emanating from SFC Card, but he downplayed [redacted], and stated he was a [redacted]" who would [redacted].[474] [redacted] opinion was based [redacted]

---

464 *Id.*
465 Exhibit J2 pg. 4.
466 *Id.*
467 *Id.*
468 *Id.*
469 Exhibits J2 pg. 4, C24. The information [redacted] provided to [redacted] regarding weapons differs greatly from [redacted], in which [redacted] believed that SFC Card still had all his weapons.
470 Exhibit B3.
471 *Id.*
472 Exhibit J2 pg. 5.
473 *Id.*
474 Exhibit B3.

(21) [redacted] informed [redacted] that "the Guard (sic) is in the process of trying to get Card to retire from the Guard with conditions that he get some mental health treatment."[475] [redacted] concluded [redacted] was of the opinion that forcing a contact with Card was [sic] necessary or advantageous. He thought it best to let Card have some time to himself for a bit."[476]

(22) [redacted] spoke with [redacted] on 17 September 2023.[477] [redacted] confirmed that [redacted] was "able to confirm that he was able to get [redacted] guns."[478] However, [redacted] also told [redacted] the guns "were in a gun safe that the [redacted] has access to at the [redacted]" and that he would "work with [redacted] to get the guns moved somewhere else."[479] [redacted] further informed [redacted] that he would "try and work with Robert to make sure he does not have any other firearms."[480] [redacted] then told [redacted] it was "our intention to make sure Robert does not do anything to hurt himself or others," but told [redacted] to "make his own judgment" as to whether SFC Card needed an evaluation.[481] [redacted] warned [redacted] that "when Robert answers the door at his trailer, in the past he usually does so with a handgun in hand out of view from the person inside."[482]

(23) [redacted] was "later contacted by [redacted]" at an unidentified date and time and told that "between [redacted] they would work to ensure that Robert does not have any access to any firearms. They have a way to secure his weapons."[483]

(24) According to [redacted] attempted to retrieve and secure SFC Card's weapons on 23 September 2023.[484] [redacted] maintains that SFC Card called [redacted] [redacted] and threw [redacted] off his property.[485]

(25) SFC Card texted [redacted] on 23 September 2023, stating that he was

---

475 Exhibit J2 pg. 5.
476 *Id.*
477 *Id.*
478 *Id.*
479 *Id.*
480 Exhibit J2 pg. 5.
481 *Id.*
482 *Id.*
483 *Id.*
484 Exhibit B23.
485 Exhibit J2 pg. 5.

"[j]ust sitting here going insane like the plan is no one will tell me we're this shit being said turned [redacted] and my friends against me, so their plan is working."[486] [redacted] responded, texting "I can't imagine how difficult this is for you. I don't understand why this would be happening to you. It has to be for a purpose greater than we can know and see. I think your [redacted] and friends love you and don't know how to help. It is fear of hurting you. [redacted]

(26) Following the 23 September 2023 incident, [redacted] reported that "[redacted] asked for help from law enforcement to take Robbie's weapons because Robbie kept kicking us off his property."[488]

(27) On 26 September 2023, [redacted] attempted to contact SFC Card to determine if an extension of his behavioral health profile was necessary and requested that SFC Card call him back.[489]

(28) Unit members and SFC Card's [redacted] had limited contact with SFC Card following the incident in which SFC Card punched [redacted] in the face. [redacted] "could tell that he was declining fast after 9/23/23 and 10/13/23."[490] She indicated that [redacted] had texted her, explaining that SFC Card "thought we were all against him and this was the first time he accused [redacted] of being in on the conspiracy too. [redacted] by his accusations."[491] [redacted] "attempted to reach out via text, but he accused me of being part of the conspiracy. I knew he was really hurt and angry, but I didn't know how else to help. [redacted]

(29) Likewise, [redacted] had irregular contact with SFC Card after 13 September 2023. He indicated that he occasionally saw SFC Card at [redacted] in passing, but they did not speak to each other.[493] [redacted] asked his [redacted] at

486 Exhibit C10.
487 Exhibits C10, C11.
488 Exhibits B21, E1.
489 Exhibit E1.
490 Exhibit B21.
491 *Id.*
492 *Id.*
493 Exhibit B36.

the [redacted] to arrange his work schedule so he would have no contact with SFC Card.[494]

(30) [redacted] final interaction with SFC Card occurred on or about 14 September 2023.[495] SFC Card called [redacted] and yelled at him for "posting stuff on Facebook," eventually hanging up on him.[496] [redacted] claimed he had not posted anything on Facebook in years, and "certainly not about SFC Card."[497] According to [redacted], SFC Card called him again on 22 September 2023, but he did not answer.[498]

(31) According to [redacted], at some point in late September 2023, he contacted SFC Card's [redacted] and asked him to remove all the weapons from SFC Card's home.[499]

m. October 2023.

(1) Despite several attempts, [redacted] was unable to reach SFC Card between 23 September 2023 and 13 October 2023.[500] [redacted] last contact with SFC Card occurred on 13 October 2023, texting [redacted][501] SFC Card responded, asking her to "tell me where this fucking shit online is"[502] [redacted] never heard from SFC Card again.[503] This is the last known interaction between SFC Card and [redacted].

(2) Despite not hearing from SFC Card, [redacted] contacted [redacted] on 17 October 2023, requesting his behavioral health profile be extended and allowing SFC Card additional time to obtain and submit documentation.[504] As the designated ARMMC [redacted] approved a 90-day Temporary Profile extension that same day.[505] [redacted] instructed [redacted] to utilize the command if SFC Card remained unresponsive.[506]

---

494 *Id.*
495 *Id.*
496 *Id.*
497 *Id.*
498 Exhibit B36.
499 *Id.*
500 Exhibit C12.
501 *Id.*
502 *Id.*
503 Exhibit B21.
504 Exhibit E1.
505 *Id.*
506 *Id.*

(3) On 19 October 2023, [redacted] again unsuccessfully attempted to contact SFC Card.[507] [redacted] then emailed SFC Card and [redacted].[508]

(4) According to open-source media, SFC Card was in Hudson, New Hampshire, on 19 October 2023, making a delivery to a Country Kitchen Bakery Outlet.[509] Bakery outlet employees said SFC Card accused them of talking about him.[510] Before he left, SFC Card reportedly told employees, "Maybe you will be the ones I snap on."[511]

(5) On 23 October 2023, [redacted] emailed SFC Card, informing him his case had been reassigned to a new [redacted] and reminding him that he needed to update his behavioral health information.[512] SFC Card's case was transferred because [redacted] duties were changing to become a [redacted].

(6) On 24 October 2023, the new [redacted] attempted to contact SFC Card by phone.[513] [redacted] previously served as a [redacted] but switched roles with [redacted] in mid-October 2023. A male answered the phone, [redacted] asked to speak with SFC Card, and the male on the other end of the line then hung up.[514] [redacted] tried the number again, but the call went to voicemail, and she left a message.[515] [redacted] then emailed SFC Card, cc'ing [redacted].[516]

n. Mass Shooting and Suicide.

(1) On 25 October 2023, national media outlets reported a mass casualty shooting event in Lewiston, Maine.[517] That evening, the media showed a photograph of the shooter from security footage taken from Just-in-Time Recreation, a family bowling center located in Lewiston, Maine.[518]

---

507 *Id.*
508 *Id.*
509 Exhibit T1.
510 *Id.*
511 *Id.*
512 Exhibit E1 pg. 1.
513 *Id.*
514 *Id.*
515 *Id.*
516 *Id.*
517 Exhibit T1.
518 Exhibits G24-G29.

(2) That evening, [redacted] to inform him of the shooting.[519] [redacted] identified SFC Card as the shooter after reviewing photographs from other law enforcement departments.[520] [redacted] a police officer in Rockland, Maine, also identified SFC Card after running his registration plate through [redacted] Mobile Data Terminal.[521]

(3) As events progressed, additional reports suggested the shooter had moved to Schemengees Bar and Grille.[522] [redacted], was one of the officers called to respond to the active shooter event that evening.[523] After responding to several unconfirmed reports pertaining to SFC Card's whereabouts, [redacted] identified SFC Card's vehicle at the Lisbon Falls boat ramp.[524]

(4) [redacted] gave his name and phone number to the on-scene commander that evening, but no one followed up with him before SFC Card's suicide.[525] Police were unable to locate SFC Card after they found his vehicle at the boat ramp that evening.[526] A manhunt then ensued.

(5) SFC Card killed 18 people and wounded an additional 13 people.[527]

(6) At approximately 1945 on 27 October 2023, SFC Card's body was located at Maine Recycling, 36 Capital Avenue, Lisbon, Maine 04252.[528] SFC Card's body was discovered in the back of a tractor trailer parked on a Maine Recycling annex storage lot.[529] The cause of death was listed as "gunshot wound [redacted]" and the manner of death was listed as "suicide (shot self with handgun)."[530] The toxicology report did not reveal any findings of toxicological significance other than the presence of caffeine and nicotine in SFC Card's system.[531]

---

519 Exhibits B1, B43.
520 *Id.*
521 *Id.*
522 Exhibits G48-G53.
523 Exhibit B5.
524 Exhibits B5, G34-39.
525 Exhibits B1, B43.
526 *Id.*
527 Exhibits J10, T1-T3.
528 Exhibit E2.
529 *Id.*
530 Exhibits D, E2.
531 Exhibit E2.

(7) The 3/304th submitted both a CCIR for the mass shooting on 25 October 2023 and a separate CCIR for SFC Card's suicide on 27 October 2023.

**4. Findings:** I make the following findings by a preponderance of the evidence:

a. Military History.

(1) Provide a complete accounting of SFC Card's military history. Include any periods of Active-Duty Service, Mobilization, Deployments, Inactive Duty Training, etc. Include promotions, reductions, transfers, awards, Uniform Code of Military Justice violations, unfavorable personnel actions, etc.

(a) SFC Card enlisted in the United States Army Reserve on 14 December 2002, and his Military Occupational Specialty (MOS) was 92F, Petroleum Supply Specialist with an Additional Skill Identifier EH7, Enlisted Petroleum vehicle operator. SFC Card completed Basic Training (Initial Entry Training) in 2003 and completed at least the minimum-required statutory Inactive Duty Training and Annual Trainings every year through 2023 in the U.S. Army Reserve. He never served on active duty in the Regular Army or in the Army National Guard and he never mobilized or deployed to a CONUS (Continental U.S.) or OCONUS (Outside Continental U.S.) location. In addition to his AT periods, he completed multiple active-duty periods consistent with a full career, including Professional Military Education (Initial Entry Training, Advanced Individual Training, Warrior Leader Course, Advanced Leader Course) and additional skills training (Unit Prevention Leader, Advanced Marksmanship Training, CBRN Defense Course). His promotions, unit assignments, and awards are listed below. SFC Card received no unfavorable actions during his career as indicated in his official military file, to include Uniform Code of Military Justice violations or unfavorable personnel actions.[532]

(b) <u>Promotions (Date of Rank)</u>

| | |
|---|---|
| 14 DEC 2002 | E2 |
| 14 DEC 2003 | E3 |
| 22 MAR 2004 | E4 |
| 01 JAN 2008 | E5 |
| 01 MAR 2016 | E6 |
| 02 JUL 2020 | E7 |

(c) <u>Assignment and Enlistment Orders</u>

| | |
|---|---|
| 14 DEC 2002 | Initial Enlistment/Assignment to 947 QM CO |

---

532 Exhibits H2, N79.

| | |
|---|---|
| 16 APR 2006 | Transfer order to 439 QM (Quartermaster) CO 3 PLT |
| 28 MAR 2008 | MOS order 92F2OH7OO (Petroleum Vehicle Operations) |
| 31 DEC 2013 | Reenlistment - Six Years |
| 09 APR 2014 | Transfer order 304 REGT 3 BN |
| 31 JUL 2020 | Reenlistment – Indefinite |

(d) Additional Active-Duty Training

| | |
|---|---|
| 20 MAR 2003 | Initial Entry Training (Basic Training) |
| 6 JUN 2003 | Advanced Individual Training (92F-Petroleum Supply) |
| 12 MAY 2006 | Warrior Leader Training |
| 06 MAR 2009 | CBRN Defense Course |
| 26 SEP 2012 | Petroleum Supply Specialist, Advanced Leader Course |

(e) Awards

| | |
|---|---|
| 06 MAR 2009 | Commandant's List CBRN Defense Course |
| 06 APR 2009 | Army Reserve Components Achievement Medal |
| 19 JUN 2009 | Army Achievement Medal |
| 28 JUN 2013 | Certificate of Appreciation |
| 05 MAY 2018 | Army Reserve Components Achievement Medal |
| 14 SEP 2020 | Humanitarian Service Medal |

(f) Assignments

| | |
|---|---|
| 14 DEC 2002 | 947 QM CO (PETRL SPT) |
| 01 JAN 2008 | 439 QM CO (PETRL SPT) |
| 09 APR 2014 | B Company, 3d Battalion, 304th Infantry Regiment |

(g) Deployments/Mobilizations
None

(2) Did SFC Card require any waivers to join the Army?

No. Despite his reported hearing issues, SFC Card did not require any waivers to join the Army.[533]

(3) Was SFC Card hospitalized during periods of Active-Duty service? If so, was he properly discharged? If on active-duty orders, was he properly released from his orders?

[533] Exhibit N25.

(a) SFC Card was hospitalized while on AT orders dated 15 July 2023 through 28 July 2023. His orders were extended on a different type of order for six days to facilitate his stay in the hospital.[534] SFC Card was not hospitalized while in a duty status prior to July 2023. SFC Card was hospitalized at KACH on 16 July 2023 and then transferred to Four Winds.[535] KACH was unable to provide the required level of treatment as they do not have an inpatient behavior health facility, so they requested a transfer to Four Winds on 16 July 2023. His admission to Four Winds was due to reports of psychosis, mood lability/aggression, homicidal ideations (having a "Hit list"), paranoia, and auditory hallucinations.[536] He was rated a "very low risk" of committing harm against himself or others [redacted] at Four Winds, after a full psychological evaluation approximately 10 days after entry into the hospital and after he started psychiatric medication. SFC Card was eventually discharged with a diagnosis of "Brief Psychotic Disorder" and scheduled for follow-on treatment and orders to continue to take prescription medication.[537]

(b) I defer findings on whether SFC Card was properly discharged from the Four Winds Hospital to the experts at the Walter Reed Department of Forensic Psychology. I am unable to conclusively determine if SFC Card received discharge instructions from Four Winds when discharged on 3 August 2023. The discharge summary with information related to appointments, medication, and care received was not signed by Four Winds providers until 7 August 2023, 8 August 2023, 10 August 2023, and 11 August 2023.[538] On the surface, SFC Card was permitted to leave the hospital and may have had information on what to do next. However, according to [redacted], "When I got there, he was immediately released and they let him out right away, no one needed to talk to me first, and I never saw the discharge instructions."[539] The official documents, which were not signed until at least four to eight days after SFC Card was already released, indicate SFC Card was discharged by Four Winds under guidance from [redacted] and SFC Card received follow-up care instructions and medication. SFC Card arranged on his own to have [redacted] come pick him up from the hospital. [redacted] at KACH, wrote a medical note: "Call placed to SM [on 11 August 2023].... Educated him on the services provided by Telemynd which he was referred to by Four Winds. Services which include medication management and therapy. Instructed him to go to their website to apply for an appointment...."[540] The standard of care requires a patient to have a discharge order, therapy follow up, and

---

[534] Exhibits R3, R6.
[535] Exhibits B7, B3, B6, N32, R6, E1.
[536] Exhibit E1 pgs. 3-5.
[537] *Id.* at pgs. 14, 54-71.
[538] *Id.* at pg. 12.
[539] Exhibit B36.
[540] Exhibit E1 pgs. 17, 22.

medication follow up at the time of discharge. The documents I received as part of my investigation show none of these items were completed until four to eight days after SFC Card was already released. However, I defer to Walter Reed to opine on whether it is customary or within the standard of care for a patient to receive unsigned discharge instructions.

(c) A preponderance of the evidence shows SFC Card was not properly released from his orders. Because SFC Card was hospitalized for over 24 hours during his service on active duty, SFC Card's unit should have initiated a Line of Duty Investigation (LODI) while SFC Card was still in the hospital or immediately after his discharge. He should have been continued on active-duty orders until the LODI was completed to determine if his condition was aggravated by his service and if he was entitled to follow-on medical care at the government's expense, either on or off active-duty orders.

(1) Rules/Law. Per AR 600-8-4, paragraph 2-2, a LODI should be initiated on any Soldier that experiences a loss of duty time for a period of more than 24 hours and the injury, illness, or disease is of lasting significance or may require follow-on care for Reserve members on duty for less than 30 days. Additionally, per paragraph 2-2d, a formal LODI *must* be conducted when an injury, illness, or death occurs under *strange* or doubtful circumstances or when a member of the USAR becomes disabled due to that injury, illness, or death (emphasis added). Per paragraph 5-3 of that same regulation, Commanders, medical officers, S1s, Staff Judge Advocates, unit administrators, noncommissioned officers, and Reserve Component Soldiers who learn of a Soldier's injury, illness, disease, or death that occurred under circumstances that might warrant a Line of Duty Investigation/Determination must take an active role in ensuring that an investigation/determination is initiated and completed. Per AR 135-181, paragraph 2-8c, Soldiers serving on active duty for 30 days or less may be continued on active duty after their orders expire to continue health care treatment for the "in the line of duty" (ILD) condition. Finally, per 10 United States Code (USC) § 12322, a member may be continued on active duty for a period of more than 30 days while the member is being treated for (or recovering from) an injury, illness or disease incurred or aggravated in the line of duty.

(2) Application. While on active-duty orders, SFC Card was admitted to KACH for psychiatric evaluation due to reports of erratic and concerning behavior. When KACH determined they lacked the resources to treat SFC Card's condition, they referred him to Four Winds. SFC Card stayed at Four Winds from 16 July 2023 to 3 August 2023, including the entire two-week active-duty training time.[541] SFC Card was on AT orders

[541] Exhibit E1.

from 15-28 July 2023 and then extended on Active Duty utilizing medical ADOS orders from 29 July – 3 August 2023 for a total of 20 Active-Duty days and 19 spent receiving treatment. This means SFC Card missed at least 10 duty days. Additionally, on-call [redacted], determined SFC Card was not fit for military service (did not meet medical retention standards). SFC Card's mental condition could be considered "strange" under AR 600-8-4, which would require a Line of Duty determination.

(3) The medical professionals at KACH and Four Winds documented that SFC Card would require follow-on care, and [redacted] completed a DA Form 3822, Report of Mental Status Evaluation, stating SFC Card did not meet medical retention standards. [redacted] recommended SFC Card be entered into the Disability Evaluation System and be evaluated for behavioral health medical readiness due to "unspecified psychosis."

(4) Because SFC Card missed more than 24 hours of duty, the circumstances were strange, he was likely to be determined medically unfit for military service, and his condition required follow-on care, the requirement to initiate a LODI under AR 600-8-4 was met. The command should have initiated a LODI while SFC Card was still in the hospital or immediately after his release.

(5) Additional good cause for extension on active-duty orders is because SFC Card was found to need follow-on care to a condition discovered and treated during his time on active duty. To receive that follow-on care at government expense, a LODI would be necessary to determine if the condition was caused or aggravated by military service. Because the follow-on care for SFC Card needed to occur immediately, the unit should have continued SFC Card on medical ADOS orders, per AR 600-8-4, AR 135-381, and 10 USC § 12322.

(6) The need for a LODI to determine service connection is further bolstered by the statements of two providers, one reviewing the file near in time to the inciden[redacted] KACH [redacted] and one reviewing the file after SFC Card's death [redacted] KACH [redacted] These providers have differing opinions on whether this condition was fully service aggravated, with [redacted] believing it was "exacerbated while on AT" and [redacted] believing it was not at all military-service aggravated.[542] An investigation should have been conducted to conclusively determine if the condition for which SFC Card was treated in July 2023 was service aggravated or if it existed prior to

[542] Exhibits B30, B34

service and was not affected by military service. I defer findings on whether SFC Card's condition in July – August 2023 should be considered in the Line of Duty.

(7) Because SFC Card needed immediate follow-on care, and because his condition may have been aggravated by his military service, he should have been extended on active-duty orders, and a LODI should have been conducted to determine his entitlement to medical care before he was released from his orders. Additionally, AR 40-400, paragraph 5-9 states that Reserve Component members on active-duty orders for 30 days or less will be evaluated for an MEB (Medical Evaluation Board) upon completion of hospitalization before release from the Military Treatment Facility (MTF). Upon release from Four Winds, SFC Card should have been returned to KACH for an MEB rather than released of his own accord. Because he was released without a LODI and MEB, a preponderance of the evidence shows SFC Card was improperly released from his active-duty orders.

(d) A preponderance of the evidence shows the unit did not properly release SFC Card from his orders because the unit did not ensure SFC Card was properly returned to the Reserve Center in Saco, Maine (where SFC Card's AT began). [redacted] Regardless, [redacted] should have been placed in a duty status to accomplish this task. Although [redacted] was later paid (on 26 October 2023) for his time using a DA Form 1380, he was not paid for associated costs such as mileage.

(4) How long had SFC Card been in his current unit? Had he properly been in-processed and counseled IAW Army regulations?

(a) SFC Card joined B Company, 3d Battalion, 304th Infantry Regiment (United States Military Academy) (3/304th), 104th Training Division, 108th Training Command, on 9 April 2014 when he was a SGT.[543]

(b) B Company, 3/304th was unable to provide any in-processing or counseling documents.

(5) What were SFC Card's assigned duties?

(a) SFC Card was assigned as a "Senior Trainer" of USMA Cadets.

(b) SFC Card provided a variety of firearms instruction, with a particular focus as a "grenade pit safety NCO" on the hand grenade range and a lane instructor for crew-served weapons. Army Training Circular 3-23.30 doctrinally defines a safety NCO and weapons instructor as having responsibility for the instruction and safety during live hand grenade training and weapons training.[544]

(6) What type of suicide or resiliency training did SFC Card participate in, and in what time frame? When did SFC Card last complete a suicide stand-down/training?

SFC Card last participated in the FY22 annual suicide prevention training held during the June 2022 Battle Assembly conducted by [redacted], Suicide Prevention [redacted], 104th Training Command.[545]

(7) What was SFC Card's reputation at the unit? What ratings had he received on his NCOERS in his current unit?

(a) SFC Card was generally considered a steady, average performer, who was "solid and reliable."[546] He was described as a follower who would rather execute the mission than lead other Soldiers. He was also described as kind, friendly, calm, and generous.[547] SFC Card's [redacted] reported no previous performance or conduct issues prior to the Spring of 2023.[548]

543 Exhibit H2.
544 Exhibits H2, B5, B10, B7, B4, B42, R13.
545 Exhibit R-14.
546 Exhibit B18.
547 Exhibits B10, B42, B18, B36.
548 Exhibit B3.

(b) During SFC Card's last eight NCOER ratings, he received a mix of average (met standard) and above average (exceeded standard) ratings.[549]

(8) Had SFC Card been singled out or harassed in any way by unit members or leadership?

(a) There was no evidence of actual harassment, bullying, or hazing. However, SFC Card believed that unit members were talking behind his back, claiming he was either gay, a pedophile, or that he had a small penis. Nevertheless, according to at least one unit member [redacted] shared intimate details about SFC Card during the June 2023 Battle Assembly. [redacted] shared the intimate details (*i.e.*, possible sexually transmitted disease, discussion of pedophile, and small penis, etc.) with [redacted] in his position as SFC Card's [redacted] and as a basis for why the unit needed to watch SFC Card. [redacted] sharing of the above information with [redacted] in this context would not be considered harassment. It is unknown whether [redacted] shared these details with other unit members beyond [redacted].

(b) Due to his deteriorating mental state, it is likely SFC Card attributed potential harassment occurring at his civilian job at Maine Recycling to his fellow military service members.[550]

(9) When was the last time SFC Card qualified on his assigned weapon? What was his level of proficiency?

(a) SFC Card last qualified on his assigned weapon on 23 October 2021.

(b) SFC Card qualified as an Expert Marksman (40/40).

(10) Did SFC Card make any protected communications to the IG, Command, Congressional, etc.? If so, what was the result of those communications?

SFC Card did not make any protected communications to the IG, the command, or Congress during his tenure at the 3/304th from 2014 to 2023.[551]

(11) Did SFC Card develop an injury, illness, or disease during a period where he was in a duty status? If so, were there any Line of Duty Investigations conducted into any injuries, illnesses, or diseases obtained by SFC Card? If not, why not? Did military

549 Exhibits N9-N18.
550 Exhibit B10.
551 Exhibits K35, K36.

service aggravate any medical or mental conditions SFC Card may have had? Should a formal Line of Duty Investigation be conducted IAW AR 600-8-4?

(a) Yes. SFC Card required treatment for a "Brief Psychotic Disorder" while on active-duty orders in July 2023. SFC Card's mental health issues likely manifested in January 2023, or earlier, while in a non-duty status.[552] His condition may have been aggravated by subsequent military service during IDT periods in Spring 2023 or during his AT in July 2023.[redacted] noted, "My opinion is that SFC Card's preexisting condition was exacerbated while on AT, but this condition pre-dated SFC Card's AT." However, [redacted] opined that SFC Card's condition was not service connected/aggravated, stating: "I don't believe records reflect that [this was service aggravated]. He believed that he was hearing voices. I don't believe that this is military service aggravated."[553]

(b) A LODI was not conducted for SFC Card. [redacted] stated that the unit did not consider conducting a LODI a requirement at the time.[554] As discussed above, the unit erred in not initiating a formal LODI based on SFC Card's hospitalization in July 2023.

(c) At present, there are conflicting opinions whether military service aggravated any medical or mental conditions SFC Card may have had. This reinforces the necessity of a LODI. As stated previously, SFC Card's mental health issues may have been exacerbated because he may not have wanted to be at AT.[555] When he experienced his mental health episode during the first two days of AT in July 2023, fellow unit members who SFC Card considered as peers and trusted colleagues recognized his symptoms and reported their concerns to the command. SFC Card was then taken to KACH, and later Four Winds, for evaluation and treatment.[556]

(d) A formal LODI should be conducted IAW AR 600-8-4, focusing on SFC Card's July 2023 admission to KACH and Four Winds as well as his condition prior to discharge on 3 August 2023. The threshold question of whether his psychosis was service connected, or service aggravated must be determined before any findings can be made regarding SFC Card's suicide. As noted above, it is possible, military duties exacerbated SFC Card's condition in July 2023, but [redacted] opinions differ on this issue. A LODI should have been conducted in July

---

552 Exhibit B38.
553 Exhibits B34 pg. 2, B30 pg. 2.
554 Exhibits B3, P5 pg. 6, B6.
555 Exhibit B36.
556 Exhibits E1, B5, B10, B2.

2023 to make a finding as to service connection. As such, I defer findings on whether SFC Card's suicide occurred in the line of duty pending the results of an expert medical opinion from the Walter Reed National Military Medical Center on SFC Card's mental health condition as of July 2023.[557] I acknowledge that, as a general rule, a LODI would not be required for SFC Card's suicide because he was not in a duty status at the time of his death in October 2023. However, should the results of the initial LODI reflect that SFC Card's mental condition was exacerbated by his service and therefore in the line of duty, then a follow-on LODI should be conducted to determine if that same condition resulted in his suicide.[558]

b. Personality, Lifestyle and Medical History.

(1) What was SFC Card's basic personality (relaxed, intense, jovial, gregarious, withdrawn, outgoing, morose, bitter, suspicious, angry, hostile, combative, other)?

(a) According to numerous members of his unit and [redacted] SFC Card was quiet and laid back for most of the time they knew him. He spoke with a slow drawl.[559] He was also described as friendly, kind, and generous. [redacted] mentioned that he was "grumpy and cynical towards the military," but "his attitude was the same as the rest of us as we end our careers."[560]

(b) However, [redacted] described him as "angry."[561] [redacted] described [redacted] as "aggressive, and he would yell a lot" and that "he never had anything nice to say" about [redacted].

(2) Was SFC Card's personality and demeanor before the suspected suicide different from his normal behavior?

(a) In the months leading up to his suicide, beginning in or about January 2023, SFC Card became increasingly paranoid that others were talking about him behind his back, claiming he was a pedophile, gay, or had a small penis. When discussing these matters, SFC Card would become easily agitated if anyone doubted his claims.[562]

---

557 Exhibits B3, D, P6.
558 Exhibits B3, D.
559 Exhibits B10, B21, B5, B4.
560 Exhibit B42.
561 Exhibit B39.
562 Exhibit B38.

(b) As a result of his paranoia, SFC Card engaged in altercations with [redacted] and strangers at local retail establishments, including with [redacted] in September 2023.[563]

(3) Explain any recent change(s), if any, in mood or symptoms of mental illness.

(a) SFC Card's paranoia was indicative of his mental illness. His repeated mentioning of hearing people talk about him could be attributed to feeling anxious or worried.

(b) Other noted symptoms of mental illness can be emotional outbursts to include changes in mood, extreme distress, anger, or the feeling that people are out to get them.

(4) Explain any recent change(s) if any, in behavior, such as eating, sleeping, social relationship, drinking, or drugs.

(a) SFC Card had reduced his alcohol intake.

(b) Additionally, SFC Card lost a considerable amount of weight, which he attributed to eliminating soda from his diet. SFC Card had increased his exercise.[564] His weight loss was so extreme that [redacted] became concerned and on 3 May 2023 asked him to see a doctor. She later tried to follow up to make sure that he saw someone.[565]

(c)SFC Card also self-reported to Four Winds that he was sleeping about 3-4 hours a day.[566]

(5) Describe SFC Card's friendship group. Were there many, few, casual, or intense friendships?

(a) SFC Card had a very small group of friends.

(b[redacted] described himself as SFC Card's [redacted].[567] SFC Card also associated with [redacted].[568]

563 Exhibits B21, B10, B36, J1.
564 Exhibit B10.
565 Exhibit B21.
566 Exhibit E1.

(c) [redacted] and SFC Card attended many Army training events together and looked forward to seeing each other at drill weekends.[569]

(6) Explain any recent withdrawal from any friend(s) or acting out, such as gambling, overspending, or fighting.

(a) SFC Card routinely went to the casino with [redacted] but was not known to have a gambling addiction.

(b) SFC Card had an altercation with [redacted] on 15 July 2023 during his AT at Camp Smith, New York. SFC Card charged [redacted], stating "I can't believe you're talking about me like that," referring to rumors about him being a pedophile and gay. [redacted] denied saying anything negative about SFC Card, but SFC Card then threatened to fight [redacted].[570]

(c) On 13 September 2023, SFC Card got into an altercation with [redacted] after leaving the Oxford Casino. SFC Card became agitated and was making threats of violence towards others. SFC Card then accused [redacted] of talking about him behind his back before punching him in the face. SFC Card then told [redacted] he was done with him.[571]

(7) Explain how SFC Card spent his free time.

(a) According to [redacted] SFC Card spent a fairly large time in the outdoors fishing and hunting with [redacted].

(b) SFC Card would gamble at casinos, participate in horseshoe and cornhole leagues and tournaments, and was a regular member of a bowling league "throughout the years."

(c) There were no reports that SFC Card developed any friendships with any participants while conducting these activities. On the contrary, SFC Card was reportedly more of a loner with only a few close relationships such as with [redacted] and [redacted].

---

[567] Exhibit B36.
[568] Exhibits B10, B36.
[569] Exhibit B10.
[570] Exhibit B10.
[571] Exhibit B36.

(d) In addition, he collected various types of firearms and accessories and would sometimes show scopes and other accessories to his fellow unit members. He was also interested in investing in the stock market and would frequently discuss his investments.[572]

(8) Provide an accounting of SFC Card's civilian employment experience. Identify any periods of unemployment.

(a) SFC Card worked at Friendly's Restaurant in 2001 for an undetermined amount of time.[573]

(b) SFC Card attended University of Maine from the Fall of 2001 until the Spring of 2003. There was no record of civilian employment obtained for this time period.[574]

(c) There were no records of SFC Card's employment history from 2003 through 2009.[575]

(d) SFC Card began working for Baxter Brewing Company as a delivery truck driver in or around 2009 or 2010.[576]

(e) There were no records available to determine SFC Card's employment history from 2010 through 2023; however, [redacted] reported he worked for several other companies, including Baxter Brewing Company, Pine State Beverage, and Kris-Way Truck Leasing.

(f) SFC Card began working at Maine Recycling in the Spring of 2023. SFC Card worked at Maine Recycling until he left in July 2023 following an incident with a [redacted] regarding the size of SFC Card's penis.[577]

(g) SFC Card then started working for First Fleet as a bread truck delivery driver in the summer of 2023.[578]

---

572 Exhibits B21, B10, B5, B36, B38, K42.
573 Exhibits B39, B21.
574 Exhibit N74.
575 I did not attempt to obtain tax records through the Internal Revenue Service.
576 Exhibit B18.
577 Exhibits B10, B21, B36.
578 Exhibit B36.

(9) Did SFC Card experience a recent loss (death, breakup of a relationship)? If so, explain.

(a) Yes. SFC Card dated [redacted]

(b) [redacted][579]

(10) Did SFC Card have any significant financial issue(s) or problem(s)? If so, describe the nature of the problem(s).

(a) No. SFC Card did not have any significant financial issues.

(b) SFC Card was reportedly skilled at investing in day-trading stocks and crypto currency. [redacted] reported that SFC Card made over $50,000 in profit between 2021-2022.[580]

(c) SFC Card was very interested in financial topics and education as evidenced by the 16 Army electronic learning (distance learning) finance and accounting courses he completed in and about 2011-2012. These courses included, Basic Accounting Principles and Framework, The Balance Sheet, The Cash Flow Statement, and The Value of Money and Investments for Non-Financial Personnel.[581]

(11) Did SFC Card have a significant health problem(s)? If so, describe the nature and treatment of the problem(s).

(a) No. However, SFC Card dealt with hearing loss. In 2017, SFC Card had surgery on his ears, but the surgery was not completely successful. After he was retained by the MOS Administrative Retention Review (MAR2), SFC Card purchased commercial hearing aids and received them on approximately 2 March 2023.[582]

(b) Further, in 2008, according to SFC Card's [redacted], he fell from the roof of his home and reportedly broke his neck, possibly leading to a traumatic brain injury.[583] I

[579] Exhibit B38, B10, B21.
[580] Exhibit B36, B10, B38.
[581] Exhibit N80.
[582] Exhibits B10, B21.
[583] When the neck snaps around rapidly, the force can place enough stress on the brain to cause damage. This often results in a concussion, the most common type of traumatic brain injury.

was unable to obtain SFC Card's civilian medical records to confirm his reported cervical fracture. Additionally, I defer to Walter Reed to opine on the impact of SFC Card's broken neck in relation to his mental health in the months leading to his death in 2023.

(12) Is there any indication that SFC Card was experiencing difficulties in a relationship with a spouse, partner, parents, or children?

(a) In January 2023, SFC Card was [redacted]

(b) In April 2023, SFC Card was involved in a verbal altercation with [redacted] This incident, together with other observed paranoid behavior, caused [redacted] to report [redacted] to law enforcement and to reduce the amount of contact and visits he had with [redacted].[584]

(c) On 23 September 2023, when [redacted] went to SFC Card's home attempting to safely remove his firearms, SFC Card called [redacted] and kicked them both off his property.[585]

(d) [redacted] attempted to reach out to [redacted] after this incident and explain that the voices he was hearing were not real. On 23 September 2023, SFC Card texted that he was: "just sitting here going insane like the plan is no one will tell me we're this shit being said turned [redacted] and my friends against me, so their plan is working".[586] When [redacted] texted him on 13 October 2023 to tell him that [redacted], SFC Card responded: "well tell me where this fucking shit online is." When [redacted] explained that there was nothing online and that his delusions were not real, she never heard from SFC Card again.[587]

(e) According to [redacted].[588]

(13) Had SFC Card ever been arrested? If so, what were the charges and the disposition of those charges?

---

[584] Exhibit B38.
[585] Exhibit B21.
[586] Exhibits C10, J4.
[587] Exhibit C12.
[588] Exhibit B39.

(a) SFC Card was arrested for and convicted of 'misdemeanor operating under the influence' on 14 April 2007 in Topsham, Maine.

(b) SFC Card was found guilty on 15 May 2007, fined $500.00, incarcerated for 48 hours, and his license was suspended for 90 days.[589]

(14) Did SFC Card have a history of illegal drug use or prescription medication abuse? If so, explain.

According to [redacted], SFC Card "always been straight edge but experimented with drugs when he was younger like a lot of people."[590]

(15) Did SFC Card have any recent communication(s) on the internet (that is, with social networking sites)? If so describe or include these communications.

During this investigation, I discovered that SFC Card's social media sites were either deleted or locked. However [redacted] confirmed that SFC Card had used Facebook.[591]

(16) Did SFC Card contact Army OneSource? Is so, about what issue?

Military One Source did not reply to my inquiry dated 8 January 2024.[592]

(17) Was SFC Card prescribed any prescription drug(s) at the time of his death? If so, list the prescription drugs and for what the drugs were prescribed. When were the drugs prescribed? Who prescribed the medications(s) and what type of provider was he/she (*i.e.*, Civilian doctor, Veteran's Affairs, Military Treatment facility)?

(a) SFC Card was prescribed the anti-psychotic, Olanzapine, during his hospital stay and at the time of his discharge from Four Winds on 3 August 2023.[593] Four Winds also recommended SFC Card take the following medications upon discharge: Omega-3 Fatty acid 1 gram daily, Melatonin 3mg daily at bedtime, and Vitamin D3 1000 units daily.[594]

---

589 Exhibit J4.
590 Exhibit B21.
591 Exhibit B36.
592 Enclosure 6F.
593 *Id.*
594 Exhibit E1. Olanzapine is a second-generation (atypical) antipsychotic medication. The FDA has approved this medication for schizophrenia if the patient is over the age of 13 and bipolar disorder,

(b), From the onset, SFC Card did not want to take this medicine because how it made him feel. On 28 July 2023, [redacted] noted in the medical record that SFC Card stated to the Four Winds treatment team, that "tomorrow he will refuse to take his medication."

(c) During her 11 August 2023 follow up call with SFC Card after his release, SFC Card told [redacted] he (SFC Card) "stopped taking his medications because he did not like how they made him feel." Finally, SFC Card told [redacted] on their drive back to Maine on 3 August 2023 that, "he didn't like how the medications made him feel, it made him feel 'lazy'."

(18) What was SFC Card's religion and was SFC Card active in any religious programs? If so, when was the last time he saw a religious professional? Did SFC Card ever seek out a chaplain or was he ever command referred to a chaplain during military service?

(a) SFC Card's listed religion is Baptist Churches; Other[595]

(b) There was insufficient information to determine the last time SFC Card saw a religious professional or if SFC Card was referred to a command chaplain.

(19) Did SFC Card communicate a threat of suicide or homicide? If yes, then answer the following: (a) To whom did SFC Card communicate the threat? (b) When and where did he communicate the threat? (c) Was/were the communication(s) written, spoken, or nonverbal? (d) Was the chain of command aware of the suicide and homicide threats? If yes: How did the command react to the threats (referral to law enforcement, chaplain, combat stress team, mental health provider, other)? (e) What was the diagnosis or opinion of these professionals if SFC Card was referred to a medical health provider?

(a) Yes. SFC Card communicated threats, explicit and implicit, multiple times between January 2023 and October 2023. In July 2023, SFC Card told [redacted] he would "take care of it" after accusing [redacted] of talking about him.

---

including mixed or manic episodes. Olanzapine helps to manage symptoms of mental health conditions such as: seeing, hearing, feeling, or believing things that others do not, feeling unusually suspicious or having muddled thoughts (schizophrenia) feeling agitated or hyperactive, very excited, elated, or impulsive (mania symptoms of bipolar disorder).
[595] Exhibit N79.

(b) While a patient at Four Winds, SFC Card conveyed mood lability/aggression, homicidal ideations, and admitted he had a "hit list."[596]

(c) SFC Card did not directly communicate a threat to [redacted] however, SFC Card did tell [redacted] on the way home from the Oxford Casino on 13 September 2023 that he could take out 100 people with this expensive scope he had just bought followed by different places he could shoot up.[597] Based upon this discussion, [redacted] was concerned SFC Card was going to commit a mass shooting. Between January 2023 and October 2023, SFC Card made comments about wanting to punch several people. He made these comments to [redacted] Additionally, in June 2023, SFC Card told [redacted] that if [redacted] hurt him emotionally, he would kil [redacted].[598]

(d) The chain of command was aware of the threats, and they referred the threat in September 2023 to local law enforcement in the form of [redacted] letter to the Sagadahoc County Sheriff's Office.[599] [redacted] concluded his letter by saying that he "would rather err on the side of caution with regards to Card since he is a capable marksman and, if he should set his mind to carry out the threats made to [redacted] he would be able to do it."[600] The chain of command did not confer with PHP which would have revealed SFC Card was non-compliant with pursuing treatment or available resources.

(e) Referral was made to law enforcement, not a medical health provider. SFC Card's medical diagnosis remained unchanged after he was discharged from Four Winds.

(20) Had SFC Card previously attempted suicide? If so, provide a history of the attempt(s) and responses(s), indicate what circumstances led to those previous attempts.

There is no record of any previous suicide attempts by SFC Card. He had previously denied having attempted suicide or having suicidal ideations.[601]

---

596 Exhibit E1 pg. 5.
597 Exhibit B10. This specific information was not included on [redacted] warning of a shooting to the Chain of Command.
598 Exhibits B36, B38.
599 Exhibits B3, B7.
600 Exhibit J2.
601 Exhibits E1, B15 pg. 2, B30 pg. 2.

(21) Provide a complete accounting of SFC Card's medical and behavioral health interactions dating back to 1 January 2020.

(a) SFC Card completed his Periodic Health Assessment (PHA) on 16 November 2019, 15 January 2021, 19 October 2021, and 2 January 2023.[602]

(b) There is no mention of any additional medical or mental health care sought, planned, or completed until his Emergency Department visit to KACH and transfer to Four Winds on 16 July 2023 after being ordered to undergo a Command Directed Behavioral Health Evaluation.[603]

c. Prior to the Incident.

(1) From 15-28 July 2023, SFC Card was ordered to perform AT at Camp Smith, New York. While at AT, when did SFC Card begin showing signs of mental distress? What did the command do in response? Please be as detailed as possible.

(a) SFC Card began showing signs of mental distress immediately upon arriving at Camp Smith. The command allowed SFC Card to sleep overnight and reengaged him in the morning.

(b) The [redacted] ultimately ordered a Command Directed Behavioral Health Evaluation. *See* Section 3.i. July 2023.

(2) On or about 15 July, SFC Card received care for his mental distress at Keller Army Community Hospital (KACH), West Point, NY. (a) What was his diagnosis? (b) What information did KACH give to SFC Card's Chain of Command regarding his condition? (c) What information did KACH provide to the civilian mental health facility, Four Winds Hospital?

(a) The medical providers at KACH coded the visit as "Primary- R45.850 homicidal ideations, Secondary-unspecified psychosis not due to a substance or known physiological condition." Medical records list the provider at KACH as [redacted], [redacted] Keller Army Community Hospital confirmed that [redacted]. This diagnosis of homicidal ideations on 16 July 2023 was the first time any medical professional formally documented that SFC Robert Card was noted as potentially homicidal.

---

[602] Exhibits E6 - E9
[603] Exhibits B15, E1, B3.

(b) [redacted] completed a request for a Command Directed Behavioral Health Evaluation (CDBHE). KACH only provided [redacted] with a copy of the DA 3822.[604]

(c) KACH provided Four Winds with the following documents: Consent to Transfer; DA Form 4700, Interhospital Patient Transfer Form; EKG; DD2870, Authorization of Disclosure of Medical or Dental Information; and the Sitter Brief, Medical Necessity Certification Statement for Non-Emergency Ambulance Services.[605]

(3) When was SFC Card admitted to Four Winds? (a) What medical diagnosis did SFC Card receive at Four Winds? (b) How long was this care provided? (c) How much information about this care did Four Winds provide with SFC Card's chain of command?

(a) SFC Card was transferred from KACH and admitted to Four Winds on 16 July 2023.[606] SFC Card received care from Four Winds from 16 July 2023 to 3 August 2023 for a total of 19 days.[607]

(b) SFC Card received Individual Therapy, Group Therapy, Medication, Art Therapy, Family Therapy, and Recreation Therapy. He also received psychological testing.[608]

(c) After he was transferred to Four Winds, SFC Card was diagnosed with Brief Psychotic Disorder, with no secondary diagnosis listed. The diagnosis from Four Winds was based on the results of psychological testing, and therapy. At discharge from Four Winds, SFC Card was diagnosed with "Brief psychotic disorder" by [redacted] and [redacted].[609] While receiving care as a patient at Four Winds, SFC Card was also referred for psychological testing to assist in differential diagnosis and treatment planning. At that time, the diagnosis under primary consideration was "unspecified schizophrenia spectrum or other psychotic disorder."[610]

(d) Four Winds did not provide [redacted] with any information regarding SFC Card's diagnosis, prognosis, or discharge instructions. Compounding matters, neither [redacted] nor [redacted] maintained any contact with KACH following SFC Card's

---

604 Exhibit B3.
605 Exhibit E1 pgs. 84-89.
606 Exhibit B3.
607 Exhibit E1.
608 *Id.* at pgs. 3, 54-71.
609 *Id.* at pg. 3.
610 *Id.* at pg. 54.

discharge from Four Winds. [redacted] believed [redacted] would not "be given any information due to HIPPA (sic)."[611]

(4) Was Four Winds providing updates to KACH on SFC Card's care? If so, how often and to whom? If so, was KACH providing this information to SFC Card's Chain of Command?

(a) Four Winds provided updates to KACH. [redacted] indicated "KACH and Four Winds met every Friday to discuss patients and meetings were held on 7/21 and 7/28." [redacted] also indicated that [redacted] participated on behalf of KACH and [redacted] participated on behalf of Four Winds. According to [redacted], the "[redacted] keeps tabs on the meeting and patients."[612]

(b) [redacted] indicated the only update received from KACH regarding SFC Card's care was that SFC Card was still at Four Winds around 25 or 26 July 2023.[613] [redacted] said "during that week someone from Keller contacted [redacted] on approximately 25/26 July. I can't recall the name, but it was a female representative. She told me that SFC Card was still at Four Winds Hospital and Keller and Four Winds were communicating during a weekly meeting they have for referred patients."[614]

(5) What actions did SFC Card's Chain of Command take while he was hospitalized?

(a) On 17 July 2023, [redacted] 104th Training Division, received the CCIR related to SFC Card's hospitalization and forwarded it to [redacted] 108th Training Command.

(b) On 27 July 2023, the 3/304th placed SFC Card on a medical ADOS-RC order. [redacted] did not visit SFC Card at Four Winds [redacted] was told SFC Card was not accepting visitors and thought [redacted] not have access to health information due to HIPPA (sic)."[616]

---

611 Exhibit B3.
612 Exhibit B30.
613 Exhibit B3.
614 *Id.*
615 [redacted]
616 Exhibit B3.

(c) [redacted] assumption was incorrect. DoD Instruction 6490.08 was enacted to balance patient confidentiality rights with the commander's need to make informed operational and risk management decisions within the Military Healthcare system. Authorized activities for which Protected Health Information (PHI) may be disclosed to a commander include, but are not limited to, fitness for duty determinations, fitness to perform a particular assignment, or the service member's ability to carry out any other activity essential for the military mission. Accordingly, [redacted] would have been able to receive information from KACH that was received from Four Winds during their weekly meetings.

(d) This information was available to [redacted] because mental health services were obtained because of a Command Directed Behavioral Health Evaluation. [redacted] gave a valid military order for SFC Card to undergo the evaluation. Conversely, Four Winds considered SFC Card's hospitalization to be voluntary, because involuntary hospitalization typically requires a court order. The military and civilian constructs are incongruent. Therefore, [redacted] had the ability to request and receive PHI related to SFC Card's mental health treatment that was sent to KACH from Four Winds as well as be involved with and receive updates from the KACH behavioral health provider. Further, DoDI 6490.08, paragraph 3.3 directs that "the commander should aim to interact and cooperate with the provider in a manner that does not breach confidentiality as described in this instruction. This interaction should occur with the intent of building partnerships, enabling, and encouraging Service Members to feel comfortable in obtaining care via self or medical referrals while furthering the successful accomplishment of the military mission." While Four Winds may not have disclosed information directly to [redacted], they certainly provided information to KACH for the purposes of treatment, and billing/reimbursement from TRICARE. KACH in turn would have provided that information to [redacted].

(e) [redacted] called Four Winds asking to visit SFC Card but was told that SFC Card was not accepting visitors. [redacted] gained contact information for SFC Card's care team ([redacted]) and passed that information to [redacted] asked the care team if SFC Card needed anything, to which they replied he needed pants, a hearing aid charger, and shoes. [redacted] subsequently voluntarily delivered these items.[617] [redacted] never followed up with [redacted].

---

[617] Exhibits B7, B42.

(f) [redacted] instituted a no-alcohol policy upon first learning of the incident involving SFC Card and [redacted] because he mistakenly believed SFC Card's aggression was caused by excessive alcohol.[618] Further, he "relied on [redacted] and the NCOs to handle it as he was 300 miles away."[619]

(g) On 3 August 2023, [redacted] notified [redacted] (104th Training Division Suicide Prevention [redacted]) of SFC Card's discharge from Four Winds. They did not discuss a treatment plan.[620]

(6) When did SFC Card's command depart West Point at the end of its annual training?

Based on mission requirements, there were staggered orders for different groups of Soldiers. [redacted][621] [redacted].[622]

(7) Was SFC Card's AT order extended to provide him additional care? Was this the proper mechanism to obtain treatment for SFC Card beyond his initial annual training period?

(a) On 27 July 2023, IAW 10 U.S.C. § 12301(d), the 81st Readiness Division placed SFC Card on Active Duty Operational Support-Reserve Component (ADOS-RC) orders for an additional six days for "MEDICAL APPTS – ADOS HOSPITAL STAY."[623] The 81st Readiness Division's issuance of these extension orders do not appear inconsistent with the USARC G-1 Standard Operating Procedure for Active Duty Medical Care, dated 30 December 2022.[624]

(b) I was unable to determine why SFC Card's orders were only extended for six days; whether the unit issued orders based off Four Winds release date, or whether Four Winds discharged SFC Card based off the date his orders were ending.

(8) What were the discharge instructions by Four Winds for SFC Card? Did they provide these instructions to SFC Card's chain of command or KACH? If not, did the

---

618 Exhibit B6.
619 *Id.*
620 Exhibit B14.
621 Exhibit B3.
622 Exhibit B7.
623 Exhibits R15, B12. 10 U.S.C. § 12301(d) provides that a member of a reserve component may, with the consent of that member, be ordered or retained on active duty.
624 Exhibit O36.

Chain of command or KACH seek information from Four Winds on SFC Card's discharge instructions, prognosis, need for follow on care etc.?

(a) SFC Card was discharged from Four Winds at 1355 on 3 August 2023. The Discharge Summary indicated that "SFC Card received Individual, Group, Art, Family and Recreation Therapies. The discharge diagnosis was noted as "F23 Brief Psychotic Disorder." His abilities to attend to activities of daily living, day to day ability to attend work/school and family/peer interaction are noted as "fair." His ability to access treatment after discharge is noted as "poor". He was discharged without appointments, with a note of "referrals pending."[625]

(b) The Discharge Summary further noted that SFC Card "appeared to be resistant to psychoeducation throughout treatment when discussing presentation of symptoms. He often appeared to place blame on others for his behaviors, stating that 'they were messing with me.'" At the time of discharge, he denied any auditory or visual hallucinations. At the time of discharge, he did not demonstrate a "risk of harm to self or others."[626]

(c) Four Winds did not share the discharge instructions with SFC Card's chain of command which was customary based on the referral relationship through TRICARE. Instead, Four Winds faxed the Discharge Summary to KACH on 11 August 2023, eight days after SFC Card was released.[627] This document was not uploaded by KACH into the military medical system until 21 August 2023.[628]

(d) [redacted] did not seek information from Four Winds after SFC Card was discharged.[629]

(9) Did SFC Card's chain of command maintain contact with KACH following SFC Card's discharge from Four Winds? If not, why not?

(a) [redacted] command team did not maintain contact with KACH following SFC Card's discharge from Four Winds.

(b) [redacted] did not follow up with KACH after SFC Card's discharge because he "did not think that he would be given any information due to HIPPA (sic)"[630]

---

625 Exhibit E1 pg. 4.
626 *Id.* at pg. 7.
627 *Id.* at pg. 2.
628 Exhibit E1.
629 Exhibit B3.

(10) What other agencies / commands with the Army Reserve were monitoring his care and communicating with SFC Card? Please provide the 5Ws for every communication. What did these agencies do after SFC Card was discharged from Four Winds?

(a) Aside from the chain of command, the other agencies that were monitoring SFC Card's care were KACH, the ARMMC,[631] and the PHP.[632] The following is a summary of their activities:

(b) On 20 July 2023, [redacted] was assigned the case and issued a 90-day Behavioral Health profile for SFC Card, restricting his access to his assigned weapon.[633] [redacted] instructed [redacted] to touch base with the command to determine SFC Card's status.[634] [redacted] sent [redacted] an email informing him that SFC Card was issued a profile and followed up the email with a phone call. Despite the indication that [redacted] spoke directly with [redacted] that day, in our interview with him, [redacted] told us that he "missed the e-mail on 20 July 2023" and that he

---

630 Exhibit B3.
631 ARMCC provides case management for Soldiers with a deployment-limiting medical condition. ARMMC tracks and manages all USAR P3/P4 profiles using a team of providers, team leads, nurse case managers, and patient administrative assistants working with individual Soldiers and units. ARMMC's Mission Statement and Scope: Supports United States Army Reserve (USAR) commands and provide case management for Soldiers with a deployment limiting medical condition. Centralized management and tracking of all profiles received from Army Reserve Soldier's or Logistics Health Incorporated (LHI). Centralized location for MEB/NDPEB/MAR2 packet building and submission into the Disability Evaluation System (DES) and the Major Subordinated Commands (MSC). Centralized location for review of USAR SRU packets. / The case management team consists of Providers, Team Leads, Nurse Case Managers, Patient Administrative Assistants, the Soldier, and the Soldier's Command/Unit. The AR-MMC staff tracks and manages all USAR (TPU/) P3/P4 profiles. The case management team works collaboratively with the Soldier, the Commander, the Psychological Health Program (PHP), Deployment Health Assessment Program (DHAP), the Health Services Branch representative (HSB), and other internal and external stakeholders to ensure the highest quality of service is provided to the Soldier.

632 PHP is an Army Reserve-specific program designed to facilitate behavioral health services for Soldiers and family members who need them. PHP Mission Statement: To achieve and sustain the most resilient and mentally fit Reserve force in the Nation. We will accomplish this by facilitating behavioral health services for Soldiers and family members who need them. Assist operational leadership through Command consultation, preserving unit cohesion through traumatic event management, and developing enduring partnerships with sister organizations.

633 Exhibit E1 pg. 4.
634 *Id.*

did not see it "until after October 26."[635] [redacted] then stated he "did not recall" what the profile stated.[636]

(c) On 7 August 2023, [redacted] (KACH) entered a note into SFC Card's military medical record. Specifically, [redacted] noted SFC Card's care as "continued."[637]

(d) On 7 and 8 August 2023, [redacted] unsuccessfully attempted to reach SFC Card by phone. On 8 August 2023, [redacted] assigned [redacted] as SFC Card's provider.[638]

(e) On 11 August 2023, Four Winds finally faxed SFC Card's discharge summary to KACH. This document was not uploaded into the military medical system until 21 August 2023.

(f) On 11 August 2023, [redacted] (PHP) spoke to SFC Card by phone. SFC Card expressed his frustration since being discharged due to limitations on his ability to purchase new weapons. SFC Card admitted problems with anxiety but no anger problems or safety issues. SFC Card denied any suicidal or homicidal ideations. SFC Card reported a NCM contacted him about starting his virtual therapy which he planned to start soon. [redacted] and SFC Card discussed phone applications he could use at home and his behavioral health profile.

(g) On 25 August 2023, [redacted] (ARMMC) emailed SFC Card, cc'ing [redacted] asking SFC Card for a status report to update SFC Card's profile. SFC Card did not respond.

(h) On 28 August 2023, [redacted] unsuccessfully attempted to call SFC Card to follow-up and provide support. [redacted] noted in the record that if SFC Card did not respond by 31 August 2023 his case management/care with PHP would be terminated in accordance with PHP standard operating procedures.

(i) On 31 August 2023, [redacted] closed SFC Card's case. PHP would reopen the case if SFC Card established contact.[639]

---

635 *Id.*
636 *Id.*
637 *Id.* at pg. 18.
638 *Id.* at pg. 20.
639 Exhibit E1.

(j) On 26 September 2023, [redacted] again emailed SFC Card, cc'ing [redacted] asking SFC Card for a status report to update a SFC Card's profile. SFC Card did not respond.[640]

(k) On 17 October 2023, [redacted] contacted [redacted] and requested a profile extension for SFC Card of his own accord (without having heard back from SFC Card). [redacted] requested the profile extension to allow SFC Card more time to obtain/submit BH documentation.[641]

(l) On 17 October 2023, [redacted] extended SFC Card's behavioral health profile for an additional 90 days. [redacted] directed [redacted] to encourage SFC Card to seek care if he was not already doing so. [redacted] also directed [redacted] to seek assistance from SFC Card's chain of command if SFC Card continued to be unresponsive.[642]

(m) On 19 October 2023, [redacted] unsuccessfully attempted to reach SFC Card by phone to inform him his profile had been extended. [redacted] followed up with an email to SFC Card, again cc'ing [redacted].[643]

(n) On 23 October 2023, [redacted] sent an email to SFC Card, again cc'ing [redacted] notifying SFC Card that his case had been reassigned to a new NCR.[644]

(o) On 24 October 2023, [redacted] (ARMMC) contacted SFC Card by phone. SFC Card hung up the phone after [redacted] identified herself and asked to speak with SFC Card. [redacted] called SFC Card again, but SFC Card sent the call to voicemail. [redacted] left a message to return her call.[645] [redacted] followed up with an email to SFC Card, again cc'ing [redacted], notifying him that she was his new [redacted].[646] She also unsuccessfully attempted to call [redacted] to seek his assistance with SFC Card. [redacted] concluded her review of SFC Card's records on 24 October 2023.[647]

(11) Was SFC Card entitled to follow-on care following his release from Four Winds? If so, did he receive follow-on care? Did these agencies provide any information regarding SFC Card's care or communications following his discharge to SFC Card's

---

640 *Id.*
641 *Id.* at pg. 2.
642 *Id.*
643 *Id.*
644 Exhibit E1 pg. 1.
645 *Id.*
646 *Id.*
647 *Id.*

chain of command. If not, why not? What entities within the Army were responsible for providing follow-on-care and monitoring SFC Card following his release? Were appropriate procedures followed in regard to follow-on-care?

(a) SFC Card was entitled to follow-on care after his discharge from Four Winds. On 2 August 2023, [redacted] documented that she spoke to [redacted] at Four Winds.[648] She noted that SFC Card withdrew his 72 hour request for discharge and that his court appearance was cancelled. [redacted] documented that SFC Card would be discharged at 1100 on 3 August 2023 with the discharge plan to have Telemynd for psychiatry and psychology."[649]

(b) SFC Card did not receive follow-on care. According to Four Winds personnel, at the time of discharge, they reached out to Telemynd for the status of SFC Card's referral. Telemynd explained that patient appointments were still pending. They were informed that an appointment can be given, and that the patient has been given all of the necessary information to schedule a follow up appointment. Four Winds personnel were subsequently informed by Telemynd that SFC Card had not set up an appointment and had not checked his email which contained instructions on how to create an account and to schedule an appointment. Four Winds personnel continued attempting to connect Telemynd and SFC Card for a conference call to arrange for follow-on care.[650]

(c) None of these communication failures were conveyed to SFC Card's chain of command. Based upon [redacted] statement, KACH does not admit or track Soldiers who are on orders for 30 days or less.[651] Therefore, KACH was not following up on SFC Card's care. Furthermore, Four Winds noted that the medication card for SFC Card would be completed by West Point Behavioral Health.[652] Follow-up appointments were not completed by Four Winds upon SFC Card's discharge. It appears that Four Winds' discharge of SFC Card was lacking any follow through regarding medication management or adequate arrangements for SFC Card's follow-on care. Four Winds believed KACH would follow up. KACH was not tracking SFC Card's care because he was not on orders for more than 30 days. As a result, no one adequately followed up on SFC Card's discharge care. Although Four Winds indicated that they had spoken to SFC Card's [redacted] regarding discharge, [redacted] SFC Card's [redacted]

---

648 *Id.* at pg.17.
649 *Id.*
650 Exhibit E1 pg. 5.
651 Exhibit B34.
652 Exhibit E1 pg. 12.

[redacted]. SFC Card's [redacted] was concerned about his becoming aggressive when he consumes alcohol. [redacted] also told Four Winds personnel that [redacted] and that SFC Card could not return to [redacted].[653] SFC Card's [redacted] however, Four Winds released SFC Card anyway.

(d) During SFC Card's stay at Four Winds, [redacted] noted that he was admitted to Four Winds Hospital due to reports of psychosis, mood lability/aggression, HI (homicidal ideations), patient endorses having a "hit list", paranoia and AH (auditory hallucinations).[654] Despite the disturbing information regarding a "hit list," Four Winds discharged SFC Card without an adequate plan for follow-on care or notification to the chain of command or proper authorities regarding the potential danger SFC Card posed. I defer to Walter Reed on whether Four Winds met the standard of care.

(e) I cannot emphasize strongly enough the results of [redacted] testing noting that "psychotropic medication use may be somewhat limited," that SFC Card is "unlikely to see himself as having any problems for which psychotherapy would be appropriate," and his "prognosis for significant change must be considered guarded."[655] [redacted] also noted that according to his test results, SFC Card "does appear to be at greater risk for violence throughout the course of his lifetime."[656] I defer to Walter Reed on whether the results of this testing should have resulted in continued in-patient treatment, transfer to long-term treatment, and urgent notification directly to SFC Card's chain of command.

(f) I was unable to conclude by a preponderance of the evidence that Four Winds attempted to invoke New York's Safe Act or if it reported to New York state officials that SFC Card was "likely to engage in conduct that could seriously harm the patient himself or others." Regardless, SFC Card was a transient and not a resident of the state. Nonetheless, the facts surrounding SFC Card's discharge are suspect.

(g) SFC Card requested release from Four Winds on or about 26 July 2023, and a court hearing was scheduled in accordance with New York state law for 2 August 2023. However, SFC Card rescinded his request, and the court hearing was cancelled. Nevertheless, Four Winds released SFC Card anyway, without utilizing the court

---

653 *Id.* at pg. 6.
654 *Id.* at pg. 5.
655 *Id.* at pg. 60.
656 *Id.* at pg. 60.

hearing procedures. This suggests Four Winds may not have followed the appropriate procedures.

(h) ARMMC and PHP provided information to [redacted]. On 21 July 2023, [redacted]. [redacted] exchanged texts with [redacted]. In addition to the initial 20 July 2023 email, [redacted] emailed or copied [redacted] on 25 August 2023, 26 September 2023, 17 October 2023, 19 October 2023, and 23 October 2023. On 24 October 2023, [redacted] called and emailed [redacted]; otherwise, he would have seen SFC Card was not cooperating or receiving treatment.

(i) Although [redacted] received or was copied on emails to SFC Card multiple times, he claims he did not see any of the emails until after 26 October 2023.[657] [redacted] command team did not maintain any contact with KACH following SFC Card's discharge from Four Winds. [redacted] claims his only update regarding SFC Card's care was that SFC Card was still at Four Winds around 25 or 26 July 2023.[658] It appears that [redacted] is referring to the 21 July 2023 text from [redacted]. He does not acknowledge any of the other communications from ARMMC, [redacted]

(j) KACH was responsible for providing an adequate hand-off to SFC Card's chain of command for his follow-on care and monitoring. KACH BH failed to properly close out the case with SFC Card's military leadership. The Four Winds discharge summary clearly noted that the West Point Behavioral Health department was responsible for the medication follow up.[659] Four Winds also noted a referral to therapy would be provided through Telemynd, a virtual provider.[660]

(k) Appropriate procedures were not followed regarding SFC Card's follow-on care. Four Winds did not appropriately note KACH's role in SFC Card's follow-on care, as KACH would not be responsible for managing SFC Card's medications. Although KACH technically followed its procedures for not providing follow-on care for Soldiers on orders for 30 days or less, we recommend that those procedures be modified to incorporate continuous follow-on care for Reserve Component Soldiers until a hand-off with the command is completed.

(l) It appears that ARMMC followed their procedures. Despite PHP's procedures proving to be inadequate, the members of the PHP followed the procedures that were in

657 Exhibit B3.
658 *Id.*
659 Exhibit E1 pg. 12.
660 *Id.*

place at the time. While ARMMC and PHP are not explicitly required to provide care, only give a status on profiles, or provide resource recommendations for care, respectively, both organizations also failed to make adequate attempts to advise SFC Card's chain of command of the serious diagnoses and warning signs in his medical chart. This is of grave concern given ARMMC's and PHP's unrestricted access to SFC Card's medical files. Both programs lacked an enforcement mechanism beyond informing [redacted] of SFC Card's non-compliance.

(12) What were the circumstances surrounding the physical altercation between [redacted] and SFC Card on 13 September 2023? Please provide the 5Ws.

(a) On 13 September 2023, SFC Card and [redacted] decided to go to the Oxford Casino located in Oxford, Maine, to gamble and drink.[661] During the ride home from the casino, SFC Card began to repeat "they are ruining my life" and started to get very angry. He also described "places" where he believed that people were talking about him and got angry about those as well.[662]

(b) Shortly thereafter, SFC Card began to accuse [redacted] of talking about him, and then he began to punch the steering wheel and shouted, "Shut the fuck up!" SFC Card then punched [redacted] in the face.

(c) At that point, [redacted] began "to put two and two together" regarding SFC Card's deteriorating mental health.[663] As an excuse to get out of the car, [redacted] told SFC Card that he wanted to get a pack of cigarettes and asked him to pull over at a nearby gas station. When [redacted] got out of the car, SFC Card said he was "done with" [redacted], and left him at the gas station.[664]

(13) On 15 September 2023, [redacted] sent a text message to [redacted] indicating SFC Card threatened a mass shooting at the unit's Reserve Center. (a) What exactly did the message say? (b) What actions did the command take in response? (c) Were CID or the Insider Threat Hub notified once the command received a potential threat to the organization/installation? If not, why not? (d) Were these actions appropriate considering the threat and mental health history of SFC Card?

(a) At 0204 on Thursday, 14 September 2023, [redacted] texted [redacted] and [redacted]: "You up i have something to report. Change the passcode at the unit

---

661 Exhibit B36.
662 *Id.*
663 *Id.*
664 *Id.*

gate and be armed if sfc (sic) card does arrive. Please. I believe he's messed up in the head. And threaten the unit and other places. [redacted] but I do not know how to help him, and he refuses to get help or continue help. I'm afraid he's going to fuccck (sic) up his life from hearing things he thinks he heard. When i dropped him off he was concerned his weapons were still in the car. I beleive (sic) they were at the unit. And no one searched his vehicle on federal property. And yes, he still has all of his weapons. [redacted]. I believe he's going to snap and do a mass shooting."[665]

(b) [redacted] directed [redacted] to request the Sagadahoc County Sheriff's Office conduct a well-being check on SFC Card to gauge his mental health and decide whether he was a threat to himself and/or others.[666]

(c) [redacted] did not contact either CID or the Insider Threat Hub[667] because he "did not think of it at the time."[668]

(d) [redacted] given the nature of the alleged verbal threats from SFC Card. [redacted] and SFC Card were described as [redacted]. Based on the length and scope of their friendship, [redacted] was the person best equipped to provide an accurate warning about SFC Card. However, [redacted] downplayed [redacted] warning about the mass shooting, informing the Sagadahoc County Sheriff's Office that [redacted] Although, according to [redacted] would call him at all hours of the morning because [redacted] worked the overnight shift. At one point [redacted] in June 2023, [redacted] called [redacted] in the morning, [redacted], [redacted]. While [redacted] mid-September warnings, given the pattern and lengthy reporting of SFC Card's dangerous threats.[669]

---

665 Exhibits B36, J2.
666 Exhibits B7, J2.
667 The Army Insider Threat Program is outlined in Army Regulation 600-20, Army Command Policy, paragraph 5-18. It requires commanders to ensure compliance with reporting requirements for information related to insider threats.
668 Exhibit B3.
669 Exhibit K39.

(14) Was SFC Card absent from battle assembly for September and October of 2023? If so, what did his unit do in response? Was SFC Card coded as U- unexcused for the IDT periods? Did the chain of command attempt to contact him?

(a) SFC Card was coded as unexcused absence (U) for the September and October 2023 Battle Assemblies.

(b) SFC Card was angry about the circumstances of his hospitalization during AT in July 2023. He relayed to [redacted] that he had his 20-year letter and wanted to retire.

(c) While [redacted] did provide retirement information to SFC Card through the [redacted] coded SFC Card as a "U" for both the September and October Battle Assemblies.[670] [redacted] did not attempt to reach SFC Card for the October Battle Assembly but did speak with him briefly on the phone the day prior to the September Battle Assembly.

(15) Did SFC Card receive a profile for his mental health issues? If so, for how long and by whom? If so, was the fact that he was the subject of a profile ever communicated to SFC Card or his unit? If so, was this profile ever extended? If so, why? Obtain a copy of the profile if one exits.

(a) SFC Card received a profile for his mental health issues on 20 July 2023 for 90 days.

(b) On 20 July 2023 [redacted] emailed SFC Card and [redacted] informing them that ARMMC created a profile for SFC Card. We have no indication SFC Card confirmed receipt of his profile.

(c) In addition to the email sent to SFC Card and [redacted] spoke to [redacted] on the phone and informed him of the profile on 20 July 2023.

(d) On 17 October 2023, [redacted], extended the profile for 90 days.[671] Based on the Army Reserve Medical Management Center (ARMMC) Behavior Health SOP criteria for profiles, the Nurse Case Manager shall ensure the Soldier and Commander understand that the profile will be automatically

---

[670] Exhibits B3, L2, L3.
[671] Exhibits E5, B25.

extended up to one year at which point a Medical Evaluation Board or Non-Duty Physical Evaluation Board process may start. ARMMC did not receive any information related to SFC Card's behavioral health status and because there was no contact between ARMMC and [redacted] or SFC Card, [redacted] extended the profile.

(16) Did the chain of command have any communication with local law enforcement regarding SFC Card? If so, provide the 5Ws on each communication.

The chain of command had communications with law enforcement on the following days; descriptions of these incidents are discussed at length above:[672]

3 May 2023 – Sagadahoc County Sheriff's Office
4 May 2023 – Sagadahoc County Sheriff's Office
16 July 2023 – New York State Police
14 September 2023 – Ellsworth Police Department
15 September 2023 – Sagadahoc County Sheriff's Office
25 October 2023 – Various Entities – Identified SFC Card as the Shooter

d. The Incident.

(1) What was SFC Card's duty status from 24 October 2023 to 28 October 2023?

(a) SFC Card was not in a duty status from 24-28 October 2023.

(b) SFC Card's last day in a duty status was his last day of active-duty orders (ADOS-RC) on 3 August 2023, the day he was discharged from Four Winds. The unit did not have a Battle Assembly in August 2023. SFC Card did not attend the September or October 2023 Battle Assemblies.[673]

(2) How, when, and where did SFC Card die?

(a) The Office of Chief Medical Examiner of the State of Maine determined that SFC Card's death be ruled a suicide which took place on 27 October 2023. The exact time is unknown. His body was found at 1945 by law enforcement at the Maine Recycling Corporation (trailer storage annex), Lisbon Falls, Maine.

---

672 Exhibits B7, H12.
673 Exhibits L3, N32.

(b) According to the medical examiner, SFC Card died due to a single perforating self-inflicted gunshot wound [redacted].[674] The toxicology report did not reveal any findings of toxicological significance other than the presence of caffeine and nicotine.[675]

(3) Where and when did SFC Card get the weapon(s) used to carry out his apparent suicide? What weapons were used?

(a) There is no database in the State of Maine for privately owned weapons. It would difficult to track down each individual firearm purchase from licensed (03FFL) firearms dealers and private purchases/transfers. However, open-source media reports indicate SFC Card legally purchased the three weapons (two rifles, one handgun) to conduct the mass shooting and commit suicide at a Cabela's and two local gun shops in 2012, 2018, and July 2023.[676]

(b) Two weapons were found with SFC Card's body; a Smith and Wesson M&P .40 caliber handgun, located to the right of the body, and a Smith and Wesson M&P AR-15 style rifle, found under the body, with the muzzle visible to the left side of the body.[677] An AR-10 style Ruger SFAR .308 rifle was found in his abandoned Subaru Outback at the Lisbon Falls boat ramp.[678] Multiple reports indicate he owned a large number of weapons (10-15) and was identified as a collector of various types of firearms.[679] According to [redacted], the Maine State Police confiscated all weapons from SFC Card's house and at the scene of the crime.[680]

(4) Who were the last people to speak with SFC Card before the suspected suicide? (a) What was discussed? (b) What did that person observe or hear, what did that person think or perceive about SFC Card, and what actions did that person take? (c) Did his family and/or friends report his behavior prior to the suicide? If so, for what reason? To whom? What was the response?

(a) [redacted] was the last known person to have any communication with SFC Card via text message. [redacted] last contact with SFC Card occurred on 13 October 2023. She texted him, "[redacted][681] SFC Card responded, "Well tell me where this fucking shit

---

674 Exhibit E2.
675 *Id.*
676 Exhibit T7.
677 *Id.*
678 Exhibit T1, T6.
679 Exhibits B36, B38, H6.
680 Exhibit K43.
681 Exhibit C10.

online is."[682] She never heard from him again.[683] [redacted] told us she believed that SFC Card's mental health was declining fast. She responded to SFC Card by telling him that he was "experiencing delusions to make you think it is real. Please trust me when I say it is not real."[684]

(b) On 27 February 2024 and 15 March 2024, [redacted] (Maine State Police) confirmed that a forensic audit (Cellebrite), was conducted on SFC Card's cellphone, but he was unwilling to provide me with a copy of the examination results until completion of their investigation and with permission from state authorities.[685] These results will provide greater understanding of who SFC Card spoke with during the last two weeks of his life.

**5. Regulatory Requirements:** Did commanders at echelon adhere to the requirements of AR 600-92 (Army Suicide Prevention Program)?

a. A preponderance of the evidence indicates the Army took prudent actions regarding suicide prevention and monitoring based on the evidence available prior to SFC Card's death. Additionally, the Army responded appropriately to the report of SFC Card's death by initiating this investigation into his suspected suicide in accordance with the requirements of AR 600-92.

b. The key piece of information to remember when evaluating the actions of the unit and the Army in retrospect is that both KACH medical professionals and Four Winds medical professionals wrote in their paperwork that SFC Card had no history of suicidal ideations, nor did he have any current intent to harm himself or others. He was rated a "very low risk" for such behaviors.

c. Army Regulation 600-92 (Army Suicide Prevention Program) became effective on 8 September 2023. Before that, Department of the Army Pamphlet (DA Pam) 600-24, (Health Promotion, Risk Reduction, and Suicide Prevention) and Army Directive (AD) 2023-12 (Ask, Care, Escort [ACE] Suicide Prevention Program) guided the Army's

---

682 *Id.*
683 Exhibit B21.
684 Exhibits B21, C10.
685 A Cellebrite extraction reviews and analyzes the digital data on a cellphone. [redacted] only verified that a forensic audit was conducted and did not offer to share the results, which would have confirmed if [redacted] was indeed the last person to communicate with SFC Card. There is no information which confirms whether SFC Card had contact with others after 13 October 2023. An interview with his employer at the time (First Fleet Inc.) may have provided additional context on SFC interactions with others during the last two weeks of his life.

suicide prevention and response efforts. Each of these documents were considered during the course of this investigation.

d. Generally, Reserve Components (RC) only have access to/authority over their non-mobilized Soldiers for about 38 calendar days of military service per fiscal year, compared to year-round access for the Active Army. The applicable law which covers the jurisdiction of RC commanders over assigned Soldiers is 10 U.S. Code § 802 - Art. 2.[686] It states "Reservists: A member of the Reserves is subject to the UCMJ while performing Inactive Duty for Training (IDT), Active Duty for Training (ADT), or active duty. Accordingly, all offenses committed by a reservist while on active duty, IDT, or ADT may subject the reservist to discipline, including NJP. Personal jurisdiction over reservists performing IDT includes travel to and from their IDT training site, intervals between consecutive periods of IDT on the same day, and intervals between IDT on consecutive days." The above 1 January 2019 amendment to the Uniform Code of Military Justice primarily closes the gap in authority or jurisdiction a RC commander has when a Soldier travels to and from a home of record and a duty location or the time between consecutive Battle Assemblies (drill days). In effect, [redacted] would have had command authority over SFC Card only until he arrived at his home of record at [redacted], Bowdoin, Maine on the evening of 3 August 2023. [redacted] would have only had command authority over SFC Card during IDT periods such as the September and October 2023 Battle Assemblies.

e. This results in a lack of jurisdiction for periods when Reserve Soldiers are in a non-duty status. Therefore, we considered command and leadership regulations to guide evaluation of the gap in access to Soldiers between the Active and Reserve Components. Because Army Reserve commanders do not have year-round access to their Soldiers, their ability to fully "encourage Soldiers to seek assistance if they are experiencing challenges or mental health issues" (AR 600-92, 1-33) or facilitate the "safe storage of lethal means" (AR 600-92, 1-33) is limited.

f. DA PAM 600-24 and AR 600-92 sugges[redacted]. Further, although [redacted], their jurisdiction over SFC Card was limited to the monthly Battle Assembly. An Active-Duty commander would have had many tools at their disposal to accomplish these goals, from providing escorts,

[686] See 10 USC 802.

scheduling medical appointments, and even requiring SFC Card to move onto a military reservation and surrender his weapons to a unit arms room.

g. However, a different standard applies to the USAR. SFC Card was a civilian and the USAR did not have jurisdiction nor authority over him in that capacity. [redacted] jurisdiction over SFC Card was limited to periods of Active Duty, or Inactive Duty Training (IDT). Additionally, the USAR has to articulate a legitimate military purpose in order to order a Soldier onto active duty, as such, the ability to order SFC Card onto a military reservation was limited. There is no authority to order him to surrender his weapons.

(1) [redacted] they were limited by authority and access. SFC Card was command directed to undergo a behavioral health evaluation. He was then committed to a civilian hospital for 19 days and given medication to aid him in his condition. Following his discharge, members of his unit made sure he got home, and they stayed in touch with him to see how he was doing. [redacted] called, [redacted] called [redacted] called and visited, [redacted] from KACH called him about follow-up treatment, and [redacted] from the Reserve Psychological Health Program called and informed him of the resources available to him. SFC Card failed to respond or turned down almost every offer of assistance or care, as was his right as a civilian. Multiple members of the unit reached out to SFC Card's [redacted] to try and deliver support as well. Ultimately, [redacted] was limited to AT and IDT periods (38 statutorily required calendar days per year) to compel attendance for Behavioral Health treatment.

(2) According to AR 600-92, [redacted] could have formally requested SFC Card voluntarily store his weapons in a safe location (possibly the Saco USAR Center). [redacted] did not ask SFC Card to voluntarily store his privately owned weapons. Rather [redacted] stated: "I did not talk to him under assumption that [redacted] made arrangements with SFC Card's [redacted] to get the weapons and safeguard them. I don't know if it was [redacted] or someone else who would remove the weapons. I did not personally talk to [redacted], and I did not follow up on it."[687] [redacted] is mitigated, however, because even if he did ask SFC Card to store his weapons and SFC Card said no, [redacted] would not have had the authority to confiscate the weapons nor order SFC Card to reside on a military reservation to control his access to weapons.

---

687 Exhibit B3 pg. 6.

g. The 104th Training Division, a higher unit in charge of SFC Card's unit, had a current policy on suicide prevention from February 2023.[688] However, this policy was not renewed between the time AR 600-92 became effective and SFC Card's death, a period of approximately one month. As such, a new requirement in AR 600-92, which is the Suicide Prevention Liaison, was not yet implemented, which may have aided communication between the various entities involved in SFC Card's care. This is not unusual due to the short time between the events under investigation and the publishing of the new regulation, and it should not reflect negatively on the unit or the unit leadership.

h. A unit in the Army is not just one person, it is a team. That team is usually led by a command team, and there are levels of hierarchy between Soldiers and their command teams. As mentioned earlier, multiple individuals in the unit attempted to stay in contact with SFC Card, or to inquire after his wellbeing, after he departed Four Winds Hospital and returned to his civilian life. Members of the unit were in contact with SFC Card's [redacted] because SFC Card had proven so difficult to reach. [redacted] regularly spoke with SFC Card's [redacted], and he even reached out to SFC Card's [redacted] to try to determine if SFC Card's behavior in July 2023 was normal, but SFC Card's [redacted] would not talk with him nor anyone in the unit.

i. For their part [redacted]

j. Further, refer to Additional Finding 2, below, which describes in detail actions taken by the unit and actions that local law enforcement failed to take which may have prevented SFC Card from doing what he did.

k. Finally, according to [redacted], the Suicide Prevention [redacted], would come to the unit and give suicide prevention/awareness classes. SFC Card was at most of these.[689]

---

688 Exhibit O6.
689 Exhibit B8.

l. Overall, SFC Card's unit was in the difficult position of having no authority over a non-cooperative Soldier, and their actions were compliant with AR 600-92. The unit was under the impression that SFC Card was acting strangely, but medical professionals had determined that SFC Card was a "very low risk" of harm to himself or others, and the actions undertaken by unit personnel were, based on the information available at the time, prudent. When information came to the unit's attention that indicated immediate action needed to be taken, members of the unit reached out to local law enforcement with all the information they had to try to get the entity with actual jurisdiction to handle the problems identified.

**6. Additional Findings.**

a. Additional Finding 1. I am unable to determine, by a preponderance of the evidence, what caused SFC Card to commit the mass shooting and suicide. As such, I have requested assistance from Walter Reed National Military Medical Center. The assistance will help determine what mental condition, disease, or defect caused SFC Card to act as he did. Additionally, an expert may help determine if there is a nexus between SFC Card's paranoia and auditory hallucinations and his hearing aids, the purported mass on his head, or the concussive force of yearly training (annual two-week AT periods) on the grenade range.

b. Additional Finding 2. I find by a preponderance of the evidence that if Sagadahoc County Sheriff's Office (SCSO) had fully executed their health and welfare check on SFC Card in September 2023, then the mass shooting and suicide may have been avoided. Courts have, in the past, refused to find that law enforcement's failure to police would lead to a shooting.[690] Therefore, I cannot apply a traditional proximate cause analysis to determine who bears responsibility for SFC Card's criminal actions.[691] Regardless, I find SCSO had the last, best, chance of impacting SFC Card's actions. SCSO was the law enforcement agency with jurisdiction over SFC Card.

(1) [redacted] reported SFC Card's behavior to Maine law enforcement in May 2023, which was documented by [redacted] of the SCSO in Deputy Report for Incident 23-006566.[692] That report resulted in action by the SCSO to meet with SFC Card's [redacted] to discuss the situation and formulate a plan for how to

[690] https://www.americanbar.org/groups/tort_trial_insurance_practice/publications/the_brief/2019-20/winter/liability-mass-shootings-are-we-a-turning-point/
[691] Proximate cause is defined as "a cause that directly produces an event and without which the event would not have occurred." *See Black's Law Dictionary* 91 (3d ed. 2006).
[692] Exhibit J1.

address the [redacted] concerns about SFC Card. The information delivered to SCSO, among other things, was that SFC Card began hearing voices and exhibiting paranoia in approximately January 2023. Additionally, SFC Card had exhibited what appeared to be deteriorating mental conditions and had recently picked up 10-15 handguns/rifles that had previously been stored at SFC Card's [redacted] house. [redacted] took this information and reached out to [redacted] via voicemai[redacted] called back, he and [redacted] discussed the situation regarding SFC Card at length, and [redacted] concluded the call stating he would immediately reach out to [redacted] to figure out options to get SFC Card help.[693]

(2) Additionally, [redacted] called [redacted], SFC Card's [redacted] and they discussed the situation at length. [redacted] stated he was not aware that SFC Card had retrieved his weapons, but that SFC Card's paranoia/anger started around the same time he got his hearing aids. [redacted] also said that SFC Card had messaged him that day stating he was going to get a lawyer to deal with the people accusing him of being a pedophile. [redacted] followed up by leaving a voicemail for [redacted].

(3) Finally, [redacted] noted that he followed up with the [redacted] on 4 May 2023, and the [redacted] reported that when they visited SFC Card, he answered the door with a gun, talking about people outside casing his house. [redacted] also delivered this information to [redacted] via voicemail, and later that day [redacted] called him back. [redacted] noted their plan was to sit down with SFC Card to figure out what was going on; [redacted] informed [redacted] that SFC Card had answered the door to greet his [redacted] with a gun, and the call ended. However, while [redacted] told [redacted] the USAR would work with SFC Card to get him help, the SCSO had legal jurisdiction over SFC Card and should have continued to determine a reasonable course of action to mitigate the threat during the spring and early summer 2023. And while there is no indication that any of SFC Card's leadership, [redacted], [redacted], discussed the jurisdiction issue with law enforcement, the SCSO should have been aware the USAR did not have legal authority over SFC Card when he was in a non-duty status.

(4) On or about 15 September 2023, approximately four months later, [redacted] received a report from [redacted], one of SFC Card's only friends, that SFC Card had punched him and that SFC Card said he was going to commit a mass shooting. [redacted] then reported SFC Card's July 2023 hospitalization and [redacted] warning of SFC Card's threat to the SCSO. [redacted] was so concerned, he went through official channels [redacted] Ellsworth Police Department. Not only did [redacted] seek guidance from [redacted], an unbiased individual, he explained his

[693] Exhibit J1, B7.

concerns in a letter that was reviewed and validated by the Ellsworth Police Department prior to requesting formal assistance from the SCSO. Based on the report in May, SFC Card's admission to a psychiatric hospital in July, and this new threat reported by [redacted] SCSO may have had enough information to take SFC Card into protective custody and implement the next step in Maine's "Yellow Flag Law." However, I defer to legal experts on Maine law to opine definitively on whether SCSO had probable cause to employ the Maine Yellow Flag Law. However, SCSO failed to meaningfully confront SFC Card about the recent and very detailed information they received from [redacted]. [redacted] in requesting formal assistance from the SCSO. Further [redacted] attributes SFC Card's actions to SCSO failing to conduct a meaningful welfare check.[694]

(5) [redacted], in response to [redacted] report, unsuccessfully attempted to contact SFC Card on 15 September 2023. [redacted] returned on 16 September 2023 at about 0845 hours and discovered SFC Card was home. [redacted] requested backup and 45 minutes later [redacted] of the Kennebec County Sheriff's Office arrived to assist.[695] Both deputies then attempted to contact SFC Card.[696] The deputies could hear SFC Card moving around inside his trailer, but he would not answer the door.[697] The deputies ultimately decided to leave the property "due to being in a very disadvantageous position."[698] Based on the deputies' actions, they were clearly fearful, perceived SFC Card to be a threat, and should have requested additional backup. Had they taken SFC Card into custody that day, they likely would have been able to invoke Maine's "Yellow Flag Law" and apply for a court order to get SFC Card's firearms temporarily taken away. Instead, the SCSO and KCSO officers departed the scene, and after a discussion with [redacted], did not confront SFC Card. They wrote a report saying they were going to, essentially, ignore a letter from a fellow law enforcement officer that delivered information about an eye-witness account of a threat to commit a mass shooting. Further, given SFC Card's adversarial response to New York State Police questions on 16 July 2023, stating, "they're scared I'm going to do something, because I am capable," it is highly likely that if SCSO forced an interaction with a larger police presence in mid-September, SFC Card likely would have responded in a similar confrontational manner, resulting in his arrest.[699]

---

694 Exhibit K39.
695 Exhibit J2 pg. 4.
696 *Id.*
697 *Id.*
698 *Id.*
699 Exhibit T7.

(6) It was unreasonable for [redacted] to believe [redacted] and the USAR exercised dominion and control over SFC Card such that their actions would supplant a need for local law enforcement. It was also unreasonable to believe that SFC Card had been divested of all weapons, regardless of what [redacted] told him. The report made by [redacted] clearly indicated that SFC Card was a danger to others, and that he had, as recently as 48 hours before, expressed to at least one other person that he had his guns and was going to shoot up the drill center at Saco and other places. This information was conveyed by [redacted] to the SCSO via letter, documented in Deputy Report for Incident 23-015694.[700] [redacted] included that [redacted] had been assaulted by SFC Card the night prior and was the one that had warned him SFC Card was going to commit a mass shooting.

(7) Maine law enforcement's failure to take substantive action on [redacted] report was unreasonable. [redacted] attempted to do the right thing. Any reliance on the military to handle this matter was also unreasonable because the Army did not have jurisdiction nor authority over SFC Card in his civilian capacity. [redacted] was directed by the Ellsworth Police Department to keep his professional distance from SFC Card and allow the SCSO to handle interactions with SFC Card.

c. Additional Finding 3. I find, by a preponderance of the evidence, Four Winds released SFC Card under questionable circumstances; however, I defer findings to Walter Reed on whether SFC Card's treatment or discharge from Four Winds were within the standard of care.

(1) There are conflicting reports resulting from the testing and the provider's observations on whether SFC Card required continued care, either at Four Winds or a higher-level facility. I am unable to determine exactly why SFC Card was released on 3 August 2023. SFC Card was command directed to Four Winds; however, Four Winds considered SFC Card's hospitalization as voluntary. While hospitalized and under the influence of medication, SFC Card informed Four Winds he wanted to leave the facility because he believed there was nothing wrong with him. However, the facts indicate that based on observation and testing, Four Winds believed SFC Card should remain hospitalized and scheduled a court date in order to receive a court-ordered hold of SFC Card. SFC Card rescinded his request to leave the facility. Nevertheless, Four Winds released SFC Card anyway, despite noting SFC Card likely needed continued care, including possibly, a higher level of care. It is unclear whether SFC Card was released on 3 August 2023 because his orders were terminating, or if any attempt was made to extend SFC Card's orders for the purposes of treatment, as there was no evidence that

[700] Exhibit J2.

Four Winds queried KACH about extending the orders. It is unclear why SFC Card's orders were only extended for six days; whether the unit issued orders based off Four Winds release date, or whether Four Winds discharged SFC Card based off the date his orders were ending. As discussed above, SFC Card was possibly released without the required discharge instructions.

(2) KACH Behavioral Health (BH) Department bears culpability as well. KACH BH's standard procedures do not include the case management of Reserve Component Soldiers on orders for less than 30 days. Nevertheless, [redacted] became aware of SFC Card's release on 2 August 2023 [redacted][701]

d. Additional Finding 4. I find by a preponderance of the evidence that even if [redacted] had done everything correctly, the USAR would have had limited jurisdiction over SFC Card, and he would have remained under the jurisdiction of the local authorities.

(1) It is clear the actions of the chain of command were lacking in April – June 2023. For the sake of argument, if [redacted] had sent a CCIR for the May 2023 incident, SFC Card likely would not have been placed on AT orders. If SFC Card was not required to conduct an AT in July 2023, he would not have been hospitalized at Four Winds. A Line of Duty Investigation would not have been required. SFC Card could have retired from the USAR based on his twenty-years of service and would have been the responsibility of the local authorities.

(2) If SFC Card had received a Line of Duty determination in July/August 2023 and a Medical Evaluation Board, he may have been extended on Active Duty. Absent indefinite hospitalization, I cannot conclude that he would have responded to treatment. At some point in time, SFC Card would have been released and would have either voluntarily or medically retired. SFC Card could have also refused disability processing in lieu of his twenty-year retirement. In this scenario, SFC Card would still have been the responsibility of the local authorities.

(3) If [redacted] had submitted a CCIR or called the Insider Threat Hub in September 2023, the USAR still had no enforcement mechanism and limited jurisdiction over SFC Card. [redacted] could have ordered SFC Card to attend behavioral health treatment during Battle Assembly; however, [redacted] options were limited during periods where SFC Card was voluntarily absent from BA, such as in September and

---

[701] Exhibit E1.

October 2023. Again, SFC Card would have been the responsibility of the local authorities.

e. Additional Finding 5. I find by a preponderance of the evidence that Army Reserve Medical Management Command (ARMMC) staff was derelict in their duties. ARMMC created the initial profile and extension of that profile for SFC Card. ARMMC [redacted] accessed the discharge summary portion of SFC Card's record in the medical system on 22 and 25 August, 22 and 26 September, and 17 and 19 October 2023. Given [redacted]

f. Additional Finding 6. I find by a preponderance of the evidence that the Psychological Health Program's (PHP) standard operating procedures were inadequate.

(1) SFC Card's case should not have been closed due to unresponsiveness. We recommend that their procedures be modified so that PHP is required to report to the command any time they are unable to contact the Soldier before terminating behavioral health facilitation. We further recommend that before services are terminated, the command acknowledges, in writing, understanding of their responsibilities and the process.

(2) [redacted] had the opportunity to review SFC Card's discharge summary for approximately seven days (21 – 28 August 2023) from the day it was uploaded to JLV until the day she closed the case in MEDCHART. However, she did not access JLV after 11 August. She spoke to SFC Card on 11 August. He reported some frustration based on limitations with his weapons, but no anger. She attempted contact again on 28 August with no response. Based on the PHP SOP, by not having any response from SFC Card, she closed the case without notification to SFC Card's command leadership. Our finding is the PHP SOP does not sufficiently support effective communication nor provide adequate emphasis to a Soldier's command leadership.

**7. Recommendations.**

a. Strategic/Long Term.

(1) I recommend you forward this investigation to the Director, Defense Health Agency:[702]

(a) Pending the expert opinion of Walter Reed on whether Four Winds met the standard of care, I recommend DHA consider removing Four Winds as an authorized treatment facility, in accordance with Title 32 to the Code of Federal Regulations Part 199 (32 CFR 199).[703] If the Director, DHA, determines a provider committed fraud or abuse as defined in this part, the provider shall be excluded or suspended from CHAMPUS/TRICARE for a period of time determined by the Director. Abuse can include care of an inferior quality. For example, consistently furnishing medical or mental health services that do not meet accepted standards of care. In this case, Four Winds appears to have conducted testing of SFC Card beyond the typical standard of care. However, if Walter Reed determines Four Winds treatment did not meet accepted standards of care based on the manner SFC Card was discharged, then there would be a basis for the Director of DHA to remove them as an authorized facility. It is unclear why Four Winds released SFC Card on 3 August 2023. SFC Card requested discharge on or about 27 July 2023. Four Winds scheduled a court hearing to keep him hospitalized which was scheduled for 2 August 2023. SFC Card rescinded his request for release. Nevertheless, Four Winds released SFC Card the day after the cancelled court hearing. Overall, the manner in which SFC Card was released causes significant concern regarding Four Winds adhering to the standard of care.

(b) I recommend DHA consider terminating the contract of Spectrum Services Group, Inc. for cause. [redacted]. We find that [redacted] The [redacted] stopped the critical information flow to other KACH team members and all levels of SFC Card's chain of command. The critical information included SFC Card's resistance to psychoeducation. SFC Card's [redacted] told Four Winds when they called her during her

---

[702] The Defense Health Agency manages authority, direction, and control of military hospitals and clinics worldwide. DHA also manages the DoD health plan – TRICARE. The Director organizes, directs, and manages the DHA and all assigned resources, including the administration of all DoD medical programs. DoDD 5136.13, Defense Health Agency, 30 Sept 2013.

[703] The Code of Federal Regulations (CFR) is a codification of the general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government, including policies and procedures published by the Defense Health Agency (DHA) on the delivery of health care. Title 32 is for National Defense. Part 199 covers the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS).

[redacted] stay, that "he could not return to [redacted] She also stated that the majority of his firearms were stored in [redacted] gun safe. This statement would point to the fact that some of the guns were still in his possession or at an unknown location. SFC Card was discharged without a scheduled follow up plan for behavioral health or medication management appointments. [redacted] noted that she spoke to SFC Card on 11 August 2023. Her note indicated progression of aggressive tendencies. He reported no follow up care at this time. This information is not noted to be forwarded to SFC Card's chain of command. There was a ten-day delay from Four Winds faxing the document on 11 August 2023 until it was entered into the military medical record system on 21 August 2023. On 30 January 2023, I requested assistance from the [redacted] Keller Army Health Hospital, [redacted] Specifically, I requested all Quality Assurance inquiries conducted by the hospital or by the Defense Health Agency regarding its care of SFC Card. Additionally, I asked for the Quality Assurance Surveillance Plan (QASP) for [redacted] and Spectrum Services Group, Inc. On 2 February 2024, [redacted] provided a QASP for "the month SFC Card was treated at [redacted] facility."[704] [redacted][705] However, the note from 11 August 2023 combined with the information included in the discharge summary dated 11 August 2023 is a critical oversite in coordination of care and monitoring. [redacted] did not agree to or participate in the interview process. I find that [redacted].[706]

(c) I recommend requesting the Director, DHA, provide a copy of this investigation to the Reserve Affairs Office at DHA for lessons learned and how to strengthen case management of USAR Soldiers.

---

[704] Exhibit K37.

[705] Additionally, although not rising to the level of obstruction, the [redacted], KACH, surreptitiously requested an attorney from DHA travel to West Point for our interviews with KACH staff. To avoid a direct confrontation in front of witnesses, I allowed the civilian DHA counsel to sit in on one interview. However, due to what I perceived to be a chilling effect on the witness's forthrightness, I instructed the civilian counsel to leave the room.

[706] The DHA Medical Q-coded Services Task Order Performance Work Statement for Registered Nurse-Behavioral Health Case management dated 07 JUN 2022 contains the following requirements: Provide nursing expertise about the CM process, including assessment, planning, implementation, coordination, and monitoring. Identify opportunities for CM and identify and integrate local CM processes. Maintain liaison with appropriate community agencies and organizations. Establish mechanisms to ensure proper implementation of patient treatment plan and follow-up post discharge in ambulatory and community health care settings. Provide appropriate health care instruction to patient and/or caregivers based on identified learning needs.

(2) I recommend that you direct USARC Force Management to lead a working group to assess whether the current USAR Warrior Transition Support Program (WTSP) adequately supports the Army Reserve. The WTSP currently provides continued collaboration of efforts with the Army Recovery Care Program (ARCP), MEDCOM, Mobilization Force Generation Installations (MFGI) and USARC that focuses involvement throughout the process of addressing and resolving issues encountered by USAR Soldiers as they navigate through their comprehensive recovery plans. The WTSP currently has Soldier Readiness Unit (SRU) coordinators and MFGI coordinators that are USAR Soldiers on ADOS orders. The working group should determine if the WTSP functions primarily in an administrative nature and if so, should it transition to an operational role, directly supporting units and their Soldiers during a mental health crisis. I recommend the working group considers the addition of 28 personnel (14x O3/O4 67D (Psychologist) or 73A (Licensed Clinical Social Worker) and 14x E7/E8 68X Behavioral Health Specialists) to the program. The shift to an operational focus by the WTSP and the addition of clinical providers allows for enhanced coordination between the treatment locations and better support to USAR Soldiers and their commands.

(3) I recommend you direct USARC Force Management to conduct an analysis of the impact of establishing a USAR Behavioral Health Liaison, geographically/regionally based to manage multiple MTFs and SRUs. Liaisons may remain members of their parent unit while performing collateral duties for USAR commanders, and supporting Soldiers dealing with mental health issues or may be a full-time AGR/ADOS.

(4) I recommend you direct the USARC Deputy Chief of Staff for Operations (G-3/5/7) to lead a working group consisting of the G-1, G-33, and Surgeon to assess whether the current USARC Serious Incident Reports (SIR) and Commanders Critical Information Requirements (CCIR) listing (OPORD 23-032, Annex B, [Feb 2024]) provides sufficient consideration for mental health/behavioral health issues, which could lead to acts of self-harm or violence against others. Of the twenty-three (23) SIRs and thirty-one (31) CCIRs, no single reportable incident allows commanders/leaders to inform senior USAR leadership of a mental health issue for a TPU Soldier in a non-duty status, not requiring hospitalization. Given the prevalence of mental health issues throughout the military and the likelihood these issues will not abate over time, a specific incident tailored to a mental health criteria or event could provide early warning of possible mental health-related threats. In SFC Card's case, a CCIR for the 3 May 2023 event in which [redacted] reported to law enforcement [redacted] delusions and threats of violence may have provided more visibility and opportunity for the chain of command to direct an appropriate response sooner.

b. Operational/Short Term.

(1) The USAR averaged 44 suicides over the past four calendar years, which necessitates a better response to mental health.[707] Therefore, I recommend you direct USARC Force Management to lead a working group to assess courses of action for establishing Behavioral Health sections (Behavioral Health Officer-67D, Army Social Worker-73A and BH Specialist- 68X) down to the Brigade level across all USARC Major Subordinate Commands (MSCs). Currently, the USARC only authorizes 67D/68X for select operating force MSCs (MIRC, 200th MP Command, Engineers, Chemical etc.) at Brigade and higher and Army Reserve Medical Command (ARMEDCOM) units at Detachments and higher. I recommend behavioral health sections be considered at generating force MSCs as well. Specific roles and responsibilities would be defined by the working group analysis but should include management of all mental health related CCIRs in their commands. This provides oversite and tracking, inter and intra-unit action lanes and situational awareness capabilities in medical and mental health related CCIRs. In concert with a recommendation to reform the USAR Warrior Transition Support Program, a more comprehensive system will be in place to support Soldiers with behavioral health conditions and provide better tools and guidance for their respective chains of command.

(2) I recommend you direct a working group (G-3/7, ARRTC) be created to assess whether the current USAR CCFSC and BBPCC attendance policies place sufficient emphasis on completion and define consequences (possible removal from command, etc.) for failure to complete. Further, recommend the working group assess whether any current iteration of the pre-command training (USAR and Active Duty provide sufficient blocks of instruction on behavioral health and mental health, as well as associated issues, including HIPAA responsibilities, commanders' legal authorities for TPU Soldiers at civilian treatment centers, commanders' legal authorities during Command Directed Behavioral Health Evaluations and during a mental health crisis in a non-duty status.

c. Tactical/Near-term.

(1) I recommend you take appropriate administrative action [redacted]

---

[707] In Calendar Year (CY) 20 – 42 suicides, CY 21 – 46, CY 22 – 38, CY 23 – 48, CY 24 YTD – 9.

[708] After in-depth consultation with my legal counsel, prior to conducting any witness interviews, I determined I would not provide rights warnings under Article 31, Uniform Code of Military Justice, to any witness. At the time, I did not suspect [redacted] any [redacted] witness of committing any misconduct. Even after my initial interviews, I did not suspect misconduct. Upon completion of my investigation, reviewing a totality of the circumstances, [redacted]

(b) (6), (b) (7)(C) [redacted]

(a) (b) (6), (b) (7)(C) [redacted]

(b (b) (6), (b) (7)(C) [redacted]

(c) (b) (6), (b) (7)(C) [redacted]

---

(b) (6), (b) (7)(C) [redacted]

709 *See Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, ¶ 18.c.(3).
710 Exhibit B3.

(b) (6), (b) (7)(C) [redacted]

(d) (b) (6), (b) (7)(C) [redacted]

(e) (b) (6), (b) (7)(C) [redacted]

(f) (b) (6), (b) (7)(C) [redacted]

(g) (b) (6), (b) (7)(C) [redacted]

(h) (b) (6), (b) (7)(C) [redacted]

(i) (b) (6), (b) (7)(C) [redacted]

---

712 *Id.*
713 Exhibits B36, J2.
714 Exhibit E1, p. 32.

(b) (6), (b) (7)(C) [redacted]

(j) (b) (6), (b) (7)(C) [redacted]

(k) (b) (6), (b) (7)(C) [redacted]

---

715 Exhibit B36.
716 Exhibit K42.
717 (b) (6), (b) (7)(C) [redacted]

(b) (6), (b) (7)(C) [redacted]

(l) (b) (6), (b) (7)(C) [redacted]

(m) (b) (6), (b) (7)(C) [redacted]

(n) (b) (6), (b) (7)(C) [redacted]

(2) I recommend you direct (b) (6), (b) (7)(C) [redacted]

(3) I recommend you take appropriate administrative action (b) (6), (b) (7)(C) [redacted]

---

718 (b) (6), (b) (7)(C) [redacted]

(a) (b) (6), (b) (7)(C) [redacted]

(b) (b) (6), (b) (7)(C) [redacted]

(c) (b) (6), (b) (7)(C) [redacted]

(d) (b) (6), (b) (7)(C) [redacted]

(4) I recommend you take appropriate administrative action (b) (6), (b) (7)(C) [redacted]

(a) (b) (6), (b) (7)(C) [redacted]

---

719 Exhibits B8, B22.

[redacted].

(b) [redacted].

(c) [redacted]

(5) I recommend you thoroughly review the actions of [redacted] the chain of command, specifically, [redacted], the 104th Training Division Commander, BG Kristina Green, and the 108th Training Command Commander, MG William Dyer. I recommend you consider whether their actions constituted the appropriate level of oversight of SFC Card's hospitalization and release in July/August 2023, with the understanding the [redacted] level did not report the May 2023 incident, update the July 2023 CCIR upon SFC Card's release in August, or report the September 2023 incident. When I asked [redacted] if she or her command team sought information from Four Winds on SFC Card's discharge instruction, prognosis, or need for follow on care, [redacted] reported to me that they believed they were not privileged to this medical information due to HIPPA (sic) and SFC Card not signing a release of of (sic) information for them." There are no indications the chain of command sought guidance from their serving Legal Advisor or Command Surgeons. Nevertheless, [redacted] and MG Dyer are attorneys.[721] At the very least, some members of the chain of command should have known of the command exception to HIPAA and the command's authority to request PHI from KACH as part of the Command Directed

[720] Exhibit B36.
[721] [redacted] MG Dyer attend Samford University, Cumberland School of Law and has been a Judge Advocate in the United States Army Reserve since 1992. Under [redacted] command, all four of his battalion commanders have attended the PCC.

Behavioral Health Evaluation. If you determine the command's actions were not appropriate given the circumstances, then consider taking administrative action.[722]

(6) I recommend you direct mandatory refresher training for all Command Teams and Legal Advisors for the entire 108th Training Command on HIPAA. Commanders at echelon and their Judge Advocate Legal Advisors may have a misunderstanding of information they are authorized to receive under the command exception to HIPAA. Commanders should receive more training that what is provided at the BBPCC.

(7) I recommend you direct the USARC Surgeon to update the current Psychological Health Program (PHP) Standard Operating Procedures to close out the Soldier's file (case) by providing a final out brief to unit commanders at the lowest level and ensuring battalion or higher commanders receive a copy of the out brief. This would apply to all PHP cases (Soldier discharge, ETS, transfer to IRR, IMA, and/or veteran status). In SFC Card's case, the case was closed due to SFC Card's failure to make contact with the PHP.

(8) I recommend you direct the Army Reserve Medical Management Command (ARMMC) update its current Standard Operating Procedures to close out the Soldier file (case) by providing a final out brief to unit commanders at the lowest level and ensuring battalion or higher commanders receive a copy of the out brief. This would apply to all ARMMC cases (Soldier discharge, ETS, transfer to IRR, IMA, and/or veteran status)

(10) I recommend USARC policy for the submission of CCIRs/SIRs be updated such that if a CCIR/SIR is submitted for a behavioral health issue it should trigger an immediate Command Directed Behavioral Health Evaluation (Unless ETP is written and approved) and a Line of Duty Evaluation (as needed) is initiated. And the MSC surgeon and lowest unit surgeon or behavioral health officer at echelon should follow the CCIR through close out.

**8. Additional considerations.** Based on time constraints, willingness to participate in the investigation, or other factors, the following are outstanding/unresolved issues:

a. Understanding [redacted] has no regulatory or contractual obligation to participate in this investigation, I requested the Contracting Officer who manages the contract for

---

722 I do not conclude the chain of command's actions constitute dereliction of duty; therefore, I defer findings on whether their actions qualify as adverse information as defined in AR 15-6 Section II Terms. As such, I am not referring this investigation to [redacted], BG Green, or MG Dyer for a response for the purposes of the Army Adverse Information Program referenced in AR 15-6 or Army Directive 2023-03. If you, as the Approving Authority determines that [redacted], BG Green, and/or MG Dyer were derelict in their duties, I recommend notifying them of their due process rights outlined in AR 15-6.

DHA to request a contract modification with Spectrum Services Group, Inc. to require [redacted] to participate in our investigation. The Contracting Officer declined to make the requested modification.

b. On multiple occasions, I requested but never received the Maine State Police reports, which included interviews with other witnesses we needed to interview and other forensic information about the last days of SFC Card's life.

c. Interviews with witnesses:

(1) Individuals at Maine Recycling Corporation. Of interest would have been SFC Card's harassment claims of Maine Recycling employees calling him a pedophile or that he had a small penis. In general, I would have asked the Maine Recycling [redacted] whether SFC Card potentially experienced any significant harassment that would have exacerbated his mental health issues.

(2) First Fleet Trucking, Inc. Of interest would have been his work schedule during September and October. SFC Card worked at First Fleet, Inc. [redacted] I would have asked management about any potential work-related issues SFC Card may have experienced that would have exacerbated his mental health issues.

(3) [redacted]

(4) [redacted]

(5) Four Winds Hospital. I attempted to arrange interviews with [redacted] employees at Four Winds Hospital, Katonah, NY. [redacted], [redacted] at Four Winds responded to our request and explained that absent a "proper waiver from whoever owns Mr. Card's

rights (presumably, an estate) or a court order, [Four Winds] are by law not permitted to disclose any more information than we already have, which is the discharge summary that Four Winds provided to the referent, Keller Army Community Hospital."[723] These medical professionals are most familiarized with physical and mental care SFC Card received and could provide a situational understanding with information surrounding these incidents. I would have also asked Four Winds why they released SFC Card on 3 August 2023. SFC Card requested discharge. Four Winds scheduled a court hearing to keep him hospitalized which was scheduled for 2 August 2023. SFC Card rescinded his request for release. Nevertheless, Four Winds released SFC Card the day after the cancelled court hearing.

d. On 12 January 2024, I requested the expert assistance of [redacted] Forensic Psychology at the Walter Reed National Military Medical Center.

(1) I provided him with our preliminary exhibits on 19 January 2024. Upon completion of our investigation, I submitted all exhibits to [redacted] for his expert opinion on a Root Cause Analysis and Forensic Autopsy.

(2) In addition, I made a supplemental request to [redacted] for his expert opinion for SFC Card's Line of Duty determination and to determine if SFC Card's condition was exacerbated by his military service in July 2023.

(3) I defer findings, pending the results of Walter Reed's evaluation, on whether Four Winds met the standard of care, or whether mental health treatment could have prevented the mass shooting and/or suicide. Based on the testing administered by Four Winds, I believe SFC Card should have remained hospitalized in July/August 2023 rather than being released after a brief 19 days; however, I defer to the expert medical opinion of providers at Walter Reed. Although he was unresponsive to treatment (therapy and medication) during his hospitalization, I cannot predict how SFC Card would have responded to continued treatment. Additionally, I acknowledge that anything short of indefinite hospitalization would have still exposed the public to SFC Card at some point in time. Again, I defer to the experts at Walter Reed to provide an opinion on whether SFC Card's mass shooting and suicide could have been prevented.

f. Boston University. On 6 March 2024, the Card Family released the results of Boston University's study of SFC Card's brain.[724] The Boston University Chronic Traumatic Encephalopathy (CTE) Center determined SFC Card's brain showed degeneration in the nerve fibers that allow for communication between different areas of

---

[723] Exhibits E, I.
[724] Exhibit T5.

the brain, inflammation, and small blood vessel injury. Boston University could not conclude whether SFC Card's exposure to concussive forces as a grenade range instructor caused his injury. SFC Card's records do not indicate any significant brain trauma occurred while in a duty status, indicating SFC Card's injury occurred during a non-duty status, and not related to his military service. I defer to the experts at Walter Reed on whether they can draw a connection to SFC Card's brain study and his potential exposure to concussive forces.

8. The point of contact for this memorandum is the undersigned at [redacted]

[redacted]
Investigating Officer