Exhibit K to the United States' Motion to Dismiss

*Seal v. United States*, Case No. 2:25-cv-442 (D. Me.)

# FINAL REPORT
# OF THE
# INDEPENDENT COMMISSION
# TO INVESTIGATE THE FACTS OF
# THE TRAGEDY IN LEWISTON



Presented to

Governor Janet T. Mills

Attorney General Aaron M. Frey

State of Maine

August 20, 2024

"When there is someone who is a danger to themselves, or to the community, do the uncomfortable task and protect us."

Danielle Jasper, survivor and victim

Cover photo courtesy of the City of Lewiston: https://www.lewistonmaine.gov/

# Table of Contents

Letter from the Chair.................................................................................i

Content Advisory......................................................................................ii

Dedication ..............................................................................................iii

In Memoriam......................................................................................... iv

I.   INTRODUCTION
         A. Establishment and Work of the Commission.....................1
         B. Membership.................................................................1
         C. Commission's Charge....................................................1

II.  EXECUTIVE SUMMARY.............................................................2

III. GENERAL PROCESS...................................................................4
         A. Organization and Approach............................................4
         B. Public Meetings.............................................................6
         C. Private Meetings............................................................7
         D. Website and Email Notification System.............................7

IV. DETERMINATION OF CONTENT OF INTERIM REPORT...................8

V.  FACTS AND FINDINGS...............................................................8
         A. Chronological History Prior to October 25, 2023...............8
              1. May....................................................................8
              2. June..................................................................10
              3. July and August ...............................................11
              4. September.........................................................19
              5. October1-25......................................................24
         B. Robert Card II's Actions on October 25, 2023, and the
            Immediate Aftermath ...............................................25
         C. The Emergency Response-October 25-27, 2023................27
         D. Victim Services Response-October 25-Present...................38

VI. WEAPONS RESTRICTION LAWS
         A. NY SAFE Act................................................................41
         B. NY Extreme Risk Protection Act (Red Flag Law) ................42
         C. Maine's  Protection From Substantial Threats Act (Yellow
            Flag Law)..................................................................44

**VII.    TIMELINE**................................................................................................46

**VIII.   DISCUSSION AND OBSERVATIONS**.........................................................58

     A. Law Enforcement Response Before October 25, 2023...................58

     B. Army Reserve Response Before October 25, 2023.........................59

     C. Medical Response Before October 25, 2023...................................61

     D. Law Enforcement Response October 25, 2023 and Beyond...........61

**IX.    ACKNOWLEDGMENTS AND THANKS**...........................................................63

**X.    INTERNET CITATION STATEMENT** ..............................................................66

**XI.    APPENDICES**..............................................................................................67

     A.  Executive Order No. 4 FY23/24, Order Establishing the Commission to Investigate the Facts of the Tragedy in Lewiston with Member Letter  (November 2023)

     B. Resolves 2023, ch. 129.  Subpoena Law.  (February 2024)

     C. 34-B MRS  §3861-3862, Maine's Involuntary Commitment Law (blue paper)

     D. 4-B MRS § 3682-A - Maine's Yellow Flag Law in effect in 2023

     E. Chapter 675, PL 2023 - New Changes to Yellow Flag Law effective August 9, 2024

     F. 15 MRS §393- Maine's Possession of Firearms by Prohibited Persons Law

     G. United States Department of Justice Model Red Flag Law

     H. NY CPLP 6340- New York SAFE ACT (Red Flag Law) and Model Policy

     I.  NY MHL 9.40 et seq.-New York Involuntary Commitment Law

     J.  25 MRS §2804-C Standard Mandated Policies on Training- Maine Criminal Justice Academy - Yellow Flag Law Section 2-E

     K.  Maine Yellow Flag Law - Written Training Materials and Forms

     L.   Army Reserve Components law- 10 USC § 12301-Reserve Components and 10 USC § 1090-b - Command Directed Evaluation

     M.  Army Regulation AR 190 - Policy-Storage of Guns

     N.  DOD Instruction 6490.04 - Mental Health Evaluations of Members of the Military Services (Command Directed Evaluation)

     O. Command Directed Behavioral Health Evaluation Process Chart-US Army

     P. Military Command Exception to the Health Insurance Portability and Accountability Act (HIPAA ) Memo

     Q.  18 U.S.C. 922(9) -Federal Law-Firearms Prohibition

R.  27 C.F.R.§478.1 and 27 C.F.R. § 478.11 Meaning of Terms- Definitions and ATF Involuntary Commitment Summary

S.  Subpoenas Issued Report

T.  Compilation of Reports and Studies Reviewed

U.  Blast Over Pressure Safety Act, H.R. 8025, 118th Congress, Second Session, 2024

August 20, 2024

The Honorable Janet T. Mills
Governor of Maine
State House Station 1
Augusta, ME  04333

Dear Governor Mills,

On behalf of the Independent Commission to Investigate the Facts of the Tragedy in Lewiston (Independent Commission), I hereby submit to you a final public report of its findings pursuant to your Executive Order dated November 9, 2023.

We are grateful to you, the Attorney General, and the people of Maine for entrusting us with investigating the complete facts and circumstances surrounding the unspeakable tragedy in Lewiston. And we thank the Maine State Legislature for granting us subpoena power so that we could complete our work unimpeded.

Members of the Independent Commission took  their responsibility to the public interest seriously. Individually and collectively, we conducted work thoughtfully and thoroughly with an open mind and a hardened determination to find the truth. We asked questions. We followed leads. We unearthed information.  I extend my gratitude to each member. While none of us wished to be in the position of serving on a commission investigating a mass shooting, I could not be prouder of the individual commissioners you chose to complete this solemn task and the final work product we share with you today.

I also wish to thank and acknowledge the following Commission staff members for their hard work and dedication to our state: Executive Director Anne Jordan, investigators Brian MacMaster and Jim Osterrieder, and communications consultant Kevin Kelley.

Every Mainer was touched by what occurred on October 25, 2023. The acts of violence ended and upended our lives, forever changed our communities, and damaged a sense of safety and tranquility that defines what it means to live in Maine. Our investigation and the information and findings set out in this final report are meant to bring truth to the victims' families, to those who were injured, and to the people of our state and nation. We hope this truth will help the healing process while simultaneously enabling the public and policymakers to learn from mistakes.

Again, thank you for the honor of serving the people of Maine.
Sincerely,

Honorable Daniel E. Wathen Chairman

CC: The Honorable Aaron M. Frey, Attorney General of Maine

i.

## Content Advisory

The Commission and the staff took great care to be deliberate about the words and phrases used in this report. The purpose of this report is to convey the facts as found by the Commission and to expose the truth. Nevertheless, the descriptions may be upsetting for some readers due to the explanations of this incident, the age or status of the victims and survivors, and the circumstances they endured.

The Commission carefully considered the FBI's recent recommendations not to name the shooter to avoid glorifying his actions and out of respect for the victims and survivors.[1] However, after careful deliberation and in light of the widespread and continuing use of the shooter's name by the media, the public, and the witnesses who testified at public hearings, the Commission decided to refer to him by name. This decision was not made to diminish the nature of his acts; rather, it was made to assist the reader in comprehending the report's content and the need to report the facts.

For resources, including free and confidential emotional support, please visit https://988lifeline.org or call or text 988 to reach the Suicide & Crisis Lifeline. If you are a veteran, press 1 for veterans' services. This service is available 24 hours a day, 365 days a year. Services are also available for teens and young adults by texting (207) 515-8398. For help managing stress and for resiliency resources for anyone in Maine experiencing stress reactions, call (207) 221-8198. This service is available from 8 a.m. to 8 p.m., seven days a week. For deaf and hard of hearing individuals, please contact the Maine Association for the Deaf at https://deafmaine.org/. Finally, the Maine Resiliency Center, located at 184 Main Street in Lewiston, offers trauma-informed resources, counseling, and support for anyone affected by the October 25, 2023, shootings, including family, friends, and loved ones of individuals killed on October 25th, victims and survivors, those present at the scenes, first responders, and medical personnel, and any member of the community. The Center may be reached at (207) 515-3930, by email at info@maineresileincycenter.org, or by visiting its website at https://www.maineresiliencycenter.org/.

---

[1] The Don't Name Them Campaign, endorsed and supported by the F.B.I., encourages media, law enforcement, and public information officers to shift their focus from the perpetrators of active shooter incidents towards the victims, survivors, and heroes who stopped them as well as the communities that come together to help in the healing process. dontnamethem.org. The Commission lauds these goals but reminds the readers that the charge contained in the Governor's Executive Order requires it to investigate the facts and response of law enforcement and the Army before and after the shooting. It must directly name all involved to carry out its charge.

## Dedication

This report is dedicated to the memory of the 18 persons killed on October 25, 2023, at Just-In-Time Recreation and Schemengees Bar and Grille in Lewiston, Maine.

The report is also dedicated to the victims and survivors—those who were physically and/ or emotionally injured, those who feared for their lives and the lives of their loved ones and friends, and those who risked their own safety and lives to protect others.  They offered aid and comfort, called for help, transported injured persons, and assisted first responders during the dreadful aftermath.   To the hundreds of survivors in this community, we acknowledge the harm that was inflicted and that your grief and fear linger today. To the hundreds of law enforcement and emergency medical responders who  immediately responded to the scenes and rendered aid and protection, we thank you.

We honor all of you by remembering your loved ones and relating your stories to the rest of the country.  We hope  our review of the events of the days and months leading up to and after October 25, 2023, provides some answers to your questions and offers lessons learned that may help other survivors, victims, and communities in the future. Sadly, despite intensive efforts by law enforcement and the Commission, some questions may never be answered. The limitations of the human condition and the  lack of evidence prevented the Commission from definitively answering all your questions.


The State of Maine and the nation  mourned with the Lewiston community on that tragic day.  We continue to do so.   While we remain heartbroken by your loss, we are driven by the need to provide an authoritative accounting of the days and months leading up to that day, the response that transpired on October 25th, and the events and actions that followed.

iii.

## In Loving Memory:

| | | |
|---|---|---|
| Peyton Brewer-Ross | Robert Violette | Lucille Violette |
| Thomas Ryan Conrad | Arthur Strout | Ronald Morin |
| Joshua Seal | Bryan MacFarlane | Joseph Walker |
| Aaron Young | Maxx Hathaway | Stephen Vozzella |
| William Young | Michael Deslauriers | Jason Walker |
| Tricia Asselin | William "Billy' Brackett | Keith Macneir |



Photo of Just-In-Time Recreation by Kathleen Walker, survivor and widow of Jason Walker.

# I.    INTRODUCTION

## A.  Membership

On November 9, 2023, by Executive Order No. 4 FY23/24, Governor Janet T. Mills established the Independent Commission to Investigate the Facts of the Tragedy in Lewiston.[2]  Governor Mills named the following individuals, who served without compensation, to the Commission:

1.  The Honorable Daniel E. Wathen, Chair.  Chair Wathen is a retired Chief Justice of the Maine Supreme Judicial Court.

2.  Dr. Debra Baeder.  Dr. Baeder is a forensic psychologist who was the Chief Forensic Psychologist for the State Forensic Service in Maine and the Director of Clinical Services for the Office of Behavioral Health.

3.  George T. (Toby) Dilworth, Esq.  Attorney Dilworth is a Portland attorney and a former federal prosecutor.

4.  The Honorable Ellen A. Gorman.  Justice Gorman is a retired Associate Justice of the Maine Supreme Judicial Court.

5.  Dr. Anthony Ng.  Dr. Ng is a practicing psychiatrist in Bangor and provided services in the aftermath of the Newtown, Connecticut, school shooting and consulted on other mass shootings.

6.  The Honorable Geoffrey Rushlau.  Judge Rushlau is a retired District Court judge and the former District Attorney for Lincoln, Knox, Waldo, and Sagadahoc counties.

7.  The Honorable Paula D. Silsby.  Attorney Silsby is of counsel to a Portland law firm and served as the U.S. Attorney for the District of Maine for nine years.

## B. Commission's Charge

The purpose of the Commission was to: "(d)etermine the facts surrounding the tragedy in Lewiston on October 25th [2023], including relevant facts and circumstances leading up to

---

[2] See Appendix A for a copy of the Governor's Executive Order .

and the police response to it."  The Executive Order further stated that the Independent Commission "should determine the full scope of its work, and should ask any question necessary of any person that is relevant to the charge of gathering the facts regarding Robert Card's mental health history, contact with State, Federal or military authorities, access to firearms, the initial law enforcement response to the Lewiston Shootings and the manhunt that ensued, and any other matters the Independent Commission determines are relevant to its purpose."

In a letter to the Commission members, Governor Mills and Attorney General Aaron M. Frey stressed "*all that we ask is that you follow the facts, wherever they may lead, and that you do so in an independent and objective manner, biased by no one and guided only by the pursuit of truth.*"[3]

The Executive Order provided that the Chair would preside at, set the agenda for, and schedule Commission meetings, seek funding from the Attorney General as determined necessary to hire sufficient staff or consultants on a contract basis to fulfill its mission and, to the extent practical without hindrance and where possible, conduct its work in a manner open and accessible to the public.  The records, proceedings, and deliberations of the Commission were specifically exempted from the provisions of Maine's Freedom of Access Act, 1 M.R.S. c. 13.

It is important to acknowledge that the Commission was not asked to make policy recommendations regarding access to firearms, suggest amendments to Maine's statutes, or propose operational changes for government agencies.  Those responsibilities properly rest with elected and appointed officials.  The Commission's responsibility was to find the facts so that the public, law enforcement, military leaders, and elected and appointed officials can make informed decisions and reduce the risk of more such tragedies.

## II.    Executive Summary

At 6:54 p.m. on October 25, 2023, 40-year-old Army Reservist Robert Card II (Card) entered the Just-In-Time Recreation Facility in Lewiston, Maine, armed with a .308 Ruger SFAR[4] rifle with a scope and laser.  Over 60 patrons and employees, including 20 children, were present. In 45 seconds, Card fired 18 rounds, killing eight people and wounding three others. Additional people suffered injuries while trying to hide or escape.  Card then drove about four

---

[3] See Appendix A for the joint letter from the Governor and the Attorney General to the members of the Commission.

[4] Small frame autoloading rifle.  Card purchased this firearm legally from the Fine Line Gun Shop in Poland, Maine, on July 6, 2023, nine days before his hospitalization in New York.

miles to Schemengees Bar and Grille.  He left his car running outside the main entrance and entered the building at 7:07 p.m.  In 78 seconds, he fired 36 rounds, killing ten more people and wounding ten others.  Additional individuals suffered other injuries during the chaos.  In total, Card killed 18 people and wounded 13 in less than two minutes inside those businesses.

Card is solely responsible for his own conduct. He caused the deaths and injuries inflicted that night.  Although he might still have committed a mass shooting even if someone had managed to remove Card's firearms before October 25, 2023, there were several opportunities that,  if taken, might have changed the course of events.

The Commission affirms its earlier unanimous finding that in September 2023, the Sagadahoc County Sheriff's Office (SCSO) had sufficient probable cause to take Card into protective custody under Maine's yellow flag law[5] and to initiate a petition to confiscate any firearms he possessed or over which he had control.

Several law enforcement officials testified that the yellow flag law is cumbersome, inefficient, and unduly restrictive regarding who can initiate a proceeding to limit  a person's access to firearms. Further, the SCSO is justified in pointing out that the Army Reserve (AR) did not share all the relevant information it had about Card's behavior.  Nevertheless, under the circumstances existing and known to the SCSO in September of 2023, the yellow flag law authorized the SCSO to start the process of obtaining a court order to remove Card's firearms.

The Commission further finds that the leaders of Card's (AR) Unit failed to undertake necessary steps to reduce the threat he posed to the public.  His commanding officers were well aware of his auditory hallucinations, increasingly aggressive behavior, collection of guns, and ominous comments about his intentions.  Despite their knowledge, they ignored the strong recommendations of Card's Army mental health providers to stay engaged with his care and "mak[e] sure that steps are taken to remove weapons" from his home.  They neglected to share with the SCSO all the information relating to Card's threatening behavior, and actually discounted some of the evidence about the threat posed by Card.  Had they presented a full and complete accounting of the facts, the SCSO might have acted more assertively in September.  While the AR leaders correctly point out that their authority over a reservist like Card is not as broad as the authority the military has  over their active-duty

---

[5] 34-B M.R.S. 3862-B (2024) authorizes a law enforcement officer to seek a court order that prohibits an individual from having or purchasing dangerous weapons, including firearms. The appropriate term for the order is "threat-based restriction."  However, for ease of reading and understanding, this report refers to it as the "yellow flag" law.  The Legislature has since amended the law in place in October 2023.  *See* LD 2224, enacted into law as P.L. 2023, ch. 675 (signed by the Governor on April 26, 2024), Appendix D. The changes have not altered the Commission's finding that there was probable cause to take Card into protective custody and to initiate a yellow flag petition in September  2023.

service members, they failed to take advantage of the available opportunities to exercise their authority over him.

Finally, we find that the challenges faced by law enforcement in responding to the shootings were unprecedented in Maine: two active shooting sites with dozens killed and injured, multiple reports of other active shooting sites, gathering and preserving evidence for a possible criminal prosecution, and a simultaneous state-wide manhunt. Many law enforcement officers demonstrated bravery and professionalism in the face of danger. While the first hours were, at times, "utter chaos" as hundreds of law enforcement officers poured into Lewiston and were dispatched or self-dispatched to numerous scenes, the actions of law enforcement ultimately resulted in the discovery of Card's body within 49 hours without further loss of life. While the Commission makes some findings about the actions of law enforcement following the shooting, we anticipate that the Maine State Police (MSP) will conduct a full after-action review with an independent evaluation by an entity with policing expertise. The MSP has already completed a "Manhunt Operations After Action Review" focused on tactical operations with an independent evaluation by the Pennsylvania State Police. Not only would a full after-action review allow for professional recommendations about policy, protocol, and other policing improvements, it would likely confirm what this Commission recognizes as positive and successful examples of the law enforcement response.

## III. General Process
### A. Organization and Approach

The Commission held its first public meeting on November 20, 2023. At that time, it appointed staff members Anne Jordan, Esq., as the executive director, Brian MacMaster and James Osterrieder as investigators, and Kevin Kelley as the Commission's media relations specialist. The Commission took public commentary. It also voted unanimously to formally request that the Governor and the Attorney General seek subpoena power for the Commission so that all the relevant and necessary documents, evidence, and testimony could be obtained.

Emergency legislation was introduced on January 25, 2024, to grant the Commission the necessary powers to issue subpoenas.[6] After a public hearing before the Legislature's Judiciary Committee on January 29, 2024, and a work session on January 31st, the bill received unanimous support from both the House of Representatives and the Senate and was signed into law by the Governor on February 13, 2024. Because it was emergency legislation, the law went into effect immediately.

---

[6]Resolves 2023, chapter 129, granted this subpoena power , *See* Appendix B.

During its investigation, the Commission took voluntary statements from some witnesses and testimony under oath from others.[7] Some, especially victims, submitted written statements. The Commission issued twelve subpoenas to testify and produce documents and three other subpoenas to produce records.[8] Some law enforcement agencies voluntarily produced records and provided officers to testify, while others required subpoenas or other formal process.[9] The Commission reviewed over a terabyte of electronic local, county, and state law enforcement records and engaged in other investigative tasks.

The Commission reviewed thousands of additional pages of reports and records from various institutions and agencies, including the Maine State Police Crime Lab, the Office of Chief Medical Examiner, the Boston University Chronic Traumatic Encephalopathy (CTE) Center, the Maine State Police Computer Crimes Unit, the Maine Information and Analysis Center (MIAC), the New Hampshire and New York State Police, the New York Department of Criminal Justice Services, the regional communications centers,[10] various District

---

[7] Persons who were subpoenaed were placed under oath. A court reporter recorded their testimony and transcribed it. Each subpoenaed witness was provided a copy of the testimony and allowed to review it, make corrections, and sign the transcript

[8] *See* Appendix S for a detailed report on the subpoenas issued as required by Resolves 2023, ch. 129, section 13. One subpoena to testify was withdrawn by the Commission.

[9] Lewiston, Lisbon, the Maine State Police, the Hudson New Hampshire Police Department, and Sagadahoc County Sheriff's Office all voluntarily produced witnesses and/or records directly to the Commission. Many other agencies from across the state voluntarily produced reports that were gathered by the Maine State Police and turned over to the Commission. Other agencies or their employees requested or required a subpoena due to various state or federal confidentiality or security laws or because the employees were both police officers and members of the AR. The regional dispatch centers produced partially redacted records pursuant to the confidentiality provisions of 25 M.R.S. §2929. Federal agencies required a formal *Touhy* request. Some federal agencies, including the FBI, the AR, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Customs and Border Patrol, and the U.S. Attorney's Office for the District of Maine produced some, but not all, requested records, or produced partially redacted records citing various federal laws or attorney-client, or attorney work product privilege. Of note, the AR only produced 115 pages of the 3200 page internal investigation report requested via multiple Touhy requests. These requests began in December 2023. The Army completed and signed the report in March 2024.

[10] Lewiston-Auburn, Department of Public Safety at Augusta, Sagadahoc County, and Cumberland County.

5.

Attorney's offices, the New York Administrative Office of the Courts,[11] the FBI,[12] the Bureau of Alcohol, Tobacco, Firearms and Explosives, and extensive medical records from Keller Army Community Hospital and Four Winds Hospital in New York.

The Commission also scrutinized records, policies, statutes, and regulations from the United States Army and ARs, hundreds of videos and photographs, maps, and hundreds more pages of text and email messages between various individuals.  It reviewed a compilation of videos gathered from multiple businesses in and around the two scenes that partially documented the shooter's path of travel that evening.   It reviewed after-action reports from Maine law enforcement and others to gather the necessary information to conduct this investigation.  Commission members read dozens of external reports and reviewed numerous websites regarding related topics.

## B. Public Meetings

To the extent possible, the Commission conducted its business in public.  It held  sixteen public hearings over the course of nine months.   All but five of these meetings were conducted in a public building and all public hearings were recorded and live-streamed. This procedure allowed members of the public to attend either in person or via live stream and to see and hear the testimony as it unfolded.[13] One hearing was a combination of live in-person testimony and live testimony over Zoom.   Other hearings were conducted by Zoom live stream because the witnesses were located out of state or out of the country, and the use of Zoom live stream in a webinar format was the most appropriate mechanism to permit live public observation of the testimony.[14]  Video recordings of each session were posted on the

---

[11] New York's "Red Flag Law" has strict confidentiality provisions prohibiting public access to actual court records by any person or agency that is not a party to the case.  The New York Administrative Office of the Courts, through the assistance of the New York Division of Criminal Justice Services, did provide the Commission a summary of requested case information without revealing the names of the parties or providing copies of court records.  This provided the details the Commission needed while protecting the privacy interests of the parties involved.

[12] For some records, the FBI required the return of the records upon completion of the Commission's work.  In others, the Commission was allowed to keep the records but was required to and did secure permission to include the information in this report.  The agreement provided that before any of the records can be released to the public, the requestor needs permission specifically granted by the FBI.

[13] Public hearings were held in the Cross Building at the Capitol Complex in Augusta, the  Deering Building in Augusta,  the University of Maine in Augusta, and Lewiston City Hall.  At each of these locations, the facilities, and  highly skilled technology and other staff were provided free of charge.

[14] The Zoom online seminar format permitted the witnesses and members of the Commission to fully participate and offer testimony or ask questions.  Persons who were not testifying or asking questions could only observe; they could not speak or interrupt the proceedings, thus avoiding the "Zoom bombing" problem encountered by other governmental boards.

Commission's website.[15]  Those who testified under subpoena were provided with transcripts of their testimony in accordance with the provisions of the subpoena law.

The Commission endeavored to ensure that members of Maine's Deaf community had full access to all the public proceedings.  Certified American Sign Language (ASL) interpreters were employed, and their interpreting was simultaneously broadcast on a split screen.  Prior to each live stream hearing, members of the staff and technical specialists met with the interpreters and enlisted their suggestions and guidance for room arrangement, interpreter location, and camera angles to ensure that the interpreters would be seen clearly and simultaneously on the screen.  For one Zoom hearing, interpreters were not available. Closed captioning was enabled during the live hearing, and a split-screen interpretation was added to the recording of the session and posted on the Commission's website.

## C.  Private Meetings

Once the Commission received a compilation of all victim and survivor contact information, the Commission's Executive Director wrote to each individual and offered an opportunity to speak to the Commission.[16]  This included the options of appearing in public, submitting written letters or comments, or meeting with the Commission in private.  Some requested private meetings with the Commission, while others asked that their written statements remain private.  Recognizing the need for confidentiality and the protection of privacy and emotional well-being, the requests were granted.  Ten individuals testified in private.[17] The Commission also received written statements from three other victims and witnesses who requested the statements remain private.

## D.  Website and Email Notification

The day the Governor announced the creation of the Commission, a public website was launched.  https://www.maine.gov/icl/.  The website provided and continues to provide background information, regular announcements and updates on public hearing dates.  It also serves as a repository for the recordings of all the Commission public hearings. Included on the website is a system for automated email notifications.  This allowed all interested parties to receive timely notification of upcoming Commission meetings and announcements.  Information concerning the availability of the automated system was

---

[15] https://www.maine.gov/icl/

[16] Over 200 letters were sent out.  Three of the letters were returned as undeliverable.  Staff then reached out to private counsel, victim witness advocates, and/or friends or fellow survivors to offer those individuals the opportunity to provide testimony or letters.

[17] Four of these individuals subsequently elected to testify in public-Nicole Herling, James Herling, Katie Card and Cara Lamb.

7.

provided to victims and survivors via the victim witness advocates.  Notice of its availability was published on the website.

## IV.  DETERMINATION OF THE CONTENTS OF THE INTERIM REPORT

Early in the process, and after conferring with legislative leaders, the Commission agreed that it was important to divulge the Commission's findings up to that point.  Recognizing that the Commission's work was not completed but that victims, survivors, public officials, and the general public were eager to learn of the Commission's work and findings to date, the Commission issued an Interim Report.  The Report was provided to the Governor and the Attorney General and then released to the public on March 15, 2024.[18]  It provided a detailed description of the facts that had been found to date and the course of action that remained to be taken.  This report is published on the Commission's website: www.maine.gov/icl/sites/maine.gov.icl/files/2024-03/Commission%20Interim%20Report%203-15-24.pdf.

## V.  FACTS AND FINDINGS
### A.  Chronological History Prior to October 25, 2023
#### 1.  May 2023

In early May 2023, Card's then 17-year-old son, Colby Card, spoke to his mother, Cara Lamb (Card's former wife), concerning his father's increasingly erratic behavior, anger, and paranoia.  He described his father's insistence that people were talking about him and calling him gay and a pedophile.  When Colby told his father that people were not talking about him, Card became very angry and accused Colby of participating in the conversations.

This behavior, which started in the late winter of 2023, shortly after Card acquired hearing aids,[19] was out of character for Card and deeply concerned his son.  Colby told his mother that he was so worried about his father's actions, anger, and behaviors that he was no longer comfortable spending time at his father's house.[20]  Colby also expressed concerns about his

---

[18] It was brought to the attention of the Commission that one of the times included in the Interim Report concerning the actions taken by the Sagadahoc County Sheriff's Office on September 15, 2023, was incorrect. This clerical error was corrected and  the correct time is reflected in the Timeline contained in Section VII of this report.  While the Commission acknowledges this mistake, it did not alter or affect its findings.

[19] Card's AR colleague and good friend, Daryl Reed, also testified to this behavioral change and time frame.

[20] Before 2023, Colby split his time between his father's and mother's homes.  He had a good relationship with his father, and the two spent time together fishing, boating, jet skiing, motorcycling, and participating in other outdoor pursuits.  At the time of his meeting with the SRO, Colby was a senior in high school and had his own vehicle, which allowed him to travel freely back and forth between the two homes.

father's access to the 10-15 firearms that were stored at his father's house, in his truck, and at other family properties.

After speaking with Colby, Cara decided to seek help and advice. On May 3, 2023, Colby and Cara met with the school resource officer (SRO) at Colby's school, Mount Ararat High School in Topsham. They explained their concerns for Card's mental health. When the SRO learned that Card resided in Bowdoin, she called the Sagadahoc County Sheriff's Office (SCSO) and asked that a deputy respond.

A short while later, SCSO Deputy Sheriff Chad Carleton met with them at the school. He took detailed statements. He learned that neither Colby nor Cara wanted Card to know that they were the ones who made the report. During the interview, Carleton learned of Card's long service in the AR.[21] Carleton, Cara, and Colby decided that Carleton would reach out to Card's AR unit in Saco and try to get him help through the AR. That same day, Carleton spoke with First Sgt. Kelvin Mote, the senior non-commissioned officer (NCO) in Card's company at the AR unit, who was also a police officer in Ellsworth, Maine.

Mote told Carleton that members of the unit were starting to see behavioral changes in Card, but that he did not know it was as serious as described by Colby. Mote told Carleton that the AR unit had a "battle assembly" coming up and that AR members would sit down with Card and see if they could get him to "open up."[22] Mote was familiar with the AR Psychological Health Program (PHP), which provides mental health assistance to reservists, their families, and their commanders. During his call with Carleton, Mote did not provide any information about the PHP to give to Card's family.

The next day, Carleton received a call from Cara Lamb. She said that she had spoken to Card's brother, Ryan Card, and told him about their concerns. She informed Carleton that on the evening of May 3, 2023, Ryan and his sister, Nicole Herling, had gone to Card's home to check on him. Card met them at the door with a gun in his hand. Although the meeting

---

[21] Card joined the AR in 2003. He enjoyed favorable annual reviews and was praised for his work effort, dedication to the unit, and his willingness to lead. Colby and Cara both believed that Card was more likely to listen to one of his fellow reservists than to a law enforcement officer. During his years in the AR, Card had received a series of promotions and was a Sergeant First Class at the time of the shootings in Lewiston. He initially served as a petroleum supply specialist. In 2013, he became a trainer, working each summer with the 1,200 incoming cadets at the West Point Military Academy. He was primarily responsible for teaching the cadets how to properly throw live hand grenades. Over the course of his career, Card was present when thousands of live grenades were thrown each year.

[22] Battle assembly is the term used by the AR for the once-a-month reserve duty that the soldiers in the unit must attend. AR regulations require regular attendance at the battle assembly. *See* AR-135-91, which sets out attendance requirements for reservists and the consequences, including discharge, for failure to attend the necessary number of battle assemblies each year.

was cordial for the most part, Card accused his siblings of talking about him behind his back. He also told them that he thought people were stalking him or casing his home.  After receiving  this information, Carleton tried to reach Mote again but was unsuccessful.

Carleton then sent the following message to all members of the SCSO patrol division:

> *Use extreme caution if responding to Robert Card's residence.  Robert's mental health is in decline, and he is experiencing paranoia and hearing voices.  He has several guns inside the house and is in the Army Reserves.  His family and the Army are working on getting Robert help but his brother Ryan reported Robert answered the door with a gun on 5/3/23 when Ryan went to see him.  Robert allegedly believes people are watching/talking about him.*

There is no evidence that members of the AR sat down with or even attempted a meeting with Card during the May battle assembly or, for that matter, the June battle assembly.  There is also no evidence that any member of the AR reached out to the PHP for assistance on how to address Card's deteriorating mental health.

## 2.  June 2023

Throughout the month of June, Herling continued to research ways to get help for her brother.  She testified that on June 3, 2023, she called the VA Crisis line.  The worker she spoke with advised her not to inform command about her brother's delusions of being called gay or a pedophile as it could harm his career.   Herling also testified that despite extensive online searches, she could not find clear information on where to report her concerns; much of the online information was outdated.

Between May and July 15, 2023, when Card reported to active duty at West Point, Herling attempted to reach someone at the AR unit in Saco to talk about the family's increasing concerns about Card and his deteriorating mental health.[23] She left five voicemail messages on various phones asking for a callback.  No one called her back.  She also spent hours conducting Internet and telephone research trying to find help for Card.  She called 988 and other numbers and researched behavioral health programs for members of the AR.  There is no evidence that she found the PHP website.

---

[23] During this time, Card and his family primarily communicated by text.  Nicole Herling explained that Card also accused family members of talking about him, but they hoped by continuing the contact they could get him help and assure him his family loved and supported him.  They were concerned that Card was getting worse.

### 3.   July and August 2023

On July 6, 2023, Card legally purchased a .308 Ruger SFAR rifle with a scope and laser and a 9mm Beretta pistol from Fine Line Gun Shop in Poland, Maine.  On that date, Card had never been involuntarily hospitalized and had no felony criminal record, domestic violence protection order, or weapon restriction ("yellow flag") order that would have prohibited his purchase under Maine or federal law.[24]   Nothing prohibited him from purchasing the firearms.

In the early summer of 2023, Card received orders requiring him to report to the U.S. Military Academy at West Point for his annual training responsibilities.  He and his unit were scheduled to instruct new cadets on properly throwing grenades and operating other weapons.  On July 15, 2023, Card drove to New York and arrived at his accommodations at Camp Smith, a New York National Guard facility, where he and some members of the unit were staying.  He checked in and joined his fellow soldiers at the pool.  He immediately began to tell them that the woman at the front desk was talking about him being a pedophile.  He also reported that clerks at a rest-stop restaurant on the way to West Point had been saying the same things.  Members of his unit tried to tell him that was not happening, but he did not believe them.  Many members of his unit found his behavior and statements odd and disconcerting.

Later in the early evening, Card and two other members of the AR unit, Daryl Reed and Christopher Wainwright, drove from the hotel to purchase beer and pizza.  During the ride, Card accused the other soldiers of talking about him.  When asked what he was talking about, Card would not explain the comment any further.  When they stopped to purchase beer, Card angrily left the vehicle and, upon returning after purchasing his beer, Card, without provocation, suddenly and aggressively charged his longtime friend Reed with balled-up fists, wanting to fight.  Reed backed away and avoided a physical altercation but found the behavior very disturbing.  Reed was also concerned that Card kept repeating, "I'll take care of it.  It's okay.  I'll take care of it."  Upon their return to the hotel, Card grabbed his beer and stormed off to his room.

Reed and Wainwright took the pizza to a common room and told their fellow soldiers about Card's behavior.  They were concerned for the safety of the cadets and soldiers if Card were to react violently during the training.  They contacted Master Sergeant Ed Yurek to report their concerns.  Yurek listened to the account of Card's behavior and, believing that the behavior was alcohol-related, suggested they should let him "sleep it off."  The other reservists disagreed and asked that Yurek meet with Card that night.  The soldiers also notified Mote

---

[24] *See* Appendices C, D,  and F for the various laws that prohibit certain individuals from possessing firearms.

about the situation and asked him to assist.  Mote was staying some distance away but
arrived as quickly as he could.

Yurek and Mote then made repeated attempts to get Card to open his door and speak to
them. He refused to open the door, telling them to leave him alone.  Eventually, they
summoned base security, who opened the door with a master key.  Yurek and Mote were then
finally able to observe Card's condition.  Mote described him as having a blank, fixed
expression, which he called "a thousand-yard stare."  Mote stated that the expression on
Card's face was so disturbing that it made the hairs on the back of his neck stand up.

Yurek and Mote scanned the room for weapons and found none.  They took the keys to Card's
rental car.  Because of the beer in Card's room, Yurek still suspected alcohol might be the
issue.[25]  Yurek and Mote agreed they would evaluate Card the following day to see if his
condition had improved.

Early the next morning, July 16, Yurek and Mote found no change.  Card was again locked in
his room.  He refused to open the door despite orders to do so and would not communicate
with his superiors.  They then asked for assistance from the New York State Police.

Three New York troopers responded.  When the troopers arrived, various reservists explained
what had been happening and Card's troubling behavior.  They also mentioned the private
weapons that Card owned.  The troopers went to Card's room with Yurek and Mote to assess
Card's condition.  Card again refused to open the door despite orders to do so.  After base
security again opened the door with a master key, the troopers entered and attempted to talk
to Card.  He briefly spoke to them, telling them that members of the unit were "scared of me
[because they know ] I am  capable."[26]  When asked what he meant by that, Card did not
answer.

After further discussions and the New York troopers telling the reservists their hands were
tied because they did not hear Card make any direct threats, the AR unit's leaders agreed
that a command-directed behavioral health evaluation (CDBHE) was warranted.  Cpt.
Jeremy Reamer, the company commander  who was at home in New Hampshire, verbally
authorized a CDBHE over the telephone.[27]  Card was informed of the decision to have him
evaluated and acknowledged that because it was an order, he had to comply.

---

[25] A search of Card's room the next day confirmed it was not alcohol related: Card had only consumed two
beers.

[26] All this interaction was captured on the NY State Police body worn cameras.

[27] Reamer was in New Hampshire and was not scheduled to be at West Point until later in the deployment.

12.

Three soldiers accompanied Card to Keller Army Community Hospital (Keller) in the nearby city of West Point. Mote drove while Reed and Sgt. Matthew Noyes, also a Maine law enforcement officer, sat in the middle seat. Card was intentionally placed in the third-row seat so that he would not have access to the door. Two cruisers, operated by the troopers, and a third vehicle driven by Wainwright, followed the vehicle transporting Card. This caravan was established to ensure the occupants' safety and to provide an immediate police response if the need arose.

Reed and Noyes watched Card throughout the nearly hour-long ride to Keller.[28] Reed described him as quiet, just staring out the window, not saying anything. At one point, Card started to weep quietly. When they attempted to get him to talk, he did not say a word.

Upon arrival at Keller, hospital personnel instructed the group to maintain a watch on Card. He was taken to an examination room, and the soldiers who accompanied him to the hospital took turns sitting with him. During the first hour, Card and Reed were having a "normal everyday conversation" when Card blurted out, "There they go again, talking about me." When asked who was talking about him, Card pointed to some nurses outside the room, even though the room was enclosed in glass partitions and the doors were closed. Reed described Card's behavior as paranoid. Wainwright then took over the watch. He later reported to Reed that Card indicated he wanted to "beat [Reed] up and knock out his teeth," or words to that effect. Both found this behavior disturbing.

An emergency room physician initially examined Card and determined that he was exhibiting psychosis and paranoia and needed to be further examined. Shortly thereafter, a psychiatric nurse practitioner, Capt. Matthew Dickison,[29] examined Card and completed a Report of Mental Status Evaluation (DA Form 3822). The evaluation report stated that Dickison diagnosed Card with "Unspecified Psychosis not due to a substance or physiological condition." Based on his evaluation of Card, Dickison determined that Card needed to be transferred to another hospital for a higher level of care. When explaining this to Reamer as Card's company commander, Dickison also gave Reamer a series of recommendations: (1)"ensure that Card attends all follow-up appointments, (2) increase leader/supervisory support with intent of keeping [Card] engaged with unit members and other sources of support; (3) encourage Card to temporarily secure personal weapons with MPs, arms rooms, or other trusted sources, and (4) restrict access to or disarm all military weapons and

---

[28] Testimony indicated that the normal drive time to Keller was around 15 minutes. However, due to the washout of a local bridge, the caravan had to take a different, longer route to the hospital.

[29] Dickison, a master's level psychiatric nurse practitioner with 12 years of experience, was on temporary assignment at Keller. He was later assigned to a post overseas, promoted to Major and testified via Zoom.

ammunition. No range duties." He further informed Reamer that Card was not fit for duty.[30] According to Dickison, Reamer appeared to understand the recommendations, expressed no concerns about his ability to carry them out, and left Dickison with the impression that he would follow them.

Dickison informed Card that he needed psychiatric hospitalization, and Card agreed to be transferred.[31] Arrangements were made to have Card transported via ambulance to Four Winds Hospital (Four Winds) in Katonah, New York. Dickison informed the members of Card's unit who were at the hospital, including Reamer, of the plan. Card was taken to Four Winds on July 16, 2023, and, after discussions with staff there, he signed a form indicating that he was voluntarily admitting himself to the hospital for treatment.[32] He stayed at Four Winds from July 16 to August 3, 2023.[33] Upon admission, he received a psychosocial assessment during which he acknowledged having a "hit list." He also stated that he had told a military peer that if he didn't stop talking about him, he'd "be added to my list." Card was assessed as having psychosis and thought disorder. The risk factors and high-risk psychosocial issues requiring immediate intervention in a treatment plan were Card's access to firearms and his active thoughts of homicidal ideation, as demonstrated by his hit list.

On July 26, 2023, ten days later, Card underwent a psychodiagnostic evaluation to assist his treatment team in reaching a diagnosis and developing a treatment plan.[34] The psychologist who conducted the evaluation stated that there were three aspects of Card's personality that were likely to cause him difficulty: inconsistent coping skills, poor emotional controls, and narcissism. This was apparently based, in part, on Card's reporting that "he feels constantly persecuted, misunderstood, and underappreciated by others." The psychologist

---

[30] Card's access to his assigned (military- owned) weapon was restricted on July 20, 2023.

[31] Dickison testified that because Card agreed to go to Four Winds, there was no need for him to begin the process under New York law for an involuntary commitment. *See* Appendices H and I.

[32] Under both federal and state laws that prohibit a person involuntarily hospitalized from possessing a firearm, there must be a finding by a court, board, commission, or other lawful authority that a person, as a result of a mental illness, is a danger to self or others and that the person must be committed to the hospital for further treatment. In this case, no hearing was ever held, and no finding that Card was a danger to himself or others was ever made by a court. *See* Appendices C, D, E, F, I, and Q for the various statutes.

[33] Reamer extended Card's active-duty orders to include this entire period, thereby enabling him to get paid while hospitalized. Reamer could have invoked other AR regulations that would have extended his duty and allowed continued treatment and care, and continued Army authority over him after his discharge. He did not do so.

[34] Card's treating psychiatrist voluntarily agreed to provide a statement and to be questioned by the Commission. Due to New York privacy law concerns, the Commission agreed to a private meeting. The psychiatrist relied, in part, on this psychodiagnostic testing in formulating Card's treatment plan.

14.

also opined that Card's paranoia "is of sufficient magnitude that it may reach delusional proportions at least part of the time." The doctor further suggested that given all the factors involved, although there might be some limited benefit from the use of psychotropic medications, Card appeared to be a poor candidate for psychological treatment, and his prognosis for significant change was guarded.

On July 27, 2023, at 5 p.m., Dickison called Reamer. He reviewed the findings on DA 3822 and the need for discharge planning for Card. In the notes he made after speaking with Reamer, Dickison wrote that he told Reamer that he needed to "include medical regarding discussion to start medical board process[35] and service members (sic) medical disposition going forward." He also wrote, "It was also discussed with Commander about making sure that steps are taken to remove weapons from service members home to ensure safety." Dickison noted, "Commander did not have any questions or concerns after our conversation."

Reamer said he had had difficulties retrieving a copy of the DA 3822 form due to email issues and agreed to come to Keller on July 28, 2023, to pick up a hard copy left for him at the front desk.[36] This report provided a diagnosis, findings, and the list of specific recommendations referenced above.

When Dickison testified before the Commission, he explained,[37] "I was all about making sure the service member did not have access to weapons." Dickison told the Commission that Reamer appeared to understand all his recommendations, was going to ensure that Card's personal weapons were removed from his home and see to it that the recommendations were followed. At no time did Reamer express concerns that he would be unable to follow the recommendations or that he lacked the authority to do so. After this conversation, Dickison had no further contact with Reamer.

---

[35] The Medical Board review process occurs when a service member's treating physicians believe the soldier will not be able to return to duty for medical reasons. It can be part of the discharge and/or retirement process and is initiated by the soldier's treating physician. See Army Regulation 40-501 (Standards of Medical Fitness) and Army Regulation 635-40 (Disability Evaluation for Retention, Retirement or Separation).

[36] Reamer needed to return to Keller to complete other paperwork. In the further comments section of the DA 3822, it was specifically recommended the "SM( Service Member) Chain of Command stay engaged with the SM care." It was also recommended that measures be taken to safely remove all firearms and weapons from SM's HOR (home of residence).

[37] The nurse practitioner previously sent a copy of the DA 3822 form to Capt. Reamer's email. The DA 3822 form is a report of a soldier's mental status evaluation. Capt. Reamer later testified that his email was not working at the time. Nevertheless, Capt. Reamer was verbally informed of the information on the form, including Card's diagnosis and condition and the need to ensure the weapons were removed. A hard copy was left for him to pick up at the front desk.

Reamer neglected to follow any of the recommendations Dickison gave him.  In fact, he
ignored them.  Nor did he complete the Developmental Counseling Form (DA Form 4856)
that, among other things, directed Card to make and maintain regular contact with his case
management team.  Reamer failed to follow up with treatment providers, failed to read email
messages[38] concerning Card, failed to heed the advice of the providers to ensure the removal
of all firearms from Card's home, [39] failed to contact the SCSO or have other members of his
unit who were law enforcement officers in Maine contact the SCSO to arrange for the
removal of the weapons, and failed to follow up with Card to ensure that he was participating
in treatment.

Lt. Col. Ryan Vazquez, who assumed the position of  Battalion Commander in late June
2023,  testified that he discussed Mr. Card's diagnosis and hospitalization with Reamer first
on July 16, 2023.  They discussed his diagnosis, his inpatient hospitalization, and the
Commander's Critical Information Report (CCIR).[40]  Vazquez and Reamer spoke about
Card's treatment progress a few more times during Card's hospitalization.  It does not appear
that Vazquez provided Reamer with any meaningful advice, guidance, or direction about
Card.  Neither Reamer nor Vazquez ordered a Line of Duty Investigation to determine Card's
duty status.

Reamer and Vazquez both explained to the Commission that the AR had more limited
authority over Card while he was in civilian status than they would have had if Card had been
a full-time soldier.  However, they neglected to use the tools available to them.  They failed
to initiate a Line of Duty Investigation (LODI) while Card was still at Four Winds.  That process
would have extended Card's active-duty orders and allowed him to be held longer.  Reamer
made no effort to compel Card to appear at either the September or October 2023 battle
assemblies.  This omission flew in the face of Dickison's recommendation, which Reamer
appeared to accept, to "increase leader/supervisory support with intent of keeping [Card]
engaged with unit members and other sources of support." At the battle assemblies, Reamer
or a ranking NCO could have engaged Card about his failure to attend his follow-up
appointments and encouraged Card to "temporarily secure personal weapons with MPs,
arms rooms, or other trusted sources."[41]  Reamer also could have ordered Card to undergo
another command-directed mental health evaluation.

---

[38] Card's treatment providers also sent Reamer this report via email on July 27, 2023.  Reamer testified that he
did not read this message until after the shootings in Lewiston occurred, some three months after it was sent.
He testified that "his computer was down" during those three months.

[39] Four Winds also urged Reamer to have Card's weapons removed from his home.  Reamer ignored Four Wind's
recommendation.

[40] A CCIR is a Commander's Critical Information Report.  In this case, it contained details surrounding the
incident that led to Card's transportation to Keller  and Card's diagnosis.

[41] See AR-190-11, Sections 4-5.                                                                                      16.

The AR leadership did not try any of these options.  Card was left to continue in his isolation, disengaged from other unit members or other sources of support.  Instead of trying to secure Card's weapons through the chain of command, Reamer inexplicably left the task to Sean Hodgson, Card's friend, who had no authority over Card[42] and was himself prohibited from possessing firearms during the summer and fall of 2023.

On July 26, 2023, a nurse case manager from the Army Reserve's Psychological Health program (PHP) emailed Card, introduced herself, and offered Card help in securing services when he got out of Four Winds.  The only information provided to her about Card was the CCIR report that had been created as a result of Card's Command Directed Behavioral Health Evaluation.  She was never provided and never had access to any of Card's medical records from either Keller or Four Winds, his psychological assessment results, or the DA 3822 Report of Mental Status Evaluation.

Card underwent extensive medical and psychiatric testing while at Four Winds.  While he initially resisted group therapy or treatment, he was always compliant with his medication and, over the course of his treatment, hospital staff saw improvements in his condition.  Dr. Klagsbrun, Card's treating psychiatrist,  and other staff members participated in weekly calls with Dr. Sanchez and others at Keller and specifically discussed Card's care and situation.  While Klagsbrun said the name Reamer was familiar, she could not state with certainty that Reamer was on any of these calls.

On July 28, 2023, Four Winds Hospital filed a petition with a New York court, seeking an order of continued admission for involuntary treatment.  This was because Card had filed a petition for release a few days earlier.  The hospital's petition was dismissed on August 1, 2023, after Card withdrew his petition for release.   No court hearing ever occurred.  Klagsburn stated that given Card's progress in treatment, his agreement to continue his medications and participate in therapy  and his stabilization at that point in time, she did not feel that the hospital would be successful in court.

Klagsbrun also testified that she considered six factors over the course of Card's treatment, in determining when, and if, he was safe for discharge:
1.   His aggression risk,
2.   His homicidal risk,
3.   His suicidal risk,
4.   His behavior in the hospital (i.e. was he unsafe to self or others),
5.   His protective factors vs. risk factors, and
6.   His medication compliance.

---

[42]  Card was an E-7, and Hodgson was an E-6.

It was her opinion, that as of the date of his discharge, Card was safe to be released. His discharge plans were discussed by Klagsbrun with Sanchez at Keller on August 1, 2023. They also discussed the need to see that the firearms were removed from Card's home. Klagsbrun called Sanchez asking him to ensure that the SAFE Act petition had indeed been filed as it was a very important safety concern.[43]

After 19 days of treatment at Four Winds, Card was discharged, and he returned home to Maine on August 3, 2023.[44] Prior to his discharge, Card told the medical professionals that he would engage in treatment, take his medications, and reach out for help and support from family members and friends.[45] Despite these promises, he engaged in no treatment between August 3 and October 25, 2023, took almost none of his prescribed medication,[46] and did not answer or return calls or emails from treating professionals.[47] He also failed to make any appointments with a telemedicine service that was chosen for him. In an entry dated September 21, 2023, Keller records indicated that Card's case with the hospital would be closed due to his noncompliance.[48]

On August 5, 2023, two days after his release from the hospital, Card went to Coastal Defense Firearms in Auburn, Maine, to pick up a silencer he had previously ordered. As

---

[43] In an earlier conversation, Sanchez told Klagsbrun he thought a SAFE Act petition had been filed but that he had to verify it.

[44] His friend and fellow Army Reservist Sgt. Sean Hodgson drove from Maine to New York to pick up Card. Hodgson had text message exchanges with Reamer before he left Maine, during the trip back and upon their return home. Despite Reamer's claims to Army investigators that he did not know about Card's discharge, text messages produced to the Commission demonstrate otherwise.

[45] Hospital records indicate that it was initially difficult for medical personnel to reach Card's mother, who was named as the only family point of contact. There was a family meeting via conference call where his discharge and follow-up were discussed. Testimony taken by the Commission demonstrated that Mrs. Card had limitations that would have made her unable to truly supervise or assist Card in his post-release treatment.

[46] After the Lewiston shootings, the Maine State Police obtained a search warrant for Card's home. They found a prescription for Olanzapine for 60 pills that was filled on August 3, 2023. The instructions were to take one pill in the morning and one at night. They found 53 pills left in the container. A postmortem examination and autopsy found no evidence of this or any other medication in Card's system.

[47] Card did have one conversation with a nurse from Keller on August 11, 2023. During that conversation, he reported he "was fine" but that he was not taking his medication and would not go for follow-up treatment. In all, that same nurse left eight voicemail messages for Card between August 7 and September 21, 2023, asking him to call. None of these calls was returned. It does not appear that this nurse took any steps to alert Reamer or Vazquez of Card's refusal to take his medications or participate in treatment.

[48] The Army Reserve Medical Management Center (AR-MMC) did attempt to continue contact with Card. Its efforts are described later in this report.

18.

mandated by federal law, the gun shop required Card to fill out and sign a form concerning his eligibility to purchase it.  On that form, Card indicated that he had been committed to a mental health institution.[49]  Based on that response, the gun shop refused to complete the transaction and Card left without the silencer.[50]  In subsequent discussions with his fellow Army Reservists and his brother, he expressed anger about being denied the opportunity to purchase the silencer.

On August 9, 2023, Card texted his brother and told him he had "purchased a gun safe" for himself. This safe was located in his garage after the shooting.  There were  multiple other firearms inside.

On August 11, 2023,  the PHP nurse case manager again reached out to Card and spoke to him by phone.  She offered assistance to help him secure treatment services.  She did not ask him about access to firearms, but Card volunteered that his access to firearms was limited.  In responding to questions from the Commission, the nurse case manager described him as being frustrated by that.  The nurse stated that Card told her that he had already been connected with care and that he did not need any additional resources.  Per her employer's standards of care in place at the time, she closed the case because the soldier declined services.[51]  The nurse case manager provided no report or other information to Card's Commanders to let them know the outcome.

## 4. September 2023

The AR unit did not hold a battle assembly in August 2023.  One was scheduled for September 16-17, 2023.  During the early morning hours of September 13, 2023, Hodgson was traveling back from the casino in Oxford, Maine, with Card.  Card, who was driving erratically, suddenly became very angry, pounded the steering wheel, and punched Hodgson in the face.  Hodgson was able to exit the vehicle safely and walk home.  Hodgson called Reamer when he got home and reported what happened.  Reamer took no action.  That same night, Hodgson also spoke to Reed and reported what happened.[52]

---

[49] Card mistakenly thought that his voluntary admission met the criterion to answer yes to the question, "Have you ever been committed to a mental institution?"  Only involuntary commitments meet that criterion.  *See* Appendix R.

[50] There is no requirement in federal law for the gun shop owner to report the refusal to sell the silencer, or for that matter any other firearm, to  local, state, or federal  law enforcement.

[51] This policy was changed after October 25, 2023.

[52] Records recently obtained from First Fleet, the employer of both Card and Hodgson, show that they both had the day off on Tuesday, September 12. This corroborates information from other sources that the Casino trip was on September 12 and the assault and threatening occurred in the  early morning hours of September 13."

Then, on Friday September 15, in the early morning hours, Hodgson sent the following text
message to Reamer and Mote:

> *Change the passcode to the unit gate and be armed if sfc card does arrive.*
> *Please. I believe he is messed up in the head. And threaten the unit other and*
> *other places. I love to death but do not know how to help him and he refuses*
> *to get help or continue help. I'm afraid he's going to fuck up his life from hearing*
> *things he thinks he heard. When I dropped him off, he was concerned his*
> *weapons were still in the car. I believe they were at the unit. And no one*
> *searched his vehicle on federal property. And yes he still has all his weapons.*
> *I'm not there I'm at my own place. I believe he is going to snap and do a mass*
> *shooting.*

Mote testified that Hodgson's text again caused "the hairs to go up on the back of my neck."
Later that morning, Mote discussed Hodgson's text with Reamer, and they decided to ask the
SCSO to conduct a well-being check on Card at his residence in Bowdoin to gauge his mental
health and determine if he was a threat to himself or others. Mote, himself a member of the
Ellsworth Police Department, discussed the plan with his deputy chief, who told him to have
an Ellsworth detective request a well-being check by the SCSO.[53]

Later that day, Mote spoke with Ellsworth police detective Corey Bagley. Bagley opened an
investigation into Card's threats against Mote and his AR unit. Mote prepared a detailed
narrative outlining all that had happened with Card in the previous months.[54] Mote told the
Commission he intended that narrative to be "a statement of probable cause" for the
Sheriff's Office to use to begin securing a yellow flag order.[55] Mote had successfully obtained
such an order in another matter the week before and was familiar with the procedure.

---

[53] Because Mote had been instrumental in initiating the hospitalization in New York and could be a potential
target of Card's anger, his deputy chief believed it was best to have another officer initiate the contact with the
Sagadahoc County Sheriff's Office.

[54] This detailed statement from Mote provided more than sufficient information for Skolfield to initiate the yellow
flag law petition. It has been long established in Maine that a police officer may establish probable cause through
the collective knowledge of all law enforcement officers involved in an investigation. *See, State v. Bradley,* 658 A.2d
236 (Me 1995*), State v. Baker,* 502 A.2d 489 (Me. 1985), *State v. Libby*, 453 A,2d 481, 485 (Me. 1982). This also
includes information from private citizens who have spoken with or interacted with them. *See,* 34-B MRS §3862(1).

[55] Before October 25, 2023, no yellow flag petitions had been filed by the Sagadahoc County Sheriff's Office.
Statewide, 81 petitions were filed between 2020 and late October 2023. As of July 31, 2024, records
maintained by the Office of the Attorney General indicate that since October 25, 2023, 290 petitions have been
filed statewide. SCSO filed 14 of them.

20.

After receiving the information from Mote, Bagley attempted to reach Carleton.  When he learned Carleton was not on duty, he asked for a supervisor because the matter "can't wait" and was "time sensitive."  At 2:38 p.m., Bagley spoke to Sgt. Aaron Skolfield of the Sagadahoc County Sheriff's Office.  Bagley informed him of the contents of Mote's statement and asked Skolfield to perform a welfare check on Card.

At 2:46 p.m., Skolfield notified his dispatch center that he would be attempting a welfare check.  He downplayed the serious nature of Card's mental health decline,[56] stating in this recorded telephone call that the matter "was not as pressing as they (the Ellsworth, Maine, Police Department)[57] made it sound" and stated, "He's flagged in-house, known to be armed and dangerous, blah blah blah."[58]  When Skolfield arrived at Card's home at 3:09 p.m., no one was home.  After looking for but not finding Card at his father's home, Skolfield returned to Card's home at 3:24 p.m.  Again, no one was home.  Thirteen minutes later, Skolfield received an email that included Mote's statement.

Despite his stated belief that the matter was not as pressing as the members of the AR unit made it seem, Skolfield broadcast the following "File 6" notice regarding Card to law enforcement agencies statewide at 5:11 p.m. on September 15th:

> *\*\*\*CAUTION OFFICER SAFETY-KNOWN TO BE ARMED AND DANGEROUS\*\*\* ROBERT HAS BEEN SUFFERING FROM PSYCHOTIC EPISODES &HEARING VOICES.  HE IS A FIREARMS INSTRUCTOR AND MADE THREATS TO SHOOT UP THE NATIONAL GUARD ARMORY IN SACO.  HE WAS COMMITTED OVER THE SUMMER FOR TWO WEEKS DUE TO HIS ALTERED MENTAL HEALTH STATE, BUT THEN RELEASED......IF LOCATED USE EXTREME CAUTION, CHECK MENTAL HEALTH WELLBEING AND ADVISE SAGADAHOC SD VIA SAGADAHOC COMMS 443-9711*

Other members of the AR unit were also concerned about Card.  Yurek, who had been present in New York when Card's behavior led to his command-directed evaluation and hospitalization, was also a lieutenant with the Brunswick Police Department.  He reached out to Sgt. Monica Fahey of the Saco Police Department at 2:17 a.m. on September 16th to

---

[56] While Skolfield was aware of the warning Carlton posted in the SCSO internal records system in May regarding Card, he did not access or know of Carleton's May 2023 report.

[57] In that conversation with Skolfield, Bagley specifically suggested that Card was a perfect candidate for a yellow flag law petition.  During this same conversation, Skolfield reported to Bagley that he was going on vacation.

[58] The Sagadahoc County Sheriff's Office provided a transcript of this telephone conversation early in the investigation.  On May 7, 2024, Skolfield's counsel provided a rebuttal to the Commission's Interim Report, including an audio recording of this conversation, in which he discussed Card's mental state.  The recording demonstrates that Skolfield's comments were made  in a dismissive tone of voice.

21.

advise her of the background of the case, the existence of the File 6 notice that Skolfield had issued the evening before, and of Card's threat to "shoot up the Armory" in Saco.  At 7 a.m. a Saco police sergeant and three patrol officers were assigned to position themselves in the immediate area of the AR facility to respond if Card appeared for the battle assembly on September 16, 2023.  Card did not appear.[59]  The Saco officers spoke to Reamer later that morning.  Reamer told them that he had spoken with Card and Card reported that he was not going to attend the battle assembly that weekend.  He also downplayed the severity of the threat relayed by Hodgson despite his knowledge of Card's  long  hospitalization just eight weeks earlier  and  the fact that other members of the AR unit were deeply worried.

At 8:45 a.m. on September 16, 2023, while the Saco officers were awaiting Card's possible arrival at the Saco AR facility, Skolfield returned to Card's residence.  He noticed that Card's vehicle was there and called the Kennebec County Sheriff's Office for a backup unit.  A short while later, a Kennebec County deputy arrived, and the two deputies knocked on Card's door.  Although they could hear someone moving around inside, no one answered.  Skolfield expressed concern about "their exposure" at the front of the house  so they left the residence.  This attempt by Skolfield and the Kennebec County deputy sheriff to contact Card took approximately 16 minutes from start to finish.

Later that morning, Skolfield spoke with Card's father, who said he did not know where Card's guns were located. Skolfield was unable to reach Card's brother, Ryan Card, that day. At 10:46 a.m. on September 16th, Skolfield called Reamer.  Reamer did not tell Skolfield that the providers at Keller and Four Winds recommended that Card not have access to weapons in the military or at home.  Reamer did not suggest that Card needed to undergo a risk assessment, and despite acknowledging that "I don't think this is gonna get any better," he appeared to minimize the risk that Card posed to the community.[60]  Shortly after this conversation, Skolfield was called away  to a domestic violence call and did not return to Card's residence.

On September 17, 2023, Skolfield spoke briefly to Ryan Card and his wife Katie Card.  Around noon, Katie told him the guns had not been removed.  Two hours later, when  Skolfield spoke

---

[59] During a phone conversation on September 15th, Card told Reamer he would not be appearing for the battle assembly that weekend and that he was "still mad" about what happened in New York.  Reamer did not relay this information to Mote, Yurek, or other members of the unit who had been involved in getting Card to Keller in July.

[60] During the conversation Reamer gave very basic responses to Skolfield's questions. Skolfield briefly discussed the yellow flag process but then said" that um, obviously is a hurdle we have to deal with, but at the same time , we don't wanna throw a stick of dynamite into a pool of gas either and make things worse".  Reamer replied "yea, yeah, I hear ya."

22.

to Ryan and inquired about the status of the guns,[61] Ryan responded that he would try to secure them.  Skolfield also asked Ryan to determine whether Card needed a psychiatric evaluation and to report his observations back to Skolfield.  Skolfield made no plans with Ryan for a follow-up conversation other than to state that if *Ryan* determined a psychiatric evaluation was needed, Ryan should call the Sheriff's Office, and personnel would "assist the family in arranging for Card to be evaluated."[62]  Skolfield made no plans to contact Card or to follow up to see if the firearms had indeed been removed.

At that point, Skolfield decided there was no need for him or the SCSO to be involved any further.  He considered the matter "resolved," stating that no person expressly said that he or she "wanted to press charges."[63]  Skolfield notified his supervisor, Lt. Brian Quinn, of his conclusions.  Quinn deferred to his "judgment as an experienced officer" and did not undertake any further action or review other than notifying his supervisor, Chief Deputy Brett Strout.  Strout did not take any further action and did not assign any other deputy sheriff to the matter.

 Skolfield failed to follow up with Ryan Card, did not attempt another well-being check, did not consult with the District Attorney's Office about the possibility of a yellow flag order, and did not contact the AR unit or any of its members for further information.  He failed to  read Carleton's report from May.  Skolfield left on  vacation on September 18, 2023.

In September 2023, the SCSO and other area law enforcement agencies entered into a contract with a mental health specialist who was hired specifically to provide services, advise officers on mental health matters, and function as a liaison between the department and citizens.  The goal of this contract was to assist officers handling mental health cases and to get citizens in distress the help they needed.  The mental health specialist underwent training in September and was fully available in October but was never consulted or used in Card's case.  Skolfield had received the National Alliance on Mental Illness (NAMI) weeklong Crisis Intervention Team training.  He did not consult with NAMI, the Maine Office of

---

[61] Skolfield apparently did not appreciate the seriousness of the situation.  Card's paranoia and delusions were unchecked, he believed he was being reviled and persecuted, and he had access to multiple guns at two locations-his home and a gun safe located at the family farm.  Skolfield did not inquire as to the number, location, and types of firearms at Card's home or in the family safe.  Had he read Deputy Carleton's May report, he would have learned some of this information.

[62] As the Commission previously stated in the Interim Report, these actions were an abdication of the duty of the SCSO.

[63] It is not up to private citizens to decide whether to "press charges."  Prosecutors decide which charges to file based on their review of the information provided to them by investigating law enforcement officers.

23.

Behavioral Health, or Sweetser, which all provide mental health services or information, or any other mental health resources.

## 5. October 1-25, 2023

After Skolfield returned from vacation on October 1, 2023, he did not attempt to meet with Card, check back with other members of the Card family, or attempt to call Card.  He never called Hodgson or other members of the AR unit who could have provided him with first-hand information about Card and his declining mental health.   Neither he nor anyone else in the Sheriff's Office consulted with the mental health liaison on ways to address the issue or seek assistance in contacting Card.   He closed the case on October 1, 2023.   Without taking any further action, Skolfield canceled the File 6 notice at 8:54 a.m. on October 18, 2023, just one week before Card committed Maine's deadliest mass shooting.

On October 19, 2023, Card made a delivery to a warehouse in Hudson, New Hampshire. While there, he told two employees that he knew they were talking about him.  Card told them, "Maybe you will be the ones I snap on."  Neither worker had said anything about him or to him, and nothing further occurred.  They reported this information to the Hudson Police Department in the early morning hours of October 26, 2023, after one of the workers recognized Card's photograph on the news.

On October 23, 2023, Bagley spoke with Mote concerning the open Ellsworth Police Department case on Card.  Mote told him that nothing had been done with Card.  He stated that  Card was not helping himself by failing to cooperate with the military and that he would be "forced out with a discharge" in the next few days.[64] Mote stated that he was unaware of any new threats against him; Bagley closed the case.

A post-shooting forensic analysis by the Maine  State Police Computer Crime Unit (CCU) of Card's emails showed that between August 25, 2023, and October 26, 2023, Card received over 1200 emails to his personal email address.  Of these, he opened fewer than 20. He received and opened five emails from personnel with the Army Reserve Medical Management Center (AR-MMC).  In each email, AR-MMC personnel indicated they were attempting to reach him to update his behavioral health profile and provide various documents.  In at least two of the emails, the AR-MMC personnel indicated that they had tried to reach Card by phone.  Card did not respond to any of these emails.  The last email

---

[64] Military records provided to the Commission indicate that initial retirement paperwork was sent to Card earlier in the summer.  There was no pending retirement application, and Reamer failed to file any reports or other documents needed to begin the medical board review process or force a medical discharge.  Card received computer-generated notices about his absences from the April, September, and October battle assemblies that could have resulted in discipline or discharge.  The third notice, sent by registered mail, was returned undelivered on October 25, 2023.

that Card opened was from the AR-MMC on October 24, 2023.  Reamer was copied on each
of the five AR-MMC emails.[65]   No documents were provided by the AR or the AR-MMC
indicating that Reamer responded to or inquired about the contents of the emails.

Another post-shooting forensic analysis was conducted on Card's cell phone.  On October
22, 2023, at 16 minutes past midnight, Card generated a note stating that he had "had
enough" and was trained to "hurt people."  It does not appear that this note was ever
transmitted to anyone.  The analysis also determined that the last message from Card's
phone occurred at 11:01 a.m. on October 24, 2023, and was sent to an unknown number.
Card was looking for the power cord for his griddle.  The last instant message/text he received
before the shootings was an automated message on October 24, 2023, at 11:21 a.m., from
his house cleaning service.  The last call to Mr. Card occurred on October 24, 2023.  It was
from the AR PHP program.   When the caller identified herself, Card hung up.   Card's phone
last moved at 6:05 p.m. on October 25, 2023.  He left it behind at his home before departing
for Just-In-Time Recreation.[66]

## B.   Robert Card II's Actions on October 25, 2023, and the Immediate Aftermath

Sometime after 6:05 p.m. on October 25, 2023, Card left his home in Bowdoin and traveled
approximately 17 miles to Just-In-Time-Recreation in Lewiston.  His precise route and
whether he made any stops along the way are unknown.[67]

Card entered Just-In-Time Recreation at 6:54:20 p.m. through a set of double glass doors at
the front entrance.  More than 60 patrons and employees, including 20 children, were
present.  Card was armed with a .308 Ruger SFAR rifle with a scope and a laser targeting
device.

In 45 seconds,[68] he fired 18 rounds, killing eight people and wounding three others.
Additional people suffered physical injuries while trying to hide or escape.  Among those

---

[65] Reamer also failed to follow up with Card about these emails, whether via text, email, instant message, by
phone or by arranging for a personal visit by him or others in the unit's command staff.  He testified that his
emails were "down" at the time they were originally sent,  and that he did not read them until after the shooting.
He did not explain why, as Card's commanding officer, he had not read any AR emails between July and October
2023.

[66] Both searches and analyses occurred only after applications for search warrants had been approved.

[67] Security videos secured from businesses immediately surrounding Just-in-Time Recreation show his arrival
and departure.

[68] These times were determined by analysis of the security camera tapes at Just-in-Time Recreation.

killed at Just-In-Time were Tricia Asselin, Thomas Conrad, youth bowling league coach Robert Violette, his wife Lucille Violette, and 14-year-old Aaron Young and his father, William Young. Two patrons, Jason Walker and Michael Deslauriers II, were killed as they charged at and attempted to disarm Card. Their actions gave other patrons more time to flee or hide and saved many lives. There were numerous other acts of bravery and heroism.

Card departed Just-in-Time at 6:55:05 p.m. He got into his white Subaru and headed south on Main Street (US Route 202) toward Schemengees Bar and Grille.

At 6:55:31 p.m., a dispatcher received the first 911 call from Just-in-Time. Multiple other calls followed. Regional communications centers in Lewiston-Auburn, Cumberland County, and Augusta immediately dispatched law enforcement officers to respond to the scene. At 6:59 p.m., the first officers from the Lewiston Police Department and an Androscoggin County deputy sheriff arrived. Less than 20 seconds later,[69] they entered the building to search for Card and render aid to victims.[70] Emergency medical services also responded.

Meanwhile, Card drove approximately four miles from Just-in-Time Recreation to Schemengees Bar and Grille. He left his car running and entered the building at 7:07:34 p.m.[71] During the next 78 seconds, he fired 36 rounds, killing ten people and wounding ten others. Bartender Joseph Walker was killed as he grabbed a knife and tried to stop Card. His actions distracted Card and saved lives. Others responded bravely and helped save lives.

The other persons killed at Schemengees were Arthur Strout, Joshua Seal, Ronald Morin, Stephen Vozzella, Keith Mcneir, Bryan MacFarlane, Maxx Hathaway, Peyton Brewer-Ross, and William Brackett. Seal, Vozzella, Brackett, and MacFarlane were members of Maine's Deaf community.

While Card was still shooting at people in Schemengees, a patron located the main power switch and shut off the power to the building. Because that action rendered the building pitch dark, it allowed others to flee or hide. Card left six seconds later.

---

[69] The Commission notes that the first responding officers did not hesitate to rush in to try and locate Card and render aid to the victims and survivors.

[70] The co-owner of the business, Samantha Juray, quickly locked the doors as soon as Card departed. She also unlocked the doors for law enforcement and provided them with a description of Card. Another employee escorted children into a safe area and was shot in the process. Another patron hustled several children, including one who was badly injured, into a storage closet and barricaded the door.

[71] On his way in, he passed an unidentified individual standing outside next to the door and left him unharmed.

The first calls for help to 911 operators from Schemengees Bar and Grille were received at 7:08 p.m.  Multiple calls followed.  The first three officers arrived at 7:13 p.m.  They were met by patrons in the parking lot, some screaming that the shooter was still inside while others shouted that he had left.  Like the officers who responded to Just-in-Time Recreation, the first responding officers did not hesitate to rush inside, searching for Card and then rendering aid to victims.  Realizing that there were many wounded individuals who needed immediate aid, first responders also stepped up to transport them in their cruisers and trucks, ensuring that they received medical attention as quickly as possible.[72]

Eighteen .308 caliber cartridge casings, four live .308 caliber cartridges, multiple bullets, and bullet fragments, and one 25-round capacity magazine containing twenty-two live .308 caliber cartridges were recovered inside Just-In-Time.  Thirty-six fired .308 cartridge casings, one empty 25-round capacity magazine, and multiple bullets and bullet fragments were recovered inside and outside Schemengees.

## C.  The Emergency Response - October 25-27, 2023

During the unprecedented manhunt and criminal investigation that followed Card's actions, over 400 law enforcement personnel responded to Lewiston and the surrounding communities in search of Card.  They came from local, county, state, and federal agencies from across Maine, New England, and beyond.  Additionally, 16  tactical teams, multiple aircraft and dive teams, and other specially trained evidence response teams from across the Northeast participated in the search and investigation.

Hundreds more emergency communication specialists, emergency medical technicians, police cadets, data analysts, victim witness coordinators, ASL interpreters, and hospital employees also responded.  The precise number of responders or the number of responders from individual agencies cannot be reliably determined because no centralized list or database was established or maintained.  Some came at the specific direction or orders of their agencies; others, on their days off or on vacation, simply appeared and went to work.[73]

The emergency communication centers answered more than 900 calls, and the tipline entered over 861 calls into its database.  Over 580 pieces of evidence were collected,

---

[72] A private company provides ambulance services for the City of Lewiston.  All its ambulances were tied up at Just-in-Time Recreation.  While calls to other communities for ambulance response were made, first responders decided not to wait for their arrival and, instead, transported some of the injured persons in cruisers or game warden trucks.  One unidentified private citizen was flagged down and took an injured person to the hospital.

[73] For example, a director of victim witness services from Iowa was on vacation in Maine when the shootings happened.  She canceled her remaining vacation plans and came to Lewiston for three days to assist Maine's victim witness advocates.

cataloged, and stored.  An additional 475 non-evidentiary personal effects were gathered by
the Maine State Police and the Maine  Office of Chief Medical Examiner, and, with the
coordination of the FBI Victim Services Response team, all the items were cataloged and
eventually returned to their owners or the next of kin.  A few of the items were destroyed at
the owners' request.  Personal vehicles that had been parked at the two scenes were
photographed, processed, and returned to their owners.[74]

All law enforcement command-level officials candidly admitted that in the initial hours after
the first 911 call, the response and the scenes were utter chaos.  The sheer number of
responding officers, the severity of the injuries at each location, the number of false reports
in quick succession, and the need to quickly and effectively "clear the buildings" to ensure
the shooter was still not inside and to render aid to the injured, created unprecedented
challenges.

## 1. October 25, 2023

Lt. James Theiss of the Lewiston Police Department and Chief Jason Moen of the Auburn
Police Department quickly determined that scene command and control was necessary at
each location until the Maine State Police could assume control.[75]  They directed responding
officers and emergency medical personnel to enter and search, establish perimeters,
provide security, render aid, and direct survivors/witnesses to centralized locations so that
officers could begin gathering necessary identifying information and statements.  They
attempted to coordinate dispatch responses, control the scene, and communicate
directions to officers.  Other first-responding officers assisted in these matters.

Early in the process at the two crime scenes, survivors were instructed to gather in an area
away from the buildings but in areas that were well lit and visible to responding officers.[76]
Police officers searched for victims who had fled into adjoining wooded areas or along the

---

[74] In one of the unlocked vehicles, investigators observed a firearm and related equipment.  The investigators
needed to determine ownership and ensure that it was not related to the shootings.  This caused a delay in the
release of some of the other vehicles because they needed to process and document the scene.  In some
instances, owners did not have their keys because they had been left behind.  Keys had to be retrieved,
documented and matched to the owners before the cars could be moved.

[75] Under Maine law, the Attorney General is responsible for investigating and prosecuting all homicides.  The
Maine State Police are designated as the investigating agency statewide, except in Portland and Bangor.  In
those cities, the municipal police departments are so designated.  Maine State Police troopers had to travel to
Lewiston to establish the Command Center.

[76] Some survivors testified that being directed to an area directly under the illuminated business sign made
them feel exposed and vulnerable.  On the other hand, other survivors would have felt uncomfortable if they
were told to stay in the shadows.

28.

riverbank.  An injured Deaf individual[77] was found in the woods along the riverbank and transported to the hospital.  Eventually, survivors were taken to the Lewiston Armory, where officers from the Cumberland County Sheriff's Office and agents from the FBI conducted preliminary interviews and obtained information.  The survivors were then transported from the Armory to a local school where a "family reunification center" was established.[78]

When it was discovered that some of the victims were members of the Deaf community, an officer from the Lewiston Police Department who knew American Sign Language was assigned to the Armory.  Certified American Sign Language interpreters were initially turned away from the Armory by officers providing security[79] and were not permitted entrance into the hospitals for several hours by security personnel.[80]

Throughout the evening and nighttime hours of October 25, patrol officers saturated Lewiston and surrounding communities and responded to dozens of reported sightings.[81] Officers went to local businesses that were open, advised them to close, and escorted patrons to their cars.  They provided security at area hospitals and at the scenes of the crimes. When citizens reported strange noises or suspicious persons or vehicles, they searched area homes and yards.  They patrolled neighborhoods and checked closed businesses and schools.

Initially, many of the officers responded to the Lewiston Police Department headquarters in downtown Lewiston.  When it became clear that there was simply not enough space or parking, officers from outside Lewiston were directed to a staging area at the Colisée in

---

[77] An initial call to 911 by a hearing survivor relayed that he was with an injured person who appeared to be Deaf. It is not clear from the records if the presence of Deaf individuals was relayed to responding officers or EMS at that time.  Command staff members were not initially made aware of the presence of Deaf individuals and victims.

[78] Notification of the creation of the family reunification center was broadcast, and many family members went to meet their loved ones.  For some families, their loved ones were not there, and no reunification occurred, making the name of the center unfortunate.

[79] These ASL interpreters self-dispatched to the Armory and the hospitals as soon as they learned through social media that members of the Deaf community had been injured and killed.  Because of lockdown and security policies, and because they could not verify that the Incident Command Center had requested them, the interpreters were turned away.  There is no uniform statewide identification badge for certified interpreters.

[80] Coordination among law enforcement, emergency communication specialists, the ASL interpreters, and the hospitals could have prevented this.

[81] The Maine Emergency Management Agency (MEMA) issued and broadcast a shelter-in-place advisory at 7:55 p.m. Eleven minutes later, MSP issued a social media alert on Facebook, Instagram, and X (formerly Twitter) advising citizens of the active shooter situation and asking them to stay off the street, shelter in place, and report any suspicious activity.  The City of Lewiston issued a shelter-in-place order at 8:57 p.m.

Lewiston to await further directions. Some officers were immediately assigned to specific tasks, but some of those who were not  immediately assigned did not comply with the request to wait for an order; many self-dispatched to scenes.  These actions were sometimes helpful [82] but in other situations, created confusion, blocked roads, and resulted in some duplication of efforts. [83]

At 7:34 p.m., law enforcement obtained the video of Card entering Just-in-Time Recreation. Major Lucas Hare of the MSP established the Incident Command Center (ICC) at 7:42 p.m. at the Lewiston Police Department.[84]  The Incident Management Team (IMT)[85] mapped duties and responsibilities, assigned responding officers to various patrols and searches, and coordinated investigative responses with members of the homicide investigation team.  This included assigning personnel to security matters, interviewing witnesses and survivors, coordinating incoming messages, and establishing a tipline for citizens to call in possible leads.

Video surveillance from Schemengees Bar and Grille and other businesses in the area captured Card's white Subaru as he fled.  The video images of Card from Just-in-Time Recreation were released to law enforcement at 7:52 p.m. and publicly disseminated seconds later.  The image of his car[86] was publicly distributed at 8:06 p.m.  At 8:57 p.m., a nationwide police bulletin was broadcast describing, but not naming, Card and his vehicle.

---

[82] For instance, dozens of officers self-dispatched to the Walmart Distribution Center.  Several officers stopped and confronted an armed private citizen who had decided to respond to the Center to "find the shooter," while others  quickly organized themselves and conducted a security sweep of facility and determined the call was false.

[83] Col. William Ross, Chief of the Maine State Police, testified that this is a difficult balancing act.  He explained that, when faced with an active shooter scene, all responding officers are wanted and necessary.  Once the emergency response is over, however, self-dispatching officers could interfere with an organized, systematic, and well-executed operation.

[84] Prior to their arrival at the Lewiston PD, multiple Command team members began coordinating search and investigative matters with specialized teams from across Maine and New England.  The MSP's participation in the New England State Police Compact and earlier training and contact with other local, county, and federal law enforcement agencies allowed the MSP to quickly connect with and request assistance from these other agencies.

[85] An Incident Command Center is part of the Incident Command System, comprising nationally recognized policies and procedures for managing large-scale disasters and crime scenes.  Every law enforcement officer in Maine receives initial basic training on the incident command system while attending the Maine Criminal Justice Academy Basic Law Enforcement Training Program.  The Incident Management Team runs the operations.

[86] Shortly after the description of the car was broadcast, multiple officers responded to a crash involving a vehicle similar to Card's that had just occurred on an entrance ramp to the Maine Turnpike.  This crash turned out to be unrelated.

Between the arrival of the first responding officers to Just-in-Time and Schemengees and the distribution of the nationwide police bulletin, the Lewiston-Auburn Communication Center received calls of active shooters at three additional scenes. At 7:51 p.m., there was a report of an active shooter at DaVinci's Restaurant. At 8:11 p.m., there was a report that a man armed with a gun had entered the massive Walmart Distribution Center[87] and a third report that a shooter was seen on a nearby street. All these reports later proved to be unfounded, but each required an immediate response by dozens of law enforcement officers.[88]

At 9:20 p.m., members of Card's family called the Lewiston Police Department and identified him as the shooter in the images from the video surveillance at Just-in-Time Recreation. Nicole Herling and Cara Lamb provided positive identification that police immediately verified through driver's license and vehicle registration information. With that confirmation in hand, law enforcement broadcast the information to all responding officers, many of whom immediately started patrolling Lewiston and other communities looking for Card.

Once Card's identity was established, the separate investigative and manhunt operations teams focused on learning about Card. Members of Card's family went to the Lewiston Police Department and gave detailed statements to investigators that allowed law enforcement to concentrate its efforts, provide security details to other potential targets, and focus on planning for and obtaining search warrants. This information also allowed investigators to seek and obtain cell phone location information, employment information, gun ownership information, and information from members of Card's AR unit. Their information also provided investigators with clues concerning Card's past actions, the type and number of his firearms, his mental health status and treatment, and possible course of travel.

Twelve minutes after the shooter was identified, the Maine State Police contacted Card's cellular service provider seeking location information for his cell phone. Four minutes later, the provider notified the State Police that the phone was at his residence in Bowdoin. It had last moved at 6:05 p.m.

Lisbon Police Chief Ryan McGee instructed his officers to concentrate their patrol in Lisbon, a town adjoining Lewiston. At 9:56 p.m., two officers spotted a car, apparently abandoned and not running, at the public Papermill Trail/Miller boat launch in Lisbon. A license plate

---

[87] This center is over 800,000 square feet in size.

[88] Two other individuals called the police and claimed that they were involved in the shootings. Extensive investigation that night and the next day proved that these reports were false and unrelated to the events. This tied up valuable investigative resources that could have been directed elsewhere.

31.

check verified that the vehicle was registered to Card. The Lisbon officers notified the MSP of the car's discovery, and MSP dispatched tactical operators to the boat launch. The Lisbon officers, who were not equipped with any protective equipment, were instructed to park near the vehicle and train their weapons in that direction but not to approach the car until appropriately equipped officers arrived. A canine patrol officer from the Topsham Police Department arrived shortly thereafter and assisted in securing the scene.

Members of the MSP Tactical Team were immediately dispatched to the boat launch. Before the tactical team arrived, its members and Lisbon officers were in radio communications with a New Hampshire State Police helicopter and provided information and details that assisted in the helicopter's night vision search of the area. Another tactical team assumed a position on a bridge nearby.[89] However, dozens of other officers, some in uniform and some not, also responded to the scene. Many left their vehicles running, and some unidentified officers, who were not in uniform or equipped with appropriate safety gear, entered the woods surrounding the boat launch, using a paved recreational path that ran parallel to the boat launch.[90] MSP witnesses testified that these actions contaminated the scene and factored into the MSP tactical commander's determination that a canine search would be too dangerous and most likely futile.[91]

While all this activity was occurring in Lisbon, a press conference was held at Lewiston City Hall. This was recorded and made available on YouTube.[92] Card's name had not yet been released. At 10:14 p.m., the Maine Information and Analysis Center (MIAC) disseminated a "law enforcement sensitive bulletin"[93] naming Card as the active shooter suspect. Very

---

[89] One member of this team issued a public statement accusing members of a third tactical team of being intoxicated. The respective law enforcement agencies investigated these allegations. This report did not affect the Commission's findings or the police response, making any further discussion unnecessary.

[90] A camera that was on the path was not working that evening. There were no video cameras around the boat launch.

[91] Witnesses from the MSP testified that, due to the length of time that had passed since Card left Schemengees and the contamination of the scene, it was unlikely that such a search would have been fruitful. In addition, the lack of appropriate safety gear for patrol officers to enter a pitch-dark area in search of a man equipped with a high-powered rifle and, reportedly, a night vision scope, created unsafe conditions. A New Hampshire State Police helicopter equipped with thermal imaging cameras and spotlight had already flown above the area, and another tactical team with thermal imaging capabilities stood watch on a nearby bridge. Neither had seen any sign of Card. In addition to finding Card, it was a high priority of the Incident Command Team to prevent the death or injury of any responding law enforcement personnel.

[92] At this first press briefing, no ASL interpreter was visible on the screen. This was frustrating for members of Maine's Deaf community as it had been reported over social media that four of their community members had been killed and additional members had been injured.

[93] All law enforcement officers in Maine are trained and are aware that these types of bulletins are not to be released or distributed further.                                                                                          32.

shortly thereafter, the confidential bulletin was leaked to the media. Within minutes, his name and image were posted and broadcast across social media and by local, state, national, and international news outlets.[94]

After tactical teams secured the scene, they approached Card's car. At 10:37 p.m., they confirmed that Card was not inside. They found the Ruger firearm, with fourteen live cartridges in the magazine and one live cartridge in the chamber, and five more magazines containing sixty-three live .308 cartridges, inside the car. There was no evidence found in the car to assist in the search for Card. Police towed the car from the scene. They obtained a search warrant and analyzed the weaponry. It was later determined that the Ruger recovered from the car was the murder weapon.

During the night of October 25, Officers in two Lisbon cruisers decided to perform a sweep of the overflow trailer parking lot at Maine Recycling. Initially, they began inspecting the various trailers, including opening the rear doors but soon realized that given their lack of protective equipment, insufficient lighting, the height of the trailers[95] and the lack of appropriate backup, that it was not safe to continue the individual inspections of the trailers. They finished with a visual sweep of the lot. The Lisbon police chief told a state trooper about their abbreviated search and the existence of the overflow lot. Two other individuals- the manager of the Maine Recycling Center and Card's brother - also told police of the existence of the overflow lot. This information was not relayed to the commander of the manhunt team. Nearly two days passed before this lot was thoroughly searched and Card's body was found.

Operational briefings for law enforcement only were held at 11 p.m. on October 25 and again at 2 a.m. the next morning. The briefings provided the latest updates to the law enforcement officers in attendance, and it was expected that the chiefs or command staff of each agency would convey the law enforcement-sensitive materials to their officers. Numerous operational tasks were identified, discussed, and assigned during both briefings. Many of the assignments were investigative, involving personal or safety-sensitive matters that were not for public release.

---

91  According to the Maine State Police, the premature broadcast of this information and the additional leaking of law enforcement sensitive information interfered with the search for Card and potentially put investigators, witnesses, and responding officers in danger.

95  The doors to the trailers were approximately four feet off the ground, putting the officers' upper bodies at trailer entrance level. Without protective gear, this positioning made the officers targets for anyone who might have been inside.

The search for Card continued through the night and into the next morning.  Patrols scoured the area and officers responded to multiple calls.

## 2.  October 26, 2023

After the 2 a.m. briefing, the ICC was moved to Lewiston High School.  This permitted the IMT to establish separate and secure working areas for command staff, the manhunt and investigative teams, victim service representatives, Attorney General representatives, chaplains, the tipline staff, operational and food services, and space for law enforcement partners from local, county, state, and federal agencies.  At 2:24 a.m., Card's vehicle was removed from the boat launch and secured at the State Police Crime Lab in Augusta pending the issuance of a search warrant.

At 6:13 a.m., a social media alert was posted  announcing an expansion of the shelter-in-place order to include Bowdoin, Lisbon, Lewiston, all of Androscoggin County, and northern Sagadahoc County.  More than 30 school districts in towns as far south as Wells and Ogunquit, as far east as Rockland, and as far north as Augusta, closed.  The processing of the crime scenes began and continued for two days.

Another operational briefing was held at 8 a.m. on October 26.  The Major Crimes Unit of the MSP coordinated this law enforcement-only briefing.  Goals were outlined for the operational cycle from 8 a.m. to 10 p.m. and some limited tactical plans were reviewed so that those in attendance would understand the manhunt strategy and plans.  Criminal investigative information was also shared, along with specific instructions for officers should they apprehend Card.  A tipline, dedicated to this incident, was launched to take information from the public.[96]  A standard confidential radio frequency was established for all law enforcement agencies.

Maine police cadets and troopers from the New Hampshire State Police took over 800 calls on the tipline, sorted and prioritized the information, and relayed pertinent tips to the  IMT[97] for further dissemination to the manhunt and criminal investigative teams.

A second press conference was held at 10:30 a.m.  ASL interpreters were present.  Updates from the Governor and state and federal law enforcement were provided.  An affidavit for an arrest warrant charging Card with 18 counts of murder was drafted, reviewed by a District

---

[96] The dispatch centers fielded over 900 calls during this incident.

[97] The Maine State Police have acknowledged that the tipline team should have included experienced local officers who knew the area and members of the homicide investigation and manhunt teams who could have coordinated and screened the information received.  In their view, a more coordinated dissemination of information between the manhunt and criminal investigative teams would have been helpful.

34.

Court judge, and issued at 10:00 a.m.  The arrest warrant was entered into a nationwide wanted person database.[98]

Throughout the day and into the evening of October 26, 2023, investigators drafted, judges issued, and law enforcement executed search warrants.  This included warrants for searches of Card's home, multiple other locations where it was thought he might be, and his car.  Investigators also conducted consent searches that did not require a search warrant at the homes of Card family members, businesses where he had worked, empty buildings or businesses, and other locations.  Law enforcement officers conducted consensual safety sweeps of the homes of potential witnesses, neighbors, and businesses.  They also provided security for and helped transport potential witnesses to safe locations.

An investigative briefing for law enforcement was held at 3:35 p.m.  MSP shared information about the progress and the results of the various searches.  Before the briefing was even completed, law enforcement-only information was leaked to the press.  Because of the leaks, the IMT staff decided to limit the information shared at future briefings.[99]  Another law enforcement-only briefing was held at 8:00 p.m.  Attendees were specifically instructed that the information could only be shared with law enforcement and was not to be distributed further.

The manhunt for Card continued throughout the day and evening of October 26, 2023. The ICT, along with members of the Maine Warden Service, developed and implemented a detailed grid search plan that was used to extend the ground and water search for Card.  Multiple search warrants were also  obtained to search Card's residence and other locations.  Patrol officers responded to hundreds of calls from concerned citizens who thought they had spotted Card or who heard suspicious sounds.

Police patrols looking for Card across multiple communities continued throughout the night.  The IMT made plans for the next day's operations, including supporting the manhunt, extending the ground search, using dive teams and air support, and adding tactical team searches. The tipline continued and relevant information was passed on.  Crime scene processing continued as well.  Members of the MSP and FBI evidence response teams traced, cataloged, and collected over 500 pieces of evidence, thousands of photographs and videos, and extensive GPS mapping of each of the scenes.  In addition, these teams managed the recovery, cleaning, and cataloging of  475 items of personal property.

---

[98] One victim survivor complained that her loved one's name was published in the charging documents and made public hours before she received official notification of his death.

[99] The existence of and contents of a note left at Card's home was leaked.  The release of this information caused anguish to innocent individuals.

### 3. October 27, 2023

The first operational briefing of the day was held at 8 a.m.  These operational briefings were open to law enforcement and, as had been the practice from the beginning, each agency lead was encouraged to pass the law enforcement sensitive information onto their respective officers.  Some agency leads remained at the command center throughout the search, while others returned to their communities.

Lewiston's Chief of Police David St. Pierre and Maine Department of Public Safety Commissioner Michael Sauschuck conducted a press conference at 10 am.  ASL interpreters were present, and Commissioner Sauschuck requested that any news organization that broadcast from the press conference ensure that the interpreters remain fully visible on the screen.

Patrols continued throughout the day.  Shortly after noon, a search warrant was issued for Card's cell phone, including his voicemail messages, texts, emails, and instant messages.  At 2:44 p.m., a separate search warrant for his cell phone records was issued.[100]  The Maine State Police Computer Crimes Unit conducted a forensic examination of his phone.

To keep all agencies informed about the investigation and the manhunt, Col. Ross, chief of the MSP, conducted a virtual operations briefing with police chiefs and sheriffs from across the state at 2:30 p.m.

In the late afternoon of October 27, 2023, MSP determined that the trailers in the overflow lot of the Maine Recycling Company in Lisbon had never been adequately searched.  Two specially trained tactical teams began searching and clearing the trailers just after 7 p.m.  At 7:40 p.m., Card's body was found in the 55th and last trailer to be searched.  The officers also found a Smith and Wesson .40 caliber handgun with a total of 45 live rounds in three magazines, a Smith and Wesson MP15 .556 mm rifle, and 242 live cartridges in eight magazines.[101]  Card died of a self-inflicted gunshot wound to the head from the handgun.

---

[100] A U.S. Supreme Court ruling requires law enforcement to obtain a search warrant before they can inspect or search the content of a person's cell phone.  *See Riley v. California*, 573 U.S. 373 (2014).  Records maintained by his cell phone provider are separate and require a second separate warrant.  MSP was able to obtain initial location information within hours of the shootings that informed them that the phone was left behind at Card's home.

[101] Card legally purchased both weapons: the Smith and Wesson handgun in July 2012 from Cabela's in Scarborough, Maine, and the Smith and Wesson rifle in November 2018 from Rideout's Gunworks in Richmond, Maine.

After Card's identity was confirmed, an operations briefing for law enforcement was held at 8:30 p.m. At 10:00 p.m., a public press conference with Governor Mills, Chief St. Pierre, Commissioner Sauschuck, and ASL interpreters was held, announcing that Card's body had been found.[102]

Despite extensive investigation, neither law enforcement nor the Commission has been able to determine Card's whereabouts between the time he abandoned his vehicle at the Lisbon boat launch and when his body was discovered. Evidence gathered from the trailer yielded no clues. It is known that Card did not return to his home, the homes of his family members, or the family farm.[103] His exact location and movements after leaving his car have not and likely will never be determined.

Likewise, due to several variables, including the nature of Card's self-inflicted injury and the ambient air temperature in the box trailer where he was found, the Office of the Chief Medical Examiner was unable to determine the precise time of his death.

By the end, over 400 sworn law enforcement officers and hundreds more emergency dispatchers, emergency medical responders, victim witness advocates, doctors, nurses, medical technicians, ASL interpreters, prosecutors, judges, court clerks, volunteers, and support staff participated in the shooting response. Sixteen tactical teams undertook 29 separate tactical team missions. Local, county, state, and federal agents worked thousands of hours during these 49 hours. Thousands more hours were devoted to investigations, report writing, post-incident after-action analysis, and response to requests for reports and testimony before the Commission.

## D. Victim Services Response - October 25-Present

On October 25, 2023, victim witness advocates (VWAs)[104] from across the state, advocates from the Maine Attorney General's Office, and Victim Witness Advocate Coordinator and

---

[102] During this time, another search warrant was issued, this time for the infotainment center on Card's vehicle. Investigators were looking for GPS information that could have provided clues as to his whereabouts and his routes of travel before and after the shooting on October 25th. Because Maine's Crime Lab does not have the technology to conduct such examinations, it was sent to the New York State Police Crime lab. As of the date of this report, the results have not been received.

[103] The Card family cooperated fully with law enforcement investigators and has been of great assistance to the Commission.

[104] There are 46 VWAs who work in prosecutors' offices across the state. Three VWAs are assigned to the Attorney General's Office for the general homicide caseload. Two other agencies, the Elder Abuse Institute of Maine and the Portland Police Department, immediately allowed their respective VWAs to respond to Lewiston.

Director of Victim Services Cara Cookson attended the annual Maine Prosecutors' Conference in Bar Harbor, Maine.[105]  Shortly after 7:30 p.m.,  they received word of the shootings in Lewiston.  Some made plans to depart the conference immediately and go to Lewiston, while others planned for a departure at sunrise.  Planning for services, contact with state and federal partners, and coordination with the homicide prosecutors began immediately and continued throughout the night.[106]  Knowing the VWAs would be overwhelmed by the sheer number of victims and survivors, Cookson requested assistance from the FBI Victim Services Response Team.  The FBI sent a team of approximately 50 people with specialized skills, including direct victim services, information technology, victim and survivor data collections, needs assessments and referrals, ASL interpretation, and the cataloging and return of personal effects.

During the 49-hour manhunt, VWAs were available, provided services, and answered hundreds of questions and inquiries from survivors, victims' families, and members of the public.  They initiated processes to secure emergency funding for victims and survivors and provided grief support.[107]  Each time law enforcement officers made a death notification, the VWAs initiated contact with the families.

The VWAs initially had trouble obtaining accurate contact information for witnesses and survivors of the shootings who had not required medical attention.  In the first two days after the shootings, these challenges were compounded by the shelter-in-place orders and the fact that a Family Assistance Center had not yet been established.[108]   A Family Assistance Center was eventually established at the Lewiston Armory and opened on the morning of

---

[105] Each year, the Maine Judicial Branch sets aside three days in October when only emergency court hearings are held.  This allows prosecutors and their staff, judicial officers,  and the criminal defense bar to hold separate conferences or meetings where continuing education and frank discussions can be held.  Victim witness advocates have, for years, joined the prosecutors' conference, where they attend some joint sessions and hold their own training sessions to stay up to date on the latest research and programming for their profession.

[106] Cookson knew that crime victim services were not yet addressed in any state mass violence response plan or incident command program.  However, prior to October 25th, she had initiated conversations with the Office of Chief Medical Examiner, MEMA, the U.S. Attorney's Office for Maine, and the FBI Boston division to learn about the resources available to begin addressing this gap.

[107] Kelly McGinnis and Kim Ward, victim compensation specialists with the Maine Attorney General's Office, also immediately responded and established a remote office to meet with victims and survivors and process short-form applications specially designed for mass casualty events.  They were assisted by members of the victim services team from the Maine Department of Corrections.

[108]A Family Assistance Center is a large physical space where anyone affected by a mass shooting or other calamitous event can come and receive a wide variety of services under one roof.  Law enforcement personnel were concerned with the safety of opening such a center when Card was still at large.

October 28th.[109]  A separate center for community members who felt the effect of the incident was established at the Ramada Inn.  Members of the press were not permitted to enter either site.

Services provided to survivors and victims included assistance with victim compensation applications, gift cards for immediate financial needs, trauma-informed childcare that allowed adults to have separate conversations, psychological and spiritual first aid and care, legal services, and educational resources.  The FBI and the Harvard, Massachusetts, Police Department provided two therapy dogs for psychological support.  When requested, advocates assisted families in arranging funeral services.

The American Red Cross and the Salvation Army  set up the site and coordinated services and financial assistance and offered three meals each day for all who came to the Family Assistance Center.  Disability Rights Maine and the Maine Association for the Deaf rapidly built and deployed systems to facilitate communication with members of the Deaf community.  The New Hampshire Department of Justice deployed three VWAs; victim specialists from the U.S. Attorney's Office for Maine and New Hampshire also assisted the Maine VWAs with their duties.  Many of these individuals continued to provide services beyond the initial days following the shootings.  Local VWAs from Androscoggin County teamed up with FBI specialists and met with victims and their families at the local hospitals and at their homes.

The Family Assistance Center remained open for six days, serving 200 individuals.  It closed on November 2nd and was replaced by a Resiliency Center, which opened in record time on November 13, 2023, and remains open.  This Center provides long-term continuing support and programming for survivors, their families, and any other member of the community affected by the tragedy.

When Card's body was found, VWAs scrambled to notify as many victims and survivors as possible before the discovery was publicly announced.  Unfortunately, this news was once again leaked before the official press conference, and many victims and survivors learned about it through social media and unconfirmed news reports.[110]   Once the Incident Command Center was closed, the need for a consistent, secure, and private location where

---

[109] Many survivors expressed dismay over the selection of this location by the FBI, given that they had been transported to the Armory the night of the shooting, and returning there would be traumatic for them.  However, after reviewing multiple sites in the city, the FBI Victim Services team determined it was the only site within the city boundaries that could provide the space for law enforcement, private meeting space, food services, and handicap accessibility for such a large operation.  Some who needed the services stayed away because they did not feel psychologically safe at that location.

[110] This continues today each time law enforcement, the press, or others release information.

VWAs could meet locally with families of the deceased developed. Bates College has provided the VWAs with an office building equipped with furniture and supplies.

As of July 31, 2024, the Victim Compensation Program has received 114[111] applications for assistance. The program reimbursed up to $12,000 for each funeral. A separate $5,000,000 Maine Mass Violence Care Fund was established and funded by an act of the Legislature to provide coverage for physical and mental health out-of-pocket expenses that are not covered by insurance. The funds will be managed by the Office of the State Treasurer with eligibility determined and proceeds distributed by the Maine Crime Victims Compensation Board within the Office of the Attorney General. An additional application for a non-competitive federal grant has been submitted through the U.S. Department of Justice Anti-Terrorism Emergency Assistance program. The Attorney General's Office anticipates receiving these additional federal funds in January 2025. These funds will be used to support the Resiliency Center.

Donations from across the nation flooded into Lewiston to help the victims and survivors of the tragedy. The Lewiston-Auburn Metro Chamber of Commerce, the City of Lewiston, the Maine Community Foundation, and Androscoggin Bank worked together and established two programs: the #One Lewiston Fund to address immediate unpaid bills and to create a lasting memorial in the area;[112] and a separate fund administered by the Maine Community Foundation called the Lewiston-Auburn Area Response Fund. The Response Fund distributed larger awards to victims and survivors.[113] The Chamber also manages several other donor-advised funds that provide financial gifts to victims and survivors. VWAs worked with businesses and other entities that donated non-financial gifts.[114]

The work of the VWAs continues today and will continue for months to come. To date, the homicide VWA team has served at least 132 surviving family members and friends of those who were killed. The District Attorney's Office team has served at least 89 direct and

---

[111] This includes applications for deceased victims, via their families, those with gunshot injuries, those with other physical injuries and those with psychological injuries. The program also serves their family members as secondary victims which more than doubles the number of individuals seeking or inquiring about assistance from the program.

[112] *See* https://onelewiston.org/

[113] This fund received 5,241 contributions from around the world. 100% of the 6.6 million dollars received were distributed to 162 individuals and 29 non-profits in the Lewiston- Auburn area. *See* https://www.mainecf.org/initiatives-impact/additional-initiatives/lewiston-auburn-area-response-fund/broad-recovery-efforts-and-organizations-fund/.

[114] These gifts ranged from home heating fuel, Bruins, Patriots, and Gardens Aglow tickets, frozen turkeys, Christmas trees, gift cards for meals or services, and Build-A-Bear gift certificates.

40.

secondarily injured victims.[115]  Victims who testified before the Commission universally praised the VWAs for their compassion, support, hard work, and dedication.

# VI. WEAPONS RESTRICTION LAWS

## A. New York's SAFE Act

The New York SAFE Act law, found at NY MHL 9.46 et seq., and enacted in 2013,[116] requires that any time a mental health professional who is providing treatment services believes that a patient is likely to engage in conduct that would result in serious harm to self or others, the professional must report this information as soon as possible to the county's director of community services.  If the director agrees with the determination, the director in turn must transmit this report to the New York Division of Criminal Justice Services (DCJS).  DCJS will determine if the individual has a firearms license and, if so, will notify the appropriate local licensing official.  The individual is required to surrender the license and all firearms.  If the firearms are not surrendered, police are authorized to remove them.  The State of New York has issued both a general guide[117] and a hospital guide[118] for SAFE Act reporting.  It has also issued a detailed manual to assist mental health professionals in using the established Integrated SAFE Act Reporting System (ISARS).[119]  The report is submitted electronically using a one-page form.[120]  The Act's reporting standard, i.e., that an individual is likely to engage in conduct that will cause serious harm to self or others, is consistent with the standard used in New York for an emergency "removal" of a person to a psychiatric hospital for an examination, *see* New York MHL Section 9.45, as well as emergency involuntary admissions for observation, care, and treatment. *See* New York MNH Section 9.39.[121]

---

[115] While the press has repeatedly reported thirteen  persons were injured, that number includes only those injured by gunshots that evening.  According to records on file with the VWA programs,  twenty other individuals suffered other kinds of physical injuries escaping the scenes, and many  others have sought VWA services for their psychological injuries.  Numerous others have chosen to address their needs without involving victim witness services.  The exact number of those physically or emotionally injured is not known.

[116] *See* Appendix I.

[117] https://nics.ny.gov/system/files/documents/2023/07/mental_health_law_section_9.46_guidance-document_0.pdf

[118] https://nics.ny.gov/system/files/documents/2023/07/hospital_guidance.pdf

[119] https://nics.ny.gov/system/files/documents/2023/07/integrated_safe_act_reporting_system_user_guide.pdf

[120] https://nysafe.omh.ny.gov/

[121] In many aspects, New York's involuntary commitment laws track the processes of Maine's involuntary commitment law. *See* Appendix E.

Dickison, the psychiatric nurse practitioner at Keller, testified that he did not initiate a SAFE Act petition because his research indicated that the law applied only to New York residents. The statute's language does provide that the petition is to be filed in the subject's "county of residence." It does not further define "residence," nor does it specifically provide that it applies only to residents of New York. Training materials obtained from the New York Division of Criminal Justice Services (NYDCJS) state that petitions may be filed against non-residents.[122] Eleven such petitions have been filed against non-residents, and ten have been granted. Dickison was not aware of these NYDCJS training materials.

The discharge summary prepared by Four Winds and sent to Keller indicated that Keller personnel completed the SAFE Act report before Card was transferred to Four Winds. No copy of such a report exists in the Keller records provided by the United States Army. Dickison testified that he did not file such a petition or see one in Keller's records. Klagsburn asked Sanchez to verify that a SAFE Act petition was filed. According to the New York State Police, no such entry in the name of Robert Card II is in the New York SAFE Act registry.

## B. New York's Extreme Risk Protection Act (Red Flag Law)

The statute creating New York's process for obtaining an Extreme Risk Protection Order (ERPO) is found at NY CPLR 6340, et seq. That law, which became effective in 2019 and is commonly referred to as a red flag law, permits a police officer, district attorney, family or household member, school administrator, physician, registered nurse, licensed clinical social worker, licensed clinical nurse or nurse practitioner, licensed mental health worker, or a licensed clinical marriage or family therapist to file a petition with the court[123] setting forth the facts and circumstances justifying the issuance of an order.[124] This process is separate from a SAFE Act petition. The court may initially grant an *ex parte* temporary order after considering seven relevant factors.[125] If the court grants the temporary order, the person is prohibited from purchasing, possessing, or attempting to purchase or possess a firearm, rifle, or shotgun. The temporary order must be served on the person, and the person is required to immediately surrender to law enforcement all firearms, rifles, or shotguns in the

---

[122] *See* footnotes 113-117 above.

[123] The statute also states that the petition shall be "filed in the county where the respondent resides."

[124] The statute permits medical professionals to disclose otherwise confidential health care and treatment information related to the need for a petition and provides immunity to these professionals for their good faith reporting of the medical information. All filings are confidential and closed to public inspection.

[125] *See* Appendix H for a copy of this law. An ex parte order is one given after a petition is filed by just one side in an action, in other words the person who is subject to the request for a temporary order is not notified ahead of time.

person's possession.  Law enforcement may search for the weapons in accordance with New York law or as directed by the court.

A second hearing is held within six business days after entry of the temporary order.  At that hearing, the party who filed the petition must prove, by clear and convincing evidence, that the subject of the order is likely to engage in conduct that would result in serious harm to self or others.  If the court finds that the party filing the petition has met the burden of proof, a permanent order is entered[126] and the subject of the order is prohibited from owning, possessing, or attempting to own or possess any rifle, firearm, or shotgun.  Law enforcement is authorized to search for and seize firearms.  The order is valid for one year and may be renewed by the court.  There is no provision in this law that explicitly provides for enforcement of the order outside of New York.[127]

Between 2021 and June 2024, eleven out-of-state residents were subject to a temporary extreme risk protection order in New York.  A final extreme risk protection order was granted in ten of the eleven cases.  One was denied in 2022 with the court's notation being "out of state address."[128]

In the case of Card, none of the parties who could have filed a petition in New York for such an order did so.[129]  Even if a red flag law petition had been filed in New York, however, it is questionable whether it could have been enforced in Maine.  At that time, Maine's yellow flag

---

[126] Between 2021 and June 2024, eleven out-of-state residents were subject to a temporary extreme risk protection order in New York. A final extreme risk protection order was granted in ten of the eleven cases.  One was denied in 2022, with the Court's notation being "out-of-state address."  Telephone conversations with Adam Dean, New York Division of Criminal Justice Services, June 21 and 28, 2024.

[127] Some have questioned whether a New York court order could have been registered in Maine and then enforced under the Uniform Enforcement of Foreign Judgments Act, 14 M.R.S. §§ 8001-8008 (2024).   This, however, would have required knowledge of the order and access by a nonparty to the court filings and judgment.  Given the strict confidentiality provisions of the New York law, it is highly unlikely that this could have occurred.  Unlike the federal Violence Against Women Act, 18 U.S.C. § 2265(a),  which allows one state to enforce a domestic violence protection order issued in another state, no such provision exists in federal law for red or yellow flag law enforcement outside the state of issuance.  In 2023, no such provision existed in Maine law.  Maine's law has since been amended to permit enforcement of another jurisdiction's weapons prohibition orders.  See Appendix D.

[128]  Telephone conversations with Adam Dean, New York Division of Criminal Justice Services, June 21 and 28, 2024.

[129] The database that contains these orders is also confidential and not open to public inspection.  It is only open to law enforcement and to federally licensed firearms dealers.  NY State Police have queried the database, and no order exists.

43,

law made no provision for the enforcement of out-of-state orders.  That has since been changed.[130]

### C. Maine's Protection from Substantial **Threats** Act (Yellow Flag Law)

The Maine Legislature passed a "protection from substantial threats" law in 2019 that took effect on July 1, 2020.[131]  Unlike red flag laws in other states, only a law enforcement officer is permitted to file a petition with a court requesting entry of an order that restricts an individual from possessing or obtaining a firearm, and an officer may do so only after placing the individual in protective custody.  34-B M.R.S. 3862-A.  Once a law enforcement officer takes an individual into protective custody, the officer is required to "deliver the person immediately for examination by a medical practitioner" and provide the practitioner with the "information that led to the protective custody, including information that gave rise to the probable cause determination, the person's pertinent criminal history and other known history, and recent or recurring actions and behaviors." *Id.*  After that assessment, which can be done either in person or by telemedicine, the medical practitioner determines if the individual presents "a likelihood of foreseeable harm." *Id.*

After the assessment is completed, the medical practitioner must notify the officer in writing of the results.  If the medical practitioner finds that the individual presents a likelihood of foreseeable harm, the officer then presents to a judge, justice, or justice of the peace, the results of the medical assessment, the officer's declaration that the person was taken into protective custody, and that the officer has probable cause to believe that the individual possesses, controls, or may acquire a dangerous weapon.  The judge or justice decides whether to endorse the assessment.  If the judicial officer endorses the assessment, she enters an *ex parte* order that temporarily prohibits the person from possessing, controlling, acquiring, or attempting to possess, control, or acquire a dangerous weapon.  A copy of the order is served on the person subject to the order, at which time the person is prohibited from possessing, controlling, or acquiring a dangerous weapon.  The temporary order is entered into a database of persons prohibited from purchasing firearms.  The officer may then seize and secure any firearms or other dangerous weapons within the possession or control of the now-prohibited person.

---

[130] *See* Appendix D.

[131] *See* Appendix C for the law in effect in 2023 and Appendix D for the changes to the law effective on August 9, 2024.  Maine's law is commonly referred to as a "yellow flag law."  It is the only such law in the nation.  After the Lewiston tragedy, legislation was passed that allows a  law enforcement officer to petition the court for a warrant to take a person into protective custody to begin the evaluation and yellow flag process.  It also specifically permits the law enforcement officer and the court to consider affidavits and reliable third-party reports in the process.  This eliminates the "we couldn't lay eyes on him" issue.  *See* Appendix D.

44.

Within five days after the date the person is notified of the order, the district attorney for the prosecutorial district where the individual resides is required to file a petition for judicial review of the initial restrictions in the District Court that has jurisdiction over the person's town of residence.  Within 14 days after the notice of prohibition, the court must hold a hearing to determine whether to dissolve or extend the initial restrictions.[132]  At that hearing, the prosecuting attorney has the burden of proving by clear and convincing evidence that the restricted person presents a likelihood of foreseeable harm.  If the court enters a final order, it is valid for up to one year and may be extended after another hearing.  The court is required to send a copy of the permanent order to the Maine Department of Public Safety for transmission to the FBI National Instant Criminal Background Check System (NICS) for entry into the national database of persons prohibited from owning, possessing, or attempting to own a firearm.

No law enforcement officer in Maine filed a yellow flag petition either before or after Card's hospitalization in New York. Skolfield testified that because he was unable to "lay eyes on him," he could not begin the process.[133] Members of Maine law enforcement who were also in the AR unit believed that the SCSO was responsible for filing the petition.  However,  other than the contact previously discussed, none of them contacted their peers at the SCSO to inform them of Card's conduct and hospitalization in New York, his threatening and ominous statements, or his collection of firearms.[134]

---

[132] This 14-day time restriction has been amended to 30 days.  Many prosecutors noted that the initial time frames were burdensome and often prevented them from securing the necessary paperwork in time.

[133] Law enforcement officers routinely rely upon the statements of other officers to establish the probable cause in criminal cases.  That same practice can and should be used when an officer is considering whether to take a person into protective custody.  Although the person must be physically taken into protective custody to start the yellow flag process, the Sheriff's Office  had probable cause to take Card into protective custody.

[134] Multiple witnesses testified that they did not make suggestions or recommendations to their peers in other law enforcement agencies because their input would automatically be rejected.  They testified that police officers in other agencies would resent any advice or suggestions.

## VII. TIMELINE

| 05/03/2023 | 10:37 | Sagadahoc County Deputy Sheriff Chad Carleton met with Colby Card & Cara Lamb at Mt. Ararat High School to address concerns regarding Robert Card II's (Card) declining mental health.  Carleton contacted the Army Reserve (AR)  Center in Saco and later spoke with  AR Sgt. Kelvin Mote (an Ellsworth, Maine, police officer) and Card's brother, Ryan Card. |
|---|---|---|
| 05/03/2023 | | Ryan Card and Nicole Herling (Card's sister) went to Card's home during the evening; Card met them at the door with a gun. |
| 05/04/2023 | | Lamb informed Carleton that Ryan Card and Nicole Herling went to Card's home the evening before, and Card met them at the door with a gun.  Carleton also followed up with Mote, who said there was an upcoming battle assembly and that he would contact Card to assess the situation.  No such meeting took place. |
| 05/04/2023 | | Carleton included in his report a caution for other officers to be aware of Card's paranoid behavior and that he was known to carry a firearm in his house and vehicle. |
| June 2023 | | Throughout June, Nicole Herling researched ways to get help for her brother.  On June 3, 2023, she called the VA Crisis line.   The worker advised her not to inform the AR command about her brother's delusions, as it could harm his career.  Despite extensive online searches, she could not find helpful information on where to report her concerns; much of the online information was outdated.  Between May and July 15, 2023, when Card reported to active duty at West Point, Herling attempted to reach someone at the AR unit in Saco to discuss the family's increasing concerns about Card.  She left five voicemail messages at the Saco AR Armory.  None of the messages was returned.  She called 988 and other numbers and researched behavioral health programs for members of the AR.  There is no evidence that she found the PHP website. |
| 06/12/2023 | | Card voluntarily left employment at Maine Recycling.  (His employment there started on 02-07-2023.) |
| July 2023 | | The AR ordered Card to conduct weapons training at West Point.  The orders were originally for 14 duty days beginning 7/15/2023 and later extended to 8/3/2023. |
| 07/03/2023 | | Card started working as a delivery driver for First Fleet of Auburn. |
| 07/06/2023 | | Card purchased the murder weapon, a .308 Ruger rifle, and a 9mm Beretta pistol from Fine Line Gun Shop in Poland, Maine. |
| 07/15/2023 | | Card arrived at West Point and told members of his unit that people were saying he was a pedophile.  Later that evening, Card and fellow reservists Daryl Reed and Christopher Wainwright argued.  Card clenched his fists at Reed, wanting to fight.  Card locked himself in his room. |
| 07/16/2023 | | Card refused to answer the door, and his commanders ordered him to go to Keller Army Community Hospital in West Point, New York, for a command-directed behavioral health examination. New York State Police also responded. His behavior was~~is~~ sufficiently concerning that two AR service |

47

| | | |
|---|---|---|
| | | members were~~are~~ assigned to watch him the entire way while a third drives and two NYSP cars follow.  He was diagnosed with "unspecified psychosis not due to a substance or physiological condition."  Among other things, the clinician recommended to Card's commander, Capt. Jeremy Reamer that he ensure that Card attends all follow-up appointments, increases the leader/supervisory support for Card to keep him engaged with unit members and other sources of support, and secures Card's personal weapons.  "It is also recommended that measures be taken to safely remove all firearms and weapons from [Card's residence."  He further told Reamer that Card was not fit for duty.  Card was then transferred to Four Winds Hospital in Katonah, New York, where he signed a voluntary admission acknowledgment form. |
| 07/16/2023 | | At the start of his stay at Four Winds, Card was "notably paranoid and guarded with auditory hallucinations."  Upon admission, he received a psychosocial assessment during which he acknowledged having a "hit list." He also stated that he had told a military peer that if he didn't stop talking about him, he'd "be added to my list."  Card was assessed as having psychosis and thought disorder.  During his stay, he was prescribed Olanzapine, attended group sessions, and by the end of his stay, "showed notable improvement with no further auditory hallucinations and decreased paranoid delusions, irritability, and anxiety." |
| 07/26/2023 | | Card underwent a psychodiagnostic evaluation to assist his treatment team in reaching a diagnosis and developing a treatment plan.  The psychologist who conducted the evaluation stated that three aspects of Card's personality were likely to cause him difficulty: inconsistent coping skills, poor emotional controls, and narcissism.  This was apparently based partly on Card's reporting that "he feels constantly persecuted, misunderstood, and underappreciated by others."  The psychologist also opined that Card's paranoia "is of sufficient magnitude that it may reach delusional proportions at least part of the time."  The doctor further suggested that given all the factors involved, Card appeared to be a poor candidate for psychological treatment, and his prognosis for significant change was guarded.  However, there might be some limited benefit from the use of psychotropic medications. |
| 07/26/2023 | | A nurse case manager from the Army Reserve's Psychological Health program emailed Card, introduced herself, and offered Card help in securing services when he got out of Four Winds.  The only information provided to her about Card was the report that had been created as a result of Card's command-directed behavioral health evaluation, the CCIR.  She was never provided and never had access to any of Card's medical records from either Keller or Four Winds, his psychological assessment results, or the report of mental status evaluation. |
| 07/27/2023 | 17:00 | A psychiatric nurse practitioner called Reamer.  He reviewed the findings and the need for discharge planning for Card.  He told Reamer that Reamer needed to consider starting a medical board process and determining Card's |

| | | |
|---|---|---|
| | | medical disposition going forward. The practitioner also discussed with Reamer about taking steps to remove weapons from Card's home. The practitioner noted that Reamer "did not have any questions or concerns after our conversation." |
| 07/28/2023 | | After Card announced that he intended to leave the hospital, Four Winds Hospital filed a petition for Card's involuntary hospitalization until it could complete a safe discharge plan. Card was assigned counsel under NY law. He filed a request for discharge. |
| 08/01/2023 | | After a family meeting with Card's mother and completing a safety plan, Four Winds withdrew its petition for Card's involuntary hospitalization. Card withdrew his request for discharge. |
| 08/03/2023 | 13:55 | Card was released from Four Winds. Before his discharge, Card told the medical professionals that he would engage in treatment, take his medications, and reach out for help and support from family members and friends. Despite these promises, he engaged in no treatment between August 3 and October 25, 2023, took almost none of his prescribed medication, and did not answer or return calls or emails from treating professionals. He also failed to make any appointments with a telemedicine service that was chosen for him. Sean Hodgson, a close friend and fellow AR reservist, drove him to Maine. Four Winds gave Card a folder containing his discharge records and 60 Olanzapine 10 mg tablets. Hodgson remained in contact with Reamer via text throughout the trip and informed Reamer that they arrived safely in Maine. Reamer thanked Hodgson. |
| 08/05/2023 | | Card attempted to purchase a silencer previously ordered from Coastal Defense Firearms in Auburn, Maine. He was denied the purchase after he incorrectly checked the box "Yes" on the ATF Form 4473, asking whether he had "ever been committed to a mental institution?" He had not been "committed" as defined under federal law. |
| 08/07/2023 | | A registered nurse (GB) at Keller called Card and left a message to call her back. There was no return call. |
| 08/08/2023 | | GB left another message for Card to call her. There was no return call. |
| 08/11/2023 | 14:32 | Four Winds sent Card's discharge summary to Keller, and a Four Winds physician left a voicemail message for a Keller physician to inform Keller of the discharge. |
| 08/11/2023 | | GB spoke with Card on the phone, and he told her he was not taking his medication and he would not go to follow-up treatment. |
| 08/15/2023 | | GB called and left a message for Card. No return call. |
| 08/21/2023 | | GB called and left a message for Card. No return call. |
| 08/23/2023 | | GB called and left a message for Card. No return call. |
| 08/29/2023 | | GB called and left a message for Card. No return call. |
| 08/30/2023 | | GB called and left a message for Card. No return call. |
| 09/13/2023 | 02:04 | Hodgson called Reamer to report that Card assaulted him after leaving the Oxford Casino, that Card had guns, and was going to "shoot up" the Saco AR facility. Reamer took no action and did not report this conversation to anyone else in the AR. Later that day, Hodgson told Reed about the assault. |

| 09/15/2023 | 02:30 | Hodgson sent text messages to Reamer and Mote reporting that Card assaulted him after leaving the casino, that Card had guns, and was going to "shoot up" the Saco AR facility. |
|---|---|---|
| 09/15/2023 | | Hodgson spoke to Reamer and also Mote to report that Card assaulted him after leaving the casino, that Card had guns, and was going to "shoot up" the Saco AR facility. Reamer reviewed the situation with Lt. Col. Vazquez and Sergeant Major Tlumac. Card's commanders decided to ask local law enforcement to do a "well-being" check on Card. |
| 09/15/2023 | | Reamer spoke with Card by telephone, who told him he would not attend the battle assembly in Saco the weekend of 9/16/2023 because he had to work. Reamer replied, "Okay, that's fine." Card expressed lingering anger over the NY hospitalization and said he wanted to punch Reed. Reamer did not tell anyone else in the unit that Card did not plan to attend the battle assembly until he arrived at Saco that morning after Saco PD had stationed officers in the vicinity. |
| 09/15/2023 | 14:28 | Ellsworth Police Det. Corey Bagley telephoned the Sagadahoc County Sheriff's Office to speak with Carleton about a "time-sensitive" matter. Carleton was not on duty. |
| 09/15/2023 | 14:38 | Sagadahoc County Sgt. Aaron Skolfield conferred with Bagley, who provided a summary of longstanding concerns about Card's mental health, including the confrontation between Card and Hodgson the night of 9/13-9/14/2023, Card's threat to "shoot up" the Saco AR facility, and Card's hospital commitment for two weeks earlier in the summer. Bagley requested that the Sheriff's Office conduct a "welfare check" on Card, who was hearing voices calling him a pedophile. Bagley said he would email Skolfield a document prepared by Mote regarding concerns about Card's behavior and the need for a mental health evaluation to determine if Card was dangerous to himself or others. Mote's report summarized the relevant events for use as the basis for a yellow flag petition and requested that the SCSO conduct a well-being check "to gauge his mental health and determine if he is a threat to himself and/or others." Hodgson's text to Mote was also attached:<br><br>*Change the passcode to the unit gate and be armed if sfc card does arrive. Please. I believe he is messed up in the head. And threaten the unit other and other places. I love to death but do not know how to help him and he refuses to get help or continue help. I'm afraid he's going to fuck up his life from hearing things he thinks he heard. When I dropped him off, he was concerned his weapons were still in the car. I believe they were at the unit. And no one searched his vehicle on federal property. And yes he still has all his weapons. I'm not there I'm at my own place. I believe he is going to snap and do a mass shooting.* |

| | | |
|---|---|---|
| 9/15/2023 | 14:46 | Skolfield notified Dispatch he would be attempting a welfare check on Card, although he did not think the matter "as pressing" as previously believed. While aware of an "armed and dangerous" flag in the Sheriff's Office records system, Skolfield was unaware of Carleton's contacts with Card's son and ex-wife on May 3, 2023, because he did not access Carleton's report. |
| 09/15/2023 | 15:09 | Skolfield arrived at Card's residence in Bowdoin. Card was not home nor at his father's house in Bowdoin. |
| 09/15/2023 | 15:24 | Skolfield returned to Card's residence, but Card was still not there. |
| 09/15/2023 | 15:47 | Skolfield received an email message from Bagley that included the document prepared by Mote. |
| 09/15/2023 | 17:11 | Skolfield issued a statewide "File 6 attempt to locate" teletype broadcast regarding Card:<br>***Caution Officer Safety – KNOWN TO BE ARMED AND DANGEROUS***ROBERT HAS BEEN SUFFERING FROM PSYCHOTIC EPISODES & HEARING VOICES. HE IS A FIREARMS INSTRUCTOR AND MADE THREATS TO SHOOT UP THE NATIONAL GUARD ARMORY IN SACO. HE WAS COMMITTED OVER THE SUMMER FOR TWO WEEKS DUE TO HIS ALTERED MENTAL HEALTH STATE, BUT THEN RELEASED. HE ALSO DRIVES ME/MC 82MW BLUE 2020 YAMAHA WR250R. MULTIPLE ADDRESSES HAVE BEEN CHECKED WITH NEGATIVE CONTACT SO FAR. IF LOCATED, USE EXTREME CAUTION, CHECK MENTAL HEALTH WELLBEING AND ADVISE SAGADAHOC SD VIA SAGADAHOC COMMS 443-9711. |
| 09/15/2023 | | During the evening, Sagadahoc Sheriff's Deputy Zach Kindelan looked for Card at Card's and Card's parents' residences without success. |
| 09/16/2023 | 02:17 | Brunswick Lt. Ed Yurek (an AR member) telephoned Saco PD and spoke with Sgt. Monica Fahey (recorded). He told her that Card would be at the Saco AR facility at 7 a.m. and advised her of the information in the statewide "File 6" broadcast. Yurek's call was apparently the first time Saco PD officers became aware of the threat to the AR facility. |
| 09/16/2023 | 06:45 | Saco PD units were positioned to intercept Card on his way to the Army Reserve facility. Card did not show. |
| 09/16/2023 | 07:46 | Saco PD officers spoke with Reamer at the Saco AR facility (recorded). They learned that Card had notified Reamer the day before that he would not be at the weekend drill. Reamer told them the AR only desired a "well-being check" on Card and questioned Hodgson's credibility about the potential danger Card presented. |
| 09/16/2023 | 08:45 | Skolfield went to Card's residence accompanied by a Kennebec County deputy sheriff. Although Card's vehicle was there, no one answered the door. Skolfield believed Card was at home at that time. |
| 09/16/2023 | 10:31 | Skolfield telephoned Saco PD to confirm the PD had received the "File 6" broadcast regarding Card and was advised of Saco PD's actions earlier that morning. He also asked Saco PD for the name of a contact for the AR Unit. |
| 09/16/2023 | 10:46 | Skolfield and Reamer spoke by telephone (recorded) regarding Card. Skolfield learned that Card had no access to military weapons. Reamer said he had no information regarding the outcome of Card's hospitalization |

| | | |
|---|---|---|
| | | because of HIPAA. He told Skolfield that the family was supposed to secure Card's weapons. Reamer asserted that the military was only requesting a well-being check on Card to "confirm that he is alive and breathing" and asked Skolfield to "document" the check. |
| 09/16/2023 | 11:09 | Skolfield discussed with Lt. Brian Quinn, his supervisor, the attempts to contact Card and the discussion with Reamer. They decided to leave Card alone. Skolfield said he would ask Ryan Card to assist in securing Card's firearms and would tell the family to contact the Sheriff's Office if there was any reason to believe Card needed a psychiatric evaluation. Lt. Quinn concurred. |
| 09/17/2023 | 11:34 | Skolfield attempted to contact Ryan Card without success. At noon, he spoke briefly with Katie Card, who told him the guns had not been secured. |
| 09/17/2023 | 14:42 | Skolfield spoke by telephone with Ryan Card about securing Card's firearms and having the family contact the Sheriff's Office if there was a need for a psychiatric evaluation of Card. (Not recorded.) No member of Card's family ever told Skolfield that they had successfully removed Card's guns. |
| 09/18/2023 | | Skolfield went on vacation, considering the case closed. Skolfield decided there was no need for him or the SCSO to be involved further. He considered the matter "resolved," stating that no person expressly "wanted to press charges." Skolfield notified his supervisor, Lt. Brian Quinn, of his conclusions. Quinn deferred to Skolfield's "judgment as an experienced officer" and did not undertake further action or review other than notifying his supervisor, Chief Deputy Brett Strout. Strout did not take any further action or assign any other deputy sheriff to the matter. |
| 09/21/2023 | 12:40 | GB called and left a message for Card. She did not receive a return call, so she closed the case for noncompliance with communications. |
| 10/01/2023 | | When Skolfield returned to work from vacation, he took no further action on the matter and did not follow up with Card or his family members. |
| 10/18/2023 | 08:54 | Skolfield canceled the "File 6" broadcast while leaving the "armed and dangerous" flag on Card in the Sheriff's Office records management system. |
| 10/19/2023 | | While delivering at a warehouse in Hudson, NH, Card told two workers there that he knew they were talking about him and stated, "Maybe you will be the ones I snap on." Neither worker had said anything about Card. (The workers did not report this information to the Hudson Police Department until the early morning of 10/26/2023, several hours after the shootings in Lewiston.) |
| 10/22/2023 | 00:16 | A note was generated on Card's cell phone stating that he had had enough and was trained to hurt people. The entry was discovered post-shooting via forensic analysis. |
| 10/23/2023 | 07:47 | Bagley spoke with Mote concerning the open Ellsworth Police Department case on Card. Mote told him that nothing had been done with Card. He stated that Card was not helping himself by failing to cooperate with the military and that he would be "forced out with a discharge" in the next few days. Mote stated that he was unaware of any new threats against him; Bagley closed the Ellsworth case. |

52

| 10/25/2023 | 18:05 | The last time Card's cell phone was mobile, it was at his residence in Bowdoin. |
| 10/25/2023 | 18:54:20 | Card entered the Just-in-Time Recreation Center, where he shot and killed eight people and wounds three others. Others were physically or psychologically injured. |
| 10/25/2023 | 18:55:05 | Card departed Just-in-Time Recreation Center. |
| 10/25/2023 | 18:56 | The first 911 calls from Just-in-Time were received. |
| 10/25/2023 | 18:59 | The first Lewiston PD units and an Androscoggin County deputy sheriff arrived at Just-in-Time. |
| 10/25/2023 | 19:00:13 | Officers entered the Just-in-Time Recreation Center. |
| 10/25/2023 | 19:07:34 | Card drove into the parking lot of Schemengees Bar & Grille and entered the facility, where he shot and killed ten people and wounded ten others. Others are physically or psychologically injured. |
| 10/25/2023 | 19:08 | The first 911 calls were received from Schemengees Bar & Grille. |
| 10/25/2023 | 19:08:46 | A patron shut off power inside Schemengees Bar & Grill. |
| 10/25/2023 | 19:08:52 | Card departed Schemengees. |
| 10/25/2023 | 19:13 | The first law enforcement officers arrived at Schemengees. |
| 10/25/2023 | 19:34 | Law enforcement obtained an image of the shooter from Just-in-Time's surveillance footage. |
| 10/25/2023 | 19:42 | Maine State Police (MSP) established an initial command post at Lewiston PD. |
| 10/25/2023 | 19:51 | MSP received a call of another possible shooter at DaVinci's Restaurant, which was determined to be unfounded. |
| 10/25/2023 | 19:52 | Just-in-Time's image of the suspect was disseminated to law enforcement. |
| 10/25/2023 | 19:55 | Maine Emergency Management Agency (MEMA) issued a shelter-in-place advisory. |
| 10/25/2023 | 20:06 | Image of suspect publicly disseminated. |
| 10/25/2023 | 20:06 | Image of suspect's vehicle obtained from Schemengees surveillance footage publicly distributed. |
| 10/25/2023 | 20:06 | MSP issued a social media alert on Facebook, Instagram, and X (formerly Twitter) about an active shooter in Lewiston and asked people to shelter in place, stay off the streets, and report any suspicious activity. |
| 10/25/2023 | 20:11 | Lewiston-Auburn Communications Center received a call about a possible shooter at Walmart Distribution Center, a report of a shooter seen on a nearby street, and a later report that Card's vehicle was involved in an accident on the on-ramp to I-95; police dispatched to those locations; the reports were unfounded. |
| 10/25/2023 | 20:33 | The City of Lewiston announced a shelter-in-place order while the manhunt was underway. |
| 10/25/2023 | 20:57 | A nationwide police bulletin was broadcast describing Card and his vehicle. |
| 10/25/2023 | 21:20 | Nicole Herling and Cara Lamb contacted Lewiston PD and identified Card from the Just-in-Time image. |
| 10/25/2023 | 21:32 | Law enforcement contacts Card's cellular phone service provider for phone data. |
| 10/25/2023 | 21:33 | Cellphone data indicated that Card's cell phone was at his residence in Bowdoin. |

| 10/25/2023 | 21:56 | Lisbon PD found Card's abandoned vehicle at the Papermill Trail/Miller Park boat launch in Lisbon. |
| 10/25/2023 | 22:00 | A press conference and briefing were held at Lewiston City Hall. |
| 10/25/2023 | 22:05 | The MSP Tactical Team commander was notified of the discovery of Card's vehicle in Lewiston. |
| 10/25/2023 | 22:14 | The Maine Information & Analysis Center (MIAC) bulletin, identified as "law enforcement sensitive," and naming Card as an active shooter suspect was disseminated to law enforcement. Very shortly after, it was leaked to the media. |
| 10/25/2023 | 22:37 | The MSP Tactical Team determined no one was in Card's abandoned vehicle. |
| 10/25/2023 | 23:00 | MSP Major Crimes Unit conducted its first operations briefing at Lewiston PD. |
| 10/25/2023 | 23:57 | MSP issued a social media alert on Facebook, Instagram, and X naming Card as the suspected active shooter, announcing that his vehicle had been located and asking people to continue to shelter in place and to report any suspicious activity. |
| 10/26/2023 | 02:00 | MSP Major Crimes Unit conducted its second operations briefing at Lewiston PD, during which it was announced that the Command Post was moving to Lewiston High School and that an incident command model was being implemented. |
| 10/26/2023 | 02:24 | Card's vehicle was removed from the boat launch in Lisbon. |
| 10/26/2023 | 03:00 | Command Center relocated from Lewiston PD to Lewiston High School |
| 10/26/2023 | 03:05 | Card's vehicle was secured at the MSP Crime Lab in Augusta. |
| 10/26/2023 | 06:13 | MSP issued a social media alert on Facebook, Instagram, and X announcing an expansion of the shelter-in-place order, including school closings in Bowdoin. |
| 10/26/2023 | 08:00 | The incident management team coordinated the MSP operations briefing, which included Col. Bill Ross (Chief of MSP), Lewiston Police Chief David St. Pierre, Lt. Randall Keaten (MSP Major Crimes Unit), Sgt. Greg Roy (MSP Tactical Team commander), and Lt. Jodell Wilkinson (MSP Incident Management Assistance Team (IMAT) Commander). The team established a standard radio frequency for all law enforcement agencies. |
| 10/26/2023 | 08:52 | MSP issued a social media alert on Facebook, Instagram, and X asking the public for any information on Card or the Lewiston shootings and providing telephone numbers to call. |
| 10/26/2023 | 09:38 | Search warrants for Card's vehicle and residence were issued. |
| 10/26/2023 | 10:00 | An arrest warrant was issued for Card, charging knowing and intentional murder. |
| 10/26/2023 | 10:30 | Press conference with ASL interpreters at Lewiston City Hall with Governor Mills, Lewiston Police Chief St. Pierre, Maine Public Safety Commissioner Sauschuck, MSP Col. Ross, and FBI Special Agent-in-Charge Cohen. |
| 10/26/2023 | 10:50 | MSP searched Card's residence in Bowdoin. |
| 10/26/2023 | 15:35 | The Incident Management Team coordinated an investigative briefing at Lewiston High School, during which certain investigative information was relayed to law enforcement in attendance, including the discovery of a note left by Card at his residence. The information about the note was leaked to |

54

| | | the media immediately after.  Because of the leaks by law enforcement, the release of information at further briefings would be limited. |
|---|---|---|
| 10/26/2023 | 15:50 | An evidentiary search of Card's residence in Bowdoin began. |
| 10/26/2023 | 16:50 | A Card family property was searched on the Meadow Road in Bowdoin. |
| 10/27/2023 | 08:00 | An operations briefing coordinated by the Incident Management Team was held at Lewiston High School.  Officers were reminded to wear visible law enforcement markings and respond when assigned to do so rather than "self-dispatch" or "self-deploy," and that information shared in the briefings was law enforcement sensitive and not to be further shared. |
| 10/27/2023 | 10:00 | Chief St. Pierre and Commissioner Sauschuck conducted a press conference with ASL interpreters at Lewiston City Hall. |
| 10/27/2023 | 11:00 | An investigative briefing coordinated by the Incident Management Team was held at the Lewiston High School. |
| 10/27/2023 | 12:17 | A search warrant for Card's cellular phone was issued. |
| 10/27/2023 | 14:30 | Col. Ross conducted a virtual operations briefing with police chiefs and sheriffs to update them on the investigation and the manhunt.  He announced that sensitive information that could compromise the investigation and create safety issues for those involved in the manhunt had previously been leaked to the media. |
| 10/27/2023 | 14:44 | A search warrant for Card's cellphone records was issued. |
| 10/27/2023 | 17:00 | Chief St. Pierre and Commissioner Sauschuck conducted a press conference at Lewiston City Hall. |
| 10/27/2023 | 19:08 | Tactical teams began searches of box trailers in the Maine Recycling overflow lot. |
| 10/27/2023 | 19:34 | MSP issued a social media alert announcing the establishment of a Family Assistance Center at the Lewiston Armory where victims could get help and support. |
| 10/27/2023 | 19:40 | Card's body was found in a box trailer at Maine Recycling in Lisbon.  The cause of death was suicide by gunshot to the head. |
| 10/27/2023 | 20:10 | A search warrant was issued for the infotainment center of Card's vehicle. |
| 10/27/2023 | 20:30 | Col. Ross, Chief St. Pierre, Commissioner Sauschuck, and MSP Major Scott Gosselin conducted an operations briefing at the Lewiston High School Command Post, during which it was announced that Card's body had been located. |
| 10/27/2023 | 22:00 | Governor Mills, Chief St. Pierre, and Commissioner Sauschuck conducted a press conference at Lewiston City Hall to announce the discovery of Card's body. |
| 10/27/2023 | 23:34 | MSP issued a social media alert announcing the discovery of Card's body. Shelter-in-place orders lifted. |
| 10/28/2023 | | FBI Victim Services Response Team open the family assistance center at the Lewiston Armory.   A separate site for individuals affected by the shootings was established at the Ramada Inn on Pleasant Street in Lewiston. |
| 10/28-10/30/2023 | | MSP issued seven more social media bulletins concerning donations to support victims and families, returning victims' personal effects and vehicles to families, and resources available at the Family Assistance Center. |
| 10/30/2023 | 16:14 | MSP launched a website to share investigative information with the public. |

| | | |
|---|---|---|
| 11/02/2023 | | The Family Assistance Center was closed. |
| 11/13/2023 | | A Community Resilience Center was established in the Peck Building, 184 Main Street, Lewiston. |
| 11//29/2023 | | The Ramada Inn site for individuals affected by the shootings was closed. |

## IV. Discussion and Observations

### A. Law Enforcement Response Before October 25, 2023

As discussed previously, Robert Card is solely responsible for his actions on July 25, 2023. It is impossible to know whether this tragedy could have been prevented. Even if anyone had managed to remove the firearms from his home in the summer or fall of 2023, he could have acquired access to other firearms. Nevertheless, the Commission finds that authorities had several opportunities to reduce the risk.

First, the Sagadahoc County Sheriff's Office could have sought an involuntary commitment order (a "blue paper"). Law enforcement (or family member, social worker, or friend) may seek a person's involuntary commitment to a hospital qualified to provide mental health services if a mental health clinician certifies that the individual is mentally ill and poses a likelihood of serious harm. It does not appear that Skolfield considered obtaining a blue paper order to get Card treatment from a mental health provider. While the blue paper order would not have immediately prohibited Card from possessing a firearm in the future, law enforcement would have had time to pursue additional steps to reduce the risks.

Second, the Sheriff's Office missed an opportunity to pursue a "yellow flag" order against Card in September of 2023. Based on the information available to the Sheriff's Office from Card's family members and colleagues in the AR, as well as the historical information available within its own files, the Sheriff's Office had probable cause to believe that Card was mentally ill and that due to that illness, he posed a likelihood of serious harm.

Indeed, the available information concerning Card's declining mental health and threats of violence was greater than the information forming the basis for many "yellow flag" orders obtained by law enforcement officers in Maine before September of 2023.[1] Once they obtained the "yellow flag" order, the Sheriff's Office could have seized any firearms in Card's possession or over which he had control.

Third, the Sheriff's Office missed another opportunity in October 2023. At that time, its newly hired mental health liaison, who had been in training in September, was fully available. Had the Sheriff's Office followed up with Card's family in October, the officer and the liaison would have learned that there had been no improvement in Card's mental health and that he still had some or all his weapons. The mental health liaison could have reached out to Card and attempted to secure his cooperation. If Card had failed to cooperate, the Sheriff's Office would still have had probable cause to take him into protective custody and begin the yellow flag process. The Sheriff's Office had available a variety of other mental health

---

[1] It should be noted that the Commission's investigator monitors all Yellow Flag petitions and as part of that process reviews each probable cause statement. The Commission therefore has a basis for this conclusion.

resources from which it could have received assistance on approaching Card.  They failed to avail themselves of these resources.

## B.  The Army Reserve Response Before October 25, 2023

The Army Reserve unit also missed several opportunities that might have reduced the risk of this tragedy occurring.

First, when contacted by Deputy Sheriff Carleton in May 2023, principal members of the unit failed to follow through on a plan to "sit down and talk" with Card during the May 2023 or even the June 2023 battle assemblies.

Second, none of the five individuals who received voicemail messages at the AR unit ever called Nicole Herling back.  These calls were placed before the July 2023 New York training assignment.  Had any of these officials returned her calls, Herling had a wealth of information about her brother she could have shared with them.

Third, AR officials failed to follow up with Card after his hospitalization in New York.  The actions taken by various members of the AR unit on July 15 and 16, 2023, were the appropriate first steps in getting Card evaluated and helped.  Calling for a command-directed behavioral evaluation, driving Card to the Keller Army Community Hospital with a safety and security plan in place, and then staying with him during his initial emergency room intake and evaluation were all necessary and appropriate.

The failure was due to the inaction of the company  leadership and commander, Captain Jeremy Reamer.  Reamer failed to follow the July 16, 2023, recommendations of the psychiatric nurse practitioner, Captain Mathew Dickison,  to (1) ensure that Card attended all follow-up appointments, (2) increase leader/supervisory support with the intent of keeping [Card] engaged with unit members and other sources of support; and (3) encourage Card to temporarily secure his personal weapons in the AR unit's arms room or another safe location.

On July 27, 2023, in a 5 p.m. phone call, Dickison again told Reamer he should ensure (1) that [Card] followed through with his treatment appointments, (2) that his weapons were removed from his home, and (3) that a medical review board process be initiated.  Reamer led Dickison to believe that he would follow these recommendations, and never expressed concern that he lacked authority to enforce them.  However, Reamer did nothing to follow them.

While Card was on active duty and under his command from July 16 through August 3, 2023, Reamer could have endeavored to arrange for Card to voluntarily turn over his weapons. Reamer was in contact with Hodgson on August 3, 2023, as Hodgson drove Card from New York to the unit's headquarters in Saco, Maine.  Reamer could have arranged for one of his

unit's officers to meet Card upon his arrival while Card was still on active duty orders and arranged to store Card's guns.

Reamer also failed to initiate the medical review board process or contact Keller or Four Winds to learn about Card's diagnosis, discharge plan, and prognosis. The Health Insurance Portability and Accountability Act (HIPAA) specifically provides an exception to the privacy rules that allow a commander to secure information about a soldier's diagnosis and treatment. *See* Appendix P for the military command exception.

Reamer failed to check with Card after Card's return to Maine on August 3rd, and he failed to order Card to appear for the September or October battle assemblies. Reamer said that it was "okay" for Card not to attend the battle assembly despite the fact that he later used it in the letter citing his unexcused absences When Card was on active duty, such as during battle assemblies, he was subject to Reamer's command authority. Either in September or October, a plan could have been put in place to meet Card at the Army Reserve facility gate, evaluate him, and, if appropriate, initiate a second command-directed behavioral health evaluation.

Dickison recommended that Card be encouraged to store his weapons at the AR facility in Saco. The testimony regarding the AR's authority to store Card's personal firearms was inconsistent. Vazquez testified that the AR strongly discouraged the storage of service members' personal weapons. He referred to a memorandum he said was issued in May 2024 – seven months after the shooting – that he claimed makes storage of a service member's personal firearms "very challenging" and "very, very difficult" to do. He testified that "without certain permissions, it would have been impossible." Vazquez promised to provide the Commission with a copy of this memo, but, despite repeated requests from the Commission's executive director, the AR still has not produced it.

On the other hand, in his Report of Medical Status Evaluation (DA Form 3822, June 2019), Dickison checked the box recommending that Reamer encourage Card "to secure personal weapons with . . . unit arms rooms, or other trusted source." That recommendation was one of several options appearing on the Army's preprinted Evaluation form. Army Regulation 190-11, Physical Security of Arms, Ammunitions, and Explosives, specifically allows a commander of a facility to allow the storage of personal weapons in the facility's arms room. It is implausible that the Army's own preprinted form would present an option that is impermissible for AR commanders to follow.

Reamer testified that the AR could have stored Card's firearms, but he did not pursue the option because he expected Card's family to take them-even though Card's family never represented that they were able to do so. Nevertheless, he conceded that the AR can store service members' personal firearms. During his conversation with Dickison at Keller, Reamer led Dickison to believe he would follow through on the recommendation and did not

60

express any concerns about his authority to do so.  It appears that the AR could have complied with Dickison's recommendation.

The AR also failed to avail itself of or educate Card or his family concerning the resources available through the PHP.  The PHP is a specific program to assist reservists and their families in obtaining behavioral health services and to assist Command.  When the Sagadahoc County Sheriff's Office contacted Mote about Card's family's quest for help dealing with Card's deteriorating mental health, Mote never informed the Sheriff's Office of the PHP.  None of the soldiers who received Herling's voicemails availed themselves of the opportunity to provide this information to Card's family or to the Sheriff's Office.  At no time did the Command staff at Card's AR contact the PHP for help in how to manage Card before his hospitalization at Keller and Four Winds or after his discharge.

It is evident that Reamer had inadequate support in a difficult situation.  Vazquez testified that he and Reamer discussed Card's diagnosis, inpatient hospitalization, and the CCIR. However, it does not appear that Vazquez provided Reamer with any meaningful advice, guidance, or direction about Card.  Further, neither Reamer nor Vazquez ordered a Line of Duty Investigation to determine Card's duty status.

## C.  Medical Personnel Response Before October 25, 2023

Medical staff at Keller Army Community Hospital failed to file a SAFE Act notice and/or initiate the New York red flag petition process.  Staff apparently misunderstood the laws, believing that they applied only to New York residents.  The Four Winds medical director did call a psychiatrist at Keller, asking him to ensure that a Safe Act petition had been filed.

After Card was discharged from Four Winds Hospital, staff at Keller Army Community Hospital, the Army Reserve Mental Health Program (PHP), and the Army Medical Management Center made multiple efforts to contact him.  For the most part, Card did not acknowledge or return telephone messages or respond to email messages.  He did participate in one phone call with a nurse case manager on the PHP staff but declined all services.  The staff failed to reach out by telephone to Reamer or his superiors to follow through.  Per established protocols at the time, the case was closed.

Given the severity of Card's symptoms, follow-up with Card's superiors was important both for Card's benefit and the safety of the AR and to ensure that Card's  "not fit for duty" status was re-evaluated.  When Reamer failed to respond, his superior officer should have been contacted.

## D.  The Law Enforcement Response on October 25, 2023

On the evening of October 25, 2023, and the days that followed, Maine law enforcement faced the largest and most complex challenge in its history.  The first hours were admittedly chaotic.   Once the Incident Command Center (ICC) was established, the tactical,

operational, and investigative operations improved. No additional civilian lives were lost, the citizens of Lewiston and surrounding communities were kept safe, and key witnesses were protected.

Members of the Deaf community and the interpreters who work with them encountered difficulties with access to information and other communication problems. They have requested an opportunity to work with law enforcement and other governmental actors to improve information sharing and communication with Maine's Deaf community. Such a project could also be helpful for all non-English-speaking members of the Maine population.

Communication between teams and among the various agencies responding to the tragedy was not always smooth or effective. Our charge does not include making recommendations for operational or policy changes, but we anticipate that the Maine State Police will follow through with an independent after-action review to address the challenges identified and any other needed changes.

Finally, some members of the judiciary and law enforcement expressed frustration with the yellow flag process. Law enforcement officers reported that the process was too burdensome and took too long, placing outsized burdens, especially on smaller law enforcement agencies forces. Judges were frustrated by the Judicial Branch's paper-based, court location-specific mental health involuntary commitment records system. For example, if a judge is presented with a petition for involuntary commitment and a yellow flag order in Portland, there is no centralized database available to determine if a similar petition or order has ever been filed in another court location. Absent separate phone calls to each of the 37 District Court locations and then a hand search of the paper records at each location, judges are unable to properly analyze all the information they need to make an appropriate decision. Again, it is not within the scope of our charge to make recommendations for administrative or operational change, but we anticipate that all branches of government will work together to address these concerns.

## IX. Acknowledgment and Thanks

The Commission would like to thank and acknowledge the following individuals and organizations for their work, dedication, and amiable responses to our many requests for assistance. Their service and skills were instrumental in our operations. Without them, we would not have been able to conduct our investigation or public hearings.

**Pine Tree Society- American Sign Language Interpreting**: Ashlee Fitch, Joe Toledo, David Krueger, Meryl Troop, Marisa Zastrow, Shelly Parks, Cid Pollard, Maurita Marr, Margaret Haberman, Grace Cooney, Kevin Bohlin, Amy Richardson, Tristen Evah Hellewell, Amanda Eisenhardt, Stacey Bsullak, and Rebecca Breton for providing interpretating services.

**Disability Rights Center of Maine:** For providing interpreting services at the Family Assistance Center.

**MVP Litigation Services-Court reporting services**: Julia Varney, Angella Clukey, Peggy Stockford, Melinda Simon, and Veronica Morrill for their professionalism, willingness to work long days, and flexibility with multiple schedule changes.

**Pro AV Systems**: Jeff Souza and Jacob Audet for assistance in video technology matters.

**Department of Administration and Financial Services-State of Maine**: Elaine Clark, Marsha Alexander, Michael Koss, and Michael McPeak for coordinating meeting space and information technology services and for providing free office space for Chair Wathen.

**Department of Health and Human Services-State of Maine, South Portland Office:** Andrea Ray and Stephen DeKubber for providing free office space, office supplies, a desk telephone, photocopying and scanning machines. And to the entire Office of Family Independence staff for the kindness and genuine welcome shown to the Executive Director.

**Department of Transportation -State of Maine**: Michael Cole for information technology and video services.

**Department of Public Safety-Capitol Police-State of Maine**: Chief Matthew Clancy and his officers for providing security and assistance at public meetings at the Deering building. A special thanks to Officer Alden Weigelt for arranging free psychological first aid providers for victims and survivors who came to testify.

**Department of Public Safety- Maine State Police-State of Maine**: To the entire command staff, including Colonel William Ross, Lieutenant Colonel Brian Scott, Major Lucas Hare, and Major Scott Gosselin, for their offers of help and willingness to provide information and testimony in an organized and thorough manner. We express a special expression of gratitude to Lieutenant Thomas Pickering for his work assembling and transmitting thousands of reports, photographs, videos, and electronic information, for gathering

additional information sought by the Commission, and for his  prompt responses to any inquiry or request from the Commission.

**Lisbon Police Department**:  Chief Ryan McGee for arranging and conducting a tour of relevant locations in Lewiston and Lisbon for the Commission and its staff.

**University of Maine Augusta**: Dr. Jen Cushman, Noel March, Kera Synder, Greg Keneborus, Peter Starkey, and Richard Burns for coordinating and providing free meeting space and information technology services,  and for their willingness to work with the Commission to ensure that live split-screen Zoom was available for every meeting.

**City of Lewiston:** Mayor Carl Sheline**,** Brian O'Malley, Dottie Perham-Whittier, Nicole Welch, Heather Hunter, David Gudas, Matt Charest, Moe Pelletier, Craig Starr, David Saucier, Bill Storm, Nate Cheevers, Janet Labbe, Martin Mujiba, and Ange Amores for providing and setting up meeting space, information technology services,  and marketing/communications services and for their willingness to assist the Commission with last minute meeting needs so that we could better serve the victims and witnesses who testified.

**Office of the Attorney General-State of Maine**:  Attorney General Aaron M. Frey for providing funding to conduct the investigation, Chief Deputy Attorney General Christopher Taub, Deputy Attorney General Thomas Knowlton, and Assistant Attorney General Jonathan Bolton for legal advice and contractual and legal filings on behalf of the Commission; Summer Carter and Paul Knowles for accounting services; Cara Cookson for coordination of victim witness services and answering endless emails; Kelly McGillis for providing Maine Crime Victims' Compensation Program information;  and to the victim/witness advocates statewide who provided and continue to provide vital support to the victims of this tragedy.

**The Androscoggin County District Attorney's Office**: Deputy District Attorney Kate Bozeman and her staff for providing local victim witness advocate services.

**Southern Maine Community College**: Administrative Assistant Lorri Hall for her skillful assembly of the initial interim report.

**Sagadahoc County Sheriff's Department**: Sheriff Joel Merry and his staff for  providing the Commission with police reports, dispatch records and logs, phone records, and transcripts of various phone calls.

**The family members, survivors, victims, business owners, friends, and witnesses**: Thank you for your courage and willingness to share your stories, as well as the poignant and loving memories you shared publicly or privately with the Commission.  Your presence and participation reminded us of the importance of our mission.

**The Maine Resiliency Center**: For assisting victims and survivors with their presentations to the Commission.

**New York State Division of Criminal Justice Services**: Joseph Popcun and Adam Dean for tracking down and providing important background and data information regarding New York's red flag law.

The evening of October 25, 2023, and its aftermath was an unprecedented event for the citizens of Maine and one we hope never to experience again. This sad and tragic event has touched us all, and the memories will remain etched on our hearts forever. The dedication, responsiveness, and willingness of so many people to encounter danger, work long hours, and do whatever it took to bring an end to this tragedy, and the people, businesses, and community partners who immediately volunteered their time, talent, equipment, supplies and facilities to assist in this endeavor, and who continue to do so as we move forward, is acknowledged with deep gratitude and appreciation. Among those we must acknowledge are the following:

The hundreds of law enforcement officers, emergency medical responders, emergency communication specialists, hospital personnel, the FBI Victim Services Rapid Response Team, the Lewiston School Department, Bates College and its student volunteers, Bangor Savings Bank, Androscoggin Savings Bank, Community Concepts, the Lewiston Auburn Metropolitan Chamber of Commerce, youth and staff of the Tree Street Youth Center, the Maine Community Foundation, the Harvard Police Department Canine Unit, the FBI Crisis Response Canine Unit, Build-A Bear Workshops, L.L. Bean, Island Treasure Toys, Vermont Teddy Bear Company, U-Haul, Walmart, Amato's, Dunkin Donuts, Coke Northeast, Big Fish Promotions, Hannaford Supermarkets, Broadway Gardens, and all the individuals, businesses and community organizations that immediately responded and offered their time, talents, goods, and resources.

65

# X. Internet Citation and Statement

The internet references cited in this report were valid as of the date of its printing. Given that URLs and websites constantly change, the Commission cannot vouch for their continuing validity after the publication of this report.

This report may be freely distributed and used only for noncommercial and educational purposes. The photograph by Kathleen Walker contained in this report is her original work and should not be used for any commercial purposes without her express permission.

Recommended citation:

> The Commission to Study the Facts of the Lewiston Tragedy, 2024, *Final Report Of The Independent Commission To Investigate The Facts Of The Tragedy In Lewiston*