**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| **ELIZABETH A. SEAL** as Personal Representative of The Estate of **JOSHUA A. SEAL**, *et al.*,<br>Plaintiffs<br><br>v.<br>**THE UNITED STATES OF AMERICA**,<br>Defendant | No. 2:25-cv-00442-LEW<br><br>**Oral Argument Requested.** |

# PLAINTIFFS' OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

## TABLE OF CONTENTS

Introduction ........................................................................................ 1

Factual Background ............................................................................. 2

1. July 2022–June 2023: The Army knows about Card's mental-health crisis. .......................................................................... 3
2. May–July 2023: After undertaking to address Card's alarming behaviors, the Army fails to follow mandatory regulations .................... 3
3. July 2023: Card's mental state becomes dangerous, and the Army orders involuntary hospitalization in New York. .......................... 4
4. July 16–Aug. 3, 2023: The Army learns of Card's hit list, undertakes to seize his weapons, and fails on every front. ..................... 5
5. Sept. 2023: Army learns Card will "snap and do a mass shooting" but violates its own regulations by standing down law enforcement and failing to initiate a CCIR ............................................. 6
6. Sept. 9, 2025: Department of Defense Inspector General finds Army fails to follow regulations and caused mass shooting. .................. 7

Standard of Review ............................................................................... 8

1. The Government's Factual Attack on Plaintiffs' Claims Should Not Be Adjudicated on a 12(b)(1) Motion ................................................ 8
2. The FTCA is a broad wavier of immunity that treats exceptions like affirmative defenses. ..................................................................... 10

Subject-Matter Jurisdiction ................................................................. 10

1. Defendant does not have discretionary immunity from Plaintiffs' claims. ........................................................................................ 11
   - A. Military decisions are not categorically immunized ..................... 12
   - B. Failure to promptly refer Card for evaluation violated mandatory policy ........................................................................ 13
   - C. Failure to enforce mandatory discharge directives ...................... 14
   - D. Failure to report Card to the FBI Background Search Database ................................................................................ 15

E. Failure to refer Card to Department of Defense Medical Evaluation Board and Physical Evaluation Board ....... 16

F. None of the Army's failures were grounded in public policy or susceptible to policy analysis. ....... 17

2. Plaintiffs' claims are not barred by the assault-and-battery exception. ....... 22

A. The assault-and-battery exception does not apply to Plaintiffs' independent negligence claims. ....... 22

B. The Government misstates the law of the assault-and-battery exception. ....... 24

3. Plaintiffs' claims are not barred by the misrepresentation exception. ....... 26

4. Plaintiffs' claims are not barred by the contractor exception because the Plaintiffs are not suing over contractor actions. ....... 31

State Law ....... 31

1. Choice of Law ....... 31

2. Plaintiffs' allegations adequately state causes of action for negligent undertaking (Counts A, C, E, and F). ....... 33

A. Maine recognizes a "negligent undertaking" cause of action. ....... 34

B. The Complaint satisfies the requirements of pleading a "negligent undertaking" claim stemming from the Army's handling of Card (Count A) ....... 37

(1) The Army rendered services to another that it should recognize as necessary for the protection of a third person. ....... 37

(2) The Army's conduct increased the risk that Card posed. ....... 39

(3) The Government's conduct induced reliance by Card. ....... 41

C. The Army's violation of mandatory statutory and regulatory obligations supports Plaintiffs' negligent undertaking claim (Counts C, E, and F). ....... 42

(1) Negligence of the Army in violating its own commitments, orders, and conditions (Count C). ....... 43

(2) Negligence in failing to follow process for Line of Duty investigation and Medical Board Adjudication of Card's illness (Count E). .... 44

(3) Negligence in failing to report Card to FBI Background Search Database after he was committed to a mental institution (Count F). .... 46

3. Plaintiffs' claims for negligent treatment (Count D) and failure to file a SAFE Act report (Count G) state claims for relief under New York law. .... 47

A. New York Federal Courts recognize a duty of care to third parties arising from the negligent care and treatment of potentially dangerous patients. .... 48

B. Plaintiffs have a cause of action arising from Army's failure to report Card under the New York SAFE Act. .... 49

4. Plaintiffs have a cause of action for negligent training and supervision (Counts H & I). .... 51

5. Plaintiffs have stated a cause of action for negligent infliction of emotional distress (bystander claims, Count J). .... 53

6. Plaintiffs have a cause of action for "Zone of Danger" NIED claims (Count K). .... 54

7. Plaintiffs' survival claims (Count L) and wrongful death claims (Count M) are actionable. .... 56

8. Plaintiffs have demonstrated causation between the Army's negligence and the Lewiston mass shooting. .... 56

Conclusion .... 58

# TABLE OF AUTHORITIES

## Cases

*Abbey v. United States*, 112 F.4th 1141 (9th Cir. 2024) .................................. 28

*Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023) ...................................... 29

*Adams v. Buffalo Forge Co.,* 443 A.2d 932 (Me.1982) ...................................... 32

*Adams v. Rubin*, 964 F. Supp. 507 (D. Me. 1997) ............................................ 32

*Andrulonis v. United States,* 952 F.2d 652 (2d Cir. 1991) ............................... 19

*Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993) ................................ 10

*Baroni v. United States*, 662 F.2d 287 (5th Cir. 1981) .................................... 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 51

*Bell v. Dawson*, 2013 ME 108 ........................................................................ 52

*Bembenista v. United States*, 866 F.2d 493 (D.C. Cir. 1989) ........................... 23

*Berkovitz v. United States*, 486 U.S. 531 (1988) ........................................ 10, 11

*Billingsley v. United States*, 251 F.3d 696 (8th Cir. 2001) .............................. 23

*Blackburn v. United States*, No. 20-8005, 2021 WL 3027979 (10th Cir. July 19, 2021) ................................................................... 23

*Block v. Neal,* 460 U.S. 289 (1983) ......................................................... passim

*Boivin v. Somatex, Inc.*, 2022 ME 44 .............................................................. 55

*Bolduc v. Haywood*, No. CV-00-18, 2001 WL 1712679 (Me. Super. July 12, 2001) ........................................................................... 36

*Brock v. United States*, 64 F.3d 1421 (9th Cir. 1995) ...................................... 23

*Calderon v. Royal Park, LLC*, 132 N.E.3d 1021 (Mass. Ct. App. 2019) ............................................................................................... 54

*Cameron v. Pepin*, 610 A.2d 279 (Me. 1992) .................................................... 53

*Campbell v. David and Tammy Boutot*, 1999 Me. Super. LEXIS 535 (Dec. 30, 1999) .......... 36

*Campbell v. United States*, 167 F. Supp. 2d 440 (D. Mass. 2001) .......... 23

*Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000) .......... 10

*Chang v. United States*, 139 F.4th 1087 (9th Cir. 2025) .......... 17

*Chaparro v. Carnival Corp.,* 693 F.3d 1333 (11th Cir. 2012) .......... 54

*City of Portland v. McKernan*, 1993 Me. Super. LEXIS 268 (1993) .......... 36

*Clendening v. United States,* 19 F.4th 421 (4th Cir. 2021) .......... 12

*CNA v. United States*, 535 F.3d 132 (3d Cir. 2008) .......... 23

*Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994) .......... 54

*Conway v. United States*, No. CV 17-71-GF-JCL, 2018 WL 6605887 (D. Mont. Dec. 17, 2018) .......... 20

*Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000) .......... 18, 19

*Cuadrado-Concepcion v. United States*, 851 Fed. App'x. 985 (11th Cir. 2021) .......... 12, 20

*Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433 (Me. 1982) .......... 54

*Dalehite v. United States*, 346 U.S. 15 (1953) .......... 17

*Davallou v. United States*, 998 F.3d 502 (1st Cir. 2021) .......... 10

*Deane v. Cent. Maine Power Co.*, 2024 ME 72 .......... 27

*Doe 1 v. United States*, 166 F.4th 1255 (11th Cir. 2026) .......... 23

*Dolan v. United States Postal Serv.*, 546 U.S. 481 (2006) .......... 10

*Durden v. United States*, 736 F.3d 296 (4th Cir. 2013) .......... 23, 25, 26

*E.D. v. United States*, 764 F. App'x 169 (3d Cir. 2019) .......... 23

*Eccles v. Shamrock Cap. Advisors, LLC*, 245 N.E.3d 1110 (2024) .................32

*Est. of Trentadue ex. rel. Aguilar v. United States*, 397 F.3d 840 (10th Cir. 2005) .................29

*Franklin v. United States*, 992 F.2d 1492 (10th Cir. 1993) .................25

*Glade v. United States*, 692 F.3d 718 (7th Cir. 2012) .................25

*Gonzalez Figueroa v. J.C. Penney P.R., Inc.,* 568 F.3d 313 (1st Cir. 2009) .................34

*Green v. United States*, 629 F.2d 581 (9th Cir. 1980) .................29

*Guile v. United States*, 422 F.3d 221 (5th Cir. 2005) .................20

*Hansen v. Sunday River Skiway Co.*, 726 A.2d 220 (Me. 1999) .................33, 34, 37

*Harper v. United States*, No. CV 12-1802 (CKK), 2020 WL 4192540 (D.D.C. July 21, 2020) .................20

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. App. 2011) .................55

*Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49 (2d Cir. 2016) .................47

*Hendry v. United States*, 418 F.2d 774 (2d Cir. 1969) .................17

*Holcombe v. United States,* 388 F. Supp. 3d 777 (W.D. Tex. 2019) ......... passim

*Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 67217 (W.D. Tex. Jan. 6, 2021) .................21

*In re Flint Water Cases*, 482 F. Supp. 3d 601 (E.D. Mich. 2020) .................37, 39

*In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273 (S.D. Fla. 2020) .................33, 37

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) .................10, 41

*Jablonowska v. Suther*, 948 A.2d 610 (N.J. 2008) .................54

*Jimenez-Nieves v. United States*, 682 F.2d 1 (1st Cir. 1982) .................27

*Joy v. E. Me. Med. Ctr.*, 529 A.2d 1364 (Me. 1987) .................42

*K.A.C. v. Benson*, 527 N.W.2d 553 (Minn. 1995) ............................................. 54

*Keller v. United States*, 771 F.3d 1021 (7th Cir. 2014) .................................... 19

*Kennedy v. Pine Tree Council & BSA*, No. CV-91-752, 1995 WL 18036799 (Me. Super. June 14, 1995) ........................................................ 36

*Klingerman v. SOL Corp. of Me.*, 505 A.2d 474 (Me. 1986) ............................. 56

*Kristensen v. United States*, 372 F. Supp. 3d 461 (W.D. Tex. 2019) ....................................................................................... passim

*Lawrence v. United States*, 340 F.3d 952 (9th Cir. 2003) ................................ 28

*Leytman v. TSA*, 804 F. App'x 78 (2d Cir. 2020) ............................................. 23

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009) ................................ 27, 29

*Linke v. United States*, No. W-14-CV-444, 2015 WL 12743613 (W.D. Tex. June 2, 2015) ........................................................... 20, 58

*LM ex rel. KM v. United States*, 344 F.3d 695 (7th Cir. 2003).................. 23, 25

*Lounge 22, LLC v. Scales*, 680 F. Supp. 2d 343 (D. Mass. 2010)..................... 51

*Malone v. United States*, 61 F. Supp. 2d 1372 (S.D. Ga. 1999) ....................... 20

*Mandel v. United States*, 793 F.2d 964 (8th Cir. 1986) ................................... 29

*Marlys Bear Med. v. United States*, 241 F.3d 1208 (9th Cir. 2001) ..................................................................................... 11

*McNeily v. United States*, 6 F.3d 343 (5th Cir. 1993) ...................................... 24

*Miami N., Inc. v. U.S. Dep't of Lab. Penobscot Job Corps Ctr.*, 939 F. Supp. 53 (D. Me. 1996) ..................................................... 24

*Miglino v. Supermarkets Gen. Corp.,* 243 A.D.2d 451 (N.Y. App. Div. 2d Dep't 1997) ..................................................................... 57

*Mullens v. United* States, 785 F. Supp. 216 (D. Me. 1992)............................. 28

*Mulloy v. United States*, 884 F. Supp. 622 (D. Mass. 1995) ...................... 23, 26

*Murrey v. United States*, 73 F.3d 1448 (7th Cir. 1996)................................... 29

*Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970) ............................................... 55

*O'Ferrell v. United States*, 253 F.3d 1257 (11th Cir. 2001) ............................ 24

*Olsen v. United States*, 144 F. App'x 727 (10th Cir. 2005) ............................. 25

*Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003) .............................. 19

*Prue v. Alyssa Rose Co.*, No. CV-04-744, 2006 WL 5218438, (Me. Super. Mar. 16. 2006) ........................................................................ 36

*Ramirez v. United States*, 567 F.2d 854 (9th Cir. 1977) ................................. 29

*Rich v. United States*, 811 F.3d 140 (4th Cir. 2015) ....................................... 19

*Richards v. United States,* 369 U.S. 1 (1962) ................................................. 31

*Rivera v. N.Y. City Health and Hosps. Corp.*, 191 F. Supp. 2d 412 (S.D.N.Y. 2002) ........................................................................... 48

*Robb v. Pa. R.R. Co.*, 210 A.2d 709 (Del. 1965) ............................................... 54

*Roberson v. United States,* 382 F.2d 714, 721 (9th Cir. 1967) ........................ 39

*Sanchez v. United States,* 671 F.3d 86 (1st Cir. 2012) .................................... 12

*Sanders v. United States*, 493 F. Supp. 3d 470 (D.S.C. 2020) .................. 33, 42

*Sanders v. United States*, 937 F.3d 316 (4th Cir. 2019) .............................. 1, 15

*Savva v. Longo*, 8 A.D.3d 551 (N.Y. App. Div. 2d Dep't 2004) ........................ 55

*Schrempf v. State*, 66 N.Y.2d 289 (N.Y. 1985) ................................................ 48

*Shannahan v. Moreau*, 202 A.3d 217 (R.I. 2019) ............................................ 55

*Shansky v. United States*, 164 F.3d 688 (1st Cir. 1999) ................................. 18

*Sheridan v. United States*, 487 U.S. 392 (1988) ...................................... passim

*Sherrod v. McHugh,* 334 F. Supp. 3d 219 (D.D.C. 2018) ................................ 54

*Shipe v. Chesapeake Bay Fishing Parties, Inc.*, 940 F. Supp. 130 (D. Md. 1996) ....................................................................................... 39

*Smith* v. *United States*, 509 F. App'x 436 (6th Cir. 2012)................................20

*Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152 (9th Cir. 2017)..........................................................................28

*Stewart v. United States*, 486 F. Supp. 178 (C.D. Ill. 1980) ............................17

*Stubbs v. Bartlett,* 478 A.2d 690 (Me.1984)......................................................57

*Thiersaint v. Dep't of Homeland Sec.*, 85 F.4th 653 (1st Cir. 2023)..............................................................................................10

*Thigpen v. United States*, 800 F.2d 393 (4th Cir. 1986)..................................24

*Thompson v. Holden Bros. Ford*, 1984 Me. Super. LEXIS 125 (July 24, 1984)..........................................................................36

*Torres-Negron v. J & N Recs., LLC*, 504 F.3d 151 (1st Cir. 2007) ....................9

*United States v. Gaubert*, 499 U.S. 315 (1991)................................................11

*United States v. Johnson*, 481 U.S. 681 (1987) ...............................................12

*United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012) ................................47

*United States v. Shearer*, 473 U.S. 52 (1985) ..................................................24

*United States v. Varig Airlines*, 467 U.S. 797 (1984).......................................17

*United States v. Wong*, 575 U.S. 402 (2015) ....................................................10

*Westcott v. City of Omaha*, 901 F.2d 1486 (8th Cir. 1990)...............................25

*Wheeler v. White*, 1998 ME 137.........................................................................51

*Winters v. N.Y. City Health & Hosps. Corp.*, 223 A.D.2d 405 (N.Y. App. Div. 1st Dep't 1996) .....................................................48

*Wood v. United States*, 115 F. Supp. 2d 9 (D. Me. 2000) ................................31

*Woods v. United States*, 677 F. Supp. 3d 1112 (S.D. Cal. 2023)........................1

*Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1977).......41, 43, 44

*Zelaya v. United States*, 781 F.3d 1315 (11th Cir. 2015)...........................28, 29

**Statutes**

18 U.S.C. § 922 .......... 15

18-C M.R.S. § 2-806 .......... 56

18-C M.R.S. § 3-817 .......... 56

28 U.S.C. § 2671 .......... 12

28 U.S.C. § 2680(h) .......... 22, 26, 27, 28

28 U.S.C. §1346 .......... 31

34 U.S.C. § 40901 .......... 15

34-B MRS § 3863 .......... 47

N.Y. Mental Hygiene Law § 9.46 .......... 49

**Regulations**

27 C.F.R. § 478.11 .......... 16

Army Regulation 635-40 .......... 16

DoD Instr. 6490.04 .......... 13, 14, 30

MEDCOM Policy Memo 22-020 .......... 16, 30

U.S. Dep't of Def., Writing Style Guide .......... 13

**Journals**

Nicole Rosenkrantz, *The Parent Trap: Using the Good Samaritan Doctrine to Hold Parent Corporations Directly Liable for Their Negligence,* 37 B.C. L. Rev. 1061 (1996) .......... 35

Rebecca L. Andrews, *So the Army Hired an Ax-Murderer*, 78 Wash. L. Rev. 161, 187–95 (2003) .......... 25

**Legislative Materials**

S. Rep. No. 90-1097 (1968) ........................................................................46

**Other Authorities**

Brief of Defendant/Appellant Sunday River Skiway Corp., *Hansen v. Sunday River Skiway Co.*, 1998 WL 35031941 (Me. June 8, 1998) ........................................................................34

Restatement (Second) of Conflicts § 145 (1971) ..............................................32

Restatement (Second) of Torts § 315 (1965) ....................................................52

Restatement (Second) of Torts § 324A (1965) ........................................ passim

Restatement (Third) of Torts: Phys. & Emot. Harm § 47 (2012) ....................55

## INTRODUCTION

On October 25, 2023, an Army Reserve Soldier killed eighteen people and injured countless others in a mass shooting that the Army could have prevented had it followed mandatory policies and responded reasonably to a known threat to the community. Now, the Government moves to dismiss by recycling the same arguments it raised in prior mass shooting cases—arguments federal courts have uniformly rejected. *See Sanders v. United States*, 937 F.3d 316 (4th Cir. 2019) (2015 mass shooting caused by Government's negligence in conducting background check of shooter); *Holcombe v. United States,* 388 F. Supp. 3d 777 (W.D. Tex. 2019) (2017 mass shooting caused by Air Force's failure to report shooter's criminal history to national background check system); *see also Kristensen v. United States*, 372 F. Supp. 3d 461 (W.D. Tex. 2019) (2015 mass shooting caused by Army's negligent failure to respond to shooter's domestic violence history and mental instability); *Woods v. United States*, 677 F. Supp. 3d 1112, 1116 (S.D. Cal. 2023) (failure to report single-victim shooter's mental history not barred by misrepresentation exception and viable under state law). The Government's own DoD Inspector General report catalogued the specific "mandatory" policies the Army failed to follow as Robert Card's alarming behavior escalated in the months before the shooting.

Between July 2022 and October 2023, the Army knew that Card's mental health was in freefall; that he possessed an arsenal of weapons; that he reported homicidal ideation; that he had created a "hit list"; that he boasted of mass violence as recently as September 2023; and that a fellow reservist warned the Army that Card would "snap and do a mass shooting." Army personnel told local law enforcement and Card's family they would handle it.

But the Army performed its undertaking to handle Card negligently—through its actions and failures to act. The Army violated mandatory regulations and policies that would've resulted in intervention, treatment, and Card's disarmament before the massacre on October 25, 2023.

The Motion to Dismiss must be denied. None of the FTCA exceptions cited by the Government immunize it from Plaintiffs' claims. And the Army's acts and omissions between 2022 and October 2023, satisfy the elements of a cause of action for negligent undertaking—a cause of action recognized in Maine.

## FACTUAL BACKGROUND

For decades, the Army knew that military service creates significant mental-health risks for Soldiers and their communities. This understanding developed from a series of mass shootings by service members with similar warning signs: mental-health deterioration, weapons access, social isolation, and escalating threats that went unreported or unaddressed. Am. Compl. ¶¶ 4.5–11, ECF No. 13. To protect the public and its own Soldiers, the Army established mandatory policies requiring medical providers, commanders, and supervisors to report all violent threats up the chain of command. *Id.* ¶ 4.12. It developed and undertook a comprehensive framework of mandatory protocols that were backed by federal law and military regulation.[1] *Id.* ¶¶ 1.14, 4.17–27.

---

[1] The Amended Complaint details each law, military directive, and order by which the Army failed to abide. *See* Am. Compl. ¶¶ 6.1–6.53, ECF No. 13.

1. ***July 2022–June 2023: The Army knows about Card's mental-health crisis.***

Over a year before the Lewiston mass shooting, the Army learned that Card's mental health was deteriorating, leaving him paranoid and delusional. *Id.* ¶¶ 5.9–18. In the summer of 2022, Staff Sergeant (SSG) Sean Hodgson reported to CPT Reamer that Card was experiencing paranoia, hearing voices and accusing others of calling him a pedophile and gay. *Id.* ¶¶ 5.9–11.

In early May 2023, worried about Card's delusions and access to firearms, Card's 17-year-old son and ex-wife reported their concerns to authorities. *Id.* ¶¶ 5.12–14. Card's family and the Sheriff's Office asked the Army to intervene, believing Card would respond better to help from his unit and his commanders that had legal authority over him. *Id.*

On May 3, 2023, a Sheriff's deputy contacted First Sergeant (1SG) Kelvin Mote and told him that Card owned 10 to 15 handguns and rifles and that Card's son was worried. *Id.* ¶¶ 5.16–18. Mote, already concerned, responded that the Army knew something was wrong based on prior reports. *Id.* Mote told the deputy that the Army had a plan and would address Card's situation at an upcoming training on May 6–7. *Id.* He would also immediately discuss options to get Card help with CPT Reamer. *Id.* But nothing was done. *Id.*

2. ***May–July 2023: After undertaking to address Card's alarming behaviors, the Army fails to follow mandatory regulations.***

From May through July 15, 2023, Card's family contacted his Unit at least five times about his worsening mental health. *Id.* ¶¶ 5.20–22. No one returned their calls. *Id.* ¶ 5.21. Despite promising to help Card during June 2023 training, the Army did nothing—claiming it would "let the doctors

handle the situation." *Id.* ¶¶ 5.19–22. But no doctors were involved in Card's care, and the Army never took steps to involve any. *Id.* ¶ 5.19. During a regimental event in June, CPT Reamer also failed to inform his commander about Card's mental-health issues or the multiple reports of risk of violence. *Id.* ¶ 5.22. The Army failed to order a mandatory Command-Directed Behavioral Health Evaluation (CDBHE).

### 3. ***July 2023: Card's mental state becomes dangerous, and the Army orders involuntary hospitalization in New York.***

In July 2023, while Card was under orders to train cadets at West Point, he continued to insist that members of the public and his own unit were calling him a pedophile. *Id.* ¶¶ 5.24–28. After confronting Card when he tried to initiate a fight with a fellow reservist, Mote described Card's blank, fixed "1000-mile stare" made the hairs on the back of his neck stand up. *Id.* The next morning, Mote and Master Sergeant Ed Yurek found Card unimproved and contacted New York State Police. *Id.* ¶¶ 5.29–36. Card told the police his fellow Soldiers were "scared of me [because] I am capable." *Id.* In response, Mote, Yurek, and Reamer ordered a CDBHE, which could only be ordered if a Commanding Officer found a Soldier presented a risk of *serious injury* to himself or others and that such harm is *likely*. *Id.*

Card's fellow Soldiers took him to Keller Army Community Hospital (Keller Hospital), where his records document auditory hallucinations, paranoia, and delusional thinking. *Id.* ¶¶ 5.40–41. Card said that he was "afraid of what I may do if people still keep bothering me." *Id.* Keller Hospital transferred him by ambulance in physical restraints to Four Winds Hospital (Four Winds) in Katonah, New York, for "enduring homicidal ideation." *Id.*

4. ***July 16–Aug. 3, 2023: The Army learns of Card's hit list, undertakes to seize his weapons, and fails on every front.***

Four Winds noted Card had developed a "hit list" of people he intended to harm, including bowlers and cornhole players at the places he would later attack. *Id.* ¶¶ 1.24, 5.42, 5.88. Testing warned Card's "poor emotional controls" would cause "volatile and extreme reactions," that his traits increased the risk for violence. *Id.* ¶ 5.43.

On July 28, 2023, Keller Hospital personnel and CPT Reamer discussed discharge planning, including Reamer's undertaking to remove Card's weapons. *Id.* ¶¶ 5.46–50. It was understood that Reamer would remove the weapons, but he did not. *Id.* ¶¶ 5.46–47. In violation of Army Command Policy, Reamer delegated the task to SSG Hodgson, who lacked authority to compel compliance from Card and was himself prohibited by bail conditions from possessing firearms. *Id.* ¶ 5.48. Keller Hospital issued Card's DA Form 4856—the military order requiring multiple follow-up actions related to Card, including removal of his personal firearms—to Reamer. *Id.* ¶ 5.49. But Reamer failed to ensure that its mandatory requirements were fulfilled. *Id.* ¶¶ 5.49–5.50. Reamer didn't even sign the Form, and Card's nurse manager never followed up on the lack of signature to see if the orders had been followed. *Id.* ¶ 5.50.

After 19 days at Four Winds, Card was discharged on August 3, 2023, and multiple mandatory duties were again ignored or executed negligently. Keller Hospital never filed a mandatory Secure Ammunition and Firearms Enforcement (SAFE) Act Report under New York law and regulations, even though it told Four Winds that it did. *Id.* ¶¶ 7.79–84. After Card's discharge, CPT Reamer failed to facilitate, monitor, or follow up with Card and did not

speak directly to Card again until September 15. *Id.* ¶ 5.51. Card's chain of command took no action and Keller Hospital failed to report Card's noncompliance to the Unit. *Id.*

5. ***Sept. 2023: Army learns Card will "snap and do a mass shooting" but violates its own regulations by standing down law enforcement and failing to initiate a CCIR.***

At 2:30 AM on September 13, 2023, SSG Hodgson called 1SG Mote to report that Card complained of being called a pedophile again, told Hodgson he could use his new scope to kill 100 people, and listed places he planned to "shoot up," including the Army drill center in Saco. *Id.* ¶¶ 5.57–58. When Hodgson told him to "knock it off" because he would "get into trouble," Card punched him and left. *Id.* Two days later, in the early morning, Hodgson texted Mote: "I believe [Card's] going to snap and do a mass shooting." *Id.*

Mote found Hodgson's account credible and believed he was dangerous. *Id.* ¶¶ 5.59–60. Mote knew there was probable cause to put Card in protective custody and take his weapons under Maine's Yellow-Flag law. *Id.* Yet Mote failed to invoke these procedures, failed to tell Reamer about it, and failed to communicate his assessment to local law enforcement. *Id.* Mote, Reamer, and CSM Tlumac agreed Card posed a "critical threat." *Id.* Mote drafted a letter to the Sheriff's Department he characterized as "basically . . . a probable cause statement." *Id.* ¶¶ 5.60-61. But the letter did not report that the Army had revoked Card's access to military weapons, it did not report that the psychiatric hospital to which he had been involuntarily committed had discharged Card only on the condition that Army personnel would seize his personal firearms, and it did not mention Maine's Yellow-Flag Law. *Id.*

¶ 5.62. Nor did Card's commanders initiate a Commander's Critical Incident Report (CCIR). *Id.* ¶ 6.49.

When Saco police spoke to Reamer, he downplayed Card's dangerousness in violation of Army regulations and his undertakings, dismissing Hodgson's warning that Card had threatened to shoot up the Army drill center. *Id.* ¶¶ 5.64-67. Reamer did not share Hodgson's texts with the Saco police or ask them to charge Card with criminal threatening or assault. *Id.* ¶¶ 5.65–68.

Meanwhile, Sheriff's Deputy Aaron Skolfield spoke to 1SG Mote, who dismissed the danger in violation of Army regulations and his undertakings, claiming Hodgson was "alarmist." *Id.* ¶¶ 5.71–72. When Reamer spoke with Skolfield, who was parked in view of Card's driveway in preparation to conduct a welfare check and invoke Maine's Yellow-Flag Law, Reamer minimized Card's danger and failed to report Card's recent threats and the fact that physicians had restricted Card's firearms. *Id.* ¶¶ 5.71–80. This conversation convinced Skolfield not to conduct a welfare check on Card. *Id.*

After that, the Army had no further contact with Card and made no further reports to the chain of command or the Sheriff. *Id.* ¶¶ 5.81–86.

6. ***Sept. 9, 2025: Department of Defense Inspector General finds Army fails to follow regulations and caused mass shooting.***

After the Lewiston shooting tragedy, The DoD Inspector General investigated the adequacy of policies and procedures to respond to reports of violent threats made by Service members, such as Card. *Id.* ¶¶ 6.43–6.44. The DoD IG investigation reviewed the Army's own internal investigation and summarized several failures by the Army in the lead up to the mass

shooting, including failing to ensure Card's weapons were secured; failing to initiate CCIRs on May 3, August 3, and September 15, 2023; failing to inform the Army Criminal Investigation Division or the Army Insider Threat Hub on Card's threats of violence; and failing to complete a Line of Duty (LOD) determination. *Id.* ¶ 6.49. The DoD Inspector General concluded that the failure to report violent threats could increase the risk of additional violent incidents by Service members "such as what occurred with SFC Card, on October 25, 2023." *Id.* ¶ 6.50. The Army concurred with the DoD IG's findings and recommendations and did not dispute them in any way. *Id.* ¶ 6.52.

## STANDARD OF REVIEW

### 1. *The Government's Factual Attack on Plaintiffs' Claims Should Not Be Adjudicated on a 12(b)(1) Motion.*

The Government's 12(b)(1) motion, predicated on exceptions to the Federal Tort Claims Act (FTCA), attacks the factual underpinnings of Plaintiffs' claims on their merits. Rather than primarily controverting the accuracy or sufficiency of the factual allegations, the Government offers *additional* (claimed) facts about its own conduct and motives, and cites *other* portions of rules and regulations to argue for a different interpretation—in some cases, different than the interpretation of the same rule provided by the Army in its own internal investigation.[2]

[2] *See, e.g.,* Mot. Dismiss at 17–18, ECF No. 29 (citing provisions outside Complaint to argue for a different interpretation of the mandatory behavioral health evaluation language contained in DoD Instruction 6490.04 and MEDCOM Policy Memo 22-020); at 22 (arguing for an interpretation of the LOD rules in Army

But unlike a facial challenge to the accuracy or legal sufficiency of jurisdictional allegations, marshaling outside facts to challenge the merits of Plaintiffs' claims is not something that should be adjudicated on a motion to dismiss. The First Circuit has clarified that if "the resolution of the jurisdictional question is dependent on factual issues going to the merits," the summary judgment standard should apply. *Torres-Negron v. J & N Recs., LLC*, 504 F.3d 151, 163 (1st Cir. 2007) (cleaned up). When, as here, "the jurisdictional facts … are inextricably intertwined with the merits of the case … the court may defer resolution of the jurisdictional issue" until trial. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 n.3 (1st Cir. 2001); *id.* at 363 ("[T]he court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction.").

At minimum, if the Court harbors any doubt about the jurisdictional facts, it should deny the motion and permit the parties to conduct discovery. The Government's motion rests on its own characterization of its employees' conduct and motives—characterizations that Plaintiffs dispute and that cannot be resolved in the Government's favor on a cold record. Dismissal at this stage, before any discovery has occurred, would improperly credit the Government's account over Plaintiffs' and deny Plaintiffs a fair opportunity to test it. The Court should deny the motion or, at a minimum, order jurisdictional discovery before ruling.

Regulation 600-8-4 different from the Army's own internal investigation that found that such rule was violated here).

### 2. *The FTCA is a broad wavier of immunity that treats exceptions like affirmative defenses.*

The FTCA is a "broad waiver of sovereign immunity." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The "broad and just purpose" of the FTCA is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable." *Indian Towing Co. v. United States*, 350 U.S. 61, 68–69 (1955). As the Supreme Court has repeated, "unduly generous interpretations of the exceptions" frustrate the central purpose of the statute. *Dolan v. United States Postal Serv.*, 546 U.S. 481, 491–92 (2006). (cleaned up). "[T]he FTCA treats the United States more like a commoner than like the Crown." *United States v. Wong*, 575 U.S. 402, 419 (2015).

The exceptions to the FTCA are unique because, while the plaintiff bears the burden of pleading, the Government bears the burden of proof. *See Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021); *Thiersaint v. Dep't of Homeland Sec.*, 85 F.4th 653, 664 (1st Cir. 2023). Indeed, "[a]ll circuits to address the issue have concluded" that the Government bears the burden of proving an exception to the FTCA. *Autery v. United States*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993).

## SUBJECT-MATTER JURISDICTION

The Court has subject matter jurisdiction under the FTCA's broad waiver of sovereign immunity. Once Plaintiffs establish that their claim is facially within the bounds of the FTCA, the burden shifts to the United States to prove that specific exceptions to the waiver apply. *Cestonaro v. United States*, 211 F.3d 749, 756 n.5 (3d Cir. 2000). Here, the Government tries to flip this

on its head, urging the Court to make improper presumptions and place the burden for their defense on Plaintiffs. *See* Mot. Dismiss 14, ECF No. 29. The Court should reject the Government's invitation to improperly shift the burden and make the Government meet its burden at trial.

1. ***Defendant does not have discretionary immunity from Plaintiffs' claims.***

For the discretionary function exception to apply, the Government must establish *both* prongs of the *Berkovitz-Gaubert* test for each act of negligence: (1) that it was discretionary, in that it involved an element of judgment or choice and was not compelled by statute, regulation, policy, or other lawful order, and (2) that the judgment or choice in question was grounded in considerations of public policy or susceptible to policy analysis. *See United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988). As detailed below, the Government fails on both prongs.

The Government mischaracterizes the treatment, management, and reporting obligations here as discretionary rather than mandatory. *See* Mot. Dismiss at 17–18, ECF No. 29. The Department of Defense Inspector General Report found that Army policies *required* medical personnel and commanding officers to report violent threats to law enforcement agencies and the chain of command. *See* Am. Compl. ¶¶ 6.45–6.46, ECF No. 13. As the Ninth Circuit has stated, a "failure to effectuate policy choices already made will not be protected under the discretionary function exception." *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1215 (9th Cir. 2001).

### A. Military decisions are not categorically immunized.

The FTCA applies to activities of both civilian and military federal employees. *See* 28 U.S.C. § 2671; Mot. Dismiss 14, ECF No. 29 (*citing Sanchez v. United States,* 671 F.3d 86, 93 (1st Cir. 2012)). In cases involving the military, courts consistently apply the *Berkovitz-Gaubert* test.[3] *See, e.g., Clendening v. United States,* 19 F.4th 421, 432 (4th Cir. 2021). The cases the Government cites for a presumption of immunity in the military context are simply cases where that test was satisfied. *See, e.g., Cuadrado-Concepcion v. United States*, 851 Fed. App'x. 985, 988 (11th Cir. 2021) (applying the two-prong test without presumption for military).

This case is not about decisions made by military officers in combat. It is about non-policy related military decisions that, in similar cases, have subjected the Government to FTCA liability. *See, e.g., Sheridan v. United States*, 487 U.S. 392 (1988) (negligent undertaking to prohibit possession of firearms on naval base); *Holcombe v. United States,* 388 F. Supp. 3d 777 (W.D. Tex. 2019) (negligent undertaking to establish then fail to report to national background-check system); *Kristensen v. United States*, 372 F. Supp. 3d 461 (W.D. Tex. 2019) (negligent undertaking to protect domestic violence victim). Indeed, one of those situations in which the exception did not apply to military personnel involved just the type of personal and community safety decisions as those concerning Card. *See Holcombe,* 388 F. Supp. 3d 777.

---

[3] The exception to that general analysis is the Supreme Court's *Feres* doctrine, which bars FTCA claims "for injuries to members of the military service arising out of or in the course of activity incident to service." *United States v. Johnson*, 481 U.S. 681 (1987). The doctrine has no bearing on the claims of injury by civilians.

The *Berkovitz-Gaubert* test requires the Government to prove both prongs. It cannot.

### B. Failure to promptly refer Card for evaluation violated mandatory policy.

Department of Defense policy states:

> A commander or supervisor *will* refer a Service member for an emergency [mental-health evaluation] as soon as is practicable whenever: (1) A Service member, by actions or words, such as actual, attempted, or threatened violence, intends or is likely to cause serious injury to him or herself or others. (2) When the facts and circumstances indicate that the Service member's intent to cause such injury is likely.

DoD Instr. 6490.04 ¶ 3.d, ECF No. 29-1 (emphasis added);[4] *see also* Am. Compl. ¶ 6.41, ECF No. 13.

Compared to the preceding section that uses discretionary language for non-emergency mental-health evaluations, the language used in subsection d of the instruction is mandatory. *Compare* DoD Instr. 6490.04 ¶ 3.b, ECF No. 29-1 ("Referral . . . for a non-emergency MHE *may* be initiated only by a commander . . . [and] *may* be for a variety of concerns") *with* DoD Instr. 6490.04 ¶ 3.d, ECF No. 29-1 ("A commander or supervisor *will* refer a Service member for an emergency MHE as soon as is practicable . . ."). The Government ignores this clear distinction, instead focusing on a separate

---

[4] *See also* U.S. Dep't of Def., Writing Style Guide, at 4 ¶ 1.2(b) (2020) ("Use 'will' to denote a required action in the future."), *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/iss_process/Writing_Style_Guide.pdf

definitional provision describing who has authority that precedes these operational directives. *See* Mot. Dismiss 17, ECF No. 29.

Read properly, a commanding officer must order a mental-health evaluation (MHE) under any of the three circumstances listed in ¶ 3.d. The instruction is not a request. And the commander must do so "as soon as is practicable." *See* DoD Instr. 6490.04 ¶ 3.d, ECF No. 29-1.

The Government argues that determining whether a service member made threats or is likely to cause serious injury or death is itself discretionary. It isn't. A fact either occurred or it didn't. And here, the Army's own personnel believed Card was dangerous. That belief alone satisfies the factual predicate. And acting on that belief does not involve policy analysis. In any event, the allegations would support a factfinder's conclusion that the predicate facts requiring an MHE of Card existed long before any MHE was ordered. *See, e.g.,* Am. Compl. ¶¶ 5.9–5.22, ECF No. 13. The failure to order the MHE for Card "as soon as is practicable" violated DoD policy. To the extent the Government contests the existence of the underlying facts giving rise to the mandatory order for an emergency MHE, that argument is irrelevant to this motion to dismiss.

### C. **Failure to enforce mandatory discharge directives.**

Keller Hospital issued a DA 4856 form to Card upon discharge, which constituted military orders, subject to court-martial and imprisonment. *See* Am. Compl. ¶ 5.49, ECF No. 13. Card's commanding officer CPT Reamer had mandatory, ministerial, and operational responsibility for enforcing these orders; he had no discretion to ignore them. *Id.* Here, the DA 4856 required CPT Reamer to maintain contact with Card, oversee his follow-up medical

care, and ensure that Card's personal firearms were removed. *Id.* These obligations were neither discretionary nor susceptible to policy analysis.

### D. Failure to report Card to the FBI Background Search Database.

Background-check reporting obligations and associated agency procedures can require Government officials to act. When they do, those acts are non-discretionary, and when performed negligently, they can provide the basis for FTCA liability. *See Sanders v. United States,* 937 F.3d 316, 332 (4th Cir. 2019) (no immunity defense where the case turned "on the NICS Examiner's alleged negligence in failing to follow a clear directive—contact the arresting agency—contained within the mandatory SOPs"). As alleged, the Army had a duty to report Card under 34 U.S.C. § 40901 and 18 U.S.C. § 922(g). *See* Am. Compl. ¶¶ 7.55–56, ECF No. 13. The Brady Act requires federal agencies, including the Department of Defense and the Army, to report "any record of any person demonstrating that the person falls within one of the [922(g)] categories." 34 U.S.C. § 40901(e)(1)(C).

And the Department of Defense's own policies recognize this obligation. As the *Holcombe* court explained, "in enacting the DOD regulations mandating that information be collected and reported to NICS" the Department of Defense has no discretion in carrying them out and must do so reasonably. *See Holcombe*, 388 F. Supp. 3d at 805. A claim based on failure to carry out those policies can thus proceed under the FTCA's waiver of sovereign immunity. *Id.*

Thus, a factfinder could reasonably conclude that Card had "been committed to a mental institution." A factfinder could also reasonably conclude that had the Army properly followed protocol and conducted the

LOD investigation and Medical Evaluation Board (MEB) process, Card would have been "adjudicated [a] mental defective[]." Either of these conclusions triggers a mandatory reporting obligation by the Army. It is undisputed that the Army made no such report.

### E. Failure to refer Card to Department of Defense Medical Evaluation Board and Physical Evaluation Board.

After Card's hospitalization, Keller Army Hospital completed DA Form 3822, formally concluding that Card "does NOT meet medical retention standards, has reached medical retention determination point, and a Disability Evaluation System referral is indicated." Am. Compl. ¶ 7.37, ECF No. 13. Under MEDCOM Policy Memo 22-020, completion of DA Form 3822 officially communicates the service member's mental status to command. *Id.* ¶¶ 6.21–6.23. The determination that Card did not meet medical retention standards required a referral to the MEB.

That did not happen. *See id.* ¶ 6.27. For service members with behavioral health diagnoses, as Card had here, convening those Boards is not optional. Army Regulation 635-40 ¶ 4-12(b)(8) orders that the Boards determine—in writing, as part of a narrative summary—" whether the Soldier is dangerous to themselves or others." Am. Compl. ¶ 7.46, ECF No. 13. The Complaint also alleges that "any reasonable Board process would have yielded a determination that Card continued to present a danger to himself and others." *Id.* ¶ 7.50. That finding, had the Army fulfilled its non-discretionary obligations, would have constituted an adjudication within the plain meaning of § 922(g)(4) and 27 C.F.R. § 478.11—automatically triggering the firearms prohibition of the Gun Control Act and the Army's obligation to report Card to the NICS database.

### F. None of the Army's failures were grounded in public policy or susceptible to policy analysis.

The Government's prong-two argument fares no better. Even if discretion is present, the exception protects only conduct that is "susceptible to policy analysis"—conduct grounded in "social, economic, and political policy" of the kind Congress sought to insulate from tort liability. *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). Decisions about how to structure the Army's mental-health referral system or how to allocate psychiatric resources across the Reserves are policy decisions. But whether a specific commander complied with a mandatory Form 3822 directive to remove a specific soldier's firearms is not. The exception does not reach the latter.

The second prong examines whether the complaint targets the "nature of the rules which a government agency has formulated," or the way those rules are applied. *Hendry v. United States*, 418 F.2d 774, 782 (2d Cir. 1969) (citing *Dalehite v. United States*, 346 U.S. 15, 27 (1953)). If the allegations concern the latter, the discretionary function exception does not apply, even if the first prong is met. The exception was meant to protect the legitimacy of regulations, not their application. *Id.*; *see also Stewart v. United States*, 486 F. Supp. 178, 181 (C.D. Ill. 1980) (the purpose of the exception "was to preclude testing the legality of a statute or regulation by a tort action").

As the Ninth Circuit recently put it, "the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not." *See Chang v. United States*, 139 F.4th 1087, 1094 (9th Cir. 2025). None of the allegations here challenge the legitimacy, efficacy, or wisdom of Department of Defense

policies and regulations. Indeed, the allegations rely on those very policies and regulations to establish the Army's failure to follow its own rules.

For example, the Plaintiffs do not challenge the Army's decision to create the Command-Directed Evaluation process, or the Army's decision to structure the CCIR reporting requirements. Instead, the conduct challenged here includes a series of failures to follow established rules:

- failure to follow Army regulations and order a CDBHE in 2022 and 2023 when Card began hallucinating. Am. Compl. ¶¶ 6.1–6.14, ECF No. 13.
- failure of a company commander, having ordered a CDBHE and having received the resulting Form 3822, to comply with that form's specific directives regarding firearms removal and medical follow-up. *Id.* ¶¶ 6.21–6.23.
- failure of Army medical providers, after evaluating Card and determining he was dangerous, to file the mandatory SAFE Act report. *Id.* ¶¶ 7.81–7.82.
- failure to maintain Card on activity duty pending completion of a LOD investigation and MEB review. *Id.* ¶¶ 7.35–7.51.
- failure of the first sergeant, having received a 2 AM text warning that Card was about to commit a mass shooting, to file the required Serious Incident Report (SIR) with Army criminal investigators. *Id.* ¶¶ 6.36–6.42.

These are not contested policy tradeoffs. They are instances of specific people not following mandatory rules.

Likewise, in *Coulthurst v. United States*, the Second Circuit held that "if a government official's actions were motivated by "'laziness,' 'haste,' or 'inattentive[ness],' the discretionary function exception does not shield the United States from liability." 214 F.3d 106, 110 (2d Cir. 2000); *accord Shansky v. United States*, 164 F.3d 688, 693 (1st Cir. 1999) ("We do not suggest that any conceivable policy justification will suffice to prime the

discretionary function pump. Virtually any government action can be traced back to a policy decision of some kind, but an attenuated tie is not enough to show that conduct is grounded in policy."). Other circuits have followed the Second Circuit's approach. *See, e.g., Keller v. United States*, 771 F.3d 1021, 1025 (7th Cir. 2014) (citing *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003)); *Rich v. United States*, 811 F.3d 140 (4th Cir. 2015); *see also Andrulonis v. United States,* 952 F.2d 652, 653 (2d Cir. 1991) (discretionary function exception doesn't apply to CDC's failure to warn about obvious dangers when lab tech was infected by rabies because it does not protect decisions to "keep silent about obvious, easily correctable dangers").

And here, one such Army failure stands out. CPT Reamer failed to open an email from Army medical personnel detailing Card's discharge requirements. This was not some careful policy consideration central to the Army's defense of the nation or its preparedness; it was simple laziness or inattention. *See* Am. Compl. ¶ 7.24, ECF No. 13.

Other acts alleged fit this same pattern of conduct divorced from any policy consideration. For instance, there is no plausible policy justification for ignoring a Form 3822 directive to remove a Soldier's firearms from his home after he disclosed homicidal ideation and a "hit list." Nor is there any plausible policy justification for Captain Reamer's affirmative conduct towards Sagadahoc County Deputy Skolfield that caused law enforcement to stand down when they were prepared to invoke Maine's Yellow Flag law. These are not policy choices. They are implementation failures.

To hold otherwise would hollow out the FTCA. *See Coulthurst*, 214 F.3d at 110 ("almost every act involves some modicum of discretion regarding the manner in which one carries it out. Such a result is not required by the

language of the DFE and would undercut the policy aims at the heart of the FTCA."). The discretionary function exception was enacted to protect genuine social, economic, and political policymaking from judicial second guessing—not to immunize a company commander who never read his emails and never followed up or followed through.

What's more, all the cases cited by the Government are distinguishable from this case. In one group of cases, for example, the application of the discretionary function exception was not meaningfully analyzed, and, in most of them, plaintiffs failed to adequately contest the issue. *See Cuadrado-Concepcion v. United States*, 851 F. App'x at 988 ("Cuadrado does not meaningfully dispute the court's analysis that the challenged conduct involved judgments grounded in considerations of public policy"); *Smith* v. *United States*, 509 F. App'x 436, 443 (6th Cir. 2012) ("[W]e need not reach the district court's alternative basis for dismissal—the FTCA's discretionary function exception."); *Linke v. United States*, No. W-14-CV-444, 2015 WL 12743613, at *1 (W.D. Tex. June 2, 2015) ("Plaintiffs failed to correct the defects in their pleadings after repleading"); *Conway v. United States*, No. CV 17-71-GF-JCL, 2018 WL 6605887, at *5 (D. Mont. Dec. 17, 2018) ("Conway does not argue otherwise in response.").

The other cases contain materially different factual scenarios: contract obligations or lack thereof in *Guile v. United States*, 422 F.3d 221 (5th Cir. 2005); "decisions concerning the hiring, training, and supervising of" government employees in *Harper v. United States*, No. CV 12-1802 (CKK), 2020 WL 4192540, at *5 (D.D.C. July 21, 2020); and pre-trial detention in *Malone v. United States*, 61 F. Supp. 2d 1372 (S.D. Ga. 1999).

Notably, in the most closely analogous case yet decided by any court—*Holcombe*—the Government did not initially assert the discretionary function exception. *See Holcombe*, 388 F. Supp. 3d at 805 ("Many arguments like Plaintiffs' fail because . . . plaintiffs often run into the misrepresentation or discretionary-function exceptions. Not so here."). When finally asked to apply that exception at the summary judgment stage to a subset of plaintiffs' claims (negligent supervision and training), the Court held that the discretionary function did not fully bar them. *See Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 67217, at *25, *29 (W.D. Tex. Jan. 6, 2021).

Yet another closely analogous case involving a mass shooting committed by an Army Service member is *Kristensen v. United States*. 372 F. Supp. 3d 461 (W.D. Tex. 2019). Like *Holcombe,* the *Kristensen* case arose from a shooting in which the government failed to comply with mandatory reporting obligations that would have prevented the shooter from obtaining firearms. As in *Holcombe*, the court rejected the government's attempts to dismiss the FTCA claims allowing them to proceed to trial. *Id.* at 469–70.

Here, like in *Holcombe* and *Kristensen*, the mandatory obligations are prescribed by federal statute and DoD policy. Here, like in *Holcombe*, the DoD Inspector General identified systematic compliance failures and connected those failures directly to the resulting tragedy. Here, the Army formally concurred with the Inspector General's conclusions. And here, as in those cases, the Government asks this Court to treat operational failures as protected policy choices—a position these courts and others routinely reject.

This case does not present close questions about how an agency chose to allocate resources or balance competing institutional priorities. Instead, it's a straightforward account of mandatory obligations that were never met. The

Government's own Inspector General reviewed this record and reached the same conclusion: Army personnel failed to follow mandatory policies across the board, and those failures increased the risk of exactly the kind of violence that occurred on October 25, 2023. Am. Compl. ¶¶ 6.43–6.53. And the Army did not dispute that finding—it formally concurred with it. *Id.* ¶ 6.52.

Now, the Government's litigation position is that those same violations were protected exercises of policy discretion. But the discretionary function exception protects policy choices, not rule-breaking. The motion to dismiss must be denied.

### 2. *Plaintiffs' claims are not barred by the assault-and-battery exception.*

#### A. **The assault-and-battery exception does not apply to Plaintiffs' independent negligence claims.**

When the individual "negligence of other Government employees . . . allow[s] a foreseeable" violent act to occur, the assault-and-battery exception does not apply. *Sheridan v. United States*, 487 U.S. 392, 401 (1988). The United States Supreme Court interpreted the scope of the FTCA's "assault-and-battery exception" (28 U.S.C. § 2680(h)) in *Sheridan*. That case addressed claims based on the failure of naval corpsmen to control or warn others about "an obviously intoxicated off-duty serviceman . . . [who ultimately] fired several rifle shots into an automobile." *Id.* at 393–94. The Court rejected the Government's argument that the plaintiff's claims were barred by the assault-and-battery exception. Instead, it held that "the negligence of other Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of [the assailant's] employment status." *Id.* at 401.

In other words, the drunk and armed off-duty serviceman was "a foreseeably dangerous individual"—a "dangerous human instrument." *Id.* at 403 ("[T]he theory of liability in this case is analogous to cases in which a person assumes control of a vicious animal, or perhaps an explosive device."). "Because neither [the serviceman's] employment status nor his state of mind has any bearing on the basis for [the plaintiff's] claim for money damages," the assault-and-battery exception did not apply. *Id.*

Every Court of Appeals to consider the issue has reached the same conclusion: "claims of independent negligence committed by Government employees are not barred by the assault-and-battery exception." *CNA v. United States*, 535 F.3d 132, 148 (3d Cir. 2008).[5]

Courts in the First Circuit follow this logic. *Sheridan* does not require a "rule barring all claims alleging negligent hiring and negligent supervision by the government." *Mulloy v. United States*, 884 F. Supp. 622, 630–31 (D. Mass. 1995) (exception inapplicable to claims that soldier kidnapped and killed plaintiff based on negligent hiring and Army's voluntary undertaking to screen soldiers). This is particularly true where, as here, "a negligent decision to hire led to an assault which was committed outside of the employee's scope of employment." *Id.*; *Campbell v. United States*, 167 F. Supp. 2d 440, 445–46 (D. Mass. 2001) (holding exception inapplicable to claim by contractor

---

[5] *See also Doe 1 v. United States*, 166 F.4th 1255, 1263–64 (11th Cir. 2026); *Blackburn v. United States*, No. 20-8005, 2021 WL 3027979, at *6 (10th Cir. July 19, 2021); *Leytman v. TSA*, 804 F. App'x 78, 80 (2d Cir. 2020); *E.D. v. United States*, 764 F. App'x 169, 173 (3d Cir. 2019); *Durden v. United States*, 736 F.3d 296, 308–09 (4th Cir. 2013); *Bodin v. Vagshenian*, 462 F.3d 481, 489 (5th Cir. 2006); *LM ex rel. KM v. United States*, 344 F.3d 695, 699 (7th Cir. 2003); *Billingsley v. United States*, 251 F.3d 696, 698 (8th Cir. 2001); *Brock v. United States*, 64 F.3d 1421, 1425 (9th Cir. 1995); *Bembenista v. United States*, 866 F.2d 493, 498 (D.C. Cir. 1989).

assaulted by Navy enlistee and noting that the Government is "liable for negligence for failure to prevent an assault and battery [] where it breaches an independent duty owed to the victim to refrain from acting in a way which would place the victim in foreseeable danger"); *Miami N., Inc. v. U.S. Dep't of Lab. Penobscot Job Corps Ctr.*, 939 F. Supp. 53, 56 (D. Me. 1996) (noting same and approvingly discussing *Mulloy*).

In sum, the assault-and-battery exception does not apply to claims of negligence by Government employees. It thus does not apply here.

### B. The Government misstates the law of the assault-and-battery exception.

The Government leans on *Shearer* for a broad reading of the assault-and-battery exception. *United States v. Shearer*, 473 U.S. 52 (1985); Mot. Dismiss 32–34, ECF No. 29. But *Shearer*'s discussion of the assault-and-battery exception was never the law—it was a plurality opinion, and six justices rejected it. 473 U.S. at 53 (excluding Part II-A from the opinion of the Court). Instead, *Shearer* was decided on the *Feres* doctrine. *Id.* at 57–59.

The Government contends, wrongly, that the "majority of circuits" have held that the exception bars negligent supervision and failure to prevent claims arising out of an underlying assault and battery. *Id.* at 33. That is simply untrue, as any scrutiny of the cases cited by the Government reveals.[6]

---

[6] The Government cites pre-*Sheridan* cases based on *Shearer*, like for example, *Thigpen v. United States*, 800 F.2d 393 (4th Cir. 1986), rather than that court's post-*Sheridan* jurisprudence. Two of its cases do not address the assault-and-battery exception at all. *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993) (misrepresentation); *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001) (same). Another group of cases contained no independent negligence claim. *See Olsen v. United States*, 144 F. App'x 727,

The Government also gives no explanation why this would (or should) be the rule based on the FTCA's text, structure, or history.[7]

The key distinction here is between cases where harm arises "from a breach of a duty that the government assumed prior to the actual assault" and "cases such as *Shearer*," in which "the alleged duty of the government to the victim arises only at the time of the assault and because of the assault." *LM*, 344 F.3d at 699 ("Only the latter cases fall within" the assault and battery exception); *Glade v. United States*, 692 F.3d 718, 724 (7th Cir. 2012) (negligence in hiring, retaining, or supervising employee creates independent negligence claim).

This approach properly balances Congress's intent to prevent the Government from being vicariously liable for its employees' assaults, while still allowing recovery where it assumed an independent duty to control an employee who, for tort law purposes, was merely a "dangerous instrument." *Sheridan*, 487 U.S. at 403; Rebecca L. Andrews, *So the Army Hired an Ax-Murderer*, 78 Wash. L. Rev. 161, 187–95 (2003).

The Fourth Circuit rejected the Government's argument in *Durden v. United States*, 736 F.3d 296 (4th Cir. 2013). The *Durden* court held that "although the legal duty to control a tortfeasor must be independent of the tortfeasor's status as a government employee, knowledge of the tortfeasor's

---

734 (10th Cir. 2005); *Franklin v. United States*, 992 F.2d 1492 (10th Cir. 1993); *Westcott v. City of Omaha*, 901 F.2d 1486, 1489 (8th Cir. 1990).

[7] Contrary to the Government's representation, the First Circuit is not "aligned with this approach." Mot. Dismiss 33, ECF No. 29. It has never addressed the issue. The case it cites, *Dynamic Image Techs., Inc. v. United States*, did not address the scope of the assault-and-battery exception. 221 F.3d 34 (1st Cir. 2000).

propensity for violence or criminal history gained as a result of such status does not, per se, nullify an FTCA claim." *Id.* at 308–09 (cleaned up).[8]

That the Government acquired its knowledge and duties through Card's employment does not bar Plaintiffs' claims. *See Mulloy*, 884 F. Supp. at 630–31; *Durden*, 736 F.3d at 308–09. Card was "a foreseeably dangerous individual" and a "dangerous human instrument." *Sheridan*, 487 U.S. at 401. "Because neither [Card's] employment status nor his state of mind has any bearing on the basis for [the plaintiff's] claim … the intentional tort exception to the FTCA is not applicable in this case." *Id.*

3. ***Plaintiffs' claims are not barred by the misrepresentation exception.***

The Government invokes the FTCA's misrepresentation exception, 28 U.S.C. § 2680(h), to defend what is, at its core, a series of failures to perform mandatory operational duties. But Plaintiffs never relied on any governmental communication. Every claim rests on the Army's negligent performance of operational tasks—any communications were incidental.

The Supreme Court settled this question in *Block v. Neal,* 460 U.S. 289 (1983). The misrepresentation exception[9] "applies only when the action itself falls within the commonly understood definition of a misrepresentation claim, which … has been confined 'very largely to the invasion of interests of a

[8] The Government claims that on remand, the Fourth Circuit rejected the argument that adoption of regulations constituted a voluntary undertaking giving rise to a duty. Mot. Dismiss 34 n.20, ECF No. 29. But the Fourth Circuit's decision was based on the application of Maryland state law to the specific facts in that case, not on any FTCA exception. *Durden,* 736 F.3d at 308–09.

[9] The United States cannot be held liable under the FTCA for any claim "arising out of . . . libel, slander, misrepresentation, [or] deceit." 28 U.S.C. § 2680(h).

financial or commercial character, in the course of business dealings.'" *Block v. Neal*, 460 U.S. 289, 296 n.5. The exception reaches only "pecuniary injuries which are wholly attributable to reliance on the Government's negligent misstatements." *Id.* at 297.

The First Circuit, following the Supreme Court's limiting principle in *Block,* applies the exception only when the alleged conduct meets the excepted tort on all fours. "[I]f there is merely a loose connection, a family resemblance, or even a partial overlap between the conduct on which the asserted claim rests and that comprising an excepted tort, the claim is not barred by section 2680(h)." *Limone v. United States*, 579 F.3d 79, 92–93 (1st Cir. 2009) (citing *Block*, 460 U.S. at 298). A "negligence claim [is] not barred by [the] misrepresentation exception [where] reliance [by the plaintiff is] not present." *Id.* (citing *Jimenez-Nieves v. United States*, 682 F.2d 1, 4 (1st Cir. 1982) (holding same and noting that "one essential element of misrepresentation remains reliance by the plaintiff himself upon the false information that has been provided")). Maine law has the same requirements. *Deane v. Cent. Maine Power Co.*, 2024 ME 72, ¶¶ 23–24.

None of the Plaintiffs relied on any of the communications by the Army at issue. In fact, they were not a recipient of them at all. And where, as here, a false statement "was not made to the plaintiff and he did not rely upon it," that is "sufficient to remove this case from the core, or traditional view of misrepresentation as a separate tort." *Jiminez-Nieves*, 682 F.2d. at 5. Neither did they suffer commercial loss; their injuries were physical. As a result, multiple key elements of the tort of misrepresentation, as incorporated into § 2860(h), are absent from the allegations here.

Recognizing this problem, the Government turns to inapposite cases to argue that the exception extends to communications neither received nor relied on by Plaintiffs. For example, the Government relies on dicta from *Lawrence v. United States*, a case decided based on the discretionary function exception that did not address the Ninth Circuit's misrepresentation exception precedent. *See* 340 F.3d 952, 958 (9th Cir. 2003);[10] Then, *Zelaya* expressly rested on two facts: (1) the only tortious act alleged was a failure to communicate and (2) the only harm was pecuniary loss in a commercial context. 781 F.3d 1315, 1338 (11th Cir. 2015). Likewise, *Mullens v. United States*, was expressly based on pecuniary loss in a commercial setting based on a misrepresentation to them, that they relied on, in the sale of a house. 785 F. Supp. 216, 220 (D. Me. 1992). But neither of those elements is present here.

Finally, *Baroni v. United States*, 662 F.2d 287, 289 (5th Cir. 1981) does not help the Government either. The Government reads *Baroni* to mean that any governmental communication in the causal chain triggers § 2680(h). That reading conflicts with *Block v. Neal*, which the Supreme Court decided two years after *Baroni*. Here, the Plaintiffs made no decision, commercial or otherwise, based on anything the Army said to anyone.

---

[10] The Government also cites *Abbey v. United States*, 112 F.4th 1141, 1146 (9th Cir. 2024). While Abbey did find third-party communications may be covered by the misrepresentation exception, it did so by expressly rejecting *Block's* teachings, based its decision primarily on the centrality of the alleged misrepresentations to the plaintiff's claims, and failed to address the precedent (within its own circuit) requiring a pecuniary loss in a commercial context. *Id.*; cf. *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1160, aff'd with minor unrelated corrections, 868 F.3d 1048 (9th Cir. 2017) (exception inapplicable because no pecuniary loss through deceit). It is an outlier.

In *Block*, the Supreme Court rejected the Government's new argument for an exception without borders, warning that such a reading "would encourage the Government to shield itself completely from tort liability by adding misrepresentations to whatever otherwise actionable torts it commits." 460 U.S. at 298.

The Government then claims a few of the Plaintiffs' allegations are based on failures to properly execute reports to agencies outside the Army and should therefore be barred. Mot. Dismiss 37, ECF No. 29 (pointing to Compl. ¶¶ 7.4h–i, 7.12h–i, 7.30 (negligent medical care, treatment, discharge, and follow up), 7.78–7.88 (failure to file SAFE Act Report)). First, this argument fails based on the absence of commercial context, pecuniary loss, and reliance by the Plaintiffs. *Limone*, 579 F.3d at 92–93. Nor do these claims rest on a duty to avoid misrepresentation. They rest on the Army's voluntarily assumed duty to follow its own regulations and its common-law duty to warn.[11] *See Zelaya*, 781 F.3d at 1325 ("[I]t is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his '[G]ood Samaritan' task in a careful manner.")

*Block* draws a second, independent line: the exception "does not bar negligence actions which focus not on the Government's failure to use due

---

[11] Multiple federal circuit courts have applied *Block v. Neal* to failure-to-warn claims or other claims involving failures to convey information about concealed dangers, holding such claims are not barred by the misrepresentation exception. See, e.g., *Abbott v. United States*, 78 F.4th 887, 903 (6th Cir. 2023) ("Plaintiffs' failure-to-warn claim sounds in negligence, and not in misrepresentation"); *Est. of Trentadue ex. rel. Aguilar v. United States*, 397 F.3d 840, 854–55 (10th Cir. 2005); *Mandel v. United States*, 793 F.2d 964, 967 (8th Cir. 1986); *Ramirez v. United States*, 567 F.2d 854, 586–57 (9th Cir. 1977); *Green v. United States*, 629 F.2d 581, 585 (9th Cir. 1980); *Murrey v. United States*, 73 F.3d 1448, 1450–51 (7th Cir. 1996).

care in communicating information, but rather on the Government's breach of a different duty." 460 U.S. at 297. And here, each duty is purely operational. For instance, the Army's obligation to complete an LOD investigation arose from Card's hospitalization. Its duty to secure Card's firearms was required by the DA Form 3822—orders enforceable by court-martial. Its duty to initiate a CDBHE after Card threatened mass shootings was mandatory under MEDCOM Policy Memo 22-020 and DoD Instruction 6490.04. These duties existed independent of any communication. The DoD Inspector General concluded that the failure to consistently report Card's violent threats "could increase risk of additional violent incidents by Service members, such as what occurred with SFC Card on October 25, 2023." Am. Compl. ¶ 6.50. That is operational failure, not miscommunication.

Courts faced with mass-casualty claims arising from the same pattern of government inaction have reached the same conclusion. When the Government advanced this identical argument in *Holcombe*, the court rejected it on two grounds: there was "not even indirect reliance on Plaintiffs' part anywhere in the chain of causation," and "the gravamen of Plaintiffs' allegations is the Government's negligence in performing the operational task of collecting, handling, processing, and entering Kelley's background information." *Holcombe v. United States*, 388 F.Supp.3d 777, 794 (W.D. Tex. May 23, 2019). "Any miscommunication in the chain of causation is merely collateral." *Id.* at 793. The same is true here.

Where the gravamen of the complaint is the Government's operational negligence, or negligent undertaking in "carrying out their supervisory activity," the misrepresentation exception affords the Government no relief. *Block v. Neal,* 460 U.S. at 296–97. And the gravamen of this case is the

Government's operational failure to comply with a host of mandatory obligations. Accordingly, the misrepresentation exception does not apply and the Government's motion on it must be denied.

4. ***Plaintiffs' claims are not barred by the contractor exception because the Plaintiffs are not suing over contractor actions.***

The FTCA's independent contractor exception states that "the United States retains its sovereign immunity when the acts or omissions that serve as the basis for a claim are committed by contractors hired by the United States." *Wood v. United States*, 115 F. Supp. 2d 9, 16 (D. Me. 2000). But the Plaintiffs' claims do not rely on the actions of contractors. Nowhere do the Plaintiffs allege that the acts, omissions, or negligence of Four Winds, its employees, or any other contractor caused their injuries. Rather, the Plaintiffs' allegations related to Four Winds hinge on the Army's failures to follow through on actions it agreed to undertake in securing Card's discharge from Four Winds. *See, e.g.*, Am. Compl. ¶¶ 5.51, 7.30, ECF No. 13. And so, the FTCA contractor exception does not apply.

## STATE LAW

1. ***Choice of Law***

The FTCA and well-established caselaw direct this Court to apply the choice-of-law rules of Maine to this case. *See* 28 U.S.C. §1346(b) (the government is subject to liability according to "the law of the place where the act or omission occurred"); *Richards v. United States,* 369 U.S. 1 (1962) (the law of the state is the "whole law," including the state's choice-of-law rules).

And as this Court has explained in prior decisions, Maine follows the Second Restatement of Conflicts for tort cases. *See Adams v. Rubin*, 964 F. Supp. 507, 509 (D. Me. 1997) (citing *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 934 (Me.1982)). Under that rule, a court should apply the law of the state with more significant contacts and more substantial relationships to the events and the parties. *See* Restatement (Second) of Conflicts § 145 (1971).[12]

Applying that framework to the Plaintiffs' claims, counts A, B, C, E, F, H, I, J, K, L, and M all have their basis in events and relationships that occur largely in Maine. Thus, Maine law dictates whether and how they should proceed. Counts D and G—negligence by the medical providers at Keller Hospital and its failure to file a SAFE Act report—center on conduct that occurred, or should have occurred, in New York. Thus, New York choice-of-law controls those two distinct causes of action.

And New York choice-of-law states that New York substantive law controls those claims too. In New York, if "the tort law at issue regulates primary conduct[—as opposed to allocation of loss after a tort occurs—]the law of the place of the tort's commission will typically govern." *Eccles v. Shamrock Cap. Advisors, LLC*, 245 N.E.3d 1110, 1120–21 (N.Y. 2024). The tort law related to Claims D and G regulate primary conduct, i.e., rules designed to regulate conduct designed to prevent injuries occurring in the first place. New York substantive law thus applies to those causes of action.

---

[12] Factors for a court to consider are: "a) the place where the injury occurred, b) the place where the conduct causing the injury occurred, c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and d) the place where the relationship, if any, between the parties is centered." *Restatement (Second) of Conflicts* 145 (1971).

2. ***Plaintiffs' allegations adequately state causes of action for negligent undertaking (Counts A, C, E, and F).***

The Government undertook to protect the public from potentially dangerous Soldiers that it was aware posed a threat. It thus had a duty to do so with reasonable care. Plaintiffs have sufficiently pled that the Government owed them a duty of care and breached it.

Plaintiffs' negligent undertaking claims fall into two categories: (1) the claim specific to the Government's negligence in undertaking to protect those citizens to whom Card posed a threat (Count A); and (2) claims related to the Army's negligence in following mandatory statutory and regulatory obligations that were intended to prevent violent, mentally ill service members from posing extreme risks to themselves and others and ensuring that they not have continued access to deadly weapons (Counts C, E, and F).

Maine, like most jurisdictions, recognizes a cause of action for negligent undertaking where (1) a defendant undertakes to do something it should recognize is necessary to protect others from physical harm, (2) the defendant negligently performs the undertaking, and (3) its negligence increases the risk of harm. *See Hansen v. Sunday River Skiway Co.*, 1999 ME 45, ¶ 10.

Cognizable duties arise from "a wide variety of undertakings by the federal government." *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273, 1290 (S.D. Fla. 2020) (collecting cases). And those undertakings often arise from mandatory statutory and regulatory obligations. *See, e.g., Sheridan,* 487 U.S. at 401 (prohibition of firearms on naval base); *Sanders v. United States*, 493 F. Supp. 3d 470, 485 (D.S.C. 2020) (national background check system requirement); *Holcombe*, 388 F. Supp. 3d

at 805 (same); *Kristensen v. United States*, 372 F. Supp. 3d 461 (W.D. Tex. Jan. 31, 2019) (requirement to protect victim of domestic violence).

### A. **Maine recognizes a "negligent undertaking" cause of action.**

With respect to a cause of action for "negligent undertaking" in Maine, the "course that the state courts would take is *reasonably clear*." *See Gonzalez Figueroa v. J.C. Penney P.R., Inc.,* 568 F.3d 313, 323 (1st Cir. 2009) (emphasis added). Decisions of Maine's Law Court and numerous Superior Courts show that Maine law recognizes negligent undertaking claims in accordance with the Restatement (Second) of Torts § 324A.

The Law Court has expressly held that a jury instruction on "negligent undertaking" was a "substantially correct statement[] of the law." *Hansen*, 1999 ME 45, ¶ 10. The specific jury instruction provided:

> If you find that the Defendant, Sunday River, undertook efforts with respect to its ski trails and signs posted on those *trails which it should recognize as necessary to protect skiers from bodily injury or death*, Sunday River may be liable to the Plaintiff if you find *<u>either</u>* that Sunday River's failure to exercise reasonable care in its undertaking *increased the risk of harm* to Mr. Hansen, **<u>or</u>** that Mr. Hansen was harmed because he *relied upon* Sunday River's undertaking.

Brief of Defendant/Appellant Sunday River Skiway Corp. at 19, *Hansen v. Sunday River Skiway Co.*, 1998 WL 35031941 (Me. June 8, 1998).

This jury instruction tracks the precise elements of a "negligent undertaking" claim under the Restatement, which provides in full:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

The Law Court's endorsement of the trial court's jury instruction as a "substantially correct" statement of Maine law makes it "reasonably clear" that Maine recognizes a claim of "negligent undertaking" tracking § 324A—at least for those claims alleged under the "increased risk" (§ 324A(a)) and "reliance" (§ 324A (c)) subsections. *Hansen* brings Maine in line with the majority of states on the issue. *See* Nicole Rosenkrantz, *The Parent Trap: Using the Good Samaritan Doctrine to Hold Parent Corporations Directly Liable for Their Negligence,* 37 B.C. L. Rev. 1061, 1061 n. 6 (1996) ("Most states have expressly adopted § 324A.").

Beyond the Law Court's decision in *Hansen*, Maine Superior Courts[13] have consistently applied § 324A when analyzing a negligent undertaking claim. *See Prue v. Alyssa Rose Co.*, No. CV-04-744, 2006 WL 5218438, (Me.

---

[13] Some Maine Superior Court cases appear only on Lexis. Thus, some cites to authority are in Lexis format by necessity.

Super. Mar. 16. 2006) (finding "no evidence that [boiler repair company] undertook to repair [the plaintiff's] hot water problem").[14]

In a case with many similarities to this one, a Superior Court in Maine held that a sexual assault victim stated a claim against the Boy Scouts of America for an alleged sexual assault committed by a local troop leader. *Kennedy v. Pine Tree Council & BSA*, No. CV-91-752, 1995 WL 18036799 (Me. Super. June 14, 1995). The abuse victim, the court found, stated a "negligent undertaking" claim based upon allegations that the Boy Scouts of America undertook to investigate allegations of prior abuse by the local troop leader. *Id.* at *3 ("When undertaking an obligation, one is negligent if he does something that an ordinary careful person would not do or fails to do something which an ordinary person would do in the same situation.").

So, both the Law Court and Maine's lower courts have consistently applied the theory of "negligent undertaking" as requiring a duty of reasonable care for decades.

---

[14] *See also Bolduc v. Haywood*, No. CV-00-18, 2001 WL 1712679 (Me. Super. July 12, 2001) (assuming a duty existed under § 324A but granting summary judgment for the defendant due to lack of proximate causation); *Campbell v. David and Tammy Boutot*, 1999 Me. Super. LEXIS 535 (Dec. 30, 1999) (holding an adult has a duty to supervise a friend's child based upon Restatement (Second) of Torts § 316 but also citing favorably to §324A); *City of Portland v. McKernan*, 1993 Me. Super. LEXIS 268, *2 (citing Restatement (Second) of Torts §§ 323 and 324A for the proposition that the actor's undertaking must be reasonably performed, and that the actor must not worsen the other's position); *Thompson v. Holden Bros. Ford*, 1984 Me. Super. LEXIS 125 (July 24, 1984) (relying upon § 324A in holding that the plaintiff stated a cause of action for negligent inspection of a motor vehicle).

B. **The Complaint satisfies the requirements of pleading a "negligent undertaking" claim stemming from the Army's handling of Card (Count A).**

The approved jury instruction in *Hansen*, tracking § 324A, shows that the elements of a "negligent undertaking" claim in Maine require allegations of services rendered *and* that such services *either* increased risk (§ 324A(a)) *or* induced reliance by Card (§ 324A(c)). Plaintiffs have alleged both.

(1) **The Army rendered services to another that it should recognize as necessary for the protection of a third person.**

Section 324A(a) first requires that the defendant "voluntarily acted for the benefit of [a third party]." *In re Flint Water Cases*, 482 F. Supp. 3d 601, 618 (E.D. Mich. 2020). The Comments to § 324A(a) explain that the voluntary act (*i.e.*, the "services rendered") need not be significant nor be for consideration to give rise to a duty. *See* Cmt. b ("This Section applies to any undertaking to render services to another"); Comment f ("[C]ourts have tended to seize upon trivial and technical acts" as an undertaking).

Under § 324A, the services rendered must be the kind that the defendant "should recognize as necessary for the protection of a third person." Restatement (Second) of Torts § 324A(a) (1965). But "the doctrine does not require that the [defendant] must have undertaken to provide services to the victims of the shooting;" the defendant need only render services that they should understand as necessary to protect *any* third party, including unidentifiable members of the public. *See Marjory Stoneman Douglas*, 482 F. Supp. at 1292–93 ("pursuant to § 324A an undertaker can owe a duty to third parties that are unknown or unidentifiable at the time of the undertaking").

The Government concedes that some Army services were undertaken for the protection of others but argues that ordering Card to attend training and coordinating with local law enforcement were done in the Army's own interest—not for the protection of others. Mot. Dismiss at 40, ECF No. 29.

But the Government's litigation-motivated characterization of its intent does not control. The Complaint alleges that the Army told both the Sagadahoc County Sheriff and the Card family that it was ordering Card to attend his training so that it could confront Card about his mental-health decline and violent threats and develop a plan to address these issues. Am. Compl. ¶¶ 5.16–5.18, 7.3, ECF No. 13. And Plaintiffs allege that the Army recognized that its actions served not only its own interests, but also those of local law enforcement, the Card family, and at least those members of the community targeted with Card's threats. *Id.* ¶ 7.3(a-d).[15]

The Complaint alleges in detail how the Army's actions were not self-serving—prior mass casualty tragedies involving service members made the Army all too aware of the heightened risks posed by mentally ill and trauma-impacted soldiers. *See id.* ¶¶ 1.43–44; 4.1–4.15. The Army was specifically aware of Card's mental decline leading to erratic behaviors and escalating threats of violence directed at members of the community. *See id.* ¶¶ 5.9, 5.20, 5.57. Given that, it strains credulity that the Army failed to understand its undertakings were necessary for the protection of others.

---

[15] Alleging that the Army undertook, "following reports of Card's declining mental status, erratic behaviors, threats of violence and access to weapons in March through July 2023, [to inform] the Sagadahoc County Sheriff's Department and the Card family that it would ensure that Card received the necessary treatment and services to address Card's condition and minimize the dangers he posed to the community."

And even if the Army acted partly in self-interest, this does not negate common-sense recognition that such conduct would also be necessary for the protection of others. As the Government's own authority makes clear, self-interested conduct insulates an actor from liability only when done "for entirely self-serving purposes." *Shipe v. Chesapeake Bay Fishing Parties, Inc.*, 940 F. Supp. 130, 134 (D. Md. 1996); *see Roberson v. United States,* 382 F.2d 714 (9th Cir. 1967) (government "was not undertaking to render services to the contractor" because it "sought only to protect its own interest").

The Army recognizes the importance of addressing the risk that violent servicemembers pose to public safety. *See* Am. Compl. ¶¶ 4.1–4.5, ECF No. 13. The Complaint adequately alleges that the Army's conduct relating to Card was not exclusively based on its own self-interest.

(2) **The Army's conduct increased the risk that Card posed.**

The Government argues that Plaintiffs cannot state a claim because the Army never increased Card's pre-existing risk of harm. Mot. Dismiss at 40, ECF No. 29. But every day the Army failed to act while Card deteriorated, the risk grew. Both action *and* inaction can establish negligence when the Government has undertaken a responsibility to act. *See, e.g., In re Flint Water Cases*, 482 F. Supp. 3d 601, 619 (E.D. Mich. 2020) (EPA inaction in response to Flint Water Crisis "was in the course of an undertaking"). And here, both the acts and omissions increased the risk of harm to the public.

The risk Card posed on October 25, 2023, was the end point of an evolving problem that began in 2022. When that risk escalated in the more than six months before the mass shooting, the Army had multiple opportunities to understand and address it. Am. Compl. ¶¶ 5.9–11, ECF No.

13 (2022); 5.12–14, (May 2023); ¶ 5.19 (June 2023); ¶¶ 5.42–43 (July–August 2023); ¶¶ 5.57–58 (September 2023)). Instead, the Army unreasonably neglected the responsibility it had undertaken.

The Army increased the risks by not only failing to act over time, but also by acting to "exacerbate Card's paranoia, resentment and anger such that it actively increased the risks posed by Card following his discharge back into the community." *Id.* ¶ 7.5. The Army increased the risk to the public by helping discharge Card from the psychiatric hospital, returning him to the community, and then abandoning the safeguards it had undertaken to keep Card and the public safe. *Id.* ¶¶ 7.16–7.18. For example, the Army began—but did not complete—the mandatory LOD and MBE processes. *Id.* ¶¶ 7.35–7.39.

Plus, as a condition of Card's return to the community, the Army undertook to remove Card's firearms but then did so negligently. *Id.* ¶¶ 5.46–5.48 (Captain Reamer promised to "take care of" it but delegated the task to Staff Sergeant Hodgson, whom Reamer knew lacked the authority and was himself legally prohibited from possessing firearms; Reamer later admitted in sworn testimony that this delegation violated Army Command Policy). Ultimately, the Army's botched efforts to remove Card's firearms increased the risk he posed to the public, because Card's doctors agreed to discharge him back to the community only after the Army had agreed to ensure that Card no longer had access to firearms. *Id.* ¶ 7.18. But that is not the end of it.

After receiving a report that Card was going to "snap and commit a mass shooting," the Army actively dissuaded the Sagadahoc County Sheriff's Department from intervening. *Id.* ¶ 5.79 (Deputy Skolfield testified that the

Army "convinced him not to conduct a welfare check on Card"). Because of the Army's intervention, Deputy Skolfield stood down. *Id.* ¶¶ 5.79-80.

The Government reads *Zabala Clemente* to establish a categorical rule: inaction can never increase risk. 567 F.2d 1140 (1st Cir. 1977). That is not what the case holds. In fact, the court drew the opposite conclusion for air traffic controllers, where reliance is inherent and safety "is dependent on every action and inaction"—and it reaffirmed that federal statutes are a "far stronger foundation" for actionable duties. *Id.* at 1150. Here, the Army's obligations come from binding statutes and regulations. It made specific commitments—to address Card at training, to seize Card's weapons, to coordinate with law enforcement—and then abandoned them. It helped discharge Card from a mental hospital and returned him to the community while assuring law enforcement that it had the situation handled. Indeed, the conduct left Card's victims worse off than if the Army had done nothing at all. That's exactly what Restatement § 324A(a) addresses. *Id.* at 1148 (citing *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), collecting cases of "air controller liability" and recognizing the risk to traffic safety is "dependent on every action and inaction").

(3) **The Government's conduct induced reliance by Card.**

Independent of whether the governmental conduct increased the risk, the Government is subject to liability for services rendered to "another which he should recognize as necessary for the protection of a third person" if "the harm is suffered because of reliance of the other *or* the third person upon the undertaking." Restatement (Second) of Torts § 324A; *see also* cmt. e (1965). Thus, while the undertaking is for the protection of "a third person"—here, those injured or killed in the mass shooting—the reliance is not limited to

reliance on the part of the "third person," but also extends to reliance on the part of the "other"—here, Card. *See Joy v. E. Me. Med. Ctr.*, 529 A.2d 1364 (Me. 1987) (plaintiff injured by impaired motorist had viable claim against doctor prescribing medication and failing to warn driver).

Here, the Complaint alleges a reliance interest on the part of Card sufficient to support Plaintiffs' "negligent undertaking" causes of action. Card had a decades-long history of service in the Army. Am. Compl. ¶ 5.1, ECF No. 13. He depended on the Army for a myriad of things, including health care. And as to his mental health specifically, the Army undertook to address his worsening condition and to get him help. *Id.* ¶ 7.3(a)–(c). Unfortunately, it did so negligently. Further, the Army's own research linked blast-induced brain injuries to depression, anxiety, paranoid thinking, and aggressive behavior—precisely what Card exhibited. *Id.* ¶ 4.16. Because the Army may have caused his condition, its own regulations required it to evaluate and treat him. Card relied on this undertaking, to his and the public's detriment.

### C. The Army's violation of mandatory statutory and regulatory obligations supports Plaintiffs' negligent undertaking claim (Counts C, E, and F).

Beyond its negligent management of Card, the Army also failed to comply with binding statutory and regulatory obligations. Courts have recognized negligent undertaking claims on exactly that basis. *See Holcombe*, 388 F. Supp. 3d at 805 ("[I]n enacting the DOD regulations mandating that information be collected and reported to NICS, the Government assumed a duty to act non-negligently in doing so."); *see also Sanders*, 493 F. Supp. 3d at 485 ("Federal regulations … may establish the standard of care to which a NICS examiner should be held."); *Kristensen*, 372 F. Supp. 3d at 469

(enacting regulations and acting under color of them is "voluntarily assumed … affirmative conduct" that subjects the actor to a duty of reasonable care); *Sheridan*, 487 U.S. at 401 (regulations forbidding possession of firearms on naval base established a duty of care).

Here, Plaintiffs have pled that the Army negligently violated its own mandatory internal commitments and orders (Count C). They have also alleged that the Army's failure to conduct a mandatory LOD investigation and MEB (Count E) led directly to its failure to report Card to the FBI Background Database as required by law, and that the Army also failed to report Card to the FBI Background Database after Card was involuntarily committed to Keller Hospital and Four Winds (Count F).

And the arguments above explaining why the claim for negligent undertaking in Count A meets the requirements of § 324A(a) or § 324A(c) of the Restatement apply with equal force here.

(1) **Negligence of the Army in violating its own commitments, orders, and conditions (Count C).**

The Army undertook to protect victims of dangerous Soldiers like Card by, in part, enacting its own internal policies, commitments, and orders that worked to prevent tragedies like the ones in Sutherland Springs or Lewiston. Many of these internal commitments and orders were mandatory when circumstances met a certain threshold established by the Army itself. The Army's negligence in following those internal policies is thus actionable.

The Government contends that internal orders or policies do not create legal duties. *See* Mot. Dismiss at 54, ECF No. 29 (*citing Zabala Clemente,* 567 F.2d at 1144). Again, the Government misinterprets *Zabala*. Although the

First Circuit held that certain sections of the Federal Aviation Act did not create a legal duty of care for the victims of a plane crash, it also recognized that internal policies and communications can create legal duties when they satisfy the elements of a negligent undertaking under Sections 323 and 324A of the Restatement (Second) of Torts. *See Zabala Clemente*, 567 F.2d at 1145 (declining to find a duty because "none of" the conditions required by Sections 323 or 324A applied "in the matter before us").

So, contrary to the Government's contention, a duty of care arises when a defendant negligently fails to act in accordance with its own internal commitments or orders when doing so satisfies the negligent undertaking factors. That is the case here. The orders and commitments that Defendant is accused of ignoring were designed to limit the risk of harm that Card posed to those around him. Those orders included Card's CDBHE, which required mandatory follow-up and monitoring, securing Card's home arsenal, and ensuring that Card continued to take the medication he was prescribed. Am. Compl. ¶¶ 6.21–25; 7.16–22. None of these orders were adhered to.

By negligently failing to adhere to its own required commitments and orders, the Army increased the risk of harm to the victims of Cards' violence. Under *Zabala Clemente* and Section 324A of the Restatement, the Army's undertaking as expressed in its own orders and policies created a duty of care to Plaintiffs to enforce those orders and regulations with reasonable care.

(2) **Negligence in failing to follow process for Line of Duty investigation and Medical Board Adjudication of Card's illness (Count E).**

The Army's regulations required a LOD investigation and MEB review of Card's mental illness. It did neither. That failure prevented Card from being

adjudicated a "mental defective," kept him off the FBI's NICS database, and left him untreated, unmedicated, and armed. *See* Am. Compl. ¶¶ 7.54–7.60.

As alleged, the Army's internal investigation concluded that the Army violated its own regulations when it failed to keep Card on active duty pending a LOD investigation and MEB review. *Id.* ¶ 6.25. And the lack-of-fitness findings by the Army doctor at Keller Hospital[16] required the Army to immediately refer Card to the Disability Evaluation System and keep him on active duty pending the conclusion of that process. *Id.* ¶ 6.26. The Army failed to do any of these things.

The Disability Evaluation Process would have triggered MEB review of Card's history and a determination of whether he posed a danger to himself or others. *Id.* ¶¶ 6.27–6.28, 7.46. This process would have resulted in a "board" adjudicating precisely the elements of the definition of "adjudication as a mental defective," as defined by the ATF regulations.[17] This would have triggered mandatory reporting of him to the FBI's NICS. Based on Card's mental-health condition at the time, the Complaint sufficiently alleges that "any reasonable Board process would have yielded a determination that Card continued to present a danger to himself and others." *Id.* ¶ 7.50.

The Army's failures kept Card out of the NICS database and left him armed in the community. Count E sufficiently pleads this undertaking claim.

---

[16] Keller Hospital providers found that Card did not meet medical retention standards, had "reached medical retention determination point," and that he needed referral to the Disability Evaluation System. Am. Compl. ¶ 6.22, ECF No. 13.

[17] *See* 27 C.F.R. § 478.11 (a person is "adjudicated as a mental defective" when a "board" determines that "mental illness" has caused them to be "a danger to himself or others").

(3) **Negligence in failing to report Card to FBI Background Search Database after he was committed to a mental institution (Count F).**

Finally, Card's commitment to Keller Hospital and Four Winds should have triggered an automatic report to the FBI Background Search Database under the Gun Control Act. The purpose of the prohibitions in the Gun Control Act is to keep deadly weapons out of the hands of those who pose dangers to themselves and others. *See* S. Rep. No. 90-1097 (1968). Congress determined that persons "committed to a mental institution," posed a unique danger and should not be allowed access to weapons.

The facts alleged in the Complaint, taken as true, show that Card's "commitment" to Keller and Four Winds was "involuntary." After concluding that it was likely that Card intended to seriously injure himself or others, Card's Reserve Unit Command *ordered* him to submit to compulsory psychiatric evaluation. Am. Compl. ¶¶ 5.32–33, ECF No. 13. This was a military order that he was required to follow under penalty of court-martial and potential imprisonment. *Id.* ¶ 5.35. Card himself believed that he did not "have a choice" in the matter. *Id.* ¶ 5.25. He was delivered to the hospital under police escort and surrounded by other Soldiers. *Id.* ¶ 5.37. Card told providers that he was wrongly committed (*Id.* ¶ 7.70), and his only way out of the facility was to petition a request for the right to leave. *Id.* ¶ 7.72. Card later, during an attempt to purchase a silencer, completed a form showing that he had indeed been "committed." *Id.* ¶ 5.54.

But the Government suggests that Card's compulsory commitment to Keller Hospital and Four Winds under Army order cannot constitute a "commitment" under § 922 because there was insufficient due process in the

wake of the U.S. Supreme Court's decision in *Heller*. Mot. Dismiss at 56, ECF No. 29. But the only case law the Government relies on is inapposite because it analyzes *state* law commitment processes, not federal regulations or orders. *See United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) ("Temporary hospitalization under Maine's emergency procedure for admission to psychiatric hospital (34-B M.R.S. § 3863) does not constitute a ""commitment' under section 922."). Card was committed under a valid U.S. Army order while he was under active military orders and in the custody and control of the U.S. Army. Card was required to follow orders under penalty of court-martial, including the order for admission to a mental institution.

Further undermining the Government's argument, *Rehlander*—even if viewed as analogous—is a First Circuit decision, and Card's hospitalization occurred in New York, a state governed by Second Circuit law. As it stands, the Second Circuit has simply maintained that "the restriction on gun purchases by individuals committed to a mental institution is presumptively lawful." *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016).

Under any common sense understanding of the distinction between voluntary and involuntary, any reasonable Army commander would have understood that Card's commitment was involuntary and proceeded under federal authority. Captain Reamer admitted as much in his sworn testimony. Accordingly, federal law required an automatic report to the FBI database.

3. ***Plaintiffs' claims for negligent treatment (Count D) and failure to file a SAFE Act report (Count G) state claims for relief under New York law.***

Two of Plaintiffs' claims fall under New York law. The negligent care and treatment of Card outlined in Count D took place in New York at Keller

Hospital, and the violation of the SAFE Act outlined in Count G is the violation of a New York law. Both sufficiently state claims for relief under New York law.

### A. New York Federal Courts recognize a duty of care to third parties arising from the negligent care and treatment of potentially dangerous patients.

In *Rivera v. N.Y. City Health and Hosps. Corp.*, the Southern District of New York held that New York law not only established a duty from mental healthcare providers to their patients, but "a duty to third parties in certain circumstances, and … mechanisms by which to seek to control patients, including outpatients, who are a threat to themselves or others." 191 F. Supp. 2d 412, 422–23 (S.D.N.Y. 2002). In *Rivera*, an injured victim of a mentally unstable patient could proceed against the V.A. hospital that treated and released the patient. *See id.* Relying on two New York state cases,[18] the Court held that "substantial New York case law … supports the conclusion that health care providers may be liable to third parties in outpatient situations." *Id.* at 420. Relevant here, the court noticed one critical "theme" governing the liability of mental-health care providers for the actions of their patients—the amount of control the providers exercised over the patient. *Id.* at 422.

---

[18] *See Winters v. N.Y. City Health & Hosps. Corp.*, 223 A.D.2d 405 (N.Y. App. Div. 1st Dep't 1996) (holding issues of fact existed on whether the hospital's decision to release a dangerous psychiatric patient was based on an error in the exercise of professional medical judgment or whether the hospital had failed to make necessary inquiries); *Schrempf v. State*, 66 N.Y.2d 289, 294–95 (N.Y. 1985) (stating there is a "duty … to the outside public to restrain the dangerous, or potentially dangerous, so that they may not harm others").

The Army's control over Card while on active duty was complete. This includes the doctors at Keller Hospital. The Army had total control over Card while he remained on active duty, could subject him to orders he was required to follow at the risk of court-martial and imprisonment, and even had the ability to extend his period of active duty until it determined whether he was a threat. The Army knew that Card was "capable" of violence, and that he posed a particularly heightened threat to anyone at Just-in-Time bowling alley or Schemengee's bar. The Army thus owed a duty of care to those members of Card's community to whom he posed a threat.

### B. Plaintiffs have a cause of action arising from Army's failure to report Card under the New York SAFE Act.

New York's Secure Ammunition and Firearms Enforcement (SAFE) Act imposes a mandatory reporting obligation on mental-health professionals when they determine that a patient in their care is "likely to engage in conduct that would result in serious harm to self or others." N.Y. Mental Hygiene Law § 9.46. As a result, the New York Division of Criminal Justice Services determines whether the subject of the report is eligible to possess a firearm under state and federal law. *See* N.Y. Mental Hygiene Law § 9.46(b).

A reasonable factfinder could conclude that the Army's failure to file a SAFE Act report allowed Card to keep the weapons he used in the shooting. But the claim goes further: the Army told Four Winds a report had already been filed, and Four Winds relied on that and filed nothing. *See* Am. Compl. ¶ 7.84, ECF No. 13. The Army's false assurance caused his mental-health providers to forgo the exact action the SAFE Act required.

Card's presentation at Keller Hospital and Four Winds would compel any reasonable mental-health professional to conclude that the SAFE Act's

reporting threshold was met. Card's Keller Hospital records documented active homicidal ideation, with the field for "Harm to Others/Violent Behavior" checked "yes." *Id.* ¶ 5.40. Keller Hospital physicians recommended Card for transfer to a higher-level psychiatric facility specifically because of "safety concerns regarding his active auditory hallucinations, paranoia, and potential violence." *Id.* ¶¶ 5.40–5.41.

Four Winds was then in a position to assess—and to report—the danger Card posed. The Complaint alleges that while at Four Winds, Card admitted to preparing a "hit list" of people he intended to kill. *Id.* ¶ 5.42. Four Winds providers administered psychological tests revealing "personality traits increasing the risk for violence." *Id.* ¶ 5.43. These findings—which exceeded the threshold for SAFE Act reporting—were documented in Four Winds' records and known to its treating staff. Four Winds did not file a report only because the Army had already told it that one had been filed. *Id.* ¶¶ 7.84–85.

The Government contends that a SAFE Act report would not have led to the removal of Card's firearms because the statute's mechanism is limited to the suspension or revocation of New York firearms licenses, and Card lived in Maine and had no New York license. Mot. Dismiss at 52–53, ECF No. 29. This argument misstates both the scope of the SAFE Act's consequences and the Complaint's allegations regarding causation.

Had the Army filed the SAFE Act report, it would likely have triggered reporting to NICS, notification to law enforcement of Card's prohibited-person status, a bar on future firearms purchases, and a search and seizure of his weapons. Whether each of these consequences would in fact have followed from a timely SAFE Act report is a question of fact for trial, not a basis for dismissal on the pleadings. *Lounge 22, LLC v. Scales*, 680 F. Supp.

2d 343, 345 (D. Mass. 2010) ("To survive a motion to dismiss, a complaint must state 'enough facts to state a claim to relief that is plausible on its face.' … This standard does *not* 'impose a *probability requirement* at the pleading stage,'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added)).[19]

What the Complaint plausibly alleges—and what must be accepted as true at this stage—is that a timely report by Keller Hospital providers, made in July 2023 when Card was still hospitalized, would have initiated a regulatory and law enforcement response that likely would have resulted in Card's disarmament before October 2023.

#### 4. ***Plaintiffs have a cause of action for negligent training and supervision (Counts H & I).***

The negligent training and supervision claims alleged by Plaintiffs are based on direct liability. Plaintiffs allege that negligent training and supervision of Army officers proximately caused those officers to negligently oversee, monitor, discharge, report within the chain of command, and follow-up with Card to prevent the Lewiston shootings. *See* Am. Compl. ¶¶ 7.90; 7.97–98. In other words, this is a straightforward negligence claim invoking

---

[19] The Government's argument that the SAFE Act contains no mechanism for removing firearms from a non-New York resident is also premature. The question is not whether the SAFE Act alone, operating in isolation, would have disarmed Card. The question is whether the Army's failure to file a SAFE Act report was a substantial contributing factor in the sequence of events that caused Card to remain armed in the community. *See Wheeler v. White*, 1998 ME 137, ¶ 10 (liability attaches when the alleged negligence played "a substantial part in causing the damage").

the four elements of duty, breach, injury, and causation. *See, e.g., Bell v. Dawson*, 2013 ME 108, ¶ 17, (listing the elements).[20]

The Army, through its own orders and commitments, undertook to respond to potentially dangerous Soldiers like Card. That undertaking included training and supervising its Soldiers on the standards for reporting personnel who may pose a threat of workplace violence (*Id.* ¶¶ 6.5; 6.38), for ordering CDBHE (*Id.* ¶¶ 4.18; 6.9); the Form 3822 requirements (*Id.* ¶ 6.23); and other standards for identifying and monitoring potentially dangerous Soldiers. *Id.* ¶¶ 6.20; 6.25, 6.27; 7.12.

Another court has upheld similar claims against the United States related to a mass shooting committed by an armed services member. *See Holcombe*, 388 F. Supp. 3d at 806. There, the district court held that the claims for negligent training or supervision survived dismissal because the plaintiffs had successfully alleged, against federal employees, "an actionable tort for negligent undertaking." *Id.* Because the plaintiffs there alleged that federal employees negligently collected and reported important information, the court reasoned that if they could prove that the negligence was proximately caused by negligent supervision or training, the United States could be liable under negligent training or supervision theories. *Id.*

So too here. By instituting mandatory policies to identify and manage Soldiers like Card, the Army created a duty to train and supervise Soldiers to carry them out. As in *Holcombe*, if the Army's negligent handling of Card was

---

[20] Because this claim is made against the Army in its capacity as trainer and supervisor of the Soldiers around and above Card, rather than Card himself, the caselaw relied on by Defendant citing Section 315(b) of the Restatement (Second) of Torts is inapposite. *See* Mot. Dismiss at 57–58, ECF No. 29.

proximately caused by failures in that training and supervision, it is liable. The motion to dismiss must be denied.

### 5. *Plaintiffs have stated a cause of action for negligent infliction of emotional distress (bystander claims, Count J).*

The rules of pleading require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At this stage, the Complaint "needs only enough detail to provide a defendant with 'fair notice of what the claim is and the grounds upon which it rests.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (*quoting Twombly*, 550 U.S. at 555) (cleaned up).

Maine recognizes bystander claims for NIED when a plaintiff shows "that he i) was present at the scene of the accident, ii) suffered serious mental distress as a result of contemporaneously perceiving the accident, and iii) was closely related to the victim." *Cameron v. Pepin*, 610 A.2d 279, 284–85 (Me. 1992). The Group 3 Plaintiffs allege that they "were at the bowling alley or bar with a family member(s) or close relation(s)" and "suffered severe emotional distress and/or physical injuries caused by their severe emotional distress" when they saw a family member or close relation "suffer injuries; … suffer the threat of serious injury;" and or know that a family member or close relation "was in danger of serious injury." Am. Compl. ¶¶ 7.102–7.103, ECF No. 13.

In summary, Plaintiffs have precisely alleged each element necessary for a bystander NIED claim under the Federal pleading standards. A bystander claim for NIED need not specifically allege who a plaintiff witnessed being injured and what the plaintiff's relationship to the injured party is. What's

more, during the administrative phase of this matter, Plaintiffs provided this information to the Government. To the extent the Court disagrees with Plaintiffs' position on this issue, Plaintiffs request leave to amend.

### 6. *Plaintiffs have a cause of action for "Zone of Danger" NIED claims (Count K).*

Group 4 Plaintiffs were in direct danger of immediate and serious bodily harm and suffered severe emotional distress as a result. *Id.* ¶¶ 7.107, 7.109. The Army argues that "Maine has rejected the 'zone of danger' rule for" NIED claims. Mot. Dismiss at 59, ECF No. 29.

The Law Court applied the bystander rule instead of the zone of danger rule over forty years ago in a suit brought by a mother who watched her baby choke to death, *see Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433, 436 (Me. 1982). But it has never been asked to apply the zone of danger rule to claims for emotional distress suffered by people in situations of imminent mortal danger like the people in the path of Card the night of the shootings. Were these Group 4 claims to appear before Maine's Law Court, the court would likely adopt the zone of danger rule as a coequal branch of an NIED claim along with bystander liability and the special relationship test.

Several other states, the federal government, and maritime law, recognize the zone of danger theory of liability (or something very similar) for direct NIED claims.[21] And the American Law Institute supports joint regimes

---

[21] See, e.g., *Robb v. Pa. R.R. Co.*, 210 A.2d 709, 714–15 (Del. 1965); *Sherrod v. McHugh,* 334 F. Supp. 3d 219, 261 (D.D.C. 2018); *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 556 (1994) (Federal Employer's Liability Act); *Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1338 (11th Cir. 2012) (Maritime law); *Calderon v. Royal Park, LLC*, 132 N.E.3d 1021, 1030 (Mass. Ct. App. 2019); *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995); *Jablonowska v. Suther*, 948 A.2d 610, 618 (N.J. 2008); *Savva v. Longo*, 8 A.D.3d 551

of NIED claims under both the "zone of danger" and "close relationship" theories. The Restatement (Third) of Torts for Physical and Emotional Harm describes two versions of direct NIED claims acceptable under the law: where the negligent conduct puts the plaintiff in "immediate bodily harm and the emotional harm results" or where, due to the relationship between the parties, the conduct is "especially likely to cause serious emotional harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 47 (Am. L. Inst. 2012).

The Law Court relied on the Restatement and cited Section 47 to support its recognition of the special relationship test. Accordingly, the Law Court would likely find Section 47 persuasive in applying a zone of danger test as well. *See Boivin v. Somatex, Inc.*, 2022 ME 44, ¶ 16 n.7 (citing Restatement (Third) of Torts: Liability for Phys. and Emot. Harm § 47, cmt. f).

The zone-of-danger and special relationship rules are complementary, not contradictory, bases for duty in emotional distress cases. The former limits recovery to those in physical danger; the latter extends it to those whose emotional harm is equally foreseeable—just through the relationship rather than physical proximity. *See, e.g., Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 800 (D.C. App. 2011) (adopting special-relationship test while noting the Restatement articulated "a rule that finds a duty based upon undertaking or relationships to be a supplement to—rather than a substitute for—the 'zone of physical danger' rule that permits recovery in the absence of such a relationship").

---

(N.Y. App. Div. 2d Dep't 2004); *Niederman v. Brodsky*, 261 A.2d 84, 90 (Pa. 1970); *Shannahan v. Moreau*, 202 A.3d 217, 229–30 (R.I. 2019).

The Law Court would likely adopt the zone of danger test as a logical response to the facts before it, recognizing that the special relationship test does not capture every type of direct NIED claim worthy of recovery. Every person in that bowling alley and bar was in a warzone—watching people around them shot dead, seeing a laser sight searching for the next target, believing they were about to die. A minor cut should not differentiate who can recover and who cannot.

### 7. *Plaintiffs' survival claims (Count L) and wrongful death claims (Count M) are actionable.*

Under Maine's survival statute, 18-C M.R.S. § 3-817, and wrongful death statute, 18-C M.R.S. § 2-806, tortfeasors are liable for damages when their negligence or other action causes pre-death suffering and/or death. Because the Plaintiffs have actionable negligence claims against the Government, both their survival claims and wrongful death claims are actionable.

### 8. *Plaintiffs have demonstrated causation between the Army's negligence and the Lewiston mass shooting.*

The Government asks this Court to dismiss Counts B through K of the Complaint for want of causation.[22] The Complaint sufficiently alleges that the Army's negligence substantially contributed to causing the mass shooting and that the shooting was a foreseeable consequence.

As a rule, proximate cause is a question for the trier of fact, not an issue properly adjudicated on a motion to dismiss filed before any discovery has occurred. *See Klingerman v. SOL Corp. of Me.*, 505 A.2d 474, 478 (Me. 1986)

[22] The government's motion does not attack causation as to the "negligent undertaking" claim in Count A.

(“[I]f an injury is reasonably foreseeable, proximate cause exists. … [W]hether a particular result is reasonably foreseeable … is to be resolved by the trier of fact.”) (citing *Stubbs v. Bartlett,* 478 A.2d 690, 693 (Me.1984); *see also Miglino v. Supermarkets Gen. Corp.,* 243 A.D.2d 451, 451 (N.Y. App. Div. 2d Dep’t 1997) (“The question of proximate cause is normally for the trier of fact, and may be determined … as a matter of law only when there is but one conclusion that may be drawn from the facts.”). The Government has provided no basis to depart from that rule here.

And the Government’s critiques of the causal chain demonstrate precisely why it is inappropriate to address these issues on a motion to dismiss. First, the Government contends that it is “completely unknown” how any different approach to Card’s medical care would have made a difference. Mot. Dismiss 48, ECF 29. Setting aside that this argument proves why it is inappropriate to address causation in a motion to dismiss, the Plaintiffs’ allegations, taken as true, easily clear the low bar that notice pleading sets.

Even though foreseeability does not require this degree of precision, the Complaint alleges that, beginning in 2022, Card told Army personnel of his paranoid fixation centered on a specific bar and bowling alley. Am. Compl. ¶¶ 5.11, 6.3, 7.12(a), ECF No. 13. The Army nonetheless did not refer Card for treatment until July 2023. *Id.* ¶ 7.12(b). And following that belated commitment, the Army failed to follow through on promises to ensure Card did not pose a danger to others. *See id.* ¶¶ 7.18, 7.21 (citing DA Form 3822)). As a direct result, Card remained in the community, armed, untreated, unmedicated, and fixated on the bowling alley and bar. *Id.* ¶ 7.13. On October 25, 2023, he entered those locations and killed 18 people. *Id.* ¶¶ 5.87–5.91.

Had the Army acted reasonably in responding to the known danger Card posed, he would not have been able to carry out the attacks.[23]

Finally, the Government argues that reporting Card to NICS wouldn't have prevented the shooting. But Plaintiffs allege it would have—at minimum, law enforcement would have known a prohibited person was stockpiling firearms, a felony requiring immediate seizure *at the very time* they were investigating him for violent threats. *Id.* ¶ 7.75.[24]

In short, Plaintiffs have satisfied their notice pleading obligation on causation. The Government cites no case allowing a court to resolve a fact-intensive causation dispute on a motion to dismiss.

## CONCLUSION

The Government's Motion to Dismiss must be denied.

---

[23] The government cites an unreported decision for the proposition that acts of violence by servicemembers are not foreseeable. Mot. Dismiss 47, ECF No. 13 (citing *Linke v. United States*, No. 14-CV-444, 2015 WL 12743613 (W.D. Tex. June 2, 2015)). But the decision in *Linke* turned on deficiencies not present here: failures of the plaintiff to allege which specific Army personnel were negligent or what Army regulations were violated. *See Linke*, 2015 WL 12743613, at 4.

[24] Although the Ruger 308 assault rifle used in the shooting was purchased on July 6, 2023, before Card's commitment to Four Winds, it is unclear when Card purchased the ammunition he used on that date. Moreover, but for the Army's negligence between 2022 and July 2023, Card would not have been able to purchase the Ruger.

Respectfully submitted,

/s/ Benjamin R. Gideon
Benjamin R. Gideon, Bar #9419
bgideon@gideonasenlaw.com
Meryl E. Poulin, Bar #5960
mpoulin@gideonasenlaw.com
Rosalie B.C. Wennberg, Bar #10316
rwennberg@gideonasenlaw.com
**Gideon Asen LLC**
95 Main Street, #5
Auburn, ME04210
Service@gideonasenlaw.com

/s/ Travis M. Brennan
Travis M. Brennan, Bar #4525
tbrennan@bermansimmons.com
brennanservice@bermansimmons.com
Charles P. Hehmeyer, Bar #10096
chehmeyer@bermansimmons.com
hehmeyerservice@bermansimmons.com
Elizabeth A. Kayatta, Bar #5039
ekayatta@bermansimmons.com
kayattaservice@bermansimmons.com
Charles M. King, Bar #10221
cking@bermansimmons.com
**Berman & Simmons, P.A.**
129 Lisbon St. P.O. Box 961
Lewiston, ME 04243-0961

/s/ Jamal Alsaffar
Jamal Alsaffar, *pro hac vice*
jamal@trial.law
Texas State Bar #24027193
Tom Jacob, *pro hac vice*
tom@trial.law
Texas State Bar #24069981
**National Trial Law, PLLC**
1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346

/s/ Josh Koskoff
Josh Koskoff, *pro hac vice*
jkoskoff@koskoff.com
Connecticut State Bar #410518
Margaret Donovan, *pro hac vice*
mdonovan@koskoff.com
Connecticut State Bar #445982
Matt Blumenthal, *pro hac vice*
mblumenthal@koskoff.com
Connecticut State Bar #438605
**Koskoff, Koskoff & Bieder, PC**
350 Fairfield Avenue, Ste. 501
Bridgeport, CT 06604