UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| ELIZABETH A. SEAL as Personal Representative of The Estate of JOSHUA A. SEAL, et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 2:25-cv-442-LEW |
| v. | ) ) ) | |
| UNITED STATES of AMERICA, | ) ) | |
| Defendant. | ) ) | |

**REPLY BRIEF IN SUPPORT OF**
**<u>DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS</u>**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PHILIP D. MACWILLIAMS
Director, Torts Branch

<u>/s/ *Jocelyn Krieger*   </u>
JOCELYN KRIEGER
BRANDON CAPECE
Trial Attorneys, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-1679
jocelyn.krieger@usdoj.gov

## **INTRODUCTION**

Plaintiffs in this matter seek to impose liability on the United States based on the alleged failures of Army personnel to take certain actions in the supervision of Robert Card, which, they assert, would have prevented the shooting in Lewiston, Maine, on October 25, 2023. In its Motion to Dismiss (ECF 29, "Mot."), the United States demonstrated that the court lacks subject matter jurisdiction over Plaintiffs' claims based on the application of multiple exceptions and exclusions under the Federal Tort Claims Act ("FTCA"), including: the discretionary function exception, 28 U.S.C. § 2680(a); the assault and battery exception, *id.* § 2680(h); the misrepresentation exception, *id.* § 2680(h); and the contractor exclusion, *id.* § 2671. In addition, the United States demonstrated that Plaintiffs' causes of action do not state claims upon which relief can be granted. In particular, the United States demonstrated that, under Maine law, Plaintiffs did not establish the elements of negligent undertaking, and that their ordinary negligence claims fail for lack of duty and causation. The United States further demonstrated that Maine law does not support certain of the individual causes of action asserted.

In their opposition (ECF 33, "Opp."), Plaintiffs repeatedly ignore or attempt to recast the United States' arguments and the language of the statutes at issue. In other instances, Plaintiffs do not engage with the relevant standards or elements but simply restate their allegations. Thus, as explained below, Plaintiffs' opposition does not overcome the reasons for dismissal identified in the United States' Motion.

**ARGUMENTS IN REPLY**

I.   **ALL OF PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION**

    **A.  The Discretionary Function Exception Applies in This Case**

Plaintiffs argue that the discretionary function exception does not bar their action for several reasons.[1]  First, Plaintiffs contend that the various actions that make up the basis of their Complaint all implicate mandatory duties.  Second, Plaintiffs contend that, even to the extent the conduct at issue was discretionary, that conduct does not implicate the type of policy considerations that the discretionary function was designed to shield.

Yet, Plaintiffs continue to fail to identify any mandatory statute, regulation, or established agency policy that prescribed a specific course of conduct to be followed by individuals employed by the Army, despite their attempts to recast the language of the policies at issue.  Further, Plaintiffs fail to overcome the well-established presumption that the type of conduct at issue here is exactly that which the discretionary function exception was designed to shield.

    **1.  Failure to Promptly Refer Card for Evaluation Did Not Violate Mandatory Policy**

Plaintiffs argue that Department of Defense ("DoD") Instruction 6490.04 sets forth a mandatory directive that required Army personnel to refer Card for a mental-health evaluation.  To this end, Plaintiffs focus on the policy's use of the word "will" to suggest that there was a

---

[1] Plaintiffs argue that the Government has the burden of proving application of the discretionary function exception.  Not so.  Although the United States bears a burden of production, the First Circuit "places the burden on the plaintiff to show that discretionary conduct was not policy-driven and, hence, falls outside the exception." *Carroll v. United States*, 661 F.3d 87, 100 n.15 (1st Cir. 2011); *accord Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) ("The discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." (quotations omitted)); *Bolduc v. United States*, 402 F.3d 50, 60 (1st Cir. 2005).  The United States has satisfied its burden of production by identifying the applicable policies.  Plaintiffs have failed to satisfy their burden of persuasion.

mandatory directive. Plaintiffs' selective focus on the policy's use of "will" does not defeat application of the discretionary function exception.

As the First Circuit has recognized, the "whole" policy language must be taken into account, including the "surrounding context in which the cited statement appears." *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir. 1999) (rejecting plaintiff's efforts to "pluck" out statements in isolation). The United States explained in its motion that the guidance pertaining to the Army's decision to initiate a command-directed evaluation imbues significant discretion in the commanding officer. Here, those are qualitative, subjective evaluations of the propensity of a service member to pose a risk of harm to himself or others. By isolating the guidance's use of the word "will" out of context, Plaintiffs err in arguing there was an applicable mandatory policy.

Further, Plaintiffs attempt to generalize application of the policy by discussing the "Army's" conduct, rather than focusing on the conduct of a specific Government employee. Under the plain language of DoD Instruction 6490.04, the decision whether to refer Card for a mental health evaluation was committed to his "commander or supervisor," CPT Reamer. No other individual besides CPT Reamer could have made the determination to refer Card under this policy. As such, it does not matter for purposes of the discretionary function exception whether some nondescript "Army[] . . . personnel believed Card was dangerous." Opp. at 14.

### 2. Failure to Enforce Mandatory Discharge Directives Did Not Violate Mandatory Policy

Plaintiffs assert that the issuance of a DA 4856 Form to Card established a "mandatory, ministerial, and operational responsibility" by CPT Reamer to enforce those orders. Opp. at 14-15. Plaintiffs' arguments fail to meaningfully address the arguments raised in the United States' Motion. At no point do Plaintiffs identify any language in the Form, implementing regulations, or policy to support their contention that this Form constituted a mandatory or specific directive

3

applicable to either Card *or* CPT Reamer. Rather, as already explained, the DA 4856 Form provides recommendations for actions that Card's chain of command could take upon his discharge, including removal of personal firearms. *See Hooker v. United States*, No. 21-1825, 2024 WL 6046398, at *2 (1st Cir. 2024) (applying discretionary function exception where policy provided discretion to "accept, reject, or modify the recommendations made by medical staff"); *Elder v. United States*, 312 F.3d 1172, 1180 (10th Cir. 2002) (applying discretionary function exception to a safety action plan that "contains 'recommendations,' not compulsory directives").

### 3. Failure to Report Card to the FBI Background Search Database Did Not Violate Mandatory Policy

Plaintiffs identify two sources that they aver set forth a mandatory duty to report Card to the FBI's National Instant Criminal Background Check System ("NICS"): the Gun Control Act of 1968 ("Gun Control Act"), 18 U.S.C. § 922; and the Brady Handgun Violence Prevention Act of 1993 ("Brady Act"), 34 U.S.C. § 40901. However, Plaintiffs must plead a federal statute, regulation, or policy that "specifically prescribe[s] a course of action such that the [Army] had no rightful option but to adhere to the directive." *Hooker*, 2024 WL 6046398, at *1 (cleaned up). Neither statute provides the specificity required to defeat the discretionary function exception.

Beginning with the Gun Control Act, Plaintiffs argue that "the Army had a duty to report Card under . . . 18 U.S.C. § 922(g)." Opp. at 15. This cited provision imposes no such duty. Rather, subsection (g) sets forth the various conditions under which it shall be unlawful for any person to, *inter alia*, possess a firearm or ammunition. It contains no language addressing the obligations of the United States in the event a prohibited person is in possession of a firearm. Tellingly, Plaintiffs do not identify a single federal court that has held that § 922(g) mandates specific conduct by the United States.

4

Nor are Plaintiffs saved by the Brady Act, 34 U.S.C. § 40901, which Plaintiffs also contend imposed a duty on the Army to report Card.  To be clear, subsection (e)(1)(C), which Plaintiffs rely upon, requires the Army to periodically report individuals with disqualifications to purchase a firearm under § 922(g).  However, generally worded statutes "do not satisfy *Gaubert*'s and *Berkovitz*'s specific prescription requirement."  *Shansky*, 164 F.3d at 691.  Here, subsection (e)(1)(C) provides no specific prescriptions for how or when Army personnel should have made the determination that Card's treatment constituted an involuntary commitment, rather than voluntary commitment, and thus a disqualification under § 922(g) that required reporting to NICS.  Therefore, neither the Gun Control Act nor the Brady Act constitute mandatory and specific directives to render the discretionary function exception inapplicable.[2]

In furtherance of their arguments, Plaintiffs selectively quote *Holcombe* to suggest the NICS regulations do not afford discretion.  Opp. at 15 (citing *Holcombe v. United States*, 388 F. Supp. 3d 777, 805 (W.D. Tex. 2019)).  Read in full, the *Holcombe* court said: "in enacting the DOD regulations mandating that information be collected and reported to NICS, the Government assumed a duty to act non-negligently in doing so."  *Holcombe*, 388 F. Supp. 3d at 805.  This language appears in the section discussing whether the *Holcombe* Plaintiffs sufficiently demonstrated duty under Texas law.  The court did not address application of the discretionary function exception, nor consider the discretionary function exception in the specific context of an

---

[2] Moreover, Card's treatment was voluntary despite Plaintiffs' suggestions otherwise.  ECF No. 29-11 ("Maine Report") at 14 ("Card . . . signed a form indicating that he was *voluntarily* admitting himself to [Four Winds] for treatment." (emphasis added)).  Because Card was never involuntarily committed, no mandatory duty required reporting to NICS.  Further, there are serious constitutional implications as to whether Card's voluntary mental health treatment constitutes a disqualifying factor for his possession of a firearm.  *See also* Maine Report at 14 n.32 ("Under both federal and state laws . . . there must be a finding by a . . . lawful authority that a person, as a result of a mental illness, is a danger to self or others and that the person must be committed to the hospital . . . .  In this case . . . no finding that Card was a danger to himself or others was ever made by a court.").

alleged duty stemming from the Brady Act or Gun Control Act.[3]  Accordingly, Plaintiffs' reliance on *Holcombe* cannot defeat application of the discretionary function exception.

### 4. Failure to Refer Card to Department of Defense Medical Evaluation Board and Physical Evaluation Board Did Not Violate Mandatory Policy

Next, Plaintiffs argue that upon release from Four Winds, completion of DA Form 3822 required Card to be referred to the Medical Evaluation Board pursuant to Army Regulation 635-40 ¶ 4-12(b)(8).  As discussed in the United States' Motion, the Medical Evaluation Board ("MEB") and related processes are used to determine, in part, whether a service member should be separated or retired for physical disability.  Again, Plaintiffs mischaracterize the nature of the Army's duty and contend, without citing to any language of AR 635-40, that it imposes a mandatory duty.  Even the regulation's seemingly prescriptive provisions are imbued with discretion.  For example, AR 635-40 ¶ 4-12(f) provides in part that "[t]he MEB will recommend that the case file be forwarded to a [Physical Evaluation Board ("PEB")] for a fitness determination when the MEB finds that one or more of a Soldier's medical conditions individually or collectively do not meet medical retention standards."  Whether medical conditions individually or collectively do not meet medical retention standards reflect a similar commitment of discretion as whether to initiate a line of duty investigation.  Because Plaintiffs fail to identify a mandatory duty here, the discretionary function exception applies.[4]

---

[3] *Holcombe* is also factually distinct from the present matter.  There, Devin Kelley, the shooter, was alleged to possess several disqualifications from possessing a firearm that required reporting to NICS: a misdemeanor domestic violence conviction; conviction of a crime punishable by more than a year; dishonorable discharge from the military; and an *involuntarily* commitment to a mental institution.  *Holcombe*, 338 F. Supp. 3d at 786.

[4] Plaintiffs repeat their allegations regarding what they believe the findings of the MEB would have been and how that would have compelled the Army to report Card to NICS.  At best those allegations pertain to whether Plaintiffs adequately pleaded causation; they have no bearing on the discretionary function analysis.  Plaintiffs cannot substitute allegations for their burden of demonstrating the presence of an applicable mandatory statute.

### 5.    The Army's Conduct Was Grounded in Public Policy or Susceptible to Policy Analysis

Contrary to Plaintiffs' contentions, the United States has not argued that military decisions are categorically immunized by the discretionary function exception or that they *ipso facto* satisfy the second prong of the *Berkovitz-Gaubert* test.  That said, "[w]hen a function is discretionary, there is a presumption that 'the agent's acts are grounded in policy when exercising that discretion.'"  *Irving v. United States*, 162 F.3d 154, 168 (1st Cir. 1998).  Moreover, as discussed in the United States' motion, this presumption is both heightened in the context of military activities, *Abreu v. United States*, 468 F.3d 20, 27-28 (1st Cir. 2006), and applies even to operational tasks, *Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021).

Even apart from this presumption, the United States still demonstrated that the conduct was of the kind that the discretionary function exception was designed to shield and is susceptible to a policy analysis.  Here, the manner in which Army personnel allocated their resources, including time, energy, and attention, directly implicates military readiness, operational effectiveness, and safety.  Card's commanding officers were entrusted with the discretion to determine how to balance those policy considerations.

Despite Plaintiffs' reliance on *Holcombe*, the court in *Holcombe* largely found that plaintiffs' claims for negligent training and supervision were barred.  *Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 67217, at *25-26 (W.D. Tex. Jan. 6, 2021).  Nor can Plaintiffs find shelter in *Kristensen*, in which the court never considered the discretionary function exception.  Finally, CPT Reamer's subjective motivations are irrelevant to the analysis.  It does not matter whether he "consciously engaged in any analysis of any policy considerations or . . . was in fact motivated by a policy concern[.]  Rather, we ask only whether 'some plausible policy

7

justification could have undergirded'" the conduct.  *Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021) (citations omitted); *Fothergill v. United States*, 566 F.3d 248, 253 (1st Cir. 2009).

Finally, *Morris v. United States*, 176 F.4th 355 (5th Cir. 2026), an out of circuit decision, is inapposite.  *See* Plaintiff's Notice of Supplemental Authority ("Notice"), ECF No. 39.  To the extent *Morris* bears on the instant matter, the Fifth Circuit affirmed that the second prong "depends on the factual context" and the conduct at issue here is readily distinguishable.  *Morris*, 176 F.4th at 370.  Accordingly, Plaintiffs have failed to rebut the presumption that the second prong of the *Berkovitz-Gaubert* test is satisfied for all of the challenged conduct.

### 6.  Plaintiffs Failed to Contest the United States' Discretionary Function Exception Arguments

Plaintiffs fail to contest that the discretionary function exception deprives this court of subject matter jurisdiction as it pertains to their allegations of: negligent hiring and supervision; failure to investigate potential abuse and harassment of Card; failure to directly address Card at his May 2023 training; and negligent training.  Accordingly, all claims based on these categories of conduct should be dismissed.  *See In re Compact Disc Minimum Price Antitrust Litig.*, 456 F. Supp. 2d 131, 152 (D. Me. 2006) ("A party's failure to oppose specific arguments in a motion to dismiss results in waiver of those issues."); *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (granting Defendant's Motion to Dismiss based on waiver).

### B.  Plaintiffs' Claims Are Barred by the Assault and Battery Exception

Plaintiffs argue that the assault and battery exception, 28 U.S.C. § 2680(h), is inapplicable.  However, the case law is clear that the exception applies not only to a direct assault or battery, but all claims "arising out of" an assault or battery.  *See* 28 U.S.C. § 2680(h).  Properly understood, all of Plaintiffs' theories of liability arise out of the alleged failure to properly supervise Card.  That places Plaintiffs' allegations squarely within the scope of the

8

assault and battery exception.  Every duty identified by Plaintiffs arises from the relationship between Card and Army personnel as a function of his employment status.

Plaintiffs do not meaningfully suggest otherwise—every purported failure is premised on either the ability of Card's commanding officers to exercise command authority over him directly or those commanding officers' alleged obligations resulting from Army policies that apply expressly to service members by virtue of their duty status.  For this reason, Plaintiffs' attempt to analogize this present case to *Sheridan* falls short.

Plaintiffs further argue that district courts in the First Circuit have taken a narrow view of the exception, as reflected in cases such as *Mulloy v. United States*, 884 F. Supp. 622 (D. Mass. 1995) and *Campbell v. United States*, 167 F. Supp. 2d 440, 445–46 (D. Mass. 2001).  Both cases are readily distinguishable based on the existence of independent duties in those cases.  The court in *Mulloy* found an independent duty under Illinois law to keep the tort victim safe as a tenant on a military base.  884 F. Supp. at 631-32.  Likewise, the Court in *Campbell* found an independent duty because the Navy had a special relationship with the tort victim as an invitee on Navy property.  *Campbell*, 167 F. Supp. 2d at 446.  Here, no such independent duty nor special relationship exists and "*Shearer* dictates that the Government does not owe a duty to the world to prevent employees from committing foreseeable illegal or violent acts . . . off the job."  *Miami N., Inc. v. U.S. Dep't of Lab. Penobscot Job Corps Ctr.*, 939 F. Supp. 53, 56 (D. Me. 1996).

### C.  Plaintiffs' Claims Based on the Communication of Information and Failures to Communicate Information Are Barred by the Misrepresentation Exception

Plaintiffs' arguments regarding application of the misrepresentation exception also miss the mark.  As an initial matter, the First Circuit does not limit "misrepresentations" to the commercial context: "the tort of misrepresentation involves the dissemination of information generally and not only in commercial contexts."  *Jimenez-Nieves v. United States*, 682 F.2d 1, 4

(1st Cir. 1982); *Mullens v. United States*, 785 F. Supp. 216, 220 (D. Me. 1992); *accord Morris*, 176 F.4th at 360–61 (declining to identify a commercial context or pecuniary harm as a necessary element to apply the exception). Thus, Plaintiffs' reliance on the absence of commercial activity or harm as a basis for arguing that the misrepresentation exception does not apply is misplaced.

Further, the misrepresentation exception applies where there is a breach of the "duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely[.]" *United States v. Neustadt*, 366 U.S. 696, 706 (1961). As such, the Court "must look past the nomenclature employed by the plaintiff and focus on the actual nature of the plaintiff's grievance." *Limone v. United States*, 579 F.3d 79, 92 (1st Cir. 2009). Here, Plaintiffs' claims fall within this framework. The alleged failures of members of Card's chain of command to communicate information with local law enforcement, the federal government, and the public are a necessary part of the causal chain that Plaintiffs contend gives rise to liability. As such, Plaintiffs' reliance on *Morris* is unfounded. *See* Notice at 1–2. In *Morris*, the gravamen of the plaintiffs' allegations was the probation officer's negligent failure to include certain information he otherwise intended to include in his warrant application. Plaintiffs' claims here, however, focus on the accuracy of the information the Army communicated to third parties about how it was responding to Card's behavior. Thus, these alleged failures to communicate are the gravamen of Plaintiffs' claims, not the Army's actual performance of operational tasks.

Finally, even if Plaintiffs' claims do not satisfy all the elements of the tort of misrepresentation, the misrepresentation exception still bars any claim that "arises out of" the government's failure to use due care in communicating information. *Abbey v. United States*, 112 F.4th 1141, 1145–51 (9th Cir. 2024) (applying the misrepresentation exception to bar claims of

10

negligent undertaking, negligent failure to warn, negligent supervision, and negligent misrepresentation, among others).  This is so even where plaintiffs did not detrimentally rely on the government's communications made to a third party.  *Id.* at 1149–51 (discussing also the Fifth and Eleventh Circuit's application of the misrepresentation exception to third-party communications); *accord Morris*, 176 F.4th at 360–61 (examining the misrepresentation exception where the communications were made to the court as a third party).

### D.  The Contractor Exclusion Bars Several Claims

The United States argued in its Motion that several of Plaintiffs' claims are barred by the FTCA's contractor exclusion, 28 U.S.C. § 2671, to the extent they are based on acts or omissions of individuals who are not employees of the Government.  Mot. at 37–38.  In particular, the exclusion bars any of Plaintiffs' allegations based on the conduct of providers at Four Winds Hospital or contactors employed by Spectrum Services Group, Inc. that were involved in Card's post-discharge care.  *See* Am. Compl. ¶¶ 7.28–7.30.

Plaintiffs argue that their claims "do not rely on the actions of contractors" and "[n]owhere do the Plaintiffs allege that the acts, omissions, or negligence of Four Winds, its employees, or any other contractor caused their injuries."  Opp. at 31.  However, Plaintiffs' allegations necessarily rely on the conduct of these contractors.  Although Plaintiffs argue, *inter alia*, that "[t]he Army increased the risk to the public by helping discharge Card from the psychiatric hospital," Opp. at 40, Plaintiffs plead in their Complaint, as they must, that Four Winds made the decision to discharge Card.  *See* Am. Compl. ¶¶ 5.51–5.52.  Accordingly, the court lacks subject matter jurisdiction over negligence claims premised on the discharge decision.  *See, e.g.*, Am. Compl. ¶ 7.30(a), (c), (e) (all asserting negligence on the basis that the United States permitted Card to be discharged from care).

## II.   PLAINTIFFS' STATE LAW COUNTS FAIL TO STATE CLAIMS UNDER RULE 12(b)(6).

### A.  The Court Should Apply Maine Law to All Causes of Action

Plaintiffs assert that Maine's choice-of-law rules apply, and that the Court should therefore apply Maine law to Counts A, B, C, E, F, H, I, J, K, L, and M, but New York law to Counts D and G.   The United States agrees with Plaintiffs that Maine's choice-of-law rules apply.[5]  Opp. at 31–32.   But Plaintiffs' contention that New York's choice-of-law rules should apply to causes of action D and G is unavailing.   While some FTCA cases have applied choice-of-law rules on an "act by act basis," this approach is "unworkable" in cases such as this one where the "plaintiffs' injuries are indivisible and cannot be parsed based on the alleged acts by the United States." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 182 (3d Cir. 2000). Because the parties agree that Maine's choice-of-law rules apply, there is no need to look further at New York's choice-of-law rules—Maine's rule determines whether the substantive law of Maine or New York should apply. *See, e.g.*, *Rodriguez v. United States*, 54 F.3d 41, 44 (1st Cir. 1995) (applying New York choice-of-law rules to determine that Puerto Rico substantive law applied).

Next, Plaintiffs assert that, using Maine's choice-of-law rules, New York substantive law applies to some of the causes of action here.[6]  Not so.   Maine's choice-of-law rules require using

---

[5] Plaintiffs correctly cite *Richards v. United States*, 369 U.S. 1 (1962) to state that the "law of the place where the act or omission occurred" in the Federal Tort Claims Act includes the "whole law" of the state, including choice-of-law rules.  Opp. at 31.  Here, Plaintiffs have asserted negligent acts or omissions in two states, New York and Maine, but failed to analyze which state's choice-of-law rules apply.  This analysis can be done in a multitude of ways. *See, e.g.*, *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 180–83 (3d Cir. 2000); *see also* Rodney Patton, *Sisyphus, the Boulder, and the Choice-of-Law Hill: The Analytical Framework for Resolving the Unusual and Complex Choice-of-Law Issues That Can Arise When the United States Is a Party in an Aviation Case*, 71 J. Air L. and Com. 471 (2006).  However, because the United States agrees that under any method of determination Maine's choice-of-law rules apply here, no further analysis is required.

[6] Notably, "Maine has not explicitly endorsed the principle of *depecage*, under which a court applies the laws of different states to different substantive issues within a single case." *Walker v. Unum Life Ins. Co. of Am.*, 530 F. Supp. 2d 351, 354 (D. Me. 2008).  On that ground alone, it is inappropriate to apply New York law to some of the causes of action.

Maine substantive law for all causes of action, including D and G.

As Plaintiffs state, in personal injury cases, Maine follows the most significant contacts and relationships test as set forth in the Second Restatement of Conflicts. Opp. at 32. This test provides that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties." *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 934 (Me. 1982) (cleaned up). "Factors for a court to consider are: 'a) the place where the injury occurred, b) the place where the conduct causing the injury occurred, c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and d) the place where the relationship, if any, between the parties is centered.'" *Adams v. Rubin*, 964 F. Supp. 507, 509 (D. Me. 1997) (quoting Restatement 2d of Conflicts § 145).

Plaintiffs assert that New York law should apply to Counts D and G because those causes of action "center on conduct that occurred, or should have occurred, in New York." Opp. at 32. This sole focus on factor (b) is misplaced. Looking at the other factors, the injuries here occurred in Maine and Plaintiffs all reside in Maine; there is no direct relationship between the Army and the Plaintiffs, but the relationship between the Army and Card was centered in Maine.

Moreover, even if factor (b) were given more significant weight, it is not the case for Count D that the "conduct causing the injury" occurred solely in New York. The allegations asserted under Count D include conduct that would have occurred in Maine, not New York, such as: the alleged failure to warn individuals on Card's "hit list," Am. Compl. ¶ 7.30(b); the alleged failure to provide follow up and additional medical treatment, Am Compl. ¶ 7.30(f); and the alleged failure to report Card's threat to Army law enforcement and chain of command, Am. Compl. ¶ 7.30(g), as Card's unit was based in Maine, Am. Compl. ¶ 5.2.

13

Three of the four factors under Maine's choice-of-law rules point to Maine as the state with the most significant contacts and relationships; the fourth factor, even when looking specifically at the conduct alleged in Count D, is equivocal. Accordingly, Maine substantive law should apply to all of Plaintiffs' causes of action.

**B. Plaintiffs Have Not Met the Elements of Negligent Undertaking – Counts A, E, F**

### 1. Maine Courts Have Not Clearly Recognized Negligent Undertaking

Plaintiffs rely primarily on *Hansen v. Sunday River Skiway Co.*, 726 A.2d 220 (Me. 1999), to argue that Maine courts recognize negligent undertaking. That case, however, was specific to the interpretation of a statute involving the inherent risks of skiing, Me. Rev. Stat. Ann. tit. 27, § 488 (repealed). It did not involve the general application of a negligent undertaking cause of action. Similarly, the *Kennedy v. Pinetree Counsel & BSA* case does not cite section 324A or apply any of its standards, such as increased risk of harm or reliance. No. CV-91-752, 1995 WL 18036799 (Me. Super. June 14, 1995). The remaining cases cited by Plaintiffs either contain a single "see" citation to the Restatement (Second) of Torts § 324A[7]; no citation to Section 324A at all[8]; or find, without determining whether Section 324A applies in Maine, that the Plaintiffs could not meet the standards set forth in the Restatement.[9] Notably, Plaintiffs do not cite to any Maine cases that support their interpretations of Section 324A— because no such case law exists.

### 2. Plaintiffs have not met the requirements of Section 324A

Plaintiffs misunderstand the case law regarding undertakings. *See* Mot. at 40. Moreover,

---

[7] *Campbell v. David & Tammy Boutot*, No. CV-97-99, 1999 Me. Super. LEXIS 353 (Me. Super. 1999), *15; *Thompson v. Holden Bros. Ford*, No. CV-83-115, 1984 Me. Super. LEXIS 125, *3 (Me. Super. 1984).

[8] *City of Portland v. McKernan*, No. CV-93-54, 1993 Me. Super. LEXIS 268, *29 (Me. Super. 1993).

[9] *Prue v. Alyssa Rose Co*, No. CV-04-744, 2006 WL 5218438 (Me. Super. Mar. 16, 2006); *Bolduc v. Haywood*, No. CIV. A. CV-00-18, 2001 WL 1712679, at *3 (Me. Super. July 18, 2001).

14

Plaintiffs do not dispute that at least some of their alleged "undertakings" constitute mere promises, without affirmative actions, and they do not cite any authority indicating that Maine courts view promises as "undertakings." Opp. at 38; Mot. at 40. Indeed, no Maine court has.

Even if some of Plaintiffs' allegations constitute undertakings, Plaintiffs have not plausibly alleged either an increased risk of harm or reliance. Plaintiffs do not dispute that they must show that the risks of harm were increased beyond that which existed without the undertaking. Mot. at 41. Instead, they repeatedly assert that risks "grew" or "increased" without clearly asserting what the risks might have been had there been no undertaking. For example, Plaintiffs state that the Army "helped to discharge Card from the psychiatric hospital, returning to the community, and then abandoning the safeguards it had undertaken," which they clarify include the mandatory Line of Duty ("LOD") and MEB processes that were begun but not completed. Opp. at 40. But Plaintiffs do not, and cannot, suggest that their risks would have been lower had the Army never begun the LOD and MEB processes, or if those processes did not exist. And, as already noted, there are no plausible allegations in the Complaint that the hospitalization worsened Card's mental state and made it more likely that he would commit a mass shooting. Mot. at 42. Similarly, as the Army had no authority to remove Card's personal firearms, Plaintiffs cannot reasonably argue that they would have been less at risk had the Army never suggested trying to remove Card's firearms. Mot. at 26.

As for reliance, Plaintiffs admit that neither they nor Card's family members relied on the Army's actions, Opp. at 27; they argue instead that Card himself relied on the Army's undertakings, Opp. at 41.[10] This is clearly incorrect. There are no allegations that Card forewent

---

[10] The Restatement does state that the reliance prong can be met if "the other," not just a third party, relied on the undertaking. The case cited by Plaintiffs on this point, *Joy v. E. Me. Med. Ctr.*, 529 A.2d 1364 (Me. 1987), does not discuss reliance or negligent undertaking at all; it involves duty to a third party under ordinary negligence.

15

any specific action in reliance on the Army's undertakings.  *See* Restatement (Second) of Torts § 324A cmt. e; *see also Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994).  To the contrary, the Complaint is clear that Card rebuffed numerous offers of help by Army contractors.  Am. Compl. ¶¶ 5.55–56.

Finally, the Army's alleged violations of "mandatory statutory and regulatory obligations," Opp. at 43–47, do not alter the increased risk of harm or reliance requirements of a negligent undertaking theory.[11]  *See Zabala Clemente v. United States*, 567 F.2d 1140, 1145 (1st Cir. 1977) (explaining no liability under ordinary negligence where a private party undertook an action, and that negligent undertaking would require increased risk of harm or reliance).

### C.  Plaintiffs Have Not Shown the United States Had a Duty of Care

Plaintiffs attempt to refute the United States' duty arguments by arguing that failure to comply with statutory and regulatory obligations may constitute a negligent undertaking.  Opp. at 42.  However, Plaintiffs have failed to engage with the United States' argument that their allegations do not establish a *prima facie* case that the United States owed them a duty of care under Maine law.  Mot. at 43–47.  Because Plaintiffs do not and cannot refute these arguments, all of Plaintiffs' ordinary negligence causes of action must be dismissed under Maine law.[12]  *See In re Compact Disc*, 456 F. Supp. 2d at 152; *Mahoney*, 342 F. Supp. 3d at 217.

### D.  Plaintiffs Cannot Show Causation

As an initial point of clarification, the Motion erroneously did not include Count A in its discussion of causation.  However, Count A includes the same conduct as the other causes of

---

[11] Plaintiffs argue that the violations of the Army's internal commitments and orders (Count C) may create a legal duty when they satisfy the elements of negligent undertaking.  Opp. at 44.  However, Count C does not allege a negligent undertaking or plead the requirements thereof.  Am. Compl. ¶¶ 7.16–7.27

[12] While all Counts should be dismissed under Maine law, Plaintiffs have not asserted that Counts B, C, H, or I involve anything other than ordinary negligence under Maine law.  Accordingly, there is no question that these counts should be dismissed for lack of duty.

16

action.  *Comp.* Am. Compl. ¶ 7.4 *with* ¶ 7.12.  The original Motion is clear that Plaintiffs' assertions that any of the alleged failures by the Army could have prevented the shooting are speculative, *see* Mot. at 47, and this argument applies equally to the negligent undertaking claims in Count A as the remaining Counts.

Plaintiffs broadly assert that their "allegations, taken as true, easily clear the low bar that notice pleading sets."  Opp. at 57.  However, Plaintiffs make no effort to counter the United States' point that every proposed action or intervention by the Army would have required multiple subsequent discretionary actions of additional parties, which would have had to occur in time to prevent the shooting.  This attenuated causal chain does not support proximate causation.

Further, Plaintiffs' assertions as to causation with respect to the LOD investigation, MEB process, the New York SAFE Act, and NICS fail entirely to examine the relevant statutes and regulations to determine how these processes work, and whether the procedures could have prevented the shooting here.  As explained in detail in the United States' Motion to Dismiss, none of these investigations or reporting mechanisms would have prevented the shooting here.[13]  "Plaintiffs allege it would have," Opp. at 58, cannot be sufficient when the processes outlined in the statutes and regulations make clear that they do not work the way Plaintiffs allege.

### E.  Plaintiffs Have Not Met the Elements of Negligent Treatment (Count D) Under New York Law

Plaintiffs assert that Count D arises under New York law as explained in *Rivera v. N.Y. City Health and Hosps. Corp.*, 191 F. Supp. 2d 412 (S.D.N.Y. 2002).  Opp. at 48.  As already explained, New York law should not apply in this case, and Plaintiffs do not dispute that Maine

---

[13] In discussing NICS, Plaintiffs note that "it is unclear when Card purchased the ammunition" he used for the shooting.  Opp. at 58 n.24.  Maine does not require a background check to purchase ammunition.  Maine Gun Laws, *NRA-ILA*, <https://www.nraila.org/gun-laws/state-gun-laws/maine/> (last accessed June 2, 2026).

law does not permit such a cause of action in the circumstances here.  However, even under New York law, Plaintiffs have not asserted a cause of action under Count D.

In *Rivera*, the Southern District of New York held that "a psychiatrist or mental health practitioner has [a] duty to exercise 'professional judgment' and treat patients using a 'proper medical' foundation," and that "in certain circumstances this duty is owed . . . to the outside public as well." *Id.* at 418.  Critically, however, this duty applies only to medical providers who are treating patients.  *See id.* at 419 (describing cases where hospitals released psychiatric patients who later killed third parties), 421–22 (discussing whether duty applies to outpatients).  Here, all the treating medical providers were contractors, not Army employees.  Mot. at 37–38.

In attempting to avoid the contractor exclusion, Plaintiffs claim that their allegations in Count D "hinge on the Army's failures to follow through on actions it agreed to undertake in securing Card's discharge from Four Winds." Opp. at 31.  As discussed *supra*, Plaintiffs' allegations necessarily implicated Four Winds.  Furthermore, medical follow-up was conducted by medical contractors such as Spectrum Services group, Mot. at 38; non-medical follow-up was, or should have been, conducted by non-medical personnel, such as Captain Reamer.  To the extent Plaintiffs complain of negligent medical treatment, they are barred by the contractor exception of the FTCA; to the extent they complain of failures by non-medical personnel, these allegations do not fit within a cause of action for "negligent treatment."  Count D should therefore be dismissed.

### F.  Failure to Report to the FBI Background Search Database (Count F)

Plaintiffs assert that the First Circuit's decision in *United States v. Rehlander*, 666 F. 3d 45 (1st Cir. 2012) would not apply because it analyzes state law commitment processes rather than federal regulations or orders.  Opp. at 47.  But *Rehlander* was addressing a constitutional claim.  *See id.* at 48 ("Ordinarily, to work a permanent or prolonged loss of a *constitutional*

liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required" (emphasis added)).  There is no reason to believe this constitutional test would apply differently in the context of a U.S. Army Order.

Moreover, the Army Order at issue was a Command Directed Behavioral Health Evaluation—that is, an order to submit to an evaluation, not a commitment order.  Am. Compl. ¶ 5.32, MEDCOM Policy Memo 22-020 ¶ 5(a), ECF 29-2 ("the CDBHE is defined as a psychiatric examination or evaluation . . . or any other clinical means of assessing the mental/behavioral health of a SM.").  In other words, Card was not "committed under a valid U.S. Army Order," Opp. at 77; he was evaluated pursuant to an order but, as previously explained, his subsequent commitment was voluntary.  Maine Report at 14, ECF 29-11.  Even if *Rehlander* did not apply, the Second Circuit has never held that voluntary commitments meet the standards of 18 U.S.C. § 922(g) and (h).  *See Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 53 (2d Cir. 2016) (rejecting claim that *involuntary* commitment to mental institution violated Second Amendment).  Indeed, such a ruling would be contrary to the regulations that interpret the statute.  *See* 27 C.F.R. § 478.11 ("The term [committed to a mental institution] does not include a person in a mental institution for observation or a voluntary admission to a mental institution.").

### G.  Negligent Training (Count H) and Supervision (Count K)

Plaintiffs assert that the negligent training and supervision counts are "straightforward negligence claim[s] invoking the four elements of duty, breach, injury, and causation."  Opp. at 51–2.  However, the case law is clear that a negligent supervision claim—which is a claim of vicarious liability—requires a special relationship between the parties.  *See, e.g.*, *Dragomir v. Spring Harbor Hosp.*, 970 A.2d 310, 315 (Me. 2009).  Even the case that Plaintiffs cite to support their elements of negligence, *Bell v. Dawson*, states "[t]he tort of negligent supervision first requires that the defendant owe a duty of supervision to the plaintiff.  That duty arises from

19

a special relationship . . . between the parties." 82 A.3d 827, 832 (Me. 2013). The fact that the Army was training or supervising soldiers "around and above Card," rather than Card himself, does not mean that Plaintiffs can avoid the special relationship requirement under Maine law.

### H. Negligent Infliction of Emotional Distress (Zone of Danger) (Count K)

Plaintiffs acknowledge that the Maine Law Court has rejected the zone of danger rule, but argue that, "[w]ere these group 4 claims to appear before Maine's Law Court, the court would likely adopt the zone of danger rule." Opp. at 54. That is not for this court to decide. The role of a federal court is "to apply state law, not, if we can be persuaded to doubt its soundness, to participate in an effort to change it." *Tarr v. Manchester Ins. Corp.*, 544 F.2d 14, 15 (1st Cir. 1976); *see also City of Phila. v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002); *Cargill, Inc. v. Offshore Logistics, Inc.*, 615 F.2d 212, 215 (5th Cir. 1980). Because Maine has rejected the zone of danger rule for negligent infliction of emotional distress, Count K must be dismissed.

### CONCLUSION

For the reasons stated in the United States' Motion to Dismiss and in this reply, this action should be dismissed for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted.[14]

Dated: June 15, 2026                    Respectfully Submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        PHILIP D. MACWILLIAMS

---

[14] Plaintiffs contend that jurisdictional discovery is needed to the extent the United States' arguments represent a factual attack, rather than a facial attack, to Plaintiffs' Complaint. For the reasons set forth in the United States' opening briefing, all of the United States' arguments are properly construed as a facial attack and the United States relies only on materials explicitly cited or implicitly incorporated into Plaintiffs' Complaint. Therefore, the Court need only apply the 12(b)(1) standards, and no jurisdictional discovery is warranted. Mot. at 3-5.

Director, Torts Branch

/s/ *Jocelyn Krieger*
JOCELYN KRIEGER
BRANDON CAPECE
Trial Attorneys, Torts Branch
United States Department of Justice
175 N. St. NE
Washington D.C. 20002
(202) 616-1679
jocelyn.krieger@usdoj.gov

21